**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BRITTANY WATTS | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 25-cv-00049 |
| v. | ) |
| | ) |
| BON SECOURS MERCY HEALTH; | ) Hon. Sara Lioi, Chief Judge |
| MERCY HEALTH YOUNGSTOWN | ) |
| LLC D/B/A ST. JOSEPH WARREN | ) JURY TRIAL DEMANDED |
| HOSPITAL; CONNIE MOSCHELL; | ) |
| JORDAN CARRINO; PARISA | ) |
| KHAVARI; SUZANNE ZUPKO; FRED | ) |
| RAINES; CITY OF WARREN, OHIO; | ) |
| NICHOLAS CARNEY; UNKNOWN | ) |
| OFFICERS, and UNKNOWN MEDICAL | ) |
| PROFESSIONALS, | ) |
| | ) |
| Defendants. | |

## AMENDED COMPLAINT

BRITTANY WATTS ("Plaintiff"), through her attorneys, LOEVY & LOEVY,

complains of Defendants BON SECOURS MERCY HEALTH; MERCY HEALTH

YOUNGSTOWN LLC d/b/a ST. JOSEPH WARREN HOSPITAL ("ST. JOSEPH WARREN

HOSPITAL"); CONNIE MOSCHELL; JORDAN CARRINO; PARISA KHAVARI; SUZANNE

ZUPKO; FRED RAINES; UNKNOWN EMPLOYEES OF MERCY HEALTH; CITY OF

WARREN, OHIO; and NICHOLAS CARNEY, as follows:

1.      In September 2023, Plaintiff Brittany Watts experienced an expectant mother's

worst nightmare—the pregnancy she very much wanted ended in a miscarriage. Ms. Watts

should have received proper medical care to address her pregnancy complications and should

have been able to privately grieve her pregnancy loss. Instead, Defendants deprived Ms. Watts of the medical care she requested and was entitled to. And after she miscarried, when Ms. Watts was in the hospital and most vulnerable, Defendants reported her to the police, interrogated her while she was tethered to her hospital bed with IVs, and caused her to be falsely charged with a felony. She was eventually cleared by a grand jury, but the harm remains. Ms. Watts now brings this lawsuit seeking redress for Defendants' misdeeds and to hold them accountable.

## **INTRODUCTION**

2.      Brittany Watts is nursing student and Ohio native.

3.      On September 19, 2023, Ms. Watts was about 21 weeks pregnant. That day, Ms. Watts started experiencing pain and bleeding and went to St. Joseph Warren Hospital seeking care. There, doctors told her she had developed a condition called placental abruption, which endangered her pregnancy. Eight hours later, Ms. Watts had received no meaningful treatment or guidance. Devastated and scared, she returned home.

4.      By morning, Ms. Watts's condition had significantly worsened. She returned to the hospital and learned that her water had broken prematurely, her cervix was dilated, and infection had set in. Her pregnancy was doomed, her doctor told her; and until the fetus was removed, Ms. Watts was at risk of hemorrhaging, sepsis, and death. Time was of the essence.

5.      Defendants dragged their feet, however, allowing Ms. Watts to languish in the hospital—effectively untreated—for 10 more hours. Ms. Watts, confused and even more devastated and scared than on the previous day, again returned home untreated.

6.      In the early morning hours of September 22, 2023, Ms. Watts went to the bathroom and painfully miscarried. Inside the toilet bowl was a mess of tissue, blood, and blood

clots. And hidden therein was the already-deceased, under-one-pound fetus, which Ms. Watts never saw.

7.     Confronted with this bloody mess, Ms. Watts did what was reasonable: she flushed the toilet. The toilet began overflowing. Ms. Watts did her best to clear the toilet, removing some of the bloody mess with a bucket.

8.      Unwell and with her life in danger, Ms. Watts returned to St. Joseph Warren Hospital for a third time, never suspecting that anyone there would intentionally harm her. But while the hospital staff should have been treating Ms. Watts with great care, Defendant Moschell, a nurse, along with Defendants Zupko and Raines, decided to call the police to falsely report Ms. Watts had committed a crime.

9.     Although Defendant Moschell and her coconspirators, including Defendant Carney, a police detective, and Defendant Carrino, another nurse, knew Ms. Watts had committed no crime, they saw to it that she would face criminal charges for having an experience shared by hundreds of thousands of women every year.

10.     To that end, as Ms. Watts lay in a hospital bed hooked up to I.V.s and awaiting urgent treatment, Defendants Carney, Moschell, and Carrino conspired to interrogate Ms. Watts and accuse her of harming the fetus. They worked together to fabricate evidence to falsely implicate Ms. Watts in criminal conduct. They knowingly created reports and hospital notes that contained blatantly false information. As a result, Ms. Watts was arrested and charged with a felony: abuse of a corpse. She faced a year in prison for simply having a miscarriage at home.

11.     Fortunately, the evidence was finally evaluated by a grand jury and the truth won out. The grand jury declined to return an indictment, finding instead that there was no probable cause to support the criminal charge. The prosecutor who had presented the case to the grand

jury publicly concurred with the grand jury's decision, stating that Ms. Watts's alleged actions did not amount to a crime.

12.     While Ms. Watts was relieved that the truth had prevailed, the closing of the criminal case did not erase the harm Defendants' misconduct caused.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to the United States Constitution and 42 U.S.C. § 1983; the federal Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd; and Ohio law, to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution and state law.

14.     This Court has jurisdiction over Plaintiff's federal claims to 28 U.S.C. § 1331 and supplemental jurisdiction over her state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the deprivation of medical care, Defendants' investigation, and Plaintiff's prosecution.

## PARTIES

16.     Plaintiff Brittany WATTS is an Ohio resident and nursing student. In September 2023, she was denied medical care at St. Joseph Warren Hospital for life-threatening pregnancy complications. After she miscarried at home, she was charged with a crime she did not commit.

17.     Defendant CITY OF WARREN is a municipal corporation in the State of Ohio.

18.     At all times relevant to this complaint, Defendant CARNEY was a police officer with the Warren Police Department, which is a department of the City of Warren, acting under color of law and within the scope of his employment.

19.     At all times relevant to this complaint, Defendant BON SECOURS MERCY HEALTH was a Catholic healthcare system headquartered in Cincinnati, Ohio.

20.     At all times relevant to this complaint, Defendant ST. JOSEPH WARREN HOSPITAL was wholly owned by Bon Secours Mercy Health. St. Joseph has an emergency department and receives Medicare funds.

21.     At all times relevant to this complaint, Defendants KHAVARI, MOSCHELL, ZUPKO, RAINES, and CARRINO were employed by St. Joseph Warren Hospital and acted within the scope of their employment. MOSCHELL and CARRINO also were acting in conspiracy with Defendant CARNEY and thus under color of law.

## ALLEGATIONS

### Ms. Watts Seeks Care at St. Joseph Warren Hospital

22.     Before noon on September 19, 2023, Brittany Watts, who was pregnant, came to St. Joseph Warren Hospital with vaginal bleeding. She was admitted to the hospital.

23.     Ms. Watts believed she was perhaps a few weeks pregnant, but the hospital estimated that she was in fact a few days over 21 weeks.

24.     Doctors diagnosed her with placental abruption. They noted that she was at risk of complete abruption, as well as "hemorrhage, disseminated intravascular coagulation, sepsis, multiorgan failures, respiratory arrest, inability to control bleeding, need for hysterectomy and inability to carry any future pregnancies, worsening illness, chronic pain, permanent disability and death."

25.     Nevertheless, for eight hours after receiving this difficult news, Ms. Watts received effectively no treatment.

26.     Feeling frustrated and abandoned, Ms. Watts went home for the night.

***Ms. Watts Seeks Care at St. Joseph Warren Hospital a Second Time***

27.    Ms. Watts returned to Mercy Hospital the next morning around 8:30 a.m. with worsening symptoms.

28.    In addition to placental abruption, Ms. Watts had developed premature rupture of membranes, which meant, in colloquial terms, that her water had broken. Doctors determined that no amniotic fluid remained in her uterus.

29.    Ms. Watts's white blood cell count had been elevated for two days, and she was diagnosed with an infection. Further, Ms. Watts had advanced cervical dilation.

30.    Doctors informed Ms. Watts that her fetus was non-viable and would either die in utero or shortly after delivery.

31.    Doctors also concluded that Ms. Watts was at a high risk of bleeding and/or a serious infection that could kill her. These findings were memorialized in a note accessible to all medical providers at Mercy Health.

32.    On information and belief, Ms. Watts's treating medical staff would have reviewed this note in the course of their treatment.

33.    The standard of care for a person in Ms. Watts's condition was to induce labor or to perform a dilation and evacuation ("D&E") procedure, depending on the patient's preference. Either approach would protect the pregnant woman's health and life, with the D&E allowing for a quicker resolution without the need for labor and delivery. The standard of care also requires that hospitals not offering D&E procedures inform patients of their options for obtaining the procedure elsewhere. Defendant KHAVARI, Ms. Watts's doctor, is an obstetrician-gynecologist who would have been well aware of this standard.

34.     Yet, no doctor, including Defendant KHAVARI, offered Ms. Watts a D&E, despite Ms. Watts indicating that such a treatment option would be preferable. Nor did they inform her that she could obtain one at another facility.

35.     Doctors, however, did conclude that labor should be induced immediately and that they should not wait until Ms. Watts was "on death's door" before providing treatment. Doctors noted that waiting to induce put Ms. Watts at risk of hemorrhage, sepsis, and death.

36.     Because Ms. Watts was unaware of all her options, she agreed to the recommended induction.

37.     But despite her consent and doctors' conclusions that Ms. Watts should be induced immediately, neither Defendant KHAVARI nor any other doctor began the induction. This delay was unjustified and cannot be explained by any concern to protect the life of the fetus.

38.     Defendants' actions cannot be explained by concern for the life of the fetus because the doctors, including Defendant KHAVARI, knew that there was almost no chance of the fetus surviving the induced labor. Tellingly, in the event the fetus was delivered and needed resuscitation, St. Joseph Hospital had a policy against attempting to sustain the life of a 21-week-old fetus. Consistent with this understanding, at no point did any medical professional at St. Joseph take any action to try to save the fetus.

39.     Having been at the hospital for around 10 hours during her second day there, again with effectively no treatment, Ms. Watts went home. She was confused, tired, scared, frustrated, and sad because she had not been given the care she was told she needed.

40.     She left in fear and disbelief that her medical team had not taken a single material step to prevent the possible complications she faced, including infection, blood clot, hemorrhage, or death. She was not sure what was true or what she should do.

7

41.     Despite knowing that Ms. Watts would miscarry, neither Defendant KHAVARI nor any of Ms. Watts's other medical providers told her how to manage her impending miscarriage at home. In particular, Ms. Watts was never told what her fetal remains would look like or how to dispose of them.

***Ms. Watts Miscarries at Home***

42.     Before dawn on September 22, 2023, Ms. Watts woke up in a medical crisis. She was doubled over in pain but made it to the bathroom.

43.     After a time, Ms. Watts felt like she was having a painful bowel movement. She then saw the toilet was full of tissue, blood, and blood clots.

44.     Ms. Watts believed she had miscarried but saw no fetus. She heard no sound following the initial discharge. She looked at the toilet but saw no fetus or movement. Nothing suggested she had delivered a living fetus, and indeed she had not. She thought the clots and tissue visible in the toilet bowl were the fetal remains. She did not believe the fetus was intact, and understandably, she did not want to see more.

45.     Ms. Watts collapsed on the floor in her bathroom. She laid there for nearly an hour, bleeding. She was terrified and disoriented and thought she might die. She was distraught and in shock. Her toilet was full of blood, her bathroom floor was covered in blood, she continued to lose blood, and she had just miscarried a baby she had wanted.

46.     Eventually, Ms. Watts flushed the toilet, which began to overflow. She attempted to scoop up the overflowing contents with a bucket and cleaned the bathroom as best she could.

47.     In other words, Ms. Watts attempted to manage her miscarriage at home, as so many other women have and as no one at the hospital ever advised against.

48.     Unbeknownst to Ms. Watts, the fetus, which was under one pound and had died in utero, was intact and had become lodged in the toilet's P-trap.

***Ms. Watts Returns to St. Joseph for a Third Time***

49.     Ms. Watts eventually collected herself but was losing so much blood that she returned to the hospital. Ms. Watts was admitted for a third time.

50.     Defendants CARRINO and MOSCHELL knew Ms. Watts's pregnancy had been non-viable and that she had delivered a fetus that had no chance of survival. They also knew from Ms. Watts that she had seen no indication of fetal life after miscarrying.

51.     Despite knowing that Ms. Watts had done nothing illegal, Defendant MOSCHELL contacted the hospital's risk management department and falsely suggested to them that Ms. Watts had given birth at home to a viable, live baby, and had left the live baby in a bucket.

52.     Alternatively, Defendant MOSCHELL truthfully told Defendant ZUPKO, who worked in risk management, that Ms. Watts had not delivered a viable fetus or living baby.

53.     Defendants MOSCHELL and ZUPKO then agreed that MOSCHELL would contact Defendant RAINES, a law enforcement officer on the hospital's staff.

54.     Defendant MOSCHELL either told Defendant RAINES falsely that Ms. Watts had given birth at home to a viable, live baby, and had left the live baby in a bucket, and Defendant RAINES, on information and belief, took no investigative steps to confirm this account. Or, alternatively, Defendant MOSCHELL told Defendant RAINES truthfully that Ms. Watts had not delivered a viable fetus or living baby.

55.     Defendant RAINES, without probable cause to believe a crime had been committed, then agreed with Defendant MOSCHELL that she would call the City of Warren Police Department.

56.     Defendant CARRINO fanned the flames. She wrote a medical note falsely stating that Ms. Watts said she had seen and touched the fetus, writing that "the baby was 'not moving or making any noise' so she placed it in a bucket behind the trash can."

57.     Defendant MOSCHELL called the police that afternoon—roughly eight hours after Ms. Watts had miscarried on the toilet and several hours after she arrived at the hospital— and falsely told them that Ms. Watts had given birth at home, did not want the baby and so did not look to see if it were alive, and had come to the hospital without the baby. Defendant MOSCHELL falsely suggested the baby could be alive and that Ms. Watts may have done something wrong or illegal.

58.     Defendant MOSCHELL knew there were no countervailing interests justifying the unauthorized disclosure of private health information about Ms. Watts's pregnancy. Indeed, she knew the fetus was not viable, could not be saved, and had been delivered into a toilet hours earlier without making any sound or movement. Defendant MOSCHELL knew that the only person facing any risk at that time was Ms. Watts.

59.     As Ms. Watts lay in her hospital bed bleeding, her home security app dinged. She checked and watched as approximately four police cars, with lights on, screeched up to her home.

60.     Defendant CARRINO told Ms. Watts that there was a biohazard at her home and "per policy" police had been called. This was false.

10

61.     The call to police was not truly about a biohazard but was instead to report a supposed crime. Accordingly, Defendant CARNEY came to the hospital to interrogate Ms. Watts.

***The Interrogation***

62.     Before beginning the interrogation, Defendants CARNEY, MOSCHELL, and, on information and belief, Defendant CARRINO met to discuss their plan. Defendants MOSCHELL and CARRINO knew that Ms. Watts was in a health crisis and awaiting surgery. It was also obvious to any lay person that Ms. Watts was in distress and in the midst of receiving medical care.

63.     Defendants CARNEY and MOSCHELL then descended upon Ms. Watts, who was in her hospital gown in her hospital bed, hooked up to I.V.s and monitoring machines.

64.     The two closed the door and effectively locked Ms. Watts in her room. Defendant MOSCHELL positioned herself between Ms. Watts and the door.

65.     The two jointly interrogated Ms. Watts for nearly an hour. While they told her she was free to leave, she was in no condition to do so, as both knew.

66.     Ms. Watts told them she was scared and nervous. She was disoriented, trapped, traumatized, and emotionally distraught, making her vulnerable to police influence and emotional distress.

67.     Defendant CARNEY pretended to be on Ms. Watts's side. He told Ms. Watts multiple times that she was not in trouble and made other false promises of leniency. Defendant MOSCHELL also told Ms. Watts that she was not in trouble and that she and Defendant CARNEY were there to help her.

11

68.     Based on the totality of these circumstances, Ms. Watts had no real choice but to talk with CARNEY and MOSCHELL about what had happened earlier that day.

69.     During the interrogation, Defendants CARNEY and MOSCHELL asked Ms. Watts leading and suggestive questions, eliciting statements from that Defendant CARNEY would later misrepresent to use against her in criminal proceedings.

70.     At points during the interrogation, Defendants CARNEY and MOSCHELL stepped out of the room to continue discussing their strategy. On information and belief, Defendants CARNEY and MOSCHELL included Defendant CARRINO in their discussions and sought her aid, for example in obtaining ultrasound pictures they hoped to employ in the interrogation.

71.     Ms. Watts continually answered Defendants' questions to the best of her knowledge about the location of the fetus. She explained that if the fetal remains had not been scooped up in the bucket, it must still be in the toilet. But they would not accept her answers. Instead, without basis, they accused her of nefarious conduct, suggesting that perhaps Ms. Watts had birthed a live baby and hidden it "in a cabinet."

72.     Defendants' treatment of Ms. Watts was extreme and outrageous.

73.     Defendant CARNEY later provided flatly false information in police reports, including that Ms. Watts had seen and touched the fetus, writing that she told him she had "taken the fetus out of the toilet and placed it in a black bucket." Defendant CARNEY also omitted material information from his reports, including that Ms. Watts never saw the fetus, that she believed it had come out in bits and pieces, and that she had taken no steps to cause the harm to the fetus.

74.    In sum, Defendant CARNEY set out to present a false version of the facts to make it look like a crime had been committed: that Ms. Watts had given birth at home to a live baby and caused it to die.

***Ms. Watts Is Charged with Felony "Abuse of Corpse"***

75.    The autopsy, however, revealed "prolonged intrauterine fetal demise," meaning that Ms. Watts's fetus had died in utero. In other words, as had been apparent at the time, the autopsy confirmed that Ms. Watts had delivered an already-deceased fetus.

76.    Despite knowing this, Defendant CARNEY searched for a way to ensure Ms. Watts would be charged with a crime. He ultimately filed charges through Warren Municipal Court for felony "Abuse of a Corpse."

77.    A reasonable officer would have known that there was no probable cause to arrest or charge Ms. Watts for any crime.

78.    Nevertheless, the next day, October 5, 2023, while Ms. Watts was grieving the loss of her pregnancy, Defendant CARNEY, continuing his extreme, outrageous, and malicious conduct, arrested her at her home. He handcuffed her in the driveway and put her in his squad car.

79.    Ms. Watts was terrified, angry, and confused; she thought she was going to jail and did not know when she would get out.

80.    Defendant CARNEY let Ms. Watts sit, still handcuffed, at the police station for about an hour before taking her to the courtroom where she would be arraigned.

81.    Consistent with her innocence, Ms. Watts pleaded not guilty.

82.    Ms. Watts was devastated. She had learned that she faced up to a year in prison, for experiencing a medical trauma through no fault of her own.

13

83.     Defendants' treatment of Ms. Watts compounded the trauma of her pregnancy loss and denied her the ability to mourn that loss on her own terms.

84.     Word of Ms. Watts's arrest spread quickly on the news and social media; Ms. Watts's home address and phone number were publicized without Ms. Watts's knowledge or consent.

85.     Ms. Watts received unsolicited phone calls at all hours of the day, and reporters showed up at her house without warning.

86.     The whole ordeal made Ms. Watts fearful and anxious; she largely stayed inside her home because of all the publicity.

***Preliminary Hearing***

87.     After Ms. Watts was arraigned, Defendants CARNEY and MOSCHELL met with prosecutors to discuss the evidence and to prepare Defendant CARNEY for  the preliminary hearing.

88.     Even though they knew Ms. Watts had miscarried a fetus that she never saw, and which had died in utero, Defendants CARNEY and MOSCHELL set out to present a version of events in which Ms. Watts had given birth to a baby she thought may be alive and had then abused it.

89.     When Defendant CARNEY testified at the preliminary hearing, he continued to misleadingly represent Ms. Watts's statements from her coercive interrogation.

90.     Defendant CARNEY also made flatly false statements, including but not limited to that Ms. Watts had wanted to deliver her baby into the toilet and may have thought it was alive at birth. He also falsely suggested that Ms. Watts's miscarriage was not a natural phenomenon.

14

91.     A recording of Defendants CARNEY's and MOSCHELL's hospital-bed interrogation was not presented at the preliminary hearing. Upon information and belief, Watts's counsel and the prosecutor's office were unaware of the recording or its exculpatory contents at that time.

92.     Months later, on January 11, 2024, a grand jury declined to indict Ms. Watts, determining no probable cause supported the charge against her, and she was finally free of the criminal case Defendants had engineered. The county prosecutor announced publicly that he agreed with the grand jury that Ms. Watts had committed no crime.

***Ms. Watts's Damages***

93.     Even though the criminal case has concluded, Ms. Watts has not recovered.

94.     As described in this Complaint, Defendants' actions, both jointly and severally, deprived Ms. Watts of her rights protected under the United States Constitution, federal law, and state law. As a proximate result of Defendants' actions, Ms. Watts suffered deprivation of liberty, reputational harm, public humiliation, distress, pain, and suffering, for which she is entitled to compensatory damages, including damages for mental and emotional distress.

95.     Defendants' failures to treat Ms. Watts's medical condition in a timely manner caused her extreme physical harm, including pain, severe bleeding, and infection, as well as severe emotional distress and harm.

96.     Defendants' actions causing Ms. Watts to be arrested and charged with felony abuse of corpse caused her loss of liberty, financial loss, loss of privacy, reputational harm, and severe emotional distress and harm.

97.     Ms. Watts provided timely notice of her medical claims, described below, to Defendants via certified mail on August 2, 2024, return receipt requested.

15

## CLAIMS

### COUNT I – Fourth and Fourteenth Amendments – False Arrest and Prosecution without Probable Cause – 42 U.S.C. § 1983
### (against CARNEY, MOSCHELL, CARRINO, ZUPKO, and RAINES)

98.     Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

99.     Without probable cause, Defendants CARNEY, CARRINO, MOSCHELL, ZUPKO, and RAINES caused criminal proceedings to be instituted and continued against Ms. Watts.

100.     Probable cause was lacking in numerous ways. For example, Defendants were aware that Ms. Watts lacked the requisite mental state. Ohio's felony abuse of a corpse statute is not a strict liability crime, and Defendants knew that Ms. Watts took no action intended to harm or abuse her deceased fetus.

101.     Probable cause to arrest and charge Ms. Watts for abuse of corpse also was lacking because, in Ohio, a fetus does not have legal status until viability, meaning a pre-viable deceased fetus is not a "corpse."

102.     Defendant CARNEY accused Ms. Watts of criminal activity knowing, or having reason to know, that those accusations were not supported by probable cause, and he made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings without any probable cause for doing so, in violation of Ms. Watts's rights secured by the Fourth and Fourteenth Amendments.

103.     Furthermore, Defendant CARNEY intentionally and/or recklessly withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Ms. Watts, as set forth above.

16

104.    The misconduct described in this Count was undertaken intentionally, with reckless indifference to the rights of others.

105.    The legal proceedings terminated in Ms. Watts's favor.

106.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain, suffering, and deprivation of liberty.

## COUNT II
**Fifth and Fourteenth Amendments – Unconstitutional Interrogation – 42 U.S.C. § 1983**
(against CARNEY and MOSCHELL)

107.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

108.    As described more fully above, Defendants CARNEY and MOSCHELL, acting under color of law, conducted an unconstitutional interrogation of Ms. Watts, which caused Ms. Watts to make involuntary statements that were then twisted to appear inculpatory and presented against her during criminal proceedings, in violation of her rights secured by the Fifth and Fourteenth Amendments.

109.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally.

110.    As a result of Defendant CARNEY's and Defendant MOSCHELL's misconduct described in this Count, Ms. Watts suffered injuries, including but not limited to loss of liberty and emotional distress.

### COUNT III – Fourteenth Amendment – Due Process – 42 U.S.C. § 1983
### (against CARNEY, MOSCHELL, and CARRINO)

111.   Ms. Watts incorporates each paragraph of this Complaint as if fully restated here.

112.   Defendants CARNEY, MOSCHELL, and CARRINO intentionally fabricated evidence against Plaintiff that was then used to deprive her of liberty in violation of the Due Process Clause.

113.   As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain, suffering, and deprivation of liberty.

### COUNT IV - Conspiracy – 42 U.S.C. § 1983
### (against CARNEY, MOSCHELL, CARRINO, ZUPKO, and RAINES)

114.   Ms. Watts incorporates each paragraph of this Complaint as if fully restated here.

115.   Defendants CARNEY, MOSCHELL, CARRINO, ZUPKO, and RAINES agreed among themselves and with other individuals to act in concert in order to deprive Ms. Watts of her constitutional rights, including her rights to be free from unreasonable seizure and prosecution without probable cause, all as described in the various paragraphs of this Complaint.

116.   In this manner, Defendants, acting in concert with other unknown coconspirators, conspired by agreement and concerted action to accomplish an unlawful purpose by unlawful means.

117.   In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as reporting false evidence, making false promises of leniency during Ms. Watts's interrogation, instigating Ms. Watts's arrest and prosecution—and was an otherwise willful participant in joint activity.

18

118.    As a direct and proximate result of the prior agreement and actions in furtherance of the conspiracy referenced above, Ms. Watts's rights were violated, and she suffered injuries, including but not limited to loss of liberty and emotional distress.

119.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally.

### COUNT V – EMTALA Violation
### (against BON SECOURS MERCY HEALTH and ST. JOSEPH WARREN HOSPITAL)

120.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

121.    Congress enacted Emergency Medical Treatment and Labor Act (EMTALA) in 1986 to ensure that *everyone* who comes to an emergency department at a Medicare-funded hospital can access the emergency care they need. In 1989, Congress amended the statute to clarify and extend protections for pregnant people, and the statute's plain text requires emergency departments to provide stabilizing treatment to pregnant individuals in labor, pregnant individuals who have emergency conditions unrelated to labor, and individuals who need emergency treatment or manage pregnancy loss. For some pregnant individuals experiencing a medical emergency, including prolonged miscarriages where the pregnancy is nonviable but fetal cardiac activity remains, the necessary stabilizing treatment is terminating the pregnancy in a medical setting, where healthcare providers can guard against the risks of infection, hemorrhage, and stroke (among others)

122.    EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395cc(a)(1).

123.    As discussed above, St. Joseph Warren Hospital has an emergency department and participates in Medicare.

124.     EMTALA obligates covered hospitals to provide any "individual" that has an "emergency medical condition" with either (a) "such further medical examination and such treatment as may be required to stabilize the medical condition"; or (b) under limited circumstances, a medically beneficial "transfer" to another facility. 42 U.S.C. § 1395dd(b)(1) (the "Stabilization Requirement").

125.     Violations of EMTALA create civil liability. 42 U.S.C. § 1395dd(d).

126.     Ms. Watts's condition upon arrival at Defendant ST. JOSEPH WARREN HOSPITAL on September 20, 2023, qualified as an emergency medical condition under EMTALA.

127.     Defendant ST. JOSEPH WARREN HOSPITAL was aware that Ms. Watts had at least one emergency medical condition.

128.     Although induction or a D&E procedure were medically necessary, Defendant ST. JOSEPH WARREN HOSPITAL failed to provide stabilizing treatment to Ms. Watts within the meaning of EMTALA and then constructively released her. At no point did ST. JOSEPH offer or take steps to transfer Ms. Watts to another facility or even provide her with information on obtaining treatment elsewhere.

129.     Ms. Watts suffered physical, emotional, and financial harm as a result of Defendant ST. JOSEPH WARREN HOSPITAL'S denial of care, including a traumatic miscarriage and multi-day hospital stay that could have been avoided.

### COUNT VI – State Law Claim – Malicious Prosecution
(against MOSCHELL, CARNEY, CARRINO, ZUPKO, and RAINES)

130.     Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

131.    As described more fully above, Defendants CARNEY, MOSCHELL, and CARRINO individually, jointly, and/or in conspiracy with one another, falsely accused Ms. Watts of criminal activity, knowing those accusations were without probable cause, and made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

132.    In the alternative, Defendants CARNEY, MOSCHELL, and CARRINO, with reckless disregard for the truth, falsely accused Ms. Watts of criminal activity, for which there was no probable cause, and made those statements to prosecutors to institute and continue judicial proceedings.

133.    These Defendants caused Ms. Watts to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued for an improper purpose, resulting in injury.

134.    Defendants' statements regarding Ms. Watts's alleged culpability were made with knowledge, and/or with reckless disregard for the truth, that those statements were false and/or misleading due to the omission of material facts.

135.    These Defendants were aware, and/or had reason to know that, as described more fully above, no true or reliable evidence implicated Ms. Watts in a crime, and all allegedly inculpatory evidence was obtained by coercion and/or fabricated.

136.    The legal proceedings terminated in Ms. Watts's favor.

137.    The misconduct described in this Count was undertaken intentionally and with reckless indifference to the rights of others.

21

138.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering.

### COUNT VII – State Law Claim – Intentional Infliction of Emotional Distress
(against CARNEY, MOSCHELL, ZUPKO, RAINES, and CARRINO)

139.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

140.    Defendants knew or should have known that their actions, including interrogating Ms. Watts in her hospital bed when she was in medical distress and causing her arrest and criminal proceedings, would cause her severe emotional distress.

141.    Defendants' conduct as described above was extreme and outrageous such that it went beyond all possible bounds of decency and would be considered completely intolerable in a civilized community.

142.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering that no reasonable person could be expected to endure.

### COUNT VIII – State Law Claim – Intentional Infliction of Emotional Distress
(against KHAVARI)

143.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

144.    Defendant KHAVARI knew or should have known that denying Ms. Watts medical care, creating a hostile environment, and failing to inform her of her options for treating her emergency pregnancy complications would result in severe emotional distress.

145.    Defendant's conduct as described above was extreme and outrageous such that it went beyond all possible bounds of decency and would be considered completely intolerable in a civilized community.

146.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain and suffering that no reasonable person could be expected to endure.

## COUNT IX – State Law Claim – Negligent Infliction of Emotional Distress
### (against KHAVARI)

147.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

148.    Ms. Watts witnessed and/or experienced a real or impending danger to herself and her unborn fetus.

149.    As alleged below, Defendant KHAVARI breached her duty to care for Ms. Watts, putting her and her unborn fetus in danger.

150.    As a direct, proximate, and reasonably foreseeable result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering.

## COUNT X – State Law Claim - Medical Negligence
### (against KHAVARI)

151.    The applicable standard of care required Defendant KHAVARI to obtain Ms. Watts's informed consent prior to proceeding with a treatment plan. This meant that Defendant KHAVARI was required to apprise Ms. Watts of the two treatment options for her pregnancy complications: immediate induction or a D&E procedure. If the D&E procedure was

not offered at St. Joseph Warren Hospital, the standard of care required Defendant KHAVARI to inform Ms. Watts of her ability to obtain the procedure elsewhere.

152.     Defendant KHAVARI also failed to meet the standard of care by delaying treatment to Ms. Watts on September 20, 2023. The delay ignored evidence-based medicine which required Ms. Watts to be treated expeditiously.

153.     Defendant KHAVARI further breached the standard of care by creating and/or facilitating an inhospitable environment that consisted of, for example, ignoring Ms. Watts's preferred treatment plan, making statements to others in her presence that her case presented ethical dilemmas that justified withholding care, and disparaging Ms. Watts to medical staff.

154.     These failures, among others, directly and/or proximately caused Ms. Watts to sustain, and continue to sustain, injuries as set forth above, including loss of liberty, loss of privacy, and suffering.

155.     Defendant KHAVARI's breaches of the standard of care are attested to in the attached affidavit from a highly qualified obstetrician-gynecologist.

**COUNT XI – State Law Claim –**
**Unauthorized Disclosure of Confidential Medical Information**
(against BON SECOURS MERCY HEALTH, ST. JOSEPH WARREN HOSPITAL,
MOSCHELL, ZUPKO, RAINES, and CARRINO)

156.     Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

157.     As discussed above, Defendant MOSCHELL, Defendant CARRINO and Defendant HOSPITAL gained protected health information from Ms. Watts while she was being treated at St. Joseph Hospital.

158.    Defendant MOSCHELL, Defendant CARRINO, and Defendant HOSPITAL engaged in unauthorized, unprivileged disclosure of Ms. Watts's protected information to law enforcement.

159.    This disclosure was not made pursuant to a statutory mandate or common-law duty, nor was it necessary to protect or further a countervailing interest that outweighed Ms. Watts's interest in confidentiality. The disclosure violated Ms. Watts's right to confidentiality under federal and state statutes and regulations.

160.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including loss of liberty, loss of privacy, and suffering.

### COUNT XII – State Law Claim – Conspiracy
#### (against CARNEY, MOSCHELL, and CARRINO)

161.    Each paragraph of this Complaint is incorporated as if restated fully herein.

162.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown coconspirators, conspired by agreement and concerted action to accomplish an unlawful purpose by unlawful means.

163.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to Ms. Watts's false arrest and intentional infliction of emotional distress upon her.

## COUNT XIII – State Law Claim – *Respondeat Superior*
(against ST. JOSEPH WARREN HOSPITAL, BON SECOURS MERCY HEALTH, and CITY OF WARREN)

164.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

165.    In committing the acts alleged in the preceding paragraphs, Defendants MOSCHELL,CARRINO,  and KHAVARI were employees, members, and/or agents of Bon Secours Mercy Health and/or St. Joseph Warren Hospital, acting at all times within the scope of their employment.

166.    Consequently, Defendants BON SECOURS MERCY HEALTH, ST. JOSEPH WARREN HOSPITAL, and CITY OF WARREN are liable for the actions of their employees.

167.    In committing the acts alleged in the preceding paragraphs, Defendant CARNEY was an employee of the CITY OF WARREN, acting at all times within the scope of his employment.

168.    Consequently, Defendant CITY OF WARREN is liable for its employee's actions that violate state law.

## COUNT XIV – State Law Claim – Indemnification
(against CITY OF WARREN)

169.    Each paragraph of this Complaint is incorporated as if restated fully herein.

170.    Ohio law provides that political subdivisions are directed to pay any tort judgment for compensatory damages for which employees are liable as a result of actions taken within the scope of their employment activities.

171.    Defendant CARNEY was a City of Warren employee, who acted within the scope of his employment in committing the misconduct described herein.

172.    The City of Warren is responsible for paying any judgment for compensatory damages entered against Defendant CARNEY.

## JURY DEMAND

Plaintiff Brittany Watts hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Watts respectfully requests that judgment be entered for Ms. Watts against Defendants jointly and severally for the damages described above.


Dated: August 21, 2025                            Respectfully Submitted,

                                                  /s/ Julia Rickert
                                                  *One of Plaintiff's Attorneys*
                                                  Rachel Brady
                                                  Julia Rickert
                                                  Renee Spence
                                                  Loevy + Loevy
                                                  311 N. Aberdeen St., 3rd Floor
                                                  Chicago, IL 60607
                                                  Phone: 312.243.5900
                                                  Fax: 312.243.5902
                                                  julia@loevy.com

## CERTIFICATE OF SERVICE

I, Julia Rickert, an attorney, hereby certify that on August 21, 2025, the foregoing document was filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Julia Rickert
*One of Plaintiff's Attorneys*