IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **BRITTANY WATTS** | CASE NO. 4:25-cv-00049 |
| **Plaintiff** | JUDGE SARAH LIOI |
| v. | **Defendants' Motion for Leave to File Initial Motion for Summary Judgment and a Stay of all Expert Witness Discovery** |
| **BON SECOURS MERCY HEALTH,** *et al.*, | |
| **Defendants.** | |

Now comes the Hospital Defendants[1] and jointly request leave to file an initial summary judgment motion, deviating from the Court's standard rule that it will only permit one summary judgment motion. This is unusual: the Plaintiff has refuted nearly all the material allegations in the Complaint. Further, the Hospital Defendants request a stay of expert discovery pending the first Motion for Summary Judgment. The basis for this Motion is more fully set forth in the Memorandum in Support below.

Respectfully Submitted,

*/s/ Thomas A. Prislipsky*
Thomas A. Prislipsky (0067623)
**REMINGER CO., LPA**
950 Windham Court Suite 200
Youngstown, Ohio 44512
Tel: 330-744-1311 | Fax: 330-744-7500
tprislipsky@reminger.com

*/s/ Patrick Kasson*
Patrick Kasson (0055570)
**REMINGER CO., LPA**
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
Tel: 614-228-1311 | Fax: 614-232-2410
pkasson@reminger.com

*Counsel for Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino, Parisa Khavari, Suzanne Zupko, and Fred Raines*

---

[1] Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino, Parisa Khavari, Suzanne Zupko, Fred Raines, City of Warren, Ohio, and Nicholas Carney.

**MEMORANDUM IN SUPPORT**

This Court has a general rule that only one motion for summary judgment is permitted. And that is normally a very good rule. But following Plaintiff's deposition, this case is no longer a normal case. To be sure, Plaintiff has completely retracted the vast majority of the allegations in the Complaint. And now there is no way to support the inflammatory story in the Complaint.

In addition, Dr. Khavari did not receive an 180-day letter to extend the statute of limitations. Nor was one even addressed to her. The claim against her is time-barred.

An early summary judgment motion will present an opportunity to resolve this matter efficiently, at an early stage, and on *Plaintiff's own testimony*. But given the medical nature of this matter, expert testimony will eventually provide *additional* bases for summary judgment. However, the cost of medical and expert discovery is significant. So, these Defendants are faced with a tough choice under the standard rules. The case is effectively over after Plaintiff's deposition. But they face enormous expense in expert discovery, before they can present all their summary judgment arguments. Accordingly, to avoid significant expense and to promote judicial economy—while also preserving issues out of an abundance of caution—these Defendants seek leave to file an early MSJ now, without prejudice to a future Rule 56 motion.

1. **The law permits an early summary judgment motion, without prejudice to a future motion for unique circumstances, such as presented here.**

Typically, Rule 56 allows a party to file one motion for summary judgement "at any time until 30 days after the close of discovery." Civ.R.56(b). However, a district court has broad discretion to allow a party to file multiple motions for summary judgment where they present a good reason for doing so. *See Jacobs v. Tricam Indus., Inc.*, No. CV 10-11469, 2013 WL 12181861, at *1 (E.D. Mich. Apr. 12, 2013) (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806,

835 (6th Cir. 2000)). A good reason exists because Plaintiff has forsaken the story her the Complaint tells.

## 2. The Plaintiff has refuted almost every material allegation in the Complaint.

The Plaintiff's Complaint portrays an inflammatory and scandalous course of events. Essentially, it claims 1) Plaintiff was held against her will, 2) forced to answer questions from a detective she did not want to answer, 3) was set up for a prosecution for a simple miscarriage, 4) received no treatment and 5) left the hospital untreated because of the hospital's conduct and her resulting mental state. But when deposed, the Plaintiff disagreed. Importantly, this is not a case where one or two admissions were tricked out. Rather, the entire narrative was refuted by the Plaintiff:

| **Allegation in the Complaint:** | **Plaintiff's Deposition Testimony:** |
|---|---|
| **A.  Claim** – conspiracy to have Plaintiff charged with crime:<br><br>¶ "Defendants conspired to interrogate Watts and accuse her of harming the fetus."<br><br>Complaint DOC #: 1, PageID #: 3 ¶ 10 | **Testimony** – they just wanted to help find the baby:<br><br>Q.  Okay. And in that meeting where Nurse Moschelle was in there with the detective, *it was clear* in that meeting **that *all* they were trying to do was trying to find out where the baby's body was?**<br><br>A.  **Correct**.<br><br>(Plf's Depo. Pg. 92) (Emphasis added)[2]<br><br>Q.  And what they were doing if I recall from the recording is **they were asking you questions and then the detective was on the** |

---

[2] The deposition pages have been attached as Exhibit A. While these Defendants would have preferred to file the entire deposition, Plaintiff believes it is prohibited by the rules and are aggressively adamant the entire deposition of Plaintiff not be made part of the public record. While these Defendants disagree, to avoid any dispute, they have just attached the relevant pages (and the page before and after) to this Motion. If the Court wishes to have the entire deposition transcript filed, the Defendants are happy to do so. And the Defendants would then direct the Court to the totality of the Plaintiff's cross-examination at Pgs. 87-124 and 132-135 which adds even further context to this Motion.

| | |
|---|---|
| | **phone with somebody at the scene trying to direct them somewhere to find the baby**, right? |
| | A. Correct. |
| | (*Id.*)(Emphasis added) |
| | Q. And you wanted to help them find the baby in that meeting, right? |
| | A. Correct. |
| | (*Id.* at Pg. 93) |
| **B. Claim** – Plaintiff simply had a miscarriage at home: | **Testimony** -- Watts knew *she flushed and plunged* a 10-inch-long baby down the toilet, knew it was there the whole time and agreed it was an inappropriate way to dispose of a baby: |
| "To that end…. **She faced a year in prison for simply having a miscarriage at home.**" | Q: At some point you tried to **flush the toilet; correct**? |
| "Defendants knew Watts had committed no crime, they saw to it that she would face criminal charges for having an experience shared by hundreds of thousands of women every year." | A: That's correct. …. Q: Okay. My understanding is you also **used a plunger after you flushed the toilet**? |
| (Complaint DOC #: 1, PageID #: 3 ¶ 9) (Emphasis added). | A: That's correct. |
| "Unbeknownst to Ms. Watts, the fetus, which was under one pound and had died in utero, was intact and had become lodged in the toilet's P-trap." | (Plf's Depo. Pg. 29)(Emphasis added). Q: Okay. You also would have told Detective Carney that you flushed the toilet and then plunged the toilet; is that correct? |
| (Complaint DOC #: 1, PageID #: 9 ¶ 48) | A: Correct. |
| | (Plf's Depo. Pg. 58) |
| | Q: Nurse Moschell says "Were you fearful that maybe it did go down the toilet when you |

4

were plunging?" And your response is "That's a possibility also." Correct?

A: Right.

(Plf's Depo. Pg. 63)

Q: …so at that point in time when you went back into the hospital and they were talking to you about, you know, there would be a **full baby**?

A: Correct.

(Plf's Depo. Pg. 88) (Emphasis added)

Q: …the only place it could be was in the toilet, right?

A: Correct.

(Plf's Depo. Pg. 88-89)

Q: **And you knew that [the baby was in the toilet] when you spoke to them**?

A: **Correct.**

Q: … And since you didn't see it in the bucket and you knew there was a baby anyway, **you knew the only place it could be was in the toilet** *when you went to the hospital*, right?

A: Correct.

(*Id*. at 89) (Emphasis added).

Q: And you can understand how someone would think that a baby **ten inches long** that you felt enough to name, being halfway flushed down **would be an inappropriate way to treat that baby's body**?
A: Yes.

Q: …And, in fact, **you probably think that** in looking at it in retrospect, don't you?

5

|  |  |
|---|---|
|  | A: Yes. |
|  | (Plf's Depo. Pg. 90) (Emphasis added) |
| **C. Claim** – Watts was interrogated against her will:<br><br>"The two jointly interrogated Watts for nearly an hour when they told her she was free to leave, she was in no condition to do so, as both knew."<br><br>(Complaint DOC #: 1, PageID #: 11 ¶ 65) | **Testimony** – Watts willingly participated because she wanted the baby to be found and has no complaint that the nurses helped:<br><br>Q: And **you wanted[3] to help them find the baby in that meeting**, right?<br><br>A: **Correct**.<br><br>Q: Because you knew it was the right thing to do to find the baby?<br><br>A: Correct.<br><br>Q: And you knew it was the right thing to try to find the baby even though you didn't know what the laws were, right?<br><br>A: Correct.<br><br>(Plf's Depo. Pg. 93) (Emphasis added)<br><br>Q: And if the nurses hadn't asked and involved law enforcement the baby would not have been found; correct?<br><br>A: Correct.<br><br>Q: … **do you hold it against the nurses that they asked you questions, got law enforcement involved, and helped find your baby**?<br><br>A: No.<br><br>(Plf's Depo. Pg. 94)(Emphasis added). |

---

[3] This is past tense. And it is not based on any assumptions – thus this is what she thought during meeting with the detective and nurse.

6

**D.    Claim** – Ms. Watts was untreated at the hospital:

"On September 19, 2023, … **received no meaningful treatment** or guidance. Devastated and scared, she returned home."

(Complaint, DOC #: 1, PageID #: 2 ¶ 3) (Emphasis added).

Defendants dragged their feet, however, allowing Ms. Watts to languish in the hospital—**effectively untreated**—for 10 more hours…
(Complaint, DOC #: 1, PageID #: 2 ¶ 5) (Emphasis added).

"She was denied medical care at St. Joseph for life threatening pregnancy complications…

(Complaint, DOC #: 1, PageID #: 4 ¶ 16).

"[H]er Medical team had not taken a single material step to prevent the possible complications she faced…."

(Complaint, DOC #: 1, PageID #: 8 ¶ 40).

**Testimony** – Watts was accessed, monitored and treated including treatment to prevent complications and prepare her for induction:

Q: All right. Just generally speaking, your time in the hospital, you know, as a nurse-in-training you understand there's different types of care, right?

A: Yes.

(Plf's Depo. Pg. 108)

Q: With respect to the first time at the hospital where they took you across the parking lot, **we can agree they provided you continuous supportive care** until you left?

A: Correct.

Q: And we can agree on the second visit that they provided you **continuous supportive care until left**?

A: Correct.

(Plf's Depo. Pg. 108-109) (Emphasis added)

Q: When you left the hospital on the second visit there, **they were giving you IV antibiotics**, weren't they?

A: Correct.

(Plf's Depo. Pg. 132) (Emphasis added)

Q: You understand that **antibiotics can be used prophylactically to get you ready for surgery so when you have the surgery there's less chance of infection,** right?

A: Correct.

(Plf's Depo. Pg. 135) (Emphasis added)

Q: Did they put an IV in you?
A: Yes.

7

| | |
|---|---|
| | Q: Okay. And you understand that part of medical care is supportive care with fluids and so forth?<br><br>A: Yes.<br>Q: And as a nurse you understand why that is important?<br><br>A: Yes.<br><br>Q: All right. And they took a history from you?<br><br>A: Yes.<br><br>Q: And you understand taking a history is part of medical care?<br><br>A: Yes.<br><br>Q: All right. And they were monitoring you?<br><br>A: Yes.<br><br>(Plf's Depo Pg. 97) (Emphasis added) |
| **E.  Claim** – She wanted a D&E: | **Testimony** – She wanted the procedure the doctor recommended—she did not want an abortion: |
| "No doctor offered a D&E despite Watts indicating that such a treatment option would be preferable. Nor did they inform her that she could obtain one at another facility."<br><br>(Complaint DOC #: 1, PageID #: 7 ¶ 34)<br><br>"Because Watts was unaware of all of her options, she agreed to the recommended induction."<br><br>(Complaint DOC #: 1, PageID #: 7 ¶ 36) | Q: **If they had offered you an abortion you would have declined**, right?[4]<br><br>A: Correct.<br><br>Q: **What you wanted, as what the doctor had proposed and made sense to you**, induce you, the baby would be born naturally, and if it didn't make it, it didn't make it.<br>But that was the way you'd want it to happen if you stayed at the hospital; correct?<br>A: Correct. |

---

[4] Had Plaintiff asked for an abortion – in layperson's terms – she would have been given a D&E at a facility which performed abortions.

8

(Plf's Depo Pg. 112) (Emphasis added)

---

| | |
|---|---|
| **F.  Claim** – Watts left the hospital because she felt frustrated and abandoned:<br><br>"Feeling frustrated and abandoned, Ms. Watts went home for the night."<br><br>(Complaint DOC #: 1, PageID #: 4 ¶ 15) | **Testimony** – Nothing they did caused her to leave. Watts left because she got tired of waiting and was fully aware of the risks of leaving:<br><br>Q: Okay. **And there was *nothing any of the hospital folks did* to drive you out,** you just didn't want to wait, right?<br><br>A: Correct.<br><br>(Plf's Depo. Pg. 103) (Emphasis added).<br><br>Q: What you did was **you just didn't want to wait for whatever care they were going to give you,** you wanted to leave and go home?<br><br>A: Yes.<br>. . .<br><br>Q: Okay. So you **made a personal choice to leave**?<br><br>A: Yes.<br><br>Q: You signed an AMA [against medical advice] form?<br><br>A: Correct.<br>. . .<br><br>Q: And the AMA form also told you were taking medical risks in terms of leaving that would include death, right?<br><br>A: Correct.<br><br>(Plf's Depo. Pg. 99) (Emphasis added) |

9

Q:  And again, when you were back the second time in the hospital you had a choice you could make, right?

A:  Correct.

Q:  And one of the choices was you could stay and have a procedure?

A:  Correct.

Q:  And **you made a decision to leave because that's the choice you wanted to make,** right?

A:  Correct.

Q:  You left over a service issue, right?

A:  Correct.

Q:  And **you didn't leave because you thought they were going to perform a procedure you didn't want. You left because you didn't want to wait for it,** right?

A:  Correct.

Q:  . . . and you made a choice because you didn't want to wait for the procedure to go home and have the miscarriage there, right?

A:  Correct.

Q:  And **you certainly understood that if you made the choice to leave the second time, that would be against medical advice**?

A:  Correct.

(Plf's Depo. Pg. 100-101) (Emphasis added)

Q:  **And you understood that, and as you sit here today, it would have been a better course for you had you stayed at the hospital, right**?

A:  Correct.

10

(Plf's Depo. Pg. 102-103) (Emphasis added)

---

**G.  Claim** – No medical providers told her how to manage her impending miscarriage at home or what the baby would look like:.

"Despite knowing that Ms. Watts would miscarry, neither Defendant KHAVARI nor any of Ms. Watts's other medical providers told her how to manage her impending miscarriage at home. In particular, Ms. Watts was never told what her fetal remains would look like or how to dispose of them."

(Complaint DOC #: 1, PageID #: 8 ¶ 41).

**Testimony** – Watts left fully aware of the risks and *without anyone knowing* – so the hospital couldn't have advised of these things. They didn't know she was leaving. Plus, she knew the baby would be fully formed:

Q: So what you did is **you left without telling anybody, right**?

A: Correct.

Q: Had you told somebody you know they would have had you sign a second AMA [against medical advice], right?

A: Correct.

Q: But you knew leaving, **you were leaving against AMA, against medical advice**, and that the hospital would seek the same thing they sought when you signed the first form, right?

A: Correct.

(Plf's Depo. Pg. 101) (Emphasis added)

Q: All right. So you went and you went home. Now, going home, **you certainly understood that whatever happened at home was probably riskier than if you stayed in the hospital**?

A: Correct.

Q: And you made the choice to accept that risk?

A: Correct.

11

Q: **And you understood that, and as you sit here today, it would have been a better course for you had you stayed at the hospital, right**?

A: Correct.

. . .

Q: And – but you made the choice and accepted responsibility to go home and have the baby at home, right?

A: Correct.

Q: Okay. **And there was nothing any of the hospital folks did to drive you out, you just didn't want to wait, right**?

A: Correct.

(Plf's Depo. Pg. 102-103) (Emphasis added).

Q: …so at that point in time when you went back into the hospital and they were talking to you about, you know, there would be a **full baby**?

A: Correct.

(Plf's Depo. Pg. 88) (Emphasis added)

---

**H. Claim** – The hospital provided false information that was used at the probable cause hearing.

"During the interrogation, Defendants CARNEY and MOSCHELL asked Ms. Watts leading and suggestive questions, eliciting statements from that Defendant CARNEY would later misrepresent to use against her in criminal proceedings." (¶ 65)
.

**Testimony** – Everything that was said at the probable cause hearing was accurate. And the hospital was not involved in it, anyway.

Q: In the probable cause hearing where the judge found there was probable cause to charge you with a crime, **did anybody from the hospital testify at that**?

A: No.

(Plf's Depo. Pgs. 95-96) (Emphasis added)

12

Q: Okay. To your recollection **did the police officer say anything on the stand that was untrue**?

A: No.

(Plf's Depo Pg. 96) (Emphasis added)

Also, *compare* the testimony at the probable cause hearing (Doc #44-1) with the above cited testimony that:

- Plaintiff knew, when she spoke to the police, the baby was in the toilet.

- She knew the baby would be a fully formed baby.

- Plaintiff knew she flushed the toilet with the baby in it.

- Plaintiff knew she plunged the toilet with the baby in it.

- The baby was, in fact, a 10-inch long fully developed baby.

Simply, there was nothing said at the probable cause hearing, *upon which probable cause was found*, which was not true, pursuant to Plaintiff's testimony.

### 3. Dr. Khavari's claim is clearly time-barred.

The claim against Dr. Khavari is clearly time-barred. And informal attempts to have the Plaintiff dismiss Dr. Khavari have failed. So a Motion on the Statute of Limitations is needed.

To start, it is undisputed that Dr. Khavari was not served within one year of the alleged malpractice. (Compare DOC # 1, Complaint at ¶¶ 16, 148, noting alleged malpractice took place in mid-September with filing date of January 10, 2025). But the Plaintiff claims that Ohio's "180-day law" has extended the statute of limitations because they served a letter, attached hereto as

13

Exhibit B purportedly extended the statute of limitations against Dr. Khavari. But Plaintiff knows Dr. Khavari never received this letter. Nor was it specifically addressed to her. (*Id*).

Ohio courts have been relatively uniform in that an 180-day letter not received and/or specifically addressed to a doctor is ineffective. *Fulton v. Firelands Community Hospital,* 2006-Ohio-1119 ¶ 14 (interpreting prior comparative version of statute) (6th Dist. 2006), citing *Jones v. St. Anthony Medical Center,* 996 Ohio App. LEXIS 542 (10th Dist. 1996). And Ohio courts are clear that an 180-day letter must be received by the physician prior to the expiration of the one-year statute. *Smith v. Gill,* 2010-Ohio 4012 ¶¶ 15, 18-19. (10th Dist. 2010).

So, Dr. Khavari has a clear statute of limitations defense. While she will have ample standard of care and proximate causes defenses *after* expert discovery, she should not be forced to incur the attorney fees and expert witness costs associated with that—when it is clear she should be dismissed as the claim is untimely.

**4.  A stay is appropriate.**

Defendants understand reluctance to delay expert discovery. And they are fine if the Court refrains from ruling on a stay until the Court takes an initial look at the Defendants' Motion for a Stay. But there is no question that the cost of expert discovery will be immense. Multiple expert witnesses will be retained on standard of care, proximate cause, as well as placental pathologists. In addition, a law enforcement expert may be retained. The cost to both parties of the experts' review, reports, travel, and discovery of the experts will exceed six figures.

And normally it would make sense to continue with expert discovery. But, as set forth above, the Plaintiff has so thoroughly reputed the story it makes no sense to proceed until the dismissal of the Plaintiff's claims have been briefed just based upon the factual bases—as the Complaint is entirely based upon facts the Plaintiff concedes are not true.

14

Respectfully Submitted,

| | |
|---|---|
| */s/ Thomas A. Prislipsky* | */s/ Patrick Kasson* |
| Thomas A. Prislipsky (0067623) | Patrick Kasson (0055570) |
| **REMINGER CO., LPA** | **REMINGER CO., LPA** |
| 950 Windham Court Suite 200 | 200 Civic Center Drive, Suite 800 |
| Youngstown, Ohio 44512 | Columbus, Ohio 43215 |
| Tel: 330-744-1311 | Fax: 330-744-7500 | Tel: 614-228-1311 | Fax: 614-232-2410 |
| tprislipsky@reminger.com | pkasson@reminger.com |

*Counsel for Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino, Parisa Khavari, Suzanne Zupko, and Fred Raines*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically this 5th day of January 2026 and served upon all counsel of record via the Court's notification system.

*/s/ Patrick Kasson*
THOMAS A. PRISLIPSKY (0067623)
PATRICK KASSON (0055570)