# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRITTANY WATTS, | ) | CASE NO. 4:25-cv-49 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| BON SECOURS MERCY HEALTH, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

As alleged, this case stems from a miscarriage suffered by plaintiff Brittany Watts and her subsequent treatment by defendants Bon Secours Mercy Health; Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital; the City of Warren, Ohio; and their respective employees. Following her miscarriage in September of 2023, Watts alleges that employees of St. Joseph Warren Hospital and the Warren Police Department made false statements to have Watts wrongfully prosecuted for abuse of a corpse—the "corpse" being Watts's fetus. While a grand jury eventually found no probable cause to charge Watts, Watts alleges that her arrest and prosecution deprived her of various Constitutional rights.

Now, defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino, Suzanne Zupka, and Fred Raines (collectively, "Hospital Defendants") move for judgment on the pleadings. (Doc. No. 40 (Motion).)[1] The Hospital Defendants argue that they are immune from Watts's claims and that

---

[1] While defendant Parisa Khavari is represented by the same counsel as the Hospital Defendants, the Court does not understand Khavari to join the motion or to be seeking dismissal of the claims against her. Khavari is not listed on the

Watts fails to state a claim against them. As discussed below, Watts fails to state a claim under 42 U.S.C. § 1983 as to the Hospital Defendants, and the Hospital Defendants' claimed immunities are inapplicable. Accordingly, the motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

All facts recited herein are taken from the allegations in Watts's amended complaint. In the morning of September 19, 2023, Watts arrived at St. Joseph Warren Hospital 21 weeks pregnant and bleeding from her vagina. (Doc. No. 30 (Amended Complaint) ¶¶ 22–23.) Doctors diagnosed her with a placental abruption, which brought with it the risk of severe and potentially deadly complications if left untreated. (*Id.* ¶ 24.) Watts then waited at the hospital for eight hours and returned home without receiving treatment. (*Id.* ¶¶ 25–26.)

Watts returned to the hospital the next morning with worsening symptoms. (*Id.* ¶ 27.) Doctors informed Watts that she had developed a premature rupture of membranes, that the amniotic fluid had drained from her uterus, that she had an infection, that her pregnancy was not viable, and that the fetus would likely die in utero or shortly after delivery. (*Id.* ¶¶ 28–30.) These findings were memorialized in Watts's medical note, which was available to and reviewed by other providers treating Watts. (*Id.* ¶¶ 31–32.) Despite Watts's increasingly complicated condition, the hospital did not provide any treatment. (*Id.* ¶¶ 34–38.) After waiting at the hospital for 10 hours without receiving treatment, Watts returned home. (*Id.* ¶ 39.)

In the morning of September 22, 2023, Watts awoke in severe pain, feeling as if she were about to have a painful bowel movement. (*Id.* ¶¶ 42–43.) Watts managed to make it to her toilet

---

first page of the motion (Doc. No. 40, at 1), and counsel does not appear to make any arguments specifically aimed at the claims against Khavari.

before she miscarried, evacuating blood, blood clots, tissue, and, unbeknownst to her, her now dead fetus. (*Id.* ¶¶ 43–44, 48.) An autopsy would later confirm that the fetus had died in utero. (*Id.* ¶ 75.)

Disoriented and still bleeding, Watts attempted to clean up the blood and tissue. (*Id.* ¶¶ 45–47.) She flushed the toilet, but it began to overflow. (*Id.* ¶ 46.) Unbeknownst to her, her fetus was lodged in the toilet's plumbing. (*Id.* ¶ 48.) She shoveled out the overflowing contents with a bucket and attempted to continue cleaning her restroom. (*Id.* ¶¶ 45–46.)

Watts alleges that, upon her return to the hospital following her miscarriage, the Hospital Defendants conspired to craft a false narrative that would eventually culminate in Watts being charged with abuse of a corpse under Ohio law. According to Watts, defendant Carrino, an employee at St. Joseph Warren Hospital (*id.* ¶ 21), knew that Watts had a nonviable pregnancy and had miscarried at home. (*Id.* ¶ 50.) Despite this knowledge, Carrino falsely wrote in Watts's medical notes that Watts had seen and touched the fetus and placed it in a bucket when she saw that it was not moving or making noise. (*Id.* ¶ 56.)

Meanwhile, defendant Moschell, another hospital employee aware of Watts's nonviable pregnancy and miscarriage (*id.* ¶¶ 21, 50), told defendant Zupko, of the hospital's risk management department, that Watts had delivered a live baby and had left it in a bucket. (*Id.* ¶¶ 51–52.)[2] Moschell and Zupko then agreed to involve defendant Raines, a law enforcement officer working at the hospital, telling Raines that "Watts had given birth to a viable, live baby, and had left the live baby in a bucket[.]" (*Id.* ¶¶ 53–54.) Alternatively, Watts alleges that Moschell told Raines that

---

[2] Alternatively, Watts alleges that Moschell told Zupko that Watts "had not delivered a viable fetus or living baby." (Doc. No. 30 ¶ 52.)

Watts "had not delivered a viable fetus or living baby." (Doc. No. 30 ¶ 54.) Raines and Moschell then agreed that Moschell would call the City of Warren Police Department. (*Id.* ¶ 55.)

As Watts alleges, Moschell then called the police and "falsely told them that Ms. Watts had given birth at home, did not want the baby and so did not look to see if it were alive, and had come to the hospital without the baby." (*Id.* ¶ 57.) Moschell then "falsely suggested the baby could be alive and that Ms. Watts may have done something wrong or illegal." (*Id.*) Sometime thereafter, defendant Carney, an officer with the City of Warren Police Department (*id.* ¶ 18), arrived at the hospital. (*Id.* ¶ 61.)

Before speaking to Watts, Carney spoke to Moschell and Carrino to "discuss their plan" for questioning Watts. (*Id.* ¶ 62.) Carney and Moschell than approached the "disoriented, trapped, traumatized, and emotionally distraught" Watts. (*Id.* ¶¶ 63, 66.) Watts alleges that Carney told her "multiple times that she was not in trouble and made other false promises of leniency." (*Id.* ¶ 67.) Meanwhile, according to Watts, Moschell stated "that she was not in trouble and that she and [Carney] were there to help her." (*Id.*)

Carney and Moschell then "interrogated" Watts, occasionally stepping out to consult with Carrino. (*Id.* ¶¶ 65, 70.) During the conversation, Watts stated "that if the fetal remains had not been scooped up in the bucket, it must still be in the toilet." (*Id.* ¶ 71.) According to Watts, Carney and Moschell "would not accept her answers[,]" and "accused her of nefarious conduct, suggesting that perhaps Ms. Watts had birthed a live baby and hidden it 'in a cabinet.'" (*Id.*)

Carney then, as Watts alleges, falsely wrote in his police reports that Watts had seen and touched the fetus, and that she had taken the fetus out of the toilet and placed it in a bucket. (*Id.* ¶ 73.) Carney also omitted from his report that "Watts never saw the fetus, that she believed it had

4

come out in bits and pieces, and that she had taken no steps to cause harm to the fetus." (*Id.*)

Watts alleges that Carney, despite knowing that Watts's fetus had died in utero, searched for some way to charge her with a crime, eventually charging her with felony abuse of a corpse. (*Id.* ¶ 76.) Carney then arrested Watts at her home. (*Id.* ¶ 78.)

Carney and Moschell met with prosecutors to prepare for Watts's preliminary hearing. (*Id.* ¶ 87.) At the preliminary hearing, as Watts alleges, Carney misled the court and "made flatly false statements, including but not limited to that Ms. Watts had wanted to deliver her baby into the toilet and may have thought it was alive at birth." (*Id.* ¶ 90.) Carney further falsely suggested that Watts's miscarriage had not occurred naturally and failed to present a recording of his interrogation of Watts. (*Id.* ¶¶ 90–91.) Eventually, a grand jury declined to indict Watts, finding no probable cause to support the charged offense. (*Id.* ¶ 92.)

Watts now brings 14 causes of action: a 42 U.S.C. § 1983 claim for false arrest and prosecution without probable cause (Count I); a § 1983 claim for unconstitutional interrogation (Count II); a § 1983 due process claim (Count III); a § 1983 conspiracy claim (Count IV); a claim for violations of the Emergency Medical Treatment and Labor Act ("EMTALA") (Count V); a malicious prosecution claim under Ohio law (Count VI); two claims for intentional infliction of emotional distress under Ohio law (Counts VII & VIII); a claim for negligent infliction of emotional distress under Ohio law (Count IX); a claim for medical negligence under Ohio law (Count X); a claim for unauthorized disclosure of confidential medical information under Ohio law (Count XI); a conspiracy claim under Ohio law (Count XII); a *respondeat superior* claim under Ohio law (Count XIII); and an indemnity claim under Ohio law (Count XIV). (*Id.* at 16–

27.)[3]

## II.    LEGAL STANDARD

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a motion for judgment on the pleadings is the same as for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (citation omitted). "To survive a motion to dismiss [or judgment on the pleadings], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (citation, quotation marks, and emphasis omitted). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted).

It is typically inappropriate to dismiss a claim under Rules 12(b)(6) or Rule 12(c) based on an affirmative defense. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("[A]

---

[3] All page number references to the record herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

plaintiff generally need not plead the lack of affirmative defenses" (citation omitted)); *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015) (citation omitted). Only when the complaint's allegations themselves establish the affirmative defense will dismissal be appropriate. *Paulin*, 2015 WL 1298583, at *4; *see Cataldo*, 676 F.3d at 547.

## III.    DISCUSSION

### A.  Section 1983 and State Action

The Hospital Defendants argue that the § 1983 claims against them (Counts I, II, III, & IV) must be dismissed because Watts fails to allege state action. (Doc. No. 40, at 12–14.) Watts responds that she pleads state action under a § 1983 conspiracy theory. (Doc. No. 44, at 20–21.) A § 1983 claim requires the deprivation of a constitutional or other federal right by a *person acting under the color of state law*, also known as a "state actor." *See Tate v. Comrie*, No. 5:16-cv-3090, 2018 WL 1409288, at *4 (N.D. Ohio Mar. 21, 2018) (citations omitted). A private party conspiring with a state official will be considered a state actor for purposes of § 1983. *Harcz v. Boucher*, 763 F. App'x 536, 540 (6th Cir. 2019) (citation omitted). To sufficiently allege a § 1983 conspiracy,[4] a plaintiff must "allege facts that, when accepted as true, would allow a juror to find (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Marvaso*, 971 F.3d at 606 (quotation marks and citations omitted). The pleading standard for conspiracy is "relatively strict." *Harcz*, 763 F. App'x at 540 (citation

---

[4] The pleading standard for a conspiracy sufficient to establish state action is the same as the pleading standard for a § 1983 conspiracy generally. *Compare Harcz*, 763 F. App'x at 540 (pleading standard for conspiracy for purposes of establishing state action (citation omitted)), *with Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (pleading standard for § 1983 conspiracy (citation omitted)).

7

omitted).

Watts fails to allege the first two elements of a conspiracy. To plead these elements, Watts must allege an "agree[ment] to a 'single plan'" with a "subjectively 'shared' . . . illegal objective." *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 887 (6th Cir. 2024) (citation omitted). While circumstantial evidence may establish such an agreement, it is insufficient "if the alleged conduct is just as consistent with independent conduct as it is with a conspiracy." *Pung v. Kopke*, No. 22-1919, 2025 WL 318222, at *6 (6th Cir. Jan. 28, 2025) (citation omitted), *cert. granted sub nom. Pung v. Isabella Cnty., Michigan*, 222 L. Ed. 2d 1241 (Oct. 3, 2025).

As a preliminary matter, any conspiracy here must be based on an agreement between one or more of the Hospital Defendants and defendant Carney. Defendants Moschell, Carrino, Zupko, and Raines, as employees of St. Joseph Warren Hospital (Doc. No. 30 ¶ 21), are legally incapable of conspiring with one another under the intracorporate conspiracy doctrine. *Blick*, 105 F.4th at 887 ("[E]mployees of the same entity . . . cannot conspire with each other." (citation omitted)). The only alleged co-conspirator who is not an employee of St. Joseph Warren Hospital is Carney, a Warren police officer. Thus, to allege a § 1983 conspiracy, Watts must allege some agreement involving Carney.

Watts attempts to establish an agreement involving Carney. (*See* Doc. No. 30 ¶ 21). She alleges that Moschell and Carrino made false or misleading statements about Watts. (*Id.* ¶¶ 56–57.) She next alleges that officer Carney arrived at the hospital and met with Moschell and Carrino to "discuss their plan." (*Id.* ¶ 62.) Carney then allegedly interrogated Watts with the assistance of Moschell, occasionally stepping out to "discuss[] . . . strategy" with Carrino before continuing. (*Id.* ¶¶ 63, 70.) Watts then alleges that Carney made false or misleading statements in his police

8

report and at Watts's preliminary hearing suggesting that Watts gave birth to a live baby and had abused it. (*Id.* ¶¶ 73, 88, 90.)

Watts's allegations fall short. First, the fact that Carney conferred with Moschell and Carrino before and during his interrogation of Watts does not raise an inference of agreement or conspiracy. *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (officers conferring with private individual did not support inference of conspiracy between the two); *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (allegations that defendants conferred with each other insufficient to raise inference of plan or agreement). Rather, Watts's allegations are consistent with a typical police investigation. Watts alleges that Moschell called the police and that Carrino wrote Watts's medical note. (Doc. No. 30 ¶¶ 56–57.) It is conceivable that, Carney, as an investigating officer, wished to speak to the people who called the police and documented Watts's previous statements. Such typical investigatory steps do not raise a reasonable inference of conspiracy. *Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014) (allegations "just as consistent with legitimate police investigation as with conspiracy" insufficient (citation omitted)).

Second, the allegation that Moschell, Carrino, and Carney all allegedly made false statements about Watts (Doc. No. 30 ¶¶ 56–57, 73) does not raise the inference that they agreed to do so. Such parallel conduct, without more, is insufficient. *Mulcahey v. Chocolay Twp.*, No. 2:24-cv-7, 2024 WL 4713065, at *2 (W.D. Mich. Oct. 1, 2024) (citation omitted)*, report and recommendation adopted sub nom. Mulcahey v. Chocolay Twp., Michigan*, 2024 WL 4604055 (W.D. Mich. Oct. 29, 2024), *aff'd sub nom. Mulcahey v. Township of Chocolay, Michigan, et al.*, No. 25-1396, 2026 WL 64236 (6th Cir. Jan. 8, 2026). While this parallel conduct "may be consistent with an unlawful agreement[,]" *id.*, it is also consistent with independent conduct. For

9

example, on these facts, it is possible that Carney, after hearing Moschell's and Carrino's alleged falsehoods, believed them and wrote them in his police note. At most, these allegations suggest that Moschell and Carrino influenced Carney, not that the three entered an agreement. *See Womack*, 595 F. App'x at 495 ("[E]ven if [police officer] influenced the prosecutor to add six charges . . . due to some personal animus, this does not raise the inference of conspiracy[.]"); *Mason v. Wal-Mart Corp.*, No. 2:14-cv-446, 2016 WL 2624960, at *6 (S.D. Ohio May 9, 2016) (holding that private individual's attempt to influence investigation did not raise inference of conspiracy between private individual and police).

In the end, the fact that Carney conferred with hospital staff while taking actions adverse to Watts's constitutional rights does not adequately allege that Carney entered an agreement with hospital staff. *See Pung*, 2025 WL 318222, at *6 (holding allegations that state actor conferred with defendant before taking action adverse to plaintiff's rights insufficient to establish agreement). Additionally, because Watts fails to adequately allege any agreement or "single plan," it necessarily follows that she fails to allege a shared conspiratorial objective. *See Revis v. Meldrum*, 489 F.3d 273, 292 (6th Cir. 2007) ("[Plaintiff's] allegations here of a shared conspiratorial objective between [police officer] and the private-party defendants . . . necessarily fail[] based on our earlier determination that [police officer] did not so conspire."); *Partin v. Davis*, 675 F. App'x 575, 587 (6th Cir. 2017) (similar (citing *Revis*, 489 F.3d at 292)).

Watts thus fails to plead a § 1983 conspiracy for purposes of establishing state action. This § 1983 conspiracy was Watts's sole argument for establishing state action on the part of the Hospital Defendants. (Doc. No. 44, at 20–21.) Because it fails, all § 1983 claims against the Hospital Defendants must fail. Accordingly, Counts I, II, III, and IV are DISMISSED as against

10

the Hospital Defendants.

### B. State Civil Conspiracy

Watts's state law conspiracy claim (Count XII) fails for the same reason. While the elements of a civil conspiracy claim under federal and Ohio law differ, *Frenchko v. Monroe*, 160 F.4th 784, 802 (6th Cir. 2025) (citation omitted), both federal and Ohio law require allegations of some agreement, whether express or tacit, with an unlawful purpose. *Compare Blick*, 105 F.4th at 887 (section 1983 conspiracy requires "agree[ment] to a 'single plan'" with a "subjectively 'shared' . . . illegal objective." (citation omitted)); *with S&T Bank, Inc. v. Advance Merch. Servs., LLC*, 255 N.E.3d 164, 176 (Ohio Ct. App. 2024) (conspiracy under Ohio law requires a "common understanding or design, even if tacit, to commit an unlawful act." (citation omitted)). Further, Ohio courts, like federal courts, recognize that, under the intracorporate conspiracy doctrine, employees of the same entity cannot conspire with each other. *See e.g., Innovative Architectural Planners, Inc. v. Ohio Dep't of Admin. Servs.*, 239 N.E.3d 942, 955–56 (Ohio Ct. App. 2024); *see also Bays v. Canty*, 330 F. App'x 594, 594–95 (6th Cir. 2009) (applying intracorporate conspiracy doctrine to Ohio law civil conspiracy claim). Thus, to state a claim for civil conspiracy, Watts must allege an agreement—or "mutual understanding" in the parlance of Ohio law—between at least one of the Hospital Defendants and Carney—the only alleged conspirator not employed by St. Joseph Warren Hospital.

As discussed above, Watts fails to allege any specific facts raising the inference of an agreement between Carney and any of the Hospital Defendants. (*See supra* § III(A).) Watts thus fails to state a claim for civil conspiracy under Ohio law. *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 768 (6th Cir. 2020) (affirming dismissal of Ohio conspiracy claim after affirming dismissal

of § 1983 conspiracy claim because "[a]s in the federal claims, there is no specific factual allegations suggesting that the [d]efendants ever entered into an agreement[.]"). Count XII is DISMISSED as against the Hospital Defendants.

### C. State Law Malicious Prosecution

Next, the Hospital Defendants argue that Watts fails to state a claim under Ohio law for malicious prosecution (Count VI) against Moschell, Carrino, Zupko, and Raines. To prevail on a claim for malicious prosecution, a plaintiff must show "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froehlich v. Ohio Dep't of Mental Health*, 871 N.E.2d 1159, 1162 (Ohio 2007) (citation omitted).[5]

#### 1. Malicious Institution

Watts adequately alleges that Moschell and Carrino maliciously instituted Watts's prosecution, but she fails to do the same regarding Zupko and Raines. Typically, a private party providing information to law enforcement will not be treated as instituting any subsequent prosecution. *See Archer v. Cachat*, 135 N.E.2d 404, 406 (Ohio 1956). But if the information provided was knowingly false and acted upon by law enforcement or if the private parties' desire to prosecute the accused was the "determining factor" in the commencement of the prosecution, the private party will be treated as maliciously instituting the prosecution. *Id.*

Here, Watts fails to allege that defendants Zupko or Raines provided any knowingly false

---

[5] As an initial matter, the Hospital Defendants are correct that Watts cannot base her state law malicious prosecution claim on statements made to prosecutors. (Doc. No. 40, at 10.) Such statements, if made for the purposes of reporting a crime, are absolutely privileged under Ohio law. *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209 (Ohio 1994). Accordingly, the Court will not consider statements made to prosecutors in assessing whether Watts adequately pleads a state law malicious prosecution claim.

information to law enforcement or had any influence at all over the decision to prosecute. Regarding Zupko, Watts only alleges that she agreed that Moschell should contact Raines. (Doc. No. 30 ¶ 53.) Regarding Raines, Watts only alleges that he agreed that Moschell should contact law enforcement. (*Id.* ¶ 55.) Watts does not describe what information, if any, these individuals provided to law enforcement or what influence, if any, they exercised over the decision to prosecute. Watts thus fails to allege that Zupko or Raines maliciously instituted her prosecution. *See also Robbins v. Fry*, 594 N.E.2d 700, 702 (Ohio Ct. App. 1991) (affirming summary judgment on malicious prosecution claim where prosecutor decided to prosecute independent of defendant's influence and claimant failed to provide evidence of false statements made to prosecutor).

Watts adequately alleges that Carrino and Moschell provided knowingly false information to law enforcement. Watts alleges that Moschell, despite knowing that Watts miscarried, falsely told law enforcement that Watts "had given birth at home" and "falsely suggested the baby could be alive and that . . . Watts may have done something wrong or illegal." (Doc. No. 30 ¶¶ 50, 57.) She further alleges that Carrino made false statements that "Watts said she had seen and touched the fetus, writing that the baby was not moving or making any noise so she placed it in a bucket behind the trash can." (*Id.* ¶ 56 (quotation marks omitted).)

She next alleges that Carney arrived, and, after speaking to both Moschell and Carrino and interrogating Watts with their help (*id.* ¶¶ 62–63, 69, 70), made false statements in his police report that were quite similar to those Carrino and Moschell previously made. (*Id.* ¶ 73.) Carney would go on to charge Watts with a crime. (*Id.* ¶ 76.) Drawing all reasonable inferences in Watts's favor, these allegations are sufficient to allege that Moschell and Carrino provided knowingly false information to law enforcement that was then acted upon. Watts thus adequately alleges that

13

Moschell and Carrino maliciously instituted her prosecution. *See also Johnson v. Kroger Co.*, No. 2:18-cv-1240, 2020 WL 4038998, at *14 (S.D. Ohio July 17, 2020) (denying defendant summary judgment on Ohio malicious prosecution claim where plaintiff "presented evidence that he did not steal any DVDs, and [defendant] knowingly lied about him doing so to law enforcement, causing him to be wrongfully arrested and prosecuted.").

The Hospital Defendants argue that they cannot be treated as having instituted Watts's prosecution because officer Carney conducted his own independent investigation. (Doc. No. 40, at 18.) The Hospital Defendants are correct that an independent investigation by law enforcement would defeat a malicious prosecution claim against Moschell and Carrino. *See Archer*, 135 N.E.2d at 406 ("[I]f the officer makes an independent investigation . . . the [defendant] is not regarded as having instituted the proceedings[.]" (citation omitted)). And the Court recognizes that some of Watts's allegations suggest an independent investigation by Carney. Indeed, as the Court held above, Watts's conspiracy allegations regarding Carney are consistent with independent conduct. (*See supra* § III(A).)

But unlike a conspiracy allegation, which has a "relatively strict" pleading standard, *Harcz*, 763 F. App'x at 540 (citation omitted), that prevents a claimant from relying solely on allegations that are consistent with independent conduct, *Pung*, 2025 WL 318222, at *6 (citation omitted), there is no similarly heightened standard for state law malicious prosecution claims. Thus, the Court's finding that the allegations are *consistent* with independent conduct for purposes of the conspiracy claims does not mean that the allegations are insufficient as a matter of law to allege a malicious prosecution claim.

Watts alleges that Moschell and Carrino made knowingly false statements about Watts's

14

knowledge and treatment of her fetus. (Doc. No. 30 ¶¶ 56–57.) She also alleges that Moschell and Carrino spoke to officer Carney and assisted him in interrogating Watts, (*id.* ¶¶ 62, 70), and that Carney wrote a police report containing false statements similar to those previously made by Moschell and Carrino. (*Id.* ¶ 73.) These facts, viewed in the light most favorable to Watts, raise the reasonable inference that Carney's eventual decision to charge Watts resulted from Moschell's and Carrino's allegedly false statements and not from an independent investigation.

The Hospital Defendants resist this conclusion with citation to paragraph 76 of the amended complaint. (Doc. No. 40, at 18.) There, Watts alleges that Carney "searched for a way to ensure Ms. Watts would be charged with a crime." (Doc. No. 30 ¶ 76.) The Hospital Defendants argue that this paragraph establishes that Carney "unilaterally decided to file charges[.]" (Doc. No. 40, at 18.) In light of the above described allegations, however, the Court cannot say at this stage of the proceedings that Carney's "search[]" (*id.*) was independent and free of the influences of Moschell and Carrino, as the Court cannot tell what investigatory steps Carney took, if any, independent of Moschell's and Carrino's influence.[6] Watts, therefore, adequately alleges that Moschell and Carrino maliciously instituted Watts's prosecution.

### 2. *Probable Cause*

Watts sufficiently alleges that there was no probable cause. Probable cause is a jury

---

[6] The Court also notes that the Hospital Defendants cite no case—and the Court can find no case—in which a malicious prosecution claim was dismissed at the pleading stage on grounds that an independent investigation was conducted. Indeed, all the cases the Hospital Defendants cite on this issue are summary judgment opinions. *See Reasbeck v. Wheeling Pittsburgh Steel Corp.*, 230 F.3d 1359 (Table), 2000 WL 1434582 (6th Cir. Sept. 18, 2000) (affirming summary judgment); *Woods v. Summertime Sweet Treats, Inc.*, No. 08-ma-169, 2009 WL 3806179, at *4 (Ohio Ct. App. Nov. 13, 2009) (same), *abrogated by Foley v. Univ. of Dayton*, 81 N.E.3d 398 (Ohio 2016); *Meluch v. O'Brien*, Nos. 89008, 89626, 2007 WL 4340856, at *5 (Ohio Ct. App. Dec. 13, 2007) (same). This suggests that whether an independent investigation occurred is a fact-based inquiry, ill-suited for determination on the pleadings. The Court thus refrains from making such determination at this time.

question unless "reasonable minds could come to only one conclusion based on the evidence presented[.]" *Garza v. Clarion Hotel, Inc.*, 695 N.E.2d 811, 814 (Ohio Ct. App. 1997) (citation omitted); *see also Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (similar under federal law). "Probable cause" in this context means "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Rogers v. Barbera*, 164 N.E.2d 162, 166 (Ohio 1960) (citation omitted). Courts must assess probable cause in light of the elements of the offense actually charged, *see Mott v. Mayer*, 524 F. App'x 179, 189 (6th Cir. 2013) (reversing summary judgment "[b]ecause the district court failed to ask whether there was probable cause to prosecute [plaintiff] for the three specific crimes with which he was charged[.]"); *cf. Buchanan v. Metz*, 647 F. App'x 659, 666 (6th Cir. 2016) (affirming summary judgment where "a reasonable officer could have concluded that there was probable cause that [plaintiff's] actions satisfied every element" of the charged offense), and in light of the facts and circumstances known to the defendants at the time. *Garza*, 695 N.E.2d at 813.

Here, Watts was charged under Ohio Rev. Code § 2927.01(B), (Doc. No. 30 ¶ 76)[7], which prohibits "treat[ing] a human corpse in a way that would outrage reasonable community sensibilities." Ohio Rev. Code § 2927.01(B). Section 2927.01(B) requires a reckless state of mind. *State Farm Fire & Cas. Co. v. Condon*, 839 N.E.2d 464, 468 (Ohio Ct. App. 2005). One acts recklessly when "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." *Id.*

---

[7] While the amended complaint does not explicitly cite § 2927.01(B), the Court assumes Watts's reference to "felony 'Abuse of a Corpse'" invokes § 2927.01(B).

(citation omitted).

Here, the Court cannot determine on the pleadings that Moschell and Carrino had reasonable grounds to suspect that Watts treated a corpse in a way that "would outrage reasonable community sensibilities[,]" Ohio Rev. Code  § 2927.01(B), or that she acted recklessly. Viewing the allegations in the light most favorable to Watts, Moschell and Carrino are alleged to have known that (1) Watts's pregnancy was not viable (Doc. No. 30 ¶¶ 30–32, 50); (2) Watts had miscarried at home (*id.* ¶¶ 43–45, 50); (3) Watts did not believe there was any intact fetus (*id.* ¶¶ 44, 71, 73); and (4) Watts had attempted to clean up her miscarriage by flushing the toilet and scooping the contents into a bucket. (*Id.* ¶¶ 46, 51, 54, 56.) First, "community sensibilities" must be determined by the trier of fact. *Condon v. Wolfe*, 310 F. App'x 807, 823 (6th Cir. 2009). The Court is thus in no position to hold as a matter of law that these facts raise a reasonable suspicion that Watts's conduct outraged community sensibilities. Second, with Watts's belief that there was no fetus, a reasonable jury could find that Moschell and Carrino had no reason to suspect that Watts had "perversely disregard[ed] a known risk" that she had abused a corpse by attempting to clean up after her miscarriage.[8] At this stage, this Court cannot hold that Moschell and Carrino had probable cause as to each of the elements of the relevant crime.

The Hospital Defendants appear to argue that the state court's finding of probable cause should carry some weight in this Court's analysis. (Doc. No. 40, at 18 (citing Doc. No. 40-1

---

[8] The Court also questions whether Moschell and Carrino had reason to suspect that a "corpse" existed as that term is used in § 2927.01. The parties provide no binding case law—and the Court can find no such case law—addressing whether the remains of a fetus that died in utero are considered a "corpse." One Ohio Appellate Court decision at least suggests that human remains must have been "born alive" to fall within § 2927.01. *See State v. Gillum*, No. 2021-ca-63, 2022 WL 2118008, at *6 (Ohio Ct. App. 2022) (holding indictment adequately set forth elements of § 2927.01(B) violation where it alleged, *inter alia*, "that the baby had been born alive."). But the Court can find no Ohio Supreme Court or Sixth Circuit decisions on the issue. In any event, the lack of clarity in the law further counsels against dismissal at this early stage in litigation.

(Probable Cause Determination)); Doc. No. 52, at 3–4.) While an indictment is prima facie evidence of probable cause, *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016) (citation omitted), the Hospital Defendants cite no law for the proposition that a state judicial finding of probable cause has the same effect. Indeed, Sixth Circuit law indicates that it may not, at least in federal malicious prosecution claims. *See Sykes v. Anderson*, 625 F.3d 294, 311 (6th Cir. 2010) (finding no probable cause despite state court's previous finding of probable cause). But even if judicial findings of probable cause had the same effect as indictments, such effect is rebutted when the finding is tainted by the presentation of knowingly false evidence. *See Bickerstaff*, 830 F.3d at 398 (citations omitted). Watts alleges just that. (Doc. No. 30 ¶¶ 88–90.) The state court's finding of probable cause thus does not change this Court's conclusion that Watts has adequately alleged a lack of probable cause for her prosecution.

### 3. Termination in Watts's Favor

Finally, the Hospital Defendants do not appear to challenge that Watts's prosecution ended in her favor. Watts alleges that a grand jury found no probable cause and declined to indict her. (*Id.* ¶ 92.) The grand jury's declination to indict is certainly a termination in Watts's favor. *See Shipp v. United States*, 212 F. App'x 393, 398 (6th Cir. 2006) (finding proceedings terminated in plaintiff's favor "when the grand jury declined to indict"); *Froehlich*, 871 N.E.2d at 1162–63 ("refusal of a grand jury to indict" considered termination in favor of the accused (collecting cases)).

In sum, Watts adequately states a claim for malicious prosecution under Ohio law against Moschell and Carrino but fails to do the same as to Zupko and Raines. Accordingly, Count VI is DISMISSED as against Zupko and Raines.

18

**D. Privileges & Immunities**

The Hospital Defendants argue that the remaining claims against them should be dismissed based on certain privileges and immunities. (Doc. No. 40, at 6–9, 18–19.) Under federal and Ohio law, immunities and privileges are affirmative defenses. *See Szuch v. FirstEnergy Nuclear Operating Co.*, 60 N.E.3d 494, 500 (Ohio Ct. App. 2016) ("Statutory immunity is an affirmative defense" (citation omitted)); *Fisher v. Ahmed*, 153 N.E.3d 612, 625 (Ohio Ct. App. 2020) (describing privilege as affirmative defense (citation omitted)); *Wells Fargo Bank, N.A. v. Favino*, No. 1:10-cv-571, 2011 WL 1256771, at *15 (N.D. Ohio Mar. 31, 2011) (describing privileges and immunities as affirmative defenses). Thus, to succeed on this argument, the Hospital Defendants must establish that the amended complaint on its face pleads facts triggering these immunities and privileges. *See Paulin*, 2015 WL 1298583, at *4 (citation omitted); *Cataldo*, 676 F.3d at 547 (citation omitted). The Hospital Defendants fail to meet their burden.

*1. Immunity under Ohio Rev. Code §§ 2921.22; 3705.20*

The Hospital Defendants first argue that they are immune from liability because they had a "reasonable belief"[9] that their conduct was required by state statutes: Ohio Rev. Code §§ 2921.22 and 3705.20. (Doc. No. 52, at 4; *see also* Doc. No. 40, at 6–7 (arguing state statutes provide immunity from Watts's claims).) In relevant part, Ohio Rev. Code § 2921.22 requires one to report (1) a known felony, (2) the discovery or "first knowledge" of a body, and (3) information "bearing

---

[9] The Court questions whether a "reasonable belief" that one's conduct was required by law provides the broad civil immunity the Hospital Defendants claim. The Hospital Defendants cite case law suggesting *some* level of protection from liability for unauthorized disclosure of medical information, *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 524 (Ohio 1999), and for defamation. *Popke v. Hoffman*, 153 N.E. 248, 249 (Ohio Ct. App. 1926); *Stokes v. Meimaris*, 675 N.E.2d 1289, 1298 (Ohio Ct. App. 1996). But the exact level of requisite belief and the scope of the protections, including whether the protections reach the specific claims Watts brings, remains unclear. In any event, the Court need not address the issue now because it rejects the argument on other grounds. If the Hospital Defendants wish to persist in this defense, the Court expects the issue to be fully briefed on summary judgment.

19

on the investigation of [a] death" upon request of an investigating officer. Ohio Rev. Code § 2921.22(A)(1), (C), (D). Ohio Rev. Code § 3705.20 requires issuance of a fetal death certificate in certain circumstances. The Hospital Defendants argue that they had a reasonable belief that Ohio Rev. Code §§ 2921.22 and 3705.20 required them to report Watts to law enforcement for "flushing a 22 week only [sic] baby down the toilet[.]" (Doc. No. 40, at 9 (emphasis omitted).)

The court is unpersuaded. The Hospital Defendants' argument fails to recognize that Watts does not base her claim on a simple report to law enforcement. Rather, Watts's claims are based on (1) the provision of knowingly false statements to Watts, other hospital employees, and law enforcement (*see* Doc. No. 30 ¶¶ 51, 54, 56–57, 60, 67) and (2) the interrogation of Watts in her hospital bed. (*See id.* ¶¶ 62–74.) Neither § 2921.22 nor § 3705.20 requires anyone to make knowingly false statements or interrogate a suspect. Neither do the Hospital Defendants point to any authority for the proposition that one could reasonably believe that § 2921.22 or § 3705.20 required knowingly false statements or the interrogation of a suspect. Thus, taking the allegations in a light most favorable to Watts, the Hospital Defendants do not meet their burden of showing that Watts's allegations establish immunity under Ohio Rev. Code §§ 2921.22 and 3705.20.

### 2. Immunity under 45 C.F.R. § 164.512

The Hospital Defendants also appear to argue that they are immune from any liability because their conduct was permitted by the Health Insurance Portability and Accountability Act's ("HIPAA") enforcing regulations. (Doc. No. 40, at 6, 9.) Even assuming that HIPAA permitted their alleged conduct, the Hospital Defendants fail to provide authority—and the Court cannot locate authority—for the proposition that compliance with HIPAA provides a defense to Watts's claims. The Court thus rejects the argument. *See e.g., Owens v. Comm'r of Soc. Sec.*, No. 4:23-cv-

1288, 2024 WL 553954, at *3 (N.D. Ohio Jan. 5, 2024) (rejecting argument unsupported by any

citation to legal authority), *report and recommendation adopted*, 2024 WL 1299945 (N.D. Ohio

Mar. 27, 2024); *Gasiewski v. Comm'r of Soc. Sec.*, No. 4:22-cv-2194, 2023 WL 5673034, at *8

(N.D. Ohio Aug. 14, 2023) (same), *report and recommendation adopted*, 2023 WL 5671936 (N.D.

Ohio Sept. 1, 2023).

Apart from the broad immunity argued in its opening brief, the Hospital Defendants also

appear to argue on reply that HIPAA compliance at least defeats Watts's claim for unauthorized

disclosure of confidential medical information. (Doc. No. 52, at 6.) Again, the Hospital Defendants

provide no authority for this argument. And the Court is unable to find any authority for the

proposition that HIPAA compliance defeats a claim for unauthorized disclosure. Indeed, what case

law the Court has found indicates that the HIPAA has little to do with claims for unauthorized

disclosure. *Lutsko v. OhioHealth Corp.*, 267 N.E.3d 239, 246 (Ohio Ct. App. 2025) (rejecting

argument that HIPAA violation supported liability for unauthorized disclosure). The Court thus

rejects the argument at this stage.

### 3.  *Qualified Privilege for Statements to Law Enforcement*

The Hospital Defendants next argue that any statements made to law enforcement were

qualifiedly privileged under Ohio law. (Doc. No. 40, at 18–19.) Under Ohio law, statements to law

enforcement are at least entitled to a qualified privilege from civil liability.[10] *See Linetsky*, 2016

---

[10] The Court recognizes that there is some question as to whether statements made to law enforcement are entitled to an absolute privilege or a qualified privilege under Ohio law. The Supreme Court of Ohio has not addressed the issue, and there appears to be a split among the federal and state courts in Ohio. *Compare Linetsky v. City of Solon*, No. 1:16-cv-52, 2016 WL 6893276, at *11 (N.D. Ohio Nov. 23, 2016) (statements to law enforcement only entitled to qualified privilege); *Dehlendorf v. City of Gahanna, Ohio*, 786 F. Supp. 2d 1358, 1364 (S.D. Ohio 2011) (same); *Olsen v. Wynn*, No. 95-a-78, 1997 WL 286181, at *5 (Ohio Ct. App. May 23, 1997) (same (collecting cases)) *with Michael v. Kleiboemer*, No. 3:20-cv-1861, 2024 WL 51172, at *4 (N.D. Ohio Jan. 4, 2024) (statements to law enforcement entitled to absolute privilege); *Brunswick v. City of Cincinnati*, No. 1:10-cv-617, 2011 WL 4482373, at

WL 6893276, at *11. The qualified privilege only covers statements that are, *inter alia*, made in good faith. *See Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975) ("A qualified or conditionally privileged communication is one made in good faith . . . ."). Knowing or reckless falsehoods are not made in good faith and are thus not entitled to qualified immunity. *See Linetsky*, 2016 WL 6893276, at *11 (finding no good faith where defendant knowingly lied); *Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (noting that qualified privilege can be defeated by defendant's actual malice, "defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." (citation omitted)).

Here, the allegations do not establish, as a matter of law, that the Hospital Defendants are entitled to qualified privilege. The only alleged statements potentially made to law enforcement are Moschell's and Carrino's.  (Doc. No. 30 ¶¶ 56–57, 62.) Watts alleges that Moschell knew that Watts had miscarried and that her pregnancy was previously determined nonviable (Doc. No. 30 ¶ 50.) Watts further alleges that, despite this knowledge, Moschell told law enforcement that Watts "had given birth at home" and "that the baby could be alive[.]" (*Id.* ¶ 57.) Watts further alleges that Carrino, with the same knowledge (*id.* ¶ 50) made false statements about her treatment of her fetus (*id.* ¶ 56) and spoke to law enforcement. (*Id.* ¶ 62.) These allegations raise the reasonable inference that Moschell and Carrino knowingly lied to law enforcement. Thus, on the pleadings, Moschell's and Carrino's statements are not entitled to qualified privilege. *See Linetsky*, 2016 WL

---

*9 (S.D. Ohio Sept. 27, 2011) (same); *Lee v. City of Upper Arlington*, No. 03-ap-132, 2003 WL 23024437, at *5 (Ohio Ct. App. Dec. 30, 2003) (same). But the Court need not decide the issue now. On this motion, both Watts and the Hospital Defendants appear to assume that statements to law enforcement are entitled to qualified—not absolute—privilege. (Doc. No. 40, at 18 (Hospital Defendants stating, "[s]tatements made to police officers are protected by a qualified privilege." (citations omitted)); Doc. No. 44, at 17 (Watts stating that qualified immunity can apply to statements to law enforcement if made in good faith and under proper circumstances).) Accordingly, for purposes of this motion, the Court assumes without deciding that statements to law enforcement are only entitled to a qualified privilege.

6893276, at *11 (finding no qualified privilege where defendant knowingly lied).

***

The Hospital Defendants make no further arguments in favor of dismissing the remaining claims against them. Thus, to the extent the motion seeks dismissal of any claims not specifically addressed above, the motion is DENIED.

## IV.    CONCLUSION

For these reasons, the Hospital Defendants' motion for judgment on the pleadings (Doc. No. 40) is GRANTED in part and DENIED in part. Count I is DISMISSED as against Moschell, Carrino, Zupko, and Raines. Count II is DISMISSED as against Moschell. Count III is DISMISSED as against Moschell and Carrino. Count IV is DISMISSED as against Moschell, Carrino, Zupko, and Raines. Count VI is DISMISSED as against Zupko and Raines. Count XII is DISMISSED as against Moschell and Carrino.

The following counts remain as against the following defendants: Count I as against Carney; Count II as against Carney; Count III as against Carney; Count IV as against Carney; Count V as against Bon Secours Mercy Health and St. Joseph Warren Hospital; Count VI as against Moschell, Carney, and Carrino; Count VII as against Carney, Moschell, Zupko, Raines, and Carrino; Count VIII as against Khavari; Count IX as against Khavari; Count X as against Khavari; Count XI as against Bon Secours Mercy Health, St. Joseph Warren Hospital, Moschell, Zupko, Raines, and Carrino; Count XII as against Carney; Count XIII as against St. Joseph Warren Hospital, Bon Secours Mercy Health, and the City of Warren; and Count XIV as against the City of Warren.

**IT IS SO ORDERED**.

23

Dated: March 4, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**