## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| BRITTANY WATTS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25-cv-00049 |
| v. | ) | |
| | ) | |
| BON SECOURS MERCY HEALTH; | ) | Hon. Sara Lioi, Chief Judge |
| MERCY HEALTH YOUNGSTOWN LLC | ) | |
| D/B/A ST. JOSEPH WARREN | ) | JURY TRIAL DEMANDED |
| HOSPITAL; CONNIE MOSCHELL; | ) | |
| PARISA KHAVARI; CITY OF | ) | |
| WARREN, OHIO; and NICHOLAS | ) | |
| CARNEY, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

BRITTANY WATTS ("Plaintiff"), through her attorneys, LOEVY & LOEVY,

complains of Defendants BON SECOURS MERCY HEALTH; MERCY HEALTH

YOUNGSTOWN LLC d/b/a ST. JOSEPH WARREN HOSPITAL ("ST. JOSEPH WARREN

HOSPITAL"); CONNIE MOSCHELL; PARISA KHAVARI; CITY OF WARREN, OHIO; and

NICHOLAS CARNEY, as follows:

1. In September 2023, Plaintiff Brittany Watts experienced an expectant mother's

worst nightmare—the pregnancy she very much wanted ended in a miscarriage. Ms. Watts

should have received proper medical care to address her pregnancy complications and should

have been able to privately grieve her pregnancy loss. Instead, Defendants deprived Ms. Watts of

the medical care she requested and was entitled to. And, after she miscarried, when Ms. Watts

was in the hospital and most vulnerable, Defendants reported her to the police, interrogated her

while she was tethered to her hospital bed with an IV, and caused her to be falsely charged with a felony. She was eventually cleared by a grand jury, but the harm remains. Ms. Watts now brings this lawsuit seeking redress for Defendants' misdeeds and to hold them accountable.

## INTRODUCTION

2. Brittany Watts is a nursing student and Ohio native.

3. On September 19, 2023, Ms. Watts was about 21 weeks pregnant. That day, Ms. Watts started experiencing pain and bleeding and went to St. Joseph Warren Hospital seeking care. There, doctors told her she had developed a condition called placental abruption, which endangered both her health and her pregnancy. Eight hours later, Ms. Watts had received no meaningful treatment or guidance. Devastated and scared, she returned home.

4. By morning, Ms. Watts's condition had significantly worsened. She returned to the hospital and learned that her water had broken prematurely, her cervix was dilated, and infection had set in. Her pregnancy was doomed, her doctor told her; and until the fetus was removed, Ms. Watts was at risk of hemorrhaging, sepsis, and death. Time was of the essence.

5. Defendants dragged their feet, however, allowing Ms. Watts to languish in the hospital—effectively untreated—for 10 more hours. Ms. Watts, confused and even more devastated and scared than on the previous day, again returned home untreated.

6. In the early morning hours of September 22, 2023, Ms. Watts went to the bathroom and painfully miscarried. Inside the toilet bowl was a mess of tissue, blood, and blood clots. And hidden therein was the already-deceased, under-one-pound fetus, which Ms. Watts never saw.

2

7. Confronted with this bloody mess, Ms. Watts did what was reasonable: she flushed the toilet. The toilet began overflowing. Ms. Watts did her best to clear the toilet, removing some of the bloody mess with a bucket.

8. Unwell and with her life in danger, Ms. Watts returned to St. Joseph Warren Hospital for a third time, never suspecting that anyone there would intentionally try to harm her. But Defendant MOSCHELL, a nurse, decided to call the police to falsely report that Ms. Watts had committed a crime.

9. Although Defendant MOSCHELL and her coconspirator, Defendant CARNEY, a police detective, knew Ms. Watts had committed no crime, they saw to it that she would face criminal charges for having an experience shared by hundreds of thousands of women every year.

10. To that end, as Ms. Watts lay in a hospital bed hooked up to an I.V. and awaiting urgent treatment, Defendants CARNEY and MOSCHELL conspired to interrogate Ms. Watts and accuse her of harming the fetus. They worked together to fabricate evidence to falsely implicate Ms. Watts in criminal conduct. They knowingly created reports and hospital notes that contained blatantly false information. Based on the false information provided by both coconspirators, Ms. Watts was arrested and charged with a felony: abuse of a corpse. She faced a year in prison for simply having a miscarriage at home.

11. Fortunately, the evidence was finally evaluated by a grand jury and the truth won out. The grand jury declined to return an indictment, finding instead that there was no probable cause to support the criminal charge. The prosecutor who had presented the case to the grand

3

jury publicly concurred with the grand jury's decision, stating that Ms. Watts's alleged actions did not amount to a crime.

12.     While Ms. Watts was relieved that the truth had prevailed, the closing of the criminal case did not erase the harm Defendants' misconduct caused.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to the United States Constitution and 42 U.S.C. § 1983; the federal Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd; and Ohio law, to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution and state law.

14.     This Court has jurisdiction over Plaintiff's federal claims to 28 U.S.C. § 1331 and supplemental jurisdiction over her state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the deprivation of medical care, Defendants' investigation, and Plaintiff's prosecution.

## PARTIES

16.     Plaintiff Brittany WATTS is an Ohio resident and nursing student. In September 2023, she was denied medical care at St. Joseph Warren Hospital for life-threatening pregnancy complications. After she miscarried at home, she was charged with a crime she did not commit.

17.     Defendant CITY OF WARREN is a municipal corporation in the State of Ohio.

18.     At all times relevant to this complaint, Defendant CARNEY was a police officer with the Warren Police Department, which is a department of the City of Warren, acting under color of law and within the scope of his employment.

4

19. At all times relevant to this complaint, Defendant BON SECOURS MERCY HEALTH was a Catholic healthcare system headquartered in Cincinnati, Ohio.

20. At all times relevant to this complaint, Defendant ST. JOSEPH WARREN HOSPITAL was wholly owned by Bon Secours Mercy Health. St. Joseph has an emergency department and receives Medicare funds.

21. At all times relevant to this complaint, Defendants KHAVARI and MOSCHELL were employed by St. Joseph Warren Hospital and acted within the scope of their employment. MOSCHELL was also acting in conspiracy with Defendant CARNEY and thus under color of law.

## ALLEGATIONS

### Ms. Watts Seeks Care at St. Joseph Warren Hospital

22. Before noon on September 19, 2023, Brittany Watts came to the office of her gynecologist Dr. Parisa Khavari. Dr. Khavari was an employee of St. Joseph Warren Hospital. Her office was located across the parking lot from the hospital.

23. Ms. Watts was experiencing pain and unusual vaginal bleeding. She believed she had been a few weeks pregnant (her last period was in July) but had suffered a miscarriage. She explained she had been bleeding for two days already.

24. Upon examination, Dr. Khavari determined that the fetus was significantly older than Ms. Watts had believed, estimating the fetus to be at 18 weeks' gestational age (an estimate that would later be revised upward to 21 weeks). Dr. Khavari also determined Ms. Watts's fetal membranes had broken prematurely, roughly halfway through a normal-length pregnancy.

5

25.     The fetus had a heartbeat but was physically inactive. No amniotic fluid was evident nor was there any urine in the fetal bladder. Dr. Khavari was aware, and explained to Ms. Watts, that the fetus was nonviable and that the conditions of this pregnancy meant the fetus would die.

26.     Dr. Khavari also diagnosed Ms. Watts with partial placental abruption, a dangerous condition in which the placenta begins to detach from the uterus prematurely. Ms. Watts was at risk of complete abruption and infection, as well as "hemorrhage, disseminated intravascular coagulation, sepsis, multiorgan failures, respiratory arrest, inability to control bleeding, need for hysterectomy and inability to carry any future pregnancies, worsening illness, chronic pain, permanent disability and death."

27.     The standard of care for a person in Ms. Watts's condition requires either labor induction or cervical dilation and removal of the pregnancy, a D&E, without delay. Either approach would protect the pregnant woman's health and life. The standard of care also requires that hospitals not offering D&E procedures must inform patients, when such procedures are medically indicated, of their options for obtaining the procedure elsewhere. Defendant Khavari, Ms. Watts's doctor, is an obstetrician-gynecologist who would have been aware of this standard.

28.     Nevertheless, for eight hours after receiving this difficult news, Ms. Watts received no treatment. Rather than explaining the options of induction or D&E and their pros and cons, Dr. Khavari instead offered Ms. Watts a caesarean section, which is a major operation that no responsible medical professional would perform as an initial intervention under these circumstances. Khavari did not offer induction of labor, and she did not inform Ms. Watts of the possibility of a D&E at another facility. Feeling confused, frustrated, and abandoned, Ms. Watts

wanted to go home for the night. She was receiving no meaningful treatment, and she did not believe the hospital was going to give her the care she was told she needed. She explained that she believed she could process her feelings better at home. She then left against Dr. Khavari's advice. Neither Khavari nor any of Ms. Watts's other medical providers told her how to manage her impending miscarriage at home.

### Ms. Watts Seeks Care at St. Joseph Warren Hospital a Second Time

29. Ms. Watts returned to Mercy Hospital the next morning. She was still bleeding. No amniotic fluid remained in her uterus. Her white blood cell count, which had been elevated for two days, signaled infection. Ms. Watts had advanced cervical dilation.

30. At Dr. Khavari's request, Dr. John Stewart, an obstetrician who specializes in maternal fetal medicine, examined Ms. Watts. He concurred that the fetus Ms. Watts was carrying was nonviable and would either die in utero or shortly after delivery.

31. Dr. Stewart also concluded that Ms. Watts was at a high risk of bleeding and/or of a serious infection that could kill her. Labor should be induced immediately, he explained, using misoprostol (Cytotec) or oxytociin (Pitocin). They should not wait until Ms. Watts was "on death's door" before providing this treatment. Dr. Stewart gave this view as a "physician and a cath[olic]." Ms. Watts agreed to the recommended induction.

32. Dr. Stewart's findings were memorialized in a note accessible to all medical providers at Mercy Health. Ms. Watts's treating medical staff reviewed these notes in the course of their treatment.

7

33.     Dr. Stewart, however, was not able to direct Ms. Watts's treating physician, thus he was not authorized to direct the care of miss Watts. Defendant Khavari, as she herself acknowledges, was responsible for Ms. Watts's medical care.

34.     Defendant Khavari agreed with Dr. Stewart that induction was necessary. But Khavari did not order the needed labor induction or perform a D&E. This failure was negligent and unjustified.

35.     Defendant Khavari was aware of the risk of delaying induction. She demonstrated this awareness in many ways, including by ordering numerous intravenous antibiotics to try to keep Ms. Watts's growing infection at bay.

36.     Yet despite her awareness of the risk Ms. Watts faced, Defendant Khavari chose not to treat the root cause of Ms. Watts's infection by inducing labor, a process that can be started in mere minutes with readily available medication or by performing a D&E.

37.     Having been at the hospital for around 10 hours during her second day there, again without receiving needed treatment to bring her doomed pregnancy to a close, Ms. Watts came to believe that, no matter how long she waited, she would not get the induction she had been told she needed. Ms. Watts was confused, tired, scared, frustrated, ill, and sad. She saw no reason to wait any longer and, naturally, did not want to continue waiting for no reason, especially in the hostile environment she found herself in. She told staff she wanted to leave and did so.

38.     Despite knowing that Ms. Watts had left the hospital once already and had not received medical advice about how to manage her worsening condition, still no medical provider told her how to manage her impending miscarriage at home. Ms. Watts did not know what the

8

fetal remains would look like or how to dispose of them. Defendant Khavari had merely told her that the fetus would be "very small."

39.     As the Hospital acknowledged, Defendant Moschell's personal view and bias negatively impacted her treatment of Ms. Watts. The next day, Defendant Moschell was warned that such an approach would not be "further tolerated."

***Ms. Watts Miscarries at Home***

40.     Before dawn on September 22, 2023, Ms. Watts woke up in a medical crisis. She was doubled over in pain but made it to the bathroom.

41.     After a time, Ms. Watts felt like she was having a painful bowel movement. She then saw the toilet was full of tissue, blood, and blood clots.

42.     Ms. Watts correctly believed she had miscarried. She heard no sound following the initial discharge, and when she eventually looked at the toilet, she saw no movement or recognizable fetus. Nothing suggested she had delivered a living fetus, and indeed she had not. She thought the clots and tissue visible in the toilet bowl were the fetal remains. She did not believe the fetus was intact, and understandably, she did not want to see more.

43.     Ms. Watts collapsed on the floor in her bathroom. She lay there for nearly an hour, bleeding. She was terrified and disoriented and thought she might die. She was distraught and in shock. Her toilet was full of blood, her bathroom floor was covered in blood, she continued to lose blood, and she had just miscarried a baby she had wanted.

44.     Eventually, Ms. Watts flushed the toilet, which began to overflow. She attempted to scoop up the overflowing contents with a bucket and cleaned the bathroom as best she could.

In other words, Ms. Watts attempted to manage her miscarriage at home, as so many other women have and as no one at the hospital ever advised against.

45.     Unbeknownst to Ms. Watts, the fetus, which had died in utero a day or more earlier, was intact. Weighing a little less than one pound, it had become lodged in the toilet's P-trap.

***Ms. Watts Returns to St. Joseph for a Third Time***

46.     Ms. Watts eventually collected herself. She initially believed her medical ordeal was at an end, but she was wrong. In reality, she had lost a dangerous amount of blood, was suffering from an infection, and still had the placenta inside her uterus. Telephone and hospital records show she called Defendant Khavari's office and the hospital that morning and reported her miscarriage. No one from Khavari's office or the hospital requested a wellness check for Ms. Watts or the fetus following her call.

47.     At the urging of a friend who recognized her medical peril, Ms. Watts reluctantly agreed to return to the hospital.

48.     Unbeknownst to Ms. Watts, Defendant Moschell, fresh off her admonishment the previous day for allowing her bias and personal views to interfere with Ms. Watts's care, had been waiting for Ms. Watts to return to the hospital. She had been communicating about Ms. Watts over the course of at least two hours with a fellow nurse.

49.     When Ms. Watts arrived at St. Joseph without the fetus, Defendant Moschell texted the other nurse, "We have to have a fetus or she will be charged," which Moschell admits means charged with a crime. Defendant Moschell made this statement despite no law, policy, or

10

guidance that required a patient who miscarried at home to bring the product of conception or fetal remains to the hospital.

50.     Defendant Moschell knew that the fetus Ms. Watts had been carrying was not alive. She knew that Ms. Watts's pregnancy had been nonviable and that she had delivered a fetus that had no chance of survival. She also knew directly from Ms. Watts that there had been no indication of fetal life during or following the miscarriage. Moschell had no reason to believe Ms. Watts had committed a crime.

51.     Although Ms. Watts had never been instructed to bring the fetal remains with her to the hospital in the event of a miscarriage at home, hospital records reflect that on September 22—after hospital staff lied to Ms. Watts and told her the fetus was needed—she agreed to have someone retrieve the remains from her home and bring them to the hospital. Ms. Watts never got the chance to follow through, though, because Defendant Moschell was already taking steps to turn this personal tragedy into a police matter. First Moschell tried to enlist a hospital police officer to go to Ms. Watts's home to investigate. The officer explained that he had no jurisdiction outside the hospital and that, if a potentially living baby was at risk, a wellness check could be requested. Again, Moschell knew Ms. Watts's fetus was not living.

52.     The Officer did not tell Moschell that he believed a wellness check was in order. He did not have the information to make such a judgment. Nor did he direct, instruct, or advise Moschell to report a crime or to call the police for any other reason.

53.     Unsatisfied with her conversation with the officer, Defendant Moschell sought another way to initiate a criminal investigation into Ms. Watts and so contacted the hospital's risk management director. Like the officer, the risk management director told Moschell that the

only reason to call police would be to request a wellness check, which, again, is for people who are potentially living.

54.     The risk management director did not direct, instruct, or advise Moschell to seek a wellness check or to call the police for any other reason. The risk management director did not believe or advise Moschell that the hospital was under an obligation to alert authorities or to locate or retrieve the fetus. The risk management director did not believe a crime had been committed.

55.     Defendant Moschell nevertheless called the police that afternoon. She did not call an emergency number because she knew no emergency existed, and she did not request an ambulance. She also never requested a wellness check, but she told the dispatcher Ms. Watts had given birth at home and had come to the hospital without the baby, falsely adding that Ms. Watts did not want the baby and so did not care if it were alive. Moschell never mentioned the nonviability of the fetus or the doomed nature of the pregnancy. She gratuitously told the dispatcher that Ms. Watts had not had prenatal care. Only later did Moschell acknowledge to a dispatcher that the baby was "certainly" dead.

56.     Despite that Defendant Moschell knew the fetus was not viable, could not be saved, and had been delivered hours earlier without making any sound or movement, she falsely implied to the police dispatcher that Ms. Watts had done something wrong or illegal. She also disclosed private information about Ms. Watts's health and pregnancy without justification, including facts related to her prenatal care.

57.     Soon after, as Ms. Watts lay in her hospital bed bleeding, her home security app dinged. She watched as approximately four police cars, with lights on, approach her home.

58. Ms. Watts was alarmed. Another nurse told Ms. Watts that there was a biohazard at her home and that, "per policy," police had been called, but this was not true. The nurse however, believed this false information to be true because her supervisor, Defendant Moschell, had told her so. Defendant Moschell had also told the nurse that risk management had directed her to call the police on Ms. Watts when, in reality, Defendant Moschell had made that decision herself.

59. Defendant Moschell's call to police was not about a wellness check or biohazard but was instead to report a supposed crime. Accordingly, Defendant Carney came to the hospital to interrogate Ms. Watts. He was already familiar with the charge of "abuse of corpse" and had previously sought to bring this charge against other women.

***The Interrogation***

60. Defendant Carney arrived at the hospital without a warrant. Thus, the hospital should not have obligated any patient to meet him. Defendant Moschell, however—consistent with her belief that Ms. Watts should "be charged"—agreed to facilitate Defendant Carney's investigation of Ms. Watts.

61. Defendant Moschell knew that Ms. Watts was in a health crisis. The placenta was still in her uterus, and induction to cause its expulsion was already under way. Moschell knew surgery was likely needed. It was also obvious to any lay person that Ms. Watts was in distress and in the midst of receiving medical care.

62. Defendants Carney and Moschell spoke with each other for at least 20 minutes before entering Ms. Watts's room. The two learned during this conversation that they shared

objectives, including to undertake a criminal investigation into Ms. Watts and to obtain admissions from her concerning her miscarriage.

63.    During this preliminarily conversation, which was only partially recorded,[1] Defendant Carney asked Defendant Moschell whether Ms. Watts was of "sound mind." Defendant Moschell responded "yes," but added derisively and without evidence that Ms. Watts has "deep issues," is "odd," was "not grieving," and "just wanted the baby out of her." Neither Carney nor Moschell sought the views of any doctor on Ms. Watts's fitness to be questioned.

64.    During the same conversation, Defendants Carney and Moschell agreed to question Ms. Watts together. When Carney asked Moschell if she would like to join him, she enthusiastically responded, "I'd love to." This agreement to invade Ms. Watts's hospital room while she was in medical crisis, unable to leave and unable to give meaningful consent, and to question her as part of a criminal inquiry, was an agreement to violate Ms. Watts's rights, one that risked compromising her care. Defendants Carney and Moschell also jointly intended for this interrogation to lead to Ms. Watts being charged with some crime. Nothing justified their urgent-yet-lengthy questioning of a woman awaiting surgery.

65.    Having reached agreement, the pair entered Ms. Watts's room. She was in her hospital gown in her hospital bed, hooked up to an I.V. and monitoring machines. The two closed the door.

---

[1] The version of this recording produced by Defendant City of Warren in this litigation begins mid-sentence, as Carney and Moschell are speaking in the hallway outside Ms. Watts's hospital room. The two court reported transcripts of the recording that Defendants produced in discovery omits the hallway discussion all together.

14

66. Defendants Carney and Moschell then jointly interrogated Ms. Watts for nearly an hour. While they told her she was free to leave, she was in no condition to do so, as both knew. Acknowledging this, Defendant Carney told her he would leave instead if she wanted, but he also falsely assured her she was in no trouble and had nothing to fear. Defendant Moschell's participation in this interrogation violated hospital policy.

67. Ms. Watts told them she was scared and nervous. She felt disoriented, trapped, traumatized, and emotionally distraught, making her vulnerable to police influence and emotional distress.

68. Defendant Carney continued to pretend to be on Ms. Watts's side, telling her multiple times that she was not in trouble. Defendant Moschell also told Ms. Watts that she was not in trouble and that she and Defendant Carney were there together to help her.

69. An example of Defendants Carney and Moschell's manipulative ploy, undertaken jointly, to give Ms. Watts a false sense of security follows:

> MS. WATTS: I'm scared, like –
>
> MS. MOSCHELL: Don't be scared.
>
> DETECTIVE CARNEY: What are you scared of?
>
> MS. MOSCHELL: I told you we're here to help you; right?
>
> DETECTIVE CARNEY: Brittany, Brittany, I – I would tell you if you needed to be scared; okay?

70. Based on the totality of these circumstances, Ms. Watts felt that she had no real choice but to talk to Defendants Carney and Moschell about what had happened earlier that day.

71.     During the interrogation, Defendants Carney and Moschell asked Ms. Watts leading and suggestive questions, eliciting statements that Defendant Carney would later misrepresent to use against her in criminal proceedings. At points during the interrogation, Defendants Carney and Moschell stepped out of the room to continue discussing their strategy.

72.     A disoriented Ms. Watts at all times answered Defendants' questions to the best of her knowledge and ability. She explained that if the fetal remains had not been scooped up in the bucket, as she had believed, they must still be in the toilet. But Defendants Carney and Moschell would not accept her answers. Instead, without basis, they accused her of nefarious conduct, suggesting that perhaps Ms. Watts had birthed a live baby and hidden it "in a cabinet." Moschell falsely told Ms. Watts the baby could still be alive.

73.     Defendants' treatment of Ms. Watts was extreme and outrageous.

74.     Defendant Carney knew there was no basis to charge Ms. Watts any crime, including for the crime of abusing a corpse.

75.     Nevertheless, Defendant Carney later provided flatly false information in police reports, including that Ms. Watts had seen and touched the fetus, writing that she told him she had "taken the fetus out of the toilet and placed it in a black bucket." Defendant Carney also omitted material information from his reports, including that Ms. Watts never saw the fetus, that she believed it had come out in bits and pieces, and that she had taken no steps intended to cause any harm to the fetus.

76.     In sum, Defendant Carney set out to present a false version of the facts to make it look like a crime had been committed: that Ms. Watts had given birth at home to a live baby and caused it to die or, at a minimum, had abused it after its death.

16

***Ms. Watts Is Charged with Felony "Abuse of Corpse"***

77.     The autopsy that was ultimately conducted revealed "prolonged intrauterine fetal demise," indicating that Ms. Watts's fetus had died in utero. In other words, as had been apparent at the time of delivery, the autopsy confirmed that Ms. Watts had miscarried an already-deceased fetus.

78.     Upon learning the fetus had died in utero, Defendant Carney sought a way to charge Ms. Watts with a crime nevertheless, a goal he shared with his co-conspirator Defendant Moschell, who had wanted Ms. Watts to "be charged" without knowing with what. Carney ultimately filed charges through Warren Municipal Court for felony "Abuse of a Corpse." To do so, Carney used false information provided to him by Defendant Moschell, and he twisted information gathered during his and Moschell's interrogation of Ms. Watts. A reasonable officer would have known that the true circumstances of Ms. Watts's pregnancy loss did not create probable cause to arrest or charge Ms. Watts for any crime.

79.     Nevertheless, on October 5, 2023, while Ms. Watts was grieving the loss of her pregnancy, Defendant Carney, continuing his extreme, outrageous, and malicious conduct, arrested her at her home. He handcuffed her in the driveway and put her in his squad car, despite that he could have simply asked her to turn herself in at the station.

80.     Ms. Watts was terrified, angry, and confused; she thought she was going to jail and did not know when she would get out. At the police station, Defendant Carney left Ms. Watts to sit, still handcuffed, for about an hour before taking her to the courtroom where she would be arraigned.

81.     Consistent with her innocence, Ms. Watts pleaded not guilty.

17

82.     Ms. Watts was devastated. She had learned that she faced up to a year in prison for experiencing a medical trauma through no fault of her own.

83.     Defendants' treatment of Ms. Watts compounded the trauma of her pregnancy loss and denied her the ability to mourn that loss on her own terms.

84.     Word of Ms. Watts's arrest spread quickly on the news and social media; Ms. Watts's home address and phone number were publicized without Ms. Watts's knowledge or consent. Ms. Watts received unsolicited phone calls at all hours of the day, and reporters showed up at her house without warning.

85.     The whole ordeal made Ms. Watts fearful and anxious; she largely stayed inside her home because of all the publicity.

*Preliminary Hearing*

86.     After Ms. Watts was arraigned, Defendant Carney met with prosecutors to discuss the evidence and to prepare Defendant Carney for the preliminary hearing.

87.     Even though he knew Ms. Watts had miscarried a fetus that she never saw, and which had died in utero, Defendant Carney set out to present a version of events in which Ms. Watts had given birth to a baby she thought may be alive and had then abused it.

88.     When Defendant Carney testified at the preliminary hearing, he continued to misleadingly represent Ms. Watts's statements from her coercive interrogation.

89.     Defendant Carney also made flatly false statements, including but not limited to saying that Ms. Watts had wanted to deliver her baby into the toilet and may have thought it was alive at birth. He also falsely suggested that Ms. Watts's miscarriage was not a natural

18

phenomenon. He repeatedly referenced information that he said he had received from Defendant Moschell.

90.     A recording of Defendants Carney and Moschell's hospital-bed interrogation was not presented at the preliminary hearing. A copy of the recording was not given to Ms. Watts's attorney prior to the hearing for her to independently review. The judge heard only Carney's characterizations of the interrogation that he and Moschell had jointly conducted.

91.     Based on the incomplete and misleading evidence presented at the hearing, the municipal judge bound the case over to the county for grand jury consideration. In finding probable cause, the judge openly acknowledged that he did not understand how the law applied to the facts of this case and would leave these complexities for others to sort out.

92.     Months later, on January 11, 2024, a grand jury declined to indict Ms. Watts, determining no probable cause supported the charge against her. She was finally free of the criminal case Defendants had engineered. The county prosecutor announced publicly that he agreed with the grand jury that there was no probable cause to believe she had committed a crime.

### Ms. Watts's Damages

93.     Even though the criminal case has concluded, Ms. Watts has not recovered.

94.     As described in this Complaint, Defendants' actions, both jointly and severally, deprived Ms. Watts of her rights protected under the United States Constitution, federal law, and state law. As a proximate result of Defendants' actions, Ms. Watts suffered deprivation of liberty, reputational harm, public humiliation, distress, pain, and suffering, for which she is entitled to compensatory damages, including damages for mental and emotional distress.

19

95.     Defendants' failures to treat Ms. Watts's medical condition in a timely manner caused her extreme physical harm, including pain, severe bleeding, and infection, as well as severe emotional distress and harm.

96.     Defendants' actions causing Ms. Watts to be arrested and charged with felony abuse of corpse caused her loss of liberty, financial loss, loss of privacy, reputational harm, and severe emotional distress and harm.

97.     Ms. Watts provided timely notice of her medical claims, described below, to Defendants via certified mail on August 2, 2024, return receipt requested.

## CLAIMS

### COUNT I – Fourth and Fourteenth Amendments – False Arrest and Prosecution without Probable Cause – 42 U.S.C. § 1983
(against CARNEY and MOSCHELL)

98.     Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

99.     Without probable cause, Defendants CARNEY and MOSCHELL caused criminal proceedings to be instituted and continued against Ms. Watts.

100.    Probable cause was lacking in numerous ways. For example, Defendants were aware that Ms. Watts lacked the requisite mental state. Ohio's felony abuse of a corpse statute is not a strict liability crime, and Defendants knew that Ms. Watts took no action intended to harm or abuse her deceased fetus.

101.    Probable cause to arrest and charge Ms. Watts for abuse of corpse also was lacking because, in Ohio, a fetus does not have legal status until viability, meaning a pre-viable deceased fetus is not a "corpse."

102.    Consistent with her notion that Ms. Watts would have to "be charged," Defendant MOSCHELL falsely suggested to the police that Ms. Watts had committed criminal activity.

103.    Defendant CARNEY accused Ms. Watts of criminal activity knowing, or having reason to know, that those accusations were not supported by probable cause, and he made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings without any probable cause for doing so, in violation of Ms. Watts's rights secured by the Fourth and Fourteenth Amendments.

104.    Furthermore, Defendant CARNEY intentionally and/or recklessly withheld from and misrepresented to prosecutors additional facts that further vitiated probable cause against Ms. Watts, as set forth above.

105.    The misconduct described in this Count was undertaken intentionally, with reckless indifference to the rights of others.

106.    The legal proceedings terminated in Ms. Watts's favor.

107.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain, suffering, and deprivation of liberty.

**COUNT II**
**Fifth and Fourteenth Amendments – Unconstitutional Interrogation – 42 U.S.C. § 1983**
(against CARNEY and MOSCHELL)

108.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

109.    As described more fully above, Defendants CARNEY and MOSCHELL, acting under color of law, conducted an unconstitutional interrogation of Ms. Watts, which caused

21

Ms. Watts to make involuntary statements that were then twisted to appear inculpatory and presented against her during criminal proceedings, in violation of her rights secured by the Fifth and Fourteenth Amendments.

110.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally.

111.    As a result of Defendant CARNEY's and Defendant MOSCHELL's misconduct described in this Count, Ms. Watts suffered injuries, including but not limited to loss of liberty and emotional distress.

### COUNT III – Fourteenth Amendment – Due Process – 42 U.S.C. § 1983
(against CARNEY and MOSCHELL)

112.    Ms. Watts incorporates each paragraph of this Complaint as if fully restated here.

113.    Defendants CARNEY and MOSCHELL intentionally fabricated evidence against Plaintiff that was then used to deprive her of liberty in violation of the Due Process Clause.

114.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain, suffering, and deprivation of liberty.

### COUNT IV – Conspiracy – 42 U.S.C. § 1983
(against CARNEY and MOSCHELL)

115.    Ms. Watts incorporates each paragraph of this Complaint as if fully restated here.

116.    Defendants CARNEY and MOSCHELL explicitly agreed between themselves to act in concert to interrogate Ms. Watts, despite a complete lack of probable cause or any other justification to do so, and despite that Ms. Watts was in no condition to voluntarily consent to an interrogation, thereby agreeing to deprive Ms. Watts of her constitutional rights, including her

22

rights to be free from unreasonable seizure and prosecution without probable cause, all as described in the various paragraphs of this Complaint.

117.    In this manner, Defendants, acting in concert, conspired by agreement and concerted action to accomplish an unlawful purpose by unlawful means.

118.    In furtherance of the conspiracy, the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—e.g., agreeing to jointly interrogating Ms. Watts in her hospital bed; carrying out the interrogation; making false promises of leniency during the interrogation; and instigating Ms. Watts's arrest and prosecution—and were otherwise willful participants in joint activity.

119.    As a direct and proximate result of the prior agreement and actions in furtherance of the conspiracy referenced above, Ms. Watts's rights were violated, and she suffered injuries, including but not limited to loss of liberty and emotional distress.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally.

### COUNT V – EMTALA Violation
(against BON SECOURS MERCY HEALTH and ST. JOSEPH WARREN HOSPITAL)

121.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

122.    Congress enacted Emergency Medical Treatment and Labor Act (EMTALA) in 1986 to ensure that *everyone* who comes to an emergency department at a Medicare-funded hospital can access the emergency care they need. In 1989, Congress amended the statute to clarify and extend protections for pregnant people, and the statute's plain text requires emergency departments to provide stabilizing treatment to pregnant individuals in labor,

pregnant individuals who have emergency conditions unrelated to labor, and individuals who need emergency treatment or manage pregnancy loss. For some pregnant individuals experiencing a medical emergency, including prolonged miscarriages where the pregnancy is nonviable but fetal cardiac activity remains, the necessary stabilizing treatment is terminating the pregnancy in a medical setting, where healthcare providers can guard against the risks of infection, hemorrhage, and stroke (among others)

123.    EMTALA applies to every hospital that has an emergency department and participates in Medicare. 42 U.S.C. § 1395cc(a)(1).

124.    As discussed above, St. Joseph Warren Hospital has an emergency department and participates in Medicare.

125.    EMTALA obligates covered hospitals to provide any "individual" that has an "emergency medical condition" with either (a) "such further medical examination and such treatment as may be required to stabilize the medical condition"; or (b) under limited circumstances, a medically beneficial "transfer" to another facility. 42 U.S.C. § 1395dd(b)(1) (the "Stabilization Requirement").

126.    Violations of EMTALA create civil liability. 42 U.S.C. § 1395dd(d).

127.    Ms. Watts's condition upon arrival at Defendant ST. JOSEPH WARREN HOSPITAL on September 20, 2023, qualified as an emergency medical condition under EMTALA.

128.    Defendant ST. JOSEPH WARREN HOSPITAL was aware that Ms. Watts had at least one emergency medical condition.

24

129.    Although induction or a D&E procedure were medically necessary, Defendant ST. JOSEPH WARREN HOSPITAL failed to provide medically necessary treatment to Ms. Watts within the meaning of EMTALA and then constructively released her..

130.    Ms. Watts suffered physical, emotional, and financial harm as a result of Defendant ST. JOSEPH WARREN HOSPITAL's denial of care, including a traumatic miscarriage and multi-day hospital stay that could have been avoided.

**COUNT VI – State Law Claim – Malicious Prosecution**
(against CARNEY, MOSCHELL, BON SECOURS
MERCY HEALTH, and ST. JOSEPH WARREN HOSPITAL)

131.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

132.    As described more fully above, Defendants CARNEY and MOSCHELL individually, jointly, and/or in conspiracy with one another, falsely accused Ms. Watts of criminal activity, knowing those accusations were without probable cause, and created evidence and made statements with the intent of exerting influence to institute and continue the judicial proceedings.

133.    In the alternative, Defendants CARNEY and MOSCHELL took those actions with reckless disregard for the truth.

134.    These Defendants caused Ms. Watts to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued for an improper purpose, resulting in injury.

135.    Defendants' statements regarding Ms. Watts's alleged culpability were made with knowledge, and/or with reckless disregard for the truth, that those statements were false and/or misleading due to the omission of material facts.

25

136.    These Defendants were aware, and/or had reason to know that, as described more fully above, no true or reliable evidence implicated Ms. Watts in a crime, and all allegedly inculpatory evidence was obtained by coercion and/or fabricated.

137.    The legal proceedings terminated in Ms. Watts's favor.

138.    The misconduct described in this Count was undertaken intentionally and with reckless indifference to the rights of others.

139.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering.

### COUNT VII – State Law Claim – Intentional Infliction of Emotional Distress
(against CARNEY, MOSCHELL, BON SECOURS
MERCY HEALTH, and ST. JOSEPH WARREN HOSPITAL)

140.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

141.    Defendant MOSCHELL and the other nurses entrusted with Ms. Watts's care on September 20 knew or should have known their actions, including interfering with two doctors' plans of treatment to induce Ms. Watts to prevent her from having what they perceived to be an abortion, would cause her severe emotional distress.

142.    As an independent source of emotional distress, Defendants, including Defendants MOSCHELL and CARNEY, knew or should have known that their actions, including interrogating Ms. Watts in her hospital bed when she was in medical distress and thereafter causing her arrest and criminal proceedings based on false and fabricated evidence, would cause her severe emotional distress.

26

143.    Defendants' conduct as described above was extreme and outrageous such that it went beyond all possible bounds of decency and would be considered completely intolerable in a civilized community.

144.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering that no reasonable person could be expected to endure.

### COUNT VIII – State Law Claim – Intentional Infliction of Emotional Distress
(against KHAVARI, BON SECOURS MERCY
HEALTH, and ST. JOSEPH WARREN HOSPITAL)

145.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

146.    Defendant KHAVARI knew or should have known that denying Ms. Watts medical care, permitting a hostile environment, and failing to inform her of her options for treating her emergency pregnancy complications would result in severe emotional distress.

147.    Defendant's conduct as described above was extreme and outrageous such that it went beyond all possible bounds of decency and would be considered completely intolerable in a civilized community.

148.    As a direct and proximate result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including pain and suffering that no reasonable person could be expected to endure.

### COUNT IX – State Law Claim – Negligent Infliction of Emotional Distress
(against KHAVARI, BON SECOURS MERCY
HEALTH, and ST. JOSEPH WARREN HOSPITAL)

149.    Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

150.    Ms. Watts witnessed and/or experienced a real or impending danger.

27

151.    As alleged below, Defendant KHAVARI breached her duty to care for Ms. Watts, putting her in danger.

152.    As a direct, proximate, and reasonably foreseeable result of this misconduct, Ms. Watts sustained, and continues to sustain, injuries as set forth above, including deprivation of liberty, pain, and suffering.

**COUNT X – State Law Claim - Medical Negligence**
(against KHAVARI, BON SECOURS MERCY
HEALTH, and ST. JOSEPH WARREN HOSPITAL)

153.    The applicable standard of care required Defendant KHAVARI to obtain Ms. Watts's informed consent prior to proceeding with a treatment plan. This meant that Defendant KHAVARI was required to apprise Ms. Watts of the treatment options for her pregnancy complications: immediate induction or, if warranted, a D&E procedure. Instead, on September 19, 20203, Defendant KHAVARI offered Ms. Watts a cesarean section, which was not medically indicated, and did not inform Ms. Watts of better options.

154.    Defendant KHAVARI also failed to meet the standard of care by failing to order induction of labor for Ms. Watts on September 20, even after Dr. Stewart stressed the need to move quickly and the perils of waiting. This delay ignored evidence-based medicine which required Ms. Watts to be treated expeditiously.

155.    Defendant KHAVARI further breached the standard of care by tolerating and/or facilitating an inhospitable environment. Defendant KHAVARI knew that nursing staff was opposed to induction and considered it abortion, and she knew that frivolous ethics consultations were being initiated by nurses to prevent induction. Defendant KHAVARI had the authority and responsibility to move forward with induction despite these attempts to obstruct, but she did

28

nothing. She also ignored Ms. Watts's preferences, mental distress, and known psychological discomfort at the hospital.

156.     These failures, among others, directly and/or proximately caused Ms. Watts to sustain, and continue to sustain, injuries as set forth above, including loss of liberty, loss of privacy, and suffering.

157.     Defendant KHAVARI's breeches of the standard of care are attested to in the attached affidavit from a highly qualified obstetrician-gynecologist.

**COUNT XI – State Law Claim –**
**Unauthorized Disclosure of Confidential Medical Information**
(against MOSCHELL, BON SECOURS MERCY
HEALTH, and ST. JOSEPH WARREN HOSPITAL)

158.     Ms. Watts incorporates each paragraph of this complaint as if fully restated here.

159.     As discussed above, Defendant MOSCHELL and Defendant HOSPITAL gained protected health information from Ms. Watts while she was being treated at St. Joseph Hospital.

160.     Defendant MOSCHELL and Defendant HOSPITAL engaged in unauthorized, unprivileged disclosure of Ms. Watts's protected information to law enforcement.

161.     This disclosure was not made pursuant to a statutory mandate or common-law duty, nor was it necessary to protect or further a countervailing interest that outweighed Ms. Watts's interest in confidentiality. The disclosure violated Ms. Watts's right to confidentiality under federal and state statutes and regulations.

162.     As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including loss of liberty, loss of privacy, and suffering.

**COUNT XII – State Law Claim – Conspiracy**
(against CARNEY, MOSCHELL, BON SECOURS
MERCY HEALTH, and ST. JOSEPH WARREN HOSPITAL)

163.    Each paragraph of this Complaint is incorporated as if restated fully herein.

164.    As described more fully in the preceding paragraphs, Defendants CARNEY and MOSCHELL, acting in concert with other known and unknown coconspirators, conspired by agreement and concerted action to accomplish an unlawful purpose by unlawful means. Their unlawful purposes included the initiation of a criminal prosecution of Ms. Watts without probable cause, and their unlawful means included the invasion of Ms. Watts's medical privacy and the involuntary interrogation of her.

165.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity, including but not limited to Ms. Watts's joint interrogation, false arrest, and the emotional distress intentionally inflicted upon her.

**COUNT XIII – State Law Claim – *Respondeat Superior***
(against ST. JOSEPH WARREN HOSPITAL, BON
SECOURS MERCY HEALTH, and CITY OF WARREN)

166.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

167.    In committing the acts alleged in the preceding paragraphs, Defendants MOSCHELL and KHAVARI were employees, members, and/or agents of Bon Secours Mercy Health and/or St. Joseph Warren Hospital, acting at all times within the scope of their employment. The same is true of and the nurses involved in Ms. Watts's care.

168.    Consequently, Defendants BON SECOURS MERCY HEALTH, ST. JOSEPH WARREN HOSPITAL, and CITY OF WARREN are liable for the actions of their employees that violate state law.

30

169. In committing the acts alleged in the preceding paragraphs, Defendant CARNEY was an employee of the CITY OF WARREN, acting at all times within the scope of his employment.

170. Consequently, Defendant CITY OF WARREN is liable for its employee's actions that violate state law.

### COUNT XIV – State Law Claim – Indemnification
(against CITY OF WARREN)

171. Each paragraph of this Complaint is incorporated as if restated fully herein.

172. Ohio law provides that political subdivisions are directed to pay any tort judgment for compensatory damages for which employees are liable as a result of actions taken within the scope of their employment activities.

173. Defendant CARNEY was a City of Warren employee, who acted within the scope of his employment in committing the misconduct described herein.

174. Defendant CITY OF WARREN is responsible for paying any judgment for compensatory damages entered against Defendant CARNEY.

### JURY DEMAND

Plaintiff Brittany Watts hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Watts respectfully requests that judgment be entered for Ms. Watts against Defendants jointly and severally for the damages described above.

31

Dated: July 6, 2026

Respectfully Submitted,


/s/ Julia Rickert
*One of Plaintiff's Attorneys*

Jon Loevy
Julia Rickert*
Rachel Brady*
Renee Spence
Theresa Kleinhaus*
Loevy + Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Phone: 312.243.5900
Fax: 312.243.5902
julia@loevy.com
*Admitted *Pro Hac Vice*