UNITED STATES DISTRICT COURT

FOR THE NORTHEN DISTRICT OF OHIO

EASTERN DIVISION

CIVIL NO.: 4:25-CV-00049

| | |
|---|---|
| BRITTANY WATTS,<br>Plaintiff,<br>VS.<br>BON SECOURS MERCY HEALTH ET AL.,<br>Defendants. | VIDEOTAPED DEPOSITION<br>OF<br>CONNIE MOSCHELL |

Deposition taken before me, Gina M. DeProfio, a Notary Public within and for the State of Ohio, on March 17, 2026, pursuant to Notice and at the time and place therein specified, to be used pursuant to the Rules of Civil Procedure or by agreement of counsel in the aforesaid cause of action, pending in the United States District Court for the Northern District of Ohio, Eastern Division.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:

Julia Rickert, Esq.
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
julia@loevy.com

(Via Zoom)
Rachel Brady, Esq.
Renee Spence, Esq.
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
brady@loevy.com
spence@loevy.com

On Behalf of Defendants Bon Secours Mercy Health, Mercy Health Youngstown, LLC, dba St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino, Parisa Khavari, Suzanne Zupko and Fred Raines:

Thomas A. Prislipsky, Esq.
Reminger Co., LPA
950 Windham Court, Suite 200
Youngstown, Ohio 44512
(330) 744-1311
tprislipsky@reminger.com

APPEARANCES OF COUNSEL

On Behalf of City of Warren and Detective Nick Carney:

(Via Zoom)
John Pinzone, Esq.
Mazanec, Raskin & Ryder Co., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139
(440) 248-7906
jpinzone@mrrlaw.com

Also Present:
Mr. William Carney, Videographer

STIPULATIONS

It is stipulated and agreed by and between counsel for the parties hereto that the deposition may be taken at this time, 9:16 a.m., March 17, 2026, held via at the offices of Atty. Thomas Prislipsky, 950 Windham Court, Suite 200, Youngstown, Ohio.

It is further stipulated and agreed by and between counsel that the deposition may be taken in shorthand by Gina M. DeProfio, a Notary Public within and for the State of Ohio, and may be by her transcribed with the use of computer-assisted transcription; that the witness' signature to the finished transcript of her deposition is not waived; and that the deposition will be available for the witness to read and sign the finished transcript of her deposition.

INDEX

CROSS EXAMINATION BY MS. RICKERT - PAGE 6

OBJECTIONS AND MOTIONS:

BY MR. PRISLIPSKY: PAGE(S) 13, 28, 29, 31, 34, 35, 36, 38, 39, 40, 41, 42, 43, 45, 47, 48, 49, 50, 53, 54, 55, 56, 57, 58, 72, 73, 74, 75, 76, 77, 80, 81, 82, 83, 85, 87, 88, 89, 90, 91, 92, 97, 98, 99, 100, 101, 102, 103, 105, 106, 107, 108, 109, 113, 114, 115, 118, 120, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 158, 159, 161, 162, 163, 169, 171, 173, 174, 175, 177, 184, 185, 186, 187, 188, 191, 195, 197, 198, 199, 200, 203, 204, 207, 211, 214, 216, 217, 221, 222, 223, 224, 229, 230, 231, 232, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 250, 252, 253, 255, 256, 257, 258, 260, 263, 268, 271, 273, 274, 276, 279, 280, 284, 285, 286, 290, 294, 296, 297, 299, 300, 301, 302, 303, 304, 306, 309, 310, 313, 314, 315, 316, 325, 326, 328, 337, 338, 339, 341, 342, 347, 348, 349, 351, 353, 356, 357, 358, 361, 362, 363, 364, 366, 368, 370, 375, 377, 379, 380, 382, 383, 384, 386, 388, 389, 390, 395, 400, 401

PLAINTIFF'S EXHIBITS INTRODUCED:

EXHIBIT 1 - PAGE 49

EXHIBIT 2 - PAGE 212

EXHIBIT 3 - PAGE 259

EXHIBIT 4 - PAGE 305

EXHIBIT 5 - PAGE 335

WHEREUPON,
CONNIE MOSCHELL,
Called as a witness, having been first duly sworn by the Notary Public to testify the truth, the whole truth and nothing but the truth, was examined and testifies as follows:

CROSS EXAMINATION
BY MS. RICKERT:

Q. Okay. Good morning, Ms. Moschell.
A. Good morning.
Q. Could -- could you state and spell your name for the record?
A. Connie Moschell, C-O-N-N-I-E, M-O-S-C-H-E-L-L.
Q. All right. And I am Julia Rickert. I represent the plaintiff in this case, Brittany Watts.
A. Okay.
Q. Have you ever sat for a deposition before?
A. No.
Q. Okay.
MR. PRISLIPSKY: Wait. Think about that.
A. I -- I -- I was unsure. I was in an

auto accident years ago, and I think they may have done a deposition then --
Q. Okay.
A. -- but I don't recall.
Q. Okay.
MR. PRISLIPSKY: Can I interject as well?
MS. RICKERT: Sure, but generally --
MR. PRISLIPSKY: I -- I --
MS. RICKERT: -- I would like for you to save your things for when it's your turn to ask the questions and then you can --
MR. PRISLIPSKY: Fair enough.
MS. RICKERT: -- get clarity and stuff, but go ahead.
MR. PRISLIPSKY: The meconium case with me.
A. Oh, I did do a deposition.
MR. PRISLIPSKY: You did.
A. I'm so sorry. Yes, I'm -- I did.
Q. Okay. So another medical case?
A. Yes.
Q. In which you were represented by Mr. --
A. Yes.

Q. -- Prislipsky? Okay. And what was that case about?
A. That was a birth of a baby with meconium.
Q. Uh-huh. And it was a medical malpractice claim?
A. I believe so.
Q. Okay. And how long ago were you deposed in that case?
A. Maybe a couple years, two or three years ago.
Q. Okay. And then you also may have been deposed in connection with an auto accident?
A. And that was in 1994, yes.
Q. Okay. So quite -- quite a lot earlier?
A. Yes.
Q. All right. Well, I am going to -- well, first let me ask: The meconium case, were you a defendant in that case?
A. I was a nurse that took care of her prior to the incident, but I was then dismissed, I believe. I never had any further -- I never went to court or anything.
Q. Okay. Were you named as a defendant in that case?

A. Yes.
Q. You were. Okay. And you're not sure how it resolved?
A. I don't know.
Q. All right. And in that case, what had happened to the baby as the result of meconium?
A. I don't recall --
Q. Okay.
A. -- the details.
Q. And meconium is fetal fecal matter? Yes?
A. Yes, yes.
Q. And it can be dangerous if inhaled by a baby?
A. It depends on the situation.
Q. Okay. Do you know what the basis of the -- the claim against you was in that case?
A. I don't. I don't.
Q. Okay. All right. Let's talk about some deposition basics, and --
A. Okay.
Q. -- some of the main things we want to do is make it easy for the court reporter to take down what we're saying. So when I ask a question, try to wait for me to finish asking, even if you think you know where I'm

going so that we don't talk at the same time. And I will do the same. When you're giving an answer, I will try not to interrupt you or talk over you so that we can have a clear record.

Another part of having a clear record is that you have to give oral answers, yes and no, not head shakes. Does this all make sense?

A. Yes.

Q. Okay. And if I ask you a question that doesn't make sense or that you need more information about, just let me know that you don't understand or that the question doesn't make sense for some reason, and I will try to rephrase it for you; okay?

A. Okay. Yes.

Q. And if you answer, I will assume that you did understand the question --

A. Yes.

Q. -- fair? All right. And if you need a break at any time, you are welcome to take one. All I ask is that if I have a question pending, you answer it before the break; does that make sense?

A. Yes.

Q. Okay. So a few preliminary questions that are just standard that I always ask. Is there -- do you have any medical conditions that would interfere with

your ability to testify truthfully today?
A. No.
Q. Okay. And do you have -- are you on any medications that would interfere with your ability to testify truthfully today?
A. No.
Q. Okay. And are you on any other kind of -- you know, drug or alcohol that could interfere with your ability to testify truthfully today?
A. No.
Q. Okay. All right. So this case, as you know, concerns Brittany Watts, a former patient at St. Joseph Mercy Health; right?
A. Yes.
Q. Okay. And before we start talking about Brittany specifically, I want to just get some background on you. But before we do that, I want to understand a bit about what you did to prepare for the deposition today. I don't want you to tell me anything about conversations you had with your counsel.
A. Okay.
Q. I can ask you if you had conversations and what documents you reviewed, but not about the content of your conversations; okay?
A. Yes.

Q. Okay. So did you do anything to prepare for your deposition?
A. Yes.
Q. What did you do?
A. I reviewed my Inter- -- Interrogatory questions. I reviewed the patient's medical record.
Q. Uh-huh.
A. I reviewed things that my lawyer had sent to me. I reviewed the audio of the interview at the bedside.
Q. Uh-huh.
A. I think that's everything. Yes.
Q. Okay. When you say you reviewed the medical records --
A. That would be her patient chart. The medical records from the -- the case, the day that she was -- the three days that she was in the hospital.
Q. Okay. So all the medical records for the three days she was in the hospital you -- you reviewed?
A. Yes.
Q. So did you just review your own notes in those records, or did you review all -- everything in those records?
A. I reviewed all.

Q. Okay. And you said you reviewed your Interrogatory answers; correct?
A. Yes.
Q. And was there anything in those answers that was incorrect or that you want to correct today?
A. No.
MR. PRISLIPSKY: Objection.
A. No.
Q. All right. And did you meet with your counsel to prepare?
A. Yes.
Q. How many times?
MR. PRISLIPSKY: Objection. You can answer.
A. I don't recall how many. We had met earlier on, and then I had met recently to prepare for today. But I would -- I don't really know how many visits.
Q. More than five?
A. I don't think so.
Q. Around five?
A. Maybe five.
Q. Okay. And how long were those meetings on average?
A. Usually about an hour.

Q. Okay. So about an hour for each meeting?
A. Yes.
Q. All right. And when was the most recent one?
A. This morning.
Q. Okay. And when was the most recent one before that?
A. Yesterday. Did we meet yesterday? No, we did not meet yesterday. My mind is running together. It would have been by phone on -- what is today? Wednesday?
Q. Tuesday.
A. Tuesday. Yes, so it was yesterday by phone early in the morning at 8:00.
Q. All right. And what about before that, when was the last time?
A. I don't recall.
Q. I just want to remind you to let me finish my question before you answer just for the ease of the court reporter. In normal conversation it, you know, makes sense to answer once you know what the person's asking, but we need to keep a clean record and not make it difficult.
So -- oh. And another thing I should have mentioned

is that your counsel can object to my questions on the basis of there -- the form of the question or that it lacks foundation, but your -- you still answer, even when he objects, unless he instructs you not to answer; okay?
A. Yes.
Q. All right. Okay. Now, tell me a little bit about your educational background. Did you -- I assume you completed high school?
A. Yes.
Q. And did you go to college?
A. Yes.
Q. Okay. What -- did you get a degree?
A. Yes.
Q. In?
A. I have a bachelor of science in nursing.
Q. Okay.
A. I graduated in 1993 from Indiana University of Pennsylvania.
Q. And did you have any further education after that?
A. No.
Q. All right. And what type of nurse are you?
A. I am a registered nurse.
Q. Okay. And you're not a nurse

practitioner?
A. No.
Q. What are the main differences between a registered nurse and a nurse practitioner?
A. A nurse practitioner has her master's, and she can then have some privileges that nurses do not have.
Q. What kind of privileges?
A. Like prescribing, diagnosing, seeing patients more independently.
Q. Directing care?
A. Yes.
Q. So as a registered nurse, you cannot prescribe medications?
A. No.
Q. And you cannot direct a patient's care?
A. No.
Q. And you cannot diagnose?
A. That is correct.
Q. All right. So after you finished nursing school, which did -- you said that was nineteen ninety --
A. '93.
Q. '93.
A. Uh-huh.

Q. Did you immediately start working as a nurse?
A. Yes.
Q. Where did you start?
A. I started in a nursing home in Salem, Ohio.
Q. And what was your role?
A. I was a registered nurse in charge of as- -- assignment of patients.
Q. Okay. And were you -- were you a manager or --
A. No.
Q. -- front line?
A. Just a regular floor nurse.
Q. Okay. And how long did you stay in that position at the nursing home?
A. For one year.
Q. Okay. And where did you go next?
A. Then I went to Alliance Community Hospital in Alliance, Ohio.
Q. Okay.
A. I was a med-surg floor nurse there.
Q. What is a med-surg floor nurse?
A. I worked on a medical-surgical floor taking care of patients who had had surgery or a medical

diagnosis.
Q. Okay. Any particular kind of surgery?
A. No.
Q. All right. And how long did you stay at Alliance?
A. I was there one year.
Q. Okay. And why did you leave?
A. I left because I want -- I was seeking labor and delivery all along. That was my ultimate end goal. So I went from there to Beaver Medical Center in Pennsylvania, which was closer to where I lived, and became a float nurse, where I then floated into labor and delivery, pediatrics and med-surg, and I did that for three years.
Q. Okay. And where in Pennsylvania was that?
A. Beaver.
Q. Oh. The town is Beaver?
A. Yes.
Q. Okay. And what was the -- it was a hospital?
A. It was a hospital, Beaver Medical Center.
Q. Okay. And you said you had always planned to work in labor and delivery?

A. Yes.
Q. And when you were in school, did you specialize in any way to --
A. No.
Q. -- pursue that goal?
A. No.
Q. Was that an option?
A. No.
Q. Okay. So after three years in Beaver, then what was your next move?
A. Then I came into St. Elizabeth's in downtown Youngstown and worked -- again, another med-surg. I -- my goal was to come back into Ohio. So I worked there for one year, and at that time a position came up in Salem at the Salem Community Hospital in labor and delivery. I applied for that, and that would have been in the year 2000, and I got that job.
Q. Okay. And so that was your first job exclusively in labor and delivery?
A. Yes.
Q. And how long did you stay there?
A. And I was there for four years. I was unable to get full-time medical benefits because I was a part-time employee. So I went from there to Northside Medical Center in labor and delivery, where I was able to

purchase benefits.
Q. Okay. So you were not working full-time -- had you been working full-time at any of these jobs?
A. No.
Q. So it was always part-time?
A. It was always part-time.
Q. Like 20 hours a week or --
A. Usually 20 to 30, yes.
Q. Okay. So when you made the -- that move that you just mentioned and you were able to get insurance, where were you located at that point?
A. Northside Medical Center in Youngstown.
Q. In Youngstown. Okay. And you were working in labor and delivery?
A. Yes.
Q. All right. And how long did you stay?
A. I was there until 2009 where they were closing down. They -- I was per diem at that time, and I really wasn't able to get enough hours. It was slow working. So I then applied and got a job where I am now at St. Joseph's.
Q. Okay. So what year?
A. That was in 2009.
Q. 2009 --

A. Uh-huh.
Q. -- you came to St. Joseph. And was that a full-time job?
A. That was a part-time job.
Q. Okay. And did you become full-time at any point?
A. I became full-time in 2021.
Q. All right. And you work at St. Joseph today?
A. I do.
Q. And are you full-time?
A. Yes.
Q. Okay.
A. I am the assistant manager since 2021.
Q. Since 2021?
A. Yes.
Q. Okay. So at the same time that you become full-time --
A. Yes.
Q. -- you became an assistant manager?
A. Yes.
Q. Were those related?
A. I don't understand your question.
Q. Yeah. Sorry. Was it -- did you become full-time because you were becoming a manager?

A. Yes.
Q. Okay.
A. The job was a full-time position, so I accepted it, yes.
Q. Okay. And was -- this was a job you -- did you apply?
A. Yes.
Q. And was it a competitive process?
A. Yes.
Q. All right. And when you say assistant manager, is that your official title?
A. I am nurse assistant manager, yes.
Q. Okay. And tell me about the structure of management at St. Joseph in labor and delivery.
A. Okay. So I am the nurse assistant manager. Angelina is the nurse manager, and then over Angelina is Missy Rucci is the director of -- of her.
Q. Okay. And does anyone else hold the same position as Ms. Rechichar?
A. No.
Q. What about assistant nurse manager?
A. No.
Q. You're the only assistant nurse manager?
A. Yes, ma'am.
Q. Okay. And does that -- is there always

a nurse manager or an assistant nurse manager on duty on any given day?

A. Monday through Friday there is one -- one or the other of us is always there.

Q. Okay. Day and night?

A. No. I come -- I work from 6:00 a.m. to 4:00 p.m. Angelina works from 7:00 a.m. to 5:00 p.m.

Q. All right. And who handles management obligations when neither of you are there?

A. The team lead.

Q. All right. How many team leads are there?

A. I think there are four.

Q. And who are the team leads?

A. We have Lisa Graziano on night shift. We have Chris Musser on night shift. On day shift we have Jacqui McBlain and Jennifer Henry.

Q. Okay. And what about back in September of 2023?

A. It would have been the same.

Q. The same?

A. Yes.

Q. And you held the same position you hold now then?

A. I did.

Q. And Ms. Rechichar was your supervisor at that point, too?
A. Yes.
Q. All right. Tell me about your duties as an assistant nurse manager in labor and delivery at St. Joseph.
A. So I do payroll. I do scheduling as far as making sure every day is covered for staff. If there's a shortage, I, you know, call out for help. I do all of the charges. We do charges -- like through a delivery we review the chart and make sure all the charges have been done correctly, so I do that. I do all the ordering for the unit. I assist Angelina with, like, employee records. So, like, we go through the files and make sure everything's in order of -- everybody's up to date on all of their certifications and requirements for -- for the workplace.
I also do floor nursing. I go out multiple times a week if -- and assist. I -- I make frequent visits to the unit throughout the day to see how things are flowing. I'm in charge of the daily assignments, who the nurses -- what patients they care for, and I also take on patient care, if needed.
Q. Okay. You said that sometimes you assist. What do you mean by that?

A. On the floor. So if a patient comes in and the nurses are all busy, I may admit that patient, start a line and labs. I may run a full labor from beginning to go end to delivery. I just function as a nurse on the floor.
Q. And that's only if all the other nurses are -- are occupied?
A. Yes.
Q. And you said that you go to the floor multiple times a day?
A. (Nodding head.)
Q. Where -- do you have an office?
A. I have an office at the end of the one hall. I will come out to the desk and just see how they're doing.
Q. Okay. But direct patient care isn't your main responsibility?
A. It is not. I will be starting soon to have one day a week assigned as direct patient care. It's not assigned at this time, nor was it in 2023.
Q. Okay. What is the reason that you're going to be assigned a day of direct patient care?
A. They've just asked for that above -- the director is looking at changing the way we do our matrix, so we're just trying to evaluate need versus staff.

Q. And what do you mean by matrix?
A. The matrix is how many nurses you need per patient.
Q. Okay. And what -- what is that number currently?
A. I would have to refer to it. I'm not sure.
Q. Okay.
A. It depends on the acuity of the patient.
Q. Uh-huh. How is it changing?
A. It's not changing. We're just evaluating it.
Q. I see. And part of that evaluation involves you taking on one day a week of direct patient care?
A. Yes.
Q. And is that so that you can report on how things are functioning?
A. Possibly. They've just -- this is the ask of me, so --
Q. All right. So currently, and back in 2023, how often were you providing direct patient care?
A. I would say on average probably two to three times a week. It's not uncommon for me to come out and take on patient care.

Q. About approximately how many hours per week would you say were devoted to direct patient care?
A. I would say at least eight.
Q. Okay. So about a day's worth of work?
A. Yes.
Q. And -- but you expect that to go up now; is that --
A. Yes.
Q. All right. Because you will still --
A. Yes.
Q. -- be involved in patient care when other nurses are occupied?
A. Yes.
Q. And -- but you will also be responsible from the outset on one day a week?
A. Yes.
Q. Okay. Now, what made you choose St. Joseph as a place to work?
A. I toured it. I interviewed there, and I felt like it was a very community-friendly hospital. I feel like it's a smaller unit. It seemed to have a lot of focus on, you know, the community, and the nurses -- I guess I wouldn't have known this in the interview, but it just seemed like a nice tight-knit, teamwork effort group.

Q. That was your impression?
A. That was my impression on my tour.
Q. Okay. And did that impression turn out to be accurate?
A. Yes.
Q. And St. Joseph is a Catholic hospital?
A. Yes.
Q. Did that play any part in your --
A. No.
Q. Are you, yourself, a Catholic?
A. No.
MR. PRISLIPSKY: Objection.
Q. All right. Was St. Joseph the first Catholic hospital you worked at?
A. Yes.
Q. Okay.
A. Well, no. I'm sorry.
Q. Okay.
A. St. Elizabeth's back in 2000, '99 -- '99, when I worked that one year, that's a Catholic hospital.
Q. Okay. And either at St. Elizabeth -- well, let's start there. Did you receive any particular training about working at a Catholic hospital?
A. Not training, no.

Q. Guidelines?
A. At St. Elizabeth's, I don't recall.
Q. Okay. What about St. Joseph?
A. They do, like in their orientation process they talk about their Catholic beliefs and directives, but it's not specifically train -- training. They just talk about their overall Catholic beliefs.
Q. Okay. And what do you recall about the overall Catholic beliefs that you were informed of?
A. I really don't recall. It's just -- I remember them speaking to the fact that it's a Catholic facility. There were nuns when I first started there.
Q. Uh-huh.
A. But nothing that I can recall specifically.
Q. So what is your understanding as you sit here today of what distinguishes a Catholic hospital, if anything, from a secular hospital?
MR. PRISLIPSKY: Objection to form. You can answer.
A. As far as patient care, I don't really think it changes anything.
Q. Okay. There are no considerations that have to be taken at a Catholic hospital that would not be taken at another hospital?

A. For patient care?
Q. Yes.
A. No.
Q. Okay. And what about available procedures?
A. Yes.
Q. Okay. So what are those differences?
A. For my department, it would be anything related to an elective D&E, like an elective abortion, that's how it would affect me. We do not perform abortions.
Q. Okay. And I want us to be as clear as we can about what -- what we mean by abortion, but first I just want to back up. When I initially asked you if there were any differences when it came to patient care, you said no, but the availability of various procedures differs; is that --
A. That is correct.
Q. Okay. And you mentioned D&E. What is D&E?
A. A D&E is a dilation and evacuation. It's another term for an elective termination of a pregnancy.
Q. You're saying it's a synonym for abortion, elective abortion?

A. It's just another -- it's a -- it's -- like a D&C is a dilation and curettage. A D&E's a dilation and evacuation, so you're removing a pregnancy.
Q. Okay. And those procedures can be done, both of them, a D&E and a D&C, when the fetus is no longer living; correct?
A. No.
MR. PRISLIPSKY: Objection to form. Foundation.
A. We only do D&Cs where -- where I work.
Q. Let's -- let's break that down.
A. Okay.
Q. I'm not -- so you said that a D&E and a D&C are both elective abortions; correct?
MR. PRISLIPSKY: Objection.
A. No, ma'am.
Q. Okay.
MR. PRISLIPSKY: Misstates her testimony.
Q. Okay. So let's -- let's go back, then.
A. Okay.
Q. A D&E is a dilation and extraction; is that --
A. Evacuation.
Q. Evacuation.

A. Of a fetus.
Q. Okay. And --
A. It's further along. It's an elective. It's still living. It is still living, a D&E.
Q. That's part of the definition of a D&E, is that the fetus is still living?
A. That is my understanding. We do not perform them, but other hospitals do.
MR. PRISLIPSKY: Wait for her to finish her complete question.
THE WITNESS: I'm so sorry.
MR. PRISLIPSKY: That's okay.
A. I'm sorry.
Q. It's fine. She's the one to apologize to.
MR. PRISLIPSKY: She's giving dirty looks to me, so --
Q. Okay. So what kind of training -- or, sorry. What is the basis for your knowledge about what a D&E is?
A. My knowledge of that is just based on what I've heard through the community of nursing online. We had an employee recently who interviewed for a job at our hospital and performed D&Es at another facility, and so was asking about that at our place, so that's how I

know what it's called and what it does.
Q. So that's something you only learned recently?
A. No. I've known it throughout my career, what a D&E is.
Q. All right. And who -- or where did you get the information that a D&E is only performed when a fetus is living?
A. That is my understanding.
Q. Where did you get that understanding?
A. That's just what I thought it was.
Q. It's not based on your training?
A. No, ma'am.
Q. Okay. So it's maybe based on things that you've heard or read?
A. Yes.
Q. Is it based on information you received at St. Joseph?
A. No.
Q. Okay. And you mentioned the D&C?
A. (Nodding head.)
Q. And what is a D&C?
A. A D&C is like if a mother has had a miscarriage and there's retained product of conception, they go in with a curettage and remove anything left in

the uterus.
Q. Okay. And can a D&C also be used to perform an elective abortion?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. You can answer.
A. I really don't know.
Q. You mentioned D&E and D&C together a bit ago; right?
A. (Nodding head.)
Q. So tell me what your understanding is of --
MS. RICKERT: Or strike that.
Q. Why did you mention D&C when -- as we were talking about elective abortions?
A. I was differentiating between the two. We only do a D&C, not a D&E. I was just differentiating between them.
Q. Okay. And a D&C is performed earlier in pregnancy?
A. Yes.
Q. And you said you don't know whether D&C, the procedure, is used in some instances to perform an elective abortion?
A. I do not know.
Q. All right. How are elective abortion --

elective abortions performed, to your knowledge?
MR. PRISLIPSKY: Objection. Form. Foundation. Calls for a medical opinion. Go ahead. You can answer.
A. I do not know. I've never worked at a facility where they were performed. I've never been part of an abortion procedure.
Q. Have you ever learned about abortion?
A. Only through reading and through things you would see online. I know what they are, but I cannot tell you from a nurse's perspective how it is performed.
Q. Okay. Have you heard of a medication abortion?
A. Yes.
Q. What's that?
A. Where they take a pill --
Q. Okay.
A. -- and it starts the procedure. We've -- we have people present sometimes that way.
Q. What do you mean by that?
A. Like, you might have a patient who had taken a pill and then they're going to be bleeding, so they'll -- postabortion we've taken care of people.
Q. Okay.
A. Post.

Q. And sometimes a D&C is necessary in those situations?

MR. PRISLIPSKY: Objection. Form and foundation. Calls for a medical opinion.

A. It may or may not be, depending on the doctor's evaluation of that patient.

Q. Right. So sometimes a D&C might be called for in that situation?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. Go ahead.

A. It would be up to the provider to decide.

Q. To be clear, I'm not asking you for expert opinions.

A. Okay.

Q. I'm asking you about what you know based on your training and experience and -- and what you've learned; okay?

A. Okay.

Q. So a -- so you're -- the only surgical abortion that you're aware of is a D&E; is that right?

A. Yes.

Q. Okay. Now, what are -- you said you've never participated in an abortion?

A. That's correct.

Q. Would you?
A. No.
Q. Okay. Would that go against your personal beliefs?
A. Yes.
Q. Okay. Have you ever worked at a hospital that performed abortions?
A. No.
Q. Okay. And how do you know that?
A. I -- I've -- any of the labor and delivery units that I've worked on, which were three, none of them performed abortions.
Q. Okay. And what about when you worked at hospitals prior to being on labor and delivery, do you know whether those hospitals performed abortions?
A. I do not know.
Q. Okay. When you were looking for jobs in labor and delivery, was it important to you that you end up at a hospital that did not perform abortions?
A. Yes.
Q. Okay. And so did you make inquiries along those lines?
A. I probably did. I don't recall, but I know that during my interview, it is a Catholic hospital. I -- I know that they do not.

Q. Okay. Have you ever heard the term backdoor abortion?
A. No.
Q. Okay. You've never heard any other nurses at St. Joseph talk about backdoor abortions?
A. No.
Q. Hearing that term, what would you take that to mean?
MR. PRISLIPSKY: Objection. Foundation. Go ahead and answer.
A. I would assume it's somebody seeking an abortion where they're not legal maybe? Or outside of a medical facility. I don't know.
Q. Okay. Now, what other policies --
MS. RICKERT: Or strike that.
Q. We just talked about St. Joseph does not perform elective abortions; correct?
A. Yes.
Q. And the word abortion can have multiple meanings. We were talking about elective abortions, but there's spontaneous abortions; right?
A. Yes.
Q. And what's a spontaneous abortion?
A. A spontaneous abortion is a miscarriage.
Q. Okay. And elective abortions are -- or

what's your understanding of what constitutes an elective abortion?
A. An elective abortion is where the mother chooses to terminate the pregnancy.
Q. Okay. And is it when a mother chooses to terminate a healthy pregnancy?
A. It can be any pregnancy.
Q. Okay. And -- so even a doomed pregnancy?
A. Yes.
Q. Okay. And tell me about what policies or practices St. Joseph has around care for women who have a pregnancy that cannot proceed or that is -- let's see. That's not a good question.
MS. RICKERT: Strike that.
Q. So no elective abortions are performed. Are there any gray areas?
MR. PRISLIPSKY: Objection to form. You can answer.
A. Yes.
Q. Okay. And did you receive training at St. Joseph about how to identify gray areas and navigate them?
A. I did not.
Q. Okay. What are some of the gray areas?

A. I would say our practice is always the safety of the mother. So if you have a mother who is at risk for her health, that would be a gray area.
Q. Okay. So a pregnant woman?
A. A pregnant woman.
Q. Whose health is at risk from the pregnancy?
A. Yes.
Q. And that creates a gray area. Now, for you or for St. Joseph?
MR. PRISLIPSKY: Objection to form.
A. For St. Joseph's.
Q. Okay. What about for you?
A. Yes, for me as well.
Q. So is it -- your main goal is the -- protecting the pregnant woman?
A. Absolutely.
Q. Okay. And are you -- are you saying that the pregnant woman, her well-being takes precedence over the well-being of the fetus?
A. Always.
Q. Okay. Now, when there's a gray area, how does the hospital proceed?
MR. PRISLIPSKY: Objection to form. You can answer.

A. We would consult our ethics committee --
Q. Uh-huh.
A. -- and allow them to guide us on what they feel is in the best interest of the patient.
Q. Okay. And when you say we, who do you mean?
A. The unit. Like, there's a -- you know, nurses can consult with ethics. Physicians can consult with ethics.
Q. Uh-huh. Now, the initial assessment of the patient, is that done by a nurse or by a doctor?
MR. PRISLIPSKY: Objection. Broad and vague. Form. Foundation. You can answer.
A. When they arrive to unit, they're assessed immediately by the nurse, but then also the provider comes in to assess as well.
Q. Who makes the determination whether a woman's health is at risk from her pregnancy?
A. I would say the provider.
Q. When you say the provider, you mean the physician?
A. The physician.
Q. Okay. And you said, I would say the provider. Is there some qualification there or -- go ahead.

A. Nurses also -- you know, in our assessment, we can see signs of distress or if the mother is bleeding or if she's at risk. We -- we assess that, but we communicate that to the physician, who then would determine what action needed to be done, delivery or not.
Q. Okay. And when you -- when you say delivery or not, what do you mean?
A. Delivery of the baby. You can -- you know, if there needs to be a delivery to save the mother, then that needs to occur.
Q. Okay.
A. And that's at the discretion of the physician.
Q. All right. Nurses don't decide that?
A. No, ma'am.
Q. And how do --
MS. RICKERT: Strike that.
Q. When you are assessing a patient, a pregnant patient, and you've determined that they may be in some danger and you relay that to a physician, and the physician also determines that the patient could be in some danger, what is the nurse's role at that point?
MR. PRISLIPSKY: Objection. Broad and vague. You can answer.
A. The nurse's role is to follow any orders

given by the provider.

Q. All right. And what if you disagree with those orders?

A. You still follow the orders of the provider.

Q. What if the orders go against your personal moral beliefs?

A. That is irrelevant.

Q. When you say that, do you mean it's irrelevant to you personally or irrelevant to the system?

MR. PRISLIPSKY: Objection to form. Go ahead.

A. Me personally. If I have a provider who is giving an order in the best interest of the patient, I follow those orders. My personal beliefs do not come into play.

Q. You said that they are giving an order in the best interest of the patient. When you say in the best interest of the patient, do you mean in their best interest in your opinion, or if the doctor says it's in the best interest of the patient?

MR. PRISLIPSKY: Objection. Go ahead.

A. The doctor is the one who gives the order, so it's up to them when -- and I trust our providers' judgments. If they feel like this patient is

in danger, if I disagree, I may take it higher. I may go to my, you know, leader or go to the provider personally. I don't know. I've not ever had a situation where I have not agreed personally caring for a patient.
Q. Okay.
A. But that's how I would handle it if I did.
Q. All right. And the -- if you disagree, do you have a right to say, you know, I don't want to participate in this and -- and someone else can --
A. Absolutely.
Q. -- step in?
A. Yes.
Q. Okay. So that is something that you can do?
A. You can, yes.
Q. Yeah. But you would not?
A. I may. It depends on how I felt in that situation. Like I said, I've not had that personally happen to me, but yes, I may say I -- could I turn this care over to another nurse.
Q. Okay.
A. That is an option.
Q. So in your entire career, you have never had a doctor come up with a plan of treatment you

disagreed with?

MR. PRISLIPSKY: Objection to form. Foundation.

A. I can't recall my entire career.

Q. Okay.

A. It's been a lot of years.

Q. How about just at St. Joseph?

MR. PRISLIPSKY: Same objection.

A. No, I don't recall a time where I disagreed and didn't feel comfortable implementing their orders.

Q. All right. Have you ever had to seek additional explanation from a physician for the basis of their order?

A. Do you want a specific incident, or are you asking in general?

Q. I'm asking in general.

A. Yes.

Q. Okay. Can you, without revealing any identifying patient information, can you tell me about -- is it just one incident or more than one?

A. I have one.

Q. Okay.

A. I had a pro- -- I keep saying provider, and I apologize.

Q. That's all right.
A. I had a physician ask me to do fundal pressure at birth, and that is contraindicated, so I declined at the bedside doing that. I didn't bring it up with her in front of the patient, but outside of the room, I then asked her, you know, we -- that's contraindicated. We do not do that at St. Joe's, and the physician acknowledged why I didn't follow her order at the bedside. She wanted me to facilitate birth by applying fundal pressure.
Q. And what is fundal pressure?
A. It is applying pressure at the top of the uterus while the baby is being born.
Q. I see. And that is against St. Joseph policy?
A. Yes.
Q. And the doctor was unaware of that?
A. Evidently.
Q. All right. So the physician told you to apply fundal pressure?
A. Yes.
Q. And what did you do?
A. I just did not do it.
Q. You didn't say one way or the other -- or you didn't tell the doctor that you were unwilling?

MR. PRISLIPSKY: Objection.
A. No.
Q. You just didn't do it?
A. That is correct.
Q. And then what did the physician do when you didn't follow that order?
MR. PRISLIPSKY: Objection. Go ahead.
A. She just proceeded and delivered the baby. It was a very easy birth. And then outside the room we discussed it.
Q. All right. And were there any -- was there any follow-up related to that --
A. No.
Q. -- event? All right. Now, what about other nurses who you supervise? Have you had a situation where they disagreed with a physician's plan of treatment?
MR. PRISLIPSKY: Objection. Go ahead. You can answer.
A. Are you speaking specifically to this case?
Q. You know, let's talk about any other case, and we'll --
A. Okay.
Q. -- talk a lot about this specific case.

MR. PRISLIPSKY: Objection.
A. I don't recall any, other than this case.
Q. Where you had nurses you were supervising disagree with a -- a plan of care?
A. That's correct.
Q. All right. Did you have any training on, as a supervisor, what to do if a -- if nurses you were supervising disagreed with the doctor's plan of treatment?
A. No.
Q. Okay. So that's something you just have to kind of figure out as you go along?
A. Or seek guidance as I go along. If I come to a situation where I'm not sure how to handle it, I would seek the advice of my manager.
Q. All right. And have you ever had a situation where you felt that the plan of care was not being executed in a timely fashion?
MR. PRISLIPSKY: Objection. Broad. Vague. Form. You can answer.
A. No. I mean, that could -- that could scope many, many years. I feel we do a very good job at St. Joe's implementing care in a timely manner.
Q. All right. There could be risks for

delay; correct?

MR. PRISLIPSKY: Objection. Form. Foundation. Calls for a medical --

A. It would depend on --

MR. PRISLIPSKY: Wait. Let me finish my objection. Calls for a medical opinion. You can answer.

A. It would depend on the situation.

Q. Okay. So it is possible that a delay could pose risks for a patient; correct?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Broad and vague. You can answer.

A. It would just depend on the situation.

Q. And -- okay. So in some situations delay could have bad repercussions for the patient; correct?

MR. PRISLIPSKY: Same objection. Go ahead.

A. Yes.

Q. Okay. All right. Before we talk more about the -- this -- the specific case of Ms. Watts, I want to introduce an exhibit here. So this will be Exhibit 1.

(Whereupon Plaintiff's Exhibit 1 was marked.)

MS. RICKERT: I have a copy for you.

MR. PRISLIPSKY: Thank you.

MS. RICKERT: This does not seem to have -- oh, yeah, it does. Okay. This is RPD16-docsproduced0017 for those online.
Q. Now --
MR. PRISLIPSKY: Do you see on the top left? If you turn it upside down, there's page numbers. Okay. Just so that you're on the same page.
Q. Have you ever seen this document before?
A. I don't recall.
Q. All right. Now, have you seen documents like this?
A. Yes.
Q. What type of document is this?
MR. PRISLIPSKY: Objection to form. Go ahead.
A. It looks like it's just a directive on how to care for someone who has had a fetal demise or a stillbirth.
Q. Uh-huh. Well, when you say -- you said you've seen this type of document before. What -- what type of document is it?
A. I'm not sure.
Q. Okay. Well -- so this gives guidance on how to care for a patient who's experienced fetal demise. Are there other documents like this giving guidance on

care for patients under other circumstances?
A. So I'm -- I think what I'm thinking of is our discharge instructions on for the mother. We have similar paperwork on how to care for her following a -- a loss, emotionally and physically, but this looks like it's given for how the nurse would care for the patient.
Q. Okay. And you do not recall ever having been provided this document?
A. No, ma'am.
Q. And do you recall ever receiving any training on the contents of this document?
A. Yes. We have fetal demise cases periodically, and we -- in my orientation, I would have been shown like the paperwork that we fill out and the different things that we do through our HEAL program. We have a HEAL program, helping each other after loss. We take great care with our mothers who have had a loss.
Q. Okay. And how -- what does that care look like?
A. That care looks like a private room away from the nursery as far as possible. We do photographs of the infant. We do pastoral care. We do bathing and photography. We do a cooling cot where the infant can remain in the room with the mother. We do a lot of emotional support. Social services is consulted, and all

of us are taught how to speak to the mother, how to -- the words that we use, the care that we give.

Q. Okay. Tell me about what that training consists of.

A. It's just on-the-job training as we have cases. You know, we train our young how to do what we do and just being compassionate, listening. I -- I had a patient once ask me to pray with her. I prayed with her. Just -- really there's not a lot you can say sometimes, but you're more directed towards what she needs at that moment.

Q. Okay. So putting her needs first?

A. Absolutely.

Q. And do you see on the first page of this document there is this box that says Speaking At A Time Of Loss?

A. Yes.

Q. Is this the type of information you would have been given about how to speak to a patient?

A. Yes.

Q. Okay. Can you take a minute to look at this and then let me know if -- if you've been provided this information?

A. Yes.

Q. Okay. And do you agree with this

advice?
A. Yes.
Q. Now, if you look further up on that document to the second paragraph, it says, the loss of a baby at any stage, regardless of the cause, is a tragic and devastating experience. Do you agree with that?
A. Yes.
Q. And it goes on to say, a time of joy turns unexpectedly into a time of tragedy. Generally, shock is the first emotion that the patient experiences, followed by anger, despair, guilt, and, commonly, emptiness. Do you agree with that?
MR. PRISLIPSKY: Objection. Form. Foundation. Calls for a medical opinion. You can answer.
A. I do agree with the statement, yes. I think each patient obviously reacts differently to loss, and that's where your skills as a nurse comes into play because you really have to be in tune with your patient to meet her needs.
Q. And the next sentence is, patients grieve after a fetal demise in various ways. Would you agree with that?
A. Yes. That's what I'm referring to when I say, you know, they react differently, so --

Q. Okay. And grief can look different for different people?
A. Yes.
Q. And then it says, some patients just want to be alone with their thoughts and feelings; others want a large support system. Do you agree with that?
A. Yes.
Q. And a patient who just wants to be alone with their thoughts and feelings, you might not have a good sense of what those thoughts and feelings are; would you agree?
A. That is correct.
Q. Does that mean they're not grieving?
A. No.
Q. All right. When a person experiences fetal demise, they're often dealing with emotional concerns, which is what this document seems to be addressing; correct?
A. Yes.
Q. They also might have medical issues; correct?
A. Yes.
Q. What are some of the medical issues that a person might have after a fetal demise?
MR. PRISLIPSKY: Objection. Calls for a

medical opinion. Form. Foundation. You can answer.
A. They may have cramping, bleeding. Their vital signs may -- you know, it depends. We're just always assessing that. Those are the things I can think of right off.
Q. Okay. And can they be at risk for infection?
MR. PRISLIPSKY: Objection. Go ahead. You can answer.
A. Not because of the loss. It depends on if there was infection prior to loss, but the actual birth itself does not put them at risk for infection.
Q. Let's not talk about birth at this point. We're just talking about fetal demise. And fetal demise can occur prior to birth; yes?
A. Yes.
Q. Okay. So a person experiencing fetal demise could have medical issues as a result of fetal demise, including infection; right?
MR. PRISLIPSKY: Objection. Form. Foundation. Asked and answered. You can answer.
A. It -- it would depend on the situation.
Q. Right. And then --
A. Not every fetal demise has a risk for infection.

Q. And I'm not asking whether every fetal demise has a risk for infection. I'm asking if that can be a risk in some cases.

MR. PRISLIPSKY: Objection. Form. Foundation. Asked and answered. Go ahead.

A. It could be.

Q. Okay. Are you saying it's not one that you normally are concerned about?

A. It's one we assess for.

Q. Uh-huh.

A. We would ask questions like had the water been broke, had the mother -- was there chorioamnionitis? Is there an odor with the birth? Those types of things might indicate infection. So we're always on the alert, but I would not say that it's automatically something that happens.

Q. Right. And I'm not asking if it's automatically something that happens. When you say you consider whether their water has broken, why is that important to assessing infection risk?

A. Once you have rupture of membranes, there is a higher risk for chorioamnionitis or an infection.

Q. Okay. And that risk goes up the longer it has been since the rupture of membranes; correct?

A. Yes.
Q. All right. And who determines whether the patient is at risk for infection?
A. The physician.
Q. Okay. Are you qualified as a nurse to determine whether a patient who has experienced fetal demise is at risk for infection?
A. I am qualified to assess and see that there are signs of infection and report those signs to the physician, but I'm not qualified to diagnose it or to prescribe an antibiotic in that case.
Q. Okay. What are some of the other signs of infection that a patient might experience?
A. I would say you would see their lab -- you would see their white blood cell count significantly high. You would see an odor with the fluid. Those are the two. Or a fever, a temp, high temp in the mother.
Q. Okay. When you said significantly high white blood cell count, what do you mean by that?
MR. PRISLIPSKY: Objection. Form. You can answer.
A. I would say -- I don't really have a parameter that I would go with, but you would want to assess what her pre- -- what her prior labs might have been and compare. A slight raise in a white blood cell

count doesn't always indicate an infection. It can indicate other things, I believe, but I -- I don't know. That would be up to the doctor to decide.

Q. Okay. So you are not qualified to assess whether a patient's elevated white blood cell count is indicative of infection or not?

A. That is correct.

Q. All right. What kind of training did you get at St. Joseph or prior to your time at St. Joseph on medical privacy for patients?

A. At St. Joseph's we review HIPAA policies or practices, not really the actually policy, but we have what we call workday iLearns, and every year we complete those as part of our ongoing requirements.

Q. Okay. So every year you receive some training in the privacy rights of your patients?

A. Yes.

Q. Okay. And what are situations in which you are permitted to share private medical information with a third party, if any?

MR. PRISLIPSKY: Objection. Go ahead.

A. I mean, there -- there is a list of times when you could. I would say on our unit -- I'll be specific. If I have a minor, I'm sharing information with the custodial parent. We do have minor pregnant

patients.
Q. Let me stop you there. You said that there's a list. A written list?
A. I'm just saying there's multiple things. I don't know of a written list.
Q. Okay. So you haven't been provided with a list of times that you can share medical information with a third party?
A. In our -- in our workday iLearns, it does give you directives on times that you could.
Q. Okay. And in writing?
A. Yes.
Q. Is it like a PowerPoint presentation or a handout?
A. It's -- it's on the computer. You log in and you view it on your computer.
Q. I see. Okay. So this is not an in-person training?
A. No.
Q. Okay. So it's a training you do, and it -- as part of this training, which you do annually, it provides you with the circumstances in which you can provide private medical information about a patient to a third party?
A. Yes.

Q. And one of those situations is if the patient is a minor?
A. Yes.
Q. And is it -- is it automatic that if a patient is a minor, that their medical information can be shared with their guardian?
A. I'm not sure if it's automatic or if it's specific to the situation. I -- I don't know that.
Q. Okay. How would you decide whether to share information with a parent?
A. We usually just speak to our patient and say, you know -- and the mother -- let's just use the case of a mother is the custodian parent. She's usually present with her daughter, and we talk to the patient. We show them the consent form. Your mother will be signing this. We will be discussing your care with your mother. If she's absolutely adamant that she doesn't want us speaking to her mother, then we may, you know, go further into why. Is there a situation? Is there someone else we need to speak to? We try to keep it minimal what we would share, only what would be necessary for her care.
Q. Okay.
A. Because they have to consent to the care.

Q. The guardian?
A. Yes.
Q. I see. So if -- you said you weren't sure, you know, if it's automatic or if it's situation based whether you can share a minor's patient information with a guardian. So who would you consult if you were unsure whether you could share the information with the guardian?
A. I would consult with my upper management.
Q. Okay. Have you ever -- and I want to put aside the Brittany Watts case for now, but have you ever had occasion to share a patient's private medical information with a third party when the patient did not consent?
A. No.
Q. Okay. So you have never had to consult your supervisor on whether it was appropriate in a given situation to share private medical information with a third party?
A. No.
Q. What are some of the other situations that you've been trained are appropriate situations to share private patient medical information with a third party?

A. I feel if the safety of the patient was at risk, if, like, you have a mother who's being abused by a care- -- someone in her life and she comes in and she's fearful for her safety, then I feel like at that point we would seek outside help for her. So you may share it with a social worker, or -- I guess that -- I don't know that that would be an outside source, but you're going to want to speak up to get her the help that she needs if she's being abused.

Q. Okay. You said a couple times you feel that this would be appropriate. I'm asking first about your -- what you were trained in the annual training that you do. So you -- you've gotten this training every year since you've been working in labor and delivery at St. Joseph?

A. Yes.

Q. Okay. So -- and when I say a third party, I do mean, you know, someone outside of the hospital; okay? So what are the situations that you were trained on annually for when you can share a patient's private medical information with a third party?

A. I don't recall of any that I've had to go to a third party.

Q. I'm asking about your -- what you are trained on. You said you get this training annually. It

tells you the situations in which it is permissible to share a patient's private medical information with a third party.

So you mentioned when the patient is a minor and their guardian needs to consent to care is a time when their medical information could be shared with the third party even without the patient's consent potentially. What are the other situations that you were trained would be appropriate or a required time to share third party -- or share a patient's private medical information with a third party?

A. I would have to review those because I -- I can't give you specifics from that educational packet, and I wouldn't want to give you erroneous information. If I had a situation that I felt I needed to, I would refer to that. I would go back to that and make sure I was doing it correctly.

Q. Okay. And, again, you know, we're going to get into the details of the Brittany Watts case, but I'll just ask you: In relation to Brittany Watts, did you ever consult those materials?

A. No, I did not.

Q. Okay. Did you --

A. I -- no.

Q. You did not feel that you needed to?

A. I didn't feel like I had time to.
Q. Okay.
A. To go into the paperwork part of it.
Q. Okay. Well, we'll -- we'll come back --
A. Okay.
Q. -- to that. Do you have any recollection of your training, including law enforcement as an exception to the medical privacy rules?
A. No.
Q. Okay. So to your knowledge, the annual training you've gotten that includes when private medical information can be shared, that training did not include any instruction on when or if it's permissible to share private medical information with a member of law enforcement?
A. I do not recall our iLearn learning packet on HIPAA referring to that; however, since the case, I have myself reviewed further, and I have found where we have writing about the health and safety of the baby, contacting law -- or not the baby. I'm sorry. That's the situation -- this is the situation. But I did find within Bon Secours' writing a clause that talks about the health and safety and contacting law enforcement if I felt like I needed that looked into.
Q. Okay. But --

A. But it's not in our iLearns.
Q. Okay. It's not something that you actually had directly received training on?
A. That is correct.
Q. So there are materials that you could -- that you could access?
A. Yes.
Q. And you have since -- since the Brittany Watts case accessed?
A. Yes.
Q. But prior to the Brittany Watts case, you had never accessed those materials?
A. That is correct.
Q. And no one had ever presented those materials to you?
A. That is correct.
Q. All right. And did you receive HIPAA-specific training?
A. Yes.
Q. All right. And just so that I'm clear, your testimony is that you do not recall any exceptions in that training other than a minor whose guardian needs to consent to their care?
A. That's correct.
Q. Okay. All right.

A. That's not saying that it's not there. It's that I cannot recall it. Do you understand my answer? Okay.
Q. I do. Yes. As part of your preparation for this deposition, did you review any other witnesses' testimony?
A. Yes.
Q. Okay. Whose testimony did you review?
A. I reviewed the deposition for Dr. Khavari.
Q. Uh-huh.
A. Jordan Carrino. I reviewed Fred Raines, the detective, Nick Carney, and that is all.
Q. Okay. How many hours would you say you spent preparing and reviewing materials when you were not meeting with your attorney?
A. Maybe two. I just briefly reviewed. I didn't go into depth into those depositions, and I looked over the medical record briefly.
Q. Okay. And were there any other documents you reviewed that we haven't talked about? Because when I asked you before, I don't believe you mentioned the depositions.
A. Oh, I'm sorry.
Q. This -- it's not a memory test, so

that's why I ask follow-ups, but --
A. Yeah, I don't --
Q. -- are there any others? So the medical records, your Interrogatory answers, the depositions you just listed. What else?
A. I can't think of any.
Q. Okay. And we'll talk about some of the testimony those other witnesses gave at the appropriate parts of the deposition, so -- all right. Let's start talking about September 2023. Now, you said you work Monday through Friday?
A. Yes.
Q. And were you working Monday through Friday in September 2023?
A. I actually work Tuesday through Friday. I have Mondays as my day off, and that -- that is the way it was then, yes.
Q. Okay. Is that still true?
A. Yes.
Q. So it's four days a week?
A. Yes. I'm sorry.
Q. All right. That's okay. And so -- but when you say that Monday through Friday between certain hours, either you or Ms. Rechichar are there, that is correct?

A. That is correct.
Q. Okay.
A. We flex different days. I flex -- on Mondays I'm off, and she's off Fridays, so there's always somebody present.
Q. Okay. So much of the time you're both there?
A. Tuesday through Thursday we are both there.
Q. Okay. Now, I recognize that we're talking about events that were a couple years ago, and so if you don't remember something, don't -- that's a perfectly acceptable answer when it's true; okay?
A. Yes.
Q. And, like I said, it's not a memory test. So I just want to know what you remember, and there might be things that, you know, reviewing documents can refresh your recollection, so we'll see.
Now, September 19th, 2023, does that day have significance for you with respect to this case?
A. Yes.
Q. Okay. What happened on September 19th, 2023?
A. We received a call to the unit that Dr. Khavari was sending us a patient over that had -- was

experiencing a placental abruption.

Q. Okay. And how did you receive that information?

A. By phone.

Q. And who called?

A. I didn't take the call, so it was her office. I don't know if it was her secretary or the doctor herself, but we received a call that they -- she was coming over to our unit.

Q. Okay. How did you receive the information?

A. I was in the office, and they called back into the phone, to our office. Angelina and I were both in the office, and they called back and said we have a patient coming over from the office with a placental abruption.

Q. Okay. Who is they?

A. The nurses that were present that day, and I don't recall any specific nurses.

Q. Okay. So -- so I understand, someone from Dr. Khavari's office called over to labor and delivery and spoke to a nurse, someone?

A. To someone.

Q. Okay. And then that someone called into your office where -- do you share an office with

Ms. Rechichar?
A. Yes.
Q. And you were both there?
A. Yes.
Q. When you received the call?
A. Yes.
Q. And did she take the call, or did you take the call?
A. I took the call.
Q. Okay. And you learned that Dr. Khavari had a patient she was sending over who was experiencing placental abruption?
A. Yes.
Q. And what is placental abruption?
A. It is where the placenta comes away from the wall of the uterus, leaving a pocket where you experience bleeding.
Q. Uh-huh. And this is a dangerous condition; correct?
A. It depends on the level of abruption. You can have partial abruption. You can have a complete abruption.
Q. And what did you learn about the degree of abruption for this patient over the phone?
A. So -- so they only told us placental

abruption. So we immediately went to our operating room that is on our unit and started to open up things that would facilitate an emergency delivery. At the time that we were doing that, Angelina called back over to get more specific information, and she spoke to Dr. Khavari herself and she said, we are preparing the operating room, and Dr. Khavari said, no, no. This is a 21-weeker. She might have given the exact gestational age, I'm not sure, but it was a 21-weeker who is just having some bleeding. We suspect an abruption. You do not need to open the OR. We are just going to observe and monitor her. So we then shifted to preparing a regular labor room.

Q. Okay. Did she tell you -- I'm sorry -- the follow-up call, you said Nurse Rechichar made that call?

A. Yes.

Q. And you were present?

A. I was not present.

Q. Okay. So you were -- what you're relating to me now is what Nurse Rechichar told you?

A. Yes.

Q. Okay. And were you told that the patient was in labor?

A. No.

Q. Were you told that the patient was not in labor?
A. No.
Q. Were you told that the patient had experienced preterm, premature rupture of membranes?
A. No.
Q. Were you told --
MS. RICKERT: And I -- I meant to get this word right before the deposition -- oligohydramnios.
MR. PRISLIPSKY: Oligohydramnios.
MS. RICKERT: Oligohydramnios.
Q. Were you told that the patient was experiencing oligohydramnios?
A. No.
Q. And what is that?
A. That is -- oligohydramnios is just a low level of fluid. It doesn't mean the water has broke. It just means there's a low level.
Q. Okay. If the water has broken, that could cause oligohydramnios; right?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer.
A. They're two separate things. If your water breaks, you will have a low number, but that does not mean you have oligohydramnios. It means you no

longer have fluid around the infant, but you would expect that with rupture.

Q. Okay. So you're saying those two conditions are -- are separate?

A. Yes.

Q. Did you review the medical records -- you said you did review the medical records --

A. I did.

Q. -- in this case. Do you know that Ms. Watts was diagnosed with both premature rupture of membranes and --

A. Yes.

Q. -- and oligohydramnios?

A. Yes.

Q. So those are not exclusive --

MR. PRISLIPSKY: Objection.

Q. -- mutually exclusive --

MR. PRISLIPSKY: I'm sorry.

Q. -- conditions?

A. It -- it could -- I'm -- I'm assuming -- and I don't want to assume. If you have a spontaneous rupture of membranes, you then have an AFI. An amniotic fluid index will be very low. So I guess I think why they're both on the chart is because when she was assessed by Dr. Khavari, you have a low AFI. You don't

know if there truly was rupture of membranes, or do you have oligohydramnios? You still have fluid. So did -- the patient stated that her water broke prior. You -- on image, you see a low AFI. Do you have oligohydramnios where you just didn't have enough fluid, or did her water break and empty the womb of fluid?

Q. Uh-huh. And what was your understanding of the fluid level for Ms. Watts at the time she was being transferred from Dr. Khavari's office?

A. We didn't discuss her fluid on the -- when she -- prior to coming with that report. Once she arrived to our unit and we assessed her and got her history, she then told us that her water had broke, so then we know.

Q. Then you know what?

A. That her -- her water broke. She said she had rupture of membranes.

Q. Okay. And -- now, that doesn't necessarily mean there's no fluid; right?

A. That is correct.

Q. So you would still want to assess the fluid; right?

A. Yes.

MR. PRISLIPSKY: Objection. Calls for a medical opinion. That's fine.

Q. And amniotic fluid is necessary for fetal development; correct?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer.

A. In a normal pregnancy, in a developing pregnancy, you definitely need amniotic fluid for development. You can have a period of time where you've had rupture and you still have development.

Q. All right. And there can be some refilling even; correct?

A. Yes.

Q. And -- but you agree with me that amniotic fluid is necessary for fetal development?

A. Yes.

Q. And a -- if there is little or no amniotic fluid and no chance of that fluid being replaced, that pregnancy is not going --

MS. RICKERT: Or strike that.

Q. The fetus is not going to continue to develop; correct?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer if you know.

A. I don't agree with that. We have had cases where we have had mothers come in with spontaneous rupture of membranes, and we do expectant management for

weeks, watching. So there is still development of the fetus.

Q. Are you talking about situations in which there is little to no amniotic fluid remaining?

A. It can be, yes. I have had cases of mothers who have had little to no fluid and you still watch and observe, and you will see it refill. You may see it -- you may reach a point where the provider -- again, it's all up to the physician to decide when that delivery needs to occur based on the mother and the infant. But yes, you can have fetal development without amniotic fluid.

Q. Can you complete a pregnancy without amniotic fluid?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer.

A. It would depend on when you had rupture. At a 22-week rupture, no. I would say no.

Q. Okay. So a 22-week rupture, if it's not a situation where a physician has said I think this can refill, this pregnancy cannot continue; correct?

MR. PRISLIPSKY: Objection. Calls for a medical opinion.

A. It could continue for a period of time. It could not complete the pregnancy, but I have seen

mothers with expectant management for weeks.
Q. Sure. With little to no amniotic fluid for weeks?
A. Yes.
MR. PRISLIPSKY: Objection. Asked and answered. You're fine.
Q. When have you seen that?
A. Throughout my career as a labor and delivery nurse of 26 years. I've taken care of multiple mothers in an antepartum setting where we do daily ultrasounds. We assess them. We watch them for infection. We watch them for any signs that they need to be delivered, but we are able to do expectant management for weeks.
Q. And then have a healthy pregnancy and healthy child result?
A. Yes.
Q. And how long can a fetus go without amniotic fluid and still develop normally?
MR. PRISLIPSKY: Objection. Calls for a medical opinion.
A. That is completely sub- -- de- -- decided by the provider, and each case is different. I recently had a case on my unit of several weeks. I think it was a month we waited.

Q. A month with little to no amniotic fluid in the uterus?
A. I don't recall the AFI on that case, but --
Q. Okay.
A. -- it was definitely a significant amount of fluid lost.
Q. Okay. To be clear, I'm talking about cases where there is little to no amniotic fluid. Do you know of any cases where there was little to no amniotic fluid where the pregnancy continued for weeks and resulted in a healthy birth?
A. I can't give you a specific one, no.
Q. Are you aware of any?
A. I know that I have taken care of patients with little to no fluid that was under expectant management care.
Q. And when you say expectant management care, you mean a wait and see approach?
A. Yes.
Q. And the patients you've cared for who've had little to no amniotic fluid and who were managed -- or their care was expectant management, did any of those patients ultimately have a healthy birth?
A. So I don't follow through with the

deliveries. Oftentimes antepartum is an area -- we are sister hospitals with Boardman.

Q. Uh-huh.

A. St. -- St. Joseph and St. Elizabeth Boardman work together. They do higher level of care than we do at St. Joe's, so these patients that are under expectant management care typically are not at St. Joe's. They would be transferred to Boardman and where they are then treated and evaluated by the high-risk physicians there.

So I don't always see the outcome. I don't always -- I'm not there for the birth, but we are aware of expectant management being done. They may come back later and visit. They -- you know --

Q. Okay.

A. -- come --

Q. Go ahead.

A. They may come later if they were able to fill with fluid and have a later birth. You know, there's all different cases. You can't put all of them in the same situation.

Q. I agree. And I'm asking you about cases that you personally know of. And, again, not any patient-specific information, but I want to just be clear what I'm asking and -- and hopefully get a clear answer.

Are you personally aware of any situation in which a second trimester pregnancy where there was little to no amniotic fluid remaining through expectant management resulted in a healthy birth?

A. I --

MR. PRISLIPSKY: Objection. Go ahead.

A. I am not.

Q. Okay.

A. That would -- that would occur somewhere that I do not work.

Q. Okay. All right. So on September 19th, 2023, you learned that Ms. Watts would be coming from Dr. Khavari's office. How far away is Dr. Khavari's office?

A. It's across the parking lot.

Q. Okay. And did Dr. Khavari come with her?

A. No.

Q. All right. So she arrived at labor and delivery. Did you meet her at that time?

A. I did not.

Q. All right. And did you meet Brittany Watts at any point on September 19th, 2023?

A. No.

Q. All right. What was -- what did you

learn about Brittany Watts that day that you haven't told me yet, you know, after -- after she arrived?
A. I only learned that her bleeding was minimal. We were thinking, you know, she was hemorrhaging. She had minimal bleeding. Her vital signs were stable, and that we were just monitoring her. She was on the fetal monitor. The tracing looked good. She was not in labor, and we were just watching her.
Q. Okay. So -- and the instructions that Dr. Khavari had given to your colleague, Angelina, were that this was just to be -- she was just to be monitored?
A. Yes.
Q. Okay. And who was in charge of Ms. Watts' care at this point?
A. Her nurse that day was Sunnie.
Q. But who was directing her care?
A. Dr. Khavari.
Q. Okay. And did Dr. Khavari, to your knowledge, tell anyone in the labor and delivery unit that she had offered Ms. Watts a cesarean section?
MR. PRISLIPSKY: Objection. Speculation. Foundation. Form. Go ahead. You can answer.
A. I don't recall that.
Q. Okay. Would that have stood out to you

if you heard that?
MR. PRISLIPSKY: Objection. Go ahead.
A. Probably.
Q. How come?
A. I mean, I would have remembered that because we don't do a cesarean section on a 22-weeker typically.
Q. Okay. Why not?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. You can answer.
A. I mean, we -- it would stand out because for a C-section you would have other medical indications, like if she truly was bleeding out, or it would be emergent. You can deliver vaginally. It's much safer, more -- there's more risk with surgery. It's just -- but that is, again, up to the doctor. If she chose to do that, that's what we would have done.
Q. Okay. So if Dr. Khavari had said I offered the patient a cesarean section, and that is what she would like to do, you would have gone along with that, no questions asked?
A. Oh, absolutely.
Q. Okay.
A. Yes.
Q. And -- but based on your experience and

knowledge, a cesarean is a riskier option than vaginal delivery --
MR. PRISLIPSKY: Object --
Q. -- correct?
MR. PRISLIPSKY: I'm sorry. Objection to form. You can answer.
A. Yes.
Q. Okay. Now, you've been at St. Joe's for some time now. Do you have close relationships with any of your colleagues?
A. Yes.
Q. Okay. Who do you have a close relationship with?
A. I have close relationships with several staff members. Like, can you describe close?
Q. Sure. Someone who you would describe as a close friend.
A. So I have a few girls that I travel with. I think that would be a close friend.
Q. Okay.
A. Yes.
Q. And who are they?
A. I have a friend Denise who works as a scrub tech. We have traveled together. I have a friend Kathy, who is an LPN; we have traveled together. Sunnie

and I have traveled together. I think those -- there's one employee, her name is Alicia. I'm kind of like a mother to her. She has children. I have had her children in my home. We've done dinner together. I've been there a long time --

Q. Uh-huh.

A. -- you know, so I have those kind of acquaintances and friendships.

Q. Okay. Anyone else that you socialize with outside of work?

A. Brooke Thigpen, it's now Schubert. Brooke and I are very close friends. We've been -- you know, traveled. We do dinner out sometimes, yes.

Q. Okay. What about Angelina Rechichar?

A. No. I mean, we're friends, but we don't do things outside of work together.

Q. Okay. Do you talk about personal matters?

A. Like our own personal matters?

Q. Uh-huh.

A. At times.

Q. Okay. And what about Jordan Carrino?

A. No.

Q. You are not close friends with her?

A. No.

Q. Would you describe her as a friend at all?
A. I would just describe her as a coworker.
Q. Okay. You've never socialized with her outside of work?
A. No.
Q. All right. I want to go back really briefly to the exhibit that I showed you about fetal demise care.
A. Yes.
Q. And, you know, we talked about the emotional experience and how difficult it can be. Would you agree that later gestational age, it can be more traumatizing for a patient?
MR. PRISLIPSKY: Objection. Form. Foundation. You can answer.
A. I don't. I mean, I think it depends on the mother, but I've had women who are miscarrying a 12-week pregnancy, and they are just really having a difficult time. I've had 30-some-week loss that you wonder -- I mean, it -- it -- how they appear to be I know can be deceiving, but I think a loss at any gestational age can be very upsetting to the mother.
Q. Okay. So there have been times when it was -- they're a 33-week loss, which is nearly full-term;

right?
A. Yes.
Q. Where to outward appearances the patient appeared to be okay?
A. Not okay, but just maybe grieving in a different way.
Q. Okay. And you can't get in their mind; right?
A. Absolutely not. I cannot judge what they're going through.
Q. Okay. Does what you read of this document, the parts that we went over, does that comport with your own experience? And I don't want to raise painful memories, but I understand that you lost a pregnancy at the exact same gestational age as Ms. Watts?
A. I did.
Q. Okay. And so you know yourself that this is a difficult experience?
A. Yes.
Q. And you mentioned that when Ms. Watts was going to be sent over by Dr. Khavari, that Dr. Khavari said what the estimated gestational age was?
A. Yes.
Q. And you reviewed the medical records. Did you see that Dr. Khavari's initial assessment was

that the gestational age was 18 weeks?
A. No.
Q. Okay. So that's just something you did not see in the records?
A. I did not see that, no.
Q. Okay. And that's not the information you were given?
A. No.
Q. Now, we're talking about it a few years ago, so you -- do you remember for sure that you were not told that the fetus was 18-weeks gestation?
MR. PRISLIPSKY: Objection to form.
A. I was not told anything by Dr. Khavari. Angelina relayed to me twenty -- I don't remember if she said 21 or 22, but it was not 18.
Q. Okay. And of that you're sure?
A. I am sure.
Q. Okay.
A. Yes.
Q. Does it surprise you to hear that Dr. Khavari's initial assessment was 18 weeks?
MR. PRISLIPSKY: Objection to form.
A. I just --
MR. PRISLIPSKY: Misstates the evidence. Go ahead. You can answer.

A. I just didn't read that in the record, so yeah, I am surprised.
Q. Okay. How is gestational age, to your knowledge, determined?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Go ahead.
A. It would be determined on different measurements that they take on an ultrasound.
Q. Is that the only way of estimating gestational age?
A. That's the only way I know. They sometimes will do a fundal measurement, like where the fundus over the top of the uterus is in relation to the umbil- -- umbilicus. That's usually used later in the pregnancy. But the most accurate gestational age determination is done by ultrasound.
Q. Okay. What about last menstrual period? Isn't that a method for estimating gestational age?
A. That's probably the least reliable because you can still have a menstruation while you're pregnant.
Q. Okay. Let's talk about that a little bit. When you say you could still have a menstruation when you're pregnant, do you mean that you could actually menstruate in the medical sense, or that you may have

some bleeding that appears to be menstruation?
A. That is -- it would be you could actually have menstruation while you're -- I mean, we have patients who every month for the first few months will still have what they call a period. Is it menstruation or other source of blood, that would be -- need to be determined.
Q. Okay. Well, they're not ovulating while they're pregnant; right?
A. That is correct.
Q. Okay. And -- but you're familiar with people having what they at least perceive to be periods while they are actually pregnant?
A. Yes.
Q. And does that phenomenon sometimes delay a woman realizing that she's pregnant?
A. Yes.
Q. Okay. And that's maybe not -- well, I don't know. Would you say that's common?
MR. PRISLIPSKY: Objection. Form. You can answer.
A. I -- it's not common --
Q. Okay.
A. -- in my observation of what we see.
Q. Right.

A. No.
Q. But you're aware that it happens?
A. Yes.
Q. What was your understanding on September 19th of Brittany Watts' menstruation history over the preceding months?
MR. PRISLIPSKY: Objection to form. You can answer.
A. I didn't have any knowledge of her menstruation pattern.
Q. Okay. So you don't recall being told that she had believed she menstruated in July of 2023?
A. No.
Q. Okay. Is that a fact you ever learned?
A. No.
Q. Is that a fact that you read in the medical records when you reviewed them in preparation for this deposition?
A. No.
Q. Okay. So that's a completely new fact to you?
A. Yes.
Q. Does it change anything for you?
A. No.
MR. PRISLIPSKY: Objection.

Q. Okay. When people are pregnant, when -- at what stage do they start receiving prenatal care per recommendation?

MR. PRISLIPSKY: Objection to form. Foundation. You can answer, if you know.

A. We recommend prior to twelve weeks. Usually the typical time is at about eight weeks that they -- when they've missed that period, they usually then do a pregnancy test and seek care, but we really want it before twelve weeks.

Q. Okay. So -- and that's -- is that fairly universal?

A. I believe so.

Q. Okay. And that's part of your training?

A. It is.

Q. All right. So by the time you get to 12 weeks, you need to come see a doctor?

A. Yes.

Q. All right. So what else do you remember about September 19th relating to Brittany Watts, 2023, to be clear?

A. Yes. That's -- that's all I remember. I would have left around 4:00 that day, and I just knew that she was there being monitored, and that the baby had a strong heartbeat, that her bleeding was good. We were

very relieved because we were expecting, like, hemorrhage and -- and she wasn't bleeding, so that was reassuring to us.

Q. Okay. And what was your understanding of her fluid level at that point?

A. On that day I don't recall hearing anything about a fluid level.

Q. Okay. And I'm sorry if I asked this and -- and missed it, but were -- were you aware on September 19th that she had had rupture of membranes?

A. No.

MR. PRISLIPSKY: Objection. Asked and answered.

Q. Okay.

A. I -- I was not aware on that day that she had.

Q. Okay. So on September 19th, you said you were relieved. Was it your belief that this pregnancy could continue?

MR. PRISLIPSKY: Objection. Go ahead.

A. I didn't really have an opinion either way whether it would continue. I just was relieved that she wasn't hemorrhaging. That would be dangerous for her. And then I left. So when -- at the time of my leaving, we're just watching her or observing her and the

baby.
Q. Okay. And you did not personally observe her?
A. I did not.
Q. Did you communicate with Nurse Hudak that day?
A. I did not.
Q. Okay. So not about Brittany Watts?
A. Not that I recall.
Q. Okay. And what about after you left on September 19th? Did you communicate with Nurse Hudak about Brittany Watts?
A. No.
Q. Okay. And so you said you went home around 4:00?
A. Yes.
Q. And you went home, and as far as you know, everything was fine?
A. Yes.
Q. All right. And when did you return?
A. I returned the next morning at 6:00.
Q. Okay. And did you learn anything about Brittany Watts at that time?
A. Yes.
Q. Who did you learn information from?

A. I don't know the specific nurse, but I do remember them saying she had left the day after. Because I'm coming in, expecting to have her still on my patient census, and they said she had left against medical advice the day before.
Q. Okay. What was your reaction to that?
A. We have people leave. I mean, that's not uncommon.
Q. Okay.
A. I don't recall feeling one way or the other.
Q. Did you feel concerned for her well-being?
A. I did feel concerned. At that point I still didn't have knowledge of the rupture or -- I only knew of the abruption part of it, so the fact that she wasn't bleeding, to me she's stable, so I don't recall feeling overly concerned.
Q. So your understanding was that she was not bleeding at all?
A. Minimally. I just remember them saying she really wasn't bleeding much at all.
Q. Okay.
A. I would say minimal.
Q. Were you told on the 19th -- sorry to

skip back -- that Ms. Watts reported she had been bleeding for two days at that point?
A. No.
Q. Okay. That's not information you got?
A. No.
Q. Would that have changed anything for you?
A. I'm not sure.
Q. Okay. Why -- why are you not sure?
A. I mean, if she's not bleeding when she's with us and then she leaves, she's stable. I -- I knew after I reviewed the records that she had been bleeding for a couple days, but on that day I did not. I was not notified of that.
Q. Okay. On -- on the 19th or the morning of the 20th at 6:00 when you got there, did anyone give you any information about Ms. Watts' personality?
MR. PRISLIPSKY: Hold on. If I could just take -- you said on the morning of the 19th at 6:00.
MS. RICKERT: Oh, I'm sorry. Thank you. Let me start that over again.
Q. Either on September 19th, 2023, or the morning of the 20th when you returned, did anyone give you any information about Brittany Watts' personality?
A. No.

Q. What about her mental health?
A. No.
Q. What about her emotional health?
A. No.
Q. What about her desires for her care?
A. No. That didn't come up until later, so on the morning of the -- of the 20th, no. We -- she was still unknown to me of what her outlook was on her care.
Q. Okay. And as far as you know, had anyone -- the -- by the morning of the 20th when you arrived, had anyone reached out to Ms. Watts to check on her?
A. Not to my knowledge.
Q. Okay. And did you hear anything else about Ms. Watts before she returned on the 20th?
A. No.
Q. All right. And then Ms. Watts did return on the 20th?
A. Yes.
Q. Do you remember about what time that was?
A. It was at 9:00 something. I don't -- I don't know the exact time, but it was in the morning.
Q. Okay. And how did you learn that she had returned?

A. So I think it was one of those me coming out to the -- check on the staff, because I remember being at the nurse's station, and Elaine was the nurse caring for Brittany, and she told me that she came back into the -- you know, into the unit.
Q. Okay. And did you have questions?
A. Yes.
Q. What were your questions?
A. I just wondered what she came -- you know, what was her status? Was she bleeding? You know, we discussed her, and Elaine told me that she had presented to the desk seeking -- she was here for her medical abortion. And Elaine said, I told her that we don't do abortions. And I'm like, well, no. What did -- what else did she say? And she just said she was here for her abortion. So Elaine took her into a private room and put her on the monitor, and, you know, what we normally do for a patient arriving, and -- and then called Dr. Khavari to let her know that she was there.
Q. Do you have any idea where Ms. Watts would have gotten the idea that she could obtain an abortion at St. Joe's?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. I do not know.

Q. Are you aware of anyone telling Ms. Watts -- anyone at St. Joseph telling Ms. Watts that to induce labor at this stage would be an abortion?
A. I do not.
Q. Okay. Would you agree that to induce labor on September 19th would have constituted an abortion?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Go ahead. You can answer.
A. It would constitute a termination of a pregnancy, yes.
Q. A voluntary one?
A. Yes.
Q. So that would constitute an abortion by your definition; correct?
A. Yes.
Q. Okay. So if Ms. Watts were told that an induction under the circumstances would be an abortion, that would have been a true statement from your perspective?
MR. PRISLIPSKY: Objection to form. Go ahead.
A. No decision had been made to -- to do an induction at that point, so we would not have told her she was there for an induction. So you're asking me if

we told her she was there for an induction, she may interpret that as an abortion?

Q. No.

A. I'm sorry.

Q. I am asking -- that's fine. This is exactly why you're supposed to let me know when -- when my question doesn't make sense or you're unsure. If someone had told Ms. Watts on September 19th that inducing labor at that stage would constitute an abortion, that would have been a true statement from your perspective; correct?

MR. PRISLIPSKY: Objection to form. You can answer.

A. It would be a true statement if someone -- yes, I see what -- yes.

Q. Okay. And when you were told that Ms. Watts had returned, come to the desk and said I'm here for my medical abortion --

A. That's what term she used.

Q. Okay. Is that documented anywhere in Ms. Watts' medical records?

A. No.

Q. Why not?

A. I'm not sure why not. The nurse chose not to document that, and I don't know.

Q. Now, you're the supervisor; correct?
A. Yes.
Q. You didn't document this either?
A. I did not. Because I did not hear her say it.
Q. Okay. And you didn't instruct the nurse to document it?
A. No.
Q. This was a request for care; right?
MR. PRISLIPSKY: Objection. Go ahead. Answer.
A. What was a request for care?
Q. Assuming that Ms. Watts arrived and said I'm here for my medical abortion, this was a request for care; correct?
MR. PRISLIPSKY: Objection. You can answer.
A. She was requesting -- she was just saying that she's back now to have whatever needed to be done for her care, yes.
Q. Right. So it was a request for care?
A. Okay.
Q. You agree?
A. Yes. Yes.
Q. Okay. Do you normally document when a

patient makes a request for care?
A. We document what they present with. Like, if they're there with a headache, we document they're there for a headache. If we document that they're there for high blood pressure, we document they're there for high blood pressure.
Q. Okay. So you don't document what the patient says they want?
A. Not necessarily.
Q. Why not?
A. We just don't.
Q. And that is -- is that part of your training?
A. I mean, that's routine. If you come for a procedure, we document why you're there. If you're there for an induction of labor, I always write, here for a scheduled induction of labor. If you're there because you feel your water broke, I'll put patient perceives spontaneous rupture of membranes. If you're there because you have a headache, patient here with a headache.
Q. Right. And if a patient tells you there's particular care I'm seeking, you don't consider that to be significant?
MR. PRISLIPSKY: Objection to form. You

can answer.

A. I think it's significant. I think it could have been documented and been okay. The fact that she did not document the specific word abortion is still okay. She said that she was there, and she documented all of her care. So the fact that she didn't put in her note is something that I don't know why.

Q. Okay. Would you have documented that if you had been told that directly?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

A. I'm not sure.

Q. Why are you unsure?

A. I would -- I mean, I -- it wasn't presented to me, so would I document? I document pretty significantly, so maybe, but I can't say for sure.

Q. Okay. Did you think it was strange that Ms. Watts would have arrived and said that she was there for her medical abortion?

A. I did not, because -- I'm trying to go back to when I learned. Dr. Khavari had told us that she came to her office on the 19th seeking an abortion. So I'm trying to remember if I had that knowledge on the 19th or if I received that later on the 20th. I feel like it was later on the 20th.

Q. All right. Let's -- let's back up.
A. Okay.
Q. Dr. Khavari -- now, Ms. Watts didn't go to Dr. Khavari's office on the 20th; right?
A. No.
Q. She went on the 19th?
A. That is correct.
Q. And you're saying that Dr. Khavari reported that Ms. Watts arrived on the 19th seeking an abortion?
A. Yes. And that, I'm -- I'm remembering. That came -- so throughout the day on the 20th is when that was relayed to us, that Dr. Khavari shared that because I think Elaine's concern is why is she asking for an abortion. It was something we don't hear. And so in relaying that to Dr. Khavari, Dr. Khavari had said to Elaine, yes, she came here asking for that as well the day before. That is what I'm recalling, yes.
Q. And Dr. Khavari didn't tell her we don't do that?
A. I do not know.
MR. PRISLIPSKY: Objection. Go ahead.
A. I don't know what she told her.
Q. Okay. And are you aware that the medical records show that Ms. Watts arrived to

Dr. Khavari believing she had miscarried?
A. Yes.
Q. Okay. So that's not the same as arriving and asking for an abortion, is it?
A. It is not.
Q. So do you have any theory for where that discrepancy comes from?
A. I don't know if she came prior to the 19th. I don't know if she mentioned it on the 19th. I don't work in her office, but she told us that the patient had come to her office seeking an abortion.
Q. Did she tell you that directly?
A. No, she told Elaine. I believe it was Elaine. I did not hear it directly.
Q. All right. Did you ever talk to Dr. Khavari about Ms. Watts?
A. No.
Q. At any point?
A. No.
Q. Okay. So you don't have any information firsthand about what Dr. Khavari said about Ms. Watts?
A. That is correct.
Q. All right. So I'm assuming that Elaine -- and, again, just to the extent you know, told Ms. Watts we don't do that?

A. That is correct.
Q. Okay. But Ms. Watts didn't leave?
A. She did not.
Q. What was your understanding of what Ms. Watts wanted after she was told she could not have an abortion?
A. My understanding was that she just wanted to be cared for, that she did not want the pregnancy. She wanted to terminate the pregnancy.
Q. Okay. But she was told we don't do that?
A. That's right.
Q. And what was your understanding of -- was she -- sorry. I'm just trying to understand what you thought she was there for if she was saying I want to terminate the pregnancy and she's being told we don't terminate pregnancies?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. So I, again, on the 21st did not ever --
MR. PRISLIPSKY: Wait, wait. You said 21st.
A. I'm sorry. 20th.
Q. Uh-huh.
A. Go in and care for her or speak to her

directly. So all of my knowledge of that day is through Elaine.

Q. Okay.

A. Elaine calls the doctor, Khavari, gets orders of what to do now for her. There were antibiotics ordered. Monitoring was ordered. So I don't know what Brittany is saying in the room. I don't know her demeanor. I don't know her affect. I don't know how she took that news. I just know she was told that, and then she would have been explained her care is going to involve monitoring and IV antibiotics, and that's what we proceeded to do.

Q. Okay. And what was the reason for the IV antibiotics?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer.

A. To prevent infection.

Q. Okay. Not to treat an infection?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. You can answer.

A. It -- it would -- it could be used for either, but at this point it was just to have antibiotics on board so she would not get an infection.

Q. How do you know that?

A. That is my speculation on why she would

order antibiotics.
Q. Okay. I generally don't want you to speculate, or at least say when you are; okay?
A. Okay.
Q. Because otherwise I'll assume it's knowledge that you have --
A. Okay.
Q. -- okay? So let me ask again. What do you know about the reason that Ms. Watts was being given antibiotics that day?
MR. PRISLIPSKY: Objection. Calls for a medical opinion.
A. I would just say that they were ordered by the doctor, and if you wanted the exact reason, you would have to speak to the provider about that.
Q. Okay. So it could have been to prevent infection; it could have been to treat infection?
A. According to the doctor's discretion, yes.
Q. Yeah, the doctor could have had --
A. Dr. Khavari.
Q. Dr. Khavari could have had either one of those reasons?
A. Yes.
Q. Okay. And you were on -- on the 20th,

did you speak to Sunnie Hudak that day?
A. No.
Q. Did you have any communication with Sunnie Hudak about Brittany Watts that day?
A. No, I did not.
Q. So I think you said that you didn't have any -- because you did not interact with Ms. Watts yourself, you didn't have any information about her state of mind; correct?
A. That is correct.
Q. And you knew the words she had said?
A. Yes.
Q. All right. What did you know about how she was feeling?
A. I knew from Elaine that she said that she did not want to -- if the baby were to be born, she did not want to see it. She did not want to know about it. If it passed, then we could tell her, but that she did not want to have any involvement with the infant.
Q. Okay. How did you feel about that?
MR. PRISLIPSKY: Objection. Go ahead.
A. I mean, it's clearly what she wanted, but that explained why she was seeking a termination. In my mind, that would explain why you come looking for an abortion. You didn't want this baby.

Q. Do you know whether Ms. Watts had been told that her pregnancy was doomed?
A. I do not.
Q. Why would Ms. Watts have been asked --
MS. RICKERT: Or strike that.
Q. You said that Ms. Watts had expressed that she did not want to see the baby when it was born; correct?
A. Yes.
Q. Did she want to give it up for adoption?
MR. PRISLIPSKY: Objection. Speculation.
A. She didn't want the baby. She just made it very clear that this was a pregnancy she did not want. She didn't want the baby. She didn't want to see it. She -- they explained to her, like -- they attempted to explain like how things would go typically if you deliver. We -- we would consult social work. We would have a funeral. You would have to have all these things, and she wanted no part of that. She just wanted us to handle things for her.
Q. What do you mean we would have a funeral?
A. You're required by law to have a funeral after 20 weeks gestation. In the State of Ohio, you have

to have a burial. I will not say funeral. I will say burial.

MS. RICKERT: Hold on just one second. My colleague, Rachel, she needs to get back in. Thanks.

Q. Okay. So not a funeral. Not a religious --

A. I -- I misstated that.

Q. Not a religious service?

A. No, ma'am.

Q. And you're saying that cremation is not an option?

A. Cremation is an option.

Q. Okay. So you don't need to have a burial?

A. You have to have some form of cremation or burial. If you choose not to do it, the hospital can make those arrangements for you, but after 20 weeks, it is reported to Ohio as a fetal death, and something has to be done with the remains.

Q. Okay. And are you saying that under the law, after 20 weeks gestation, the fetal remains are never treated as medical waste in Ohio?

A. That is absolutely correct.

Q. Okay. And what law are you talking about?

A. I don't know the name of the law. I just know at our facility that is always -- we have a form that we fill out for the Ohio Department of Health.
Q. Uh-huh.
A. And that -- for every fetal death they are called.
Q. I understand the need to report the fetal death after 20 weeks. I'm talking about disposal of the remains, and I'm wondering about your knowledge of the legal requirements for disposal of fetal remains past 20 weeks gestation.
A. I'm not aware of the law. I just know that we were told that's what it has to be. That's what it has to be.
Q. Cremation or burial?
A. Yes.
Q. All right. And --
MR. PRISLIPSKY: Hold on. You're getting a high sign.
MS. RICKERT: Oh. What -- sorry. Oh. I see. Oh, I can do it. I think. Actually I can't. Okay. Let's --
MR. PRISLIPSKY: There's the mouse right there. That can --
MS. RICKERT: Oh, that -- gotcha. Okay.

Okay. Sorry. I didn't realize that was over there.
Q. Okay. So were you keeping up -- you know -- so -- all right. First of all, on the 20th, Dr. Khavari was not at the hospital there during the day when Ms. Watts initially arrived; right?
A. That is correct.
Q. Okay. And were you keeping track of what Dr. Khavari -- what -- her assessment of the patient?
A. I'm keeping track now of when she's contacted. You know, now I'm involved. I'm watching the situation unfold. I'm making sure that she did know that Brittany had arrived and what were her orders.
Q. When you say now I'm involved, do you mean that you were involved in a different way than you had been the previous day?
A. I was asking more questions and just more aware. On the 19th, I was primarily in the office and doing things. Now on the 20th, I'm more present. I'm giving support to Elaine with her questions. That -- I did not have any direct care involvement, but I'm aware of how things are going.
Q. Okay. And -- but you were not aware what Ms. Watts had been told about her pregnancy?
A. No.

Q. And her prognosis?
A. No.
Q. If Ms. Watts had been told that her fetus would not survive and that her pregnancy would not be able to progress, would that explain why she may have wanted the pregnancy to come to a swift end?
MR. PRISLIPSKY: Objection. Speculation. Form. Foundation. You can answer.
A. I don't know how it would make her feel. Like I said, every mother is different. Typically in many cases you would see a mother distraught. You know, is there anything else I can do? I don't want to lose my baby. Brittany appeared very -- according to not my own personal assessment but Elaine's assessment -- very flat, very I don't -- I don't want to have anything to do with it. You take care of it for me.
Q. Did Ms. Watts say, to your knowledge, if the baby is born healthy, I want nothing to do with it?
A. She did not use that term. She just said when the baby is born.
Q. Okay. You said different people grieve differently; right?
A. Yes.
Q. It could be hard for some women to hold a dead fetus, for example; right?

A. Yes.
Q. And -- and that's why you give options; right?
A. Yes.
Q. Does someone not wanting to hold a dead fetus mean they're not grieving?
A. No.
Q. Okay. Does someone not wanting to see a dead or dying fetus mean they're not grieving?
A. No.
Q. All right. So it seems like you knew a lot about what Ms. Watts was saying to Elaine?
A. Yes.
MR. PRISLIPSKY: Objection to form.
Q. But very little about what people were saying to Ms. Watts; is that fair?
A. That is fair. And I -- do you mean what people were saying to Ms. Watts, like her doctor?
Q. Yes.
A. Yes. I was unaware of anything that she had been told at this point from her provider.
Q. Okay. And were you aware of any assessment of the viability of the pregnancy? And actually I'm going to strike that. I don't want to use the word viability because that has a specific term -- or

that has a specific meaning in this context, right, about whether a fetus is developed enough to survive long term outside of the womb; right?
A. Yes.
Q. Okay. What I mean is, did anyone -- were you aware of any doctor making an assessment that this pregnancy was doomed?
A. No. I was aware -- so I was aware that Dr. Khavari had done an ultrasound in the office on the 19th.
Q. Uh-huh.
A. We asked for -- we asked for that report on the 20th to compare because then we did an ultrasound at the hospital.
Q. Uh-huh.
A. And when we asked for the report of the ultrasound done on the 19th, they could not produce it.
Q. Why not?
MR. PRISLIPSKY: Objection. Speculation.
A. I don't know.
Q. Okay. And is this something that you personally requested?
A. Angelina had asked for it. She said, you did an ultrasound on the -- yesterday when you

called -- she called over and spoke to them and said, you did an ultrasound yesterday. Can we have that to compare? Because now we have -- you know, on the 19th we have an abruption. On the 20th, our ultrasound is done, and we have no abruption or no sign of abruption. So we wanted to compare.

Q. So this was something that Angelina wanted to do?

A. Yes.

Q. And when you say there was no abruption, who said so?

A. Our ultrasound that we did on the 20th at St. Joe's resulted with no abruption.

Q. Okay. And who would have conducted this comparison?

A. If there were to be a comparison?

Q. Uh-huh.

A. It would be the doctor that would look at it.

Q. Okay. But the doctor didn't request --

A. Right. I mean, we would read it. If we were given an ultrasound report from the day before, we could look at it and compare it to what we have here. So here we have one on the 19th where the doctor says there's an abruption and an imminent -- I believe it's

per her words -- she could feel the baby's hair and see that the -- it was coming down, whatever. And over here we have an ultrasound done that shows a normal length cervix, a fetus with a strong heartbeat, no abruption at all. So you see where our dilemma is. We have two different scenarios.

Q. I've got a lot of questions about this.

A. Okay.

Q. I'm not sure I see where your dilemma is. The -- who read the ultrasound from the 20th and concluded there was no abruption?

A. It would have been radiology.

Q. And radiology said there was no abruption?

A. Yes. They -- they wrote the report that they then give to us.

Q. Did they say we do not detect an abruption, or there is no abruption?

A. There's no -- I believe the words were no sign of -- no apparent abruption or no sign of an abruption.

Q. Okay. And you -- you said -- when did you learn that Dr. Khavari had said she could feel hair?

A. That was on the 19th when she had said she's sending her over. They -- we did an ultrasound.

Q. Uh-huh.
A. That was relayed to Angelina.
Q. Okay. And you're telling me that even though you heard on the 19th from Dr. Khavari that she could feel hair, that you were unaware that there was rupture of membranes?
A. You can feel hair through rup- -- through membranes.
Q. So that's what you understood?
A. I didn't really think of it that way. I didn't think of hair versus no hair, because now I'm thinking of it on the 20th, and I've got an ultrasound before me that says there's a normal length cervix. I don't know that she ever felt hair.
Q. Okay. So you think she might have made that up?
MR. PRISLIPSKY: Objection. Misstates her testimony. Go ahead.
A. I'm not going to say she made it up. I'm going to say that you have one image here and you have another one here.
Q. Okay. She wasn't saying she got an image of hair; right?
A. No.
Q. She said she felt it?

A. Yeah.
Q. And -- and you stand by your testimony that you can feel hair through the amniotic sac?
A. I believe you can. I don't -- I -- yes, you can. It depends. Obviously if it's bulging, you won't. If it's up against the head, you can. There's different scenarios, but to feel hair on a 22-week fetus is going to be difficult at best, so --
Q. Okay. Have --
A. And --
Q. -- you ever felt hair through an amniotic sac?
A. No.
Q. Okay. So you're -- that's speculation?
A. I'm not assessing for that.
Q. Right. So you're speculating that hair could be felt through an amniotic sac; is that right?
A. Maybe.
Q. Okay.
A. I'm unsure. I'm just unsure.
Q. Okay. I'm asking because you said that was possible.
A. Yeah.
Q. Because I would have assumed -- and I am definitely not a medical professional --

A. Right.
Q. -- but -- that if a doctor could feel hair, that that would be a very strong indication of rupture of membranes, or at least I would have a question of whether there's ruptured membranes.
A. Yes.
MR. PRISLIPSKY: Objection to form. Misstates the evidence. But go ahead.
Q. Okay. But -- okay. So then the ultrasound is done on the 20th by radiology. And would you say that your heightened involvement on the 20th resulted from Elaine's report about what Ms. Watts had come in and said?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. I don't think it was heightened. I just think it made it -- it presented a different view of how things were going to go.
Q. What do you mean?
A. If she's seeking an abortion and doesn't want involvement with the baby, then we're going to take on the role of making sure that her wishes are honored; that we're going to care for the infant ourselves once it's born. That we're not going to do skin to skin, that we're not going to show her the baby. Those are the kind

of things that we do with our program. If there's a loss and you don't want to see it, it doesn't mean that you have to see it. That's going to change the way we care for you.

Q. Okay. Why would that cause you to be more involved in the case?

A. Oh, no. It wouldn't cause me to be more involved.

Q. All right. What caused you to be more involved on the 20th than on the 19th?

A. I just think I was out there more. I'm more aware. I'm -- you know, now she's come in twice. I'm going to be watchful over this. I -- I'm not sure why. I'm the -- I'm the assistant manager.

Q. Okay.

A. I'm going to be -- anytime something comes in that's above or different than the norm, we're more involved. And someone seeking an abortion is definitely different. Somebody that was here the day before and left and returned is different. We want to make sure now absolutely that she gets what she needs.

Q. Okay. So both of those factors, the fact that she had left the day before and then returned and fact that she was seeking an abortion, made you become more involved in this case on the 20th?

A. Yes.
Q. All right. And who told you that ultrasound is the way to diagnose an abruption?
A. Nobody told me that. That is something that we -- that is the way we look for an abruption. Anytime we suspect a partial or a full abruption, other than if it's clearly an indication to go for emergency surgery, you would do an ultrasound.
Q. Okay. And are you aware that not all abruptions are visible by ultrasound?
A. I am sure that's possible, but I can tell you that I've -- we do usually see an abruption on ultrasound.
Q. And what experience are you drawing on?
A. Just my experience as a labor and delivery nurse. You can see an abruption on an ultrasound.
Q. Okay. But if there are times when you cannot, you're unaware?
MR. PRISLIPSKY: Objection.
MS. RICKERT: Or strike that.
Q. Are you telling me that you are not aware that placental abruption sometimes cannot be detected by ultrasound?
MR. PRISLIPSKY: Objection.

A. I really don't know the answer to that.
Q. Okay. Let me ask that in a non, like, double negative form. Are you aware that placental abruption is sometimes not visible during an ultrasound?
MR. PRISLIPSKY: Objection.
A. I am not.
Q. Okay. So because you're unaware of that, the fact that the radiologist did not detect an abruption led you to conclude there was no abruption; correct?
A. That is correct.
Q. Okay.
A. And the fact that she was not bleeding at this point also led me to think that there's -- it probably correlates with the ultrasound because she, again, on the 20th, was not bleeding.
Q. Why do you say that?
A. Because Elaine documented that there -- there was no heavy -- not heavy bleeding. I -- she may have been spotting, I don't recall, but there was no heavy bleeding. You would suspect in an abruption that you're going to have a mother heavily bleeding and you need to deliver.
Q. Okay. That -- and that's in your medical judgment?

A. That is in my experience as a nurse.
Q. Okay.
A. If you have heavy bleeding and you suspect an abruption, you do a delivery.
Q. All right. And you said that Ms. Watts was not bleeding, but -- and we'll look at specific medical records --
A. Yes.
Q. -- a little bit later, but the medical records indicate that she was bleeding on the 20th and she reported bleeding. Are you not aware of that?
A. I wasn't aware of any heavy bleeding. If -- if she were spotting, the same as the day before, maybe that, but I don't recall any bleeding that would be indicative of an abruption.
Q. Okay. So when you concluded that contrary to Dr. Khavari's diagnosis from the previous day of partial placental abruption that, in fact, Ms. Watts did not have a placental abruption, did you share that view with Dr. Khavari?
A. No.
MR. PRISLIPSKY: Objection.
Q. Why not?
A. I didn't speak to Dr. Khavari that day at all.

Q. Did you direct one of your supervisees to share that information with Dr. Khavari?
A. They would have given her the results of the ultrasound, yes.
Q. Okay. And she would then assess for herself?
A. Yes.
Q. You were -- you said there was a dilemma; you were confused by the diagnosis and the current ultrasound. Why not ask a doctor to explain that discrepancy?
A. She consulted another doctor to come in.
Q. That's not my question. Why didn't you ask a doctor to explain what you perceived to be a discrepancy?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. I did not do that that day. Why, I don't know. I just didn't. I did not have any involvement with Dr. Khavari. Whether Elaine did or not, I don't know. If she -- when she gave her the results, she may have said why is it different. I don't know that conversation.
Q. Okay. But --
A. I directly did not.

Q. And you didn't learn any answer to that dilemma? Okay. So you --
A. No.
Q. -- just operated under the belief that there was no abruption?
A. That is correct.
Q. And you said she had a normal length cervix?
A. (Nodding head.)
Q. And do you mean she was not dilated?
MR. PRISLIPSKY: Objection. Go ahead.
A. It didn't -- it didn't -- it didn't -- it did not address the dilation.
Q. What do you mean?
A. The ultrasound didn't say dilated or not dilated. It just said normal length cervix.
Q. Okay. So what was the significance of the normal length cervix to you?
A. If you have a normal length cervix, it's different. If you have a fully dilated mother, your cervix is going to thin and be very thin. So as you get closer to a delivery, your cervix is no longer of a normal length. It's thin.
Q. And --
A. I --

Q. -- that's because you're becoming dilated; right?
A. You're dilating.
Q. Yes.
A. As you dilate, you thin. You would expect, if this was a case where she was dilated and ready to deliver, you would not have a normal length cervix.
Q. Okay. And so you concluded from the ultrasound showing a normal length cervix that -- that she was not dilated?
A. I didn't conclude that. I just was confused by that. I can't make a conclusion on whether or not what Dr. Khavari saw her -- the day before observed. It's just different.
Q. So you understood that Dr. Khavari had concluded that Ms. Watts was dilated?
A. Yes.
Q. Okay. And it's not possible to undilate, is it?
A. No.
Q. Okay. So were you questioning at this point whether Dr. Khavari knew what she was doing?
MR. PRISLIPSKY: Objection. Go ahead. You can answer.

A. No. I just was confused as to why there were two different scenarios.
Q. But you did not personally seek any additional information to resolve that confusion?
A. No.
Q. Okay. And your belief that Ms. Watts did not have a placental abruption and was not dilated, how did that -- or did that impact your view on what care was necessary for her?
MR. PRISLIPSKY: Objection to form. Calls for a medical opinion. Go ahead.
A. That would give us reassurance, because if she's truly not hemorrhaging and she has a normal length cervix, we may be able to do expectant management and give her a little bit more time.
Q. What did you know on the 20th about her fluid level?
A. I knew at that -- we knew that -- at that time that it was low, because the ultrasound gave us an exact number.
Q. Okay. And so how low was it?
A. I don't recall the number.
Q. Okay. But was it --
A. It was low.
Q. Very low?

A. I would say --

MR. PRISLIPSKY: Objection.

A. -- very low.

Q. Too low for -- assuming it remained that low, too low for a fetus to continue developing; right?

MR. PRISLIPSKY: Objection.

A. I can't --

MR. PRISLIPSKY: Calls for a medical opinion.

A. Yeah, I can't make that determination.

Q. And do you understand why amniotic fluid is important for development?

A. Yes.

MR. PRISLIPSKY: Objection. Asked and answered.

Q. Why?

A. Amniotic fluid is part of the growth and development of the baby. That's how they, you know, are protected and cared for. But having no fluid, they still develop.

Q. Their lungs don't develop, though, do they?

MR. PRISLIPSKY: Objection. Go ahead.

A. We -- we give medicine for -- for the development of lungs, if we can. If we're able to get

them to a gestational age where we're able to deliver, we can give betamethasone, which develops that surfactant and assists those lungs in the development. You're right. It is for lung development, but I'm saying that we have seen cases where -- you know, where we use expectant management. I was hopeful that day that we would be able to give Brittany a little bit more time.
Q. Okay. And where did you -- well, first, give -- give her more time for what?
A. For the baby to deliver safely and be alive and not a loss.
Q. Okay. So it was your view that -- on the 20th, that this pregnancy could be saved?
MR. PRISLIPSKY: Objection. Go ahead.
A. It was not my view. It would be my hope.
Q. Okay.
A. It would be my hope.
Q. And was this hope based on any medical assessment by a physician?
A. No.
MR. PRISLIPSKY: Objection. Previously asked and answered. Go ahead.
Q. Okay. And this hope was also, to your understanding, inconsistent with the patient's desires;

correct?
A. Yes.
Q. All right. So to be clear, the more -- to give Brittany more time, it was to give the baby more time to develop?
A. Yes.
Q. Okay. And I think you've answered this, but, you know, was your hope that this pregnancy could continue and result in a healthy birth, was that hope based on any judgment by a doctor?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. I hadn't spoken to her doctor, so I don't know. I -- I don't know if Khavari had talked to her about expectant management, you know, options. We could wait. We would -- I don't know what she spoke to her about. I just know prec- -- our precedence at our facility and at our sister facility is that is always how we proceed. We never would automatically just induce a 22-week gestation because the mother didn't want to carry the pregnancy. We would automatically assume expectant management. So that's a dilemma for us as nurses; we've always done it this way. Why are we not doing it this way today?
Q. Who said you weren't doing it that way

today?
A. Well, as the day -- I'm saying, as the day goes on, we have another physician visit. We have -- we're going to induce labor. This day becomes -- it becomes that to us. Like, wait a minute. This is unprecedented. Why? Why with a healthy mom and a very strong heartbeat, why are we inducing? Because we know if we induce, it will end in a demise.
Q. You -- you know that?
A. Abso- -- well, unless the baby is born and can be resuscitated, but the mother has already said no, and she has that right at 22 weeks. That would be comfort care for this baby, and a pediatrician did visit that morning and speak to her about that. Those were her wishes and we would honor that at 22 weeks.
Q. A pediatrician came to speak with Ms. Watts what morning?
A. On the morning of the 20th.
Q. Did a pediatrician also speak to Ms. Watts on the 19th?
A. I believe so, yes.
Q. Okay.
A. I was not aware of that until later review, but yes.
Q. And what -- what is the -- what was the

role of the -- it was two different pediatricians; right?
A. Yes.
Q. What was their role in this?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. Speculation. Go ahead.
A. So Akron Children's is a unit, a special care nursery adjacent to our labor and delivery unit. They partner with us if we have premature deliveries, if we have a birth that has complications, they come as a doctor and assist us with our care. So anytime we have a fetal loss, if it's living and it's going to pass and we have questions about the palliative care or the comfort care, that is their role. They come and talk to the mom to explain the development, to explain what to expect when this baby is born. What will it look like? What will it sound like? Will it cry? Will it not have breath? How long will it live? What will our measures be? This is the -- to assist mother in education and understanding of what to expect when this baby is born. Because it's at an age where it could go either way.
Let's say this baby is born at 22 weeks and it appears to be a 24-week gestation because ultrasound can go two weeks either way. They may be able to resuscitate, and they would make that determination when

it's born.
Q. Well, at what -- well, okay. First of all, were you present for either of Ms. Watts' meetings with pediatricians?
A. No.
Q. So do you know anything about what the pediatricians told her?
A. Only through their -- their narrative note.
Q. Okay. And that's -- because that's how you learn what a patient has been told --
A. Yes.
Q. -- or what a patient has said, from the notes?
A. Yes.
Q. Okay. And --
A. I do believe there was a nurse present, though.
Q. Okay.
A. It just was not me.
Q. I see. And what was the reason for two pediatricians to meet with Ms. Watts?
MR. PRISLIPSKY: Objection. Speculation. Calls for a medical opinion. Go ahead. Foundation as well.

A. On the 19th, she's our patient, so they're going to meet with her because there's a possibility -- I mean, we're monitoring her, but there is a poss- -- anytime there's a possibility that she may deliver, they will meet.

Q. Okay.

A. And so the pediatrician on the 19th is a different pediatrician because they change shifts at 7:00 in the morning. So the one on the 19th left at 7:00 in the morning of the 20th, and the one on the 20th, then the patient returned, so now we, again, need to go in and assess the situation.

Q. Now, I understand from Ms. Hudak that she asked the pediatrician on the 19th to come meet with Ms. Watts.

A. Okay. I was unaware of that. Like, I did not know that.

Q. Okay. So you did not direct anyone to have a pediatrician meet with Ms. Watts?

A. No, I did not.

Q. All right. Is it appropriate to have a pediatrician meet with a patient if there is no chance of survival --

MR. PRISLIPSKY: Objection.

Q. -- for the fetus?

MR. PRISLIPSKY: Sorry. Objection. Form. Foundation. Calls for a medical opinion. Go ahead.

A. Yes. If we -- if the mother needs to speak with someone about what to expect. It's more of a comfort for the mother. It's not directing the mother on what she needs to do. It's more of a support for her. Most mothers in that case are afraid. They don't know what to expect. What will you do? Will you try to save my baby? Will you please do everything you can? Will you -- what will it look like? Will it cry? Can I hold it? Those are all the questions that these mothers want to know.

Q. Would you say those are the questions that mothers normally --

A. Can want to know --

Q. -- ask?

A. -- yes. Not -- it's not even that it's normal or abnormal, but that is typically what you see with a loss. So that's their role is to give education, to explain. And I don't know if Brittany was given options by her doctor of expectant management. I do not know.

Q. All right. Do you know whether Ms. Watts asked to speak with a second pediatrician?

A. I do not.
Q. How did the second pediatrician come meet with Ms. Watts?
MR. PRISLIPSKY: Objection. Form. Foundation. Speculation. Go ahead.
A. Yeah, I don't know.
Q. Did you direct someone to request the pediatrician?
A. No.
Q. Do you know who requested the pediatrician?
A. I do not.
Q. Why didn't you direct someone to seek a pediatrician?
A. I wouldn't need to direct because that's just what we do. Like, the pediatricians come over in the morning. They kind of get a general report. Do you have any premature labor? We tell them this is a 33-weeker in room 6. So she'll, you know, be involved with education of that. They're very aware of who's on our floor and what deliveries we expect. So she would have probably received a report from the nursery at that morning or she may have received a report from the outgoing pediatrician from the day before that a patient had been there and left. I don't know. I -- I don't

know how she came to be in the room, but I know that it's procedure, and it's standard and it's a good thing. You know, it's part of our care.

Q. Okay. And at all times, as far as you're aware, Ms. Watts said she did not want resuscitation; correct?

A. Yes.

Q. And you said that's her choice?

A. Yes.

Q. And is that a choice that sometimes a mother will make even when she would very much like to have a living baby?

MR. PRISLIPSKY: Objection. Go ahead.

A. Yes, because at 22 weeks, the outcome is not really that good. So it's kind of like -- with technology we're getting better, 23, 24 may -- you know, it's -- it's just a call that they have to make together, the doctor and the patient. So yes, I have had mothers who've had a loss and held their baby until they passed at the same gestational age. It's -- it's their choice to -- how they want to handle it.

Q. Okay. And because, yeah, sometimes a very, very premature infant, even if it survives, can have very significant health issues?

A. Yes.

Q. And the resuscitation is not guaranteed to work; right?
A. That is right.
Q. And it could cause pain and discomfort?
A. Yes.
Q. Okay. So when does resuscitation become mandatory?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation.
A. We would do resuscitation if the pediatrician deemed at birth that the infant could be resuscitated. And you -- typically I believe it's at 24 weeks or viability, but do not quote me, because I don't work in the nursery, and I'm not familiar with a cutoff, but typically at 24 weeks is when I would say they would resuscitate.
Q. Regardless of the mother's wishes?
A. Regardless.
Q. Okay. So at your understanding --
A. Yes.
Q. -- is at 24 weeks --
A. Yes.
Q. -- resuscitation takes place no matter what the mother says?
A. That is correct.

MR. PRISLIPSKY: Objection. Go ahead.
A. If you were to have a 24-week delivery and the pediatrician deemed it to be an earlier gestation, then no. Because it can happen. You can have an infant born and they may have a 24-week pregnancy, but that infant maybe wasn't developing or, you know, they -- they have assessment tools that they use --
Q. Sure.
A. -- to determine.
Q. Let's assume an accurate gestational -- gestational assessment at -- at 24 weeks.
A. Yes.
Q. Your understanding is that regardless of the -- regardless of the woman's wishes, resuscitation will be attempted?
MR. PRISLIPSKY: Objection. Form. Foundation. Asked and answered. Calls for a medical opinion. Go ahead. You can answer.
A. Yes.
Q. Okay. And what is your understanding of the -- what is the earliest time that a resuscitation is offered?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. Go ahead.
A. It is now offered at 22.

Q. What about in 2023?

MR. PRISLIPSKY: Same objection. Go ahead.

A. It was offered in -- in 2023 because it's part of the pediatrician's note, that she mentioned that to the mother. It is not -- it is offered if they feel they can, and there have been babies that have been given resuscitation, but in her note she does state that she mentioned that to the mother, but that it's not likely to have a good outcome, and, you know, it's up to her. If you wanted us to try, we could.

Q. Okay. And -- at 22 weeks?

A. At 22 weeks.

Q. And Ms. Watts was estimated to be just short of that; right?

A. On the 20th she was short of that, yes.

Q. And so the pediatrician's note suggests there would be no resuscitation if she were to deliver that day?

A. That is correct.

Q. And was that your understanding as well?

A. Yes.

Q. That there could be no resuscitation offered if she were to deliver on the 20th?

A. That is correct.

Q. Okay. And to your mind, was this a -- a good reason to delay delivery?

MR. PRISLIPSKY: Objection. Form. Foundation. Go ahead.

A. By delay delivery, what do you mean? I mean, she imminently will deliver anyways on her own. We would never delay delivery.

Q. How about delay induction?

A. Yes.

Q. That would be a reason?

A. Yes.

Q. Okay. And that would be the right choice, in your view?

MR. PRISLIPSKY: Objection.

A. It would have to be determined between the doctor and the patient. Like I'm saying to you, I don't know if Dr. Khavari offered her expectant management, but in our hospital, we have never proceeded with an induction if there is still a heartbeat unless there is a serious issue with the mother's health. Because the baby still has life, we do not induce until the baby has passed, and then we induce.

Q. What made you think that Brittany Watts would deliver imminently on her own?

A. I didn't say imminently. It -- because

she's -- if -- now we know she's ruptured, if she doesn't, your bod- -- that's what your body does. Your body will then deliver. Eventually you're going to deliver your baby on your own.
Q. But sometimes you need assistance; right?
A. You may. Uh-huh.
Q. And if you've been, at that point, bleeding for days, there could be an infection risk; right?
MR. PRISLIPSKY: Objection.
A. I don't know how much she was bleeding for days because our assessment of bleeding was minimal, so that's a subjective thing. You're telling me you're bleeding, but you seem very stable here. Your bleeding is minimal. So bleeding for -- for days could be I was spotting, I was hemorrhaging. It's a subjective thing.
Q. Right. And as a nurse, you can't determine what's a dangerous amount, can you?
MR. PRISLIPSKY: Objection.
A. No.
Q. That's up for the doctor -- up to the doctor to determine?
A. Yes.
Q. All right. But why did you -- you knew

that there was rupture of membranes on the 20th?
A. Yes.
Q. Although -- okay. So you didn't know that she was dilated, right, as we discussed?
A. On the 20th --
Q. Yeah.
A. -- we knew this because now we've -- we've talked to -- Dr. Khavari had even talked to Angelina at one point by phone later in the day when she had asked for the ultrasound. That's how we knew that she had said she was dilated.
Q. But I understood from what we were talking about earlier that when you got the September 20th ultrasound results --
A. Yes.
Q. -- and you saw a normal length --
A. Yes.
Q. -- cervix, you believed that that meant she was not dilated?
A. That is correct.
Q. Okay. And -- but did you believe that she -- you did say there was low fluid, very low fluid?
A. Yes.
Q. So did you conclude that she had rupture of membranes?

A. Yes.
Q. Based on what?
A. Well, I have a low AFI, and the patient had then said that her water broke at home from sitting on the couch. And this is all in review later. But that day we're talking to Elaine. The patient tells her my water broke. Those are one of the questions we ask every patient. So I don't recall exactly how I came to that knowledge, but it was known that her water had broke, per her.
Q. Okay. And did you have any reason to doubt her?
A. No.
Q. Is it normal for water to break when there's no dilation?
A. Yes.
Q. So if you knew there was premature rupture but you understood the ultrasound to indicate no abruption, why was it important to you that there was no abruption?
A. Because I don't want my patient hemorrhaging.
Q. Okay.
A. That's --
Q. So you were relieved?

A. I was very relieved.
Q. And that convinced you that expectant management was the appropriate course?
MR. PRISLIPSKY: Objection.
A. That led me to expect expectant management because that has always been the precedent. We never would do anything but expectant management. I've never had a case in 26 years of labor and delivery where I've had to induce a healthy mother at 22 weeks with a heartbeat. We do -- I have never -- this was the first time.
Q. What qualifies you to determine that Brittany Watts was healthy?
A. Her assessment was -- her assessment was good. Her vital signs were stable.
Q. Let me stop you for a second.
A. Okay.
Q. What qualifies you to determine whether she was healthy?
A. This is my nursing knowledge. I can say whether or not it's an appropriate blood pressure or not. You know, I can -- I'm just saying, from my nursing judgment, she had a stable situation, and from the experience that I have with expectant care, she fell into a category where we could at least offer that to her.

Q. Okay. And was that offered to her?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. I said I don't know that -- if Khavari offered it in the office. It was not offered in the hospital, to my knowledge. Dr. Khavari did not come over and see Brittany the entire day of the 20th while I was there.
Q. I'm aware. Did that concern you?
MR. PRISLIPSKY: Objection.
A. I would want to see my doctor.
Q. And if you were a doctor with a patient who you had the previous day diagnosed with placental abruption --
A. Yes.
Q. -- you'd want to see that patient?
A. I would.
MR. PRISLIPSKY: Wait. Wait. Wait. Was the question if you're the doctor, you want to see that patient? That's inappropriate for a nurse. Objection. Calls for a medical opinion.
MS. RICKERT: All right. Well, you can state your objections on foundation grounds, and I would appreciate no speaking objections, but --
Q. But you were -- it was -- in your

experience, it was unusual for a doctor to not want to see their patient under the circumstances of September 20th --
MR. PRISLIPSKY: Objection.
Q. -- right?
MR. PRISLIPSKY: Sorry. Objection.
A. I don't know whether she wanted to see her or not. I know that I would want my doctor to come if I were the patient. I do know that Dr. Khavari was in surgery that day. So I don't know what cases she was involved in, but I would want her to come and see the patient.
Q. What makes you say Dr. Khavari was in surgery that day?
A. We have a surgery schedule, so we knew that she was in surgery that day when we were communicating with her -- not me personally. But that was her day to be -- she was in surgery that day.
Q. All right. And so, yeah, if you were a patient under these circumstances, you'd like to be able to see and consult your doctor directly; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. Yes.
Q. And patients -- that's a reasonable expectation for a patient to have --

MR. PRISLIPSKY: Objection.
Q. -- correct?
A. Yes.
Q. Now, at some point --
MS. RICKERT: First of all, you know, we've been going for over two and a half hours. Do you need a break at this point? Want a break? Anybody else?
MR. PRISLIPSKY: I could use a quick break. Oh.
MS. RICKERT: Yeah. You can ask for a break, too.
VIDEOGRAPHER: Going off the record
(A recess was taken.)
VIDEOGRAPHER: On the record.
Q. All right. So before we took a break, we were talking about the events of September 20th, 2023, and we're going to stick with that for now. So at some point a -- another doctor was brought in to consult about the Brittany Watts case; right?
A. Yes.
Q. Who is that?
A. Dr. John Stewart.
Q. And how was Dr. Stewart enlisted, do you know?
MR. PRISLIPSKY: Objection. Calls for a

medical opinion. Speculation. Go ahead.
A. He was consulted by Dr. Khavari.
Q. Okay. And how do you know that he was consulted by Dr. Khavari?
A. There was an order placed to consult him.
Q. Okay. And what was the reason, as far as you know?
MR. PRISLIPSKY: Objection. Calls for a medical opinion. Foundation. Go ahead.
A. I don't know.
Q. Okay. So Dr. Khavari asked Dr. Stewart to consult, and -- and he did so; correct?
A. Yes, yes.
Q. Were you aware that Dr. Stewart had brought in -- been brought in to consult at the time?
A. Yes.
Q. How were you aware?
A. Elaine told me.
Q. Okay. And did you see the order that Dr. Khavari placed?
A. I don't recall reviewing the orders, but that's the only way you get a consult is -- and I was told there was an order that -- to consult Dr. Stewart.
Q. Okay. And did you know Dr. Stewart?

A. Yes.
Q. Had you worked with him for some time?
A. Yes.
Q. What were --
MS. RICKERT: Strike that.
Q. Tell me about your history working with him. Like how closely, how often?
A. Dr. Stewart is a high-risk doctor, so he primarily takes care of patients in Boardman. I used to work in Boardman and St. Joe's when I was a floor nurse. I would float back and forth between the two hospitals to work. So most of my work experience would have been when I would be caring for antepartum patients in Boardman. I would -- he would be the -- the doctor consulted on their case. So my experience with him is just receiving orders and minimal interaction.
Q. Okay. And did you have an opinion of him?
MR. PRISLIPSKY: Objection. Go ahead.
A. No. I mean, he's a -- I think he's a good doctor.
Q. And he's a maternal-fetal medicine specialist; correct?
A. Yes.
Q. So he is an obstetrician; right?

A. I believe so.
Q. And he has a specialty?
A. In maternal-fetal medicine.
Q. Okay. So he has additional training that is specific to pregnancy complications and high-risk situations; right?
A. Yes.
Q. Okay. So what did you think when you heard he had been brought in to consult?
MR. PRISLIPSKY: Objection. Go ahead.
A. I didn't think anything. I mean, I think that would be expected because she's a premature delivery --
Q. Okay.
A. -- that he would be consulted on the case.
Q. And why do you say she was a premature delivery?
A. Well, a premature patient. I don't know that there's going to be a delivery that day, but she is a 22-week with some complications.
Q. Right.
A. Now her water has broke, and you would expect maternal-fetal medicine to be consulted.
Q. Okay. So you did expect her to deliver

sometime soon?
A. Yes.
Q. You did not expect her fluid to refill, did you?
A. I didn't know if it would refill, but I expected maybe a few weeks. That would be my hope, like I said earlier, but it's not up to me to expect or to know what's going to happen. I -- that's just my experience.
Q. Okay. Your hope was that the pregnancy could continue for a few weeks?
A. Yes.
Q. And at that point, the chance of survival would be greater?
A. Yes.
Q. And the decision whether to resuscitate would be no longer in Ms. Watts' hands; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. That's not why I wanted -- I didn't want the decision taken out of her hands. I wanted a viable infant in this situation, if -- if it were possible.
Q. Okay. And you wanted it to be resuscitated if necessary; right?
MR. PRISLIPSKY: Objection.
A. Yes, yes.

Q. All right. So did any doctor tell you that it was realistic to think that this pregnancy could be maintained for additional weeks?
A. No.
Q. Did you ask?
A. No.
Q. So you just hoped?
MR. PRISLIPSKY: Objection. Go ahead.
A. It was just a thought process that expectant management is always the way we go; that that's what I thought would occur here.
Q. Okay. So when did you learn of Dr. Stewart's assessment of the situation?
A. I learned of his assessment shortly after he came out of the room. Elaine was a little bit upset because in front of her he told the patient that he would write what he needed to write to get this over with for her.
Q. Okay. I'm sorry. That Dr. Stewart told Elaine -- sorry. Okay.
A. Dr. Stewart told Brittany in front of Elaine when he was consulting with her that he would write what he needed to write to get this over with for her.
Q. Okay. And Elaine reported this to you?

A. Yes.
Q. Did she --
A. And it --
Q. Go ahead.
A. It bothered her.
Q. Did it -- did she record this in the medical records anywhere?
A. No.
Q. Why not?
MR. PRISLIPSKY: Objection. Speculation.
A. Again, I don't know why she didn't document it. I was not the one documenting.
Q. You're her supervisor; right?
A. Yes.
Q. You thought that was significant that Dr. Stewart would have told a patient that?
A. I think it's very significant.
Q. But you didn't think it should be documented?
A. No.
Q. Why not?
A. The documentation is for the care of the patient and things that we do. The -- we try to leave out of documentation things that are not pertinent to the

care. You know, that is something that was addressed later.

Q. This was pertinent to the care, was it not?

A. That he would induce the labor, yes.

Q. And that he would say whatever he needed to say in the medical note?

A. Yes. But that's not something we put into our documentation.

Q. Did you document it in any other way?

A. I did not. I don't know if Elaine did.

Q. Okay.

A. Like, I know we have a process for documenting those things. I don't know that she did. I -- it will be later on in our conversation, but I did speak to Dr. Stewart about that.

Q. And did Dr. Stewart admit that he had said that?

A. Yes.

Q. All right. And did you document that anywhere?

A. No, because it was not in a health care setting. It was in a debrief.

Q. Now, when you say that Dr. Stewart, according to Elaine, told Brittany Watts that he would

say what he needed to say to get the pregnancy over with --
A. He didn't say pregnancy. He just said get this over with for you. Those -- I -- I'll never forget those words. Those are the words.
Q. Okay.
A. That she relayed to me.
Q. That Elaine relayed to you?
A. Yes.
Q. How did it make you feel?
A. Very upset. You know, I -- I -- and even now, post this situation, I do have a lot of faith and trust in Dr. Stewart. He's an incredible doctor. I -- I've seen him give great care. He's always done expectant management. He takes great care of these antepartum patients. This is not how I would expect him to care for a patient, and that bothered me.
Q. But this hasn't shaken your confidence in him?
A. No, no. It changed the way I view how he determines whether to do expectant care. He --
MS. RICKERT: I'm going to let in another colleague of mine. Shoot.
Q. Okay. So when Elaine told you that, did you go and immediately talk to Dr. Stewart?

A. No.
Q. Why not?
A. I just didn't.
Q. Even though you were very upset?
A. I wish I would have, but I didn't.
Q. Why do you wish you would have?
A. Because I think maybe I would have had a better understanding of why he chose to proceed the way he did, hearing it directly from him instead of like through a nurse.
Q. And when he said, according to Elaine, that he would write what he needed to write to bring this to an end --
A. To get this over with for her.
Q. -- to get this over with for her, did you understand from Elaine that he was saying he would write things that were not true?
MR. PRISLIPSKY: Objection.
A. I don't know what he meant.
Q. That would matter; right?
A. It would matter.
Q. Whether he was talking about I will write the true and correct assessment based on my medical opinion to make sure you get the care that you need would be different than I will write whatever I need to write,

true or false, in order to get this pregnancy over with for you; right? Those would be different?
A. Those are different.
Q. Okay. And which one did you understand him to have --
A. I felt that he was going to write what he needed to write to facilitate a termination of her pregnancy.
Q. Okay. Whether it was true or not?
A. That was my understanding.
Q. From Elaine?
A. From Elaine.
Q. All right. And that would be a very serious -- that would be very serious misconduct on the -- on the part of a physician, wouldn't it?
A. Yes.
Q. That could be the kind of misconduct that could threaten a medical license; right?
MR. PRISLIPSKY: Objection. Foundation.
A. I don't know how he would defend it. I don't know if he -- you know, I didn't hear it directly from him.
Q. Right. Well, you say -- well, we'll get to the debrief, but you said you did ultimately hear it from him?

A. Yes, yes.
Q. Okay. And was it the same as what Elaine had told you?
A. He had more of a defensive approach that he wrote what could occur, not what was occurring, because he felt like she had the right to terminate. She didn't want -- she didn't want to take the risk of these things happening, so she had the right to say, induce me now before the risk occurs. That was his debrief statement to me. I -- I asked him why he said that and that it disturbed me, and I told him of our prior experience together and how expectant management is always what he chose, that I felt very confident in his expectant management care, why did he not choose it this time? And he said he felt like because she didn't want this baby, she had the right to say I don't want to take the risk of a future infection or a future hemorrhagic event. She didn't want to take the risk, so she had the right to terminate now. And I said, well, that's unprecedented in our hospital. We -- if there's a heartbeat, we always choose expectant management. And he defended in that he was giving her the option.
Q. You've read his note; right?
A. Yes.
Q. Okay. And he assesses that he doesn't

think that the -- the risk should be taken; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. Yes.
Q. Okay. So you're saying that was -- well, let me -- we'll look at his note specifically, but as you sit here right now, do you -- do you feel that his note was false?
MR. PRISLIPSKY: Objection.
A. I don't think it was false. I think he was basing it on what she wanted versus what his -- what he would choose to do if the mother was begging him to take cake of her baby. If the mother's saying please do everything you can, is he going to say, well, you're hemorrhaging to death, and, you know. No, he -- he based his decision on what Brittany wanted.
Q. Now, everyone can -- everyone can choose to refuse care; right?
A. Yes.
Q. Any patient?
A. Yes.
Q. So he could never say you're going to hemorrhage, so we're doing this whether you like it or not; right?
A. That is correct.
Q. So that's not an option. Right. And so

what makes you think that Dr. Stewart was aware of how Brittany Watts felt about her pregnancy?
A. I don't know what conversation he had with her, but I do feel he was aware that she didn't want the pregnancy.
Q. Why do you feel that way?
A. I mean, he's her consulting physician. He would be meeting with her and discussing those things. Did he -- I -- I wasn't there. I wasn't with Elaine. I don't know.
Q. Okay. But -- so you're making assumptions?
MR. PRISLIPSKY: Objection. Go ahead. You can answer.
A. I'm trying to remember from Elaine if they discussed that. I don't know. I just don't recall.
Q. Okay.
A. Did I make an assumption that day, or did she tell me that Brittany said that, I don't recall.
Q. All right. But you made the assumption that Dr. Stewart was basing his recommendation not on medical need but on the patient's wishes?
A. He told me that in the debrief, that he based his decision on her request.
Q. And not on the medical need?

A. He didn't say medical need, because at that point she was medically stable.

Q. Is it appropriate to wait until a patient becomes unstable to give them needed treatment?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation. Go ahead.

A. They would have to decide what care they gave based on their assessment of the patient. They decide when to give the care that they give.

Q. The doctors do?

A. Yes.

Q. Right. And in your experience, if a doctor said this patient is stable, I'm -- I believe they may become unstable if we don't take action, but let's just wait and see, would that be an appropriate way to treat a patient, from your perspective?

MR. PRISLIPSKY: Objection. Broad. Vague. Improper hypothetical. Go ahead.

A. It's going to be up to them. I mean, if they say we're going to wait, then the nurses proceed with whatever orders we have. We don't get to determine whether they place orders. So their determination is when care is given, and we implement that care.

Q. Okay. And Dr. Stewart was not in charge of Brittany Watts' care; correct?

A. That is correct.
Q. So he couldn't place an order for her to have any procedures; right?
A. He could place orders, but ultimately he would be referring back to Dr. Khavari. If you're referring to like an induction, it would be Dr. Khavari who would place that order, not Dr. Stewart.
Q. Okay. So did you speak to Dr. Stewart at all on September 20th?
A. No.
Q. Did you see him?
A. No.
Q. Okay. And did you see his note on September 20th?
A. I did.
Q. Okay. And after Nurse Elaine told you what Dr. Stewart -- or, first of all --
MS. RICKERT: Strike that.
Q. Is Elaine one of your good friends at work?
A. No.
Q. Okay. After Elaine told you what Dr. Stewart had said to Ms. Watts, what did you do?
A. There was a small discussion between Elaine and myself about the care, and we were talking

about -- because Elaine also has worked with me at other hospitals. We have a long, like, work history, and we both have worked with maternal-fetal medicine, expectant management. We were discussing how this is unprecedented. I don't feel comfortable, you know, inducing with a heartbeat.

At that point Angelina had come to the nurse's station and overhead our discussion on Dr. Stewart's note, and then she decided very wisely, you know, we need to take this to ethics, because we need to know -- if we've never done it before, if we're uncomfortable with it, we need to really get a little more foundation for what our care will be. So she --

Q. Okay.

A. -- reached out to Dr. Khavari.

Q. Okay. Let me -- when you say we needed to get more information for what her care would be, you hadn't received any orders?

A. No, no. But there's talk of it. There's talk of what -- we will induce, and that's why we need Dr. Stew- -- like, through -- I think Khavari had expressed ultimately that was her -- what she was trying to decide whether she would or would not do.

Q. Okay.

A. There was no order to do it. There was

no directive to do it.
Q. Right.
A. But it seemed like that was going to be the plan, and so we were just discussing how we felt about -- not loudly, not -- not like belligerent or anything, just this is unprecedented. I've never seen this before. Why are we not just watching her?
Q. Who was involved in this discussion?
A. It was Elaine and myself.
Q. And nobody else?
A. No.
Q. Did you talk to anybody else about the situation?
A. Only Angelina.
Q. Okay. And you told her what Elaine had told you?
A. She came into the conversation, so she -- she came out to the nurse's station. We weren't, like, in with all the girls. It was kind of like off in the side there's like a little cabinet, and we were just discussing it, and she overheard us, and she's like, what's going on? And we're -- so we explained, and she said, I think that we really need to get an ethics consult involved, which was good. She went back to her office, and she spoke to Dr. Khavari and asked for that,

ethics -- an order had to be placed, so that was ordered. We reached out to -- Angelina reached out to the ethics director.

Q. Directly?

A. Directly.

Q. Okay.

A. Yes.

Q. And did you talk with the ethics director?

A. No, I did not.

Q. And that's Deanna Ford? Yes?

A. Yes, that's correct.

Q. So you told Angelina -- or, sorry. Did you or Elaine tell Angelina what Elaine had heard Dr. Stewart say to Brittany Watts?

A. Yes.

Q. Okay. And what was Angelina's reaction?

A. She didn't think that he would do -- again, she has a history with him -- that he would do anything without evidence or a need, and she didn't understand why he would say that to the patient because he -- he is a good doctor. He's a very good provider.

Q. Now, did Angelina speak with Dr. Stewart, to your knowledge?

A. I think she did. I think -- I -- I was

in the office. I do believe she did reach out to him.
Q. Okay. And so the -- the ethics consult was ordered, and is that part of the medical records you reviewed?
A. Yes.
Q. Now -- and, again, we'll look at some -- some of the medical records specifically, but the -- there's no indication in the medical records that Dr. Stewart had said anything improper to Ms. Watts; right?
A. That is correct.
Q. So the question posed to the ethics committee was simply whether a patient at risk of hemorrhage and infection at twenty-one weeks and five days or whatever pregnant could ethically be induced; right?
A. Yes.
Q. And did you feel that question was adequate?
A. Yes.
Q. Okay.
A. I mean, I feel like approaching the ethics committee was the proper thing. Angelina didn't bring up the scenario. It's then Deanna Ford goes into the chart and reads the recommendation. So she read

Dr. Stewart's note and based her recommendation on his note.
Q. And she also read the -- the ethics consultation request, which said nothing about Dr. Stewart having made --
A. Right.
Q. -- an improper statement?
A. Absolutely. No, nothing was said to Deanna Ford about his improp- -- him saying that to the patient.
Q. Wasn't that crucially important to the ethics consult?
MR. PRISLIPSKY: Objection.
A. That wasn't my decision to make. I -- I was not the one speaking to either one of them, so I don't know.
Q. Well, nothing in this scenario was your decision to make; right?
A. That's right.
Q. But you were involved?
A. Yes.
Q. And so I'm asking -- were you not concerned that the -- Deanna Ford wasn't being given the full story?
A. Yes.

Q. And why didn't you see to it that she got the full story?
A. I didn't feel like that was my place.
Q. Why not?
A. Because then I would be speaking out against a physician who has now made a -- a note. Once he documents that, that is his truth. That is what he wrote. I -- I'm not going to go and say anything about him to the ethics director.
Q. You thought that that was outside of your role?
A. Yes.
Q. Now, you were there to ensure the -- the health of your patient; right?
A. Uh-huh. Yes.
Q. And you were interested in saving the life of her baby, if possible?
A. Yes.
Q. And that was part of your role; right?
A. It is part of my role, but whether his decision is to induce or not would not have harmed Brittany. She's -- you know, it's not -- at the end when the decision is made to induce, I did not argue against it. I did not fight it. I did not say, how dare he. I'm like, it's a difficult place to be put in that

position as a nurse when you feel like a doctor has falsified a note and now this patient's going to be induced. But I can't change that. I couldn't have been like, halt everything. That -- that's not within my scope to do that.

Q. What was the purpose of contacting ethics if you're not going to reveal that Dr. Stewart had falsified a note?

MR. PRISLIPSKY: Objection. Form.

A. Just they may have come back and said that they needed more information. They may have come back and said you cannot do it. There's a heartbeat.

Q. Uh-huh. Is that what you expected them to say?

MR. PRISLIPSKY: Objection. Foundation. Go ahead.

A. I didn't know what they would say.

Q. Well, you've said that you guys always do it a certain way?

A. Yes.

Q. So did you expect that ethics would agree that that was the way to do it?

MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.

A. I didn't know what to do expect. I

really didn't. I just said I'm glad that we consulted them. I'm going to trust them to make the right decision. I -- I don't even know at that time what all they would review -- review, but I trust our ethics committee and --
Q. Now, but you understood that the ethics committee was being given information that you describe as falsified; right?
A. I'm not going to say that it was falsified. I'm saying that's what Elaine said to me, but I did not speak to him directly. If he really -- if -- because later in the debrief, he felt those were risks that could come down the line. That's -- he's the doctor.
Q. Okay. I didn't call it a falsified note. You called it a falsified note; right?
A. No, you asked me if I felt like it was incorrect information, and I do. I feel like he -- she was not hemorrhagic, and she was not in shock, and she was not bleeding, and there was no sign of a serious infection. But in his mind, those are things that are coming. I -- I do believe that he wrote it because he was assisting her in getting it quicker. But I did not speak directly with him that day.
Q. All right.

A. That is why I would not choose to go to the ethics director.
Q. Okay. But the term -- the term falsified note, that was -- those were words that came from you initially; right?
A. Today?
Q. Yes.
A. Okay.
Q. Do you agree?
A. I don't agree. I said I -- that it was incorrect information. Did he intentionally falsify it? I -- I can't be the judge of that.
Q. Okay. Well, the transcript --
A. So I think we need to maybe change that. I don't know. It -- he wrote a note that contained incorrect information. So if that is the same as falsified, then --
Q. Okay. And you believe that he wrote that note only because of Brittany Watts' wishes?
MR. PRISLIPSKY: Objection.
Q. Is that right?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. I do.
Q. Okay. And that's strictly based on the

account you got from Elaine?
A. Yes.
Q. Okay. All right. All right. We'll come -- I wanted to do all the -- hopefully do all the medical -- looking at the records at the same time for efficiency. So I -- I will have you look at Dr. Stewart's note then, but you said that you -- that it has incorrect information in it. What were you referring to?
MR. PRISLIPSKY: Objection. Broad. Vague. Go ahead. Foundation.
A. I would have to read it again with you, but there is information there about, you know, an infection leading to death or hemorrhagic shock. Those types of terms did not describe Brittany. She was very stable.
Q. Okay. And what is -- what gives you the ability to assess her stability?
A. Her vital signs, her -- I mean, that's crucial. Her vital signs. She did not have a fever. Her white blood cell count had actually come down from the prior one. She did not have any odor. Like I described earlier, there's usually an odor with a rupture. The baby had a very stable, good heartbeat. She was not in labor. She was not contracting. She,

from my nursing assessment, appeared stable.
Q. All right. And Dr. Stewart didn't say she was unstable, did he?
A. He just said -- well, hemorrhagic shock and infection leading to death is not stable.
Q. He said she was experiencing hemorrhagic --
A. I would have to read it again. Those terms are used, so I would have to, like, really put it into --
Q. Okay.
A. -- current --
Q. But your -- your recollection --
A. Recollection is those are the words that he used.
Q. And that -- and that he included false information in his note?
MR. PRISLIPSKY: Objection. Go ahead.
A. He included those terms that I feel did not portray her medical condition.
Q. All right. And so that was the information the ethics committee got?
A. Yes.
Q. And the -- and you did nothing to ensure that the ethics committee got additional information?

A. That is correct.
Q. Even though that information was, in your view, pertinent to the ethics assessment; right?
A. There's also -- you know, I -- I know that ethics does not always make the end decision. It -- they are there to guide us on, you know, situations where we're unsure, but if you, as a provider, are sure that you want to proceed a certain way, the ethics director would not change -- change their decision.
Q. Right.
A. They're just there to give guidance. They may have been there to give guidance to us who don't understand it. They may have been able to give guidance to the patient. They're just -- they're just to assure that everything is done correctly, but a provider stating they're going to do something would not change, and I know that from many years of experience with -- with ethics. It's to give direction.
Q. Okay. So have you initiated ethics -- ethics consultations in the past?
A. Oh, yes.
Q. All right. And have you done so in any other situation based on a doctor's assessment that you disagreed with?
A. No.

Q. So this is the only time you've consulted ethics or been involved with an ethics consultation --
MS. RICKERT: You know what? Strike that.
Q. This is the only time that you believe an ethics consultation was necessary because a doctor was -- had made an assessment you disagreed with; right?
A. I didn't make the decision to place the ethics consult.
Q. I understand. You thought that was appropriate?
A. I did.
Q. Okay. And you approved?
A. I -- I --
MR. PRISLIPSKY: Objection. Form. Go ahead.
A. -- didn't approve or disapprove. I didn't have -- that's not within my scope. I agreed that it was a good thing --
Q. Right.
A. -- because we had a heartbeat and we are a hospital that has never done this before.
Q. Okay. So when I say approve, I don't mean that you gave permission, but that you concurred

that this was the right approach?
A. Yes.
Q. Okay. So have you ever previously concluded that an ethics consultation was needed because you disagreed with a doctor's medical assessment?
A. No. And I don't think the ethics consult was placed on this case because of the disagreement with the note. The ethics consult was placed because we were going to induce instead of doing expectant management. It didn't have anything to do with his note. It had to do with the induction that would follow.
Q. I see. So it wasn't -- if Elaine had not told you that Dr. Stewart told Brittany he would write whatever he needed to write to get this done, you still would have thought an ethics consultation was appropriate?
A. Yes.
Q. Okay. Now, after the ethics consult came back and -- do you remember the result?
A. Yes.
Q. And what was it?
A. The decision was made to proceed with induction.
Q. All right. And what was your feeling

about that?
A. I didn't agree with it, but I did not say anything about -- we -- we determined at that point that that is how we will proceed, and the nurses -- we spoke about it again at the nurse's station. Angelina came out and talked, because, you know, it is disturbing. I mean, there's just a general feeling of -- all day of like, what's going to happen. And she said, they have decided we're going to proceed with induction, and I remember Elaine -- it was getting ready to be change of shift. Elaine was giving care to Susan, and Elaine was like, that's fine. I mean, okay. We need an order. We don't have an order. We'll wait -- we'll await Dr. Khavari's arrival to the unit. It -- it was pretty much dropped. There was not anymore, oh, my gosh. I can't believe we're doing this. I -- I -- in my own self, I was not comfortable with it. Had I been the nurse administering the medicine, I would not have been comfortable, but it was -- it was a calm, this is what we're doing. We followed our chain of command, and this is what we're doing. We will proceed.
Q. Okay. So things went smoothly?
A. Yes.
Q. And you -- you said you disagreed with the conclusion of the ethics committee?

A. Yes. But I understood why they recommended it, because they felt the mother's life was in danger --
Q. Okay.
A. -- based on the note.
Q. Right. And you disagreed with that?
A. I did.
Q. And so you disagreed that induction was ethical?
A. I did.
Q. All right. And if it had been on you to actually administer the medication, would you have refuse -- refused to do so?
A. Yes.
Q. Okay. Because this would have been an abortion to you?
A. Yes.
Q. Okay. And did you convey that feeling to anyone?
A. No, I did not.
Q. You didn't convey that feeling to Elaine?
A. No.
Q. You didn't convey that feeling to Susan Norman?

A. No. Susan Norman stated her own view of not being comfortable administering the medication, and I told her if you are not, you can have another nurse assigned to this patient at change of shift, because now we're changing shifts, and Angelina agreed that another nurse will be assigned, and one was that was comfortable with the decision.
Q. So this second conversation among the nurses that included Angelina after the ethics consultation came back, who was involved in that conversation?
A. That was Elaine, myself, Susan and Angelina.
Q. All right. And how had Susan come to be part of this discussion?
A. She was going to be assuming care of the patient.
Q. All right. And so you did not express during that conversation that you disagreed with the decision?
A. I think I might have said, if you don't feel comfortable, that's okay. I probably wouldn't -- or I wouldn't either. I think I did use that terminology. I didn't say I would never do this or whatever. But I was supporting Susan at that moment. You -- you don't

feel comfortable, I wouldn't either. We will -- we can reassign it. It wasn't like this big discussion of my personal beliefs. It was just, if you don't feel comfortable, you do not have to. You will -- we will reassign.

Q. Was the word abortion used during this discussion?

A. No, no.

Q. But that was your view?

A. That is my personal view, but it was not used at any point during an induction process. It was not used.

Q. No, I'm talking not during -- there was no induction process.

A. I mean a discussion of an induction process.

Q. Okay. Now, who -- so Susan Norman said, I can't do it, and who was re- -- reassigned, or who was assigned instead?

A. There was another nurse, Jess Rogozan, but now this is like 3:30 in the afternoon, and Rogozan doesn't come on until 7:00. So Angelina reached out to Jessica by phone and said, when you come in -- because there's no order yet. Susan maintains care of this patient until an order would -- were to be received,

because she was taking good care of Brittany. She was doing her monitoring, doing her vital signs. She just didn't feel comfortable administering medication to induce her.

So Angelina reached out to another nurse who said yes, when I come in, I will care for her. I will -- I have no problem with this. Then that would be who they would give report to. If an induction were ordered prior to her coming in, it would have to be another nurse, but that did not happen.

Q. Okay. Were any arrangements made if the order had come?

A. No.

Q. So --

A. But it was agreed that we would follow it. As soon as we have this order, we will follow it. There will be no further discussion. There will be no further delay. Whatever the doctor has chosen, this is what we're going to do. Angelina was very clear about that, and all agreed. If don't you feel comfortable administering it, we'll find another nurse, and we did.

Q. Okay. But that wasn't the end of the ethics committee's involvement, was it?

A. That -- as far as I know. I left at 4:00. That ended it for me. That discussion was shortly

prior to me leaving. I do know from reading later that they were -- they had asked that a note or an assessment be made by the provider first before it started.

Q. Who asked for that?

A. Ethics.

Q. Are you saying that ethics reached out to the hospital?

A. I don't know. I don't know if they reached out or the nurse reached out, but there was no -- still no provider assessment or note placed by Dr. Khavari, and the ethics, in their -- I -- so if you read their recommendation, it says in there that an assessment or -- we'll have to look at it together. Something about an assessment or a note or a reason or something needed to be placed by that provider prior to the administration of the medicine.

Q. Okay. And ethics, as you already said, can't actually decide what --

A. Right.

Q. -- a provider does?

A. Right.

Q. So they can't tell a provider what to do?

A. Right.

MR. PRISLIPSKY: Objection.

Q. You agree?
A. Yes.
Q. Okay.
A. They can give recommendation.
Q. Right.
A. And ultimately the decision is the doctor's.
Q. Right. And so you -- you weren't there anymore when this second ethics consultation occurred?
A. That's correct.
Q. Do you remember, or did you -- did you hear about it later?
A. I did.
Q. And did you hear what the basis was for seeking an ethics consultation?
A. I didn't understand it --
MR. PRISLIPSKY: Objection.
A. -- to be another consultation. I just thought that Susan had reached out to Deanna to -- to determine what was needed on the chart before we could proceed with an induction, because her note had stated something was needed, and so Susan was clarifying that. I don't think it was a -- a second consult.
Q. Okay. It -- it wasn't in the initial note, was it, from Deanna?

A. I don't recall what note it was in.

Q. Okay. And when -- do you recall that this second issue that was raised with ethics, which we'll worry about how it came to be raised -- involved that Brittany Watts thought that the procedure that she was being offered was an abortion?

MR. PRISLIPSKY: Objection. Form.

A. I don't recall whether she thought it was an abortion or not.

Q. Okay. You don't remember that being part of the ethics?

A. No, I do not.

Q. Okay.

A. No. I read later that -- that because the patient had been seeking an abortion, she wanted to be clear that it was written -- the doctor had written what was going to occur. Like, Dr. Khavari needed a note is what my understanding was from reading Deanna Ford's note. I was not part of that, so I don't know. Did -- you're asking me if Brittany, at that time, said something about abortion?

Q. I'm just asking what you know about it, if you --

A. Yeah. I don't know. I didn't hear anything about abortion at that point.

Q. Okay. And you don't remember seeing that in the -- in the --
A. No.
Q. -- records?
MR. PRISLIPSKY: Objection.
Q. Okay. So at no point did you advise any of the nurses you were supervising to try to slow this down?
A. No, no, no.
Q. And at no point did you tell other nurses that you believed that what Dr. Stewart was suggesting or recommending was an abortion?
A. No.
Q. Did anyone talk about a backdoor abortion?
A. No.
MR. PRISLIPSKY: Objection. Form.
A. To me on that day, no, I don't recall ever hearing that.
Q. Did you ever hear it on a different day?
A. No.
Q. Okay. I'll just tell you that that is a term that I got from your other attorney, Pat, during a call with the Court, said that the nurses on September 20th were concerned that this was a backdoor

abortion. Do you agree with that statement?
MR. PRISLIPSKY: Objection.
A. No, I -- I never heard that.
Q. Okay.
A. I never heard anything about a backdoor abortion. The first time I heard that term used was you today.
Q. Okay. All right. So then -- so you went home. Did you hear anything more about Brittany Watts that night?
A. No. No.
Q. Okay. Did you interact the -- or, sorry. Did you have any communication after you left the hospital with anyone who was still there?
A. No.
Q. Okay. So you didn't make any inquiries about Brittany Watts?
A. No.
Q. And you didn't know if the induction was ever actually ordered?
A. I did not.
Q. Did you ever advise any of your -- the nurses you were supervising that day to tell Dr. Khavari that ethics needed documentation from her?
A. No.

Q. Okay. You had no involvement with that?
A. No, I did not.
Q. All right. And you went home. Did you work the next day, the 21st?
A. I did.
Q. And you got there at 6:00 as usual?
A. Yes.
Q. All right. And what did you -- did you learn anything when you arrived about Brittany Watts?
A. That she had left, eloped this time. She didn't sign any papers. She just -- I heard that when they went to the room -- Dr. Khavari did then make it to the unit around -- I don't -- I don't know the time -- evening. After her cases were done, that she came down and went in to speak with Brittany about the induction, and Brittany was not in the room.
Q. And do you know what time Brittany had left?
A. I don't.
Q. All right. So that was -- you heard that the next morning?
A. Yes.
Q. And what was your reaction?
A. I was worried. At this point I'm very worried now because, like I told you before, she's going

to deliver. She's been here twice, and she's left both times. I'm worried about her.

Q. She was not in labor, as far as you knew?

A. She -- no. And you can go quite a long time.

Q. Right. And she was, in your view, stable?

A. Yes.

Q. And, in your view, not in danger?

A. That's correct.

Q. So why were you concerned?

A. Well, because eventually she's going to go into labor.

Q. Uh-huh.

A. And I just -- our -- our thoughts were she will be back. We need to make sure she comes back. Like, people who elope or leave tend to have a pattern of that. Like, we have people that leave AMA all the time, every time they come. You know, so you don't want -- you want her to get care. She needed care, and it will only get worse. Now that you're ruptured, it can only -- it's not going to get better at home. You don't have antibiotics at home. You don't have monitoring at home. We're not watching you.

Q. Okay. So you did agree there was a risk to her health?
A. There is a risk, always a risk.
Q. Well --
A. There's a risk to every pregnant patient.
Q. Right. But that you don't normally have them stay in the hospital to wait to go into labor; right?
A. If they've --
MR. PRISLIPSKY: Objection to form.
A. -- ruptured, they do, absolutely. We never send a patient home after rupture, never.
Q. All right. And -- okay. So who told you that Brittany had eloped?
A. It was the night shift. I don't recall what specific nurse.
Q. Okay. And so -- so now you're concerned?
A. Uh-huh.
MR. PRISLIPSKY: When you say uh-huh, do you mean --
A. Yes. I'm sorry.
Q. Did you talk with anyone else?
A. Angelina. She arrives later than me.

So she arrived at 7:00. Angelina had a conversation with me at that time about the whole -- you know, what happened. And, again, she said, oh, I'm really worried. Should we call her? And our discussion in the office was, do we reach out to her or not? Because she left twice now with instructions, paperwork, detailed -- detailed information on what this entails. Would we be violating her right to leave if we reach out, but we were -- we were concerned about her. And Angelina made the decision not to call her.

Q. Okay. Is that -- was that just solely in Angelina's discretion as your supervisor?

A. Yes.

Q. All right. Did you want to call Brittany?

A. I didn't know really what to do either. I agreed with her. Maybe because she did leave, hopefully she'll return. If she goes into labor, that -- that's what we want, is for her to come back.

Q. And you -- you said that people who leave AMA often have a pattern?

A. Of leaving.

Q. Okay.

A. They'll come, then they'll leave, then they'll come back, then they'll leave.

Q. Okay. So after Brittany had left the first day against medical advice, on that second day, you knew that there was a risk that she could leave?
A. Always, yes.
Q. But you knew there was a heightened risk --
A. Yes.
Q. -- that she would leave?
A. Well, she also was making comments throughout the day of why is this taking so long? I want to go. This should only take a few minutes. Why is it taking so long? Why -- why is there a delay? You know, to Elaine, expressing concerns of why it was taking so long. So you could see it in her behavior that she was agitated.
Q. Okay. You didn't see that yourself?
A. No.
Q. This is reported by Elaine?
A. Absolutely.
Q. That Brittany seemed agitated?
A. I did not ever go into the patient room or have any interaction with Brittany on the 20th.
Q. Okay. But Elaine reported to you that Brittany was --
A. Yes.

Q. -- agitated?
A. Yeah, and asking questions.
MR. PRISLIPSKY: Wait for her to finish her complete question. You're fine.
A. I'm so sorry. I really am sorry. It's so hard to do.
MR. PRISLIPSKY: Apologize to Gina.
THE WITNESS: I am so sorry.
MR. PRISLIPSKY: She only brought two hands today.
Q. Yeah, it's -- it's an unnatural way of talking through things but -- okay. So Elaine told you that Brittany had been agitated, that she was confused as to why it was taking so long?
A. She didn't really use the word confused. She just was asking questions.
Q. Okay. She was -- she did not know why it was taking so long?
A. Yes.
Q. And she wanted to know?
A. Yes.
Q. Okay. Do you know what she was told?
A. I do not.
Q. All right. Do you think that was reasonable for Ms. Watts to wonder what was taking so

long?

MR. PRISLIPSKY: Objection. Form. Foundation.

A. I don't think -- I don't know why she would wonder. I mean, it's not uncommon to go to a hospital and it takes a while to get things -- but she was receiving care. We were doing antibiotics. We were monitoring. We were following all provider orders. It -- there's nothing more we could have done beyond that.

Q. As a nurse?

A. As a nurse.

Q. Right. Now, Dr. Khavari could have ordered the induction to start at any time?

MR. PRISLIPSKY: Objection.

A. I don't know if she could have, if she was waiting. I don't know her reason for waiting.

Q. What makes you say you don't know if she could have?

MR. PRISLIPSKY: Objection. Go ahead.

A. I just don't know if she -- in her mind, why she didn't order it when she first came. Why didn't she order it midway. I -- I don't know.

Q. All right. So Dr. Stewart recommended induction using either Cytotec or Pitocin; right?

A. Yes.
Q. And Pitocin is given intravenously?
A. Yes.
Q. And starts contractions?
A. Yes.
Q. And Cytotec is applied to the cervix; correct?
A. Yes.
Q. And administering Cytotec can be done by a nurse?
A. Yes.
Q. And it is not a lengthy process; right?
A. Oh, it can be.
Q. Administering Cytotec?
A. Oh, not administering it. I'm sorry.
Q. Waiting can, yeah. But administering Cytotec is not a long process?
A. That's correct.
Q. And as you say, for it to work can take a long time --
A. Yes.
Q. -- right? So if there's any concern about whether something needs to happen sooner rather than later, you would want to start that process as soon as possible; right?

MR. PRISLIPSKY: Objection.
A. Can you explain what you mean by if there was a concern? What -- what concern do you mean?
Q. All right. Well, for example, Dr. Stewart said we shouldn't wait until this patient is at death's door to induce. Given that Cytotec can take a long time to actually, you know, lead to a birth, you would want to start that if -- if you agreed with him that there was some urgency here, you would want to start that sooner than later; right?
MR. PRISLIPSKY: Objection.
A. That would be up to Dr. Khavari to read his note and decide when she would start it. It -- it's not a nursing judgment ever.
Q. Right. But you have views?
MR. PRISLIPSKY: Objection.
A. This would not be a view. This would just be when the doctor orders it, we're going to start it.
Q. Okay. So on the 21st, then, you hear that Ms. Watts left the night before. You knew on the 20th that that was a risk because she was expressing -- she was agitated. She was expressing uncertainty about why things weren't happening, and -- and you -- did you also learn from Angelina that morning that there had been

this issue about whether Ms. Watts thought that this was an abortion or not?

MR. PRISLIPSKY: Objection to form.

A. I don't understand your question about the abortion.

Q. Okay. We'll just look at that note later. Were you aware that there are ways for a nurse to slow walk a plan of care?

MR. PRISLIPSKY: Objection.

A. Can you describe slow walk?

Q. Well, you might prioritize something else; right?

A. I -- I agree that a nurse can -- can take her time doing things, but on this day, every order that had been placed was implemented speedily. Everything that was ordered -- she had her antibiotics. She had her vital signs routinely taken. We were assuring that she was cared for. Within our scope, everything was being done. I don't think there was any slow process --

Q. Okay. So there was no --

A. -- by the nurses.

Q. Sorry. So there was no manpower issue day?

A. No, no.

Q. All right. So any delay had nothing to do with staffing issues?

MR. PRISLIPSKY: Objection.

A. That is correct.

Q. And you didn't think that Brittany Watts had to be administered antibiotics for some period of time prior to induction, did you?

MR. PRISLIPSKY: Objection. Form. Foundation. Calls for a medical opinion. Go ahead.

A. What do you mean by administered for a certain period of time?

Q. Did you think that Brittany Watts needed to receive antibiotics prophylactically for some period of time before induction could begin?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Go ahead.

A. Yeah, that would not be my decision to make, how long she received them. That would be up to Dr. Khavari.

Q. Okay. But was that your belief --

MR. PRISLIPSKY: Objection.

Q. -- that she needed to?

A. I didn't have any view on that one way or the other.

Q. Okay.

A. I just knew that she was getting antibiotics.
Q. All right. All right. So you learned on the -- we're on the 21st now. You learned from Angelina that Ms. Watts left, eloped?
A. I didn't learn it from Angelina.
Q. Oh. Who did you learn it from?
A. I learned it from the --
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. -- the midnight shift.
Q. Oh, I'm sorry. Okay. So you learned it from the midnight shift. You don't remember who specifically. Did you learn anything else about Brittany before Angelina arrived that morning?
A. Just that she had eloped. They had went in and found her IV up over -- she had removed her own IV, and it was up over the pump, and that she had left.
Q. Have you ever had a patient leave with IVs still in?
A. Yes.
Q. And that's a problem; right?
A. Yes.
Q. And when somebody leaves with an IV still in, you have to call for a wellness check; right?

A. Yes.
Q. Why is that?
A. They're at risk for -- I mean, an IV, you could -- they could administer drugs through there. There's a cause -- if they leave it in too long, it could get infected. It's hospital equipment. That's -- it's a risk for that patient.
Q. Okay. So under those -- if Ms. Watts had left with the IV still in, the discussion you and Angelina had about whether to call her or not, you wouldn't have had that discussion; right?
A. That is correct. She would have been called the night before. I mean, we would have -- they would have called for a wellness check --
Q. Right.
A. -- the night before. When she was found not in the room, they would have called.
Q. Okay. And a wellness check is conducted by local police; right?
A. Yes.
Q. And when you request a wellness check, you say, I want a wellness check; right?
A. Yes.
Q. So that they understand that I'm -- I'm not calling to report a crime?

A. Yes.
Q. I'm looking for a wellness check?
A. You can use that term. I -- if you don't use that term, you can describe what you're looking -- you can say, my patient left with an IV. I'm concerned. They would still do the same practice as if you used the term wellness check.
Q. Okay. Did you have training on when it was appropriate to ask for a wellness check?
A. No.
Q. Did you consider asking for a wellness check that morning, the 21st, after you learned that Ms. Watts had left and you were concerned for her health?
A. Well, that's what we discussed, Angelina and I, should we or should we not. She -- she asked me, I don't know what to do. You know, should we call her? Not the police.
Q. Right.
A. But reach out to her. And the debate was, will she feel like -- I mean, she left twice upset. Will she feel like we're invading her privacy? She didn't know the right thing to do. It was never discussed calling the police.
Q. Okay. So your understanding was that both times Ms. Watts had left, she left upset?

A. She had left upset, yes. Like, the first day she wanted to -- she had stated she wanted to process things. The second day, it was taking too long.
Q. Okay. And the -- her desire to process things at home, was that unusual?
MR. PRISLIPSKY: Objection.
A. No, no.
Q. Would you agree she had a lot to process?
A. I definitely agree.
Q. So you and Angelina discussed calling Brittany directly?
A. Yes.
Q. Did you consider a wellness check by police?
A. No.
Q. Why not?
A. Because she left stable. There was no medical indication on why to check on her.
Q. Okay. But you said you were worried?
A. We -- you're worried because you want her to deliver safely, you know.
Q. Okay. But you were minimally worried; is that --
MR. PRISLIPSKY: Objection.

Q. I'm just trying to understand -- and I'm not trying to put words in your mouth. You said that you -- you were very worried. A little bit ago you said you were very worried when she learned that -- when you learned she had left.

MR. PRISLIPSKY: Objection. Sorry. I thought you were finished.

MS. RICKERT: No, I'm not. Let me strike that and start again.

Q. You said a while ago that you were very worried when you learned she had left for her health because of all the risks, and -- but you did not -- you were not too worried -- or, sorry -- you were not so worried that you thought a wellness check would be in order; right?

MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.

A. That is correct.

Q. Okay. Now, what was Angelina's -- what else did you and Angelina talk about that morning after she arrived relating to Brittany?

A. Do you want to know other things we discussed or about the elopement?

Q. Anything that -- like in your initial conversation with Angelina when she arrived on the

21st, which -- do you know what time she arrived?
A. Angelina?
Q. Yes.
A. Around 7:00.
Q. Okay.
A. And then we kind of do a -- like a morning huddle at the desk. She'll come out, I'll go back, and I don't recall what time we were in the office, but it would have been between 7:00 and 7:30.
Q. Okay. And this is in -- in your shared office?
A. Yes.
Q. Do you still share an office?
A. Yes.
Q. Okay. And what did -- what -- that discussion, you talked about the elopement?
A. Yes.
Q. What else did you talk about relating to Brittany Watts?
A. We dis- -- so I know -- we discussed my -- she -- she discussed my leadership skills of the day before. She felt like when I was talking to Susan and Elaine about -- remember I told you we had the discussion about it being unprecedented and expectant management would be what we would expect to happen, she

felt like I should have directed them to come and talk to her rather than agreeing and saying I feel the same. Or rather than discussing it with them -- my role sometimes as assistant manager and a floor nurse come together because I've been a floor nurse for so long, so I tend sometimes to share conversations and -- and this day I was -- I felt like I was being supportive of Elaine and Susan. I'm hearing them. I'm understanding where you're coming from. I agree with you, but Angelina is very much about leadership. I've learned a lot from her. She would have preferred that instead of having so much discussion, I would have said let's take this to Angelina, and maybe we'll discuss it with her. That was the preface of her -- she did a write -- write-up in my work profile about, you know, being a leader, aligning with leadership, and my understanding of that correction was that I should have come to her with them instead of having the discussion. But I am a leader, and I -- I told her that morning that while I agreed that I could be maybe more professional on how I spoke or more -- more bringing it to her, I still felt that my personal conviction or feeling of we have not done this before and the note wasn't right, I stood by that to Angelina on the 21st. I said, I still stand by how I felt. I don't feel like it was handled correctly. I don't -- I feel like we

should have done expectant management, and that is because of what we've always done. I will always have that feeling and that belief, but I will try in the future to handle it more professionally by bringing it to you.

Q. So Angelina -- I want to understand how this -- this played out. Angelina told you that Brittany had eloped and that --

MR. PRISLIPSKY: Objection. Wait. Objection. Misstates the testimony.

MS. RICKERT: Oh, I -- I'm sorry.

MR. PRISLIPSKY: I knew you weren't try to --

MS. RICKERT: No, I'm not. I'm sorry. You're right. Okay. Strike that.

Q. You and Angelina discussed that Brittany had eloped?

A. Yes.

Q. Okay. Were you the one that informed Angelina that Brittany had eloped?

A. I think so. I'm not for sure if she heard it when she came out prior to our meeting in the office, but I -- I know we discussed it, but I don't know if I'm the first person she heard it from.

Q. Okay.

A. I don't know.
Q. All right. But it was acknowledged between you --
A. Yes.
Q. -- that this had happened? What did Angelina say about the elopement?
A. That's when she said, oh, my gosh, like, should we call her?
Q. Okay.
A. Yeah.
Q. And when did it switch to, okay, we're having a formal discussion, me as your supervisor, and you being admonished?
A. It was shortly thereafter, and it wasn't real formal, and it wasn't done with admonishment. It was just more of a direction. Like, this is what I expect from you. I had been assistant manager for one year. No, I had been -- two years, but I had had some time off for a leave, and I -- I'm still -- I've been there four years, and I'm still learning from Angelina. I still need -- we all need direction, and I feel like it was done very kindly. It wasn't done in a way of -- you know, I'm going to write you up because you did such a terrible thing. It was more of this is what I expect. This is what I want you to do in the future, and I agreed

with her. And I said, I take that. I will do better. I still stand by my belief, but I will do better in the future. It wasn't -- it was just a short little moment of -- you know. Then when I read the write-up later, I felt it was more detailed even than what we discussed.
Q. Okay. So Angelina, her -- in the actual discussion you had with her, she was concerned about the way you had been speaking in front of Elaine and Susan?
A. Yes.
Q. And said you should have included her?
A. Yes.
Q. But she was there; correct?
A. She came into it, and that's where she saw that we had been talking about it. That was her foundation for correcting me. When I came out, I hear you speaking to them about this induction, and that -- you know, that I didn't agree with it, or that I -- you don't have to -- I'm telling Susan, you don't have to. You can have another staff, which she then handled, but my discussion with them that she came into is what she addressed.
Q. Okay. So she felt that that discussion -- even though you're a supervisor --
A. I am.
Q. -- was inappropriate?

A. Yes.
Q. And she would have handled it differently?
A. She just would have handled it back in the office. I'll reassign. We're not going to discuss it anymore at the nurse's station. Drop it.
Q. Okay. So part of her concern was the -- the words you were saying, and another part of her concern was the location of the discussion?
A. Probably. I -- I think, yes.
Q. How long had that discussion been going on before Angelina entered it?
A. A minute or two. Like, it was not a long discussion.
Q. Okay.
A. Not -- it was very brief. I don't -- I don't know.
Q. Did she do anything to stop the discussion at that point?
A. No. She just re- -- said, here's what we're going to do. We're going to reassign. If you're not comfortable, we'll reassign. Are you comfortable taking care of her until there is an induction ordered? Yes. Okay. Then that's what we're going to do and proceed. And that's -- that's where we left it.

Q. So the -- the write-up that Angelina created after your discussion, you said that there's more in that write-up than was in the actual discussion you had?

A. (Nodding head.)

Q. Is that correct?

A. Yes.

Q. That's concerning; right?

MR. PRISLIPSKY: Objection.

A. I just -- it's not concerning. I just feel like that's how she wrote it. I told her, you know, the words that she used, I felt -- like the one word she used was bias. I said, I don't have a bias. My only concern was the note and the proceeding with an induction when there's still a heartbeat. None of my discussion ever had anything to do with like a personal bias or a con- -- it's just what I -- that's just what our hospital has always done. If my personal belief did not align with the hospital, I would still follow the hospital, because I'm an employee. So I felt like she interpreted it that -- that I was bringing my personal view over the hospital, but I was just agreeing with what we've always done.

Q. Okay. Let's look at that note now. I notice that the hard copy I brought only has the first

page and not the second page, which is my fault. Plus it's very small. So I'm probably -- I'm going to read it, and then I'll show it to you on my computer --

A. Okay.

Q. -- so that you can tell me if I've made any mistakes.

MS. RICKERT: And this is going to be our -- just our second exhibit, I think; right? Yes.

(Whereupon Plaintiff's Exhibit 2 was marked.)

Q. Now, I'll give you this one for now, but it just -- it doesn't have the second part. Okay. So this note from Angelina to -- you know, regarding the discussion she had with you, it -- the dates are a little weird, and it also doesn't say Brittany Watts, but I want to just look at the top where it says feedback. It says 9/21/20203. That's a typo; right?

A. Yes.

Q. So it should be 2023?

A. Yes.

Q. Okay. And you agree that this -- well, first of all, have you seen this before?

A. Yes.

Q. Okay. And what is it?

A. It is in my workday. It's just a feedback.

Q. Okay.
A. From -- she can -- she could put feedback on something I did well, something I needed corrected on. Anytime there's any interaction between a manager and an employee, she puts it in as feedback.
Q. Okay. So do you also agree that this is -- this note concerns Brittany Watts?
A. Yes.
Q. All right. So it's --
A. Well, I would correct that. It doesn't concern Brittany Watts. It concerns my conversation at the nurse's station.
Q. Okay. Your conversation about Brittany Watts?
A. Yes.
Q. Okay. So the patient at issue --
A. Yes.
Q. -- is Brittany Watts?
A. Yes.
Q. Okay. So it starts, on 9/21/2023, conversation held with Connie Moschell by Angelina Rechichar regarding exhibiting leadership behavior, her appropriate role and expectations in escalating situations, and aligning with her leadership team as an assistant manager. It goes on, upon incident taking

place on 9/20/2021, so the previous day?
A. And that should say 2023.
Q. Oh, yes. Yes. That would be two years on the day previous. So -- okay. Connie shared and discussed a high-risk doctor's decision/treatment plan based on her own personal views. Now, the high-risk doctor is Dr. Stewart; right?
A. Yes.
Q. Causing staff to become uneasy about the situation. This made the situation difficult while attempting to calm staff down, while also attempting to seek guidance from the doctor regarding questions and make important phone calls to ensure proper procedure was being followed (with doctors, ethics committee, and chaplains).
Okay. So let's try to break this part down a bit. She seems to be saying that you, by discussing your own personal views, caused staff to become uneasy; would you agree?
A. That is what she's saying.
MR. PRISLIPSKY: Objection.
A. But I do not agree that that occurred. I do not -- they were coming to me initially. Susan had mentioned not being comfortable administering, so I did not make her uneasy. She was already uneasy.

Q. Okay. And in your discussion with Angelina on September 21st, it -- this is one of the things she did tell you, though, that you had made the others uneasy?
A. She didn't say that I made them uneasy. She just said that I needed to not have those discussions with them. She did not use the word uneasy, that I recall.
Q. All right. And did she say anything about your personal views?
A. She just said that our personal views -- I understand, she said, how you feel about it, and we all feel the same, we all work here, and that's also how she felt, but that we couldn't allow that to -- I'm trying to think of her exact words. Just not allow how you feel to create a situation of -- I don't know the word she used.
Q. All right.
A. But she --
Q. I'm sorry. Go ahead.
A. She felt like by me expressing my view, that it was inappropriate. That I should just say, I'm sorry that you feel that way. Let's reassign or go to Angeline- -- let's go to Angelina. We'll reassign. I shouldn't have interjected how I felt at all. She would prefer that I did not, as a leader, interject how I feel.

I do recall that.
Q. Okay. And she told you that she agreed with your view, though?
A. She did, and she does.
Q. That induction was inappropriate in this situation?
A. No, just that we have never before had an induction with a heartbeat. She didn't go further to agree. I'm not saying she agrees with all the things that I view, but in that situation of expectant management versus a heartbeat, she felt the same way. It -- it bothered her, too, and she wanted more direction.
Q. Okay. Now, this part about this made the situation difficult while attempting to calm staff down, do you agree with her that staff needed to be calmed down?
A. No, I do not. Nobody was loud or needing calmed down, no.
Q. Why would she write this?
A. I don't know.
MR. PRISLIPSKY: Objection.
A. I don't know. I've asked her in the -- going forward multiple times.
Q. And what does she say?

A. She wrote it. She's not going to change it.
Q. Does she agree with you that it's not true?
MR. PRISLIPSKY: Objection.
A. I don't know.
Q. Has she ever told you she agrees with you that it's not true?
MR. PRISLIPSKY: Objection.
A. No. I've not -- we've not discussed whether she agreed that it's not true. I've just said, you know, we could have had this discussion and moved on.
Q. Meaning she didn't need to document it?
A. Yes.
Q. So did the discussion include her saying that staff needed to be calmed down?
A. No.
Q. She never said that to you?
A. No.
Q. And when you say she -- you could have just had the discussion and moved on, just so that we're clear, you mean she could have just talked to you and not made a formal matter in your file?
A. Yes.
Q. Okay.

A. But that is her decision, and I have great respect for her. This does not change the way I feel about her, and I learn from her. This being in my chart really doesn't have any effect on my -- on my -- the way I do nursing or -- I'm still -- I'm a great nurse, and this write-up doesn't change anything for me.

Q. Then why are you bothered that she wrote it down?

A. I'm just bothered that these terms are used, but it's been a long time ago. I have had to just close that door.

Q. Okay. All right. Let's -- let's go on. In these difficult situations, her expectation is to part of an aligned with the leadership team. I think there's a word missing there. And professionally control the situation without bias or personal views as a factor. Now, this is where the word bias comes in; right?

A. Yes.

Q. And you disagree that you showed any bias?

A. Oh, I totally disagree that I showed any bias. The only view I had was at St. Joe's, it's unprecedented to give an induction of labor with a heartbeat. This is something we have never done before. We cannot just do this. Like, this has got to go

further. That is the only even personal conviction I viewed. I did not speak of abortion versus life. I did not speak of Brittany seeking an abortion after that initial that's what she came for. The whole conversation with Sue and Elaine was we have not done this before. We always do expectant management. When there's a heartbeat, we've never given the induction. I don't -- I was very uncomfortable with that part of it. That was the only personal conviction that I expressed to nurses.

Q. Okay. And I think you said that in your actual conversation with Angelina she did not accuse you of bias?

A. Not that I recall. She did talk about my personal convictions.

Q. Okay.

A. But she did not use the word bias.

Q. Okay. And you were surprised to see that in the note?

A. Yes.

Q. Unpleasantly surprised?

A. Yes.

Q. Okay. And then we go on, Escalation with concerns and working with her leadership to come to an aligned solution that can be confidently communicated to staff, again -- now I'm going to have to give you my

computer for a second. I --

MR. PRISLIPSKY: She can see off mine, too.

MS. RICKERT: Oh, okay.

Q. Again, without personal bias or personal views, will be the expectation ongoing.

A. Yeah.

MR. PRISLIPSKY: You can see that?

Q. You see that?

A. Yes, I do.

Q. Okay. And is that --

A. And that's where I disagreed with her that -- that day on the 21st. I told her I can express my personal views and how I feel things should go. I'm not going to not express that if it aligns with the ministry and it aligns with the hospital's views, that -- I feel that should -- I should be able to express that in the best interest of the baby. I can take a step and say let's just take a moment and reconsider. Do we need ethics? You know, do we need to reconsider this? Do we -- what are we talking about? We're not just going to do it blindly. We've never done this before. Why are we doing it now? I think it's okay to say I don't agree with this decision and move forward. It doesn't mean that I will never implement in the -- do you know what I

mean? It doesn't mean because I have a view that's different than the doctor that we still won't work together or have a good relationship. But I think I should be able to express my personal view.
Q. What do you mean that you shouldn't go forward blindly or -- or whatever you just said?
A. No, I mean, I think that on this particular day not questioning at all and just saying, okay, we're going to do an induction. We have a 22-weeker. We have a heartbeat. None of us -- I don't know of a single nurse there that would go, okay, and just -- all of us were like, wait a minute. We have a heartbeat. That's not what we do. We've never done that before. That is a -- that is a -- that is across the board -- I can't think of a single nurse there that would say okay. We would all question it.
Q. Were you at all concerned that the hospital could face legal liability if they performed this procedure?
MR. PRISLIPSKY: Objection. Go ahead.
A. I didn't consider legal liability. That's not my realm.
Q. Okay. And then it goes on, Connie has been informed that she is free to and encouraged to express her views, concerns and they will be addressed as

they were in this situation. But in no way will it be further tolerated that this will be a matter that will affect or impact patient care or outcomes. That last sentence that we just read is -- it's fairly dramatic?
A. It is.
Q. It sounds like a final warning.
MR. PRISLIPSKY: Objection. Form. Go ahead.
Q. Do you agree?
A. No, I don't think it sounds like a final warning. I think it's incorrect. She's saying that by me expressing my views, it impacted patient outcome, and it -- and it didn't.
Q. Well, okay. She also is -- she's saying that in no way will it be further tolerated; right? So that is what makes it sound like a final warning to me. Do you disagree?
A. Well, she's just saying she won't tolerate it, but this is not a final warning. This just a verbal.
Q. I --
A. This is a verbal in my record. It's not a -- anything final about this.
Q. Okay. And -- but you agree that she is saying here that your expression of your views affected

patient care or outcomes?
A. She's saying it will not be -- it will not in the future affect.
Q. She says, but in no way -- in no way will it be further tolerated that this will be a matter that will affect or impact patient -- patient care or outcomes?
A. Yes.
Q. So the implication is that it has done so and it will not be further tolerated?
A. Yes.
Q. Okay. And so do you agree with her that your behavior impacted patient care or outcomes?
MR. PRISLIPSKY: Objection.
A. I don't. I don't. I don't agree. I don't think anything I did affected Brittany at all. I'm not the one who held up the order. I'm not the one -- I just asked why we weren't doing expectant management and ethics then became involved. They agreed, and it -- they were going to proceed. I don't think anything that I said in that conversation with Sue and Elaine, or anything that I did that day had an impact on Brittany Watts' care. I do not.
Q. You said you reviewed Dr. Khavari's deposition?

A. Briefly. I didn't really go through hers too much.
Q. Okay. Well, do you understand that she testified and also in an Interrogatory response said that -- that the induction was delayed because nurses had ethical concerns?
MR. PRISLIPSKY: Objection. Go ahead.
A. I was not aware of that, no.
Q. Okay. Do you agree with that?
MR. PRISLIPSKY: Objection. Go ahead.
A. No. I think an ethics consult is stand- -- is standard for our hospital to do. Like I said, it could be any patient at 22 weeks, not just Brittany, not just because of the note. But we do ethics consult with that early of a pregnancy that would lead to deliverly regardless. So it -- if she felt like the consult delayed the induction, it's not because of us. We're the ones that raised the concern, but ethics should be involved regardless. The fact that we brought it to light is standard for what we would do.
Q. Well, you've never faced this situation before; right?
A. Not this exact situation, no. We have faced patients who've had heartbeats at 22 weeks but not with an induction order.

Q. Okay. So what would be the question for ethics in a situation where there's -- wait. There was no induction order; right?
A. No.
Q. There was a recommendation?
A. A recommendation.
Q. And you -- what would be the circumstances that ethics would be consulted when there is no such recommendation for a 22-week pregnancy?
A. Just if it came to where we needed to do an induction for any reason, they would be involved. If there is going to be a recommendation -- a recommendation for induction at 22 weeks with a heartbeat, ethics has to be involved.
Q. Okay. But this is the only time, to your knowledge --
A. That is correct.
Q. -- this has ever happened?
A. Yes.
Q. So it's not standard. It's never happened before?
A. You're right. Absolutely. This exact scenario has never happened before.
Q. Have you initiated an ethics consult in another situation with a 22-week pregnancy?

A. Not that I can recall, a 22-week.
Q. Or thereabouts?
A. We had -- yes, we did have one. There was an 18-week pregnancy since her case that we have had to consult ethics because the doctor wanted to induce at 18 weeks, but that mother had a fever.
Q. Okay.
A. So it just -- because she had a fever, it was automatically understood that we needed to deliver this baby, but we still went through ethics to do the proper -- because we're a Catholic hospital. So I'm saying it follows the -- what we would do in these situations. It wasn't a debate on whether or not -- we didn't feel a debate on whether or not we should, because the mother is -- has a different clinical presentation. But ethics still gets involved.
Q. Okay. So with the 18 weeks, because the mother had a fever, your view it was completely different?
A. Yes.
Q. It was -- you had a different medical judgment?
A. Yes.
Q. Okay. But we agree you're not qualified to make a medical judgment?

A. Well, what do you mean by medical judgment? I had a -- a view on what we would do in that case. Like, if she's febrile, she's at risk now. There's an infection probably brewing. So again, I'm not going to make the decision. The doctor makes the decision, but clinically I recognize that this is a case where we're probably going to need to deliver her.
Q. Did you talk to the other nurses on September 20th about Brittany's white cell count?
A. Yes.
Q. What did you say about that?
A. I mean, we pulled it up to see what it was, and we were -- saw that it had come down from --
Q. And was this during the couple of minutes before Angelina joined the conversation?
A. Oh, no. This wasn't during -- this was earlier. Like, Elaine and I talked all day about different things related to the case on the 20th. The only conversation I had that she thought was escalating was with Sue, Elaine and me together about Sue saying she didn't want to care -- to do the induction. Earlier in the day with Elaine, we talked multiple times about the consult. We talked about the ultrasound results. We talked about the white blood cell count. None of it was confrontational. None of it was anything about a

personal view.
Q. Because you guys were in agreement?
A. Well, Elaine -- I don't know what -- Elaine's personal views. I feel like Elaine would actually be on the other side of this, to be honest, but she didn't express it, and neither did I. Elaine --
Q. Well, she raised the initial concern about what Dr. Stewart had said?
A. Yes. But I'm saying whether or not you should induce was not an issue for Elaine, that I know of. She didn't express to me, like, oh, we should just -- we agreed that we should do expectant management because that's what we always have done, but I'm saying I have a personal view that you had addressed earlier; that I would not feel comfortable administering medicine if it were ordered. I -- I don't know that I believe Elaine would have been okay doing that had it proceeded on her shift, but it did not.
Q. Okay. You're saying that you --
A. That's just --
Q. -- you don't think Elaine would have viewed this as an abortion when you would?
A. That -- that's correct.
Q. But -- so you and Elaine had talked a lot on -- on the 20th. The conversation that Angelina --

the only one that she witnessed was the one she walked in on?
A. Yes.
MR. PRISLIPSKY: Objection to form.
A. Yes.
Q. Okay. Do you think she might have been aware that there had been other conversations?
MR. PRISLIPSKY: Objection. Speculation. Go ahead.
A. I don't know.
Q. Did she raise any other?
A. No.
Q. Okay.
A. No.
Q. When did you first read this note in your chart?
A. So probably the next day. I'm -- I don't even think it would -- I think it would have been the next week, because I don't think she -- she told me that she was going to place a write-up, but she doesn't work on Fridays, so she was not there the following day, and I don't think this came -- I don't know if I have a date of when it was written, but I'm pretty sure I didn't see it until like the following week.
Q. It seems like it might have been the

following month, based on --
A. I know. It looks like it's in October.
Q. Yeah. Does that make sense to you?
MR. PRISLIPSKY: Objection.
A. I mean, it might have been. I don't know when it would have been. I know it wasn't right away --
Q. Okay.
A. -- that I read it.
Q. So she told you she was going to make a note, though?
A. Yes.
Q. Did you ask her not to?
A. No.
Q. Well, you said that you wish she would have just talked to you and moved on?
A. I do, but I respect her, and I feel like with management there are things you don't agree with, and we have a very good working relationship. I'm not going to ruin that because I didn't agree with her. I have very strong convictions on how I feel and how I practice as a nurse, and I think I take great care of my patients. I love what I do, and her writing this is not going to change that about me. And she knows that, that I'm a good nurse. I have no bias or way of treating

different people differently. I don't.
Q. So --
MS. RICKERT: Okay. Would you like to take a break? Sure? Okay.
Q. Okay. So you knew that you were going to be written up on the 21st after you had the conversation with Angelina and she told you this is going to be documented?
A. Yes.
Q. Okay. Were you upset?
MR. PRISLIPSKY: Objection. Go ahead.
A. No. I -- I felt -- I was -- I think I was more hurt than upset. I wasn't angry at her. I was just like, oh, my gosh. Like, this is a big -- I'm doing the best I can. I'm trying to be a good leader, but I want to be a better leader. It was all about my leadership. I felt like she was saying that about my leadership, and I feel like I really bridge that floor and her very well as assistant, and so I just determined to do better. It did bother me, yes.
Q. Did you talk to anyone about it?
A. No. Only -- I just talked to her about it.
Q. Okay. You didn't talk to anyone else at the hospital that day?

A. No, no, huh-uh, no.
Q. What was the rest of the 21st like, if you recall?
A. Normal day.
Q. Did you think about Brittany Watts?
A. I did.
Q. What did you think?
A. I actually prayed for Brittany Watts a lot that day.
Q. And you didn't reach out to Brittany Watts?
A. I did not.
Q. All right. Did you talk to anyone about Brittany Watts?
A. I don't recall.
Q. Did you talk to Sunnie Hudak about Brittany Watts --
A. No.
Q. -- on the 21st?
A. No, I did not.
Q. Had you, at that -- on the 21st, had you talked to Sunnie Hudak at all about Brittany Watts?
A. No.
MR. PRISLIPSKY: Objection.
Q. How often do you talk to Sunnie Hudak?

A. Oh, gosh. It's -- it's infrequently. She's a friend that I can text and I may not hear for two weeks, and then I'll talk to her for two days in a row, and then -- I don't see her all that often.
Q. Because you don't work together anymore?
A. We don't work together anymore. We are very good friends, and it's -- we're that friendship that you can go a month and not talk, and then it's as if -- you know, she's been to my house multiple times. We do not even to this day discuss Brittany Watts together. Even though we have a very good friendship, that has been our goal from the beginning. We both said -- the only time I discussed was the following -- the 22nd we did have discussion, but Sunnie and I do not discuss Brittany Watts.
Q. Why not?
A. Because that was our patient and -- and then when it turns into this, you just have to be very careful. I'm very careful, and so is Sunnie, with what you speak about it, and we had agreed together we're not going to talk about this.
Q. When did you come to that agreement?
A. I don't remember if it was right after or, you know, when things started hitting the news. People send you articles. We're just not going to talk

about this.
Q. Did you keep to that agreement?
A. Yes.
Q. Not 100 percent?
A. No, we did. We don't -- we don't discuss her. Like, there may be an article or did you -- you know, you're in the paper, I'm sorry, but yeah, we don't -- we don't discuss it. We've been on -- we were on a trip to Hawaii together and it never came up. We do not bring it up.
Q. When I say discuss, I'm also including any electronic discussions, so like text messages?
A. Yes. Like I say, on the 22nd is the only time that I ever recall speaking to her, and I -- I know there's a text message from that day. I don't even remember texting her. I remember talking to her on the phone, so I did both obviously. And no, we do not.
Q. Okay. When you worked together still, how often did you two talk?
A. Just if -- like, if she were on the floor and I'm out there helping with assignments, we -- we talked in general.
Q. All right. How much would you talk to her outside of work?
A. How much do I talk to Brittany?

Q. No. No, no. How much would you talk to Sunnie, when you still worked together, outside of work?
A. Probably the same as I do now, just occasionally.
Q. Okay. All right. So anything else of note on the 21st?
A. No.
Q. All right. Were you concerned that Brittany could have delivered at home?
A. I was worried that she might. I didn't -- I didn't know how long she would go before it would spontaneously deliver. That is -- that was a concern.
Q. All right. And so then September 22nd comes?
A. Yes.
Q. And you were working that day?
A. Yes.
Q. Tell me how that day started for you.
A. So I get there at 6:00. I would do my normal -- Fridays I'm on the floor more than I'm typically other days of the week, because I'm alone. Angelina's not present. You're kind of at the end of your week. Fridays tend to be busier days sometimes, so I may go out more often and just help. I would have done

my normal office duties with payroll and assignments and scheduling and all of that.

And then I was back in my office when -- and I don't have exact times because I don't recall exact times, but the nurse's station called me back in the office. They called my extension and said that Brittany Watts had called into the unit asking to speak to Sunnie. Sunnie wasn't working on Friday. And I'm like, okay. They said, she wants Sunnie's number. And I said, no. We -- we cannot give out a number for an employee. Sunnie can call Brittany if she wants, but we -- we're not going to give out her number for Brittany to reach out to Sunnie.

So they must have called Sunnie and said Brittany wants to talk to you. And Sunnie then called me on my phone and asked if -- if -- if she would be allowed to do that. Should she speak to the patient outside of the hospital, and I said, well, clearly when you took care of her, you made an impression on her. She really -- you took very good care of her. She's asking to speak to you. I don't know what's going on. You know, we're all worried about her. So I feel like it's okay for you to reach out to Brittany and see -- see what's going on; see what -- what she needs.

So Sunnie called Brittany and had a conversation. Then Sunnie calls me back and said what the conversation

entailed.

Q. Okay. Let's -- let's --

MS. RICKERT: Well, first of all, is this a good time for -- should we take a -- a short break?

MR. PRISLIPSKY: Sure.

MS. RICKERT: Okay. Let's go off the record.

VIDEOGRAPHER: Off the record.

(A recess was taken.)

VIDEOGRAPHER: On the record.

Q. Okay. Ms. Moschell, we are now -- we've gotten to September 22nd, a pretty pivotal day. Before we go further talking about your recollection, I want to look at some of the medical records and just talk through and you can tell me if anything's wrong or missing based on your recollection; okay?

A. Okay.

Q. So I want to start with the Dr. Stewart note that we discussed earlier, and you can find this on page 5 -- the Bates number 530, which will be in this set. And -- it should be. Yeah. All right. So this is double-sided, making it even less easy to navigate, but do you see these, the numbers I'm talking about --

A. Okay.

Q. -- the ones that say Mercy Health? And I've got 448. 534. All right. So that's where we're starting here on 530. And actually I think most of what we're going to be talking about will be in that same -- well, no, not quite. All right. All right. So do you see that note at 530?
A. Yes.
Q. And have you seen that before?
A. Yes.
Q. What is it?
A. It is his note placed in her chart, his consult note with an impression and a plan on this page.
Q. Okay. And when was the first time you saw this note?
A. I saw this note -- I believe it was the afternoon of the 20th.
Q. Okay. Now, is this the note we were discussing earlier?
A. Yes.
Q. All right. Now, you said that there was some things in here that weren't true, so I want to go through it and find out what parts you think are not true. So the first -- the first point there under IMP -- which what does IMP stand for?
A. Where are you at? I'm sorry.

Q. Where it says --
A. Oh, impression.
Q. So Brittany M. Watts is 33-year-old African American female, G2P0. What does that mean?
A. Gravidity, 2; parity, 0. She's had two pregnancies and no living children.
Q. Okay. At twenty-one days -- weeks, six days with abruption, premature rupture of membranes, elevated white count, advanced cervical dilation [sic], and 21-plus weeks gestation.
Now, is there anything in that first -- you know, that point one that you disagree with?
A. Well, we've already established with our own ultrasound that there's no abruption. Her elevated white count has actually come down from the day before. It's -- advanced cervical dilatation we cannot determine without a vag exam, which we did not do.
Q. How do you know he didn't?
A. Well, he didn't document it.
Q. Okay. Now -- so you think that his -- you -- you think there was no abruption?
MR. PRISLIPSKY: Objection. Go ahead.
A. I can't decide, but by the ultrasound there was no abruption.
Q. Okay. And you believe --

A. And I don't know at this point in time if ours had resulted. I don't know the timeline, so --
Q. Okay. And you stand by your belief that abruption shows up in an ultrasound?
A. Yes, I do.
Q. Okay. Now, what about the premature rupture of membranes, do you agree with him on that?
A. Yes.
Q. And it says elevated white count. It doesn't say anything more specific. Do you -- you disagree that it was elevated?
A. It was elevated sightly, but it had come down from the day before, which is a really good sign. So, I mean, I think in another patient he might have chosen to do expectant management based on these things, but --
Q. Okay. And I said dilation, but you're right, it's advanced cervical dilatation. And you said you don't believe that, because you don't think he could know?
MR. PRISLIPSKY: Objection. Form.
A. I don't know how he would know, but that -- that's up to him. I mean, there was never a vag exam performed. He's basing this on Dr. Khavari's previous day's evaluation.

Q. Would you consider it to be unreliable?
MR. PRISLIPSKY: Objection. Go ahead.
A. I think it's unreliable.
Q. Okay. And then at number two, the patient is having currently a small amount of bleeding, but she does have what we believed to be a placental abruption. Because of this, Mom is at great risk if she completely abruption in terms of hemorrhaging and dying. It does not make sense to me to wait till Mom has bleeding to death before we deliver a nonviable pregnancy despite the fact that there is a heartbeat.
Is there anything in there, like as a factual matter, that you disagree with?
MR. PRISLIPSKY: Objection to form.
A. This note completely goes against what he usually does, so it's just not common. I mean, every mother -- every pregnant mother is at a risk of a placental abruption. A placental abruption can happen at any point in time. When you have a baby, there's a lot of risks. There's a risk for an amniotic fluid embolism in every mother. You know, there's a risk for lots of things, but this patient is not bleeding that would show an abruption, so I -- I just feel like he put in there -- hemorrhaging and dying is very strong terms for someone who's not really showing signs of an abruption, with an

ultrasound that doesn't show an abruption.
Q. Okay. And he says at great risk. He doesn't say she's currently hemorrhaging; right?
A. Right.
Q. Three, her white count is more than twice what it has been in the past. Both of these white counts in the last two days have been elevated. This is a sign that the body is fighting infection. Given that the patient is prematurely ruptured, she is at great risk of infection -- of her infection. It does not make good clinical sense to me that we wait until Mom shows signs of sepsis and then try to save Mom's lives with antibiotics at the same time delivering the baby.
What -- is there anything in there that you factually disagree with?
MR. PRISLIPSKY: Objection. I was going to say objection to form. Foundation. Go ahead.
A. It just -- it just says that -- I mean, it's his note, but he says that the mom -- we don't want to wait until she shows signs of sepsis and then try to save her life. Well, you would get -- you would have many steps before you were septic. So let's wait and see if she even gets a fever or an elevated white count or an odor. We would be on it clinically if she stayed in the hospital, and we would know ahead of septic shock and

death. We never want a mom to go to sepsis, and -- and delivering with antibiotics, we already have her on antibiotics, so the risk of an infection or sepsis is now minimal.

Q. What -- what training do you have that allows you to assess whether --

A. I have experience.

MR. PRISLIPSKY: Wait. Let -- let her finish her question.

A. I'm sorry.

MR. PRISLIPSKY: You're fine.

Q. That allows you to assess what her risk of infection was at that point?

MR. PRISLIPSKY: Objection. Go ahead.

A. Just my clinical experience of what we watch for for infection, what we're trained to watch for and how we assess our patients every shift.

Q. All right. But you are not allowed to make decisions based on your assessment of whether a person is fighting infection --

MR. PRISLIPSKY: Objection. Go ahead.

Q. -- correct?

A. I can tell if they're fighting infection.

Q. You can?

A. Yes.
Q. So you disagree with him when he says this is a sign that the body is fighting infection?
A. I don't disagree. I think an elevated white count does go up, but it had come down, so it's just a watch and wait situation in -- but I'm not disagreeing that an elevated white blood cell count could be a sign of an infection.
Q. Okay. You just don't agree that she had an infection?
MR. PRISLIPSKY: Objection.
A. I don't know whether she had an infection. I can't determine that, but I can agree that the -- expectant management would have the same outcome as inducing at this point, because she's going to deliver. Let's just take care of her and let her do it on her own. Expectant management.
Q. Why would an induction -- let's say you could know for sure that Ms. Watts was going to deliver next day --
A. Uh-huh.
Q. -- okay? How would inducing this day be problematic?
MR. PRISLIPSKY: Objection. Foundation. Calls for a medical opinion. Go ahead.

A. One day may not matter, but what about a week? What about two weeks?
Q. You tell me.
A. It makes a big difference, because then you have a viable fetus. If you're able to expectantly manage her care and take care of her and the baby and have two patients with a good outcome, ultimately that's what you want. That's what doctors and nurses want.
Q. Did -- are you aware that Dr. Khavari testified there was no way to save this baby?
MR. PRISLIPSKY: Objection. Go ahead.
A. I don't know how Dr. Khavari would ever have a way to say that, but if that's what she said, I was not aware.
Q. Has any physician told you that Brittany Watts' baby could have been saved?
A. No.
Q. Okay. So that's just based on your own assessment?
A. Yes.
Q. And you still feel that today?
A. Yes.
Q. That her baby possibly could have been saved?
A. I do.

Q. And what do you base that belief on?
A. Just my experience. We take care of moms at 22 weeks. If you can get to 24, it's not uncommon to see a mom go to 24 weeks, 25 weeks. There's always stories of people who have been able to prolong delivery just enough, and I could -- if -- if I needed to find cases and stories, I could. I'm not -- I don't work in that unit, but I hear it all the time, and it's just what we do in labor and delivery. We try to save life. We try to help moms complete their pregnancy. That's our goal.
Q. So what treatment would have prevented Brittany Watts from giving birth?
MR. PRISLIPSKY: Objection. Foundation. Form. Calls for a medical opinion. Go ahead.
A. I -- I didn't ask you to prevent birth. I just asked you to preserve life until it either happens on its own or we can save it when it's born. We would never do anything to stop it.
Q. Well, you just said you believe to this day that Brittany Watts' baby could potentially have been saved --
MR. PRISLIPSKY: Objection.
Q. -- correct?
A. I don't know. Yes, I -- it could have

been. It didn't -- in her case, she ended up delivering on her own, so no. But that's not -- you don't know that on the 20th that she's going to deliver.

Q. I'm talking about --

MR. PRISLIPSKY: Wait, wait. She wasn't finished with her answer.

MS. RICKERT: You're right. I'm sorry. I didn't --

MR. PRISLIPSKY: You're fine. Go ahead.

A. You don't know on the 20th that she's going to deliver on the 22nd. So if we're caring for her, and we've got her in the bed and we're taking good care of her, whose -- we don't -- we're not God. We don't know. We don't know if she'll deliver in two days and it's nonviable and it's -- we don't know if she'll wait a week, two weeks. It's just what we've always done. I guess I'm a nurse who is old-school. We've always done expectant management. We always support the baby and the mom until we need to deliver. That was my problem on this day. It wasn't that she would have a baby too early and it would pass. Those things happen. And we support the mother as best we can. I just didn't feel like we were doing everything that we could to preserve that baby's life.

Q. So my question was whether knowing --

you know, as you sit here today --
A. Yes.
Q. -- you still believe that Brittany Watts' baby could have been saved, and I understand you to have answered that question yes?
MR. PRISLIPSKY: Objection. Misstates her testimony. Go ahead.
A. I didn't know you meant like if she would have stayed in the hospital versus having it at home. She delivered on her own. So she would have delivered on her own in the hospital. And could have it been saved at 22 weeks? No, I do not believe that.
Q. Okay. And do you think she would have not delivered on her own in the hospital if she had stayed there?
MR. PRISLIPSKY: Objection.
A. I -- I have no way of knowing that.
Q. So do you believe as you sit here today that Brittany Watts' baby could have been saved?
MR. PRISLIPSKY: Objection to the retrospective analysis. Go ahead.
A. I mean, I'm thinking probably not, but I don't know. Had she stayed, I don't know. I don't know what happened in her home. I don't know what she did. I don't know how she delivered. I don't know.

Q. Well, we'll talk about the autopsy report, but -- are you aware that an autopsy was conducted?
A. Yes.
Q. And are you aware that the cause of death was determined to be prolonged intrauterine demise?
A. No.
Q. You never heard that?
A. Huh-uh.
Q. This is the first time you're hearing that?
A. The prolonged, yes.
Q. Okay. Does that make a difference?
MR. PRISLIPSKY: Objection. Go ahead.
A. Does it make a difference for what?
Q. Does that make a difference to your assessment as to whether Brittany Watts' baby could have been saved?
MR. PRISLIPSKY: Objection.
A. No.
Q. Okay.
A. Because we have no way of knowing. We just -- we just do the best that we can to care for patients as they come. We do ethically in -- in our hospital everything we can do, and if -- babies die all

the time. We -- we have fetal demise patients regularly. And we do -- we care for them and we support them. I just didn't feel we were doing that in this case by inducing.

Q. Okay. Do you agree it was a medical judgment whether this fetus could be saved?

MR. PRISLIPSKY: Objection.

A. Absolutely.

Q. Okay. Now, four, the patient does not desire resuscitation for this baby, plus the baby's too early from a gestational age for any reasonable chance of survival. I do recognize that there is a fetal heartbeat waiting -- waiting until the fetal heartbeat stops until Mom shows signs of infection or until Mom is bleeding to death does not make sense to me both as a cath again as a physician.

What -- is there anything factually wrong in that fourth section?

MR. PRISLIPSKY: Objection. Form. Foundation. Go ahead.

A. We -- we recognize there's a fetal heartbeat. Waiting until it stops, until she shows signs of infection or until bleeding to death, I don't think I've ever had a mother bleed to death. I mean, even with an abruption, you're not going to bleed to death.

Q. Okay. So you think he was being overly dramatic?
A. I do.
Q. And do you understand that when he says both as a cath again as a physician, when he's says cath, he means Catholic?
A. Yes.
Q. Did it surprise you that he would put that in his medical note?
A. I think he's just saying that he recognizes that it's a Catholic issue, and he also says in the beginning of that number four that he's basing it on the fact the patient does not desire resuscitation for this baby, plus it's too early. So he's saying she doesn't -- she doesn't want it to be resuscitated regardless, so we're just going to proceed.
Q. And not wanting this to be resuscitated, we talked about that that -- that can be a choice that a loving mother makes?
A. Absolutely. Yes. But in two weeks or three weeks would she have wanted it to be resuscitated, I don't -- we don't -- we'll never know. That's speculation, and we can't do that.
Q. Was one of the purposes of having pediatricians talk to Brittany Watts to try to change her

view on resuscitation?
A. No.
MR. PRISLIPSKY: Objection.
A. Never. They talk to every mother who's going to deliver a premature baby, and they don't give one way or the other. They just talk about what their care will be.
Q. Okay. I think you said earlier that the pediatrician would tell the -- the person what the baby would like and what to expect; right?
A. Yes.
MR. PRISLIPSKY: Objection. Go ahead.
Q. Do you have any evidence that a pediatrician in this situation told Brittany Watts what her fetus would look like?
A. I don't. I would have to read the note, but, I mean, that's typically what they go over. That's -- they're helping them understand the situation.
Q. Okay. But you don't have -- you're just talking generally. You're not talking about the --
A. That's correct, and I would have to read the note to see if she did.
Q. Uh-huh. Okay. So the plan, one, my recommendation instead of waiting until Mom is on death's door before proceeding with treatment to deliver this

baby, my recommendation would be that the patient would be delivered either with Cytotec or with Pitocin. What is your reaction to that --

MR. PRISLIPSKY: Objection.

Q. -- section?

MR. PRISLIPSKY: I'm sorry. Are you finished? Objection. Form. Foundation. Go ahead.

A. Just the death's door, again, the drama, the death's door.

Q. And, two, again, I feel would be -- we would be endangering the mother by waiting for hemorrhage and/or sepsis or her to stop the fetal heartbeat. What -- do you disagree with anything there?

MR. PRISLIPSKY: Objection. Form. Foundation.

A. No. No.

Q. No? So you agree that waiting would endanger the mother?

A. No, I -- I don't think that there was a danger of hemorrhage or sepsis, because again, we're not going to reach that point, but he's saying I feel we would be endangering the mother by -- I'm trying to read the end of the note. I do not agree with it. We're not endangering her by waiting. If he felt that we were endangering a mother by waiting, that statement would say

we would never wait; right? We're endangering the mother, so we will not wait. We wait all the time. What about the next patient? And the patient after that?

Q. Well, he's talking about this patient --

A. Right.

Q. -- right?

A. But he's saying endangering --

Q. Uh-huh.

A. -- by waiting.

Q. Uh-huh. I'm not following.

A. No -- no doctor would endanger a patient or her life, so doing expectant management is not endangering the mother, or we wouldn't do it. Waiting while we have a stable mom is not endangering her, or we wouldn't do it. Right?

Q. And he's saying don't do it because it will endanger her; right?

A. He's saying we're not going to induce her because it would endanger -- we're not going to wait because she would be in danger.

Q. Yes. And he's the doctor?

A. And he's the doctor. And so I -- I told you, ultimately that's his choice, but I don't have to agree with it.

Q. Okay. And you are just basing that on

your own -- own experience?
A. It's just never been done that way. It's unprecedented. We've always done expectant management, hundreds of times, if not more.
Q. Under these exact circumstances?
A. Yes, yes.
Q. An elevated white cell count?
A. Yes.
Q. Placental -- placental abruption?
A. Not abruption.
MR. PRISLIPSKY: Objection. Objection.
A. Every patient's different. Every patient has different circumstances, so --
Q. Okay. But not -- not abruption?
A. So not this exact case. I can never say I've had an exact case like this, but it's --
Q. But you agree that waiting, if there's a placental abruption, could be -- could endanger the mother?
A. If she were --
MR. PRISLIPSKY: Wait, wait, wait. Objection to form. Foundation. Go ahead.
A. I just can't answer because I'm not seeing an abruption or any sign of abruption. He is saying that there is a chance of an abruption. There's

always a chance, but if we don't have one now, could it have -- would it -- if a patient truly abrupts, there is danger, yes.

Q. Okay.

A. That is not good for the baby.

Q. And now two doctors have diagnosed abruption --

MR. PRISLIPSKY: Objection.

Q. -- for Brittany Watts; correct?

A. I don't know if they diagnosed it.

Q. Well, it's in the medical records of Dr. Khavari, who diagnosed abruption; right?

A. Yes.

Q. And Dr. Stewart says he believes there's an abruption?

A. Okay.

Q. Right?

A. Yes.

Q. And so two doctors have concluded that there's an abruption; right?

A. And yet we see no sign of it.

Q. And you know better?

MR. PRISLIPSKY: Wait.

A. No.

MR. PRISLIPSKY: Objection. That's

argumentative.
Q. Okay. Do you know better?
A. No. No.
Q. Okay. But in your view there's no sign of abruption?
MR. PRISLIPSKY: Objection. Asked and answered multiple times. Go ahead.
A. I do not see any clinical sign of abruption. I've seen many placental abruptions and cared for those mothers.
Q. Okay.
A. It was with great relief that she was not bleeding. We were thankful that we did not see signs of an abruption, because that would be a whole different clinical picture.
Q. All right. Let's now talk about that morning. Your -- I said we were going to look at all the medical records at once, but we're not. I'm sorry. But we will be coming back to them.
That morning you talked about the -- and I'm talking about the 22nd. You said you spoke with -- you spoke with Sunnie Hudak, and did you call Sunnie?
A. No.
Q. Did Sunnie call you?
A. Yes.

Q. What -- what -- and she called you to ask if it was appropriate for her to call Brittany?
A. Yes.
Q. And who had told her she should call Brittany?
MR. PRISLIPSKY: Objection. Go ahead.
A. No one told her she should. They called her and let her know the patient requested to speak to her.
Q. Okay. And did they suggest that she call?
A. No. They asked if she was okay with taking Brittany's number. She said, I'll take Brittany's number. I don't want her to call me, but I'll call her, and she then called me to ask if that would be advised or be acceptable to call.
Q. And by that point was Angelina at work?
A. This is --
MR. PRISLIPSKY: Objection.
A. -- a Friday, so Angelina was never at work on Friday.
Q. Okay. So on the 22nd Angelina was not there at all?
A. That's correct.
Q. Okay. So you were in charge?

A. Yes.
Q. Did you consider contacting Angelina to see what she thought?
A. No.
Q. All right. And what time did you talk with Sunnie Hudak that morning?
A. I don't recall the time. It was morning.
Q. Okay.
A. I don't recall.
Q. But it was morning --
A. It was morning, yeah.
Q. All right. And -- and then you texted with her a couple hours later; right?
A. Yes.
Q. All right. So I'm going to mark this as Exhibit 3 and pass a copy to you.
(Whereupon Plaintiff's Exhibit 3 was marked.)
Q. These are text messages taken from Sunnie Hudak's phone. Have you seen this before?
A. Yes.
Q. Did you review it in advance of this deposition?
A. Yes.
Q. All right. So at 12:30 you texted

Sunnie, she has not come yet; right?
A. Yes.
Q. And -- and so this is a couple hours after you had initially talked to Sunnie?
A. Give or take. I don't remember the time that I talked to her, but yes, it was following our phone conversation. Because now on the phone conversation she told me that she had spoke with Brittany, and she had advised her to come in. I told you she called me back after she talked to the patient.
Q. Okay. And -- and Brittany, both when she talked to Sunnie and when she initially called the hospital, she reported she had miscarried; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. No. I don't think she told the hospital that. She just wanted to talk to Sunnie.
Q. Where did you get that?
A. That's the message that was relayed to me from my unit, that she had called in asking to talk to Sunnie. Nobody said anything about her delivering.
Q. Okay.
A. I think she might have called the doctor's office and reported that, but not us.
Q. When you said she might have called the doctor's office, what do you mean?

A. There's a note -- as I was reviewing the chart, there's a note from Dr. Khavari's office that she called them and told them that she had delivered, I believe.
Q. All right. So I want to -- I want you to go to page 255. I want to see if this is the note you're talking about. And would you have had access to all these notes?
A. No.
Q. Why not?
A. When it happened?
Q. Like, on the 22nd.
A. No.
Q. The notes that had been entered already.
A. No. 255. I'm sorry. I'm --
Q. Why would you not have had access to notes that had been entered?
A. They -- if they had been placed, I might have had access. I did not access them. I don't know if they had even been placed yet, but if they had been placed, I would have had access to them.
Q. Okay.
A. I did not pull up any of her previous -- I'm on 255.
Q. All right. So do you see at the bottom

of that page under notes, telephone encounter?
A. Yes.
Q. And this was filed at 10:48 that morning, so --
A. That's --
Q. That's when it was actually entered; right?
A. Yes.
Q. And it says, patient called stating that she miscarried last night. Dr. Khavari instructed the patient to go to the emergency room; okay? So is that the note you were talking about?
A. Yes, that is the note. She did call them that morning that she had -- she uses the word miscarried. That's not the correct word, but --
Q. But that's what she reported?
A. That's what she wrote, yes.
Q. And you understand that she was saying her pregnancy had ended?
A. Yes.
Q. Okay. And -- and when you talked to Sunnie on the phone after Sunnie had talked to Brittany, she also told you that Brittany had -- that the pregnancy had ended; right?
A. She told Sunnie that she delivered the

baby at 5:00 -- she goes, I -- I had my baby at five, whatever, forty -- I don't remember the exact time, and she told Sunnie that she flushed it down the toilet. And Sunnie said, I -- when she called me back, she said, I did not even talk to her about that. I just said, please go to the hospital. Are you bleeding? You know, because when you deliver the baby and you don't deliver the placenta, now you're at risk for heavy bleeding, so she told her to go to the hospital.

Q. Did Brittany tell Sunnie that the placenta was still inside of her?

MR. PRISLIPSKY: Objection.

A. I don't know what she said about the placenta.

Q. Okay. So why did you just bring up the placenta?

A. Well, because when she presented to us, I'm saying it was still in her, so you -- you've got a concern that there could have been heavy bleeding, but when Sunnie -- oh, no. I -- I take that back. She did tell Sunnie there was something hanging out of her, like the cord.

Q. Okay.

A. So Sunnie knew that it had not delivered the placenta.

Q. That something was hanging out of her?
A. Something. I mean, that's what she assumed it was.
Q. All right. And so by 10:00-something that morning, you knew that Brittany had delivered?
A. Yes.
Q. All right. And so Sunnie told you that --
A. I don't know if it was 10:00-something. I don't know what time Sunnie called. It could have been 11:00. I don't have a time frame for that.
Q. Okay.
A. But it was before our texts, so --
Q. Okay. And -- and if you had looked at the -- at the notes in -- in Brittany's chart, you would have seen that she had called saying she miscarried?
A. Yes.
Q. And when you spoke to Sunnie, she relayed this information, and she said that Brittany told her she had flushed it down the toilet?
A. Yeah. She said -- she called it my baby. I flushed my baby down the toilet.
Q. And this is what Sunnie told you Brittany said?
A. Yes.

Q. And it wasn't I flushed?
A. Right.
Q. It was very specific?
A. It was very specific.
Q. And this is -- that's what -- as relayed to you by Sunnie?
A. Yes.
Q. You did not -- you never heard this?
A. I did not.
Q. Okay. And so at that point what was your thinking?
A. I was very concerned. Now we're watching for her to come. We're hoping that she's not hemorrhaging to death because we've got something hanging out, which we assume is a cord. And that's why I texted her, I'm assuming, because I don't recall ever texting, but I -- she's not yet come, and she said -- I texted her, okay. And then I tell her that she's here.
Q. Uh-huh.
A. And then later this text is after -- I don't know the time frame on this because --
Q. The times are on the right.
A. I mean, I'm saying in relation to the detective did not come until around 2:00. The patient came around 1:00, and I spent a good bit of time trying

to help her find someone to bring this baby. I said -- because she told me when I entered her room that it was in a bucket by the garage, and I'm like, oh, that is -- in my mind I'm thinking, that is so much better than flushed down the toilet. So, okay. We can get this baby and bring it to the hospital because we have a post -- after 20-week delivery of a fetal demise. By Ohio law this needs to be reported. We need to have a proper disposal of the -- as you, you know, said, it could be a cremation or a burial. You can't just leave it in a bucket by the garage. We need to have this baby. She told me that she would find someone to go get it.

Okay. She arrives at 1:00. It's by 2:00 --

Q. Hold on a second. You didn't talk to Brittany before she arrived, did you?

A. No. No, I did not.

Q. Okay. So she didn't tell you that she would have someone retrieve it --

A. Yes.

Q. -- prior to her arrival?

A. No.

MR. PRISLIPSKY: Wait for her to finish the whole question so you guys speak the same language.

Q. Yeah. Okay. So Brittany arrives. Do you think that when you texted Sunnie she's here that

that was soon after she arrived?
A. Yes.
Q. Okay. So it was around 12:39?
A. (Nodding head.)
MR. PRISLIPSKY: You're nodding your head. Just to make sure, did you mean to say yes?
A. Yes.
Q. All right. So you -- Brittany told you that the baby was in a bucket in the backyard?
A. Yes. She told me when I went in to her -- to her room to -- to talk to her that the baby was in a bucket by the garage.
Q. And you found that sickening?
A. I mean, I found it relieving, to be honest, because if you lose the baby, there -- you know, at least it's not in the toilet. It's terrible that it's anywhere, in a bucket or by a garage, but it's so much better. I'm like, bring it here. I mean, it's a fetal demise. We handle these. We -- we know that it's not -- it can't survive, but with the dignity of this life, bring the baby in and let's -- we had already explained -- not myself, but there -- other nurses had stated they had explained to her the process after it was born and what we would do, so you can't just leave --
Q. Who?

A. Sunnie.

Q. Okay. Go ahead.

A. So the baby's in a bucket. Go -- go get it. Do you have somebody that can bring the baby in? Yes, I will find somebody. I said, okay. That will help, because then we have the baby. We can have a proper whatever, burial, cremation, whatever. If you don't want to choose, then we would arrange with the funeral home and have it done properly.

Q. What made you think that it was your responsibility to get this baby to the hospital?

A. Well, I have a patient who has delivered a baby, and there's no baby. It is my responsibility for that child to find where it is. What if it's 24 weeks? What if it's still alive?

Q. You knew it wasn't.

MR. PRISLIPSKY: Objection.

A. I was hoping at that point, since it's been so long, that it isn't, but it could have been. We -- we have to determine the well-being of this baby. At this point we have to find the baby.

Q. Okay. So when you learned hours earlier that she had delivered, why didn't you call 911?

A. Well, because she was instructed to come to the hospital, so we hoped that she's coming. I

wouldn't call 911 prior to her arrival.
Q. Yeah. You got to get her there first; right?
A. Well, I need to get her there to see if she -- does she have the baby? Did she flush it? I can't determine what went on in her home until I get the patient to me.
Q. Right. But you're saying there might be a living baby?
A. There could have been.
Q. At Brittany Watts' home?
A. Yes.
Q. I mean, time is of the essence; right?
A. Yes.
Q. Time really matters?
A. It matters, but it's also -- I also have knowledge that if she really delivered at 5:40, whatever, it's most likely, but I cannot determine that until I know. It -- I can't tell you if it was alive or dead until we see the baby. You understand? I wanted to find that baby.
Q. You wanted to?
A. I -- I felt the need to.
Q. What was that need?
A. Because the baby has a life, too. This

is her child. It can't be in a bucket by the garage indefinitely. If I would have done nothing this day, where would this baby be?
Q. I don't know. Neither do you.
A. It would have been in the toilet stuck.
Q. To this day?
A. Until she -- well, she would have had to fix it.
Q. Okay.
A. But that's not okay. That baby's 22 weeks gestation. It has a life. We have to -- by law, it has to be properly -- this is a -- this is a person. This is a human.
Q. Did you think this was your legal responsibility?
A. I thought it was my responsibility as her nurse to help her, and she seemed very willing to try at first, and then told me no one could go get it. No one can go get it.
Q. Where did you document that she told you no one could go get it?
A. I didn't.
Q. You documented that she told you someone could?
A. No, Jordan, I believe, was documenting

at that point.
Q. Okay. So Jordan documented that she said that she would get someone to go get it?
A. Uh-huh.
Q. And --
MR. PRISLIPSKY: Did you mean to say yes?
A. Yes.
Q. Okay. And -- and then you say that Brittany told you she would not. How soon after?
A. So it --
MR. PRISLIPSKY: Object -- objection. Misstates her testimony. Go ahead.
A. So I went in initially and -- and asked her to have someone go find the baby, and she told me yes. I go in close to 2:00 -- I don't know the exact time -- to see, did you -- because I'm trying to give her time. Jordan's also caring for her and getting her assessed and that, and I said, did you find somebody to go get the baby? And she said, no, I don't have anybody to go. Now I've heard from her that it's in the bucket. I've heard from Sunnie that she flushed. I'm like, there's too many -- it's inconsistent. She's not going to go and bring this baby to the hospital. We need to go find this baby.

Q. So you think that around 2:00 she told you that?
A. It was shortly before 2:00 because --
Q. Please let me finish the question.
A. I'm sorry.
Q. That's okay. It was -- you believe it was shortly before 2:00 that she told you that she would not have someone go get the fetus?
A. Yes.
Q. Okay. And she also told you that the fetus was not alive; correct?
A. She told me she didn't want to look. She didn't know because she didn't want to look.
Q. Did you document that?
A. I believe Jordan did. I did not document because I was not her nurse. I was there to support Jordan.
Q. Why?
A. Because I was her manager that day, and there was a lot -- Jordan would make multiple trips in and out, wasn't sure how to talk to her, didn't know what to ask. I'm like, do you need my help? I'll come with you. This is a situation we've never had before. A woman shows up with her cord -- umbilical cord unclamped, and we have no baby.

Q. Uh-huh.
A. This is -- it was very -- a very difficult time, and so I offered assistance to Jordan by going in. I'm also the manager that day. That's a managerial task, to go in and assess the situation and determine what needs to be done.
Q. Who was this difficult for?
A. This was difficult for all of us.
Q. Wouldn't you agree it's primarily difficult for Brittany Watts?
A. I think it absolutely was difficult for Brittany Watts.
Q. Don't you think it's primarily difficult for Brittany Watts?
A. Not primarily. I think it -- it's a situation as nurses that we found ourself in really struggling to do the right thing. We wanted to do the right thing.
Q. Okay. And you agree that Brittany Watts was in a medical crisis at this point?
MR. PRISLIPSKY: Objection. Calls for a medical opinion.
A. I don't know what you mean by crisis.
Q. Was Brittany Watts in need of immediate medical care?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Form. Foundation.
A. She appeared nonbleeding. She -- her vitals were stable. We immediately notified the physician who placed orders for her. She was talking and stable, and as we spoke, of course it's a traumatic event, but medically I would have expected a lot more bleeding. I was thankful that we didn't have that. She seemed stable. Her uterus was firm. We call it the fundus. We assess that. We check for signs of, you know, the bleeding primarily, and her vital signs, and she was stable.
Q. Did any doctor weigh in on her condition at that time?
A. No.
Q. Did you ask a doctor to?
A. Uh-huh. Jordan did call Dr. Khavari multiple times --
Q. And Dr. --
A. -- to let her know that she was there.
Q. Multiple times?
A. I mean, I think she -- whatever she documented. I did review Jordan's documentation. She was relaying things to Dr. Khavari as things happened.
Q. Okay. But Dr. Khavari did not come and

examine Brittany Watts at that time?
A. Not at that time.
Q. All right. You were talking about how it was your duty to help -- was your primary duty to help Brittany Watts or to help the baby she had delivered?
A. Both. We have a mom and a baby. It is -- they are both our responsibility.
Q. One is your patient at the hospital on the 22nd; right?
A. Yes.
Q. So does that change anything about who your primary responsibility is to?
A. Not in my mind, because we were caring for her, 100 percent, but we still have a baby that is out there.
Q. And -- okay. Let's go back. Well, first of all, let's finish with this text. So you tell Sunnie at 1:19, she says, the baby's in a bucket. Do you think she's lying? Sunnie says, at 1:25, she told me she flushed it ... You respond, I know. I think she did but doesn't want to say. We have to have a fetus or she will be charged. What kind of charges did you think would have to be brought against Brittany Watts?
A. I've really contemplated that text because I really don't recall feeling like she would be

charged. I don't know what I'm referring to. I know I had spoke to our Mercy Health Police ahead of time just because I wanted to know policies and what would I do if she came, but I don't know what I'm referring to. I honestly don't know what I meant by that.

Q. You --

A. I don't recall thinking that there would be a charge if she brings the baby in.

Q. But you thought there would be a charge if she did not bring the baby in?

A. I -- I did, and I don't recall what I thought that would be. I don't know legal terms. If you have a baby out there somewhere in a bucket by a shed, that's not okay. I didn't want her to get into trouble. She kept talking like she needed help, like -- I'm like, we'll help you. Like, we were very compassionate with her. But if you don't have the baby, that's a problem.

Q. It's a problem for you?

A. No --

MR. PRISLIPSKY: Objection.

A. -- it's a problem.

MR. PRISLIPSKY: Go ahead.

Q. It's a legal problem?

A. It is a huge problem if you do not have the baby that you have delivered and there's no

assessment of this baby; how far along was it, was it born alive? There's just a lot that goes into this scenario that caused concern. I was very concerned.

Q. So I think you just said you spoke to the hospital police officer before Brittany Watts even arrived?

A. I did.

Q. Why?

A. Because I -- by Sunnie telling me that she's coming and the baby's in the toilet, I'm thinking, what do I do if she comes without her baby? I didn't -- I didn't want to do the wrong thing. I wanted to do the right thing. I wanted to follow the guidelines of the hospital. I wanted to have direction on what I would need to do, and so when I spoke to Fred, his only real advice to me was if you need a wellness check, you would need to call the Warren City Police because we don't do that. The -- the Mercy Health Police would not do that.

Q. Uh-huh.

A. I said, okay. Well, I don't know what I'm going to -- what I'm going to -- she's not here yet, so I don't know. Maybe she'll come with the baby. I don't know. But I wanted to know if there was any certain procedure that I needed to follow or what I needed to do in the case that she shows up without the

baby.
Q. Okay. And he didn't tell you what you should do; right?
A. He didn't tell me what I should do. He just said, if you need a wellness check on the baby, you would need to call Warren City Police.
Q. All right. And you opted not to seek a wellness check at that time?
A. At that time I still don't have Brittany here, so I don't know.
Q. All right. You have some information?
A. Yes.
Q. That she has delivered; right?
A. Yes. And allegedly by Sunnie's recommendation, hopefully she's coming, so --
Q. But you don't know for sure if she'll come?
A. I don't know. I guess it was --
Q. I'm sorry. Go ahead.
A. -- about 40 min- -- 20 minutes that she did come after. I talked to him at 12:20. It looks like 12:40 I say she's here, so there was just a brief time there where, you know, she's not yet here and then she is.
Q. But you had known since -- or, I mean,

did you -- let's say --

MS. RICKERT: Strike that.

Q. Did you -- you talked to Sunnie soon after she talked to Brittany?

MR. PRISLIPSKY: Objection. Go ahead.

A. I don't know. I don't know what time. I don't remember the time frame. I wish I could go back and look at the time stamp of our call, but I don't remember what time.

Q. Okay. You wish you knew?

A. I would like to know. I mean --

Q. Okay.

A. -- I don't -- I don't know.

Q. It was long enough, though, that when you -- you thought you should write and say she has not come yet?

A. Yes.

Q. And so you're wondering what's going on; right?

A. Where is she, yes.

Q. Yeah. But at that time you did not -- sorry. Had you talked to Fred Raines by the time you said she has not yet come?

A. Yes.

Q. All right. And -- but so you had talked

to Sunnie sometime before that, but at no point -- you keep saying you didn't know what was going on because Brittany wasn't there yet. But you knew she had delivered. You knew she had said some things that were very concerning to you. You thought the baby could potentially be alive; right?

MR. PRISLIPSKY: Objection to form. Go ahead.

A. I wasn't sure.

Q. Right. You thought it could potentially be alive?

A. Yes.

Q. And you did not call the police at that time?

A. That is correct.

Q. Okay. What kind of help did Brittany need?

A. When she came?

Q. Uh-huh.

A. She really was stable. We just did her vital signs. We assessed her bleeding. We asked her if she knew where the baby was. That -- she told us it was in the bucket by the garage. Okay. She mentioned -- she denied pain. I think I -- I'm trying to recall if Jordan assessed her level of pain. We had -- we started an IV

right away. She would need an ultrasound to -- which was ordered by the doctor -- to determine like the placenta, if there's anything retained. I mean, obviously the placenta is still intact inside because we have the cord, so we know it's undelivered. But as far as -- what else would you be referring to, like --

Q. You said at some point that Brittany needed a lot of help, and so I was wondering what kind of help you thought she needed.

A. She -- she needed help like emotionally, like supportive help. Like, I don't know where the baby -- it's in the bucket by the garage. And I said, can you go get it? Well, I guess I can. I can try to find someone to go with gloves and find it. I'm like, okay, well, if you can do that. You know, she just needed guidance on what the next steps were.

Q. Okay. So you -- you felt that she needed emotional help?

A. She definitely did need emotional help, just -- every mother does when they've gone through an event.

Q. Right.

A. I felt like I was very supportive of her. I felt I was very caring. I think I'm the one that did her IV. We talked through things, you know, trying

to help her make sense of everything.
Q. Did she ask you to help her find the fetus?
A. No.
Q. So that wasn't help that she was seeking?
A. She did not.
Q. All right. Did she seem confused?
A. No.
Q. Did she seem disoriented?
A. No.
Q. Did she seem panicked at all?
A. No.
Q. What made you think that she had needed emotional help?
A. She just had lost a baby, and she didn't know where it was. She said it's in a bucket by the shed -- by the garage. She didn't seem real sure of that. She just didn't seem real sure of herself. Like, okay. It's in the bucket. I'll go have my brother go get it, or she just seemed vague about who she would call, who could go get this baby. I'll try to find someone to go.
Q. She didn't tell you she was going to have her brother go get it, did she?

A. No. I'm saying that as an example. She didn't, like, give specific -- she didn't seem like she knew what to do.
Q. Okay. So you said she didn't seem like she knew what to do, but she didn't -- but you said she wasn't confused?
A. She was not confused.
Q. You said that she didn't seem to know where the baby was; right?
A. She said it was in a bucket by the garage, but then she seemed vague when we said, okay, can you go get it? Well, I mean, I scooped it out of the toilet, and I put it in the bucket. Okay. You saw the baby? No, I didn't see the baby. Well, Brittany, you would see a baby. It's significantly, you know, of a size that you would -- did you scoop the baby out of the toilet and put it in the bucket? Well, I just scooped everything. I didn't want to look. You know, she was vague. She wasn't clear. I took the baby and put it in the bucket.
Q. She wasn't clear like that?
A. She was not clear like that. She just said, I scooped what I could out of the toilet and put it in the bucket. But when you ask, where is the baby? It's in the bucket. Did you see the baby? No.

Q. Okay.
A. So it was confusion. Like, I guess you would say confusion on -- not confusion on what I'd asked her, like not a general sense of confusion, but a vagueness of where the baby is, and I -- I took it that she wasn't being direct with me.
Q. Okay. Did she have any obligation to be direct with you?
A. I -- I think that she would want to be direct with me.
Q. That's not my question. Did she have an obligation to be direct with you?
MR. PRISLIPSKY: Objection. Go ahead.
A. No, she does not -- is not obligated to tell me anything.
Q. Right. Did you tell her she was obligated to tell you things?
A. No.
Q. You told her you needed the fetus?
A. I did. And that is true. I do need the fetus. If she's not going to get it for me, I have to be able to find it.
Q. Why do you need the fetus?
A. The hospital, not me personally, but it needs to come in to have a proper -- I say burial, but

again, cremation, whatever. We -- if a mother chooses not to do anything with their fetus, we have a plan through the hospital where we have a burial plot that we have a burial for them.

Q. Okay.

A. So it's not okay to leave the baby in a bucket by the shed.

Q. It's not okay with you?

A. It's not okay with anybody there.

Q. So the hospital needs the baby?

A. Yes.

Q. And does the hospital need all babies that are delivered out in the world?

MR. PRISLIPSKY: Objection.

A. After 20 weeks --

MR. PRISLIPSKY: Wait, wait, wait. Objection. I think that's argumentative, but go ahead, the way it was phrased.

MS. RICKERT: Let me strike that and ask it a different way.

Q. What -- Brittany gave birth at home --

A. Yes.

Q. -- right? And then she chose to come to St. Joseph?

A. Yes.

Q. If she had chosen to go somewhere else, would -- would it have been your obligation to see that this baby got brought to St. Joseph?
A. No.
MR. PRISLIPSKY: Objection.
A. Not if she went somewhere else. They would have the obligation, too, to get the baby.
Q. What -- are you talking about a moral obligation?
MR. PRISLIPSKY: Objection.
A. No.
Q. Are you talking about a legal obligation?
A. Yes.
Q. So explain this legal obligation to me.
A. So any baby after 20 weeks has to be reported a fetal death to the Department of Health. We have a form. We call them. We report it. Then a funeral home has to either come and pick up the baby, or they have to give direction on how they want it -- it can be a funeral home. It can be -- sometimes our Amish patients will do different things with their religion prior, but we -- they have to have a burial or a cremation. You can't just say I delivered it home, and I'm leaving it at home. That is not okay.

Q. I understand that you think it's not okay, and I understand the obligation to report a fetal death after 20 weeks. My question is why you believe you were under that obligation when the fetus was not at the hospital.
A. Because it's her baby, and she's now my patient, and she comes without the -- the baby, so I have to do something. When I report that fetal death, on there one of the questions is disposal. You -- what am I going to say? I never had the baby in my possession?
Q. I -- I --
A. That's not an option.
Q. Why is your responsibility to report the fetal death?
A. It is always our responsibility to report any fetal death --
Q. I'm asking why --
A. -- that occurs to one of our mothers. She comes without her baby. It was my understanding that day that I needed to find that baby.
Q. Who gave you that understanding?
A. That has always been my understanding, that it -- and I -- I did follow my chain of command. I spoke to social work that day, was on the unit. I said, do you need to handle this case because we're -- we're

going to need to figure out what to do? She said no, because I would only make funeral arrangements, but if you don't have the baby, you need to contact risk management.

Q. Right. So she didn't tell you to call police?

A. No, she did not. She told me contact risk management. I then spoke with Suzanne from risk, and I told her the situation, and she said, if you feel like you need a wellness check on the baby, then that would be handled by Warren City Police, not Mercy Health. And I said, you know, I -- I don't know what to do because I don't have a baby, and we are required by law, Ohio law, to have proper disposal of this baby. She goes, well, if you feel like you need to call, it's -- it's the Warren City Police, not Mercy Health. At that point, I've given Brittany an option to bring me the baby. She has not. So now my only option that I feel I have is to call them to go find the baby and bring it to me.

Q. Okay. So Suzanne Zupko did not tell you to call the police?

A. She advised me that that was an option that I had. She did not say I had to call, but she told me that is who would handle it if I needed a wellness

check.
Q. Right. So the same thing that Fred Raines told you?
A. Yes.
Q. So she did not tell you that it was the hospital's obligation to collect the fetus?
A. She did not say that it was our obligation to collect the fetus, but I know that I have to have the baby.
Q. How do you -- what training did you get on that?
A. I don't have training. That's -- this is an unprecedented event. So clearly I am doing what I feel is right at that time to find this baby and do what is right for the baby.
Q. Okay. And you felt unsure about what to do; right?
A. Yes.
Q. And so you consulted risk management?
A. Yes.
Q. And risk management did not tell you that you needed to call the police?
A. She didn't give a directive, but I felt from our conversation that that is her recommendation. If I did not have any other option in finding the baby,

that I would need to call them. I felt clear that that was her directive. She didn't say you have to call them right now. But if you can't find the baby and Brittany's not willing to have it brought in, then we have to have the baby. So your -- her directive to me was that would be my option is to call the Warren City Police. That's how I took what she said.

Q. So she told you -- Suzanne's Zupko told you we need to have the baby?

MR. PRISLIPSKY: Objection. Misstates her testimony.

A. I don't recall if she used those words, but that was my understanding.

Q. Okay. And you know that she has denied that she even advised you to call the police; correct?

A. I know that she said she did not tell me to call the police. And I'm telling you she didn't give a directive, but she told me that was my option if I needed to find the baby and I couldn't do it another way.

Q. And she -- but she also testified that she didn't even advise you to call the police; do you know that?

A. Well, she -- I believe -- it's my belief that that was her advice to me.

Q. Okay. You said you wanted Brittany --

you asked Brittany to go get the baby?
A. Uh-huh. Not herself. Not herself.
Q. Well, I don't -- you said that you asked her to go get the baby?
A. Do you have anyone that can go get the baby.
Q. Okay.
A. And she said, yeah, I can try to find someone.
Q. Okay.
A. And most people have family members that they would call in a situation like this. I don't know her dynamic at this point. I'm just asking, do you know of anyone that can go get the baby? You said it's in a bucket by the garage. Nothing will happen. If you go get the baby and bring it in, now we can do proper care for the baby and the mother and none of this would have happened.
VIDEOGRAPHER: Excuse me. I have to go off the record for a moment.
(A recess was taken.)
VIDEOGRAPHER: On the record.
Q. Okay. Ms. Moschell, going back quickly to the text messages with Sunnie Hudak. So you said -- when you wrote we have to have a fetus or she will be

charged, you don't remember writing that; right?
A. No.
Q. And you don't know what you're referring to?
A. I don't.
Q. You suggested that it could have had something to do with your conversation with Fred Raines?
A. I don't know that it had anything to do with my conversation with him, but I had asked him about what to do, and he said if I needed a wellness check, it would be Warren City Police.
Q. Okay.
A. But I don't recall anything -- I don't recall being -- discussing charges. That -- that's not my area of specialty. I don't -- I don't know why I wrote that. I don't know if I heard it. I don't know if somebody mentioned it while we're waiting. I honestly don't recall.
Q. And you're talking about criminal charges, to be clear; right?
A. I don't know what I was charge -- talking about.
Q. Well, you didn't mean that someone was going to send her a bill?
A. Correct.

Q. You meant criminal charges?
A. I assume by that that that's what I meant, but I do not recall.
Q. All right. And you said you -- you don't know what that charge -- that criminal charge would be?
A. Correct.
Q. Because you're not a lawyer?
A. I don't know what any charge would be.
Q. Okay. And you -- you have no recollection of what you might have been thinking of when you wrote that?
A. No.
Q. Okay. And so Brittany is there. You have told her that you need the fetus; right?
A. Yes.
Q. And that -- and you've asked her to have someone go get it. How much time did you think she should be allotted to have someone go get it?
A. I don't know if there's a specific time, but I gave her almost an hour.
Q. Okay. And you think that retrieving the fetus should have been Brittany's priority?
A. If she was unable to retrieve it, she -- she could have just asked -- like asked us what her

options were, but I -- I think it was a priority.
Q. I'm sorry. You think it was whose priority?
A. I think it would be her priority to find where this baby is.
Q. Do you think it was her priority?
A. I don't think it was her priority.
Q. You think it should have been her priority?
A. I really can't say what her priority should be. I had asked her to do it because I felt like it was needed, and she agreed to seek out help with that and then was unable to do so.
Q. Right. And you gave her an hour?
A. It was -- I -- I'm going to say it was close to an hour. It might not have been a full hour --
Q. Okay.
A. -- but --
Q. And meanwhile a possibly living baby is floating in a bucket; right?
MR. PRISLIPSKY: Objection.
A. Correct.
Q. And you do not ask for an ambulance to go there?
A. I don't think I thought that an

ambulance would respond to that, because I'm not even sure if it's in the bucket. Are they going to go do a search?

Q. Do you wait -- sorry.

A. She told that -- she told Sunnie it was in the toilet, and she tells me it's in a bucket, so I have conflicting stories.

Q. Uh-huh.

A. At this point I don't really think that she is telling me the truth, for one, and calling an ambulance was not what they gave me as a directive. Both Suzanne and Fred both said to do a wellness check. You can call Warren City Police.

Q. Now, neither one of the them told you to do a wellness check, to be clear; correct?

A. They said if I felt I needed to check on the fetus, that's how I would do it.

Q. Okay. And so they are telling you that if you, the person with the information --

A. Yes.

Q. -- about the fetus, think that a wellness check is in order, right, then it would be the Warren City Police who would do the wellness check?

A. Yes.

Q. That's all they were telling -- saying

to you?
A. Yes.
Q. And a wellness check is for people that might be alive; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. Not necessarily. If I have a fetus, if it's passed already, I still need to bring that in for proper burial or procedure. It's still -- you can't have a dead fetus left out in nature. What if a neighbor dog comes over to get a drink from the bucket?
Q. I understand your view. I am talking about a wellness check. If you know for sure that someone is deceased, a wellness check is not the appropriate response; correct?
MR. PRISLIPSKY: Objection. Asked and answered. Hold on. Sorry. I thought I turned that off. My apologies.
A. I would not know whether it's alive or deceased at this point.
Q. Right. You think it might be alive?
A. I am thinking it could always be a possibility, but I have no way of knowing that until we find it.
Q. Right. But you're going to just possibly let it expire while you wait hours to call the

police --

MR. PRISLIPSKY: Objection.

Q. -- right?

MR. PRISLIPSKY: Sorry. Objection.

A. I didn't wait hours. She wasn't -- it was one hour after her arriving without a baby that I sought help, and during that time, the majority of that time, she has assured me that she's going to have someone bring it to me. So I'm trying not to have to call anybody; right? I don't want to call for help from the police, but if you're not going to bring me the baby, somebody has to go find this baby.

Q. Because you needed that baby?

A. The hospital needs that baby.

Q. Yet nobody -- no superior of yours told you the hospital needs this baby; right?

MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.

A. I don't recall them saying those words specifically, but they were aware of the situation, and I -- it is my personal belief when I spoke to Suzanne, that that is what she would want me to do. That -- I can't -- I don't know word for word of our conversation, if she said if you need to get the baby or if you need to check on the baby, but her advice to me as an option was

if you need to find this baby, you need to call the Warren City Police, not -- she didn't say you have to. But if that's what you feel you need to do -- she -- if it were against policy --

Q. Uh-huh.

A. -- she's my risk management director. I -- I'm at a loss here. I've never had to do this. If she would have said to me in no way should you ever call the police, do not call the police, I wouldn't have. I was instructed by her that is your option if you need to find this baby, and I know that I cannot proceed without finding this baby. That's just not right.

Q. Now, she denies that you told her there was any uncertainty about the location of the baby. Are you aware of that?

A. No.

Q. Did you tell her there was uncertainty about the location of the baby?

A. No. I told her that she told me the baby was in a bucket by the garage. I did not mention anything to Suzanne, that I recall, about her flushing, because, again, that's not something I need to tell her because I'm just now trying to hope that it is in the bucket and that we really didn't flush the baby. I'm hopeful that -- not that you want it in a bucket. I -- I

would have assumed she would have brought it with her, but since she did not, we need to go find it.
Q. And her account that she left it in the bucket is something that you found to be sickening; right?
MR. PRISLIPSKY: Objection. Asked -- you already asked -- that question was already asked --
MS. RICKERT: I did.
MR. PRISLIPSKY: -- and answered.
A. Yeah, I did not say that I found it sickening. I found it almost a relief that it's not in the toilet. It's where we can actually retrieve it and bring it.
Q. You told the dispatcher that -- that you were sickened or it was sickening; right?
A. I don't recall telling the dispatcher that it was sickening.
Q. Okay. So you believe that Suzanne's Zupko told you that it was permissible for you to call the police to locate the fetus, even if it were deceased?
MR. PRISLIPSKY: Objection.
A. Yes. Yes. It -- to check -- to get the baby and bring it to the hospital, alive or deceased, I needed to call the Warren Police -- City Police.
Q. Okay. You had testified earlier that

she said if it were necessary -- if you felt that a wellness check were necessary --
A. Yes.
Q. -- right? So that's different than retrieve a dead fetus; right?
MR. PRISLIPSKY: Objection.
A. Not to me it's not different. I think even if it's deceased it's to check on the well-being. I don't know if it's deceased or alive. I can't determine that.
Q. Right. But if it might be alive, right, that's an emergency; correct?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. I -- yeah, I don't know. I -- I just was doing the best I could to get this baby.
Q. Okay.
A. I -- I don't know if it's alive. I don't know if it's deceased. I'm very disturbed by the whole thing. I'm trying to do the right thing, and I sought direction from my risk management, and that was what she instructed me as -- was one of my options, and I felt I was doing the right thing. I really did. I would never have done something that I felt would violate Brittany's rights or the hospital policy. I was just

seeking guidance.
Q. And you did not -- sorry. Brittany, again, did not ask you to help her find the fetus. There was no emergency of the type where you, you know, call 911 as soon as you hear that there might be a living baby abandoned; right?
A. Right.
Q. It wasn't that kind of emergency?
A. That is correct.
Q. And did you think maybe you should wait until after Brittany had had the surgery that you already knew she might need and then allow Brittany after her current medical condition was dealt with to try to figure this out herself?
MR. PRISLIPSKY: Objection. Go ahead.
A. No. I -- I didn't think it necessary to wait, because I -- first of all, there's no surgery scheduled. We have a retained placenta, but we -- nothing is like permanently scheduled. I don't know when it will occur. I know that this baby is in a bucket by the shed. I need to get that baby out of that bucket.
Q. Right away?
A. As -- as quickly as I can. I'm trying to have her cooperate so it doesn't become an issue, but when she cannot, then I do call the police, and, you

know, tell them my situation.
Q. Okay.
A. Yes, I -- I didn't want to wait.
Q. Waited a couple more --
A. Surgery ended up being, I believe, the next evening or even later. It wasn't that -- even that night. So if we would have waited two days, what's going to happen to that un- -- that baby that's definitely now deceased? What's going to happen to that baby in that bucket? That -- that's not okay. That's just unethical. That's -- anybody that would say leave a baby in a bucket for an indefinite amount of time is just disturbing. And then when you see a picture of the baby, you understand what I'm saying. You've seen what this child looked like.
Q. And have you seen pictures of the baby?
A. Yes, I have.
Q. And I don't want to know about anything that your attorney said to you, but did you review pictures of the baby in preparation for your deposition today?
A. Yes.
Q. Okay. So that's another thing you reviewed that you didn't mention earlier?
MR. PRISLIPSKY: Objection. Go ahead.

A. Yes.
Q. Why did you -- unless it was on attorney advice, why did you review pictures of the baby in preparation for your deposition today?
MR. PRISLIPSKY: Objection. Don't answer that question.
MS. RICKERT: Okay.
Q. Are you going to follow your attorney's advice?
A. Am I going to follow my attorney's advice?
Q. To not answer my question?
A. Yes.
Q. Okay.
MR. PRISLIPSKY: It's attorney-client privilege.
MS. RICKERT: Yeah. I figured.
Q. Okay. Let's go to the medical records again of -- I -- I just want to understand, how many hours was it permissible for the baby to stay in the bucket or the toilet?
MR. PRISLIPSKY: Objection. I think it was asked and answered, but go ahead.
A. I personally don't think it should be in the bucket or the toilet at all, but since I now have

to -- the burden of trying to get this baby to the hospital, I'm trying to give her time to help me so it doesn't turn into anything bigger, and then I called the police. Within that hour, I did what I felt I needed to do. I don't think there's any amount of time that it should be in the bucket or the toilet.

Q. Okay. And you called the police because she will be charged; right?

MR. PRISLIPSKY: Object -- objection.

A. No, absolutely not. I called them to go and find this baby and bring it to the hospital.

Q. So there was no connection between your text saying we have to have a fetus or she will be charged and you calling the police?

A. No.

Q. Totally separate?

A. I did not think she would be charged. If we have the fetus, what would they charge her for? I had no -- no legal thoughts on this at all that Brittany -- I was trying to prevent her -- by bringing the fetus, everything should be fine. Once we have the baby at the hospital, we will proceed as if she brought it herself.

Q. Okay. We are going to return to the medical records, and let's see if I can find the right

section here. We're going to go to -- let's see. Page 695, which you might need my second stack, it looks like. Yeah. I'm tethered here, so I'm just going to hand it to you.

A. Oh, I see. It's the Mercy Health 695.

Q. It's the Mercy Health, yes. Yes. So if you could go to 695 there.

A. Oh, is it part of this?

Q. Yes.

A. I'm at 650. Okay.

Q. Yeah, it's the next set here. This starts at 651 here. So 695 will be in this set.

A. Okay.

MS. RICKERT: And these medical records are going to be Exhibit 4, I think we're on.

(Whereupon Plaintiff's Exhibit 4 was marked.)

A. Okay.

Q. All right. Are you at 695?

A. I am.

Q. Okay. So we're going to be moving sort of up in the records, because I think that's the way the time works. Get this page.

Okay. All right. So on 695, there is a note in -- at -- I want to talk about the one that starts -- it's the first full note on that page. It start -- it has

your name at the beginning. It's Jordan Carrino's note from 1:37, and -- but it says Moschell RN at bedside. Do you see that?

A. Yes.

Q. So Moschell RN at bedside to obtain vitals while RN took history. RN Moschell and Carrino spoke to patient that products of conception are needed to determine what patient passed and exam to be done. Patient stated she was having someone "get the baby and gloves" and bring it here to the hospital, but she "knows it is not alive because it wasn't at birth." Do you see that?

A. Yes.

Q. And do you see there's quotes?

A. Uh-huh.

MR. PRISLIPSKY: Do you mean yes when you say uh-huh?

A. Yes.

Q. All right. And do you agree with Jordan Carrino that this is accurate?

MR. PRISLIPSKY: Objection.

A. I agree that this is what she wrote. Is that what you mean?

Q. Well, you were there for that conversation; right?

A. Yes. I agree that this is what the patient said, yes.
Q. All right. You testified earlier that the patient said she didn't know if it was alive because she didn't want to look?
A. She did. She said multiple things.
Q. Okay.
A. And now she's saying she knows it's not alive because it wasn't at birth. To me she said, I know it wasn't alive because I didn't want to look. Or I don't know if it was alive because I didn't want to look.
Q. And where is that?
A. That -- I did not document in these notes. These notes were Jordan's notes. I documented when the detective came and when the detective left, so maybe it was during his interview that she made that statement, that I'm recalling, and maybe it wasn't at the beginning, but it was made.
Q. Okay. But at this -- at this point the information you have is that it's not alive?
A. Yes.
Q. And that would be consistent with what you knew of --
MS. RICKERT: Or strike that.
Q. That would be the most likely scenario;

right?
A. I don't know if it would be the most likely, but yes. This also shows that it's at 1:35, so I -- I had thought it was more closer to 1:00, but it's actually 1:35. So from 1:35 to 2:00 is when I placed the call to Suzanne, shortly before 2:00 and then the police. So it looks like I did not take an entire hour to find this baby. It was less time.
Q. Okay. So Brittany says that she will get someone to do this because you're -- she's been told that the baby must be brought to the hospital --
A. Uh-huh.
Q. -- right? And so she says she will get someone to do that. That she knows it is not alive because it wasn't at birth. And you call the police within 25 minutes?
A. Yes. I'm looking here at the first note, because I thought there was something in here about -- she -- this is where she stated she didn't hear anything or look at the fetus. In the very first original note when Jordan first asked her -- and I was not in the room for that, but she -- she said she didn't hear anything or look at the fetus, but she was worried that she tore her -- so she got into the shower. So at this point is where I'm getting she didn't even want

to -- and later on said that. She didn't want to look. She was too afraid to look.
Q. It was not moving or making any noise?
A. How did she know that? She didn't want to look.
Q. She has ears; right?
A. She didn't look until she showered. It was not moving or making any noise, so she placed it in a bucket after she showered. That's where I got that she didn't want to look.
Q. Okay. So it was after she showered?
A. It -- it looks like she had the baby in the toilet, didn't want to look, she showers. Then she decides to -- it's not -- still not making noise. I mean, her -- it's a little jumbled but --
Q. Right.
A. -- I think that's her timeline.
Q. Okay. So she -- a little jumbled?
A. Yeah.
Q. She had lost a significant amount of blood, hadn't she?
MR. PRISLIPSKY: Objection. Foundation.
A. I don't know how much blood she lost.
Q. Did you care?
MR. PRISLIPSKY: Objection.

A. I absolutely cared, yes.
Q. All right. Well, Dr. Khavari testified that she had lost a significant amount of blood.
A. So that's her assessment. I -- when I -- when she arrived to us, she was not bleeding much, so I was thankful for that. I -- I don't know how much blood she lost in the home. That was our concern for two days of not knowing where she was is that she would have too -- too much bleeding.
Q. Right.
A. Yes.
Q. But you say you care, but you didn't take any steps to find out how much blood she had lost at this point --
MR. PRISLIPSKY: Objection. Go ahead.
Q. -- is that accurate?
A. I don't think there's any steps that I would take. We were doing blood work. That's going to show us a blood count --
Q. Uh-huh.
A. -- so we did that. We assessed her fundus, which is firm. We don't have any heavy bleeding at the time. So no, there's nothing further I would do to assess for heavy bleeding that had happened earlier.
Q. Okay.

A. Jordan took a historical event of -- from her about the bleeding, and it said that she saw a lot of blood.
Q. Uh-huh. Okay. So at 2:05, that's where one -- you put a note in at 2:28 saying that you notified the Warren Police; right?
A. 2:05.
Q. And you didn't put in this note anything about, you know, patient said no, she will not have someone bring the fetus?
A. Right. That's correct.
Q. But that's your recollection?
A. Yes.
Q. All right. And then let's go up a bit. So we're moving to -- we're on 694, and we're moving up to the note that goes from 693 to 694, and this is another one of Jordan's notes. And you can see -- so this is the note that was entered at 2:46 about things that happened at 2:43. Do you see that note?
A. Yes, I do.
Q. So RN placed Cytotec with patient consent and obtained wet prep. RN pal- -- palpated cervix, et cetera, et cetera. And then on to the next page. Patient has cameras and aware police presence at her home. Concerned she is in trouble. RN stated that

she had a biohazard and fetus passed and placed it outside, and that per policy -- and that per policy that was something initiated. That RN is here for patient care. Patient verbalized no needs at this time. Patient voided on self when RN went to enter room for sample and expressed she would tell RN when urge to void occurs again. Do you see all that?

A. Yes.

Q. And then moderate blood noted on pad; right?

A. Yes.

Q. Okay. So she peed on herself; right?

A. That -- that looks like it, yes. I mean, it could have been -- oftentimes they'll perceive it as urine, and it could be other fluids just from the birth, but that's what Jordan documented, so I'm assuming she did pee on herself.

Q. Okay. And adults don't normally pee on themselves?

A. Well, after they have babies they do. Sometimes they do. That's why we have lots of pads. We'll have mothers urinate after a birth. Everything's been through a birth, your contractions, your uterus, everything's kind of all together. They void.

Q. Because it's a major thing when you give

birth?
A. Oh, giving birth is a big deal.
Q. Yeah.
A. Yes.
Q. And you're not usually in great shape that day afterward; right?
MR. PRISLIPSKY: Objection.
A. Well, you're stable. You're not in bad shape, but you've had a baby. Things change.
Q. You're emotional?
A. It depends.
Q. You're tired?
A. You're tired.
Q. You wouldn't want anyone you care about to be subjected to a lot of stress unnecessarily on the day they gave birth, would you?
MR. PRISLIPSKY: Objection. Go ahead.
A. You don't want them subjected to stress, no.
Q. All right.
A. Which is why we tried to make this as peaceful as possible. We took very good care of Brittany.
Q. Okay. And we talked about the -- we looked earlier at the information that St. Joe's has

about -- or Mercy Health has about people who are experiencing pregnancy loss; right?
A. Yes.
Q. And so Brittany had delivered and had physical consequences of that, and then also had the kinds of consequences that come with having lost a pregnancy; right?
A. Yes.
MR. PRISLIPSKY: Objection.
A. Yes.
Q. Okay. So then let's go up to the next -- this is --
A. Can I add something to that?
Q. Sure.
A. We offered her -- not myself, Jordan offered her our HEAL program.
Q. Uh-huh.
A. And she declined it. That's -- those are the things that we do to make it more personal and to really -- we get -- you know, she didn't want pastoral care. I -- there are things that we do for loss that Brittany declined.
Q. Uh-huh. And we -- we read the part and you agreed earlier, patients grieve after a fetal demise in various ways. Some patients just want to be alone

with their thoughts and feelings?
A. Absolutely. I just wanted it to be clear that it was -- we did offer it.
Q. Okay. The fact that she declined might have meant that she's one of those people who wanted to be left alone with her thoughts and feelings; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. It could be.
Q. All right. And, again, you don't know what was in Brittany's head, do you?
A. No.
Q. And you wouldn't pretend to know what's in Brittany's head?
A. No.
Q. All right. So now we're on -- still on 693, and the next note from Jordan, which is from 2:56, patient voided on self another time. Blood noted on pad, small amount. Do you see that?
A. Yes.
Q. So at 2:56 Brittany again urinated on herself?
A. (Nodding head.)
Q. If you were in the hospital bed repeatedly urinating on yourself, would that be a time that you would want to speak with a stranger?

MR. PRISLIPSKY: Objection.
A. I'm really not sure why she was urinating, but -- I -- I don't -- she didn't -- she did not say that she did not want to speak to anybody. She just clearly is in, you know, a postpartum state here. This is a postpartum mom. They urinate on the bed.
Q. Okay. And in answer to my question, would you, if you were in that condition, want to have a stranger come speak with you?
MR. PRISLIPSKY: Objection.
A. I don't know how I would feel in that case. I've never been in that case.
Q. So Brittany never told you that she didn't want anyone to speak with her?
A. No.
Q. At any point?
A. Nev- -- her mother. She told me she did not want her mother. Her mother had brought her, and her mother was in the waiting room, and she told me she did not want her mother to come in. That's the only person she ever said she didn't want to come.
Q. Okay. So she was -- you thought the fact that she didn't want to see her mother didn't mean, you know, she might not want to see a police officer?
A. No, I did not, because she had explained

to Jordan that there was some estrangement between her and her mother. I -- that's a family dynamic. I don't -- I'm not going to get into that with her. I would never encourage her to have her mother come if she didn't want it. If the officer would have come and she would have said, I don't want to talk to you, he would have immediately left.

Q. And you did not -- you did not --

MS. RICKERT: Or, sorry. Strike that.

Q. But you went and told Brittany's mother that Brittany didn't want to see her and she should go home; right?

A. I did not tell her to go home. I went out to -- to talk with her because they had brought her in, and typically when -- because Brittany was very clear. Her mother kept coming into the -- like where you come to the desk where the -- the secretary is, wanting in, and they weren't letting her in because Brittany said no. So I went out to reassure her, I said -- and she was a very kind and sweet older woman, thanked me over and over again for coming. I said, I can't give you any details. She's like, is she pregnant? We've been feeling like she might have been pregnant. And I said, honey, I can't talk about her situation, but I can assure you that we are taking very good care of her, and she has

asked not to see you now, but if she asks for you, you absolutely can come in. And I told them, it -- I think it was one of her aunts, I was very kind, very brief. I just want you to know that she's getting care, because they were -- they were worried, and I wanted to put them at ease. I never once said you should just go home.

Q. And you -- you couldn't give them specific information because of medical privacy; right?

A. That is right.

Q. And you -- when was this? Was this before or after Detective Carney arrived that you spoke to Brittany's mom?

A. I don't remember. I was trying to place that in a timeline. I don't recall when it was. I -- I think it would have been before, because I think it would have been soon after she came, because that's when they kept trying to come in to see her, but I don't recall.

Q. Okay. Did you document anywhere that Brittany told you she didn't want to see her mom?

A. No.

Q. Why not?

A. I really wasn't documenting on her. I was the one assisting Jordan. Jordan is the one really, you know -- and she did a lot of documentation. I don't know if she did. I -- I read through her notes. I don't

recall. I think she did say something about the mother at one point, but I don't recall. I did not document it.
Q. All right. So at 2:56 Jordan entered the note about the patient voiding on herself another time --
A. Uh-huh.
Q. -- and then the next note is just from -- it's from four minutes later. It's not entered then. It's entered at 4:24, but it's concerning events starting at 3:00, and it's Warren City Police Investigator on unit and questions asked of the patient case to this nurse. Questions answered; right?
A. Yes.
Q. Now -- and then we go up to the next note you entered on that same page from 3:20; Warren City Police Investigator to patient room to ask questions of the patient. The nurse will stay in attendance during the questions. Patient cooperative and pleasant. So that's at 3:20. So Detective Carney has said that you and he spoke for about 20 minutes before entering the room. Does that comport with your recollection?
A. It -- it shows that in my documentation, so yes. I don't recall how many minutes, but that's how many minutes is when I documented, so that seems about right.

Q. All right. And -- and we agree that Detective Carney asked you to join him in the -- in the hospital room?
A. I don't know that he asked me. I remember asking him if he needed me to come with him, and he said if you want to come, and I said, well, she's our patient, and I feel like she should have a nurse with her, you know, while she's being questioned or interviewed or spoken to. And he was absolutely like he thought that would help him, if I came along. He didn't ask me to come. I asked him if he needed me, and he said I could come.
And I know during the time of the interview there were incidences where her IV was going off that I corrected. At one point she questioned me about her bleeding. He had stepped out to speak to someone, and so I was able to assess her bleeding. I don't feel -- I would not feel comfortable -- I didn't feel comfortable that day just sending him in there with her alone. I felt like that would scare her maybe or be intimidating or just -- maybe just she needed a presence of a nurse with her. And that's why I went in with her.
Q. Okay. So he didn't ask you to?
A. He did not.
Q. And --

A. That I recall. I just remember asking him, do I need to? He said, you can. And I said, I feel it would be better for Brittany.
Q. And you also said that he felt it would be helpful?
A. Just, I guess, to support her. Like maybe to help him understand what she -- I don't know what he meant by that. But that's what was my understanding.
Q. Okay. Did he say that, that he thought it would -- it would help him if you came in?
A. He just thought it would be -- I don't know if he used the word good, helpful, beneficial. I don't remember the exact word.
Q. Okay.
A. But he thought it would be good for me to come.
Q. And you guys had a -- some shared goals; right?
A. Yes.
Q. You wanted to get Brittany to tell you what had happened with the baby?
A. Yes.
Q. Both of you wanted that?
A. I wanted them to find the baby. That

was my only goal. I -- his goal was to interview her to find out what happened, because they -- they're on-site now and they can't find it.
Q. Right. But both of you, it was the same --
A. To find the baby.
Q. Right. And -- and you're hoping to find out where the baby is from Brittany?
A. Yes.
Q. And you're -- you both want that?
A. Yes.
Q. And you understood that?
A. Yes.
Q. All right. And then if we move up further to page 692, investigator finished with interviewing patient. Exits the room. So that was -- that was when Carney left; right?
A. Yes.
Q. All right. And then going up a little further to 691, now, you -- I think this is what you were talking about before about Jordan calling Dr. Khavari repeatedly. Did you -- do you see Jordan's note from 4:56, call Dr. Khavari office, closed. Page Dr. Khavari?
A. Yes.
Q. And then the next one from 5:02,

Dr. Khavari returned call. To see patients at office and return call when able to?
A. Yes.
Q. So -- and then the next one up, 619, Dr. Khavari is actually now present in the hospital; right?
A. Yes.
Q. And it says, she's aware of all results as well as consults and patient speaking to detective. Do you see that?
A. Yes.
Q. Did you speak to Dr. Khavari about the fact that a detective had been there?
A. I did not.
Q. Did you consult Dr. Khavari before letting a detective into Brittany's room?
A. No.
Q. Did you consult any other doctor before letting the detective into Brittany's room?
A. No.
Q. Did you tell Jordan Carrino that there was -- that it was necessary to call the police because risk management had instructed you to do so?
A. Yes.
Q. Okay. And -- because that was your

belief that you had been instructed?
A. Yes. I mean, I really felt like that's what she was recommending to me. I didn't feel any hesitation from her. This is what you would do. If we need to find the baby, this is what you need to do. I really believed that that is what her recommendation was to me. She didn't say you have to, but if it was against policy, I -- I felt she would have said do not. I -- I felt like that's what she was recommending me to do.
Q. Did you tell Jordan that there was a policy about biohazards?
A. No.
Q. Where did that come from?
A. I don't know. I don't know where that came from.
Q. Is there a policy about biohazards?
A. Not that I'm aware of.
Q. Okay. So that was just from Jordan?
A. I believe so.
Q. All right. Now I want to go -- sorry -- back down just a little bit to 692. The -- oh, wait a minute. When was this -- oh. Sorry. I actually want to go down to 693, the very bottom, a note from Jordan saying, RN placed Cytotec. We -- we talked about this. So the Cytotec is to induce labor; right? Contractions?

A. There -- yeah, it wouldn't be labor at this point. It would be to deliver this retained placenta.
Q. It's not called labor?
A. No.
Q. What's it called?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. It's just to induce contractions. To -- to deliver the placenta.
Q. Okay. So that was done prior to -- when was that done? Was that done while -- no, that was done before Detective Carney entered; right?
A. Yes.
Q. So the -- the induction with Cytotec to try to get the retained placenta to be delivered started at about a half an hour or a little more before Detective Carney entered the room?
MR. PRISLIPSKY: Objection to form as the question was phrased.
A. It wasn't an induction. It was just medicine that we place to -- it's like a -- it just releases oxytocin in to allow the placenta to detach and deliver.
Q. Okay. It's the same process, though;

right?
A. No. It's -- it's similar, but it's -- it's different. The dosage is different typically, and the way a patient would feel would be different as well. It's -- it's a different process to -- with a retained placenta, it's different than an induction of labor.
Q. Okay. So did you speak with Detective Carney after you guys were in Brittany's room interviewing her?
MR. PRISLIPSKY: Objection to form. Go ahead.
A. No, I just walked him to the door.
Q. And that was that?
A. No -- yeah. Yes.
Q. And did you ever speak with him again after that?
A. No.
Q. Did you ever speak with a prosecutor?
A. No.
Q. Did you ever -- okay.
MS. RICKERT: Strike that.
Q. Let's go back to before you spoke with Brittany along with Dr. -- or along with Detective Carney. During that approximately 20-minute conversation, what did you guys talk about?

A. I just answered questions. He was kind of like interviewing me. So he asked, you know, what time did she arrive? He -- he talked about how did I know there wasn't a baby? Like, how do I know she delivered? I said, well, there's a placenta, cord, but no baby. He just asked questions if I felt like she would -- was she medically stable that he could talk to her? I said we can go ask her permission. I did not give him, like, specific vital signs or the bleeding or anything, but we just talked general things like that.
Q. Okay. Did you have any concern that you might be revealing medical information that was private?
A. No, because at this point my risk management has okayed me calling. Now I have a police investigator asking me questions. I feel like I'm within my scope to give him the information he needs to find this baby. I didn't feel like it was a violation. It was for the health and safety of this baby. We have to find this baby.
Q. Okay. It's for the health and safety of the baby?
A. Yes.
Q. So you're operating as if the baby is alive?
A. Well --

MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. -- it could be dead, but I still want the safety of it. I still want to know that its dignity is preserved, and it's in a bucket, you know, or it's in the toilet. So yeah, we need to find it.
Q. Okay. That's your view?
A. Yes.
MR. PRISLIPSKY: Objection. Asked and answered several times now.
MS. RICKERT: Well, I'm per- -- perplexed, Tom.
Q. Okay.
MR. PRISLIPSKY: I can tell.
Q. So you -- he -- you talked to him about those things generally, you say, and did you express disapproval of Brittany Watts during that?
A. No.
MR. PRISLIPSKY: Objection.
Q. Did you tell Detective Carney that -- that Brittany Watts is odd?
MR. PRISLIPSKY: Objection.
A. No.
Q. Did you tell him that she has deep issues?

A. No.
Q. Did you tell him that she was not grieving?
A. No. I do not recall any of this.
Q. And he asked -- you said that he didn't ask you to join him, but I just want to see if this refreshes your memory. Did he ask you if you would join him and you responded, I'd love to?
A. No.
Q. You're sure about this?
A. Yes.
Q. Did Detective Carney record your conversation?
A. Not that I'm aware of.
Q. Do you know when he started recording?
A. He recorded after he had Brittany's consent.
Q. Okay. So did you see him start the recorder?
A. Yes.
Q. And was that in the hospital room?
A. Yes.
Q. Okay. So there's nothing from before that as far as you're aware?
A. That I know of, and I do not recall

him -- me saying I'd love to.
Q. Okay.
A. I mean, I was willing to go in and help him, but this is not -- this is not a fun process.
Q. You weren't excited?
A. No.
Q. Were you intrigued?
A. No. I wanted to find the baby.
Q. So saying I'd love to sit in would be strange; right?
A. Yes. I would not say that.
Q. Okay. And we've talked a lot about whether Brittany felt grief or whether you would be able to tell and about people's different modes. You -- you said you would not tell Detective Carney that she was not grieving?
A. I don't -- I would not say that she's not grieving. I might have expressed to him that she had -- like about her affect or she was calm or that she wasn't in an excited state, but I would not say she's not grieving, because I can't determine if she's grieving.
Q. Right. Would you tell him she just wanted it out of her?
A. I may have said that that's what she had said prior. I don't recall. I do remember that phrase

being used earlier in the hospital stay to a nurse, I just want it out of me. I don't want to see it. I just want it out of me. Why is this taking so long? So I probably did relay that to him because we were discussing the fact that she had left, the fact that she returned, yes.

Q. Why would that be relevant?

A. Because he was asking me.

Q. So was it your understanding of your training when it comes to medical privacy, that if a police officer is asking the question, you can answer no matter what the question is?

A. Yes.

Q. Yes?

A. Yes, and that's not -- I've not been trained that way. I don't recall training, but I felt like the questions he was asking me I was able to answer.

Q. That you were permitted to?

A. Yes.

Q. And what about when you initially called dispatch? Did you believe that you were permitted to disclose private medical information about Brittany at that time?

A. Yes.

Q. What made you think so?

A. Well, because I had been directed that I was -- it was acceptable to call them, and when they asked me questions, now we have a call where I'm talking to a dispatcher. They need information, so I'm giving them, you know, this is what she said. The baby's in a bucket. This -- you know, I'm giving them information that I feel that they need.
Q. Did they need to know that she had not had prenatal care?
A. I -- no, they probably don't need to know that. I believe I did say that. I did listen to my recording, and I'm not sure why I said that. Maybe to paint the picture of the fact that we don't know how far along that the fetus is because there had been no care. So now I don't know whether it's a 22-week, a 20-week, a 24-week. I wasn't saying it in a way like she didn't get care. It was -- I don't know what we're looking at with the fetus.
Q. Now -- okay. When it comes to estimating fetal age, we talked about the ways that that's done. There was nothing about the fact that she didn't have prenatal care that inhibited assessing the fetal age at the time -- on the 19th and 20th of September; right?
A. Well, typically when you have prenatal

care, the very first ultrasound that you have is the most accurate. The further you wait into your pregnancy, it's less accurate.
Q. Okay.
A. So that initial ultrasound is going to be the best determination of a gestational age later on. That's not to say you can't give an estimate, but that 21 weeks is definitely an estimate at that point.
Q. So you're talking about like a ten-week ultrasound?
A. Yeah, they actually do them at eight, ten, twelve weeks, right in there; usually ten.
Q. Now, did Susan Zupko -- Suzanne Zupko tell you that you were under no medical privacy obligations anymore --
A. No.
Q. -- with regard to Brittany Watts?
A. No.
Q. Okay. You just decided that?
A. Well, she gave me the option to call the police, so I assumed that I was not -- that I was not under -- that I could -- I was permitted to do that, and -- and I can't just call the police and say, go look at this address for a baby without giving them more information. I gave them what I thought they needed.

Q. And one of the things they needed was that Brittany Watts had not had prenatal care?

A. Probably not. That probably -- I'm going to say I probably should not have spoke that. I was in a situation where I really wasn't sure what to say and what -- I've never had to call the police like that with a patient, so, you know, should I have said that? Probably not.

Q. Did you consider asking someone with a -- ranked a little higher in the hospital to make the decision about whether to call the police?

A. That's why I asked Suzanne.

Q. Right. And Suzanne didn't offer to call the police herself?

A. Well, no, I didn't ask anybody. That's nobody else's responsibility there. I'm the highest lead that day on the floor.

Q. Right. But you could have reached out to Angelina?

A. Angelina is off on Fridays, and she is not -- she does not come in for cases. So no, I would not have reached out to her.

Q. For her advice?

A. I just typically try not to bother her on her day off. That's why I called within. I called

Suzanne. She gave me what I felt was appropriate guidance. I didn't feel I needed anybody else.

Q. All right. Let's listen to those calls that we just talked about.

MS. RICKERT: Now, so this is going to be Exhibit 5? Thank you.

(Whereupon Plaintiff's Exhibit 5 was marked.)

Q. Okay. Exhibit 5, it's an audio file, and we'll see -- hopefully you can -- here, I'll turn up my volume.

(Whereupon an audio recording is being played.)

MS. RICKERT: Okay. So I think that that is the -- that is not the whole thing. What happened? Hold on. Why did that do that? I apologize.

(Whereupon an audio recording is being played.)

MS. RICKERT: Why is this stopping? I'm so sorry. Okay. We might come back to this when I figure out my -- why it is stopping.

Q. But that's one that you reviewed; right?

A. Yes.

Q. And do you remember --

MS. RICKERT: Okay. Hold on. Do you remember -- I think I can -- I think I've got it fixed. Hold on. Okay. Let me try that again.

(Whereupon an audio recording is being played.)

MS. RICKERT: This is very strange. Let me see if this next one --

(Whereupon an audio recording is being played.)

Q. Okay. Did you hear yourself say that you were going to be sick?

A. No.

Q. All right. I'm afraid to start it again.

A. I thought that was her saying --

Q. Oh.

A. -- she -- the dispatch --

Q. Oh, you heard somebody say it?

A. Somebody said something in there. Yeah, that was not me.

Q. That wasn't you saying you're going to be sick?

A. No, no.

Q. Okay. And you heard yourself say that it is certainly not alive anymore?

A. But I then followed with we cannot be cert- -- we -- we cannot be sure because we haven't -- she didn't look. But I -- I -- again, by this time, you would think, but you have to confirm, and that's what I was reveal- -- saying to her by that statement. I'm certain it's not alive, but then I followed it with, but

we cannot be sure.

Q. But you were certain?

MR. PRISLIPSKY: Objection.

A. I was not certain. How would I be certain? I mean, I -- I am thinking that, but you don't know. You -- saying, you know, yeah, I'm certain, but then you can't really be sure until we see the baby.

Q. Okay. And you talked about Brittany's lack of prenatal care?

A. And that was right after she asked how many weeks, and that's -- I was establishing that we don't really know for sure because when you have prenatal care, you have a more accurate estimate. That was my --

Q. Okay. And it's always an estimate; right?

A. It is always an estimate, but it is more accurate when it's done throughout.

Q. Any reason the dispatcher needed to have that explanation?

A. No.

Q. Okay. Let's listen to this last one.

(Whereupon an audio recording is being played.)

Q. Okay. So there was a fair amount of medical information in that call; right?

A. Yes.

Q. Was that all stuff that the dispatcher needed to know?
A. And I've -- I've discussed with -- you know, clearly I said too much, and I -- I recognize that. I'm in a situation where I'm heightened. She's asking me questions. I feel like I'm giving her the information that she's asking for, but then I go too far. I acknowledge that.
Q. Did you think about Brittany's medical privacy at all during this time when you were calling the police?
A. No, I just felt like I was answering their questions, but I should have been more concise.
Q. All right. You said on there that Brittany didn't want the baby and so didn't look to see if it was alive --
A. Yes.
Q. -- right? You didn't say Brittany said it was not alive; right?
A. Right.
Q. But Brittany did say in your presence that it was not alive?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. She did say that and she also said that

she didn't want to look, so she didn't know. She -- she said multiple things that didn't match.

Q. I see. And you chose to tell the dispatcher that she didn't want the baby, and so didn't look and didn't know if it was alive?

A. Yes.

Q. And that was your choice?

A. Yes.

Q. Okay.

A. Like I said, I said -- if I could go back, I would say a lot less, and I own that.

Q. Anything else you would change if you could go back?

MR. PRISLIPSKY: Objection.

A. No.

Q. No? All right.

A. I would wish that Angelina were working that day and I wouldn't have dealt with it at all, but I was called upon, and I felt like I did the best that I could.

Q. All right. Well, I want to talk about the time you were in Brittany's room with Detective Carney, and, you know, go over that. We'll do that by -- by transcript --

A. Okay.

Q. -- and so that we can try to speed through it a bit. I realize we're getting kind of late, and, then, you know, there's not that much else to cover. I do have questions about your text messages and retaining them and -- and -- and some of that, but those are like the two main things that are left. Does anybody want to take a few minutes right now?

MR. PRISLIPSKY: Just a few minutes.

MS. RICKERT: Sure.

VIDEOGRAPHER: Off the record.

(A recess was taken.)

VIDEOGRAPHER: On the record.

Q. All right. Ms. Moschell, as I mentioned, we are now going to get into the substance of the -- the interview that you conducted with Detective Carney in Brittany Watts' hospital room; all right?

A. Yes.

Q. So I'm going to give you this transcript. But before we start, and I don't want you to tell me any substance, but did you talk with your attorney during the break?

A. Yes.

Q. Did you talk about the substance of your testimony?

A. No, no.

Q. Okay. Okay. So we aren't going to read the whole thing; all right? But you reviewed this?
A. Yes.
Q. Did you listen to it or just read it?
A. I listened to it. I didn't read it.
Q. Okay. All right. Let's look at page 3. You say, I told you we're here to help you; right? Do you see that?
A. Yes.
Q. So you were communicating to Brittany that you and Detective Carney were there together to help her?
A. Yes.
Q. And that was your belief?
A. Yes.
Q. All right. And then there's a lot of Brittany telling you that -- or telling the two of you that she is going to tell the truth, hand to God, God's honest truth and things like that; right?
A. She did say that multiple times.
Q. Okay. And did you feel that she was doing her best?
MR. PRISLIPSKY: Objection. Go ahead.
A. Well, I can tell you that she had multiple stories, so it didn't seem that she was telling

the truth, no.
Q. Okay. And -- and, in your opinion, it was -- she owed you the truth?
MR. PRISLIPSKY: Objection. Go ahead. Asked and answered previously.
A. Well, she did say that she would tell the truth. So yes, you are obligated to tell the truth if you say that you are going to tell the truth.
Q. Okay. And Detective Carney didn't arrive with a warrant of any kind, did he?
A. No.
Q. All right. So you could have asked him to leave the hospital?
A. Yes.
Q. But you did not?
A. No, because Brittany willingly spoke to him. If he -- if she would have expressed that she didn't want to talk to him, I would have absolutely asked him to leave.
Q. Did she -- did you ask Brittany before you went in with Detective Carney whether she wanted to speak with him?
A. I did not, but he did ask her when he came, and I remember vividly because it just moved me the way that she said it, she was almost relieved, she said,

I just want to get this off my chest.
Q. Oh. Where did she say that? Show me.
A. She said that in the beginning. And I will find it.
Q. Okay.
A. I -- again, I didn't read it. I listened, and she said I just want to get this off my chest.
Q. I -- I don't want to stop you from finding that, but I also don't want to lose track of this question.
A. If you want to talk, go ahead. I can --
MR. PRISLIPSKY: I was going to say, do you mind if I direct her to the page?
MS. RICKERT: That's fine.
MR. PRISLIPSKY: Page 15.
THE WITNESS: Oh, 15? I would have been looking a while.
A. Line 16. No, I want to get this off my chest.
Q. Okay.
A. Because he had said he would leave if she needed her -- if she needed him to. He multiple times -- I know he felt -- like, I remember him being very caring to her, like, you don't have to talk to me.

If you want me to leave at any point, please let me know, you know, and you'll see that throughout this.
Q. And you -- but this is -- so she said that, when he said if you need to take -- take a break, okay, if this gets too tough for you, I'll walk out for a little bit, and I'll come back. No, I want to get this off my chest. Yeah? That's what you're talking about?
A. Yes.
Q. Okay. And -- but you did not -- did you think that perhaps you should ask Brittany before a police officer entered her hospital room whether she wanted a police officer to come into her hospital room?
A. Well, at this point the goal was for him to help us find the baby, so I -- he had told me that he would ask her if -- and that if she didn't want to speak to him, he wouldn't, so I left that up to him.
Q. Okay. She's your patient?
A. She's Jordan's patient, but yeah, I'm caring for her as well.
Q. Okay. And you summoned the police?
A. I did. I didn't summon this investigator, though. I did not know until they told me that someone would come to interview her. I just thought they were going to go look for the baby.
Q. Okay.

A. I didn't ask for him to come to the hospital.
Q. Well, you didn't say please don't?
A. That's correct.
Q. And when he arrived, you didn't say this is a bad time?
A. That's right. Because I felt like she was stable, and, you know, if she's going to speak to the issue to help us, then -- find the baby, then that's we needed her to do.
Q. Okay. And I just want to get a clear answer that you -- it did not --
MS. RICKERT: Strike that.
Q. You did not feel that it would be appropriate for you to, as Brittany's caregiver, ask her consent to have a stranger enter her hospital room before you allowed him to enter the hospital room; is that right?
A. That is right. I did not.
Q. Okay. And you knew he was going to come in and give her her Miranda rights?
A. I didn't know about Miranda rights. I just knew he would ask permission and -- and tape it and ask her permission for that. So I left that up to him.
Q. Well, he told you before you guys went

in that he was going to give her her Miranda rights; right?

A. I don't recall that, but he probably did.

Q. Okay. Now, you hoped that she would talk; yes?

A. Yes.

Q. Okay. Let's look at page 17. And at this point in the interview Detective Carney is asking Ms. Watts about her initially going to get checked out when she suspected she was pregnant and -- and had started bleeding. Do you see all that?

A. You're talking at the top of page 17, did you take any home tests?

Q. Right. So he's asking her about the pregnancy -- you can look back at the previous page, too, if you need the context.

A. No, I --

Q. I'm going to ask you about something later at the bottom.

A. Okay.

Q. Okay. So -- and then at line 19, Brittany says, and I thought my stomach was filling up. I did that, and she sent me over here to labor and delivery. And I was room -- in Room 5 for like two days.

But nothing was -- seemed to be getting done, so I left. Do you remember her saying that?
A. Yes.
Q. So her perception was that nothing was going to happen; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. Well, she didn't even give accurate information, because she wasn't here for two days.
Q. Okay. But this is what she's explaining to him --
A. Yes.
Q. -- at that time? And on the next page, page 18, she says, This was Tuesday and Wednesday. He says, okay. She says, So I left on my own, you know, accord. I'm like, I'm frustrated. So she's explaining that she was frustrated. Did that comport with your understanding of how she had been feeling?
A. Yes.
Q. So she wasn't bored; she was frustrated; right?
A. I'm sorry. What was the first part?
Q. She didn't leave because she was bored or something; right?
A. Correct. She definitely left because she didn't think we were doing what she wanted us to do.

Q. Okay. All right. Let's see. Let's go to -- so page 27, Detective Carney tells Brittany that -- that she can give -- this is at line 14 -- that she can give consent to search, or they'll just get a search warrant. So basically either way they're going in; right?

A. Yes.

MR. PRISLIPSKY: Objection.

Q. Okay.

A. And she said to me when he stepped out she was very scared of him going into that bathroom. I really don't want him in that bathroom.

Q. Uh-huh.

A. You'll hear her say that. She, for some reason, did not want them in the bathroom.

Q. And as things go on, I mean, she concedes that she could be -- you tell her, this is a fully formed baby that would have come out, and she concedes that in that case it may be in the toilet; right?

A. She said it could be.

Q. Right.

A. She gave -- actually during this, I counted seven different places that she said this baby could be. You wonder why we were confused.

Q. What are the seven different places?
A. Seven different locations, she said.
Q. Tell me about those.
A. Well, initially she told me that it could be in -- beside the garage -- beside the garbage can in a bucket. That was number one.
Number two, it could be behind the shed. Then there wasn't a shed. Well, maybe it's in the shrubs. Is it in the shrubs? Well, I tossed it like a -- like a bucket of water, as she kind of chuckled, you know. Then she -- that's number three. Then number four, it could be anywhere on the property. And I'm having trouble remembering all, because I wrote notes. That's four. Five, it could be in the toilet, but she didn't look to see. And then she said it never left the bathroom. Later on in this interview, she said, the baby never left the bathroom. But prior to that you told me it was in the bucket. Then you said it was -- you know, so it's -- it's a very confusing story from her. She didn't really give a direct place of where the baby was.
Q. Yeah. And did it occur to you that she might be confused?
MR. PRISLIPSKY: Objection. Go ahead.
A. No, no. You deliver a baby of that size, you absolutely know where it is.

Q. Okay. So she was telling them it might be in the toilet; right?
A. Right.
Q. Or telling you --
A. Yes.
Q. -- and Detective Carney it might be in the toilet; it might be -- she talked about a shed?
A. Yes.
Q. And there was no shed?
A. There was no shed.
Q. Right. And you didn't know for sure what she knew; right?
A. What she knew?
Q. Yeah.
A. I -- I can't know what she knows from there, but I do know that you deliver a baby, and where is the -- it's -- it's a -- not a little. It's not that little. It's big enough that it won't even fit down into the toilet unless you're plunging. You -- you had to see this baby. You had to see it somewhere.
Q. Even if she chose not to look?
A. Well, if you choose not to look but you knew you delivered it, then why would you say that it's out in -- behind the shed?
Q. Well --

A. You would just leave it at that. It's in the toilet, I didn't want to look, but it's somewhere. Go get it. That would be all the time it was there, because you didn't pick it up and move it.

Q. Okay. I think you understand from what Brittany told you guys during this -- and whether you believe she's credible or not is a different question -- but that she was telling you she did not anticipate this fully formed baby that you're talking about; right?

MR. PRISLIPSKY: Objection. Sorry.

A. I never understood her to say that she did not anticipate a fully formed baby. She was educated prior to her going home on what this baby would look like.

Q. And you base that on what Sunnie Hudak has told you?

A. Well, I based it from her deposition, because I was able to review hers as well, and I -- Sunnie is a very thorough nurse. When she says that she described to her at great length what this baby would look like, there's no question that Brittany was educated on what -- how big this baby would be and what it would look like.

Q. And when you say you reviewed the deposition, you're talking about Sunnie's?

A. Yes.
Q. Okay. So you -- you're assuming that Brittany heard and comprehended everything Sunnie told her?
A. Well, I -- I know that she heard her.
Q. How do you know that?
A. Well, because she's talking to her. She spoke as a very compassionate nurse to her. Like, I -- she really cared about her. I want -- I want you to know that this is not going to be just a blob of tissue. This is going to be a baby, Brittany. That you're going to have a baby; arms, legs, the whole works. She over and over reiterated this to her, like this is something I need you to know.
When baby -- when Sunnie spoke to Brittany on that morning, Brittany didn't say, oh, there was some tissue, a blob. I don't know if I flushed or not. She said I flushed my baby down the toilet.
Q. And none of this was to you. This was all to Sunnie?
A. Exactly.
Q. Okay.
A. But I know with 100 percent clarifica- -- what -- what do you want to call it? I am certain that Sunnie speaks the truth and cares deeply

about her patients and cared deeply about Brittany and gave her the best care that she could and wanted her to know what to expect. So when you go through hours of labor, and Brittany describes being on the couch and -- and being in pain throughout the night. I know what labor feels like. I know what labor is. Now you're on the toilet and you give birth to a baby of that size, you absolutely know that it is not a blob or a clot.
Q. Did that happen to you?
MR. PRISLIPSKY: Objection.
A. I don't --
Q. I don't want to know details, but I'm just asking, are you speaking from personal experience?
A. I'm speaking from experience of multiple mothers, and I did also have a 22-week delivery. And yes, it is very painful, and -- and I had a child that I held and grieved over, and we all do differently, but you -- there's no way that I would have mistaken her for a -- a piece of tissue or a blob.
Q. Did you deliver in the hospital?
A. I did.
Q. Okay. So not on a toilet?
A. Not on a toilet. But I know that if I would have had her on a toilet, I knew what to expect.
Q. Okay.

A. And we did our best to educate her on what to expect.
Q. Now, you know that there's no documentation of Sunnie telling Brittany what to expect; right?
A. She just documented that she educated her. She didn't put in specific things that she told her.
Q. Actually, there are specific things that are in there, but not the things you're talking about; right?
A. Yes.
Q. And you said that Sunnie reiterated this over and over?
A. She just -- it just appeared that she did. I don't know how many times she said it, but Sunnie is very thorough, and I know that from Sunnie's perspective she would have felt confident that Brittany heard her and understood what she was saying. I don't know how many times she said it. Did she say it once? Did she say it three times? I don't know. In the deposition she just kept reiterating that she told her.
Q. Okay. So you're saying she reit- -- reiterated over and over in the deposition?
A. In the deposition, yes.

Q. Not that she reiterated it --
A. Correct.
Q. -- to Brittany over and over? Okay. Important clarification.
A. I'm sorry.
Q. No, no. I'm -- I do want to understand what you're -- what you're saying. I don't want to misunderstand. All right. Did you know about that at the time you were interviewing Brittany?
A. Did I know that Sunnie had explained to her? I believe Sunnie did tell me on the phone that she had told her, yes, what to expect.
Q. Did Sunnie tell you that she told Brittany it -- you -- this isn't something you can flush?
A. I don't think she told me that she told her it was something she couldn't flush, but she told her -- told me that she told her and took great detail to explain what to expect when it is born, because people don't always know. They don't always know what a pregnancy looks like at each gestational --
Q. That's --
A. You know, they -- they may be unsure. So she did reiterate to me that she had told Brittany what to expect.
Q. Okay. And you -- you have -- you have a

memory --
A. Yes.
Q. -- of Sunnie telling you that?
A. It was on the phone, yes --
Q. Okay.
A. -- when she called and told me that she flushed it.
Q. Do you -- can you think of any reason that you remember better what Sunnie told you on the phone than what you texted to Sunnie the same day?
A. I'm not sure, because I don't even remember texting her, but the phone call I do vividly remember.
Q. Okay. So you believe that Brittany Watts was lying during this interview?
MR. PRISLIPSKY: Objection. Go ahead.
A. I believe that she was evasive, because I don't think she wanted us to find this baby.
Q. Well, if she didn't want you to find the baby, wouldn't she have denied that there was any possibility it was in the toilet?
MR. PRISLIPSKY: Objection. Speculation.
A. I don't --
MR. PRISLIPSKY: Go ahead.

A. I don't know.
Q. So what makes you think she didn't want you to find the toilet -- or find the baby?
A. Because she tells so many different stories, and she also alludes to the fact that there's conflict with her mother, that her mother is abusive, and I don't think she wanted her mother to know that this was a pregnancy, and she just thought it would just go away. I'll flush it, and it goes away.
Q. Right. She thought it was small enough to flush?
A. I guess. I mean, she tried to flush it, so --
Q. So she must have thought it was flushable; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. I don't know what she thought.
Q. Women do flush miscarriages down the toilet; right?
MR. PRISLIPSKY: Objection. Form. Foundation. Go ahead.
A. I -- I don't know if -- I've never had a woman come to me and say I've flushed a miscarriage. I've had people show up with 12-week fetuses in a tissue, you know. I don't know.

Q. You don't know whether women --
A. I don't know any woman that has flushed a fetus of any age.
Q. And you've never heard of that?
A. I've heard like in the world of things happening, but I have never had an experience with a mom who's come in and said I had a miscarriage in the toilet and I flushed it.
Q. Did you ever have anyone come in postmiscarriage without a fetus?
MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.
A. Yes. Yes, I have.
Q. And what do you think happened to those fetuses?
A. I don't know.
Q. Did you ask?
A. No.
Q. Why not?
A. Because they're of an early gestational age that they may have not have even seen a fetus.
Q. At what age do you start -- at what gestational age do you start asking women what they've done with the fetus?
A. Twenty.

Q. You don't ask at 19?
A. No.
Q. You don't ask at 18?
A. You just -- they -- I've never had them not have it. I've never had them show up without it at any, like, later gestational age, but we would not ask them at an 18-, 19-week. If they had a -- a loss at home, that's not required to have that fetus with the mother, so I wouldn't ask.
Q. Okay. You wouldn't be concerned about how that fetus -- its dignity?
A. I may personally be concerned, but, like I said, I've never, ever had them not bring it. I've had them bring it in Tupperware containers, bags, linens. They always bring in whatever they can find no matter what the age.
Q. Have you ever had someone come in with a 20-week fetus?
A. The most recent one, I believe, was 18 and still wanted all of the things done, so we did, but it was not 20, exactly 20.
Q. Okay. And so you -- you said that you would -- at, let's say, 19 weeks, you would personally be concerned about the dignity of the fetus; right?
A. I've never had that happen. I've never

had a mother show up without her 19-week fetus, so I don't know how I would react in that situation.
Q. You don't know whether you would be concerned about the dignity of the fetus?
A. I would be concerned about the dignity, my personal self, because I -- that's my view.
Q. Uh-huh.
A. But I would not be required to find that fetus.
Q. Okay. And -- but at 20-plus weeks, you are -- you are, you believe, obliged to protect the dignity of the fetus?
A. It's -- it's because of the law that they have to have a burial and/or disposal of -- we either do it -- through Mercy Health, we have a -- we do our own burial, we keep it and preserve it, or they have to pick a funeral home.
Q. Could Brittany Watts not want -- decide to handle this on her own, choose a funeral home after she was released from the hospital and figure it out?
A. I mean, she could have, but that -- we -- because she showed -- she could have done that all from home, but once she comes to us without the baby, then our concern is for the baby.
Q. And not her?

A. And her.
Q. Okay. How many times have people brought a fetus to you?
A. I can't even count.
Q. Dozens?
A. Yes. Through the whole time that I've been in labor and delivery --
Q. Uh-huh.
A. -- yes.
Q. All right. And did it occur to you that maybe Brittany didn't want people in her bathroom because it was embarrassing that there was fecal matter and that kind of thing?
MR. PRISLIPSKY: Objection. Go ahead.
A. She said she had cleaned it up to the best of her ability.
Q. Uh-huh.
A. So was there still fecal matter? Maybe. I mean, I think she addressed that at one point, that there might be --
Q. Uh-huh.
A. -- that, but the concern goes farther, much farther than whether she had stool if there's a 22-week fetus in that toilet.
Q. For you?

A. For clearly even the detectives. They worked hard to -- to obtain that.

Q. So the law you were talking about that required you to call the police, what law is that?

A. I don't know the law. I just -- that's what we've always been told throughout the whole time I've been there is that if it's 20 weeks or greater, we're required to report it and have a proper burial. So we direct the moms on how to reach a funeral home. We help them with arrangements. We even have some that do it at no cost.

Q. I want to be clear, though. Were you trained that the law required you to call the police if the woman showed up without the fetus?

A. No.

MR. PRISLIPSKY: Objection. Go ahead.

A. No.

Q. Okay. All right. Can we take a look at page 38? And at line 6 you say, But you didn't see a baby, formed baby? And she answers, No, not at all. There was no formed baby. It was nothing. It was just tissue and clot and blood.

You still believed that there was no way that that could be her belief; is that correct?

A. Yes.

Q. Okay. And then on page 39, there is a discussion about -- there's a lot of discussion about the -- the shed. Do you -- you recall that; right?
A. Yes.
Q. And she -- he -- he says, All right. What shed are you talking about? This is at line 8. She says, There was a shed, like where we used to keep the -- the tin trash cans. He says, All right. You're saying there was. Is there still a shed? In my mind, yes. You see that?
A. Yes.
Q. 14. Did that strike you as odd?
MR. PRISLIPSKY: Objection. Go ahead.
A. I thought the whole thing was odd when she described the color of it, the shape of it, where it was and everything. She was very clear that there was a shed.
Q. Right. And telling Detective Carney that a shed was there that wasn't there, how would that help her?
MR. PRISLIPSKY: Objection.
A. I have no idea why she said it.
Q. Okay. Let's look over to page 40 at line 19. Detective Carney says, Okay. So you can't remember. You're thinking about the past of the shed

being there? Brittany: I probably am, because it's been a heck of a -- Detective Carney: I can't imagine. I can't imagine what you're dealing with mentally and everything. Now you're -- and she says, Yeah. And he says, You got some guy you never met bombarding you with questions. And she says, No offense. And he says, Yes, I'm not offended. Do you see that?

A. Yes.

Q. Did it occur to you at that point that maybe this issue with the shed was a symptom of Brittany's mental state not being normal?

MR. PRISLIPSKY: Objection.

A. I can't determine her mental state being normal. It might have been that she -- it is from her past. I don't know if there was ever a shed there, but I did find it very odd that -- that she described the shed and there was no shed. I don't know what that comes from.

Q. Right. But you agree with me that that's not a way to keep people out of your bathroom; right?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

A. I -- I don't know why she said it. It -- it wouldn't keep us out of the bathroom.

Q. Well, you've talked about her motives and the things that she said --
A. Yes.
Q. -- and what you think she was trying to achieve, that when she is telling you seven different places that the fetus might be, that that -- including one of them being the bathroom, that that is an attempt to keep people out of the bathroom; right?
A. No, I never said it was an attempt to keep them out of the bathroom. I just -- it was an attempt for us not to find the fetus. She didn't want us to find it, I don't feel like, or she would have said exactly where it was, because I think she knew all along where it was.
Q. You don't know that. You believe that?
A. I -- I said I think.
Q. Right.
A. I don't know. I can -- I will never know, but to say that you scooped the baby out and put it into the bucket and then say it never left the bathroom, you see how that's two different stories.
Q. Now, she said that she scooped --
A. The baby.
Q. -- with the -- she scooped with the bucket. She didn't say she put her hand in the -- in the

toilet and pulled a baby out and put it in the bucket; right?
A. To me she just said I scooped out of the toilet and put -- I scooped the baby out of the toilet and into the bucket.
Q. That she scooped with the bucket, though; right?
A. She didn't tell me that. That is -- that is in here somewhere that she used the actual bucket.
Q. Right. It's in the --
A. Yes, yes.
Q. -- it's in the interview.
A. But prior she had said to me that she scooped it out of the toilet and put it into the bucket. She didn't mention using the bucket until later with him.
Q. Okay. Is there any chance that she was being imprecise because she was in medical distress?
MR. PRISLIPSKY: Objection. Several objections to form and foundation on that one question.
A. Yeah, I just really don't know.
Q. Right. Because you -- you don't know what she was feeling?
A. Right.
Q. And you don't have a theory about why

she would make up a shed that doesn't exist?
A. That is correct.
Q. Okay. It doesn't -- it's not part of your theory that she was trying to prevent you from finding the baby; right?
A. That is correct.
Q. Okay. All right. Now, page 44, line 10 you say, Because whatever you -- whatever you pass will be a fully formed baby. And she says, Well, I didn't see anything in all that blood that there was. And then you say, Okay. And she says, I didn't see anything. And that is the God's honest truth, hand to God. Because me trying to have a bowel movement and the -- whatever came out of me, and -- and it cuts off there. You just did -- you just disbelieved her. As she was saying this, you disbelieved her in the moment?
A. I -- I did. I did disbelieve her. I didn't think that she was telling the truth because I know what it is to deliver a baby of this size, and there's -- there's no way that you could just think that -- that it's a glob of tissue in the toilet. Why would she think that? With everything we've talked about and everything we've done with her, why would she think it's a -- a clot?
Q. If Sunnie had not told her exactly what

to expect and described in great detail all the features this baby would have, would -- then would you maybe understand how she would --
A. Possibly, although I still have delivered one of my own, and I know what that entails. But that makes more sense if you hadn't been educated.
Q. Okay.
A. Yes.
Q. Right. And you wanted to see the baby you delivered?
A. Yes.
MR. PRISLIPSKY: Objection.
Q. Okay. And so that's different than Brittany's situation; right?
A. My situation is definitely different than Brittany's.
Q. Right. And one of the ways it's different is that you wanted to see the baby?
A. Yes.
Q. And she did not?
A. And she did not.
Q. And you said you didn't make an assessment about her -- her mental state?
A. I did not.
Q. And everyone's different; right?

A. Yes.
Q. And deliveries can be different?
A. Yes.
Q. And fetuses at the same gestational age can be different?
A. Different in what way? They all are pretty much the same in the fetal development, unless you have a malformation.
Q. All right. But size is approximately --
A. Very approximate. I mean, a few ounces different maybe.
Q. And a few ounces at that age makes a big difference; right?
A. It can.
Q. This fetus was under a pound?
A. Yes.
Q. So it's like less than -- you know, the -- when you get the four sticks of butter, that's a pound of butter, so it was less heavy than that?
A. Less heavy, yes.
Q. Right.
A. But more formed and long enough to clearly know where it's at when you deliver it.
Q. Well, you don't know what position it was in when it came out, do you?

A. I do not.
Q. Could it be balled up?
A. Well, once it's born, it's not balled up.
Q. How do you know?
A. Because they don't. They -- once -- once a fetus is delivered, it's elongated. It is never in that fetal -- it is dead. She delivered a dead fetus, so it's definitely not going to be in a fetal position.
Q. Okay. Do you know this from actual experience you've had?
A. Yes. I've delivered many fetal demises.
Q. Okay. And you don't know -- but you don't know once it hits the toilet water with all the other stuff that's in there, you don't what position it's in, do you?
A. Okay.
MR. PRISLIPSKY: Objection. Go ahead.
A. It's definitely not going to be in the fetal position. For an infant to get into a fetal position, it's a musculature. It's them -- this baby was dead so it is not going to be in a fetal position.
Q. Did it float?
A. I have no idea.
Q. Right. You don't know?

A. I don't know if it floated or sunk.
Q. Right. It could have sunk?
A. It could have.
Q. All right. When you say a fully formed baby, what do you mean?
A. It has arms, legs, fingernails, hair, eyes, nose, mouth, ears. You're looking at a very miniature version of a full -- fully developed -- like age-wise baby. It is still -- the skin is very translucent, but it has all its fingers and toes. It's completely -- everything that needs to form is formed. Now it just needs to grow bigger.
Q. Well, its lungs are -- are still developing; right?
A. Well, organs you don't see --
Q. Right.
A. -- from the outside in, so you wouldn't see lungs and liver and all -- it's still all there, but it's in an undeveloped form.
Q. Okay. And at what stage of fetal development would you describe a fetus as fully formed?
A. It usually -- I would have to go back and -- through my time and look, but, I mean, usually by about 13 to 14 weeks they're developed, you know, all of the extremities and that, but at 21 and 6, it has been

for some time already fully developed.
Q. Okay. So you would describe a -- you would describe a fetus at, say, 15 weeks as fully formed?
A. I would have to re- -- refer to a timeline of development and be sure so that I'm not giving you inaccurate information of when each thing develops, but --
Q. What are -- what are the necessary features for you to conclude that a fetus is fully formed?
A. It has its extremities, its eyes, nose, mouth. It's just a baby. You're looking at a baby.
Q. And all of those parts are there pretty early on; right?
A. Yes.
Q. Okay.
A. We were just preparing her for what to expect.
Q. You didn't prepare her --
A. Right.
Q. -- for what to expect, did you?
A. No.
Q. Okay. So on page 47 at line 6, you are asking for an ultrasound, and it is an unidentified speaker, which I think is Jordan Carrino, and then you

say, Like I want it right now; right?
A. Yes.
Q. What did -- what ultrasound are you looking for and why did you want it right now?
A. So what I'm referring to there -- to there is once we do an ultrasound, which her ultrasound had been done at bedside, that report goes to what we call CORE, C-O-R-E, and it's in, I believe, Columbus, and we've had a lot of trouble with CORE. We don't get results sometimes for hours. So we have to put it in as a stat order to get a reading right away.
So in a case like this and in most other cases that we do ultrasounds, we have learned we order them stat so that the reading comes quickly. Otherwise, we're calling and we're calling and we're calling, and I think that that had happened in this case. It hadn't been put in as stat. I -- I can't verify that, but I'm telling them, call CORE, and we want it now. We want it stat. Make it a stat order so that we can get the reading because Khavari's waiting on this report to see where the placenta is and if she's going to have to do surgery and that type of thing.
So my urgency wasn't because there was anything wrong with Brittany. It was that CORE doesn't result these sometimes for hours, and I wanted it done sooner.

Q. Okay. And it also wasn't for your own purposes; it was for Dr. Khavari?
A. Yes, absolutely.
Q. Okay. And you -- but you're aware that surgery might be in the -- in the future for Brittany?
A. Yes.
Q. All right. Let's look at page 50, line 4. You say, I don't think it would really fit down the toilet. It -- it would take a -- it would completely plug your toilet. It's big enough that it -- I don't -- I don't know if it could be flushed. And Brittany says, Okay. And you said, Maybe, but I'm not sure. And she says, Well, they told me that the baby wasn't even that big. And you said, Right. And she says, It was very small. And you says -- said, Well, it would be small. Do you see that?
A. Yes.
Q. You didn't say, no, Brittany, what you were told is that this would be a fully formed baby; right?
A. Yes.
Q. You agreed with her that -- that what she had been told is that it would be very small?
A. I don't know who told her that. It could have been a doctor. It could have been Sunnie. It

could have been anybody. It would be small. It is tiny, but it's not tiny enough that you don't see it.
Q. Okay. But -- but you didn't say -- you didn't tell Brittany, wait, you had other information?
A. No, I did not.
Q. Okay. All right. Page 55, at 10, Detective Carney says, And according to medical staff, would have been a baby, a baby old enough with 22 weeks where there would have been funeral services, the whole -- the whole nine yards. And Brittany says, Oh, and that's what I -- and then she -- it's kind of cut off. Is that information that you gave to Detective Carney about the funeral?
MR. PRISLIPSKY: Objection. Speculation. Go ahead. You can answer.
A. I don't recall talking about a funeral. I was talking about that they had to have a proper burial or cremation or whatever, but funeral services I don't recall. I might have said that at that gestational age it's required to have the burial.
Q. Okay. Do you know if Detective Carney consulted anyone else at the hospital?
A. I do not believe that he did, but I do not know.
Q. All right. Okay. So on page 58,

Brittany, at line 12, says, Poss- -- there's a possibility, but I can't say yes, and I can't say no. I did not want to look, because it already broke my heart to know that baby wasn't even going to survive, so to know that I was losing all this blood and there was going to be nothing left of it. And Carney says, But at no point did you reach in to try to grab the baby out? And she says, No. And then he says, of the water. And she says, Oh, no, no, no, no, no, no, no.

A. Contradictory again of what she told me, that she took the baby out of the toilet and put it in the bucket.

Q. Okay. So -- but there's no chance you misunderstand when she was talking about scooping with the bucket?

A. When she told me initially, this is back before Detective Carney came, that she scooped the baby out of the toilet and put it into the bucket. That's out of the toilet and into the bucket. She never told me that she took the bucket and she scooped it into the -- she did not tell me that until this. So that was not my image --

Q. Okay.

A. -- until she told him that.

Q. Did you tell her that if she didn't tell

you very precisely exactly what had happened that she was going to be in trouble with the police?
A. No, never. Never.
Q. Do you think you should have?
MR. PRISLIPSKY: Objection. Go ahead.
A. No.
Q. Okay. All right. So you -- you tell Brittany on page 59 at the bottom, you've just confronted her with telling Sunnie that she flushed the baby down the toilet, and she explains that she -- says she flushed the toilet, but she didn't think she said she flushed the baby down the toilet. And -- and then you say, I'm not saying -- this is at line 22, So -- and that's not -- I'm not saying that's good or bad. I'm just saying we have to find the baby. And -- so you're telling Brittany while you're there with a police officer, we have to find the baby; right?
A. Yes.
Q. And so do you think that she was getting the impression that as a legal matter the baby had to be found?
MR. PRISLIPSKY: Objection. Speculation.
A. I don't --
MR. PRISLIPSKY: Go ahead.

A. I don't know what her perception was of that.

Q. Okay. So on page 61 -- I'm sorry. Actually on -- starting on page 60, Detective Carney says, How long is she going to be here for? And then Brittany answers, A while, because we -- and Detective Carney says, Like a day or two? And then you say, She's still -- the placenta that is still intact -- in -- in you still. She has not yet delivered the afterbirth. He says, Okay. And you say, So later on I'm anticipating surgery, or she'll pass on her own. We're trying -- we're giving her medication to try to pass it. And he says, Okay. And then you say, But I would say this evening late, at least. I don't think she'll be here tomorrow. If she passes the placenta, you'll be able to go home. But I don't know.

And -- so you are anticipating surgery; right?

A. Yes.

Q. And the -- you tell Detective Carney that you believe that she might go home that day?

A. Yes.

Q. Right. And that was wrong; right?

A. No.

Q. She did not go home that day?

A. Oh, yeah. You're correct. She did not

go home that day, but there was a possibility that she could have gone home that day.

Q. Right. You thought she might?

A. I thought she might.

Q. Did -- had a doctor told you that she might go home that day?

A. No, but anytime we have a D&C, which would be what the surgery is, as soon as the mothers are done, they can go home.

Q. Right.

A. So we try to get them home as quickly as possible so that they're not in a hospital surrounded by a nursery full of babies and mothers.

Q. Sure. And the reason that Brittany couldn't go home that day is because she had an infection; right?

MR. PRISLIPSKY: Objection. Calls for a medical opinion. Go ahead.

A. She did not pass the placenta until the next -- the next day is when I believe the surgery occurred.

Q. Okay.

A. I don't think it happened that night. I'd have to check the chart for sure, but --

Q. She didn't go home the next day either?

A. Right.
Q. She was there another day?
A. And I don't know the reason why she stayed until she was discharged. I -- I don't know the reason.
Q. Is it possible that when you told Detective Carney, based on your own assessment, that she would likely go home that day, that your assessment of her condition was unduly rosy?
MR. PRISLIPSKY: Objection. Objection to form. Go ahead.
A. I don't -- I don't think it was unduly rosy. I just was saying that that is a possibility, but I can't determine when she's discharged, because that's up to the doctor. Him -- him asking me how long she'll be there, it could be a day, it could be three days, it -- we don't know. And she did need antibiotics; right? So me telling him that she may go home that evening was not false information. She very well could have gone home had circumstances led to her discharge. But that was not up to me to decide.
Q. Right. And it's possible she was in worse shape than you thought; right?
MR. PRISLIPSKY: Objection. Go ahead.
A. I don't think she was ever in worse

shape than I thought.
Q. Well, she required a longer hospital stay than you anticipated; right?
A. Yes.
Q. Okay. All right. And then there is a part starting on the bottom of 61, at 25, you say, And the thing that we're concerned, too, Brittany, is sometimes ultrasounds can show a gestational age of 21 weeks, 22 weeks. We always give or take a week or two because you could be further along than you thought. You could be less far along than you thought. And she says, Right. And you say, It comes and goes either way. So at birth, we always take a look at that baby and make sure it's not further along. And she says, Than what -- and you say, and could be resuscitated. And she says, Right. And you say, right. So we really need to find that baby so we know -- and she says, How far along. And you say, How far you were. Is the baby still alive? She says, Not the way I chucked the bucket. Is this where you talked about her kind of chuckling?
A. She chuckled and said, not the way I chucked the bucket.
Q. And you say, Well, it wasn't in the bucket, you said. She says, Yeah. And she says -- you said the baby was not in the bucket. And, you know, she

had explained earlier that she had dumped out the bucket, and that the -- I cleaned out the bucket and the bucket was in her car; right?

A. Yes.

Q. Is that what you were referring to when you said she said it wasn't in the bucket, you said?

MR. PRISLIPSKY: Objection.

A. No. Earlier initially she had said the baby was in the bucket, and then she said, no, the baby never left the bathroom.

Q. Well, wasn't --

A. The baby wasn't in the bucket.

Q. Okay. But that's because you guys told her that what she had dumped out of the bucket could not have been the baby; right?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

A. I don't -- I don't know.

Q. You don't remember that part?

A. I do remember telling her that it would be fully formed.

Q. Right. And that was after she said, I dumped the bucket, and that's all there was. And you said, Well, that's not the baby. Right?

A. Right.

Q. Okay. So you had educated Brittany that what she dumped out of the bucket could not be the baby --

A. Yes.

Q. -- right? And she believes you?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

Q. Or she seemed to accept that; right?

A. Yes.

Q. All right. And then you say, Okay. So the baby could be alive somewhere if you've tucked it somewhere. Is it in a cabinet? Why did you ask that?

A. Well, because we've had so many different stories. We still can't find the baby. Is it -- did you put it in the bathroom in the cabinet? Is that why she doesn't want us in the bathroom? I think that's a legitimate question, is it in the cabinet? Is it in a drawer? Where is the baby? We can't find -- it's very odd --

Q. Okay.

A. -- that you cannot find this baby.

Q. And she says, Oh, no, no. The baby never went further than the bathroom, as far as I -- I would know. And he says, Is the baby still in the toilet? And she says, Like I said, there's a possibility

that the baby's still in the toilet.

Okay. So when she says it hasn't -- the baby never went further than the bathroom, that's after you guys have told her that what she dumped out of the bucket couldn't be the baby; right?

A. Right.

Q. So she's -- she's -- and she has accepted that and is now saying, well, then it must be in the bathroom; right?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

A. I really don't know what she's thinking at this point --

MR. PINZONE: Objection.

A. -- because she has said so many different things, so I don't know.

Q. Okay. And you told -- you're telling Brittany that it could be alive somewhere; right?

A. Yes.

Q. Even though you told the dispatch that it's certain to be dead?

MR. PRISLIPSKY: Objection.

A. Followed by --

MR. PRISLIPSKY: Misstates her testimony. Go ahead.

Q. Okay.
A. I followed it by, but I cannot be for sure until I see the baby.
Q. Well, Detective Carney testified that you told him that the baby -- the only way it would be alive is if there's a miracle. Do you remember telling him that?
A. Well, there could have been a miracle. I -- I do recall saying that, and -- and -- and also it could have been further along. We still do not know how far along she was. But an estimate we have 22. Like I explained to her, it could be 22, 24. There's always that very slim, remote chance that that baby is still alive somewhere if it's somewhere that she placed it.
Q. Did any doctor tell you that Brittany may be further along, and that the baby could be alive somewhere?
A. No.
Q. Did you ask for any doctor's view on that?
A. No.
Q. Okay. And so when you told Detective Carney that it would take a miracle, sometimes people say that as a figure of speech, meaning there's no chance; right? Like, it would take a miracle, but you're saying

it would take a miracle, and perhaps there's been a miracle?

MR. PRISLIPSKY: Objection.

Q. Am I understanding you right?

A. Perhaps it is still alive. There is a slim chance always in my mind until they find that baby that it could be alive.

Q. Okay. And there's -- there's a chance of a miracle?

A. Yes, always.

Q. Okay. And you're going to make decisions based on that chance?

A. I didn't make decisions based on a miracle. I made decisions to find the baby, because dead or alive, I wanted to find that baby. We needed it at the hospital. So I wasn't basing my decisions on a hope of a miracle.

Q. Okay.

MR. PRISLIPSKY: Just for the record, I think we're getting really close to seven hours.

Q. Okay. I am going wrap this part up. Now, you, at the bottom of -- of page 63, at 25, you say, Losing a 22-week -- 22-week baby is not blank crime. It's nothing you did wrong; okay? If you think you know where it is and you can tell us, it solves the problem of

just wrapping this up. It doesn't mean you're in trouble. I lost a 22-week baby in my life. Lots of women lose babies at all ages. We just have to know where the baby is, and that's all. And she says, Right. And you say, Right? Okay. It's not -- it doesn't mean you did something wrong. You've been through a lot in the last three days. And you knew that you were going to -- to lose this baby. Yeah. So you're acknowledging that Brittany knew that this baby was not going to survive?
A. Yes.
Q. And -- and you say, Right? So telling us where it is is not going to get you in trouble. You're not in trouble because you had this baby at home. It happens to women all the time. And -- now --
A. The next statement she makes is I know for a fact it's -- it has to be in that backyard.
Q. Uh-huh.
A. It's not in the bucket. I know that for a fact, so now it's -- now it's in the backyard again.
Q. Right. So she's really all over the place; right?
A. Her stories change multiple times on the location of this baby. That really disturbs me.
Q. Right. Because, you know, she's --

she's there the whole time, and she knows that she's still talking to the same people she's already talked to?
A. Yes.
Q. And she's telling you all of these things; right?
A. Yes.
Q. And it's not very rational, is it?
MR. PRISLIPSKY: Objection. Speculation.
A. It's absolutely inappropriate to say that many different locations when I firmly believe having delivered it, she knew where it was.
Q. Okay. And she --
A. Yes.
Q. -- owes you the truth?
MR. PRISLIPSKY: Objection. Asked and answered multiple times. Go ahead.
A. She is being asked. I expected the truth. I don't think receive -- we received the truth.
Q. And you -- even all of this back and forth and this strangeness, it did not occur to you that she might be in medical distress and psychologically affected by what she had been through?
A. No.
Q. Okay. Didn't consider that possibility?

A. No.

MR. PRISLIPSKY: Objection. Go ahead.

Q. All right. On page 65 -- and this is the last thing on this -- at line 5, you ask her, How did you get here? And she says, My mother. And you say, Your mom? And you say, Yeah. Her, too. Okay. Now, was this the first time you learned that Brittany's mom had brought her to the hospital?

A. It is. So that leads me to believe -- well, I -- I really don't know if that's -- her mom never told me. When I talked to her mom in the waiting room, her mom did not reveal to me that she had brought her, I don't think. I -- I honestly don't remember, so I don't know if I spoke to her mom before or after.

Q. Okay. So you might have talked to her mom before this?

A. I might have.

Q. And it might have been after?

A. And it might have been after, that's correct. I don't recall.

Q. Now I'm just going -- I know we're really short on time here, so I want to go kind of quickly through just some questions relating to your -- your text messages. How many cell phones do you have?

A. One.

Q. Okay. And did you have one cell phone in 2023?
A. Yes.
Q. And does anyone have access to your phone besides you?
A. No.
Q. All right. What apps do you use to send messages?
A. It's just the texting app, and I have Facebook Messenger, but I don't really use that to send messages. Sometimes I'll send pictures to my -- of my grandchild through there, but texting is how I communicate, yes.
Q. And it's just the -- the native text app in your phone?
A. Yes.
Q. And do you have an Android?
A. Yes.
Q. Do you -- did you have an Android in 2023?
A. Yes.
Q. Okay. And do you commonly communicate with your colleagues about work using your personal phone?
MR. PRISLIPSKY: Objection to form. You

can answer.
A. No.
Q. How do you usually communicate with your colleagues about work?
A. The only thing I communicate by phone is staffing needs. I communicate very frequently with them. I'm the one who's in charge of like filling the need if there's a need for staff. So I am texting, can you work Friday at 3:00? Can you pick up call 7:00 to 3:00 on Saturday? Those are the kind of communications -- those are really the only communications I have with staff is filling the staffing need. If someone calls off, they may communicate to me. If there's a need for me to speak to them directly about anything, it's by phone, by calling.
Q. Okay. But when you're sending these messages you were just talking about, that's your personal phone --
A. Yes.
Q. -- of the scheduling stuff?
A. Yes.
Q. Okay. So you use your personal phone to do work scheduling?
A. Yes.
Q. Do you have any kind of backup system?

A. No.
Q. Do you have Cloud storage?
A. I don't.
Q. Google Drive?
A. No.
Q. All right. How long have you had the phone you currently have?
A. The current phone I bought in February of 2024.
Q. Okay. And in August of 2024, were you notified of a letter telling you to preserve all evidence related to Brittany Watts?
A. Yes.
Q. Do you know when you were notified?
A. I was notified in my email. Yeah, I think it was August. I remember getting an email.
Q. Okay. You think it was August 2024?
A. I believe it was.
Q. Okay. And did you take that seriously?
A. I absolutely took it seriously.
Q. Okay. And from then going forward, did you delete any messages you had related to Brittany Watts?
A. I didn't have any that I knew of, but I absolutely did not delete anything related to Brittany

Watts.
Q. When you got your phone in February of 2024, what happened to your previous phone?
A. It was traded in for the current phone.
Q. Okay. And was the information on the old phone transferred to the new one?
A. The information was transferred; however, I didn't transfer like all of my messages. I started fresh. There were a few that I saved that had like a video of my daughter and a contact with a physician in Connecticut that I had had conversation with years ago. Like, they're very old. Those I, like, selected to save, but I just said, wipe it clean, and we'll go forward.
Q. So --
A. I delete everything on my phone that I can delete. So to have a new phone, it was just simply I didn't have them transfer anything over to my phone.
Q. Did you have -- I'm sorry. I'm not following. You did or did not -- when you went to get a new phone, you went to a store in person?
A. No, they mailed me.
Q. Okay.
A. So the data transfers by setting your phones next to each other, so everything transfers over.

But I did not choose to transfer texts because I just left it -- that's my recollection. I don't know if I deleted it after. I just made a clean slate. It's 2024. I didn't even think of -- of what I was deleting. I just didn't need anything prior, other than those ones that I selected to save.
Q. So you selected specific texts to transfer?
A. I had two that were at the very -- two or three that were at the very oldest.
Q. Uh-huh.
A. And I kept them, but everything else I just had it -- it did not transfer over.
Q. Okay. Everything?
A. Everything. My -- everything.
Q. Okay. With the exception of how many?
A. Apps and like my contacts. I kept all of that, but I -- I believe there were two or three texts that I kept.
Q. Okay. And I assume those were not about Brittany Watts?
A. No. They were like 2018, 2020. They were really old.
Q. So when you say you delete a lot of things from your phone, tell me more about your practice

regarding deletion.

A. I usually either delete -- it's definitely weekly, but there are days I'll do two or three times a week. If I -- I just scroll through. Anybody that -- the only texts that I save are if it's related to like schedule, like if I've asked somebody to work a certain day or whatever, but I delete random. I just delete everything. I don't save any texts. I do the same with my email. I go in and I delete everything. I keep it very clean. So for me to delete old texts is not uncommon. I don't -- I did not go -- I've never gone through my phone and selected anything intentionally to delete. I just delete -- if it's old, I delete it. I only keep current.

Q. Okay. And this has always been your practice?

A. Always.

Q. And you -- since you received that letter or notification in August of 2024 about retaining messages, have you continued to delete things from your phone?

MR. PRISLIPSKY: Objection to form.

A. I do delete messages from my phone, but there's nothing that I've deleted that has referred to this case.

Q. Well, you talked about people sending you articles and things like that.

A. I probably have deleted if they sent me an article. I don't even respond to it on the text. Or I'll say, you know, where did you find this or whatever. But I'll go seek it out. There's been so many Facebook, Instagram, TikTok. I'm all over the news. I've had people threatening me. I've had people saying they're going to find me. This is very disturbing. So finding an article like that with your name in it, I -- I just think that's terrible. You know, it's very -- I -- it made me feel unsafe. There were multiple threats. I had a security system installed in my home because I didn't want to be threatened like that. So when someone would see an article, they would send it to me.

Q. Okay. And I want to be very clear that neither I, anyone on our team or Brittany Watts wants you to be subject to threats or to be afraid.

A. And I believe that, 100 percent. I think it's a social media craze out there. People are just crazy. I've never felt that Brittany Watts herself was ever behind a threat.

Q. Good. Because that's --

A. No.

Q. -- absolutely not. And -- but when you

receive -- people send you articles like that, you do acknowledge receipt?
A. Yes.
Q. And -- but you have not saved those texts?
A. That is correct.
Q. Okay. Did you think that maybe you were supposed to based on the notification you got about the need to preserve evidence?
A. No, because I didn't think of that as evidence. I was thinking of like things that I had saved chart wise, or, you know, any notes that I had taken, which I don't have any, or, you know, I didn't know it related to if someone sends me an article. That's public information, so --
Q. Okay. Is there -- you know, we've -- we've seen texts that you had with Sunnie Hudak from September 22nd. Did you have other communications like -- or I don't mean like that, but other communications about Brittany Watts around that time period?
A. Not that I recall.
Q. You don't --
A. I don't even recall Sunnie's texts back and forth, so I don't recall texting, no.

Q. But you may have?
A. I don't think so. I really don't.
Q. I --
A. I have no recollection of texting. I'm -- I try to be very careful about that, and I -- I have learned through this, even with that -- with Sunnie, you know, even though you think you're not maybe expressing information related to a patient, you still have to be very careful. And going forward I won't even breathe, you know, a patient is even -- it just really showed me a lesson, but I don't text about patients, and I did not text about Brittany.
Q. Okay. Aside from the ones we've seen with Sunnie?
A. That is correct, and I -- as I said, I don't recall, but I did, because it's there, so I own that.
Q. So it's possible that there are others that were there that you also don't remember?
A. I really don't think so. I mean, I -- I -- I don't. I don't. That was a day where I'm reaching out to her because she reached out to me by phone, and I'm, like, concerned. I would have no reason to text anything about this to anybody at work. If they want -- if they had any questions about it, they would

come to me at work.
Q. Did you -- do you remember who emailed you about the preservation?
A. I don't.
Q. Okay. And did you follow -- first of all, were you aware that Brittany Watts got arrested?
A. Yes.
Q. Okay. And did you follow that criminal case in the media?
A. I was aware of it way after. Like, I did not follow it through. I didn't know when she was arrested. I didn't know when she -- I knew that they -- there was some charges, but that they were dropped. Like, I didn't follow it daily or look it up or -- no.
Q. You didn't hear about it until --
A. After.
Q. -- until the charges were dropped?
A. I believe that's when I first heard she was arrested. I don't -- I don't think I knew that she had been arrested.
Q. Okay. I --
A. I may have known that there were charges placed on her. I don't think I knew about the arrest. Like, I read later, even just recently about -- in the deposition they were talking about how they came to her

home and took her down to the police station. I didn't know any of that.

Q. You didn't know she had been handcuffed?

A. No, I did not.

Q. But -- but you knew she was charged with a crime?

A. Yes.

Q. Did you know what crime?

A. Yes.

Q. And how did you learn that she had been charged with a crime?

A. It was on -- in the news.

Q. Okay.

A. Yeah.

Q. And how did you feel about that?

MR. PRISLIPSKY: Objection. Go ahead.

A. I really didn't know how to feel. That was not my intent for her to be charged. I do feel like flushing your baby down the toilet is abuse. I feel that's very harsh, but I'm not going to say that that was intentional. I do know that she had multiple stories, but I can't judge her. So I didn't really feel one way or the other. And when they dropped the charges, I do remember thinking, well, there's nothing that would come of it anyways, so let it go. Like, it happened; right?

There's nothing that's going to come of pushing a charge onto her. She already -- it's done. So I was not upset when they dropped the charges. I felt that was fair.
Q. You thought that was the right choice?
A. I do.
Q. That charges were dropped?
A. I do.
Q. You don't think that Brittany Watts deserved to be charged with a felony?
MR. PRISLIPSKY: Objection.
A. That's entirely --
MR. PINZONE: Objection.
A. -- a court thing. I don't understand court law or what a felony versus anything else is but --
Q. Okay.
A. -- I felt relieved when they dropped the charges.
Q. You felt relieved?
A. I did. I felt like it was the best decision.
Q. All right. And just to be really clear, and this is my -- my last question, except that I might have follow-ups, did -- so despite your text about that -- that she will be charged, you are saying you did not want her to be charged?

A. I did not want her to be charged.

MS. RICKERT: Okay. All right. Well, I don't have anything else, unless it's follow-up to somebody else's questions.

MR. PRISLIPSKY: John, do you have any questions?

MR. PINZONE: I have no questions.

MR. PRISLIPSKY: I have no questions. She will waive video, read the transcript.

VIDEOGRAPHER: We are done.

(Deposition concluded at 5:01 p.m.)

SIGNATURE NOT WAIVED

REPORTER'S CERTIFICATE

I certify that this transcript, consisting of 404 pages, is a complete, true and correct transcript of the proceedings had and the testimony taken in this case as shown by my stenotype notes taken at the time said testimony was taken.

Gina M. DeProfio
Registered Professional Reporter

CERTIFICATE OF NOTARY

COMPLETED BY DEPONENT:

I, Connie Moschell, have read the preceding pages of my testimony or have had the preceding pages of my testimony read to me and have noted any changes or corrections in form or substance of my testimony and the reasons therefor on the following errata sheet(s).

_____________________________________
Connie Moschell                    Date

COMPLETED BY NOTARY PUBLIC:

I,_________________________, a Notary Public in and for the State of __________________, hereby acknowledge that the above-named witness personally appeared before me, swore to the truth of the preceding statements and signed above as her own true act and deed.

______________________________
Notary                    Date

___________________________
Commission Expiration

# E R R A T A   P A G E

I, Connie Moschell, the witness herein, have read the transcript of my testimony taken on March 17, 2026, or have had the transcript read to me, and the same is true and correct, with the exception of the following changes noted below, if any:

PAGE   LINE   CORRECTION, CHANGE & REASON

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

_____ _____ ________________________________________

________________________________

Connie Moschell                Date

A & A Reporting & Transcription
837 Boardman-Canfield Road
Suite 203
Youngstown, OH 44512

April 1, 2026

Thomas A. Prislipsky, Esq.
Reminger Co., LPA
950 Windham Court, Suite 200
Youngstown, Ohio 44512

RE: Watts vs. Bon Secours

Dear Atty. Prislipsky:

Enclosed please find your copy of the deposition of Connie Moschell taken on March 17, 2026. The original certificate and correction pages are attached. It is my understanding from our discussion that you will arrange to have Ms. Moschell read and sign your copy of the transcript.

After the transcript has been signed, please mail the original Notary and Errata Pages to me at the above address. If I have not received the signed pages within 30 days of your receipt of this letter, pursuant to the Rules of Civil Procedure, signature will be waived.

Thank you very much for your time and consideration in this matter. If you have any questions, please don't hesitate to call me at the above number.

Sincerely,

Gina M. DeProfio

Gina M. DeProfio

Enclosure

cc: Atty. Julia Rickert
Atty. John Pinzone

## 0

0 - 240:5

## 1

1 [4] 5:20, 50:22, 50:23, 407:3
10 [2] 368:7, 376:6
100 [6] 3:7, 5:8, 235:4, 276:14, 353:23, 397:19
101 - 5:8
102 - 5:8
103 - 5:8
105 - 5:8
106 - 5:8
107 - 5:8
108 - 5:8
109 - 5:8
10:00-something [2] 265:4, 265:9
10:48 - 263:3
113 - 5:8
114 - 5:8
115 - 5:8
118 - 5:8
11:00 - 265:11
12 [2] 92:16, 377:1
12-week [2] 86:19, 358:24
120 - 5:8
122 - 5:8
123 - 5:9
124 - 5:9
125 - 5:9
126 - 5:9
127 - 5:9
128 - 5:9
129 - 5:9
12:20 - 279:21
12:30 - 260:25
12:39 - 268:3
12:40 - 279:22
13 [2] 5:6, 372:24
130 - 5:9
131 - 5:9
133 - 5:9
134 - 5:9
135 - 5:9
136 - 5:9
137 - 5:9
138 - 5:9
139 - 5:9
14 [3] 349:3, 364:12, 372:24
140 - 5:9
141 - 5:9
142 - 5:9
143 - 5:9
146 - 5:9
147 - 5:9
148 - 5:10
149 - 5:10
15 [3] 344:16, 344:17, 373:3
150 - 5:10
151 - 5:10
152 - 5:10
153 - 5:10
154 - 5:10
155 - 5:10
158 - 5:10
159 - 5:10
16 - 344:19
161 - 5:10
162 - 5:10
163 - 5:10
169 - 5:10
17 [6] 1:14, 4:7, 347:8, 347:13, 406:4, 407:11
171 - 5:10
173 - 5:10
174 - 5:10
175 - 5:10
177 - 5:10
18 [9] 88:1, 88:15, 88:21, 227:6, 227:17, 348:13, 360:3, 360:7, 360:19
18-week - 227:4
18-weeks - 88:11
184 - 5:10
185 - 5:10
186 - 5:10
187 - 5:11
188 - 5:11
19 [4] 347:22, 360:1, 360:23, 364:24
19-week [2] 360:7, 361:1
191 - 5:11
195 - 5:11
197 - 5:11
198 - 5:11
199 - 5:11
1993 - 16:17
1994 - 9:14
19th [35] 69:19, 69:22, 81:11, 81:23, 91:5, 92:20, 93:10, 93:17, 94:11, 95:25, 96:15, 96:19, 96:22, 99:6, 100:8, 103:22, 103:24, 104:6, 104:9, 105:9, 105:9, 113:18, 116:10, 116:17, 117:3, 117:24, 118:24, 119:4, 122:10, 133:20, 136:1, 136:7, 136:9, 136:14, 333:23
1:00 [3] 266:25, 267:13, 309:4
1:19 - 276:18
1:25 - 276:19
1:35 [3] 309:3, 309:5, 309:5
1:37 - 307:2

## 2

2 [3] 5:21, 213:9, 240:5
20 [15] 21:8, 21:9, 110:25, 111:17, 111:21, 112:8, 112:11, 279:20, 286:15, 287:16, 288:3, 320:20, 360:21, 360:21, 363:7
20-minute - 327:24
20-plus - 361:10
20-week [3] 267:7, 333:15, 360:18
200 [4] 2:18, 4:9, 5:11, 407:6
2000 [2] 20:17, 29:19
2009 [3] 21:18, 21:24, 21:25
2018 - 395:22
2020 - 395:22
2021 [3] 22:7, 22:14, 22:15
2023 [19] 24:19, 26:20, 27:22, 68:10, 68:14, 69:19, 69:23, 81:12, 81:23, 91:12, 92:20, 96:22, 142:1, 142:4, 150:16, 213:18, 215:2, 391:2, 391:20
2024 [6] 393:9, 393:10, 393:17, 394:3, 395:3, 396:19
2026 [5] 1:14, 4:7, 406:4, 407:3, 407:11
203 [2] 5:11, 407:2
204 - 5:11
207 - 5:11
20th [50] 96:16, 96:23, 97:7, 97:10, 97:15, 97:18, 103:24, 103:25, 104:4, 104:12, 106:23, 108:25, 113:3, 113:19, 116:13, 117:4, 117:12, 118:10, 119:12, 121:10, 121:11, 122:10, 122:25, 124:16, 125:10, 129:16, 131:13, 133:18, 136:10, 136:10, 142:16, 142:24, 145:1, 145:5, 145:14, 148:7, 149:3, 150:16, 165:9, 165:14, 188:25, 194:22, 198:22, 228:9, 228:18, 229:25, 239:16, 248:3, 248:10, 333:23
21 [4] 88:15, 334:7, 372:25, 382:8
21-plus - 240:10
21-weeker [2] 72:7, 72:9
211 - 5:11
212 - 5:21
214 - 5:11
216 - 5:11
217 - 5:11
21st [15] 106:20, 106:22, 190:4, 198:20, 201:4, 203:12, 206:1, 207:24, 216:2, 221:13, 232:6, 233:2, 233:19, 233:21, 236:6
22 [20] 88:15, 133:12, 133:15, 134:22, 139:14, 141:25, 142:12, 142:13, 147:9, 225:13, 225:24, 226:13, 247:3, 249:12, 271:10, 376:8, 378:13, 382:9, 386:11, 386:12
22-week [14] 77:18, 77:19, 120:7, 132:20, 153:21, 226:9, 226:25, 227:1, 333:15, 354:15, 362:24, 387:23, 387:23, 388:2
22-weeker [2] 83:6, 222:10
221 - 5:11
222 - 5:11
223 - 5:11
224 - 5:11
229 - 5:11
22nd [10] 234:13, 235:13, 236:14, 238:13, 248:11, 258:21, 259:22, 262:12, 276:9, 398:18
23 - 139:16
230 - 5:11
231 - 5:11
232 - 5:12
239 - 5:12
24 [9] 139:16, 140:12, 140:15, 140:21, 141:11, 247:3, 247:4, 269:14, 386:12
24-week [4] 134:23, 141:2, 141:5, 333:16
240 - 5:12
241 - 5:12
242 - 5:12
243 - 5:12
243-5900 [2] 2:8, 2:12
244 - 5:12
245 - 5:12
246 - 5:12
248 - 5:12
248-7906 - 3:9
249 - 5:12
25 [4] 247:4, 309:16, 382:6, 387:22
250 - 5:12
252 - 5:12
253 - 5:12
255 [4] 5:12, 262:6, 262:15, 262:24
256 - 5:12
257 - 5:12
258 - 5:12
259 - 5:22
26 [2] 78:9, 147:8
260 - 5:12
263 - 5:12
268 - 5:12
27 - 349:2
271 - 5:12
273 - 5:13
274 - 5:13
276 - 5:13
279 - 5:13
28 - 5:6
280 - 5:13
284 - 5:13
285 - 5:13
286 - 5:13
29 - 5:6
290 - 5:13
294 - 5:13
296 - 5:13
297 - 5:13
299 - 5:13
2:00 [8] 266:24, 267:13, 272:16, 273:1, 273:3, 273:7, 309:5, 309:6
2:05 [2] 312:4, 312:7
2:28 - 312:5
2:43 - 312:19
2:46 - 312:18
2:56 [3] 316:16, 316:20, 320:3

## 3

3 [4] 5:22, 260:17, 260:18, 342:6
30 [2] 21:9, 407:15
30-some-week - 86:20
300 - 5:13
301 - 5:13
302 - 5:13
303 - 5:13
304 - 5:13
305 - 5:23
306 - 5:13
309 - 5:13
31 - 5:6
310 - 5:13
311 [2] 2:7, 2:11
312 [2] 2:8, 2:12
313 - 5:13
314 - 5:14
315 - 5:14
316 - 5:14
325 - 5:14
326 - 5:14
328 - 5:14
33-week - 86:25
33-weeker - 138:19
33-year-old - 240:3
330 - 2:19
335 - 5:24
337 - 5:14

338 - 5:14
339 - 5:14
34 - 5:6
341 - 5:14
342 - 5:14
34305 - 3:8
347 - 5:14
348 - 5:14
349 - 5:14
35 - 5:6
351 - 5:14
353 - 5:14
356 - 5:14
357 - 5:14
358 - 5:14
36 - 5:6
361 - 5:14
362 - 5:14
363 - 5:14
364 - 5:15
366 - 5:15
368 - 5:15
370 - 5:15
375 - 5:15
377 - 5:15
379 - 5:15
38 [2] 5:7, 363:19
380 - 5:15
382 - 5:15
383 - 5:15
384 - 5:15
386 - 5:15
388 - 5:15
389 - 5:15
39 [2] 5:7, 364:1
390 - 5:15
395 - 5:15
3:00 [3] 320:10, 392:9, 392:9
3:20 [2] 320:15, 320:19
3:30 - 183:21
3rd [2] 2:7, 2:11

**4**

4 [4] 5:23, 306:15, 306:16, 375:8
40 [3] 5:7, 279:20, 364:23
400 - 5:15
401 - 5:15
404 - 404:7
41 - 5:7
42 - 5:7
43 - 5:7
44 - 368:7
440 - 3:9
44139 - 3:8
44512 [3] 2:19, 407:2, 407:6
448 - 239:2
45 - 5:7
47 [2] 5:7, 373:23
48 - 5:7
49 [2] 5:7, 5:20
4:00 [4] 24:7, 92:23, 94:15, 184:25
4:24 - 320:9
4:25-CV-00049 - 1:4
4:56 - 323:23

**5**

5 [7] 5:24, 238:21, 336:6, 336:7, 336:8, 347:25, 390:4
50 [2] 5:7, 375:7
53 - 5:7
530 [3] 238:21, 239:3, 239:6
534 - 239:2
54 - 5:7
55 [2] 5:7, 376:6
56 - 5:7
57 - 5:7
58 [2] 5:7, 376:25
59 - 378:8
5:00 [2] 24:7, 264:1
5:01 - 403:11
5:02 - 323:25
5:40 - 270:17

**6**

6 [5] 5:3, 138:19, 363:19, 372:25, 373:23
60 - 379:4
60607 [2] 2:7, 2:11
61 [2] 379:3, 382:6
619 - 324:4
63 - 387:22
65 - 390:3
650 - 306:10
651 - 306:12
691 - 323:20
692 [2] 323:15, 325:21
693 [3] 312:16, 316:16, 325:23
694 [2] 312:15, 312:16
695 [6] 306:2, 306:5, 306:7, 306:12, 306:18, 306:23
6:00 [6] 24:6, 94:21, 96:16, 96:19, 190:6, 236:20

**7**

72 - 5:7
73 - 5:7
74 - 5:7
744-1311 - 2:19
75 - 5:7
76 - 5:7
77 - 5:7
7:00 [8] 24:7, 136:8, 136:9, 183:22, 193:1, 206:4, 206:9, 392:9
7:30 - 206:9

**8**

8 - 364:6
80 - 5:7
81 - 5:7
82 - 5:7
83 - 5:7
837 - 407:1
85 - 5:7
87 - 5:8
88 - 5:8
89 - 5:8
8:00 - 15:15

**9**

9/20/2021 - 215:1
9/21/20203 - 213:16
9/21/2023 - 214:20
90 - 5:8
91 - 5:8
911 [3] 269:23, 270:1, 302:5
92 - 5:8
93 [2] 17:23, 17:24
950 [3] 2:18, 4:8, 407:6
97 - 5:8
98 - 5:8
99 [3] 5:8, 29:19, 29:20
9:00 - 97:22
9:16 - 4:7

**A**

a.m [3] 4:7, 24:6, 24:7
abandoned - 302:6
Aberdeen [2] 2:7, 2:11
ability [5] 12:1, 12:4, 12:9, 175:18, 362:16
able [24] 20:25, 21:11, 21:20, 78:13, 80:18, 114:5, 129:14, 130:25, 131:1, 131:7, 134:24, 149:20, 177:13, 221:17, 222:4, 246:5, 247:5, 285:22, 321:17, 324:2, 331:13, 332:17, 352:18, 379:15
abnormal - 137:19
abortion [58] 31:9, 31:13, 31:25, 31:25, 35:3, 35:23, 35:25, 36:7, 36:8, 36:13, 37:21, 37:24, 39:2, 39:12, 39:19, 39:23, 39:24, 40:2, 40:3, 98:13, 98:16, 98:22, 99:3, 99:7, 99:14, 99:18, 100:2, 100:10, 100:18, 101:14, 103:4, 103:19, 103:22, 104:10, 104:15, 105:4, 105:11, 106:6, 109:25, 121:20, 122:18, 122:24, 181:16, 183:6, 187:6, 187:9, 187:15, 187:21, 187:25, 188:12, 188:15, 189:1, 189:6, 199:2, 199:5, 220:2, 220:3, 229:22
abortions [15] 31:11, 32:14, 35:14, 36:1, 38:7, 38:12, 38:15, 38:19, 39:5, 39:17, 39:20, 39:21, 39:25, 40:16, 98:14
above-named - 405:16
abruption [70] 70:1, 70:16, 71:12, 71:14, 71:20, 71:21, 71:22, 71:24, 72:1, 72:10, 95:16, 117:4, 117:5, 117:5, 117:10, 117:13, 117:25, 118:4, 118:11, 118:14, 118:18, 118:18, 118:20, 118:21, 123:3, 123:5, 123:6, 123:12, 123:16, 123:23, 124:4, 124:9, 124:9, 124:21, 125:4, 125:15, 125:18, 125:19, 127:5, 129:7, 146:19, 146:20, 148:14, 240:8, 240:14, 240:21, 240:24, 241:4, 242:7, 242:8, 242:18, 242:18, 242:23, 242:25, 243:1, 251:25, 256:9, 256:10, 256:14, 256:18, 256:24, 256:24, 256:25, 257:7, 257:12, 257:15, 257:20, 258:5, 258:9, 258:14
abruptions [2] 123:10, 258:9
abrupts - 257:2
Abso - 133:10
absolutely [28] 41:17, 45:11, 53:13, 61:17, 83:22, 87:9, 111:23, 122:21, 170:8, 192:12, 194:19, 226:22, 251:8, 252:20, 274:11, 305:10, 311:1, 316:2, 319:2, 321:9, 343:18, 350:25, 354:8, 375:3, 389:10, 393:20, 393:25, 397:25
abuse - 401:19
abused [2] 63:2, 63:9
abusive - 358:6
accept - 384:8
acceptable [3] 69:13, 259:16, 333:2
accepted [2] 23:4, 385:8
access [7] 66:6, 262:7, 262:16, 262:19, 262:19, 262:21, 391:4
accessed [2] 66:9, 66:12
accident [2] 8:1, 9:13
accord - 348:15
according [5] 108:18, 114:13, 157:25, 159:11, 376:7
account [2] 175:1, 300:3
accurate [10] 29:4, 89:15, 141:10, 307:20, 311:16, 334:2, 334:3, 338:13, 338:17, 348:7
accuse - 220:11
achieve - 366:5
acknowledge [3] 339:8, 398:2, 405:15
acknowledged [2] 47:8, 209:2
acknowledging - 388:8
acquaintances - 85:8
across [2] 81:15, 222:14
act - 405:17
action [3] 1:17, 43:5, 164:14
actual [6] 56:11, 210:6, 212:3, 220:11, 367:9, 371:10
acuity - 27:9
adamant - 61:17
add - 315:13
additional [5] 46:13, 129:4, 153:4, 155:3, 176:25
address [3] 127:13, 334:24, 407:15
addressed [5] 157:1, 210:21, 222:25, 229:14, 362:19
addressing -

55:18
adequate - 169:19
adjacent - 134:8
administer [2] 181:12, 202:4
administered [2] 200:6, 200:10
administering [10] 180:18, 182:2, 184:3, 184:21, 197:9, 197:14, 197:15, 197:16, 215:24, 229:15
administration - 185:16
admit [2] 26:2, 157:17
admonished - 209:13
admonishment - 209:15
adoption - 110:10
adults - 313:18
advance - 260:22
advanced [3] 240:9, 240:16, 241:18
advice [11] 49:16, 54:1, 95:5, 194:2, 278:16, 291:24, 298:25, 304:3, 304:9, 304:11, 335:23
advise [3] 188:6, 189:22, 291:21
advised [4] 259:15, 261:9, 289:23, 291:15
affect [6] 31:10, 107:8, 223:3, 224:3, 224:6, 331:19
affected [3] 223:25, 224:16, 389:23
AFI [5] 74:22, 74:25, 75:4, 79:3, 146:3
aforesaid - 1:17
afraid [4] 137:8, 310:2, 337:7, 397:18
African - 240:4
afterbirth - 379:9
afternoon [2] 183:21, 239:16
afterward - 314:6
against [13] 10:17, 38:3, 44:6, 47:14, 95:4, 120:6, 171:6, 171:23, 194:2, 242:15, 276:23, 299:4, 325:7
age [27] 72:8, 86:13, 86:23, 87:15, 87:22, 88:1, 89:3, 89:10, 89:15, 89:18, 131:1, 134:21, 139:20, 251:11, 333:20, 333:23, 334:6, 359:3, 359:21, 359:22, 359:23, 360:6, 360:16, 370:4, 370:12, 376:19, 382:8
age-wise - 372:9
ages - 388:3
agitated [5] 194:15, 194:20, 195:1, 195:13, 198:23
agree [56] 53:25, 54:6, 54:12, 54:16, 54:23, 55:6, 55:11, 76:12, 76:23, 80:22, 86:13, 99:5, 101:23, 172:22, 174:9, 174:10, 180:2, 186:1, 189:1, 192:1, 199:13, 204:8, 204:10, 207:9, 210:17, 213:20, 214:6, 215:19, 215:22, 217:9, 217:16, 218:3, 221:23, 223:9, 223:24, 224:12, 224:15, 225:9, 227:24, 231:18, 231:20, 241:7, 245:9, 245:13, 251:5, 254:17, 254:23, 255:24, 256:17, 274:9, 274:19, 307:19, 307:22, 308:1, 321:1, 365:19
agreed [19] 4:5, 4:10, 45:4, 178:19, 182:5, 184:15, 184:20, 193:17, 198:8, 207:19, 209:25, 217:2, 218:11, 224:19, 229:12, 234:20, 295:12, 315:24, 375:22
agreeing [2] 207:2, 212:22
agreement [4] 1:16, 229:2, 234:22, 235:2
agrees [2] 217:9, 218:7
ahead [151] 8:15, 36:3, 37:10, 39:10, 42:25, 44:12, 44:22, 48:7, 48:18, 50:17, 51:15, 56:8, 57:5, 59:21, 80:17, 81:6, 82:22, 83:2, 88:25, 89:6, 93:20, 98:24, 99:9, 99:22, 101:10, 103:11, 104:22, 106:19, 109:21, 119:18, 121:8, 121:15, 126:17, 127:11, 128:24, 129:11, 130:23, 131:14, 131:23, 132:12, 134:6, 135:24, 137:3, 138:5, 139:13, 141:1, 141:18, 141:24, 142:3, 143:4, 148:3, 149:22, 151:1, 151:10, 152:19, 153:10, 154:18, 155:8, 156:4, 162:2, 163:13, 164:6, 164:18, 172:16, 172:24, 174:23, 175:11, 176:18, 178:17, 196:20, 200:9, 200:16, 201:10, 205:17, 216:19, 222:20, 223:8, 225:7, 225:10, 230:9, 232:11, 240:22, 242:2, 243:17, 243:25, 244:14, 244:21, 245:25, 246:11, 247:15, 248:9, 249:7, 249:21, 250:14, 251:20, 253:12, 254:7, 256:22, 258:7, 259:6, 261:14, 269:2, 272:13, 277:2, 277:22, 279:19, 280:5, 281:8, 285:13, 286:17, 297:5, 298:18, 301:14, 302:15, 303:25, 304:23, 311:15, 314:17, 316:7, 326:8, 327:11, 329:2, 339:24, 342:23, 343:4, 344:12, 348:6, 350:23, 357:16, 357:25, 358:16, 358:21, 359:12, 362:14, 363:16, 364:13, 365:23, 371:18, 376:15, 378:5, 378:25, 380:18, 381:11, 381:24, 383:17, 384:7, 385:11, 385:25, 389:17, 390:2, 401:16
Akron - 134:7
AL - 1:9
alcohol - 12:8
alert - 57:15
Alicia - 85:2
align - 212:18
aligned [2] 219:14, 220:24
aligning [2] 207:15, 214:24
aligns [2] 221:15, 221:16
alive [37] 131:11, 269:15, 270:19, 273:11, 278:2, 281:6, 281:11, 297:4, 297:18, 297:20, 300:23, 301:9, 301:11, 301:18, 307:11, 308:4, 308:9, 308:10, 308:11, 308:20, 309:14, 328:24, 337:19, 337:25, 339:16, 339:19, 339:22, 340:5, 382:18, 384:11, 385:18, 386:6, 386:14, 386:16, 387:5, 387:7, 387:15
allegedly - 279:14
Alliance [3] 18:19, 18:20, 19:5
allotted - 294:19
allow [5] 42:3, 216:14, 216:15, 302:12, 326:23
allowed [3] 237:15, 244:18, 346:17
allows [2] 244:6, 244:12
alludes - 358:5
alone [6] 55:5, 55:8, 236:22, 315:25, 316:6, 321:19
already [15] 133:11, 185:17, 215:25, 240:13, 244:2, 262:14, 268:21, 297:7, 300:7, 300:7, 302:11, 373:1, 377:3, 389:2, 402:2
although [2] 145:3, 369:4
AMA [2] 191:19, 193:21
ambulance [3] 295:23, 296:1, 296:11
American - 240:4
Amish - 287:21
amniotic [21] 74:22, 76:1, 76:6, 76:13, 76:16, 77:4, 77:12, 77:14, 78:2, 78:19, 79:1, 79:9, 79:10, 79:22, 81:3, 120:3, 120:12, 120:17, 130:11, 130:17, 242:20
among - 182:8
amount [9] 79:7, 144:19, 242:5, 303:12, 305:5, 310:20, 311:3, 316:18, 338:23
analysis - 249:21
and/or [2] 254:12, 361:14
Android [2] 391:17, 391:19
Angelina [67] 23:16, 23:17, 24:7, 25:13, 70:13, 72:4, 82:10, 85:14, 88:14, 116:24, 117:7, 119:2, 145:9, 166:7, 167:14, 168:2, 168:13, 168:14, 168:23, 169:23, 180:5, 182:5, 182:9, 182:13, 183:22, 184:5, 184:19, 192:25, 193:1, 193:9, 198:25, 201:5, 201:6, 201:15, 202:10, 203:14, 204:11, 205:20, 205:25, 206:2, 207:9, 207:13, 207:23, 208:6, 208:7, 208:16, 208:20, 209:6, 209:20, 210:6, 211:12, 212:1, 213:12, 214:21, 216:2, 216:23, 220:11, 228:15, 229:25, 232:7, 259:17, 259:20, 259:22, 260:2, 335:19, 335:20, 340:17
Angelina's [4] 168:17, 193:12, 205:19, 236:23
Angeline - 216:23
anger - 54:11
angry - 232:13
annual [2] 63:12, 65:10
annually [3] 60:21, 63:20, 63:25
answered [29] 56:21, 57:5, 78:6, 93:13, 126:17, 130:15, 131:23, 132:7, 132:12, 141:17, 172:24, 201:10, 205:17, 249:5, 258:7, 297:16, 298:18, 300:9, 301:14, 304:23, 320:12, 326:8, 328:1, 329:2, 329:10, 339:24, 343:5, 359:12, 389:17
answering - 339:12
answers [6] 11:6, 14:2, 14:4, 68:4, 363:20, 379:6
antepartum [4] 78:10, 80:1, 152:13, 158:16
antibiotic - 58:11
antibiotics [16]

107:5, 107:11, 107:14, 107:22, 108:1, 108:10, 191:24, 196:7, 199:16, 200:6, 200:13, 201:2, 243:13, 244:2, 244:3, 381:17
anticipate [2] 352:8, 352:12
anticipated - 382:3
anticipating [2] 379:10, 379:17
anymore [7] 180:15, 186:9, 211:6, 234:5, 234:6, 334:15, 337:19
anything's - 238:16
anytime [6] 122:16, 123:6, 134:11, 136:4, 214:4, 380:7
anyways [2] 143:6, 401:25
apologies - 297:17
apologize [4] 33:14, 46:25, 195:7, 336:14
app [2] 391:9, 391:14
apparent - 118:20
appear - 86:21
appearances [3] 2:3, 3:3, 87:3
appeared [6] 87:4, 114:13, 176:1, 275:3, 355:15, 405:16
appears [2] 90:1, 134:23
applied [3] 20:16, 21:21, 197:6
apply [2] 23:6, 47:20
applying [2] 47:10, 47:12
appreciate - 148:24
approach [3] 79:19, 161:4, 179:1
approaching - 169:22
appropriate [18] 62:18, 62:23, 63:11, 64:9, 68:8, 136:21, 147:3, 147:21, 164:3, 164:15, 178:12, 179:17, 203:9, 214:23, 259:2, 297:14, 336:1, 346:15
approve [2] 178:18, 178:24
approved - 178:14
approximate - 370:10
approximately [3] 28:1, 327:24, 370:9
apps [2] 391:7, 395:17
April - 407:3
areas [3] 40:17, 40:22, 40:25
aren't - 342:1
argue - 171:23
argumentative [2] 258:1, 286:17
arms [2] 353:12, 372:6
arrange [2] 269:8, 407:12
arrangements [4] 111:17, 184:11, 289:2, 363:10
arrested [4] 400:6, 400:12, 400:19, 400:20
arrival [3] 180:14, 267:20, 270:1
arrive [3] 42:14, 328:3, 343:10
arrived [22] 75:12, 81:19, 82:2, 97:11, 101:13, 103:18, 104:9, 104:25, 113:5, 113:13, 190:9, 193:1, 201:15, 205:21, 205:25, 206:1, 267:15, 268:1, 278:6, 311:5, 319:11, 346:5
arrives [3] 192:25, 267:13, 267:24
arriving [3] 98:18, 105:4, 298:6
article [5] 235:6, 397:4, 397:10, 397:15, 398:14
articles [3] 234:25, 397:2, 398:1
aside [2] 62:12, 399:13
asking [47] 10:25, 15:23, 33:25, 37:13, 37:16, 46:16, 46:17, 57:1, 57:2, 57:17, 63:11, 63:24, 80:22, 80:25, 99:25, 100:5, 104:14, 104:17, 105:4, 113:17, 120:21, 170:22, 187:20, 187:22, 195:2, 195:16, 203:11, 237:7, 237:19, 261:19, 288:17, 292:13, 321:5, 322:1, 328:15, 332:8, 332:11, 332:17, 335:9, 339:5, 339:7, 347:9, 347:15, 354:13, 359:23, 373:24, 381:15
asks - 319:1
assess [18] 42:16, 43:3, 57:9, 58:8, 58:24, 59:5, 75:21, 78:11, 126:5, 136:12, 175:18, 244:6, 244:12, 244:17, 274:5, 275:10, 311:24, 321:17
assessed [7] 42:15, 74:25, 75:12, 272:19, 281:21, 281:25, 311:21
assesses - 161:25
assessing [5] 43:18, 56:4, 57:20, 120:15, 333:22
assessment [36] 42:10, 43:2, 87:25, 88:21, 113:8, 114:14, 114:14, 115:23, 116:6, 131:20, 141:7, 141:11, 144:13, 147:14, 147:14, 155:13, 155:14, 159:23, 164:8, 176:1, 177:3, 177:23, 178:8, 179:5, 185:2, 185:10, 185:13, 185:14, 244:19, 246:19, 250:17, 278:1, 311:4, 369:23, 381:7, 381:8
assigned [6] 26:19, 26:20, 26:22, 182:4, 182:6, 183:19
assignment - 18:9
assignments [3] 25:21, 235:21, 237:1
assist [5] 25:13, 25:19, 25:25, 134:11, 134:19
assistance [2] 144:5, 274:3
assistant [14] 22:14, 22:20, 23:10, 23:12, 23:15, 23:21, 23:23, 24:1, 25:5, 122:14, 207:4, 209:17, 214:25, 232:19
assisting [2] 173:23, 319:23
assists - 131:3
assume [10] 11:15, 16:8, 39:11, 74:21, 108:5, 132:21, 141:10, 266:15, 294:2, 395:20
assumed [4] 120:24, 265:3, 300:1, 334:21
assuming [8] 74:20, 101:13, 105:23, 130:4, 182:16, 266:16, 313:16, 353:2
assumption [2] 163:18, 163:20
assumptions - 163:12
assure [2] 177:14, 318:24
assured - 298:8
assuring - 199:18
attached - 407:11
attempt [3] 366:7, 366:9, 366:11
attempted [2] 110:16, 141:15
attempting [3] 215:11, 215:11, 217:15
attendance - 320:17
attorney [5] 67:16, 188:23, 303:19, 304:2, 341:21
attorney's [2] 304:8, 304:10
attorney-client - 304:15
Atty [4] 4:8, 407:9, 407:23, 407:23
audio [7] 13:9, 336:8, 336:11, 336:15, 336:25, 337:3, 338:22
August [4] 393:10, 393:16, 393:17, 396:19
aunts - 319:3
auto [2] 8:1, 9:13
automatic [3] 61:4, 61:7, 62:4
automatically [5] 57:16, 57:18, 132:19, 132:21, 227:9
autopsy [2] 250:1, 250:2
availability - 31:16
available [2] 4:16, 31:4
average [2] 14:24, 27:23
await - 180:13


## B


babies [6] 142:7, 250:25, 286:12, 313:20, 380:13, 388:3
baby [291] 9:3, 10:6, 10:14, 43:8, 47:13, 48:9, 54:5, 65:20, 65:20, 92:24, 94:1, 109:16, 109:25, 110:7, 110:13, 110:15, 114:13, 114:18, 114:20, 121:21, 121:25, 130:18, 131:10, 132:4, 133:10, 133:13, 134:16, 134:20, 134:22, 137:10, 139:12, 139:19, 143:21, 143:22, 144:4, 161:16, 162:12, 171:17, 175:24, 221:18, 227:10, 242:19, 243:13, 246:6, 246:10, 246:16, 246:23, 247:21, 248:19, 248:21, 249:4, 249:19, 250:17, 251:10, 252:14, 253:5, 253:9, 254:1, 257:5, 264:1, 264:1, 264:7, 265:22, 265:22, 267:1, 267:5, 267:11, 268:9, 268:11, 268:15, 268:21, 269:4, 269:6, 269:11, 269:13, 269:13, 269:20, 269:21, 270:5, 270:9, 270:20, 270:21, 270:25, 271:3, 272:15, 272:20, 272:24, 272:25, 273:25, 276:5, 276:6, 276:14, 277:8, 277:10, 277:13, 277:17, 277:25, 278:1, 278:11, 278:22, 279:1, 279:5, 281:5, 281:22, 282:12, 283:16, 283:22, 284:9, 284:14, 284:14, 284:15, 284:16, 284:19, 284:24, 284:25, 285:5, 286:6, 286:10, 287:3, 287:7, 287:16, 287:19, 288:6, 288:7, 288:10, 288:19, 288:20, 289:3, 289:10, 289:13, 289:14, 289:18, 289:19, 290:9, 290:14, 290:15, 290:25, 291:3, 291:5, 291:9, 291:19, 292:1, 292:4, 292:6, 292:14, 292:16, 292:17, 295:5, 295:19, 298:6, 298:11, 298:12, 298:13, 298:14, 298:16, 298:24, 298:25,

299:1, 299:11, 299:12, 299:14, 299:18, 299:20, 299:24, 300:23, 301:16, 302:5, 302:20, 302:21, 303:8, 303:9, 303:11, 303:13, 303:16, 303:20, 304:3, 304:20, 305:1, 305:11, 305:22, 307:9, 309:8, 309:11, 310:12, 314:9, 322:22, 322:25, 323:6, 323:8, 325:5, 328:4, 328:6, 328:17, 328:18, 328:19, 328:21, 328:23, 331:8, 334:24, 338:7, 339:15, 340:4, 345:14, 345:24, 346:9, 349:18, 349:24, 350:16, 350:20, 350:24, 351:16, 351:20, 352:9, 352:12, 352:13, 352:20, 352:22, 353:11, 353:12, 353:15, 353:18, 354:7, 357:18, 357:20, 358:3, 361:23, 361:24, 363:20, 363:20, 363:21, 366:19, 366:23, 367:1, 367:4, 368:5, 368:9, 368:19, 369:2, 369:9, 369:18, 371:21, 372:5, 372:9, 373:12, 373:12, 375:13, 375:19, 376:8, 376:8, 377:4, 377:7, 377:11, 377:17, 378:9, 378:12, 378:15, 378:17, 378:20, 382:13, 382:16, 382:18, 382:25, 383:9, 383:9, 383:12, 383:15, 383:24, 384:3, 384:11, 384:14, 384:18, 384:21, 384:22, 384:24, 385:2, 385:5, 386:3, 386:5, 386:13, 386:16, 387:6, 387:14, 387:15, 387:23, 388:2, 388:4, 388:8, 388:9, 388:14, 388:24, 401:19
baby's [9] 118:1, 248:24, 251:10, 269:3, 271:10, 276:18, 278:10, 333:5, 385:1
bachelor - 16:15
backdoor [5] 39:2, 39:5, 188:14, 188:25, 189:5
background [2] 12:16, 16:7
backup - 392:25
backyard [3] 268:9, 388:17, 388:20
bad [4] 50:14, 314:8, 346:6, 378:14
bags - 360:14
balled [2] 371:2, 371:3
base [2] 247:1, 352:15
basically - 349:5
basics - 10:20
basing [6] 162:10, 163:21, 241:24, 252:12, 255:25, 387:16
Bates - 238:21
bathing - 52:22
bathroom [18] 349:11, 349:12, 349:15, 350:15, 350:17, 362:11, 365:20, 365:25, 366:7, 366:8, 366:10, 366:20, 383:10, 384:15, 384:16, 384:23, 385:3, 385:9
Beaver [5] 19:10, 19:17, 19:18, 19:22, 20:9
became [4] 19:12, 22:7, 22:20, 224:19
become [9] 22:5, 22:18, 22:24, 122:25, 140:6, 164:14, 215:9, 215:18, 302:24
becomes [3] 133:4, 133:5, 164:4
becoming [2] 22:25, 128:1
bed [3] 248:12, 316:23, 317:6
bedside [6] 13:10, 47:4, 47:9, 307:2, 307:5, 374:7
begging - 162:11
begin - 200:14
beginning [6] 26:4, 234:12, 252:12, 307:1, 308:18, 344:3
Behalf [3] 2:5, 2:15, 3:5
behavior [3] 194:14, 214:22, 224:13
behind [3] 350:7, 351:24, 397:22
belief [14] 93:18, 127:4, 129:6, 200:20, 208:3, 210:2, 212:18, 241:3, 247:1, 291:23, 298:21, 325:1, 342:14, 363:24
beliefs [7] 30:5, 30:7, 30:9, 38:4, 44:7, 44:15, 183:3
believed [6] 91:12, 145:18, 188:11, 242:6, 325:6, 363:23
believes [2] 257:14, 384:5
believing - 105:1
belligerent - 167:5
beneficial - 322:13
benefits [2] 20:23, 21:1
beside [2] 350:5, 350:5
besides - 391:5
best [19] 42:4, 44:14, 44:18, 44:19, 44:19, 44:21, 120:8, 221:18, 232:15, 248:22, 250:23, 301:16, 334:6, 340:19, 342:22, 354:2, 355:1, 362:16, 402:19
betamethasone - 131:2
better [13] 139:16, 159:8, 191:23, 210:1, 210:2, 232:16, 232:20, 257:22, 258:2, 267:4, 268:18, 322:3, 357:9
beyond - 196:9
bias [11] 212:13, 212:13, 212:16, 219:16, 219:17, 219:20, 219:22, 220:12, 220:16, 221:5, 231:25
bigger [2] 305:3, 372:12
bill - 293:24
biohazard - 313:1
biohazards [2] 325:11, 325:16
birth [31] 9:3, 47:3, 47:9, 48:9, 56:12, 56:13, 56:15, 57:13, 79:12, 79:24, 80:12, 80:19, 81:4, 132:9, 134:10, 140:11, 198:7, 247:13, 247:16, 286:21, 307:11, 308:9, 309:15, 313:16, 313:22, 313:23, 314:1, 314:2, 314:16, 354:7, 382:13
bit [15] 12:18, 16:7, 35:7, 89:23, 125:9, 129:15, 131:7, 155:15, 205:3, 215:16, 266:25, 312:14, 325:21, 341:2, 345:6
blank - 387:23
bleed [2] 251:24, 251:25
bleeding [57] 36:22, 43:3, 56:2, 71:17, 72:10, 82:3, 82:5, 83:13, 90:1, 92:25, 93:2, 95:17, 95:20, 95:22, 96:2, 96:10, 96:12, 98:10, 124:13, 124:16, 124:19, 124:21, 124:22, 125:3, 125:6, 125:10, 125:11, 125:12, 125:14, 144:9, 144:12, 144:13, 144:15, 144:15, 144:16, 173:20, 242:5, 242:10, 242:22, 251:14, 251:23, 258:13, 264:6, 264:8, 264:19, 275:8, 275:11, 281:21, 311:5, 311:9, 311:22, 311:24, 312:2, 321:16, 321:17, 328:9, 347:12
blindly [2] 221:22, 222:6
blob [4] 353:10, 353:17, 354:8, 354:19
blood [24] 58:15, 58:19, 58:25, 59:5, 90:6, 102:5, 102:6, 147:21, 175:21, 228:24, 245:7, 310:21, 310:23, 311:3, 311:7, 311:13, 311:18, 311:19, 312:3, 313:9, 316:17, 363:22, 368:10, 377:5
board [2] 107:23, 222:15
Boardman [6] 80:2, 80:5, 80:8, 152:9, 152:10, 152:13
Boardman-canfiel - 407:1
bod - 144:2
body [4] 144:2, 144:3, 243:8, 245:3
bombarding - 365:5
Bon [4] 1:9, 2:15, 65:22, 407:8
bored [2] 348:19, 348:22
born [17] 47:13, 109:16, 110:7, 114:18, 114:20, 121:24, 133:10, 134:16, 134:20, 134:22, 135:1, 141:5, 247:18, 268:24, 278:2, 356:18, 371:3
bother [2] 232:20, 335:24
bothered [5] 156:5, 158:17, 217:12, 219:7, 219:9
bottom [6] 262:25, 325:23, 347:20, 378:8, 382:6, 387:22
bowel - 368:13
box - 53:15
Brady - 2:10
brady@loevy.com - 2:12
break [15] 11:19, 11:21, 32:11, 75:6, 146:14, 150:7, 150:7, 150:9, 150:11, 150:15, 215:16, 232:4, 238:5, 341:21, 345:4
breaks - 73:24
breath - 134:18
breathe - 399:10
brewing - 228:4
bridge - 232:18
brief [3] 211:16, 279:22, 319:3
briefly [4] 67:17, 67:19, 86:8, 225:1
bring [26] 47:4, 159:12, 169:24, 235:10, 264:15, 267:1, 267:6, 268:18, 268:21, 269:4, 272:24, 277:10, 289:17, 289:19, 292:16, 297:7, 298:9, 298:11, 300:13, 300:23, 305:11, 307:10, 312:10, 360:13, 360:14, 360:15
bringing [4] 207:21, 208:4, 212:21, 305:20
brings - 277:8
Brittany [214] 1:6, 7:17, 12:12, 12:16, 62:12, 64:19, 64:20, 66:8, 66:11, 81:22, 82:1, 91:5, 92:20, 94:8, 94:12, 94:23, 96:24, 98:4, 107:7, 109:4, 113:13, 114:13, 131:7, 132:4, 137:21, 143:23, 147:13, 148:7,

150:19, 155:21, 157:25, 162:15, 163:2, 163:19, 164:25, 168:15, 171:22, 174:19, 175:15, 179:14, 184:1, 187:5, 187:20, 189:9, 189:17, 190:9, 190:15, 190:16, 190:17, 192:15, 193:15, 194:1, 194:20, 194:22, 194:24, 195:13, 200:5, 200:12, 201:14, 204:12, 205:21, 206:19, 208:7, 208:16, 208:20, 213:14, 214:7, 214:11, 214:13, 214:18, 220:3, 224:16, 224:22, 225:14, 233:5, 233:8, 233:10, 233:14, 233:17, 233:22, 234:10, 234:14, 235:25, 236:9, 237:6, 237:11, 237:12, 237:13, 237:22, 237:24, 240:3, 246:15, 247:13, 247:21, 249:3, 249:19, 250:17, 252:25, 253:14, 257:9, 259:2, 259:5, 261:8, 261:11, 263:22, 263:23, 264:10, 265:5, 265:19, 265:24, 267:15, 267:24, 268:8, 270:11, 272:10, 274:10, 274:12, 274:14, 274:19, 274:24, 276:1, 276:5, 276:23, 278:5, 279:9, 280:4, 281:3, 281:16, 282:7, 284:14, 286:21, 289:17, 291:25, 292:1, 294:14, 302:2, 302:11, 302:12, 305:20, 309:9, 314:23, 315:4, 315:22, 316:20, 317:13, 318:11, 318:15, 318:18, 319:19, 322:3, 322:21, 323:8, 327:23, 329:17, 329:21, 331:13, 332:22, 334:17, 335:2, 339:15, 339:18, 339:21, 341:16, 342:10, 342:17, 343:16, 343:20, 345:10, 347:23, 349:2, 352:6, 352:21, 353:3, 353:11, 353:15, 353:16, 354:1, 354:4, 355:4, 355:18, 356:3, 356:9, 356:14, 356:23, 357:14, 361:18, 362:11, 365:1, 374:24, 375:5, 375:11, 375:18, 376:4, 376:10, 377:1, 378:8, 378:15, 379:6, 380:14, 382:7, 384:1, 385:18, 386:15, 388:9, 393:12, 393:22, 393:25, 395:21, 397:17, 397:21, 398:20, 399:12, 400:6, 402:8

Brittany's [23] 228:9, 259:13, 259:13, 265:15, 291:3, 294:23, 301:25, 316:10, 316:13, 318:10, 319:12, 324:16, 324:19, 327:8, 330:16, 338:8, 339:9, 340:22, 346:15, 365:11, 369:14, 369:16, 390:7

Broad [6] 42:12, 43:23, 49:20, 50:11, 164:17, 175:10

broke [11] 57:12, 73:17, 75:3, 75:13, 75:16, 102:18, 146:4, 146:7, 146:9, 153:23, 377:3

broken [2] 57:19, 73:19

Brooke [2] 85:11, 85:12

brother [2] 283:20, 283:25

brought [18] 150:18, 151:16, 151:16, 153:9, 195:9, 212:25, 225:19, 276:23, 287:3, 291:4, 300:1, 305:22, 309:11, 317:18, 318:14, 362:3, 390:8, 390:12

bucket [71] 267:3, 267:11, 268:9, 268:12, 268:17, 269:3, 271:1, 272:21, 276:18, 277:13, 281:23, 282:12, 283:17, 283:20, 284:10, 284:13, 284:17, 284:20, 284:24, 284:25, 286:7, 292:15, 295:20, 296:2, 296:6, 297:10, 299:20, 299:24, 299:25, 300:4, 302:20, 302:21, 303:10, 303:11, 304:21, 304:25, 305:6, 310:9, 329:5, 333:6, 350:6, 350:9, 350:18, 366:20, 366:25, 367:1, 367:5, 367:6, 367:10, 367:15, 367:16, 377:12, 377:15, 377:18, 377:19, 377:20, 382:19, 382:22, 382:24, 382:25, 383:1, 383:2, 383:2, 383:6, 383:9, 383:12, 383:14, 383:23, 384:2, 385:4, 388:19

bulging - 120:5

burden - 305:1

burial [17] 111:1, 111:2, 111:14, 111:16, 112:15, 267:10, 269:7, 285:25, 286:3, 286:4, 287:23, 297:8, 361:14, 361:16, 363:8, 376:17, 376:20

busier - 236:24

busy - 26:2

butter [2] 370:18, 370:19

## C

C-O-N-N-I-E - 7:14

C-O-R-E - 374:8

C-section - 83:12

cabinet [4] 167:20, 384:12, 384:15, 384:17

cake - 162:12

calling [12] 202:25, 203:23, 204:11, 296:10, 305:14, 323:21, 328:14, 339:10, 374:14, 374:15, 374:15, 392:15

calm [4] 180:19, 215:11, 217:15, 331:19

calmed [3] 217:17, 217:19, 218:16

cameras - 312:24

can't [55] 46:4, 64:13, 68:6, 79:13, 80:20, 87:7, 103:16, 112:21, 128:13, 130:7, 130:10, 144:18, 172:3, 174:12, 180:16, 183:18, 185:18, 185:22, 222:15, 240:23, 245:13, 252:23, 256:23, 267:10, 268:20, 268:24, 270:6, 270:19, 271:1, 287:24, 291:3, 295:10, 297:8, 298:23, 301:9, 318:21, 318:24, 323:3, 331:21, 334:7, 334:23, 338:7, 351:15, 362:4, 364:24, 365:2, 365:3, 365:13, 374:17, 377:2, 377:2, 381:14, 384:14, 384:18, 401:22

cannot [22] 17:13, 17:16, 17:18, 36:10, 40:13, 67:2, 77:21, 87:9, 123:19, 123:23, 172:12, 219:25, 237:10, 240:16, 270:18, 299:11, 302:25, 337:20, 337:21, 338:1, 384:21, 386:2

cans - 364:8

care [141] 9:20, 17:11, 17:16, 18:25, 25:22, 25:23, 26:16, 26:19, 26:22, 27:15, 27:22, 27:25, 28:2, 28:11, 30:21, 31:1, 31:15, 36:23, 40:12, 45:21, 49:5, 49:18, 49:24, 51:17, 51:24, 52:1, 52:4, 52:6, 52:17, 52:18, 52:20, 52:22, 53:2, 61:16, 61:22, 61:25, 63:3, 64:5, 66:23, 78:9, 79:15, 79:17, 79:19, 79:23, 80:5, 80:7, 82:14, 82:16, 86:9, 92:2, 92:9, 97:5, 97:8, 101:9, 101:12, 101:15, 101:20, 101:21, 102:1, 102:23, 103:6, 106:25, 107:10, 113:21, 114:16, 121:23, 122:3, 129:8, 133:13, 134:8, 134:11, 134:13, 134:14, 139:3, 147:24, 152:9, 156:23, 157:1, 157:3, 157:22, 158:14, 158:15, 158:17, 158:21, 159:24, 161:14, 162:17, 164:7, 164:9, 164:23, 164:23, 164:25, 165:25, 166:13, 166:17, 180:11, 182:16, 183:24, 184:1, 184:6, 191:21, 191:21, 196:7, 199:8, 211:23, 223:3, 224:1, 224:6, 224:13, 224:23, 228:21, 231:22, 237:17, 237:19, 245:16, 246:6, 246:6, 247:2, 248:13, 250:23, 251:2, 253:7, 274:25, 292:16, 310:24, 311:12, 313:4, 314:14, 314:22, 315:21, 318:25, 319:4, 333:9, 333:14, 333:17, 333:22, 334:1, 335:2, 338:9, 338:13, 354:2

cared [8] 79:21, 106:8, 130:19, 199:18, 258:9, 311:1, 353:9, 354:1

career [4] 34:4, 45:24, 46:4, 78:8

careful [4] 234:19, 234:19, 399:5, 399:9

caregiver - 346:15

cares - 353:25

caring [9] 45:4, 98:4, 152:13, 248:11, 272:18, 276:13, 282:24, 344:25, 345:19

Carney [36] 3:5, 3:12, 67:13, 319:11, 320:19, 321:2, 323:17, 326:13, 326:18, 327:8, 327:24, 329:20, 330:12, 331:15, 340:23, 341:16, 342:11, 343:9, 343:21, 347:9, 349:2, 351:6, 364:18, 364:24, 365:2, 376:7, 376:13, 376:21, 377:6, 377:17, 379:4, 379:7, 379:19, 381:7, 386:4, 386:23

Carrino [7] 2:16, 67:12, 85:22, 307:6, 307:20, 324:21, 373:25

Carrino's - 307:1

carry - 132:20

case [57] 7:17, 8:16, 8:21, 9:2, 9:9, 9:18, 9:19, 9:25, 10:5, 10:17, 12:11, 13:16, 48:21, 48:23, 48:25, 49:3, 50:20,

58:11, 61:13, 62:12, 64:19, 65:18, 66:9, 66:11, 69:20, 74:9, 78:23, 78:24, 79:3, 122:6, 122:25, 128:6, 137:8, 147:8, 150:19, 152:15, 153:16, 179:7, 227:4, 228:3, 228:6, 228:18, 248:1, 251:3, 256:15, 256:16, 278:25, 288:25, 317:12, 317:12, 320:12, 349:19, 374:12, 374:16, 396:25, 400:9, 404:9
cases [16] 52:12, 53:6, 57:3, 76:24, 77:5, 79:9, 79:10, 80:20, 80:22, 114:11, 131:5, 149:10, 190:14, 247:7, 335:21, 374:12
category - 147:25
cath [3] 251:15, 252:5, 252:5
Catholic [15] 29:6, 29:10, 29:14, 29:20, 29:24, 30:5, 30:7, 30:9, 30:11, 30:17, 30:24, 38:24, 227:11, 252:6, 252:11
cause [8] 1:17, 54:5, 73:20, 122:5, 122:7, 140:4, 202:5, 250:5
caused [3] 122:9, 215:18, 278:3
Causing - 215:9
cc - 407:23
cell [11] 58:15, 58:19, 58:25, 59:5, 175:21, 228:9, 228:24, 245:7, 256:7, 390:24, 391:1
census - 95:4
Center [4] 19:10, 19:23, 20:25, 21:13
cert - 337:21
certain [13] 68:23, 172:19, 177:8, 200:11, 278:24, 337:25, 338:2, 338:4, 338:5, 338:6, 353:25, 385:21, 396:7
certainly - 337:19
certificate [3] 404:4, 405:1, 407:11
certifications - 25:16
certify - 404:7
cervical [3] 240:9, 240:16, 241:18
cervix [14] 118:4, 119:13, 127:8, 127:16, 127:18, 127:19, 127:21, 127:22, 128:8, 128:10, 129:14, 145:18, 197:6, 312:23
cesarean [4] 82:20, 83:6, 83:19, 84:1
cetera [2] 312:23, 312:23
chain [2] 180:20, 288:23
chance [13] 76:16, 136:22, 154:13, 251:11, 256:25, 257:1, 367:17, 377:13, 386:13, 386:24, 387:6, 387:8, 387:12
change [20] 91:23, 122:3, 136:8, 172:3, 174:14, 177:9, 177:9, 177:16, 180:10, 182:4, 218:1, 219:2, 219:6, 231:24, 252:25, 276:11, 314:9, 340:12, 388:23, 406:7
changed [2] 96:6, 158:20
changes [3] 30:22, 405:5, 406:5
changing [4] 26:24, 27:10, 27:11, 182:5
chaplains - 215:15
charge [14] 18:8, 25:21, 82:13, 164:24, 259:25, 277:8, 277:9, 293:21, 294:5, 294:5, 294:9, 305:18, 392:7, 402:1
charged [13] 276:22, 277:1, 293:1, 305:8, 305:14, 305:17, 401:5, 401:11, 401:18, 402:9, 402:24, 402:25, 403:1
charges [14] 25:10, 25:10, 25:12, 276:22, 293:14, 293:20, 294:1, 400:13, 400:17, 400:22, 401:23, 402:3, 402:6, 402:17
chart [12] 13:15, 25:11, 74:24, 169:25, 186:20, 219:4, 230:16, 239:11, 262:2, 265:15, 380:24, 398:12
check [34] 97:11, 98:2, 201:25, 202:14, 202:18, 202:21, 202:22, 203:2, 203:7, 203:9, 203:12, 204:14, 204:19, 205:14, 275:10, 278:16, 279:5, 279:8, 289:10, 290:1, 293:10, 296:12, 296:15, 296:16, 296:22, 296:23, 297:3, 297:12, 297:13, 298:25, 300:22, 301:2, 301:8, 380:24
checked - 347:10
chest [4] 344:1, 344:8, 344:20, 345:7
Chicago [2] 2:7, 2:11
child [5] 78:16, 269:14, 271:1, 303:14, 354:16
Children's - 134:7
choice [8] 139:8, 139:10, 139:20, 143:13, 252:18, 255:23, 340:7, 402:4
choose [11] 28:17, 111:16, 161:14, 161:21, 162:11, 162:16, 174:1, 269:8, 351:22, 361:19, 395:1
chooses [3] 40:4, 40:5, 286:1
chorioamnionitis [2] 57:13, 57:22
chose [7] 83:16, 100:24, 159:8, 161:13, 286:23, 340:3, 351:21
chosen [3] 184:18, 241:15, 287:1
Chris - 24:16
chucked [2] 382:19, 382:22
chuckled [2] 350:10, 382:21
chuckling - 382:20
circumstances [9] 52:1, 60:22, 99:18, 149:2, 149:20, 226:8, 256:5, 256:13, 381:20
City [13] 3:5, 278:17, 279:6, 289:11, 289:16, 291:6, 293:11, 296:13, 296:23, 299:2, 300:24, 320:10, 320:15
Civil [3] 1:4, 1:16, 407:16
claim [2] 9:6, 10:17
clarifica - 353:24
clarification - 356:4
clarifying - 186:22
clarity - 8:14
clause - 65:22
clean [4] 15:23, 394:13, 395:3, 396:10
cleaned [2] 362:15, 383:2
clear [27] 11:4, 11:5, 31:12, 37:13, 66:20, 79:8, 80:24, 80:25, 92:21, 110:14, 132:3, 184:19, 187:16, 218:22, 284:19, 284:21, 284:22, 291:1, 293:20, 296:15, 316:3, 318:16, 346:11, 363:12, 364:16, 397:16, 402:21
clearly [8] 109:22, 123:7, 237:17, 290:13, 317:5, 339:4, 363:1, 370:23
Cleveland - 3:8
clinical [5] 227:15, 243:11, 244:15, 258:8, 258:15
clinically [2] 228:6, 243:24
close [12] 84:9, 84:12, 84:14, 84:15, 84:17, 84:19, 85:12, 85:24, 219:11, 272:16, 295:16, 387:20
closed - 323:23
closely - 152:7
closer [3] 19:11, 127:22, 309:4
closing - 21:19
clot [3] 354:8, 363:22, 368:24
Cloud - 393:2
Co [3] 2:18, 3:7, 407:5
colleague [3] 82:10, 111:4, 158:23
colleagues [3] 84:10, 391:23, 392:4
collect [2] 290:6, 290:8
college - 16:10
color - 364:15
Columbus - 374:8
comes [20] 26:1, 42:16, 54:18, 63:3, 71:15, 105:7, 122:17, 191:17, 219:17, 236:15, 278:11, 288:7, 288:19, 297:10, 332:10, 333:19, 361:23, 365:17, 374:14, 382:12
comfort [3] 133:13, 134:13, 137:6
comfortable [17] 46:10, 166:5, 180:17, 180:19, 182:2, 182:6, 182:22, 183:1, 183:4, 184:3, 184:20, 211:22, 211:22, 215:24, 229:15, 321:18, 321:18
coming [17] 70:9, 70:15, 75:11, 81:12, 95:3, 98:1, 118:2, 173:22, 184:9, 207:9, 215:23, 258:19, 269:25, 278:10, 279:15, 318:16, 318:21
command [2] 180:20, 288:23
comments - 194:9
Commission - 405:21
committee [9] 42:1, 169:13, 169:23, 173:5, 173:7, 176:22, 176:25, 180:25, 215:14
committee's - 184:23
common [3] 90:19, 90:22, 242:16
commonly [2] 54:11, 391:22
communicate [9] 43:4, 94:5, 94:11, 391:13, 391:22, 392:3, 392:5, 392:6, 392:13
communicated - 220:24
communicating [2] 149:17, 342:10
communication [2] 109:3, 189:13
communications [4] 392:10, 392:11, 398:18, 398:20
community [4] 18:19, 20:15, 28:22, 33:22
community-friend - 28:20
compare [5]

58:25, 116:13, 117:3, 117:6, 117:23
comparison [2] 117:15, 117:16
compassionate [3] 53:7, 277:16, 353:8
competitive - 23:8
complete [8] 33:10, 59:13, 71:21, 77:13, 77:25, 195:4, 247:10, 404:8
completed [3] 16:8, 405:3, 405:13
completely [7] 78:22, 91:20, 227:18, 242:8, 242:15, 372:11, 375:9
complications [3] 134:10, 153:5, 153:21
comport [3] 87:12, 320:21, 348:16
comprehended - 353:3
computer [4] 60:15, 60:16, 213:3, 221:1
computer-assiste - 4:14
con - 212:17
concedes [2] 349:17, 349:19
conception [2] 34:24, 307:7
concern [18] 104:14, 148:9, 197:22, 198:3, 198:3, 211:7, 211:9, 212:14, 214:11, 225:18, 229:7, 236:13, 264:19, 278:3, 311:7, 328:11, 361:24, 362:22
concerned [24] 57:8, 95:12, 95:14, 95:18, 170:23, 188:25, 191:12, 192:19, 193:9, 203:6, 203:13, 210:7, 222:17, 236:8, 266:12, 278:3, 312:25, 360:10, 360:12, 360:24, 361:4, 361:5, 382:7, 399:23
concerning [4] 212:8, 212:10, 281:5, 320:9
concerns [8] 12:12, 55:17, 194:13, 214:7, 214:11, 220:23, 222:25, 225:6
concise - 339:13
conclude [4] 124:9, 128:12, 145:24, 373:9
concluded [7] 118:11, 125:16, 128:9, 128:17, 179:4, 257:19, 403:11
conclusion [2] 128:13, 180:25
concurred - 178:25
condition [6] 71:19, 176:20, 275:13, 302:13, 317:8, 381:9
conditions [3] 11:25, 74:4, 74:19
conducted [4] 117:14, 202:18, 250:3, 341:15
confidence - 158:18
confident [2] 161:13, 355:18
confidently - 220:24
confirm - 337:23
conflict - 358:6
conflicting - 296:7
confrontational - 228:25
confronted - 378:8
confused [10] 126:9, 128:13, 129:1, 195:13, 195:15, 283:8, 284:6, 284:7, 349:25, 350:22
confusing - 350:19
confusion [5] 129:4, 285:2, 285:3, 285:3, 285:4
Connecticut - 394:11
connection [2] 9:13, 305:12
Connie [12] 1:9, 2:16, 7:2, 7:14, 214:21, 215:4, 222:23, 405:4, 405:9, 406:3, 406:24, 407:11
consent [10] 61:15, 61:24, 62:15, 64:5, 64:7, 66:23, 312:22, 330:17, 346:16, 349:4
consequences [2] 315:5, 315:6
consider [9] 57:19, 102:23, 203:11, 204:14, 222:21, 242:1, 260:2, 335:9, 389:25
consideration - 407:17
considerations - 30:23
consistent - 308:22
consisting - 404:7
consists - 53:4
constitute [3] 99:10, 99:14, 100:9
constituted - 99:6
constitutes - 40:1
consult [33] 42:1, 42:8, 42:8, 62:6, 62:9, 62:17, 64:21, 110:18, 149:21, 150:18, 151:5, 151:13, 151:16, 151:23, 151:24, 153:9, 167:24, 169:2, 170:12, 178:10, 179:7, 179:8, 179:19, 186:23, 225:11, 225:15, 225:17, 226:24, 227:5, 228:23, 239:12, 324:15, 324:18
consultation [9] 170:4, 178:3, 178:7, 179:4, 179:16, 182:10, 186:9, 186:15, 186:18
consultations - 177:20
consulted [12] 52:25, 126:12, 151:2, 151:4, 152:14, 153:15, 153:24, 173:1, 178:2, 226:8, 290:19, 376:22
consulting [2] 155:22, 163:7
consults - 324:9
contact [3] 289:3, 289:7, 394:10
contacted - 113:11
contacting [4] 65:20, 65:23, 172:6, 260:2
contacts - 395:17
contained - 174:15
containers - 360:14
contemplated - 276:24
content - 12:24
contents - 52:11
context [2] 116:1, 347:17
continue [8] 76:19, 77:21, 77:24, 93:19, 93:22, 130:5, 132:9, 154:11
continued [2] 79:11, 396:20
contracting - 175:25
contractions [4] 197:4, 313:23, 325:25, 326:9
Contradictory - 377:10
contraindicated [2] 47:3, 47:7
contrary - 125:17
control - 219:15
conversation [32] 15:21, 126:23, 157:15, 163:3, 167:17, 182:8, 182:11, 182:19, 193:1, 205:25, 214:11, 214:13, 214:21, 220:4, 220:11, 224:21, 228:15, 228:19, 229:25, 232:7, 237:24, 237:25, 261:7, 261:7, 290:24, 293:7, 293:9, 298:23, 307:25, 327:25, 330:13, 394:11
conversations [5] 12:20, 12:22, 12:24, 207:6, 230:7
convey [3] 181:18, 181:21, 181:24
conviction [3] 207:22, 220:1, 220:9
convictions [2] 220:14, 231:21
convinced - 147:2
cooling - 52:23
cooperate - 302:24
cooperative - 320:18
cord [6] 264:22, 266:15, 273:24, 273:24, 282:4, 328:5
CORE [4] 374:8, 374:9, 374:18, 374:24
correct [104] 14:2, 14:5, 17:19, 31:18, 32:6, 32:14, 37:25, 39:17, 48:4, 49:6, 50:1, 50:9, 50:15, 55:12, 55:18, 55:21, 57:25, 59:7, 66:4, 66:13, 66:16, 66:24, 68:25, 69:1, 71:19, 75:20, 76:2, 76:10, 76:20, 77:21, 84:4, 90:10, 99:15, 100:11, 101:1, 101:15, 104:7, 105:22, 106:1, 109:9, 109:10, 110:8, 111:23, 113:6, 124:10, 124:11, 127:6, 132:1, 139:6, 140:25, 142:20, 142:25, 145:20, 150:2, 151:13, 152:23, 159:23, 162:24, 164:25, 165:1, 168:12, 169:11, 177:1, 186:10, 191:11, 197:7, 197:18, 200:4, 202:12, 205:18, 210:12, 212:6, 214:10, 226:17, 229:23, 244:22, 247:24, 253:21, 257:9, 259:24, 263:15, 273:11, 281:15, 291:15, 293:25, 294:7, 295:22, 296:15, 297:14, 301:12, 302:9, 312:11, 346:4, 348:24, 356:2, 363:24, 368:2, 368:6, 379:25, 390:20, 398:6, 399:15, 404:8, 406:5
corrected [2] 214:4, 321:15
correcting - 210:15
correction [3] 207:16, 406:7, 407:11
corrections - 405:6
correctly [4] 25:12, 64:17, 177:15, 207:25
correlates - 124:15
cost - 363:11
cot - 52:23
couch [2] 146:5, 354:4
couldn't [8] 165:2, 172:3, 216:14, 291:19, 319:7, 356:16, 380:15, 385:5
counsel [8] 1:16, 2:3, 3:3, 4:6, 4:11, 12:20, 14:10, 16:1
count [17] 58:15, 58:19, 59:1, 59:6, 175:21, 228:9, 228:24, 240:9, 240:15, 241:9, 243:5, 243:23, 245:5, 245:7, 256:7, 311:19, 362:4
counted - 349:24
counts - 243:7
couple [8] 9:10, 63:10, 69:11, 96:13, 228:14, 260:14, 261:3, 303:4
course [2] 147:3, 275:6
court [11] 1:1,

1:18, 2:18, 4:9, 9:23, 10:23, 15:21, 188:24, 402:13, 402:14, 407:6
cover - 341:3
covered - 25:8
coworker - 86:3
cramping - 56:2
craze - 397:20
crazy - 397:21
create - 216:16
created - 212:2
creates - 41:9
credible - 352:7
cremation [9] 111:10, 111:12, 111:15, 112:15, 267:10, 269:7, 286:1, 287:24, 376:18
crime [5] 202:25, 387:23, 401:6, 401:8, 401:11
criminal [4] 293:19, 294:1, 294:5, 400:8
crisis [2] 274:20, 274:23
CROSS [2] 5:3, 7:8
crucial - 175:20
crucially - 170:11
cry [2] 134:17, 137:11
curettage [2] 32:2, 34:25
current [6] 126:10, 176:12, 302:13, 393:8, 394:4, 396:14
currently [5] 27:5, 27:21, 242:5, 243:3, 393:7
custodial - 59:25
custodian - 61:13
cut - 376:11
cutoff - 140:14
cuts - 368:14
Cytotec [11] 196:25, 197:6, 197:9, 197:14, 197:17, 198:6, 254:2, 312:21, 325:24, 325:25, 326:15

**D**

D&C [15] 32:2, 32:5, 32:14, 34:20, 34:22, 34:23, 35:2, 35:7, 35:13, 35:16, 35:18, 35:21, 37:1, 37:7, 380:7
D&Cs - 32:10
D&E [15] 31:9, 31:19, 31:20, 31:21, 32:5, 32:13, 32:22, 33:4, 33:5, 33:20, 34:5, 34:7, 35:7, 35:16, 37:21
D&E's - 32:2
D&Es - 33:24
daily [3] 25:21, 78:10, 400:14
danger [8] 43:20, 43:22, 45:1, 181:3, 191:10, 254:20, 255:20, 257:3
dangerous [4] 10:13, 71:18, 93:23, 144:19
dare - 171:24
data - 394:24
date [5] 25:16, 230:23, 405:9, 405:19, 406:24
dates - 213:13
daughter [2] 61:14, 394:10
day's [2] 28:4, 241:25
dba - 2:15
de - 78:22
dead [12] 114:25, 115:5, 115:9, 270:19, 297:9, 301:5, 329:3, 371:8, 371:8, 371:22, 385:21, 387:14
deal - 314:2
dealing [2] 55:16, 365:3
dealt [2] 302:13, 340:18
Deanna [7] 168:11, 169:24, 170:9, 170:23, 186:19, 186:25, 187:18
Dear - 407:9
death [19] 111:18, 112:5, 112:8, 162:14, 175:14, 176:5, 242:10, 244:1, 250:6, 251:15, 251:23, 251:24, 251:25, 266:14, 287:17, 288:3, 288:8, 288:14, 288:16
death's [4] 198:6, 253:24, 254:8, 254:9
debate [3] 203:19, 227:13, 227:14
debrief [5] 157:23, 160:24, 161:9, 163:23, 173:12
deceased [8] 297:13, 297:19, 300:20, 300:23, 301:8, 301:9, 301:19, 303:9
deceiving - 86:22
decide [13] 37:12, 43:14, 59:3, 61:9, 77:9, 164:7, 164:9, 166:23, 185:18, 198:13, 240:23, 361:18, 381:21
decided [4] 78:23, 166:9, 180:9, 334:19
decides - 310:14
decision [25] 99:23, 154:16, 154:20, 162:15, 163:24, 170:14, 170:18, 171:21, 171:23, 173:3, 177:5, 177:9, 178:9, 179:23, 182:7, 182:20, 186:6, 193:10, 200:17, 219:1, 221:24, 228:5, 228:6, 335:11, 402:20
decision/treatme - 215:5
decisions [5] 244:19, 387:12, 387:13, 387:14, 387:16
declined [4] 47:4, 315:18, 315:22, 316:4
deed - 405:17
deemed [2] 140:11, 141:3
deep - 329:24
deeply [2] 353:25, 354:1
defend - 160:20
defendant [2] 9:19, 9:24
Defendants [2] 1:10, 2:15
defended - 161:22
defensive - 161:4
definitely [13] 76:6, 79:6, 120:25, 122:19, 204:10, 282:19, 303:8, 334:8, 348:24, 369:15, 371:9, 371:19, 396:3
definition [2] 33:5, 99:15
degree [2] 16:12, 71:23
delay [11] 50:1, 50:8, 50:14, 90:15, 143:2, 143:5, 143:7, 143:8, 184:18, 194:12, 200:1
delayed [2] 225:5, 225:17
delete [15] 393:22, 393:25, 394:16, 394:17, 395:24, 396:2, 396:7, 396:8, 396:9, 396:10, 396:13, 396:13, 396:13, 396:20, 396:23
deleted [3] 395:3, 396:24, 397:3
deleting - 395:4
deletion - 396:1
deliver [38] 83:14, 110:18, 124:23, 128:7, 131:1, 131:10, 136:5, 142:18, 142:24, 143:6, 143:24, 144:3, 144:4, 153:25, 191:1, 204:22, 227:9, 228:7, 236:12, 242:10, 245:16, 245:19, 248:3, 248:11, 248:14, 248:19, 253:5, 253:25, 264:7, 264:7, 326:2, 326:10, 326:24, 350:24, 351:16, 354:20, 368:19, 370:23
delivered [32] 48:8, 78:13, 236:9, 249:10, 249:11, 249:14, 249:25, 254:2, 262:3, 263:25, 264:24, 265:5, 269:12, 269:23, 270:17, 276:5, 277:25, 279:13, 281:4, 286:13, 287:24, 315:4, 326:16, 328:5, 351:23, 369:5, 369:10, 371:7, 371:8, 371:12, 379:9, 389:12
deliveries [4] 80:1, 134:9, 138:21, 370:2
delivering [4] 243:13, 244:2, 248:1, 261:20
deliverly - 225:16
delivery [44] 19:9, 19:13, 19:25, 20:16, 20:19, 20:25, 21:15, 23:14, 25:5, 25:11, 26:4, 38:11, 38:14, 38:18, 43:5, 43:7, 43:8, 43:9, 63:14, 70:22, 72:3, 77:10, 78:9, 81:20, 82:19, 84:2, 123:16, 125:4, 127:22, 134:8, 141:2, 143:2, 143:5, 143:7, 147:8, 153:13, 153:18, 153:20, 247:6, 247:9, 267:7, 347:25, 354:15, 362:7
demeanor - 107:8
demise [20] 51:17, 51:24, 52:12, 54:22, 55:16, 55:24, 56:14, 56:15, 56:18, 56:19, 56:24, 57:2, 58:7, 86:9, 133:8, 250:6, 251:1, 267:7, 268:19, 315:24
demises - 371:12
denied [3] 281:24, 291:14, 357:20
denies - 299:13
Denise - 84:23
department [3] 31:8, 112:3, 287:17
depend [5] 50:4, 50:7, 50:12, 56:22, 77:17
depending - 37:5
depends [9] 10:15, 27:9, 45:18, 56:3, 56:10, 71:20, 86:17, 120:5, 314:11
DEPONENT - 405:3
deposed [2] 9:8, 9:13
deposition [30] 1:7, 1:12, 4:6, 4:11, 4:15, 4:16, 4:18, 7:19, 8:2, 8:18, 10:20, 12:18, 13:2, 67:5, 67:9, 68:9, 73:9, 91:18, 224:25, 260:23, 303:20, 304:4, 352:17, 352:25, 355:22, 355:24, 355:25, 400:25, 403:11, 407:10
depositions [3] 67:18, 67:23, 68:4
DeProfio [4] 1:12, 4:12, 404:14, 407:20
depth - 67:18
describe [11] 84:15, 84:16, 86:1, 86:3, 173:7, 175:15, 199:10, 203:4, 372:21, 373:2, 373:3
described [5] 175:23, 352:20, 364:15, 365:16, 369:1
describes - 354:4
deserved - 402:9
desire [3] 204:4, 251:10, 252:13
desires [2] 97:5, 131:25
desk [5] 26:14, 98:12, 100:17, 206:7, 318:17
despair - 54:11
despite [2]

242:11, 402:23
detach - 326:23
detail [2] 356:17, 369:1
detailed [3] 193:6, 193:7, 210:5
details [4] 10:9, 64:19, 318:22, 354:12
detect [2] 118:17, 124:8
detected - 123:24
detective [40] 3:5, 67:13, 266:24, 308:15, 308:15, 319:11, 320:19, 321:2, 324:9, 324:13, 324:16, 324:19, 326:13, 326:17, 327:7, 327:23, 329:20, 330:12, 331:15, 340:22, 341:15, 342:11, 343:9, 343:21, 347:9, 349:2, 351:6, 364:18, 364:24, 365:2, 376:7, 376:12, 376:21, 377:17, 379:4, 379:6, 379:19, 381:7, 386:4, 386:22
detectives - 363:1
determination [6] 42:17, 89:16, 130:10, 134:25, 164:22, 334:6
determine [21] 43:5, 58:6, 141:9, 144:19, 144:23, 147:12, 147:18, 164:21, 186:20, 240:16, 245:13, 269:20, 270:6, 270:18, 274:6, 282:2, 301:9, 307:8, 331:21, 365:13, 381:14
determined [8] 43:19, 89:4, 89:7, 90:7, 143:15, 180:3, 232:19, 250:6
determines [3] 43:21, 58:2, 158:21
devastating - 54:6
develop [5] 76:20, 78:19, 130:20, 130:21, 132:5
developed [4] 116:2, 372:8, 372:24, 373:1
developing [4] 76:5, 130:5, 141:6, 372:14
development [15] 76:2, 76:7, 76:8, 76:13, 77:1, 77:11, 130:12, 130:18, 130:25, 131:3, 131:4, 134:15, 370:7, 372:21, 373:5
develops [2] 131:2, 373:7
devoted - 28:2
diagnose [3] 17:18, 58:10, 123:3
diagnosed [5] 74:10, 148:13, 257:6, 257:10, 257:12
diagnosing - 17:9
diagnosis [3] 19:1, 125:17, 126:9
die - 250:25
diem - 21:19
difference [5] 246:4, 250:13, 250:15, 250:16, 370:13
differences [3] 17:3, 31:7, 31:15
differentiating [2] 35:15, 35:16
differently [6] 54:17, 54:25, 114:22, 211:3, 232:1, 354:17
differs - 31:17
difficult [15] 15:24, 86:12, 86:20, 87:18, 120:8, 171:25, 215:10, 217:15, 219:13, 274:3, 274:7, 274:8, 274:10, 274:11, 274:13
dignity [7] 268:20, 329:4, 360:11, 360:24, 361:4, 361:5, 361:12
dilatation [2] 240:16, 241:18
dilate - 128:5
dilated [12] 127:10, 127:15, 127:16, 127:20, 128:2, 128:6, 128:11, 128:17, 129:7, 145:4, 145:11, 145:19
dilating - 128:3
dilation [8] 31:21, 32:2, 32:3, 32:22, 127:13, 146:15, 240:9, 241:17
dilemma [5] 118:5, 118:9, 126:9, 127:2, 132:22
dinner [2] 85:4, 85:13
direct [20] 17:16, 26:16, 26:19, 26:22, 27:14, 27:22, 28:2, 113:21, 126:1, 136:18, 138:7, 138:13, 138:15, 285:6, 285:8, 285:10, 285:12, 344:14, 350:20, 363:9
directed [3] 53:10, 207:1, 333:1
directing [3] 17:11, 82:16, 137:6
direction [7] 177:18, 209:16, 209:21, 217:13, 278:14, 287:20, 301:21
directive [7] 51:16, 167:1, 290:23, 291:2, 291:5, 291:18, 296:11
directives [2] 30:6, 60:10
directly [15] 66:3, 103:9, 105:12, 105:14, 107:1, 126:25, 149:21, 159:9, 160:21, 168:4, 168:5, 173:11, 173:24, 204:12, 392:14
director [8] 23:17, 26:24, 168:3, 168:9, 171:9, 174:2, 177:8, 299:6
dirty - 33:16
dis - 206:20
disagree [14] 44:2, 45:1, 45:8, 49:5, 219:19, 219:21, 223:17, 240:12, 241:11, 242:13, 243:15, 245:2, 245:4, 254:13
disagreed [12] 46:1, 46:10, 48:16, 49:9, 177:24, 178:8, 179:5, 180:24, 181:6, 181:8, 182:19, 221:12
disagreeing - 245:7
disagreement - 179:8
disapproval - 329:17
disapprove - 178:18
disbelieve - 368:17
disbelieved [2] 368:15, 368:16
discharge [2] 52:3, 381:20
discharged [2] 381:4, 381:14
disclose - 332:22
discomfort - 140:4
discrepancy [3] 105:7, 126:11, 126:15
discretion [3] 43:12, 108:18, 193:12
discuss [8] 75:10, 207:13, 211:5, 234:10, 234:14, 235:6, 235:8, 235:11
discussed [18] 48:10, 98:11, 145:4, 163:16, 203:14, 203:23, 204:11, 205:23, 206:20, 206:21, 208:16, 208:23, 210:5, 215:5, 218:10, 234:13, 238:20, 339:3
discussing [10] 61:16, 163:8, 166:4, 167:4, 167:21, 207:3, 215:17, 239:18, 293:14, 332:4
discussion [36] 165:24, 166:8, 167:8, 182:15, 183:2, 183:7, 183:15, 184:17, 184:25, 193:4, 202:9, 202:11, 206:16, 206:24, 207:12, 207:18, 209:12, 210:7, 210:20, 210:23, 211:9, 211:11, 211:14, 211:19, 212:2, 212:3, 212:15, 213:13, 216:1, 218:12, 218:15, 218:21, 234:14, 364:2, 364:2, 407:12
discussions [2] 216:6, 235:12
dismissed - 9:21
disoriented - 283:10
dispatch [3] 332:21, 337:11, 385:20
dispatcher [6] 300:14, 300:16, 333:4, 338:18, 339:1, 340:4
disposal [6] 112:8, 112:10, 267:9, 288:9, 289:14, 361:14
distinguishes - 30:17
distraught - 114:11
distress [3] 43:2, 367:18, 389:22
District [4] 1:1, 1:2, 1:18, 1:18
disturbed [2] 161:11, 301:19
disturbing [3] 180:6, 303:12, 397:9
disturbs - 388:24
Division [2] 1:3, 1:19
doctor [66] 42:11, 44:20, 44:23, 45:25, 47:17, 47:25, 59:3, 70:8, 83:16, 92:17, 107:4, 108:14, 108:20, 115:18, 116:6, 117:18, 117:20, 117:24, 121:2, 126:10, 126:12, 126:14, 132:10, 132:13, 134:11, 137:22, 139:18, 143:16, 144:22, 144:23, 148:11, 148:12, 148:19, 149:1, 149:8, 149:21, 150:18, 152:8, 152:14, 152:21, 155:1, 158:13, 164:13, 168:22, 172:1, 173:14, 178:7, 184:18, 187:16, 198:18, 215:7, 215:12, 222:2, 227:5, 228:5, 255:11, 255:21, 255:22, 275:13, 275:16, 282:2, 324:18, 375:25, 380:5, 381:15, 386:15
doctor's [10] 37:6, 49:9, 108:18, 177:23, 179:5, 186:7, 215:5, 261:23, 261:25, 386:19
doctors [5] 164:10, 215:14, 246:8, 257:6, 257:19
document [34] 51:8, 51:13, 51:20, 51:21, 52:8, 52:11, 53:15, 54:4, 55:17, 87:12, 100:25, 101:3, 101:7, 101:25, 102:2, 102:3, 102:4, 102:5, 102:7, 102:15, 103:4, 103:15, 103:15, 156:13, 157:10, 157:20, 218:13, 240:19, 271:20, 273:14, 273:16, 308:13, 319:18, 320:2
documentation [8] 156:23, 156:25, 157:9, 189:24, 275:23, 319:24, 320:22, 355:4
documented [14] 100:20, 103:3, 103:5, 103:8, 124:18, 156:20,

232:8, 271:23, 272:2, 275:23, 308:14, 313:16, 320:24, 355:6
documenting [4] 156:13, 157:14, 271:25, 319:22
documents [6] 12:23, 51:10, 51:25, 67:21, 69:17, 171:7
dog - 297:9
doomed [3] 40:8, 110:2, 116:7
door [6] 198:6, 219:11, 253:25, 254:8, 254:9, 327:12
dosage - 327:3
double - 124:3
double-sided - 238:23
doubt - 146:12
downtown - 20:12
Dozens - 362:5
Dr [130] 67:10, 69:25, 70:21, 71:10, 72:5, 72:7, 74:25, 75:9, 81:13, 81:13, 81:16, 82:10, 82:17, 82:18, 83:18, 87:21, 87:22, 87:25, 88:13, 88:21, 98:19, 103:21, 104:3, 104:4, 104:8, 104:13, 104:16, 104:16, 104:19, 105:1, 105:16, 105:21, 108:21, 108:22, 113:4, 113:8, 116:9, 118:23, 119:4, 125:17, 125:20, 125:24, 126:2, 126:20, 128:14, 128:16, 128:23, 143:17, 145:8, 148:6, 149:9, 149:13, 150:22, 150:23, 151:2, 151:4, 151:12, 151:12, 151:15, 151:21, 151:24, 151:25, 152:8, 155:13, 155:19, 155:21, 156:17, 157:16, 157:17, 157:24, 158:13, 158:25, 163:1, 163:21, 164:24, 165:5, 165:6, 165:7, 165:8, 165:17, 165:23, 166:8, 166:15, 166:21, 167:25, 168:15, 168:24, 169:9, 170:1, 170:5, 172:7, 175:7, 176:2, 179:14, 180:14, 185:11, 187:17, 188:11, 189:23, 190:12, 196:13, 196:24, 198:5, 198:12, 200:19, 215:7, 224:24, 229:8, 238:19, 241:24, 246:9, 246:12, 257:12, 257:14, 262:2, 263:10, 275:17, 275:19, 275:24, 275:25, 311:2, 323:21, 323:23, 323:23, 324:1, 324:5, 324:12, 324:15, 327:23, 375:2
drama - 254:8
dramatic [2] 223:4, 252:2
drawer - 384:18
drawing - 123:14
drink - 297:10
Drive - 393:4
Drop - 211:6
dropped [7] 180:15, 400:13, 400:17, 401:23, 402:3, 402:6, 402:16
drug - 12:8
drugs - 202:4
duly - 7:4
dumped [5] 383:1, 383:14, 383:23, 384:2, 385:4
duties [2] 25:4, 237:1
duty [3] 24:1, 276:4, 276:4
dying [3] 115:9, 242:8, 242:24
dynamic [2] 292:13, 318:2

E

earlier [23] 9:15, 14:16, 35:18, 141:3, 145:13, 154:7, 175:23, 228:17, 228:21, 229:14, 238:20, 239:18, 253:8, 269:22, 300:25, 303:24, 308:3, 311:24, 314:25, 315:24, 332:1, 383:1, 383:8
earliest - 141:21
ears [2] 310:6, 372:7
ease [2] 15:20, 319:6
Eastern [2] 1:3, 1:18
easy [3] 10:23, 48:9, 238:23
educate - 355:1
educated [5] 352:12, 352:21, 355:6, 369:6, 384:1
education [4] 16:19, 134:19, 137:20, 138:20
educational [2] 16:7, 64:13
effect - 219:4
efficiency - 175:6
effort - 28:24
eight [3] 28:3, 92:7, 334:11
either [23] 29:22, 68:24, 93:21, 96:22, 101:3, 107:22, 108:22, 134:21, 134:24, 135:3, 170:15, 182:23, 183:1, 193:16, 196:25, 247:17, 254:2, 287:19, 349:5, 361:15, 380:25, 382:12, 396:2
Elaine [68] 98:3, 98:11, 98:13, 98:16, 104:17, 105:13, 105:14, 105:24, 107:2, 107:4, 109:15, 113:20, 115:12, 124:18, 126:20, 146:6, 151:19, 155:15, 155:20, 155:22, 155:25, 157:11, 157:25, 158:8, 158:24, 159:11, 159:16, 160:11, 160:12, 161:3, 163:9, 163:15, 165:16, 165:19, 165:22, 165:25, 166:1, 167:9, 167:15, 168:14, 168:14, 173:10, 175:1, 179:13, 180:10, 180:11, 180:11, 181:22, 182:12, 194:13, 194:18, 194:23, 195:12, 206:23, 207:7, 210:8, 220:5, 224:21, 228:17, 228:20, 228:22, 229:3, 229:4, 229:6, 229:10, 229:16, 229:21, 229:24
Elaine's [4] 104:14, 114:14, 121:12, 229:4
elective [17] 31:9, 31:9, 31:22, 31:25, 32:14, 33:3, 35:3, 35:14, 35:23, 35:25, 36:1, 39:17, 39:20, 39:25, 40:1, 40:3, 40:16
electronic - 235:12
elevated [11] 59:5, 240:9, 240:14, 241:9, 241:11, 241:12, 243:7, 243:23, 245:4, 245:7, 256:7
Elizabeth [2] 29:22, 80:4
Elizabeth's [3] 20:11, 29:19, 30:2
elongated - 371:7
elope - 191:18
eloped [7] 190:10, 192:15, 201:5, 201:16, 208:8, 208:17, 208:20
elopement [3] 205:23, 206:16, 209:6
else's [2] 335:16, 403:4
email [3] 393:15, 393:16, 396:9
emailed - 400:2
embarrassing - 362:12
embolism - 242:20
emergency [6] 72:3, 123:7, 263:11, 301:12, 302:4, 302:8
emergent - 83:14
emotion - 54:10
emotional [8] 52:25, 55:16, 86:12, 97:3, 282:18, 282:19, 283:15, 314:10
emotionally [2] 52:5, 282:10
employee [7] 20:24, 25:14, 33:23, 85:2, 212:20, 214:5, 237:10
emptiness - 54:12
empty - 75:6
Enclosed - 407:10
Enclosure - 407:22
encounter - 263:1
encourage - 318:4
encouraged - 222:24
endanger [5] 254:18, 255:11, 255:17, 255:19, 256:18
endangering [8] 254:11, 254:22, 254:24, 254:25, 255:1, 255:7, 255:13, 255:14
ended [5] 184:25, 248:1, 263:19, 263:24, 303:5
enforcement [3] 65:7, 65:15, 65:24
enlisted - 150:23
ensure [3] 171:13, 176:24, 215:13
entailed - 238:1
entails [2] 193:7, 369:5
enter [3] 313:5, 346:16, 346:17
entered [13] 211:12, 262:14, 262:17, 263:6, 267:2, 312:18, 320:3, 320:8, 320:9, 320:15, 326:13, 326:18, 345:11
entering - 320:20
entire [4] 45:24, 46:4, 148:7, 309:7
entirely - 402:11
equipment - 202:6
errata [2] 405:6, 407:14
erroneous - 64:14
escalating [2] 214:23, 228:19
Escalation - 220:22
Esq [6] 2:6, 2:10, 2:10, 2:17, 3:6, 407:5
essence - 270:13
established - 240:13
establishing - 338:11
estimate [6] 334:7, 334:8, 338:13, 338:14, 338:16, 386:11
estimated [2] 87:22, 142:14
estimating [3] 89:9, 89:18, 333:20
estrangement - 318:1
et [3] 1:9, 312:23, 312:23
ethical [2] 181:9, 225:6
ethically [2] 169:15, 250:24
ethics [61] 42:1, 42:8, 42:9, 166:10, 167:23, 168:1, 168:2, 168:8, 169:2, 169:12, 169:23, 170:3, 170:12, 171:9, 172:7, 172:21, 173:4, 173:6, 174:2, 176:22, 176:25, 177:3, 177:5, 177:8, 177:18, 177:19, 177:20, 178:2, 178:2, 178:7, 178:10, 179:4, 179:6, 179:8, 179:16, 179:19, 180:25,

182:9, 184:23, 185:5, 185:6, 185:11, 185:17, 186:9, 186:15, 187:3, 187:11, 189:24, 215:14, 221:20, 224:19, 225:11, 225:14, 225:18, 226:2, 226:8, 226:13, 226:24, 227:5, 227:10, 227:16
evacuation [4] 31:21, 32:3, 32:24, 32:25
evaluate - 26:25
evaluated - 80:9
evaluating - 27:12
evaluation [3] 27:13, 37:6, 241:25
evasive - 357:17
evening [4] 190:14, 303:6, 379:14, 381:19
event [6] 48:14, 161:18, 275:7, 282:21, 290:13, 312:1
events [3] 69:11, 150:16, 320:9
eventually [2] 144:3, 191:13
everybody's - 25:15
everyone [2] 162:16, 162:16
everyone's - 369:25
everything [28] 13:12, 13:23, 94:18, 137:10, 162:13, 172:4, 177:15, 199:16, 199:19, 248:23, 250:25, 283:1, 284:18, 305:21, 353:3, 364:16, 365:4, 368:22, 368:23, 372:11, 394:16, 394:25, 395:12, 395:14, 395:15, 395:15, 396:8, 396:9
everything's [3] 25:15, 313:22, 313:24
evidence [7] 88:24, 121:8, 168:20, 253:13, 393:11, 398:9, 398:11
Evidently - 47:18
exact [16] 72:8, 87:15, 97:23, 108:14, 129:20, 216:15, 225:23, 226:22, 237:4, 237:4, 256:5, 256:15, 256:16, 264:2, 272:16, 322:14
exactly [7] 100:6, 146:8, 353:21, 360:21, 366:13, 368:25, 378:1
exam [3] 240:17, 241:24, 307:8
EXAMINATION [2] 5:3, 7:8
examine - 276:1
examined - 7:6
example [3] 114:25, 198:4, 284:1
except - 402:22
exception [3] 65:8, 395:16, 406:5
exceptions - 66:21
excited [2] 331:5, 331:20
exclusive [2] 74:15, 74:17
exclusively - 20:19
Excuse - 292:19
executed - 49:19
exhibit [18] 5:20, 5:21, 5:22, 5:23, 5:24, 50:21, 50:22, 50:23, 86:8, 213:8, 213:9, 260:17, 260:18, 306:15, 306:16, 336:6, 336:7, 336:8
exhibiting - 214:22
EXHIBITS - 5:19
exist - 368:1
Exits - 323:16
expect [30] 28:6, 74:1, 128:6, 134:15, 134:20, 137:5, 137:9, 138:21, 147:5, 153:24, 153:25, 154:3, 154:7, 158:16, 172:21, 172:25, 206:25, 209:17, 209:24, 253:10, 354:3, 354:24, 355:2, 355:4, 356:12, 356:18, 356:24, 369:1, 373:18, 373:21
expectant [39] 76:25, 78:1, 78:13, 79:16, 79:18, 79:23, 80:7, 80:13, 81:3, 129:14, 131:6, 132:15, 132:21, 137:22, 143:17, 147:2, 147:5, 147:7, 147:24, 155:10, 158:15, 158:21, 161:12, 161:14, 161:21, 166:3, 179:10, 206:24, 208:1, 217:10, 220:6, 224:18, 229:12, 241:15, 245:14, 245:17, 248:18, 255:12, 256:3
expectantly - 246:5
expectation [3] 149:25, 219:13, 221:6
expectations - 214:23
expected [5] 153:12, 154:6, 172:13, 275:7, 389:18
expecting [2] 93:1, 95:3
experience [27] 37:17, 54:6, 58:13, 71:17, 83:25, 86:12, 87:13, 87:18, 123:14, 123:15, 125:1, 147:24, 149:1, 152:12, 152:15, 154:9, 161:12, 164:12, 177:17, 244:7, 244:15, 247:2, 256:1, 354:13, 354:14, 359:6, 371:11
experienced [3] 51:24, 58:6, 73:5
experiences [2] 54:10, 55:15
experiencing [6] 56:17, 70:1, 71:11, 73:13, 176:6, 315:2
expert - 37:14
Expiration - 405:21
expire - 297:25
explain [11] 109:24, 110:17, 114:5, 126:10, 126:14, 134:15, 134:15, 137:21, 198:2, 287:15, 356:18
explained [10] 107:10, 109:23, 110:16, 167:22, 268:22, 268:23, 317:25, 356:10, 383:1, 386:12
explaining [2] 348:9, 348:15
explains - 378:10
explanation [2] 46:13, 338:19
express [9] 182:18, 221:13, 221:15, 221:17, 222:4, 222:25, 229:6, 229:11, 329:16
expressed [6] 110:6, 166:22, 220:9, 313:6, 331:18, 343:17
expressing [6] 194:13, 198:22, 198:23, 216:20, 223:12, 399:8
expression - 223:25
extension - 237:6
extent - 105:24
extraction - 32:22
extremities [2] 372:25, 373:11

**F**

face - 222:18
Facebook [2] 391:10, 397:6
faced [2] 225:21, 225:24
facilitate [3] 47:9, 72:3, 160:7
facility [7] 30:12, 33:24, 36:6, 39:13, 112:2, 132:18, 132:18
factor - 219:16
factors - 122:22
factual - 242:12
factually [2] 243:15, 251:17
fair [6] 8:13, 11:18, 115:16, 115:17, 338:23, 402:3
fairly [2] 92:12, 223:4
faith - 158:12
false [5] 160:1, 162:7, 162:9, 176:16, 381:19
falsified [8] 172:2, 172:8, 173:8, 173:10, 173:15, 173:16, 174:4, 174:17
falsify - 174:11
familiar [2] 90:11, 140:14
family [2] 292:11, 318:2
farther [2] 362:22, 362:23
fashion - 49:19
fault - 213:1
fearful - 63:4
features [2] 369:1, 373:9
febrile - 228:3
February [2] 393:8, 394:2
fecal [3] 10:10, 362:12, 362:18
feedback [4] 213:15, 213:25, 214:3, 214:5
feel [95] 28:21, 42:4, 44:25, 46:10, 49:23, 63:1, 63:4, 63:10, 64:25, 65:1, 95:12, 95:14, 102:18, 103:24, 109:20, 114:9, 118:1, 118:23, 119:5, 119:7, 120:3, 120:7, 121:2, 142:7, 158:10, 162:6, 163:4, 163:6, 166:5, 169:18, 169:22, 171:3, 172:1, 173:18, 176:19, 182:22, 183:1, 183:3, 184:3, 184:20, 203:20, 203:21, 207:2, 207:24, 207:25, 209:21, 212:11, 216:12, 216:13, 216:15, 216:22, 216:25, 219:3, 221:14, 221:17, 227:14, 229:4, 229:15, 231:17, 231:21, 232:18, 237:21, 242:23, 246:21, 248:23, 251:3, 254:10, 254:21, 289:9, 289:15, 289:18, 290:14, 299:3, 317:11, 321:7, 321:17, 321:18, 321:18, 322:2, 325:3, 327:4, 328:15, 328:17, 333:7, 336:2, 339:6, 342:21, 346:14, 366:12, 397:12, 401:15, 401:17, 401:18, 401:19, 401:22
feeling [14] 95:10, 95:18, 109:14, 179:25, 180:7, 181:18, 181:21, 181:24, 207:22, 208:3, 276:25, 318:23, 348:17, 367:23
feelings [5] 55:5, 55:9, 55:10, 316:1, 316:6
feels - 354:6
fell - 147:24
felony [2] 402:9, 402:14
felt [67] 28:20, 45:18, 49:18, 64:15, 65:24, 119:14, 119:25, 120:11, 120:17, 160:6, 161:6, 161:13, 161:15, 163:2, 167:4, 173:12, 173:17, 181:2, 206:22, 207:1, 207:7, 207:21, 207:24, 210:5, 210:22, 212:12, 212:20, 216:14, 216:20, 216:24, 217:11, 225:16, 232:12, 232:17, 254:24, 270:23, 282:17, 282:23, 282:24, 290:16, 290:23, 291:1, 295:11, 296:16, 301:1, 301:23, 301:24, 305:4, 321:20,

322:4, 325:2, 325:8, 325:9, 328:6, 331:13, 332:16, 336:1, 339:12, 340:19, 344:24, 346:7, 355:18, 397:21, 402:3, 402:16, 402:18, 402:19
female - 240:4
fetal [48] 10:10, 51:17, 51:24, 52:12, 54:22, 55:16, 55:24, 56:14, 56:14, 56:17, 56:18, 56:24, 57:1, 58:6, 76:2, 76:13, 77:11, 82:7, 86:8, 111:18, 111:21, 112:5, 112:8, 112:10, 134:12, 251:1, 251:12, 251:13, 251:21, 254:12, 267:7, 268:18, 287:17, 288:2, 288:8, 288:14, 288:16, 315:24, 333:20, 333:23, 370:7, 371:8, 371:9, 371:12, 371:20, 371:20, 371:22, 372:20
fetus [74] 32:5, 33:1, 33:6, 34:8, 41:20, 76:19, 77:2, 78:18, 88:11, 114:4, 114:25, 115:6, 115:9, 116:2, 118:4, 120:7, 130:5, 136:25, 246:5, 251:6, 253:15, 273:8, 273:11, 276:21, 283:3, 285:19, 285:21, 285:23, 286:2, 288:4, 290:6, 290:8, 292:25, 294:15, 294:23, 296:17, 296:21, 297:6, 297:9, 300:20, 301:5, 302:3, 305:13, 305:18, 305:21, 309:20, 309:23, 312:10, 313:1, 333:14, 333:18, 359:3, 359:10, 359:21, 359:24, 360:8, 360:11, 360:18, 360:24, 361:1, 361:4, 361:9, 361:12, 362:3, 362:24, 363:14, 366:6, 366:11, 370:15, 371:7, 371:8, 372:21, 373:3, 373:9
fetuses [3] 358:24, 359:15, 370:4
fever [6] 58:17, 175:20, 227:6, 227:8, 227:18, 243:23
fight - 171:24
fighting [4] 243:8, 244:20, 244:23, 245:3
figure [6] 49:13, 289:1, 302:13, 336:18, 361:20, 386:24
figured - 304:17
file [2] 218:23, 336:8
filed - 263:3
files - 25:14
fill [3] 52:14, 80:19, 112:3
filling [3] 347:23, 392:7, 392:12
final [5] 223:6, 223:10, 223:16, 223:19, 223:23
finding [5] 290:25, 299:12, 344:10, 368:5, 397:9
fine [11] 33:14, 75:25, 78:6, 94:18, 100:5, 180:12, 195:4, 244:11, 248:9, 305:21, 344:15
fingernails - 372:6
fingers - 372:10
finish [9] 10:25, 15:20, 33:9, 50:5, 195:3, 244:9, 267:22, 273:4, 276:17
finished [7] 4:15, 4:17, 17:20, 205:7, 248:6, 254:7, 323:15
firm [2] 275:9, 311:22
firmly - 389:11
firsthand - 105:21
fit [2] 351:18, 375:8
five [6] 14:19, 14:21, 14:22, 169:14, 264:1, 350:14
fix - 271:8
fixed - 336:23
flat - 114:14
flex [2] 69:3, 69:3
float [3] 19:12, 152:11, 371:23
floated [2] 19:12, 372:1
floating - 295:20
floor [18] 2:7, 2:11, 18:14, 18:22, 18:23, 18:24, 25:18, 26:1, 26:5, 26:9, 138:21, 152:10, 207:4, 207:5, 232:18, 235:21, 236:21, 335:17
flowing - 25:21
fluid [40] 58:16, 73:17, 74:1, 74:23, 75:2, 75:5, 75:6, 75:8, 75:10, 75:19, 75:22, 76:1, 76:6, 76:13, 76:16, 76:16, 77:4, 77:6, 77:12, 77:14, 78:2, 78:19, 79:1, 79:7, 79:9, 79:11, 79:16, 79:22, 80:19, 81:3, 93:5, 93:7, 129:17, 130:11, 130:17, 130:19, 145:22, 145:22, 154:3, 242:20
fluids - 313:15
flush [8] 270:5, 299:24, 356:14, 356:16, 358:9, 358:11, 358:12, 358:18
flushable - 358:15
flushed [17] 264:3, 265:20, 265:22, 266:1, 267:5, 272:22, 276:20, 353:17, 353:18, 357:7, 358:23, 359:2, 359:8, 375:11, 378:9, 378:10, 378:11
flushing [2] 299:21, 401:19
focus - 28:22
follow [19] 43:25, 44:4, 44:15, 47:8, 48:6, 79:25, 179:12, 184:15, 184:16, 212:19, 278:13, 278:24, 288:23, 304:8, 304:10, 400:5, 400:8, 400:11, 400:14
follow-up [3] 48:12, 72:15, 403:3
follow-ups [2] 68:1, 402:23
followed [7] 54:11, 180:20, 215:14, 337:20, 337:25, 385:23, 386:2
follows [2] 7:7, 227:12
Ford [4] 168:11, 169:24, 170:9, 170:23
Ford's - 187:18
forget - 158:5
formal [3] 209:12, 209:15, 218:23
formed [14] 349:18, 352:9, 352:12, 363:20, 363:21, 368:9, 370:22, 372:4, 372:11, 372:21, 373:3, 373:10, 375:19, 383:21
former - 12:12
forth [3] 152:11, 389:21, 398:25
forty - 264:2
forward [6] 217:24, 221:24, 222:6, 393:21, 394:14, 399:9
foundation [48] 16:3, 32:9, 35:5, 36:3, 37:4, 37:10, 39:9, 42:13, 46:3, 50:3, 54:14, 56:1, 56:21, 57:5, 82:22, 83:10, 86:16, 92:5, 114:8, 134:5, 135:25, 137:2, 138:5, 140:9, 141:17, 141:24, 143:4, 148:23, 151:10, 160:19, 164:6, 166:12, 172:15, 175:11, 196:3, 200:9, 210:15, 243:17, 245:24, 247:14, 251:20, 254:7, 254:15, 256:22, 275:2, 310:22, 358:21, 367:20
fourth - 251:18
frame [3] 265:11, 266:21, 280:7
Franklin's - 3:7
Fred [7] 2:16, 67:12, 278:15, 280:22, 290:2, 293:7, 296:12
free - 222:24
frequent - 25:19
frequently - 392:6
fresh - 394:9
Friday [9] 24:3, 68:11, 68:14, 68:15, 68:23, 237:8, 259:20, 259:21, 392:9
Fridays [5] 69:4, 230:21, 236:21, 236:24, 335:20
friendship [2] 234:7, 234:11
friendships - 85:8
front [5] 18:13, 47:5, 155:16, 155:21, 210:8
frustrated [3] 348:15, 348:16, 348:19
full [8] 26:3, 123:6, 170:24, 171:2, 295:16, 306:25, 372:8, 380:13
full-term - 86:25
full-time [10] 20:23, 21:3, 21:3, 22:3, 22:5, 22:7, 22:11, 22:18, 22:25, 23:3
fully [13] 127:20, 349:18, 352:9, 352:12, 368:9, 372:4, 372:8, 372:21, 373:1, 373:3, 373:9, 375:19, 383:21
fun - 331:4
function - 26:4
functioning - 27:18
fundal [5] 47:2, 47:10, 47:11, 47:20, 89:12
fundus [3] 89:13, 275:10, 311:22
funeral [16] 110:19, 110:23, 110:24, 111:1, 111:5, 269:9, 287:19, 287:21, 289:2, 361:17, 361:19, 363:9, 376:9, 376:13, 376:16, 376:18
future [7] 161:17, 161:17, 208:4, 209:25, 210:3, 224:3, 375:5

## G

G2P0 - 240:4
garage [12] 267:3, 267:11, 268:12, 268:17, 271:1, 281:23, 282:12, 283:18, 284:11, 292:15, 299:20, 350:5
garbage - 350:5
gave [17] 68:8, 126:21, 129:19, 164:8, 178:25, 286:21, 288:21, 294:21, 295:14, 296:11, 314:16, 334:20, 334:25, 336:1, 349:23, 354:2, 376:12
general [7] 46:16, 46:17, 138:17, 180:7, 235:22, 285:4, 328:10
generally [5] 8:8, 54:9, 108:2, 253:20, 329:16
gestation [9] 88:11, 110:25, 111:21, 112:11,

132:20, 134:23, 141:4, 240:10, 271:11
gestational [23] 72:8, 86:13, 86:23, 87:15, 87:22, 88:1, 89:3, 89:10, 89:15, 89:18, 131:1, 139:20, 141:10, 141:11, 251:11, 334:6, 356:20, 359:20, 359:23, 360:6, 370:4, 376:19, 382:8
gets [5] 107:4, 122:21, 227:16, 243:23, 345:5
Gina [5] 1:12, 4:12, 195:7, 404:14, 407:20
girls [2] 84:18, 167:19
given [21] 24:2, 44:1, 52:6, 53:19, 62:18, 72:8, 82:10, 88:7, 108:9, 117:22, 126:3, 137:21, 142:8, 164:23, 170:23, 173:7, 197:2, 198:6, 220:7, 243:8, 289:17
gives [3] 44:23, 51:23, 175:17
giving [16] 11:2, 33:16, 44:14, 44:17, 51:25, 113:20, 161:22, 180:11, 247:13, 314:2, 333:4, 333:6, 334:24, 339:6, 373:6, 379:12
glad - 173:1
glob - 368:21
gloves [2] 282:14, 307:10
goal [9] 19:10, 20:5, 20:13, 41:15, 234:12, 247:11, 323:1, 323:1, 345:13
goals - 322:18
God [3] 248:13, 342:18, 368:12
God's [2] 342:18, 368:12
goes [16] 54:8, 57:24, 133:3, 169:24, 193:18, 214:25, 222:23, 242:15, 264:1, 278:2, 289:15, 312:16, 358:9, 362:22, 374:7, 382:12
gone [5] 83:20, 282:20, 380:2, 381:20, 396:11
Google - 393:4
gosh [4] 180:15, 209:7, 232:14, 234:1
gotcha - 112:25
gotten [4] 63:13, 65:11, 98:21, 238:13
grab - 377:7
graduated - 16:17
grandchild - 391:12
Gravidity - 240:5
gray [6] 40:17, 40:22, 40:25, 41:3, 41:9, 41:22
Graziano - 24:15
greater [2] 154:14, 363:7
grief [2] 55:1, 331:13
grieve [3] 54:22, 114:21, 315:24
grieved - 354:17
grieving [9] 55:13, 87:5, 115:6, 115:9, 330:3, 331:16, 331:18, 331:21, 331:21
grounds - 148:23
group - 28:25
grow - 372:12
growth - 130:17
guaranteed - 140:1
guardian [6] 61:6, 62:1, 62:6, 62:8, 64:5, 66:22
guess [9] 28:23, 63:6, 74:23, 248:17, 279:18, 282:13, 285:2, 322:6, 358:12
guidance [10] 49:14, 51:23, 51:25, 177:11, 177:12, 177:13, 215:12, 282:16, 302:1, 336:2
guide [2] 42:3, 177:6
guidelines [2] 30:1, 278:13
guilt - 54:11
guys [10] 172:18, 229:2, 267:23, 322:18, 327:8, 327:25, 346:25, 352:6, 383:13, 385:3

## H

hadn't [5] 132:13, 166:18, 310:21, 369:6, 374:16
hair [14] 118:1, 118:23, 119:5, 119:7, 119:11, 119:11, 119:14, 119:23, 120:3, 120:7, 120:11, 120:16, 121:3, 372:6
half [2] 150:6, 326:17
hall - 26:14
halt - 172:4
handcuffed - 401:3
handle [9] 45:6, 49:15, 110:21, 139:21, 208:4, 268:19, 288:25, 289:25, 361:19
handled [5] 207:25, 210:19, 211:2, 211:4, 289:11
handles - 24:8
handout - 60:14
hands [3] 154:17, 154:20, 195:10
hanging [3] 264:21, 265:1, 266:14
happen [15] 45:20, 141:4, 154:8, 180:8, 184:10, 197:23, 206:25, 242:18, 248:21, 292:15, 303:8, 303:9, 348:5, 354:9, 360:25
happened [22] 10:6, 69:22, 193:3, 209:5, 226:18, 226:21, 226:23, 249:24, 262:11, 275:24, 292:18, 311:24, 312:19, 322:22, 323:2, 336:14, 359:14, 374:16, 378:1, 380:23, 394:3, 401:25
happening [3] 161:8, 198:24, 359:6
happens [5] 57:16, 57:18, 91:2, 247:17, 388:15
harmed - 171:21
harsh - 401:20
hasn't [2] 158:18, 385:2
haven't [4] 60:6, 67:21, 82:1, 337:21
having [18] 7:3, 11:5, 52:7, 72:9, 86:19, 90:12, 130:19, 170:5, 207:11, 207:18, 209:12, 242:5, 249:9, 252:24, 307:9, 315:6, 350:12, 389:12
Hawaii - 235:9
he's [21] 152:20, 152:20, 152:22, 158:13, 158:14, 163:7, 168:22, 173:13, 241:24, 252:5, 252:10, 252:12, 252:14, 254:21, 255:4, 255:7, 255:16, 255:18, 255:21, 255:22, 347:15
headache [4] 102:3, 102:4, 102:20, 102:21
HEAL [3] 52:15, 52:16, 315:16
health [31] 1:9, 2:15, 2:15, 12:13, 41:3, 41:6, 42:18, 65:19, 65:23, 97:1, 97:3, 112:3, 139:24, 143:20, 157:22, 171:14, 192:2, 203:13, 205:11, 239:1, 277:2, 278:18, 287:17, 289:11, 289:16, 306:5, 306:6, 315:1, 328:18, 328:20, 361:15
healthy [12] 40:6, 78:15, 78:16, 79:12, 79:24, 81:4, 114:18, 132:9, 133:6, 147:9, 147:13, 147:19
hear [22] 88:20, 97:14, 101:4, 104:15, 105:14, 160:21, 160:24, 186:12, 186:14, 187:24, 188:20, 189:9, 198:20, 210:15, 234:2, 247:8, 302:5, 309:19, 309:23, 337:4, 349:14, 400:15
heard [29] 33:22, 34:15, 36:12, 39:1, 39:4, 83:1, 119:4, 153:9, 168:14, 189:3, 189:5, 189:6, 190:11, 190:20, 208:22, 208:24, 250:8, 266:8, 272:21, 272:22, 293:16, 337:12, 337:18, 353:3, 353:5, 355:19, 359:4, 359:5, 400:18
hearing [6] 39:7, 93:6, 159:9, 188:19, 207:8, 250:10
heart - 377:3
heartbeat [23] 92:25, 118:4, 133:7, 143:19, 147:10, 161:21, 166:6, 172:12, 175:24, 178:22, 212:15, 217:8, 217:11, 219:24, 220:7, 222:10, 222:13, 226:13, 242:11, 251:12, 251:13, 251:22, 254:12
heartbeats - 225:24
heavily - 124:22
heavy [11] 124:19, 124:19, 124:21, 125:3, 125:12, 264:8, 264:19, 311:22, 311:24, 370:19, 370:20
heck - 365:2
heightened [4] 121:11, 121:16, 194:5, 339:5
held [6] 4:7, 24:23, 139:19, 214:21, 224:17, 354:17
helpful [2] 322:5, 322:13
helping [3] 52:16, 235:21, 253:18
hemorrhage [5] 93:1, 162:22, 169:14, 254:11, 254:20
hemorrhagic [5] 161:17, 173:19, 175:14, 176:4, 176:7
hemorrhaging [10] 82:5, 93:23, 129:13, 144:17, 146:22, 162:14, 242:8, 242:24, 243:3, 266:14
Henry - 24:17
here's - 211:20
hereby - 405:15
herein - 406:3
hereto - 4:6
hers [2] 225:2, 352:18
herself [14] 70:8, 72:6, 126:6, 283:19, 292:2, 292:2, 302:14, 305:23, 313:12, 313:17, 316:21, 320:4, 335:14, 397:21
hesitate - 407:18
hesitation - 325:4
high-risk [5] 80:9, 152:8, 153:5, 215:5, 215:6
higher [4] 45:1, 57:22, 80:5, 335:10
highest - 335:16
HIPAA [2] 59:11, 65:17
HIPAA-specific - 66:18
historical - 312:1
history [6] 75:13, 91:5, 152:6, 166:2, 168:19, 307:6

hits - 371:14
hitting - 234:24
hold [13] 23:18, 24:23, 96:18, 111:3, 112:18, 114:24, 115:5, 137:11, 267:14, 297:16, 336:14, 336:22, 336:24
honest [4] 229:5, 268:15, 342:19, 368:12
honestly [3] 277:5, 293:17, 390:13
honey - 318:24
honor - 133:15
honored - 121:22
hope [10] 131:16, 131:18, 131:19, 131:24, 132:8, 132:9, 154:6, 154:10, 299:23, 387:16
hoped [3] 155:7, 269:25, 347:5
hopeful [2] 131:6, 299:25
hopefully [5] 80:25, 175:4, 193:18, 279:15, 336:9
hoping [3] 266:13, 269:18, 323:7
hospital [93] 2:16, 13:17, 13:19, 18:20, 19:21, 19:22, 20:15, 28:20, 29:6, 29:14, 29:21, 29:24, 30:17, 30:18, 30:24, 30:25, 33:24, 38:7, 38:19, 38:24, 41:23, 63:19, 111:16, 113:4, 116:14, 143:18, 148:6, 161:20, 178:23, 185:7, 189:14, 192:8, 196:6, 202:6, 212:17, 212:19, 212:19, 212:22, 222:18, 225:12, 227:11, 232:25, 237:17, 243:25, 249:9, 249:11, 249:14, 250:25, 261:13, 261:15, 264:6, 264:9, 267:6, 269:11, 269:25, 272:24, 276:8, 278:5, 278:14, 285:24, 286:3, 286:10, 286:12, 288:5, 298:14, 298:16, 300:23, 301:25, 305:2, 305:11, 305:22, 307:10, 309:11, 316:23, 321:3, 324:5, 330:21, 332:1, 335:10, 341:16, 343:13, 345:11, 345:12, 346:2, 346:16, 346:17, 354:20, 361:20, 376:22, 380:12, 382:2, 387:16, 390:8
hospital's [2] 221:16, 290:6
hospitals [6] 33:8, 38:14, 38:15, 80:2, 152:11, 166:2
hour [10] 14:25, 15:1, 294:21, 295:14, 295:16, 295:16, 298:6, 305:4, 309:7, 326:17
hours [16] 21:8, 21:20, 28:1, 67:14, 68:24, 150:6, 260:14, 261:3, 269:22, 297:25, 298:5, 304:20, 354:3, 374:10, 374:25, 387:20
however [2] 65:17, 394:8
Hudak [13] 94:5, 94:11, 109:1, 109:4, 136:13, 233:16, 233:22, 233:25, 258:22, 260:6, 292:24, 352:15, 398:17
Hudak's - 260:20
huddle - 206:7
huge - 277:24
huh-uh [2] 233:1, 250:9
human - 271:13
hundreds - 256:4
hurt - 232:13
hypothetical - 164:18

I

idea [4] 98:20, 98:21, 364:22, 371:24
identify - 40:22
identifying - 46:20
iLearn - 65:16
iLearns [3] 59:13, 60:9, 66:1
Illinois [2] 2:7, 2:11
image [4] 75:4, 119:20, 119:23, 377:22
imagine [2] 365:2, 365:3
immediate - 274:24
immediately [6] 18:1, 42:15, 72:1, 158:25, 275:4, 318:7
imminent - 117:25
imminently [3] 143:6, 143:24, 143:25
IMP [2] 239:23, 239:24
impact [4] 129:8, 223:3, 224:6, 224:22
impacted [2] 223:12, 224:13
implement [2] 164:23, 221:25
implemented - 199:15
implementing [2] 46:10, 49:24
implication - 224:9
imprecise - 367:18
impression [7] 29:1, 29:2, 29:3, 237:18, 239:12, 240:2, 378:20
improp - 170:9
improper [3] 164:18, 169:9, 170:7
in-person - 60:18
inaccurate - 373:6
inappropriate [5] 148:20, 210:25, 216:21, 217:5, 389:10
incidences - 321:14
incident [4] 9:21, 46:15, 46:21, 214:25
include [2] 65:12, 218:15
included [4] 176:16, 176:19, 182:9, 210:10
includes - 65:11
including [4] 56:19, 65:7, 235:11, 366:6
inconsistent [2] 131:25, 272:23
incorrect [6] 14:5, 173:18, 174:11, 174:16, 175:8, 223:11
incredible - 158:13
indefinite - 303:12
indefinitely - 271:2
independently - 17:10
index [2] 5:1, 74:23
Indiana - 16:17
indicate [5] 57:14, 59:1, 59:2, 125:10, 146:18
indication [4] 121:3, 123:7, 169:8, 204:19
indications - 83:12
indicative [2] 59:6, 125:15
induce [21] 99:3, 99:5, 132:19, 133:4, 133:8, 143:21, 143:22, 147:9, 157:5, 161:8, 166:20, 171:21, 171:23, 179:9, 184:4, 198:6, 227:5, 229:10, 255:18, 325:25, 326:9
induced [2] 169:15, 172:3
inducing [6] 100:9, 133:7, 166:6, 245:15, 245:22, 251:4
induction [43] 99:18, 99:24, 99:25, 100:1, 102:16, 102:17, 143:8, 143:19, 165:6, 179:11, 179:24, 180:9, 181:8, 183:11, 183:14, 183:15, 184:8, 186:21, 189:19, 190:16, 196:14, 196:25, 200:7, 200:14, 210:16, 211:23, 212:14, 217:5, 217:8, 219:23, 220:7, 222:9, 225:5, 225:17, 225:25, 226:3, 226:11, 226:13, 228:21, 245:18, 326:15, 326:21, 327:6
infant [12] 52:22, 52:23, 74:1, 77:11, 109:19, 121:23, 139:23, 140:11, 141:5, 141:6, 154:21, 371:20
infected - 202:6
infection [43] 56:7, 56:11, 56:12, 56:19, 56:25, 57:2, 57:14, 57:20, 57:23, 58:3, 58:7, 58:9, 58:13, 59:1, 59:6, 78:12, 107:17, 107:18, 107:23, 108:17, 108:17, 144:9, 161:17, 169:14, 173:21, 175:14, 176:5, 228:4, 243:8, 243:10, 243:10, 244:3, 244:13, 244:16, 244:20, 244:24, 245:3, 245:8, 245:10, 245:13, 251:14, 251:23, 380:16
information [73] 11:10, 34:7, 34:17, 46:20, 53:18, 53:23, 59:19, 59:24, 60:7, 60:23, 61:5, 61:10, 62:5, 62:7, 62:14, 62:19, 62:24, 63:21, 64:2, 64:6, 64:10, 64:15, 65:12, 65:14, 70:3, 70:11, 72:5, 80:24, 88:6, 94:25, 96:4, 96:17, 96:24, 105:20, 109:8, 126:2, 129:4, 166:17, 172:11, 173:7, 173:18, 174:11, 174:16, 175:8, 175:13, 176:17, 176:22, 176:25, 177:2, 193:7, 265:19, 279:11, 296:19, 308:20, 314:25, 319:8, 328:12, 328:16, 332:22, 333:4, 333:6, 334:25, 338:24, 339:6, 348:8, 373:6, 376:4, 376:12, 381:19, 394:5, 394:7, 398:15, 399:8
informed [3] 30:9, 208:19, 222:24
infrequently - 234:1
inhaled - 10:13
inhibited - 333:22
initial [8] 42:10, 87:25, 88:21, 186:24, 205:24, 220:4, 229:7, 334:5
initially [12] 31:14, 113:5, 174:5, 215:23, 261:4, 261:12, 272:14, 332:20, 347:10, 350:4, 377:16, 383:8
initiated [3] 177:19, 226:24, 313:3
inquiries [2] 38:21, 189:16
inside [2] 264:11, 282:4
Instagram - 397:7
installed - 397:13
instances - 35:22
instead [6] 159:9, 179:9, 183:19, 207:11, 207:17, 253:24
instruct - 101:6

instructed [6] 263:10, 269:24, 299:10, 301:22, 324:23, 325:1
instruction - 65:13
instructions [3] 52:3, 82:9, 193:6
instructs - 16:4
insurance - 21:12
intact [2] 282:4, 379:8
intent - 401:18
intentional - 401:21
intentionally [2] 174:11, 396:12
Inter - 13:5
interact [2] 109:7, 189:12
interaction [3] 152:16, 194:22, 214:4
interest [7] 42:4, 44:14, 44:18, 44:19, 44:20, 44:21, 221:18
interested - 171:16
interfere [3] 11:25, 12:4, 12:8
interject [2] 8:6, 216:25
interjected - 216:24
interpret - 100:2
interpreted - 212:20
Interrogatory [4] 13:5, 14:2, 68:4, 225:4
interrupt - 11:3
interview [12] 13:9, 28:23, 38:24, 308:16, 321:13, 323:1, 341:15, 345:23, 347:9, 350:16, 357:15, 367:13
interviewed [3] 28:19, 33:23, 321:9
interviewing [4] 323:16, 327:9, 328:2, 356:9
intimidating - 321:20
intrauterine - 250:6
intravenously - 197:2
intrigued - 331:7
introduce - 50:21
INTRODUCED - 5:19
invading - 203:21
investigator [5] 320:11, 320:16, 323:15, 328:15, 345:22
involve - 107:11
involved [22] 28:11, 113:11, 113:14, 113:15, 122:6, 122:8, 122:10, 122:18, 122:25, 138:19, 149:11, 167:8, 167:24, 170:20, 178:2, 182:10, 187:4, 224:19, 225:19, 226:11, 226:14, 227:16
involvement [7] 109:19, 113:21, 121:11, 121:21, 126:20, 184:23, 190:1
involves - 27:14
irrelevant [3] 44:8, 44:10, 44:10
isn't [4] 26:16, 89:18, 269:19, 356:14
issue [10] 143:20, 187:3, 199:1, 199:23, 214:16, 229:10, 252:11, 302:24, 346:9, 365:10
issues [6] 55:20, 55:23, 56:18, 139:24, 200:2, 329:25
itself - 56:12
IV [11] 107:11, 107:14, 201:17, 201:18, 201:24, 202:3, 202:9, 203:5, 281:25, 282:25, 321:14
IVs - 201:20

J

Jacqui - 24:17
Jennifer - 24:17
Jess - 183:20
Jessica - 183:23
job [9] 20:17, 20:18, 21:21, 22:3, 22:4, 23:3, 23:5, 33:23, 49:23
jobs [2] 21:4, 38:17
Joe's [10] 47:7, 49:24, 80:6, 80:7, 84:8, 98:22, 117:13, 152:10, 219:22, 314:25
John [4] 3:6, 150:22, 403:5, 407:23
join [3] 321:2, 330:6, 330:7
joined - 228:15
Jordan [28] 2:16, 67:12, 85:22, 271:25, 272:2, 273:15, 273:17, 273:20, 274:3, 275:17, 281:24, 307:1, 307:19, 309:21, 312:1, 313:16, 315:15, 316:16, 318:1, 319:23, 319:23, 320:3, 323:21, 324:21, 325:10, 325:18, 325:23, 373:25
Jordan's [6] 272:18, 275:23, 308:14, 312:17, 323:22, 345:18
Joseph [25] 2:15, 12:13, 22:2, 22:8, 23:14, 25:6, 28:18, 29:6, 29:13, 30:3, 34:18, 39:5, 39:16, 40:12, 40:22, 41:10, 46:7, 47:14, 59:9, 59:9, 63:15, 80:4, 99:2, 286:24, 287:3
Joseph's [3] 21:22, 41:12, 59:11
joy - 54:8
jpinzone@mrrlaw. - 3:9
judge [3] 87:9, 174:12, 401:22
judgment [8] 124:25, 132:10, 147:23, 198:14, 227:22, 227:25, 228:2, 251:6
judgments - 44:25
Julia [3] 2:6, 7:16, 407:23
julia@loevy.com - 2:8
July - 91:12
jumbled [2] 310:15, 310:18

K

Kathy - 84:25
keeping [3] 113:2, 113:7, 113:10
kept [7] 277:15, 318:16, 319:17, 355:22, 395:12, 395:17, 395:19
Khavari [80] 2:16, 67:10, 69:25, 71:10, 72:5, 72:7, 74:25, 81:16, 82:10, 82:17, 82:18, 83:18, 87:21, 87:22, 88:13, 98:19, 103:21, 104:3, 104:8, 104:13, 104:16, 104:16, 104:19, 105:1, 105:16, 105:21, 107:4, 108:21, 108:22, 113:4, 113:8, 116:9, 118:23, 119:4, 125:20, 125:24, 126:2, 126:20, 128:14, 128:16, 128:23, 132:14, 143:17, 145:8, 148:4, 148:6, 149:9, 149:13, 151:2, 151:4, 151:12, 151:21, 165:5, 165:6, 166:15, 166:21, 167:25, 185:11, 187:17, 189:23, 190:12, 196:13, 198:12, 200:19, 246:9, 246:12, 257:12, 263:10, 275:17, 275:24, 275:25, 311:2, 323:21, 323:23, 323:23, 324:1, 324:5, 324:12, 324:15, 375:2
Khavari's [13] 70:21, 75:9, 81:13, 81:13, 87:25, 88:21, 104:4, 125:17, 180:14, 224:24, 241:24, 262:2, 374:20
kindly - 209:22
kinds - 315:6
knowing [5] 248:25, 249:17, 250:22, 297:22, 311:8
knowledge [21] 33:19, 33:21, 36:1, 65:10, 82:19, 84:1, 89:4, 91:9, 95:15, 97:13, 103:23, 107:1, 108:6, 112:9, 114:17, 146:9, 147:20, 148:6, 168:24, 226:16, 270:17
known [5] 28:23, 34:4, 146:9, 279:25, 400:22
knows [6] 231:24, 307:10, 308:8, 309:14, 351:15, 389:1

L

L.P.A - 3:7
lab - 58:14
labor [49] 19:9, 19:12, 19:25, 20:15, 20:19, 20:25, 21:15, 23:14, 25:5, 26:3, 38:10, 38:14, 38:18, 63:14, 70:21, 72:12, 72:24, 73:2, 78:8, 81:19, 82:8, 82:19, 99:3, 99:6, 100:9, 102:16, 102:17, 123:15, 133:4, 134:8, 138:18, 147:8, 157:5, 175:25, 191:3, 191:14, 192:8, 193:18, 219:23, 247:9, 325:25, 326:1, 326:4, 327:6, 347:24, 354:4, 354:6, 354:6, 362:7
labs [2] 26:3, 58:24
lack - 338:9
lacks - 16:3
language - 267:23
later [35] 80:14, 80:18, 80:19, 86:13, 89:14, 97:6, 103:24, 103:25, 125:9, 133:23, 145:9, 146:5, 157:2, 157:15, 173:12, 185:1, 186:12, 187:14, 192:25, 197:24, 198:10, 199:7, 210:4, 260:14, 266:20, 303:6, 310:1, 320:8, 334:6, 347:20, 350:16, 360:6, 367:16, 379:10, 400:24
law [19] 65:7, 65:14, 65:20, 65:23, 110:24, 111:21, 111:24, 112:1, 112:12, 267:7, 271:11, 289:13, 289:14, 361:13, 363:3, 363:4, 363:5, 363:13, 402:14
lawyer [2] 13:8, 294:8
lead [4] 24:10, 198:7, 225:15, 335:16
leader [6] 45:2, 207:15, 207:18, 216:25, 232:15, 232:16
leadership [9] 206:21, 207:10, 207:16, 214:22, 214:24, 219:14, 220:23, 232:17, 232:18
leading [2] 175:14, 176:5
leads [3] 24:11, 24:14, 390:9
learn [16] 71:23, 82:1, 94:22, 94:25, 97:24, 118:23, 127:1, 135:11, 155:12, 190:9, 198:25, 201:6, 201:7, 201:14, 219:3, 401:10
learned [22] 34:2, 36:8, 37:18, 71:10, 81:12, 82:3,

91:14, 103:21, 155:14, 201:3, 201:4, 201:8, 201:12, 203:12, 205:4, 205:5, 205:11, 207:10, 269:22, 374:13, 390:7, 399:6
learning [2] 65:16, 209:20
least [8] 28:3, 89:19, 90:12, 108:3, 121:4, 147:25, 268:16, 379:14
leave [26] 19:7, 95:7, 106:2, 156:24, 191:18, 191:19, 193:8, 193:17, 193:21, 193:24, 193:25, 194:3, 194:8, 201:19, 202:5, 209:19, 267:10, 268:24, 286:6, 303:11, 343:13, 343:19, 344:22, 345:1, 348:22, 352:1
leaves [2] 96:11, 201:24
leaving [5] 71:16, 93:25, 185:1, 193:22, 287:25
led [4] 124:9, 124:14, 147:5, 381:20
legal [11] 39:12, 112:10, 222:18, 222:21, 271:14, 277:12, 277:23, 287:12, 287:15, 305:19, 378:20
legitimate - 384:17
legs [2] 353:12, 372:6
length [12] 118:3, 119:13, 127:7, 127:16, 127:18, 127:19, 127:23, 128:7, 128:10, 129:14, 145:16, 352:20
lengthy - 197:12
less [8] 238:23, 309:8, 334:3, 340:11, 370:17, 370:19, 370:20, 382:11
lesson - 399:11
let's [52] 10:19, 29:23, 32:11, 32:11, 32:20, 32:20, 40:13, 48:22, 56:13, 61:12, 68:9, 89:22, 104:1, 104:1, 112:22, 134:22, 141:10, 164:14, 207:12, 212:24, 215:16, 216:22, 216:23, 219:12, 219:12, 221:19, 238:2, 238:2, 238:7, 243:22, 245:16, 245:18, 258:16, 268:21, 276:16, 276:17, 280:1, 304:18, 305:25, 306:1, 312:14, 315:11, 327:22, 336:3, 338:21, 342:6, 347:8, 349:1, 349:1, 360:23, 364:23, 375:7
letter [3] 393:11, 396:19, 407:15
letting [3] 318:18, 324:16, 324:19
level [9] 71:20, 73:17, 73:18, 75:8, 80:5, 93:5, 93:7, 129:17, 281:25
liability [2] 222:18, 222:21
license - 160:18
likely [5] 142:10, 270:18, 308:25, 309:3, 381:8
linens - 360:14
lines - 38:22
Lisa - 24:15
listed - 68:5
listen [4] 333:11, 336:3, 338:21, 342:4
listened [2] 342:5, 344:7
listening - 53:7
lived - 19:11
liver - 372:18
lives - 243:12
living [11] 32:6, 33:4, 33:4, 33:6, 34:8, 134:12, 139:12, 240:6, 270:9, 295:19, 302:5
LLC - 2:15
local - 202:19
locate - 300:20
located - 21:12
location [4] 211:9, 299:14, 299:18, 388:24
locations [2] 350:2, 389:11
Loevy [2] 2:6, 2:6
log - 60:15
longer [6] 32:6, 57:24, 74:1, 127:22, 154:17, 382:2
looking [12] 26:24, 38:17, 109:24, 175:5, 203:2, 203:5, 309:17, 333:17, 344:18, 372:7, 373:12, 374:4
looks [11] 33:17, 51:16, 52:5, 52:20, 231:2, 279:21, 306:2, 309:7, 310:12, 313:13, 356:20
lose [5] 114:12, 268:15, 344:10, 388:3, 388:8
losing [2] 377:5, 387:23
loss [20] 52:5, 52:16, 52:17, 53:16, 54:4, 54:17, 56:10, 56:11, 86:20, 86:22, 86:25, 122:1, 131:11, 134:12, 137:20, 139:19, 299:7, 315:2, 315:21, 360:7
lost [10] 79:7, 87:14, 283:16, 310:20, 310:23, 311:3, 311:7, 311:13, 315:6, 388:2
lots [3] 242:21, 313:21, 388:2
loud - 217:18
loudly - 167:5
love [4] 231:23, 330:8, 331:1, 331:9
loving - 252:19
low [17] 73:16, 73:18, 73:24, 74:23, 74:25, 75:4, 129:19, 129:21, 129:24, 129:25, 130:3, 130:4, 130:5, 130:5, 145:22, 145:22, 146:3
LPA [2] 2:18, 407:5
LPN - 84:25
lung - 131:4
lungs [5] 130:21, 130:25, 131:3, 372:13, 372:18
lying [2] 276:19, 357:15

**M**

M-O-S-C-H-E-L-L - 7:15
ma'am [6] 23:24, 32:16, 34:13, 43:15, 52:9, 111:9
mail - 407:14
mailed - 394:22
main [5] 10:22, 17:3, 26:17, 41:15, 341:6
maintained - 155:3
maintains - 183:24
major - 313:25
majority - 298:7
makes [14] 15:22, 42:17, 102:1, 149:13, 163:1, 196:18, 223:16, 228:5, 246:4, 252:19, 358:2, 369:6, 370:12, 388:16
making [10] 25:8, 113:12, 116:6, 121:22, 163:11, 194:9, 238:23, 310:3, 310:8, 310:14
malformation - 370:8
malpractice - 9:6
manage - 246:6
managed - 79:22
management [49] 23:14, 24:8, 62:10, 76:25, 78:1, 78:13, 79:17, 79:18, 79:23, 80:7, 80:13, 81:3, 129:14, 131:6, 132:15, 132:22, 137:22, 143:18, 147:3, 147:6, 147:7, 155:10, 158:15, 161:12, 161:14, 161:21, 166:4, 179:10, 206:25, 208:1, 217:11, 220:6, 224:18, 229:12, 231:18, 241:15, 245:14, 245:17, 248:18, 255:12, 256:4, 289:4, 289:8, 290:19, 290:21, 299:6, 301:21, 324:23, 328:14
manager [21] 18:11, 22:14, 22:20, 22:25, 23:11, 23:12, 23:16, 23:16, 23:21, 23:23, 24:1, 24:1, 25:5, 49:16, 122:14, 207:4, 209:17, 214:5, 214:25, 273:19, 274:4
managerial - 274:5
mandatory - 140:7
manner - 49:24
manpower - 199:23
March [4] 1:14, 4:7, 406:4, 407:11
mark - 260:16
marked [5] 50:23, 213:9, 260:18, 306:16, 336:7
master's - 17:5
match - 340:2
materials [5] 64:21, 66:5, 66:12, 66:15, 67:15
maternal-fetal [4] 152:22, 153:3, 153:24, 166:3
matrix [3] 26:24, 27:1, 27:2
matter [15] 10:10, 140:23, 159:20, 159:21, 218:23, 223:2, 224:5, 242:13, 246:1, 332:12, 360:15, 362:12, 362:18, 378:20, 407:17
matters [4] 85:18, 85:19, 270:15, 270:16
maybe [34] 9:10, 14:22, 34:14, 39:12, 67:17, 87:5, 90:18, 103:16, 120:18, 125:14, 141:6, 154:6, 159:7, 174:14, 193:17, 207:13, 207:20, 278:22, 302:10, 308:16, 308:17, 321:20, 321:21, 322:7, 333:12, 350:8, 362:11, 362:18, 365:10, 369:2, 370:11, 375:12, 398:7, 399:7
Mazanec - 3:7
McBlain - 24:17
meaning [3] 116:1, 218:13, 386:24
meanings - 39:20
means [3] 73:18, 73:25, 252:6
meant [9] 73:8, 145:18, 159:19, 249:8, 277:5, 294:1, 294:3, 316:5, 322:8
meanwhile - 295:19
measurement - 89:12
measurements - 89:8
measures - 134:18
meconium [5] 8:16, 9:4, 9:18, 10:6, 10:10
med-surg [4] 18:22, 18:23, 19:13, 20:13
media [2] 397:20, 400:9
medical [133] 8:21, 9:5, 11:25, 13:6, 13:14, 13:16, 13:18, 18:25, 19:10, 19:22, 20:23, 20:25, 21:13, 35:5, 36:3, 37:4, 37:10, 39:13, 50:3, 50:6, 50:11, 54:14, 55:20, 55:23,

56:1, 56:18, 59:10, 59:19, 60:7, 60:23, 61:5, 62:13, 62:19, 62:24, 63:21, 64:2, 64:6, 64:10, 65:8, 65:11, 65:14, 67:19, 68:3, 73:22, 74:6, 74:7, 75:25, 76:4, 76:22, 77:16, 77:23, 78:21, 83:10, 83:12, 87:24, 89:6, 89:25, 91:17, 95:5, 98:13, 99:9, 100:18, 100:21, 101:14, 103:19, 104:25, 107:16, 107:20, 108:12, 111:22, 120:25, 124:25, 125:7, 125:9, 129:11, 130:8, 131:19, 134:5, 135:24, 137:2, 140:9, 141:17, 141:24, 148:21, 151:1, 151:10, 156:7, 157:7, 159:23, 160:18, 163:22, 163:25, 164:1, 164:6, 169:3, 169:7, 169:8, 175:5, 176:20, 179:5, 194:2, 200:9, 200:16, 204:19, 227:21, 227:25, 228:1, 238:15, 245:25, 247:15, 251:5, 252:9, 257:11, 258:18, 274:20, 274:22, 274:25, 275:2, 302:13, 304:18, 305:25, 306:14, 319:8, 328:12, 332:10, 332:22, 334:14, 338:24, 339:9, 367:18, 376:7, 380:18, 389:22
medical-surgical - 18:24
medically [3] 164:2, 275:7, 328:7
medication [5] 36:12, 181:12, 182:2, 184:3, 379:12
medications [2] 12:4, 17:14
medicine [9] 130:24, 152:22, 153:3, 153:24, 166:3, 180:18, 185:16, 229:15, 326:22
meet [13] 14:9, 15:9, 15:10, 54:20, 81:20, 81:22, 135:22, 136:2, 136:5, 136:14, 136:19, 136:22, 138:3
meeting [4] 15:2, 67:16, 163:8, 208:22
meetings [2] 14:23, 135:3
member - 65:14
members [2] 84:15, 292:11
membranes [18] 57:21, 57:25, 73:5, 74:11, 74:22, 75:1, 75:17, 76:25, 93:10, 102:19, 119:6, 119:8, 121:4, 121:5, 145:1, 145:25, 240:8, 241:7
memories - 87:14
memory [4] 67:25, 69:15, 330:7, 357:1
menstrual - 89:17
menstruate - 89:25
menstruated - 91:12
menstruation [7] 89:20, 89:23, 90:1, 90:3, 90:6, 91:5, 91:10
mental [4] 97:1, 365:11, 365:13, 369:23
mentally - 365:3
mention [4] 35:13, 299:20, 303:24, 367:16
mentioned [15] 15:25, 21:11, 31:19, 34:20, 35:7, 64:4, 67:23, 87:20, 105:9, 142:5, 142:9, 215:24, 281:23, 293:17, 341:14
Mercy [13] 1:9, 2:15, 2:15, 12:13, 239:1, 277:2, 278:18, 289:11, 289:16, 306:5, 306:6, 315:1, 361:15
message [2] 235:15, 261:18
messages [12] 235:12, 260:19, 292:24, 341:4, 390:24, 391:8, 391:11, 392:17, 393:22, 394:8, 396:20, 396:23
Messenger - 391:10
met [3] 14:15, 14:16, 365:5
method - 89:18
midnight [2] 201:11, 201:13
midway - 196:23
min - 279:20
mind [12] 15:10, 87:7, 109:9, 109:24, 143:1, 173:21, 196:21, 267:4, 276:13, 344:14, 364:9, 387:6
mine [2] 158:23, 221:2
miniature - 372:8
minimal [8] 61:21, 82:4, 82:5, 95:24, 144:13, 144:16, 152:16, 244:4
minimally [2] 95:21, 204:23
ministry - 221:16
minor [6] 59:24, 59:25, 61:2, 61:5, 64:4, 66:22
minor's - 62:5
minute [5] 53:21, 133:5, 211:13, 222:12, 325:22
minutes [10] 194:11, 228:15, 279:20, 309:16, 320:8, 320:20, 320:23, 320:24, 341:7, 341:8
miracle [9] 386:6, 386:8, 386:23, 386:25, 387:1, 387:2, 387:9, 387:14, 387:17
Miranda [3] 346:21, 346:22, 347:1
miscarriage [4] 34:24, 39:24, 358:23, 359:7
miscarriages - 358:18
miscarried [5] 105:1, 261:13, 263:10, 263:15, 265:16
miscarrying - 86:18
misconduct [2] 160:14, 160:17
missed [2] 92:8, 93:9
missing [2] 219:15, 238:16
misstated - 111:7
Misstates [9] 32:18, 88:24, 119:17, 121:8, 208:10, 249:6, 272:13, 291:10, 385:24
Missy - 23:17
mistaken - 354:18
mistakes - 213:6
misunderstand [2] 356:8, 377:14
moderate - 313:9
modes - 331:14
mom [25] 133:6, 134:14, 242:7, 242:9, 243:11, 243:19, 244:1, 247:4, 248:19, 251:14, 251:14, 253:24, 255:14, 276:6, 317:6, 319:12, 319:19, 359:6, 390:6, 390:7, 390:10, 390:11, 390:12, 390:14, 390:16
Mom's - 243:12
moment [6] 53:11, 182:25, 210:3, 221:19, 292:20, 368:16
moms [3] 247:3, 247:10, 363:9
Monday [4] 24:3, 68:11, 68:13, 68:23
Mondays [2] 68:16, 69:4
monitor [3] 72:11, 82:7, 98:17
monitored [2] 82:11, 92:24
monitoring [7] 82:6, 107:6, 107:11, 136:3, 184:2, 191:24, 196:8
month [5] 78:25, 79:1, 90:4, 231:1, 234:8
months [2] 90:4, 91:6
moral [2] 44:7, 287:8
morning [35] 7:10, 7:11, 15:6, 15:15, 94:21, 96:15, 96:19, 96:23, 97:7, 97:10, 97:23, 133:14, 133:17, 133:18, 136:9, 136:10, 138:17, 138:23, 190:21, 198:25, 201:15, 203:12, 205:20, 206:7, 207:19, 258:17, 258:20, 260:6, 260:8, 260:11, 260:12, 263:4, 263:14, 265:5, 353:16
Moschell [18] 1:9, 2:16, 7:2, 7:10, 7:14, 214:21, 238:12, 292:23, 307:2, 307:5, 307:6, 341:13, 405:4, 405:9, 406:3, 406:24, 407:11, 407:12
mother's [4] 140:17, 143:20, 162:12, 181:2
mothers [15] 52:17, 76:24, 77:6, 78:1, 78:10, 137:8, 137:12, 137:15, 139:18, 258:10, 288:18, 313:22, 354:15, 380:8, 380:13
MOTIONS - 5:5
motives - 366:1
mouse - 112:23
mouth [3] 205:2, 372:7, 373:12
move [5] 20:10, 21:10, 221:24, 323:14, 352:4
moved [4] 218:12, 218:21, 231:16, 343:24
movement - 368:13
moving [5] 306:20, 310:3, 310:8, 312:15, 312:15
multiple [22] 25:18, 26:10, 39:19, 60:4, 78:9, 217:24, 228:22, 234:9, 258:7, 273:20, 275:18, 275:21, 308:6, 340:2, 342:20, 342:25, 344:23, 354:14, 388:23, 389:17, 397:12, 401:21
musculature - 371:21
Musser - 24:16
mutually - 74:17
myself [6] 65:18, 165:25, 167:9, 182:12, 268:22, 315:15

## N

named - 9:24
narrative - 135:8
native - 391:14
nature - 297:9
navigate [2] 40:22, 238:23
nearly - 86:25
necessarily [3] 75:19, 102:9, 297:6
necessary [12] 37:1, 61:21, 76:1, 76:13, 129:9, 154:23, 178:7, 301:1, 301:2, 302:16, 324:22, 373:8
needed [65] 25:23, 43:5, 64:15, 64:25, 65:24, 101:19, 155:17, 155:23, 157:6, 158:1, 159:12, 160:7, 164:4, 166:16,

172:11, 179:4, 179:15, 185:15, 186:20, 186:22, 187:17, 189:24, 191:21, 200:12, 200:22, 214:3, 216:6, 217:16, 218:16, 226:10, 227:9, 247:6, 277:15, 278:24, 278:25, 282:8, 282:9, 282:10, 282:16, 282:18, 283:14, 285:19, 288:20, 289:25, 290:22, 291:19, 293:10, 295:12, 296:16, 298:13, 300:24, 305:4, 307:7, 321:5, 321:11, 321:21, 334:25, 335:1, 336:2, 338:18, 339:2, 344:23, 344:23, 346:10, 387:15
needing - 217:19
needs [26] 43:9, 43:10, 53:10, 53:12, 54:20, 63:9, 64:5, 66:22, 77:10, 111:4, 122:21, 137:4, 137:7, 197:23, 237:23, 267:8, 274:6, 285:25, 286:10, 298:14, 298:16, 313:4, 328:16, 372:11, 372:12, 392:6
negative - 124:3
neighbor - 297:9
neither [5] 24:9, 229:6, 271:4, 296:14, 397:17
Nev - 317:17
news [4] 107:9, 234:24, 397:7, 401:12
nice - 28:24
Nick [2] 3:5, 67:13
nine - 376:10
nineteen - 17:21
ninety - 17:22
nobody [6] 123:4, 167:10, 217:18, 261:20, 298:15, 335:16
nodding [8] 26:11, 34:21, 35:9, 127:9, 212:5, 268:4, 268:5, 316:22
noise [3] 310:3, 310:8, 310:14
non - 124:2
nonbleeding - 275:3
none [7] 38:12, 212:15, 222:10, 228:24, 228:25, 292:17, 353:19
nonviable [2] 242:10, 248:15
nor - 26:20
norm - 122:17
normal [20] 15:21, 76:5, 118:3, 119:13, 127:7, 127:16, 127:18, 127:19, 127:23, 128:7, 128:10, 129:13, 137:19, 145:16, 146:14, 233:4, 236:21, 237:1, 365:11, 365:14
normally [7] 57:8, 78:19, 98:18, 101:25, 137:15, 192:7, 313:18
Norman [3] 181:25, 182:1, 183:17
NORTHEN - 1:2
Northern - 1:18
Northside [2] 20:24, 21:13
nose [2] 372:7, 373:11
Notary [8] 1:13, 4:12, 7:4, 405:1, 405:13, 405:15, 405:19, 407:14
note [80] 103:7, 135:9, 142:5, 142:8, 142:17, 157:7, 161:23, 162:5, 162:7, 165:13, 166:9, 170:1, 170:2, 171:6, 172:2, 172:8, 173:16, 173:16, 174:4, 174:15, 174:19, 175:7, 176:17, 179:8, 179:11, 181:5, 185:2, 185:10, 185:14, 186:21, 186:25, 187:1, 187:17, 187:19, 198:13, 199:6, 207:23, 212:14, 212:24, 213:12, 214:7, 220:18, 225:14, 230:15, 231:11, 236:6, 238:20, 239:6, 239:11, 239:12, 239:14, 239:15, 239:17, 242:15, 243:19, 252:9, 253:16, 253:22, 254:23, 262:1, 262:2, 262:6, 263:12, 263:13, 306:23, 306:25, 307:1, 309:18, 309:21, 312:5, 312:8, 312:16, 312:18, 312:19, 316:16, 320:4, 320:7, 320:15, 323:22, 325:23
noted [4] 313:9, 316:17, 405:5, 406:5
notes [15] 13:22, 135:14, 262:8, 262:14, 262:17, 263:1, 265:15, 308:14, 308:14, 308:14, 312:17, 319:25, 350:13, 398:12, 404:10
nothing [23] 7:6, 30:14, 114:18, 170:4, 170:8, 170:17, 176:24, 196:9, 200:1, 271:2, 292:15, 302:19, 311:23, 330:23, 333:21, 348:1, 348:4, 363:21, 377:6, 387:24, 396:24, 401:24, 402:1
notice [2] 1:14, 212:25
notification [2] 396:19, 398:8
notified [6] 96:14, 275:4, 312:5, 393:11, 393:14, 393:15
numbers [2] 51:6, 238:24
nuns - 30:12
nurse [80] 9:20, 16:22, 16:24, 16:25, 17:4, 17:4, 17:5, 17:13, 18:2, 18:8, 18:14, 18:22, 18:23, 19:12, 23:12, 23:15, 23:16, 23:21, 23:23, 24:1, 24:1, 25:5, 26:5, 42:11, 42:15, 45:21, 52:6, 54:18, 58:5, 70:22, 72:15, 72:21, 78:9, 82:15, 94:5, 94:11, 95:1, 98:3, 100:24, 101:6, 123:16, 125:1, 135:17, 144:18, 148:20, 152:10, 159:10, 165:16, 172:1, 180:18, 182:3, 182:6, 183:20, 184:5, 184:9, 184:21, 185:9, 192:17, 196:11, 196:12, 197:10, 199:7, 199:13, 207:4, 207:5, 219:6, 222:11, 222:15, 231:22, 231:25, 248:17, 271:17, 273:16, 320:12, 320:17, 321:7, 321:21, 332:1, 352:19, 353:8
nurse's [10] 36:11, 43:22, 43:25, 98:3, 166:7, 167:18, 180:5, 211:6, 214:12, 237:5
nursery [5] 52:21, 134:8, 138:22, 140:14, 380:13
nurses [31] 17:6, 25:22, 26:2, 26:6, 27:2, 28:12, 28:22, 39:5, 42:8, 43:1, 43:14, 48:15, 49:4, 49:8, 70:18, 70:19, 132:22, 164:20, 180:4, 182:9, 188:7, 188:11, 188:24, 189:23, 199:22, 220:9, 225:5, 228:8, 246:8, 268:22, 274:16
nursing [11] 16:15, 17:21, 18:5, 18:16, 25:18, 33:22, 147:20, 147:22, 176:1, 198:14, 219:5

## O

object [4] 16:1, 84:3, 272:12, 305:9
objection [311] 14:7, 14:13, 29:12, 30:19, 32:8, 32:15, 35:4, 36:2, 37:3, 37:9, 39:9, 40:18, 41:11, 41:24, 42:12, 43:23, 44:11, 44:22, 46:2, 46:8, 48:1, 48:7, 48:18, 49:1, 49:20, 50:2, 50:6, 50:10, 50:16, 51:14, 54:13, 55:25, 56:8, 56:20, 57:4, 58:20, 59:21, 73:21, 74:16, 75:24, 76:3, 76:21, 77:15, 77:22, 78:5, 78:20, 81:6, 82:21, 83:2, 83:9, 84:5, 86:15, 88:12, 88:22, 89:5, 90:20, 91:7, 91:25, 92:4, 93:12, 93:20, 98:23, 99:8, 99:21, 100:12, 101:10, 101:16, 102:25, 103:10, 104:22, 106:18, 107:15, 107:19, 108:11, 109:21, 110:11, 114:7, 115:14, 116:19, 119:17, 121:7, 121:14, 123:20, 123:25, 124:5, 125:22, 126:16, 127:11, 128:24, 129:10, 130:2, 130:6, 130:14, 130:23, 131:14, 131:22, 132:11, 134:4, 135:23, 136:24, 137:1, 138:4, 139:13, 140:8, 141:1, 141:16, 141:23, 142:2, 143:3, 143:14, 144:11, 144:20, 147:4, 148:2, 148:10, 148:21, 149:4, 149:6, 149:22, 150:1, 150:25, 151:9, 152:19, 153:10, 154:18, 154:24, 155:8, 156:10, 159:18, 160:19, 162:2, 162:8, 163:13, 164:5, 164:17, 170:13, 172:9, 172:15, 172:23, 174:20, 174:22, 175:10, 176:18, 178:16, 185:25, 186:17, 187:7, 188:5, 188:17, 189:2, 192:11, 196:2, 196:15, 196:20, 198:1, 198:11, 198:16, 199:3, 199:9, 200:3, 200:8, 200:15, 200:21, 201:9, 204:6, 204:25, 205:6, 205:16, 208:9, 208:10, 212:9, 215:21, 217:22, 218:5, 218:9, 222:20, 223:7, 224:14, 225:7, 225:10, 230:4, 230:8, 231:4, 232:11, 233:24, 240:22, 241:21, 242:2, 242:14, 243:16, 243:17, 244:14, 244:21, 245:11, 245:24, 246:11, 247:14, 247:23, 249:6, 249:16, 249:20, 250:14, 250:19, 251:7, 251:19, 253:3, 253:12, 254:4, 254:7, 254:14, 256:11, 256:11, 256:22, 257:8, 257:25, 258:6, 259:6, 259:19, 261:14, 264:12, 269:17, 272:12, 274:21, 275:1, 277:20, 281:7, 285:13, 286:14,

286:17, 287:5, 287:10, 291:10, 295:21, 297:5, 297:15, 298:2, 298:4, 298:17, 300:6, 300:21, 301:6, 301:13, 302:15, 303:25, 304:5, 304:22, 305:9, 307:21, 310:22, 310:25, 311:15, 314:7, 314:17, 315:9, 316:7, 317:1, 317:10, 326:7, 326:19, 327:10, 329:1, 329:9, 329:19, 329:22, 338:3, 339:23, 340:14, 342:23, 343:4, 348:6, 349:8, 350:23, 352:10, 354:10, 357:16, 357:22, 358:16, 358:20, 359:11, 362:14, 363:16, 364:13, 364:21, 365:12, 365:22, 367:19, 369:12, 371:18, 376:14, 378:5, 378:22, 380:17, 381:10, 381:10, 381:24, 383:7, 383:16, 384:6, 385:10, 385:14, 385:22, 387:3, 389:8, 389:16, 390:2, 391:25, 396:22, 401:16, 402:10, 402:12
objections [4] 5:5, 148:23, 148:24, 367:20
objects - 16:4
obligated [3] 285:14, 285:17, 343:7
obligation [11] 285:7, 285:12, 287:2, 287:7, 287:9, 287:13, 287:15, 288:2, 288:4, 290:6, 290:8
obligations [2] 24:9, 334:15
obliged - 361:11
observation - 90:24
observe [3] 72:11, 77:7, 94:3
observed - 128:15
observing - 93:25
obstetrician - 152:25
obtain [3] 98:21, 307:5, 363:2
obtained - 312:22
obviously [4] 54:17, 120:5, 235:17, 282:3
occasion - 62:13
occasionally - 236:4
occupied [2] 26:7, 28:12
occur [12] 43:10, 56:15, 77:10, 81:9, 155:11, 161:5, 187:17, 302:20, 350:21, 362:10, 365:9, 389:21
occurred [3] 186:9, 215:22, 380:21
occurring - 161:5
occurs [3] 161:9, 288:18, 313:6
October - 231:2
odd [5] 329:21, 364:12, 364:14, 365:16, 384:19
odor [5] 57:13, 58:16, 175:22, 175:23, 243:24
offended - 365:7
offense - 365:6
offer [3] 147:25, 316:3, 335:13
offered [15] 82:20, 83:19, 141:22, 141:25, 142:4, 142:6, 142:24, 143:17, 148:1, 148:5, 148:5, 187:6, 274:3, 315:15, 315:16
office [36] 26:12, 26:13, 70:7, 70:12, 70:13, 70:14, 70:15, 70:21, 70:25, 70:25, 75:9, 81:13, 81:14, 103:22, 104:4, 105:10, 105:11, 113:18, 116:9, 148:5, 167:25, 169:1, 193:4, 206:8, 206:11, 206:13, 208:23, 211:5, 237:1, 237:3, 237:5, 261:23, 261:25, 262:2, 323:23, 324:1
officer [7] 278:5, 317:24, 318:5, 332:11, 345:11, 345:12, 378:16
offices - 4:8
official - 23:11
oftentimes [2] 80:1, 313:14
Ohio [17] 1:2, 1:13, 1:18, 2:19, 3:8, 4:9, 4:13, 18:6, 18:20, 20:13, 110:25, 111:18, 111:22, 112:3, 267:7, 289:14, 407:6
okayed - 328:14
old-school - 248:17
older - 318:20
oldest - 395:10
oligohydramnios [10] 73:9, 73:10, 73:11, 73:13, 73:16, 73:20, 73:25, 74:13, 75:2, 75:4
on-site - 323:2
on-the-job - 53:5
ones [4] 225:18, 239:1, 395:5, 399:13
ongoing [2] 59:14, 221:6
online [3] 33:22, 36:10, 51:3
onto - 402:2
open [2] 72:2, 72:11
operated - 127:4
operating [3] 72:1, 72:6, 328:23
opinion [45] 35:5, 36:3, 37:4, 37:10, 44:20, 50:6, 50:11, 54:14, 56:1, 73:22, 75:25, 76:4, 76:22, 77:16, 77:23, 78:21, 83:10, 89:6, 93:21, 99:9, 107:16, 107:20, 108:12, 129:11, 130:9, 134:5, 135:24, 137:2, 140:9, 141:18, 141:24, 148:21, 151:1, 151:10, 152:17, 159:24, 164:6, 200:9, 200:16, 245:25, 247:15, 274:22, 275:2, 343:2, 380:18
opinions - 37:14
opted - 279:7
option [17] 20:7, 45:23, 84:1, 111:11, 111:12, 161:22, 162:25, 288:12, 289:17, 289:18, 289:23, 290:25, 291:6, 291:18, 298:25, 299:10, 334:20
options [5] 115:2, 132:15, 137:22, 295:1, 301:22
oral - 11:6
order [33] 25:15, 44:14, 44:17, 44:24, 46:14, 47:8, 48:6, 108:1, 151:5, 151:20, 151:24, 160:1, 165:2, 165:7, 166:25, 168:1, 180:12, 180:13, 183:24, 183:25, 184:12, 184:16, 196:22, 196:23, 199:14, 205:15, 224:17, 225:25, 226:3, 296:22, 374:11, 374:13, 374:19
ordered [12] 107:6, 107:6, 108:13, 168:1, 169:3, 184:8, 189:20, 196:14, 199:16, 211:23, 229:16, 282:2
ordering - 25:13
orders [17] 43:25, 44:3, 44:4, 44:6, 44:15, 46:11, 107:5, 113:13, 151:22, 152:15, 164:21, 164:22, 165:4, 166:18, 196:8, 198:18, 275:5
organs - 372:15
orientation [2] 30:4, 52:13
original [3] 309:21, 407:11, 407:14
others [4] 55:5, 68:3, 216:4, 399:18
otherwise [2] 108:5, 374:14
ounces [2] 370:10, 370:12
ours - 241:2
ourself - 274:16
ourselves - 121:23
outcome [6] 80:11, 139:14, 142:10, 223:12, 245:14, 246:7
outcomes [4] 223:3, 224:1, 224:7, 224:13
outgoing - 138:24
outlook - 97:8
outset - 28:15
outside [16] 39:12, 47:5, 48:9, 63:5, 63:7, 63:18, 85:10, 85:16, 86:5, 116:3, 171:10, 235:24, 236:2, 237:16, 313:2, 372:17
outward - 87:3
overall [2] 30:7, 30:9
overhead - 166:8
overheard - 167:21
overly [2] 95:18, 252:1
ovulating - 90:8
owed - 343:3
owes - 389:15
oxytocin - 326:23

P

p.m [3] 24:7, 24:7, 403:11
packet [2] 64:14, 65:17
pad [2] 313:9, 316:17
pads - 313:21
PAGE(S - 5:6
pages [6] 404:8, 405:4, 405:5, 407:11, 407:14, 407:15
pain [4] 140:4, 281:24, 281:25, 354:5
painful [2] 87:14, 354:16
paint - 333:13
pal - 312:22
palliative - 134:13
palpated - 312:22
panicked - 283:12
papers - 190:11
paperwork [4] 52:4, 52:14, 65:3, 193:6
paragraph - 54:4
parameter - 58:23
parent [3] 59:25, 61:10, 61:13
Parisa - 2:16
parity - 240:5
parking - 81:15
part-time [4] 20:24, 21:6, 21:7, 22:4
partial [3] 71:21, 123:6, 125:18
participate - 45:10
participated - 37:24
particular [4] 19:2, 29:23, 102:23, 222:8
parties - 4:6
partner - 134:9
party [13] 59:20, 60:8, 60:24, 62:14, 62:20, 62:25, 63:18, 63:21, 63:23, 64:3, 64:7, 64:9, 64:11
pass [7] 134:12, 248:21, 260:17, 368:8, 379:11, 379:12, 380:19
passed [6] 109:18, 139:19, 143:22, 297:7, 307:8, 313:1
passes - 379:15
past [5] 112:10, 177:20, 243:6, 364:25, 365:15
pastoral [2]

52:22, 315:20
Pat - 188:23
patient [181] 12:12, 13:15, 25:23, 26:1, 26:2, 26:16, 26:19, 26:22, 27:3, 27:9, 27:14, 27:22, 27:25, 28:2, 28:11, 30:21, 31:1, 31:15, 36:21, 37:6, 42:4, 42:11, 43:18, 43:19, 43:21, 44:14, 44:18, 44:19, 44:21, 44:25, 45:4, 46:20, 47:5, 50:9, 50:14, 51:24, 52:6, 53:8, 53:19, 54:10, 54:17, 54:19, 55:8, 58:3, 58:6, 58:13, 60:23, 61:2, 61:5, 61:11, 61:14, 62:5, 62:14, 62:24, 63:1, 64:4, 69:25, 70:15, 71:11, 71:24, 72:24, 73:1, 73:4, 73:12, 75:3, 83:19, 86:14, 87:3, 95:4, 98:18, 102:1, 102:8, 102:18, 102:20, 102:22, 105:11, 113:9, 135:11, 135:13, 136:1, 136:11, 136:22, 138:24, 139:18, 143:16, 146:3, 146:6, 146:8, 146:21, 148:12, 148:16, 148:20, 149:2, 149:9, 149:12, 149:20, 149:25, 153:19, 155:16, 156:17, 156:24, 158:17, 162:19, 164:4, 164:8, 164:13, 164:16, 168:21, 169:13, 170:10, 171:14, 177:14, 182:4, 182:17, 183:25, 187:15, 192:6, 192:13, 194:21, 198:5, 201:19, 202:7, 203:5, 214:16, 223:3, 223:12, 224:1, 224:6, 224:6, 224:13, 225:13, 234:17, 237:16, 241:14, 242:5, 242:22, 243:9, 251:9, 252:13, 254:1, 255:3, 255:3, 255:4, 255:11, 256:13, 257:2, 259:8, 261:10, 263:9, 263:11, 266:24, 269:12, 270:7, 276:8, 288:7, 307:7, 307:8, 307:9, 308:2, 308:4, 312:9, 312:21, 312:24, 313:3, 313:4, 313:4, 316:17, 320:4, 320:11, 320:16, 320:17, 320:18, 321:7, 323:16, 324:9, 327:4, 335:7, 345:17, 345:18, 399:8, 399:10
patient's [12] 13:6, 17:16, 59:5, 62:13, 63:20, 64:2, 64:7, 64:10, 131:25, 163:22, 172:2, 256:12
patient-specific - 80:24
patients [31] 17:10, 18:9, 18:25, 25:22, 52:1, 54:21, 55:4, 59:10, 59:16, 60:1, 79:16, 79:21, 79:24, 80:6, 90:4, 149:24, 152:9, 152:13, 158:16, 225:24, 231:23, 244:17, 246:7, 250:24, 251:1, 287:22, 315:24, 315:25, 324:1, 354:1, 399:11
pattern [3] 91:10, 191:18, 193:21
payroll [2] 25:7, 237:1
peaceful - 314:22
pediatrician [18] 133:13, 133:16, 133:19, 136:7, 136:8, 136:14, 136:19, 136:22, 137:25, 138:2, 138:8, 138:11, 138:14, 138:24, 140:11, 141:3, 253:9, 253:14
pediatrician's [2] 142:5, 142:17
pediatricians [6] 134:1, 135:4, 135:7, 135:22, 138:16, 252:25
pediatrics - 19:13
pee [2] 313:17, 313:18
peed - 313:12
pending [2] 1:17, 11:20
Pennsylvania [3] 16:18, 19:11, 19:15
people's - 331:14
per [9] 21:19, 27:3, 28:1, 92:2, 118:1, 146:9, 313:2, 313:2, 329:11
perceive [2] 90:12, 313:14
perceived - 126:14
perceives - 102:18
percent [4] 235:4, 276:14, 353:23, 397:19
perception [2] 348:4, 379:1
perfectly - 69:13
perform [6] 31:10, 33:8, 35:3, 35:22, 38:19, 39:17
performed [12] 33:24, 34:7, 35:18, 36:1, 36:6, 36:11, 38:7, 38:12, 38:15, 40:16, 222:18, 241:24
perhaps [3] 345:10, 387:1, 387:5
period [9] 76:7, 77:24, 89:17, 90:5, 92:8, 200:6, 200:11, 200:13, 398:21
periodically - 52:13
periods - 90:12
permanently - 302:19
permissible [4] 64:1, 65:13, 300:19, 304:20
permission [4] 178:25, 328:8, 346:23, 346:24
permitted [4] 59:19, 332:18, 332:21, 334:22
perplexed - 329:12
person's - 15:22
personal [34] 38:4, 44:7, 44:15, 85:17, 85:19, 114:14, 183:3, 183:10, 207:21, 212:16, 212:18, 212:21, 215:6, 215:18, 216:10, 216:11, 219:16, 220:1, 220:9, 220:14, 221:5, 221:5, 221:14, 222:4, 229:1, 229:4, 229:14, 298:21, 315:19, 354:13, 361:6, 391:23, 392:18, 392:22
personality [2] 96:17, 96:24
personally [16] 44:10, 44:13, 45:2, 45:4, 45:19, 80:23, 81:1, 94:2, 116:23, 129:3, 149:17, 285:24, 304:24, 360:12, 360:23, 405:16
perspective [5] 36:11, 99:20, 100:11, 164:16, 355:18
pertinent [3] 156:25, 157:3, 177:3
phenomenon - 90:15
phones [2] 390:24, 394:25
photographs - 52:21
photography - 52:23
phrase - 331:25
phrased [2] 286:18, 326:20
physical - 315:5
physically - 52:5
physician [25] 42:21, 42:22, 43:4, 43:13, 43:20, 43:21, 46:13, 47:2, 47:8, 47:19, 48:5, 58:4, 58:10, 77:9, 77:20, 131:20, 133:3, 160:15, 163:7, 171:6, 246:15, 251:16, 252:5, 275:5, 394:11
physician's - 48:16
physicians [2] 42:8, 80:9
pick [4] 287:19, 352:4, 361:17, 392:9
pictures [4] 303:16, 303:20, 304:3, 391:11
piece - 354:19
pill [2] 36:16, 36:22
Pinzone [5] 3:6, 385:14, 402:12, 403:7, 407:23
Pitocin [3] 196:25, 197:2, 254:2
pivotal - 238:13
placed [20] 151:5, 151:21, 168:1, 179:7, 179:9, 185:10, 185:15, 199:15, 239:11, 262:18, 262:20, 262:21, 275:5, 309:5, 310:8, 312:21, 313:1, 325:24, 386:14, 400:23
placenta [19] 71:15, 264:8, 264:11, 264:14, 264:16, 264:25, 282:2, 282:4, 302:18, 326:3, 326:10, 326:16, 326:23, 327:6, 328:5, 374:21, 379:8, 379:15, 380:19
placental [18] 70:1, 70:15, 71:12, 71:14, 71:25, 123:23, 124:3, 125:18, 125:19, 129:7, 148:13, 242:6, 242:18, 242:18, 256:9, 256:9, 256:18, 258:9
places [3] 349:24, 350:1, 366:6
plaintiff [3] 1:7, 2:5, 7:17
Plaintiff's [6] 5:19, 50:23, 213:9, 260:18, 306:16, 336:7
plan [11] 45:25, 48:16, 49:5, 49:9, 49:18, 167:4, 199:8, 215:5, 239:12, 253:23, 286:2
planned - 19:25
play [3] 29:8, 44:16, 54:18
played [6] 208:7, 336:11, 336:15, 336:25, 337:3, 338:22
pleasant - 320:18
please [9] 137:10, 162:12, 264:5, 273:4, 345:1, 346:3, 407:10, 407:14, 407:17
plot - 286:3
plug - 375:10
plunging - 351:19
plus [3] 213:1, 251:10, 252:14
pocket - 71:16
point [68] 21:12, 22:6, 25:2, 43:22, 56:14, 63:5, 77:8, 81:23, 82:14, 93:5, 95:14, 96:2, 99:24, 105:18, 107:22, 115:21, 124:14, 128:23, 144:8, 145:9, 150:4, 150:7, 150:18, 154:13, 164:2, 166:7, 180:3, 183:11, 187:25, 188:6, 188:10, 190:24, 211:19, 239:23, 240:12, 241:1, 242:19,

244:13, 245:15, 254:21, 259:17, 266:10, 269:18, 269:21, 272:1, 274:20, 281:1, 282:7, 289:17, 292:13, 296:9, 297:19, 308:19, 309:25, 311:14, 317:16, 320:2, 321:15, 326:2, 328:13, 334:8, 345:1, 345:13, 347:9, 362:19, 365:9, 377:7, 385:13
police [58] 202:19, 203:17, 203:23, 204:15, 277:2, 278:5, 278:17, 278:18, 279:6, 281:13, 289:6, 289:11, 289:16, 289:22, 290:22, 291:6, 291:15, 291:17, 291:21, 293:11, 296:13, 296:23, 298:1, 298:11, 299:2, 299:9, 299:9, 300:20, 300:24, 300:24, 302:25, 305:4, 305:7, 305:14, 309:6, 309:15, 312:6, 312:24, 317:24, 320:10, 320:16, 324:22, 328:14, 332:11, 334:21, 334:23, 335:6, 335:11, 335:14, 339:11, 345:11, 345:12, 345:20, 363:4, 363:13, 378:2, 378:16, 401:1
policies [4] 39:14, 40:11, 59:11, 277:3
policy [9] 47:15, 59:12, 299:4, 301:25, 313:2, 313:2, 325:8, 325:11, 325:16
portray - 176:20
pose - 50:9
posed - 169:12
position [12] 18:16, 20:14, 23:3, 23:19, 24:23, 172:1, 370:24, 371:9, 371:15, 371:20, 371:21, 371:22
poss [2] 136:4, 377:1
possession - 288:10
possibility [9] 136:3, 136:4, 297:22, 357:21, 377:2, 380:1, 381:13, 384:25, 389:25
possible [13] 50:8, 52:21, 120:22, 123:11, 128:19, 154:21, 171:17, 197:25, 314:22, 380:12, 381:6, 381:22, 399:18
possibly [5] 27:19, 246:23, 295:19, 297:25, 369:4
post [3] 36:25, 158:12, 267:6
postabortion - 36:23
postmiscarriage - 359:10
postpartum [2] 317:5, 317:6
potentially [4] 64:7, 247:21, 281:6, 281:10
pound [2] 370:15, 370:19
PowerPoint - 60:13
practice [5] 41:1, 203:6, 231:22, 395:25, 396:16
practices [2] 40:12, 59:12
practitioner [3] 17:1, 17:4, 17:5
pray - 53:8
prayed [2] 53:8, 233:8
pre - 58:24
prec - 132:17
precedence [2] 41:19, 132:17
precedent - 147:6
preceding [4] 91:6, 405:4, 405:5, 405:16
precisely - 378:1
preface - 207:14
prefer - 216:25
preferred - 207:11
pregnancies [2] 106:17, 240:6
pregnancy [62] 31:23, 32:3, 35:19, 40:4, 40:6, 40:7, 40:9, 40:13, 41:7, 42:18, 76:5, 76:6, 76:17, 77:13, 77:21, 77:25, 78:15, 79:11, 81:2, 86:19, 87:15, 89:15, 92:9, 93:19, 99:11, 106:9, 106:9, 106:16, 110:2, 110:14, 113:24, 114:4, 114:6, 115:23, 116:7, 131:13, 132:8, 132:21, 141:5, 153:5, 154:10, 155:2, 158:1, 158:3, 160:1, 160:8, 163:2, 163:5, 225:15, 226:9, 226:25, 227:4, 242:10, 247:10, 263:19, 263:23, 315:2, 315:7, 334:2, 347:16, 356:20, 358:8
pregnant [18] 41:4, 41:5, 41:16, 41:19, 43:19, 59:25, 89:21, 89:24, 90:9, 90:13, 90:16, 92:1, 169:15, 192:5, 242:17, 318:22, 318:23, 347:11
preliminary - 11:23
premature [12] 73:5, 74:10, 134:9, 138:18, 139:23, 146:17, 153:12, 153:17, 153:19, 240:8, 241:6, 253:5
prematurely - 243:9
prenatal [7] 92:2, 333:9, 333:22, 333:25, 335:2, 338:9, 338:12
prep - 312:22
preparation [4] 67:4, 91:17, 303:20, 304:4
prepare [5] 12:18, 13:1, 14:10, 14:16, 373:19
preparing [4] 67:15, 72:6, 72:12, 373:17
prescribe [2] 17:14, 58:11
prescribing - 17:9
presence [3] 312:24, 321:21, 339:21
present [13] 3:11, 36:19, 61:14, 69:5, 70:18, 72:18, 72:19, 102:2, 113:19, 135:3, 135:17, 236:23, 324:5
presentation [2] 60:13, 227:15
presented [5] 66:14, 98:12, 103:15, 121:17, 264:17
preservation - 400:3
preserve [5] 247:17, 248:24, 361:16, 393:11, 398:9
preserved - 329:5
pressure [8] 47:3, 47:10, 47:11, 47:12, 47:20, 102:5, 102:6, 147:21
pretend - 316:12
preterm - 73:5
prevent [5] 107:17, 108:16, 247:16, 305:20, 368:4
prevented - 247:12
previous [9] 113:16, 125:17, 148:13, 215:1, 215:4, 241:25, 262:23, 347:16, 394:3
previously [3] 131:22, 179:3, 343:5
primarily [6] 113:18, 152:9, 274:9, 274:13, 274:15, 275:11
primary [2] 276:4, 276:12
prior [27] 9:21, 38:14, 56:11, 56:15, 58:24, 59:9, 66:11, 75:3, 75:11, 92:6, 105:8, 161:11, 175:22, 184:8, 185:1, 185:15, 200:7, 208:22, 267:20, 270:1, 287:23, 326:11, 331:25, 350:17, 352:13, 367:14, 395:5
prioritize - 199:11
priority [8] 294:23, 295:1, 295:3, 295:4, 295:6, 295:7, 295:9, 295:10
Prislipsky [363] 2:17, 4:8, 5:6, 7:23, 8:6, 8:9, 8:13, 8:16, 8:19, 9:1, 14:7, 14:13, 29:12, 30:19, 32:8, 32:15, 32:18, 33:9, 33:12, 33:16, 35:4, 36:2, 37:3, 37:9, 39:9, 40:18, 41:11, 41:24, 42:12, 43:23, 44:11, 44:22, 46:2, 46:8, 48:1, 48:7, 48:18, 49:1, 49:20, 50:2, 50:5, 50:10, 50:16, 50:25, 51:5, 51:14, 54:13, 55:25, 56:8, 56:20, 57:4, 58:20, 59:21, 73:10, 73:21, 74:16, 74:18, 75:24, 76:3, 76:21, 77:15, 77:22, 78:5, 78:20, 81:6, 82:21, 83:2, 83:9, 84:3, 84:5, 86:15, 88:12, 88:22, 88:24, 89:5, 90:20, 91:7, 91:25, 92:4, 93:12, 93:20, 96:18, 98:23, 99:8, 99:21, 100:12, 101:10, 101:16, 102:25, 103:10, 104:22, 106:18, 106:21, 107:15, 107:19, 108:11, 109:21, 110:11, 112:18, 112:23, 114:7, 115:14, 116:19, 119:17, 121:7, 121:14, 123:20, 123:25, 124:5, 125:22, 126:16, 127:11, 128:24, 129:10, 130:2, 130:6, 130:8, 130:14, 130:23, 131:14, 131:22, 132:11, 134:4, 135:23, 136:24, 137:1, 138:4, 139:13, 140:8, 141:1, 141:16, 141:23, 142:2, 143:3, 143:14, 144:11, 144:20, 147:4, 148:2, 148:10, 148:18, 149:4, 149:6, 149:22, 150:1, 150:8, 150:25, 151:9, 152:19, 153:10, 154:18, 154:24, 155:8, 156:10, 159:18, 160:19, 162:2, 162:8, 163:13, 164:5, 164:17, 170:13, 172:9, 172:15, 172:23, 174:20, 174:22, 175:10, 176:18, 178:16, 185:25, 186:17, 187:7, 188:5, 188:17, 189:2, 192:11, 192:21, 195:3, 195:7, 195:9, 196:2, 196:15, 196:20, 198:1, 198:11, 198:16, 199:3, 199:9, 200:3, 200:8, 200:15, 200:21, 201:9, 204:6, 204:25, 205:6, 205:16, 208:9, 208:12, 212:9, 215:21, 217:22, 218:5, 218:9, 221:2, 221:8, 222:20, 223:7,

224:14, 225:7, 225:10, 230:4, 230:8, 231:4, 232:11, 233:24, 238:6, 240:22, 241:21, 242:2, 242:14, 243:16, 244:8, 244:11, 244:14, 244:21, 245:11, 245:24, 246:11, 247:14, 247:23, 248:5, 248:9, 249:6, 249:16, 249:20, 250:14, 250:19, 251:7, 251:19, 253:3, 253:12, 254:4, 254:6, 254:14, 256:11, 256:21, 257:8, 257:23, 257:25, 258:6, 259:6, 259:19, 261:14, 264:12, 267:22, 268:5, 269:17, 272:6, 272:12, 274:21, 275:1, 277:20, 277:22, 280:5, 281:7, 285:13, 286:14, 286:16, 287:5, 287:10, 291:10, 295:21, 297:5, 297:15, 298:2, 298:4, 298:17, 300:6, 300:9, 300:21, 301:6, 301:13, 302:15, 303:25, 304:5, 304:15, 304:22, 305:9, 307:16, 307:21, 310:22, 310:25, 311:15, 314:7, 314:17, 315:9, 316:7, 317:1, 317:10, 326:7, 326:19, 327:10, 329:1, 329:9, 329:14, 329:19, 329:22, 338:3, 339:23, 340:14, 341:8, 342:23, 343:4, 344:13, 344:16, 348:6, 349:8, 350:23, 352:10, 354:10, 357:16, 357:22, 357:25, 358:16, 358:20, 359:11, 362:14, 363:16, 364:13, 364:21, 365:12, 365:22, 367:19, 369:12, 371:18, 376:14, 378:5, 378:22, 378:25, 380:17, 381:10, 381:24, 383:7, 383:16, 384:6, 385:10, 385:22, 385:24, 387:3, 387:19, 389:8, 389:16, 390:2, 391:25, 396:22, 401:16, 402:10, 403:5, 403:8, 407:5, 407:9

privacy [8] 59:10, 59:16, 65:8, 203:21, 319:8, 332:10, 334:14, 339:10

private [14] 52:20, 59:19, 60:23, 62:13, 62:19, 62:24, 63:21, 64:2, 64:10, 65:11, 65:14, 98:16, 328:12, 332:22

privilege - 304:16

privileges [2] 17:6, 17:8

pro - 46:24

probably [23] 27:23, 38:23, 83:3, 89:19, 124:15, 138:22, 182:22, 211:10, 213:2, 228:4, 228:7, 230:17, 236:3, 249:22, 332:4, 333:10, 335:3, 335:3, 335:4, 335:8, 347:3, 365:1, 397:3

problem [9] 184:7, 201:22, 248:20, 277:17, 277:18, 277:21, 277:23, 277:24, 387:25

problematic - 245:23

procedure [12] 1:16, 35:22, 36:7, 36:18, 102:15, 139:2, 187:5, 215:13, 222:19, 278:24, 297:8, 407:16

procedures [4] 31:5, 31:16, 32:4, 165:3

proceed [16] 40:13, 41:23, 132:19, 159:8, 164:20, 177:8, 179:23, 180:4, 180:9, 180:21, 186:21, 211:25, 224:20, 252:16, 299:11, 305:22

proceeded [4] 48:8, 107:12, 143:18, 229:17

proceeding [2] 212:14, 253:25

proceedings - 404:9

process [18] 23:8, 30:5, 155:9, 157:13, 183:11, 183:14, 183:16, 197:12, 197:17, 197:24, 199:20, 204:3, 204:4, 204:9, 268:23, 326:25, 327:5, 331:4

produce - 116:17

product - 34:24

products - 307:7

professional [3] 120:25, 207:20, 404:15

professionally [2] 208:4, 219:15

profile - 207:15

prognosis - 114:1

program [4] 52:15, 52:16, 122:1, 315:16

progress - 114:5

prolong - 247:5

prolonged [2] 250:6, 250:12

proper [11] 169:23, 215:13, 227:11, 267:8, 269:7, 285:25, 289:14, 292:16, 297:8, 363:8, 376:17

properly [2] 269:9, 271:12

property - 350:12

prophylactically - 200:13

prosecutor - 327:18

protect - 361:11

protected - 130:19

protecting - 41:16

provide - 60:23

provided [3] 52:8, 53:22, 60:6

provider [23] 37:11, 42:16, 42:19, 42:20, 42:24, 44:1, 44:5, 44:13, 45:2, 46:24, 77:8, 78:23, 108:15, 115:21, 168:22, 177:7, 177:15, 185:3, 185:10, 185:15, 185:20, 185:22, 196:8

providers - 44:25

provides - 60:22

providing - 27:22

psychologically - 389:22

public [6] 1:13, 4:12, 7:4, 398:14, 405:13, 405:15

pull - 262:23

pulled [2] 228:12, 367:1

pump - 201:18

purchase - 21:1

purpose - 172:6

purposes [2] 252:24, 375:2

pursuant [3] 1:14, 1:15, 407:15

pursue - 20:5

pushing - 402:1

puts - 214:5

putting - 53:12

**Q**

qualification - 42:24

qualified [5] 58:5, 58:8, 58:10, 59:4, 227:24

qualifies [2] 147:12, 147:18

questioned [2] 321:8, 321:15

questioning [2] 128:22, 222:8

quick - 150:8

quicker - 173:23

quickly [5] 292:23, 302:23, 374:14, 380:11, 390:23

quite [4] 9:15, 9:15, 191:5, 239:5

quote - 140:13

quotes - 307:14

**R**

Rachel [2] 2:10, 111:4

radiologist - 124:8

radiology [3] 118:12, 118:13, 121:10

Raines [5] 2:16, 67:12, 280:22, 290:3, 293:7

raise [3] 58:25, 87:13, 230:11

raised [4] 187:3, 187:4, 225:18, 229:7

random - 396:7

ranked - 335:10

Raskin - 3:7

rather [3] 197:23, 207:2, 207:3

rational - 389:7

re [4] 183:18, 211:20, 373:4, 407:8

reach [11] 77:8, 169:1, 193:5, 193:8, 203:19, 233:10, 237:12, 237:22, 254:21, 363:9, 377:7

reached [13] 97:11, 166:15, 168:2, 168:2, 183:22, 184:5, 185:6, 185:9, 185:9, 186:19, 335:18, 335:22, 399:22

reaching - 399:22

react [2] 54:25, 361:2

reaction [4] 95:6, 168:17, 190:23, 254:3

reacts - 54:17

reading [6] 36:9, 185:1, 187:18, 374:11, 374:14, 374:19

reads - 169:25

ready [2] 128:7, 180:10

real [4] 209:15, 278:15, 283:18, 283:19

realistic - 155:2

realize [2] 113:1, 341:2

realizing - 90:16

really [72] 14:17, 21:20, 30:10, 30:21, 35:6, 53:9, 54:19, 58:22, 59:12, 86:7, 86:19, 92:9, 93:21, 95:22, 119:10, 124:1, 139:15, 166:12, 167:23, 173:1, 173:11, 176:9, 193:3, 193:16, 195:5, 195:15, 219:4, 225:1, 232:18, 237:18, 241:13, 242:25, 270:15, 270:17, 274:16, 276:24, 276:25, 281:20, 295:10, 296:9, 299:24, 301:23, 315:20, 317:2, 319:22, 319:23, 325:2, 325:6, 335:5, 338:7, 338:12, 349:12, 350:19, 353:9, 367:21, 375:8, 382:16, 385:12, 387:20, 388:21, 388:24, 390:10, 390:22, 391:10, 392:11, 395:23, 399:2, 399:10, 399:20, 401:17, 401:22, 402:21

realm - 222:22

reason [21] 11:12, 26:21, 107:13, 108:9, 108:14, 135:21, 143:2, 143:10, 146:11, 151:7, 185:14, 196:17, 226:11, 338:18, 349:15, 357:8, 380:14, 381:3, 381:5, 399:23, 406:7

reasonable [3] 149:24, 195:25, 251:11

reasons [2] 108:23, 405:6

reassign [7] 183:2, 183:5,

211:5, 211:21, 211:22, 216:22, 216:23
reassigned - 183:18
reassurance - 129:12
reassure - 318:19
reassuring - 93:2
recalling [2] 104:18, 308:17
receipt [2] 398:2, 407:15
receive [9] 29:23, 40:21, 59:15, 66:17, 70:2, 70:10, 200:13, 389:19, 398:1
received [14] 34:17, 66:3, 69:24, 70:8, 71:5, 103:24, 138:22, 138:23, 166:18, 183:25, 200:18, 389:19, 396:18, 407:15
receiving [4] 52:10, 92:2, 152:15, 196:7
recent [3] 15:4, 15:7, 360:19
recently [5] 14:16, 33:23, 34:3, 78:24, 400:24
recess [4] 150:13, 238:10, 292:21, 341:11
Rechichar [8] 23:19, 25:1, 68:24, 71:1, 72:15, 72:21, 85:14, 214:22
recognize [5] 69:10, 228:6, 251:12, 251:21, 339:4
recognizes - 252:11
recollection [11] 65:7, 69:18, 176:13, 176:14, 238:14, 238:17, 294:11, 312:12, 320:21, 395:2, 399:4
recommend - 92:6
recommendation [16] 92:3, 163:21, 169:25, 170:1, 185:12, 186:4, 226:5, 226:6, 226:9, 226:12, 226:12, 253:24, 254:1, 279:15, 290:24, 325:6
recommended [2] 181:2, 196:24
recommending [3] 188:12, 325:3, 325:9
reconsider [2] 221:19, 221:20
record [20] 7:13, 11:4, 11:5, 13:6, 15:23, 67:19, 89:1, 150:12, 150:14, 156:6, 223:22, 238:8, 238:9, 238:11, 292:20, 292:22, 330:12, 341:10, 341:12, 387:19
recorded - 330:16
recorder - 330:19
recording [7] 330:15, 333:12, 336:11, 336:15, 336:25, 337:3, 338:22
records [30] 13:14, 13:16, 13:18, 13:23, 13:24, 25:14, 68:4, 74:6, 74:7, 87:24, 88:4, 91:17, 96:12, 100:21, 104:25, 125:7, 125:10, 156:7, 169:3, 169:7, 169:8, 175:5, 188:4, 238:15, 257:11, 258:18, 304:18, 305:25, 306:14, 306:21
refer [3] 27:6, 64:16, 373:4
referred - 396:24
referring [11] 54:24, 65:17, 165:5, 165:6, 175:8, 277:1, 277:4, 282:6, 293:3, 374:5, 383:5
refill [4] 77:7, 77:21, 154:3, 154:5
refilling - 76:10
refresh - 69:18
refreshes - 330:7
refuse [2] 162:17, 181:13
refused - 181:13
regard - 334:17
regarding [4] 213:12, 214:22, 215:12, 396:1
regardless [8] 54:5, 140:17, 140:18, 141:13, 141:14, 225:16, 225:19, 252:16
registered [5] 16:24, 17:4, 17:13, 18:8, 404:15
regular [2] 18:14, 72:12
regularly - 251:1
reit - 355:23
reiterate - 356:23
reiterated [4] 353:13, 355:13, 355:24, 356:1
reiterating - 355:22
related [10] 22:22, 31:9, 48:12, 228:18, 393:12, 393:22, 393:25, 396:6, 398:14, 399:8
relating [5] 72:21, 92:20, 205:21, 206:18, 390:23
relation [3] 64:20, 89:13, 266:23
relationship [3] 84:13, 222:3, 231:19
relationships [2] 84:9, 84:14
relay [2] 43:20, 332:4
relayed [8] 88:14, 104:13, 119:2, 158:7, 158:8, 261:18, 265:19, 266:5
relaying [2] 104:16, 275:24
released - 361:20
releases - 326:23
relevant - 332:7
reliable - 89:19
relief [2] 258:12, 300:11
relieved [8] 93:1, 93:18, 93:22, 146:25, 147:1, 343:25, 402:16, 402:18
relieving - 268:14
religion - 287:22
religious [2] 111:6, 111:8
remain - 52:24
remained - 130:4
remaining [2] 77:4, 81:3
remains [4] 111:19, 111:21, 112:9, 112:10
remembered - 83:5
remembering [2] 104:11, 350:13
remind - 15:19
Reminger [2] 2:18, 407:5
remote - 386:13
remove - 34:25
removed - 201:17
removing - 32:3
Renee - 2:10
repeatedly [2] 316:24, 323:22
repercussions - 50:14
rephrase - 11:13
replaced - 76:17
report [23] 27:17, 58:9, 75:11, 112:7, 116:12, 116:16, 117:22, 118:15, 121:12, 138:17, 138:22, 138:23, 184:8, 202:25, 250:2, 287:18, 288:2, 288:8, 288:13, 288:16, 363:8, 374:7, 374:20
reported [12] 96:1, 104:9, 111:18, 125:11, 155:25, 194:18, 194:23, 261:13, 261:23, 263:16, 267:8, 287:17
reporter [3] 10:23, 15:21, 404:15
REPORTER'S - 404:4
Reporting - 407:1
represent - 7:17
represented - 8:23
request [10] 101:9, 101:12, 101:14, 101:21, 102:1, 117:20, 138:7, 163:24, 170:4, 202:21
requested [3] 116:23, 138:10, 259:8
requesting - 101:18
required [10] 64:9, 110:24, 289:13, 360:8, 361:8, 363:4, 363:8, 363:13, 376:20, 382:2
requirements [3] 25:16, 59:14, 112:10
resolve - 129:4
resolved - 10:3
respect [3] 69:20, 219:2, 231:17
respond [3] 276:20, 296:1, 397:4
responded - 330:8
response [2] 225:4, 297:14
responsibility [10] 26:17, 269:11, 269:13, 271:15, 271:16, 276:7, 276:12, 288:13, 288:15, 335:16
responsible - 28:14
rest - 233:2
result [6] 10:6, 56:18, 78:16, 132:9, 179:20, 374:24
resulted [5] 79:12, 81:4, 117:13, 121:12, 241:2
results [6] 126:3, 126:21, 145:14, 228:23, 324:8, 374:10
resuscitate [3] 134:25, 140:16, 154:16
resuscitated [7] 133:11, 140:12, 154:23, 252:15, 252:17, 252:21, 382:15
resuscitation [13] 139:6, 140:1, 140:6, 140:10, 140:23, 141:14, 141:21, 142:8, 142:18, 142:23, 251:10, 252:13, 253:1
retained [6] 34:24, 282:3, 302:18, 326:2, 326:16, 327:5
retaining [2] 341:5, 396:19
retrieve [4] 267:18, 294:24, 300:12, 301:5
retrieving - 294:22
retrospective - 249:21
return [5] 94:20, 97:18, 193:18, 305:24, 324:2
returned [10] 94:21, 96:23, 97:15, 97:25, 100:17, 122:20, 122:23, 136:11, 324:1, 332:5
reveal [3] 172:7, 337:24, 390:12
revealing [2] 46:19, 328:12
review [18] 13:22, 13:23, 25:11, 59:11, 64:12, 67:5, 67:8, 74:6, 74:7, 133:24, 146:5, 173:4, 173:4, 260:22, 275:23, 303:19, 304:3, 352:18
reviewed [23] 12:23, 13:5, 13:6, 13:8, 13:9, 13:13, 13:20, 13:25, 14:1, 65:18, 67:9, 67:12, 67:17, 67:21, 87:24, 91:17, 96:12, 169:4, 224:24, 303:24, 336:19, 342:2, 352:24
reviewing [4] 67:15, 69:17, 151:22, 262:1

Rickert [58] 2:6, 5:3, 7:9, 7:16, 8:8, 8:10, 8:14, 35:12, 39:15, 40:15, 43:17, 50:24, 51:1, 73:8, 73:11, 76:18, 96:20, 110:5, 111:3, 112:20, 112:25, 123:21, 148:22, 150:5, 150:10, 152:5, 158:22, 165:18, 178:4, 205:8, 208:11, 208:14, 213:7, 221:4, 232:3, 238:3, 238:7, 248:7, 280:2, 286:19, 300:8, 304:7, 304:17, 306:14, 308:24, 318:9, 327:21, 329:11, 336:5, 336:12, 336:16, 336:22, 337:1, 341:9, 344:15, 346:13, 403:2, 407:23
rights [5] 59:16, 301:25, 346:21, 346:22, 347:1
risk [51] 41:3, 41:6, 42:18, 43:3, 56:6, 56:12, 56:24, 57:2, 57:3, 57:20, 57:22, 57:24, 58:3, 58:7, 63:2, 83:15, 144:9, 161:7, 161:9, 161:17, 161:18, 162:1, 169:13, 192:1, 192:3, 192:3, 192:5, 194:3, 194:6, 198:22, 202:3, 202:7, 228:3, 242:7, 242:17, 242:20, 242:21, 243:2, 243:9, 244:3, 244:12, 264:8, 289:3, 289:8, 289:8, 290:19, 290:21, 299:6, 301:21, 324:23, 328:13
riskier - 84:1
risks [5] 49:25, 50:9, 173:12, 205:12, 242:20
RN [11] 307:2, 307:5, 307:6, 307:6, 312:21, 312:22, 312:25, 313:3, 313:5, 313:6, 325:24
Road [2] 3:8, 407:1
Rogozan [2] 183:20, 183:21
role [13] 18:7, 43:22, 43:25, 121:22, 134:1, 134:3, 134:14, 137:20, 171:11, 171:19, 171:20, 207:3, 214:23
room [40] 47:6, 48:10, 52:20, 52:24, 72:1, 72:7, 72:13, 98:16, 107:7, 138:19, 139:1, 155:15, 190:12, 190:16, 194:21, 202:17, 263:11, 267:2, 268:11, 309:22, 313:5, 317:19, 320:16, 320:21, 321:3, 323:16, 324:16, 324:19, 326:18, 327:8, 330:21, 340:22, 341:16, 345:11, 345:12, 346:16, 346:17, 347:25, 347:25, 390:11
rosy [2] 381:9, 381:13
routine - 102:14
routinely - 199:17
row [2] 3:7, 234:3
RPD16-docsproduc - 51:3
Rucci - 23:17
ruin - 231:20
rules [3] 1:15, 65:8, 407:16
run - 26:3
running - 15:10
rup - 119:7
rupture [25] 57:21, 57:25, 73:5, 74:2, 74:10, 74:22, 75:1, 75:17, 76:8, 76:25, 77:17, 77:18, 77:19, 93:10, 95:15, 102:19, 119:6, 121:4, 145:1, 145:24, 146:18, 175:24, 192:13, 240:8, 241:7
ruptured [5] 121:5, 144:1, 191:22, 192:12, 243:9
Ryder - 3:7

## S

sac [3] 120:3, 120:12, 120:17
safely [2] 131:10, 204:22
safer - 83:14
safety [8] 41:2, 63:1, 63:4, 65:19, 65:23, 328:18, 328:20, 329:4
Salem [3] 18:5, 20:15, 20:15
sample - 313:5
sat - 7:19
Saturday - 392:10
save [12] 8:11, 43:9, 137:9, 243:12, 243:21, 246:10, 247:9, 247:18, 394:13, 395:6, 396:5, 396:8
saved [12] 131:13, 246:16, 246:24, 247:22, 249:4, 249:12, 249:19, 250:18, 251:6, 394:9, 398:4, 398:11
saving - 171:16
saying [91] 10:24, 31:24, 41:18, 46:24, 57:7, 60:4, 67:1, 74:3, 95:2, 95:21, 101:19, 104:8, 106:15, 107:7, 111:10, 111:20, 115:12, 115:16, 115:18, 119:22, 131:4, 133:2, 143:16, 147:22, 159:16, 162:4, 162:12, 170:9, 173:10, 185:6, 207:2, 211:8, 215:17, 215:20, 217:9, 218:15, 222:8, 223:11, 223:14, 223:18, 223:25, 224:2, 227:12, 228:20, 229:9, 229:13, 229:19, 232:17, 252:10, 252:14, 254:21, 255:7, 255:16, 255:18, 256:25, 263:18, 264:18, 265:16, 266:23, 270:8, 281:2, 284:1, 296:25, 298:19, 303:14, 305:13, 308:8, 312:5, 325:24, 331:1, 331:9, 333:16, 337:9, 337:15, 337:24, 338:6, 348:2, 355:19, 355:23, 356:7, 364:8, 368:15, 378:13, 378:14, 378:14, 381:13, 385:8, 386:9, 386:25, 397:8, 402:24
says [73] 44:20, 53:15, 54:4, 55:4, 102:8, 117:24, 119:13, 140:24, 185:12, 213:15, 213:15, 224:4, 240:1, 241:9, 243:2, 243:18, 243:19, 245:2, 252:4, 252:5, 252:11, 257:14, 263:9, 276:18, 276:19, 307:2, 309:9, 309:13, 324:8, 347:23, 348:13, 348:14, 348:14, 352:19, 364:5, 364:7, 364:8, 364:24, 365:4, 365:5, 365:6, 365:6, 368:9, 368:11, 375:11, 375:13, 375:14, 375:15, 376:7, 376:10, 377:1, 377:6, 377:8, 377:8, 377:9, 378:10, 379:5, 379:7, 379:10, 379:13, 382:11, 382:14, 382:15, 382:17, 382:18, 382:24, 382:24, 384:22, 384:24, 384:25, 385:2, 388:4, 390:5
scare - 321:20
scared - 349:11
scenario [5] 169:24, 170:17, 226:23, 278:3, 308:25
scenarios [3] 118:6, 120:7, 129:2
schedule [2] 149:15, 396:6
scheduled [3] 102:17, 302:18, 302:19
scheduling [4] 25:7, 237:2, 392:20, 392:23
Schubert - 85:11
science - 16:15
scoop - 284:16
scooped [12] 284:12, 284:17, 284:23, 366:19, 366:22, 366:24, 367:3, 367:4, 367:6, 367:15, 377:17, 377:20
scooping - 377:14
scope [5] 49:23, 172:5, 178:19, 199:18, 328:16
scroll - 396:4
scrub - 84:24
search [3] 296:3, 349:4, 349:4
Secours [4] 1:9, 2:15, 65:22, 407:8
secretary [2] 70:7, 318:17
section [6] 82:20, 83:6, 83:19, 251:18, 254:5, 306:1
secular - 30:18
security - 397:13
seeing [3] 17:9, 188:1, 256:24
seek [11] 46:12, 49:14, 49:16, 63:5, 92:9, 129:3, 138:13, 215:12, 279:7, 295:12, 397:6
seeking [16] 19:8, 39:11, 98:12, 102:23, 103:22, 104:9, 105:11, 109:23, 121:20, 122:18, 122:24, 186:15, 187:15, 220:3, 283:6, 302:1
seem [11] 51:1, 144:15, 283:8, 283:10, 283:12, 283:18, 283:19, 284:2, 284:4, 284:8, 342:25
seemed [10] 28:21, 28:24, 167:3, 194:20, 271:17, 275:9, 283:21, 284:11, 348:1, 384:8
seems [5] 55:17, 115:11, 215:17, 230:25, 320:24
selected [4] 394:13, 395:6, 395:7, 396:12
self [4] 180:17, 313:5, 316:17, 361:6
send [8] 192:13, 234:25, 293:24, 391:7, 391:10, 391:11, 397:15, 398:1
sending [6] 69:25, 71:11, 118:25, 321:19, 392:16, 397:1
sends - 398:14
sense [15] 11:7, 11:10, 11:12, 11:21, 15:22, 55:10, 89:25, 100:7, 231:3, 242:9, 243:11, 251:15, 283:1, 285:4, 369:6
sent [4] 13:9, 87:21, 347:24, 397:3
separate [3] 73:23, 74:4, 305:16
sepsis [6] 243:12, 243:20, 244:1, 244:3, 254:12, 254:20
September [27] 24:18, 68:10, 68:14, 69:19, 69:22, 81:11, 81:23, 91:5, 92:20, 93:10, 93:17, 94:11, 96:22, 99:6, 100:8, 145:14, 149:3, 150:16, 165:9, 165:14, 188:25, 216:2,

228:9, 236:14, 238:13, 333:24, 398:18
septic [2] 243:22, 243:25
serious [4] 143:20, 160:14, 160:14, 173:20
seriously [2] 393:19, 393:20
service - 111:8
services [3] 52:25, 376:9, 376:18
setting [3] 78:10, 157:23, 394:24
seven [5] 349:24, 350:1, 350:2, 366:5, 387:20
several [4] 78:24, 84:14, 329:10, 367:19
shaken - 158:18
shakes - 11:6
shape [5] 314:5, 314:9, 364:15, 381:23, 382:1
share [20] 59:19, 60:7, 61:10, 61:21, 62:5, 62:7, 62:13, 62:19, 62:24, 63:6, 63:20, 64:2, 64:9, 64:10, 65:13, 70:25, 125:19, 126:2, 206:13, 207:6
shared [7] 61:6, 64:6, 65:12, 104:13, 206:10, 215:4, 322:18
sharing - 59:24
she'll [10] 138:19, 193:18, 206:7, 248:14, 248:15, 278:22, 279:16, 379:11, 379:14, 381:15
she's [94] 33:14, 33:16, 43:3, 61:13, 61:17, 63:4, 63:9, 69:4, 90:16, 95:17, 96:10, 96:10, 96:11, 101:19, 106:16, 113:10, 118:25, 121:20, 122:12, 129:13, 136:1, 144:1, 144:1, 153:12, 167:21, 171:22, 190:25, 191:1, 191:1, 191:13, 215:20, 218:1, 223:11, 223:14, 223:18, 224:2, 228:3, 228:3, 234:2, 234:9, 237:19, 240:5, 243:3, 245:15, 248:3, 248:10, 266:13, 266:17, 266:18, 267:25, 269:25, 272:23, 276:19, 278:10, 278:21, 279:15, 279:22, 279:23, 285:21, 288:6, 298:8, 299:6, 308:8, 309:10, 316:5, 318:22, 319:4, 321:6, 321:8, 324:8, 331:17, 331:20, 331:21, 339:5, 339:7, 345:17, 345:18, 346:8, 348:9, 348:15, 352:7, 353:7, 374:21, 379:7, 381:14, 385:7, 385:7, 385:12, 388:21, 388:25, 389:1, 389:1, 389:2, 389:4
shed [22] 277:13, 283:18, 286:7, 302:21, 350:7, 350:8, 351:7, 351:9, 351:10, 351:24, 364:3, 364:6, 364:7, 364:9, 364:17, 364:19, 364:25, 365:10, 365:15, 365:16, 365:17, 368:1
sheet(s - 405:6
shift [10] 24:15, 24:16, 24:16, 180:11, 182:4, 192:16, 201:11, 201:13, 229:18, 244:17
shifted - 72:12
shifts [2] 136:8, 182:5
shock [5] 54:10, 173:19, 175:14, 176:4, 243:25
Shoot - 158:23
short [5] 142:15, 142:16, 210:3, 238:4, 390:22
shortage - 25:9
shorthand - 4:11
shortly [6] 155:14, 184:25, 209:14, 273:3, 273:7, 309:6
shouldn't [3] 198:5, 216:24, 222:5
showed [6] 86:8, 219:19, 219:21, 361:22, 363:14, 399:11
shower - 309:24
showered [3] 310:7, 310:9, 310:11
showers - 310:13
showing [2] 128:10, 242:25
shown [2] 52:14, 404:10
shows [10] 118:3, 241:4, 243:11, 243:20, 251:14, 251:22, 273:24, 278:25, 309:3, 320:22
shrubs [2] 350:8, 350:9
sic - 240:9
sick [2] 337:5, 337:16
sickened - 300:15
sickening [5] 268:13, 300:4, 300:11, 300:15, 300:17
sightly - 241:12
sign [16] 4:17, 112:19, 117:5, 118:20, 118:20, 173:20, 190:11, 241:13, 243:8, 245:3, 245:8, 256:24, 257:21, 258:4, 258:8, 407:12
signature [3] 4:15, 403:12, 407:16
signed [3] 405:16, 407:14, 407:15
significance [2] 69:20, 127:17
significant [8] 79:6, 102:24, 103:2, 139:24, 156:16, 156:18, 310:20, 311:3
significantly [4] 58:15, 58:18, 103:16, 284:15
signing - 61:16
signs [22] 43:2, 56:3, 58:9, 58:9, 58:12, 78:12, 82:5, 147:15, 175:19, 175:20, 184:2, 199:17, 242:25, 243:11, 243:20, 251:14, 251:22, 258:13, 275:10, 275:11, 281:21, 328:9
similar [2] 52:4, 327:2
simply [2] 169:13, 394:17
Sincerely - 407:19
single [2] 222:11, 222:15
sister [2] 80:2, 132:18
sit [5] 30:16, 162:6, 249:1, 249:18, 331:9
sitting - 146:4
situation [56] 10:15, 37:8, 45:3, 45:19, 48:15, 49:15, 49:18, 50:7, 50:12, 56:22, 61:8, 61:19, 62:4, 62:19, 64:15, 65:21, 65:21, 77:20, 80:21, 81:1, 113:12, 136:12, 147:23, 154:21, 155:13, 158:12, 167:13, 177:23, 215:10, 215:10, 216:16, 217:6, 217:10, 217:15, 219:16, 223:1, 225:21, 225:23, 226:2, 226:25, 245:6, 253:14, 253:18, 273:23, 274:5, 274:16, 289:9, 292:12, 298:20, 303:1, 318:24, 335:5, 339:5, 361:2, 369:14, 369:15
situations [15] 37:2, 50:13, 59:18, 61:1, 62:22, 62:23, 63:19, 64:1, 64:8, 77:3, 153:6, 177:6, 214:24, 219:13, 227:13
six - 240:7
size [5] 284:16, 350:25, 354:7, 368:19, 370:9
skills [2] 54:18, 206:21
skin [3] 121:24, 121:24, 372:9
skip - 96:1
slate - 395:3
slight - 58:25
slim [2] 386:13, 387:6
slow [5] 21:20, 188:7, 199:8, 199:10, 199:20
smaller - 28:21
smoothly - 180:22
social [5] 52:25, 63:6, 110:18, 288:24, 397:20
socialize - 85:9
socialized - 86:4
solely - 193:11
Solon - 3:8
solution - 220:24
solves - 387:25
somebody [13] 39:11, 69:5, 122:19, 201:24, 269:4, 269:5, 272:19, 293:17, 298:12, 337:12, 337:13, 396:6, 403:4
someone [45] 45:10, 51:17, 61:20, 63:3, 63:18, 70:20, 70:22, 70:23, 70:24, 84:16, 100:8, 100:15, 115:5, 115:8, 122:18, 137:5, 138:7, 138:13, 242:24, 267:1, 267:12, 267:18, 271:23, 272:3, 272:15, 273:8, 282:14, 283:23, 292:9, 293:23, 294:18, 294:19, 297:13, 298:8, 307:9, 309:10, 309:14, 312:10, 321:16, 335:9, 345:23, 360:17, 392:12, 397:14, 398:14
sometime [2] 154:1, 281:1
somewhere [13] 81:9, 277:13, 287:1, 287:6, 351:20, 352:2, 367:9, 384:11, 384:12, 385:18, 386:14, 386:14, 386:17
sooner [3] 197:23, 198:10, 374:25
sorry [63] 8:20, 22:24, 29:17, 33:11, 33:13, 33:19, 65:20, 67:24, 68:21, 72:14, 74:18, 84:5, 93:8, 95:25, 96:20, 100:4, 106:14, 106:23, 112:20, 113:1, 137:1, 149:6, 155:19, 155:20, 168:13, 189:13, 192:23, 195:5, 195:5, 195:8, 197:15, 199:23, 201:12, 205:6, 205:13, 208:11, 208:14, 216:19, 216:22, 235:7, 239:25, 244:10, 248:7, 254:6, 258:18, 262:15, 273:5, 279:19, 280:22, 295:2, 296:4, 297:16, 298:4, 302:2, 318:9, 325:20, 325:22, 336:17, 348:21, 352:10, 356:5, 379:3, 394:19
sort - 306:20
sought [2] 298:7, 301:21
sounds [2] 223:6, 223:10
source [2] 63:7, 90:6
speak [41] 53:1, 53:19, 61:11, 61:20, 63:8, 106:25, 108:15, 109:1, 125:24, 133:14, 133:16, 133:19, 137:5, 137:25, 157:16,

165:8, 168:23, 173:11, 173:24, 190:15, 220:2, 220:3, 234:20, 237:7, 237:16, 237:19, 259:8, 267:23, 316:25, 317:4, 317:9, 317:14, 321:16, 324:12, 327:7, 327:15, 327:18, 343:22, 345:15, 346:8, 392:13
speaker - 373:25
speaking [13] 30:11, 48:20, 53:15, 61:18, 148:24, 170:15, 171:5, 210:8, 210:16, 235:14, 324:9, 354:13, 354:14
speaks - 353:25
special - 134:7
specialist - 152:23
specialize - 20:3
specialty [2] 153:2, 293:15
specific [25] 46:15, 48:25, 50:20, 59:24, 61:8, 70:19, 72:5, 79:13, 95:1, 103:4, 115:25, 116:1, 125:6, 153:5, 192:17, 241:10, 266:3, 266:4, 284:2, 294:20, 319:8, 328:9, 355:7, 355:9, 395:7
specifically [8] 12:16, 30:6, 30:15, 48:20, 162:5, 169:7, 201:14, 298:20
specifics - 64:13
specified - 1:15
speculate - 108:3
speculating - 120:16
speculation [27] 82:22, 98:24, 103:11, 106:19, 107:25, 110:12, 114:8, 116:20, 120:14, 121:15, 134:5, 135:24, 138:5, 148:3, 151:1, 156:11, 174:23, 230:9, 252:23, 357:23, 365:23, 376:15, 378:23, 383:17, 384:7, 385:11, 389:9
speech - 386:24
speed - 341:1
speedily - 199:15
spell - 7:12
Spence - 2:10
spence@loevy.com - 2:13
spent [2] 67:15, 266:25
spoke [27] 70:22, 72:5, 117:1, 132:16, 167:25, 180:5, 207:20, 258:21, 258:21, 261:8, 265:18, 275:6, 277:2, 278:4, 278:15, 288:24, 289:8, 298:21, 307:7, 319:11, 320:20, 327:22, 335:4, 343:16, 353:8, 353:15, 390:14
spoken [2] 132:13, 321:9
spontaneous [6] 39:21, 39:23, 39:24, 74:21, 76:24, 102:19
spontaneously - 236:12
spotting [3] 124:20, 125:13, 144:17
St [44] 2:15, 12:13, 20:11, 21:22, 22:2, 22:8, 23:14, 25:6, 28:18, 29:6, 29:13, 29:19, 29:22, 30:2, 30:3, 34:18, 39:5, 39:16, 40:12, 40:22, 41:10, 41:12, 46:7, 47:7, 47:14, 49:24, 59:9, 59:9, 59:11, 63:15, 80:4, 80:4, 80:4, 80:6, 80:7, 84:8, 98:22, 99:2, 117:13, 152:10, 219:22, 286:24, 287:3, 314:25
stability - 175:18
stable [23] 82:6, 95:17, 96:11, 144:15, 147:15, 147:23, 164:2, 164:13, 175:16, 175:24, 176:1, 176:5, 191:8, 204:18, 255:14, 275:4, 275:6, 275:9, 275:12, 281:20, 314:8, 328:7, 346:8
stack - 306:2
staff [15] 25:8, 26:25, 84:15, 98:2, 210:19, 215:9, 215:11, 215:18, 217:15, 217:16, 218:16, 220:25, 376:7, 392:8, 392:11
staffing [3] 200:2, 392:6, 392:12
stage [5] 54:5, 92:2, 99:3, 100:9, 372:20
stamp - 280:8
stand [7] 83:11, 120:2, 207:24, 210:2, 225:12, 239:24, 241:3
standard [5] 11:24, 139:2, 225:12, 225:20, 226:20
start [22] 12:15, 18:1, 18:4, 26:3, 29:23, 68:9, 92:2, 96:21, 196:14, 197:24, 198:8, 198:9, 198:13, 198:18, 205:9, 238:19, 306:25, 330:18, 337:7, 341:19, 359:22, 359:23
started [11] 18:5, 30:12, 72:2, 185:3, 234:24, 236:19, 281:25, 326:16, 330:15, 347:12, 394:9
starting [5] 26:18, 239:3, 320:10, 379:4, 382:6
starts [5] 36:18, 197:4, 214:20, 306:12, 306:24
stat [5] 374:11, 374:13, 374:17, 374:18, 374:19
state [13] 1:13, 4:13, 7:12, 109:8, 110:25, 142:8, 148:23, 317:5, 331:20, 365:11, 365:13, 369:23, 405:15
stated [8] 75:3, 182:1, 186:21, 204:2, 268:23, 307:9, 309:19, 312:25
statement [11] 54:16, 99:19, 100:10, 100:14, 161:10, 170:7, 189:1, 254:25, 308:17, 337:24, 388:16
statements - 405:16
States [2] 1:1, 1:17
stating [2] 177:15, 263:9
station [8] 98:3, 166:8, 167:18, 180:5, 211:6, 214:12, 237:5, 401:1
status - 98:10
stay [9] 18:15, 19:4, 20:21, 21:17, 192:8, 304:20, 320:17, 332:1, 382:3
stayed [5] 243:24, 249:9, 249:15, 249:23, 381:4
stenotype - 404:10
step [2] 45:12, 221:18
stepped [2] 321:16, 349:10
steps [4] 243:22, 282:16, 311:13, 311:17
Stew - 166:21
Stewart [36] 150:22, 150:23, 151:12, 151:15, 151:24, 151:25, 152:8, 155:19, 155:21, 156:17, 157:16, 157:17, 157:24, 158:13, 158:25, 163:1, 163:21, 164:24, 165:7, 165:8, 165:17, 165:23, 168:15, 168:24, 169:9, 170:5, 172:7, 176:2, 179:14, 188:11, 196:24, 198:5, 215:7, 229:8, 238:19, 257:14
Stewart's [4] 155:13, 166:8, 170:1, 175:7
stick - 150:17
sticks - 370:18
stillbirth - 51:18
stipulated [2] 4:5, 4:10
STIPULATIONS - 4:3
stomach - 347:23
stood [2] 82:25, 207:23
stool - 362:23
stop [6] 60:2, 147:16, 211:18, 247:19, 254:12, 344:9
stopping [2] 336:16, 336:18
stops [2] 251:13, 251:22
storage - 393:2
store - 394:21
stories [9] 247:5, 247:7, 296:7, 342:25, 358:5, 366:21, 384:14, 388:23, 401:21
strange [3] 103:17, 331:10, 337:1
strangeness - 389:21
stranger [3] 316:25, 317:9, 346:16
Street [2] 2:7, 2:11
stress [2] 314:15, 314:18
strictly - 174:25
strike [20] 35:12, 39:15, 40:15, 43:17, 76:18, 110:5, 115:24, 123:21, 152:5, 165:18, 178:4, 205:9, 208:15, 280:2, 286:19, 308:24, 318:9, 327:21, 346:13, 364:12
strong [6] 92:25, 118:4, 121:3, 133:7, 231:21, 242:24
structure - 23:13
struggling - 274:17
stuck - 271:5
stuff [4] 8:14, 339:1, 371:15, 392:20
sub - 78:22
subject - 397:18
subjected [2] 314:15, 314:18
subjective [2] 144:14, 144:17
substance [4] 341:14, 341:20, 341:23, 405:6
Sue [4] 220:5, 224:21, 228:20, 228:20
suggest - 259:10
suggested - 293:6
suggesting - 188:12
suggests - 142:17
Suite [4] 2:18, 4:9, 407:2, 407:6
summon - 345:21
summoned - 345:20
sunk [2] 372:1, 372:2
Sunnie [73] 82:15, 84:25, 109:1, 109:4, 233:16, 233:22, 233:25, 234:14, 234:19, 236:2, 237:7, 237:7, 237:10, 237:12, 237:13, 237:14, 237:24, 237:25, 258:22, 258:22, 258:24, 260:6, 260:20, 261:1, 261:4, 261:12, 261:16, 261:20, 263:22, 263:22, 263:25, 264:3, 264:4, 264:10, 264:20, 264:21, 264:24, 265:7, 265:10, 265:18, 265:23, 266:6, 267:25, 269:1,

272:22, 276:18, 276:19, 278:9, 280:3, 281:1, 292:24, 296:5, 352:15, 352:19, 353:3, 353:15, 353:20, 353:25, 355:4, 355:13, 355:16, 356:10, 356:11, 356:13, 357:3, 357:9, 357:10, 368:25, 375:25, 378:9, 398:17, 399:6, 399:14
Sunnie's [5] 237:9, 279:14, 352:25, 355:17, 398:24
superior - 298:15
supervise - 48:15
supervisees - 126:1
supervising [4] 49:5, 49:9, 188:7, 189:23
supervisor [8] 25:1, 49:8, 62:18, 101:1, 156:14, 193:12, 209:12, 210:23
support [9] 52:25, 55:6, 113:20, 137:7, 248:18, 248:22, 251:2, 273:17, 322:6
supporting - 182:25
supportive [3] 207:7, 282:11, 282:23
supposed [2] 100:6, 398:8
surfactant - 131:2
surgery [18] 18:25, 19:2, 83:15, 123:8, 149:10, 149:14, 149:15, 149:16, 149:18, 302:11, 302:17, 303:5, 374:21, 375:5, 379:11, 379:17, 380:8, 380:20
surgical - 37:20
surprise [2] 88:20, 252:8
surprised [3] 89:2, 220:17, 220:20
surrounded - 380:12
survival [3] 136:23, 154:14, 251:12
survive [5] 114:4, 116:2, 268:20, 377:4, 388:10
survives - 139:23
Susan [16] 180:11, 181:24, 182:1, 182:12, 182:14, 182:25, 183:17, 183:24, 186:19, 186:22, 206:22, 207:8, 210:8, 210:18, 215:23, 334:13
suspect [4] 72:10, 123:6, 124:21, 125:4
suspected - 347:11
Suzanne [11] 2:16, 289:8, 289:21, 296:12, 298:21, 299:21, 309:6, 334:13, 335:12, 335:13, 336:1
Suzanne's [2] 291:8, 300:18
sweet - 318:20
swift - 114:6
switch - 209:11
swore - 405:16
sworn - 7:4
symptom - 365:10
synonym - 31:24
system [4] 44:10, 55:6, 392:25, 397:13

**T**

taken [23] 1:12, 4:7, 4:11, 30:24, 30:25, 36:22, 36:23, 78:9, 79:15, 150:13, 154:20, 162:1, 199:17, 238:10, 260:19, 292:21, 341:11, 398:12, 404:9, 404:10, 404:11, 406:4, 407:11
takes [5] 41:19, 140:23, 152:9, 158:15, 196:6
taking [16] 18:25, 27:14, 184:1, 194:10, 194:12, 194:13, 195:14, 195:18, 195:25, 204:3, 211:23, 214:25, 248:12, 259:13, 318:25, 332:3
talks - 65:22
tape - 346:23
task - 274:5
taught - 53:1
team [6] 24:10, 24:11, 24:14, 214:24, 219:14, 397:17
teamwork - 28:24
tech - 84:24
technology - 139:16
telephone - 263:1
telling [33] 99:1, 99:2, 119:3, 123:22, 144:14, 210:18, 278:9, 291:17, 296:10, 296:18, 296:25, 300:16, 342:17, 342:17, 342:25, 351:1, 351:4, 352:8, 355:4, 357:3, 364:18, 366:5, 368:18, 374:17, 378:9, 378:15, 381:18, 383:20, 385:17, 386:6, 388:12, 389:4, 393:11
tells [6] 64:1, 102:22, 146:6, 296:6, 349:2, 358:4
temp [2] 58:17, 58:17
ten [2] 334:12, 334:12
ten-week - 334:9
tend [3] 191:18, 207:5, 236:24
term [14] 31:22, 39:1, 39:7, 100:19, 114:19, 115:25, 116:2, 174:3, 174:3, 188:23, 189:6, 203:3, 203:4, 203:7
terminate [7] 40:4, 40:6, 106:9, 106:16, 106:17, 161:6, 161:19
termination [4] 31:22, 99:10, 109:23, 160:7
terminology - 182:23
terms [7] 175:15, 176:9, 176:19, 219:9, 242:8, 242:24, 277:12
terrible [3] 209:24, 268:16, 397:11
test [3] 67:25, 69:16, 92:9
testified [7] 225:4, 246:10, 291:20, 300:25, 308:3, 311:2, 386:4
testifies - 7:7
testify [4] 7:5, 12:1, 12:5, 12:9
testimony [19] 32:19, 66:21, 67:6, 67:8, 68:8, 119:18, 120:2, 208:10, 249:7, 272:13, 291:11, 341:24, 385:25, 404:9, 404:11, 405:5, 405:5, 405:6, 406:3
tests - 347:14
tethered - 306:3
text [17] 234:2, 235:12, 235:15, 260:19, 266:20, 276:17, 276:24, 292:24, 305:13, 341:4, 390:24, 391:14, 397:4, 399:11, 399:12, 399:24, 402:23
texted [6] 260:13, 260:25, 266:15, 266:17, 267:25, 357:10
texting [8] 235:16, 266:16, 357:12, 391:9, 391:12, 392:8, 398:25, 399:4
texts [10] 265:13, 395:1, 395:7, 395:18, 396:5, 396:8, 396:10, 398:5, 398:17, 398:24
Thank [4] 50:25, 96:20, 336:6, 407:17
thanked - 318:20
thankful [3] 258:13, 275:8, 311:6
Thanks - 111:4
themselves - 313:19
theory [3] 105:6, 367:25, 368:4
there's [101] 25:9, 34:24, 39:21, 41:22, 42:7, 51:6, 53:9, 60:3, 60:4, 69:4, 73:18, 75:19, 80:20, 83:15, 85:1, 102:23, 112:23, 117:25, 118:19, 119:13, 120:6, 121:5, 122:1, 124:14, 136:2, 136:4, 146:15, 153:20, 161:20, 166:19, 166:20, 167:20, 169:8, 172:12, 175:23, 177:4, 180:7, 183:24, 192:5, 196:9, 197:22, 202:5, 212:2, 212:15, 214:4, 219:14, 220:6, 226:2, 228:4, 235:15, 240:14, 242:19, 242:20, 242:21, 247:4, 251:21, 256:17, 256:25, 257:14, 257:20, 258:4, 262:1, 262:2, 269:13, 272:23, 277:25, 278:2, 282:3, 294:20, 302:17, 305:5, 307:14, 311:17, 311:23, 328:5, 330:23, 341:3, 342:16, 352:21, 354:18, 355:3, 358:5, 362:23, 364:2, 368:20, 368:20, 377:1, 377:13, 384:25, 386:6, 386:12, 386:24, 387:1, 387:8, 387:8, 392:8, 392:13, 396:24, 397:6, 401:24, 402:1
thereabouts - 227:2
thereafter - 209:14
therefor - 405:6
therein - 1:15
they'll [7] 36:23, 193:24, 193:24, 193:25, 193:25, 313:14, 349:4
they're [34] 26:15, 36:22, 39:12, 42:14, 55:13, 55:16, 73:23, 74:24, 86:25, 87:10, 90:8, 90:9, 102:3, 102:4, 102:5, 102:6, 115:6, 115:9, 136:2, 138:20, 177:11, 177:14, 177:14, 177:16, 202:3, 244:23, 253:18, 323:2, 349:5, 359:20, 372:24, 380:12, 394:12, 397:8
they've [6] 26:23, 27:19, 92:8, 192:10, 282:20, 359:23
Thigpen - 85:11
thin [4] 127:21, 127:21, 127:23, 128:5
thing [28] 15:25, 139:2, 144:14, 144:17, 169:23, 178:20, 203:22, 209:24, 274:17, 274:18, 278:12, 278:13, 290:2, 301:20, 301:20, 301:23, 303:23, 313:25, 336:13, 342:2, 362:13, 364:14, 373:6, 374:22, 382:7, 390:4, 392:5, 402:13
thinking [15] 52:2, 82:4, 119:12, 249:22, 266:11, 267:4, 277:7, 278:10, 294:11, 297:21, 338:5, 364:25, 385:12, 398:11, 401:24
third [13] 59:20, 60:8, 60:24, 62:14, 62:20, 62:24, 63:17, 63:21, 63:23,

64:3, 64:6, 64:9, 64:11
Thomas [3] 2:17, 4:8, 407:5
thorough [2] 352:19, 355:17
though [17] 119:4, 130:21, 135:18, 159:4, 177:2, 210:23, 216:3, 217:3, 231:11, 234:11, 280:14, 326:25, 345:22, 363:12, 367:7, 385:20, 399:7
thoughts [7] 55:5, 55:9, 55:10, 191:16, 305:19, 316:1, 316:6
threat - 397:22
threaten - 160:18
threatened - 397:14
threatening - 397:8
threats [2] 397:12, 397:18
throughout [9] 25:20, 34:4, 78:8, 104:12, 194:10, 338:17, 345:2, 354:5, 363:6
Thursday - 69:8
tight-knit - 28:24
TikTok - 397:7
till - 242:9
timeline [4] 241:2, 310:17, 319:14, 373:5
timely [2] 49:19, 49:24
tin - 364:8
tiny [2] 376:1, 376:2
tired [2] 314:12, 314:13
tissue [6] 353:10, 353:16, 354:19, 358:24, 363:22, 368:21
title - 23:11
today [19] 12:1, 12:5, 12:9, 12:19, 14:5, 14:17, 15:11, 22:9, 30:17, 132:24, 133:1, 174:6, 189:7, 195:10, 246:21, 249:1, 249:18, 303:21, 304:4
toes - 372:10
toilet [50] 264:3, 265:20, 265:22, 267:5, 268:16, 271:5, 278:10, 284:13, 284:17, 284:23, 296:6, 300:12, 304:21, 304:25, 305:6, 310:13, 329:6, 349:19, 350:14, 351:2, 351:7, 351:19, 352:2, 353:18, 354:7, 354:22, 354:23, 354:24, 357:21, 358:3, 358:19, 359:7, 362:24, 367:1, 367:4, 367:4, 367:15, 368:21, 371:14, 375:9, 375:10, 377:11, 377:18, 377:19, 378:10, 378:11, 378:12, 384:25, 385:1, 401:19
tolerate - 223:19
tolerated [4] 223:2, 223:15, 224:5, 224:10
Tom - 329:12
tomorrow - 379:15
tools - 141:7
top [5] 47:12, 51:5, 89:13, 213:15, 347:13
tore - 309:24
tossed - 350:9
totally [2] 219:21, 305:16
tough - 345:5
tour - 29:2
toured - 28:19
towards - 53:10
town - 19:18
tprislipsky@remi - 2:20
tracing - 82:7
track [3] 113:7, 113:10, 344:10
traded - 394:4
tragedy - 54:9
tragic - 54:5
train [2] 30:6, 53:6
trained [8] 62:23, 63:12, 63:20, 63:25, 64:8, 244:16, 332:16, 363:13
training [34] 29:24, 29:25, 30:6, 33:18, 34:12, 37:17, 40:21, 49:7, 52:11, 53:3, 53:5, 59:8, 59:16, 60:18, 60:20, 60:21, 63:12, 63:13, 63:25, 65:7, 65:11, 65:12, 66:3, 66:18, 66:22, 92:14, 102:13, 153:4, 203:8, 244:5, 290:10, 290:12, 332:10, 332:16
transcribed - 4:13
transcript [12] 4:15, 4:17, 174:13, 340:24, 341:19, 403:9, 404:7, 404:8, 406:3, 406:4, 407:13, 407:14
transcription [2] 4:14, 407:1
transfer [5] 394:8, 394:18, 395:1, 395:8, 395:13
transferred [4] 75:9, 80:8, 394:6, 394:7
transfers [2] 394:24, 394:25
translucent - 372:10
trash - 364:8
traumatic - 275:6
traumatizing - 86:14
travel - 84:18
traveled [4] 84:24, 84:25, 85:1, 85:13
treat [3] 107:18, 108:17, 164:16
treated [2] 80:9, 111:22
treating - 231:25
treatment [6] 45:25, 48:17, 49:10, 164:4, 247:12, 253:25
tried [2] 314:21, 358:12
trimester - 81:2
trip - 235:9
trips - 273:20
trouble [8] 277:14, 312:25, 350:12, 374:9, 378:2, 388:2, 388:13, 388:14
true [18] 68:18, 69:13, 99:19, 100:10, 100:14, 159:17, 159:23, 160:1, 160:9, 218:4, 218:8, 218:11, 239:21, 239:23, 285:20, 404:8, 405:17, 406:5
truly [4] 75:1, 83:13, 129:13, 257:2
trust [4] 44:24, 158:13, 173:2, 173:4
truth [19] 7:5, 7:5, 7:6, 171:7, 296:10, 342:18, 342:19, 343:1, 343:3, 343:7, 343:7, 343:8, 353:25, 368:12, 368:18, 389:15, 389:19, 389:19, 405:16
truthfully [3] 12:1, 12:5, 12:9
tucked - 384:11
Tuesday [5] 15:13, 15:14, 68:15, 69:8, 348:13
tune - 54:19
Tupperware - 360:14
turn [6] 8:11, 29:3, 45:20, 51:6, 305:3, 336:9
turned - 297:16
turns [2] 54:9, 234:18
twelve [3] 92:6, 92:10, 334:12
twenty [2] 88:14, 359:25
twenty-one [2] 169:14, 240:7
twice [5] 122:12, 191:1, 193:6, 203:20, 243:6
type [7] 16:22, 51:13, 51:20, 51:21, 53:18, 302:4, 374:22
types [2] 57:14, 175:15
typical - 92:7
typically [13] 80:7, 83:7, 110:17, 114:10, 137:19, 140:12, 140:15, 236:22, 253:17, 318:15, 327:3, 333:25, 335:24
typo - 213:16

## U

uh-huh [57] 9:5, 13:7, 13:11, 17:25, 22:1, 27:10, 30:13, 42:2, 42:10, 51:19, 57:10, 67:11, 71:18, 75:7, 80:3, 85:6, 85:20, 106:24, 112:4, 116:11, 116:15, 117:17, 119:1, 144:7, 171:15, 172:13, 191:15, 192:20, 192:21, 245:21, 253:23, 255:8, 255:10, 266:19, 272:4, 274:1, 275:17, 278:19, 281:19, 292:2, 296:8, 299:5, 307:15, 307:17, 309:12, 311:20, 312:4, 315:17, 315:23, 320:6, 349:13, 361:7, 362:8, 362:17, 362:21, 388:18, 395:11
ultimate - 19:9
ultimately [7] 79:24, 160:24, 165:4, 166:22, 186:6, 246:7, 255:23
ultrasound [45] 89:8, 89:16, 116:9, 116:13, 116:17, 116:25, 117:2, 117:4, 117:12, 117:22, 118:3, 118:10, 118:25, 119:12, 121:10, 123:3, 123:8, 123:10, 123:13, 123:17, 123:24, 124:4, 124:15, 126:4, 126:10, 127:15, 128:10, 129:19, 134:23, 145:10, 145:14, 146:18, 228:23, 240:14, 240:23, 241:4, 243:1, 282:1, 334:1, 334:5, 334:10, 373:24, 374:3, 374:6, 374:6
ultrasounds [3] 78:11, 374:13, 382:8
umbil - 89:14
umbilical - 273:24
umbilicus - 89:14
un - 303:8
unable [3] 20:23, 294:24, 295:13
unaware [6] 47:17, 115:20, 119:5, 123:19, 124:7, 136:16
uncertainty [3] 198:23, 299:14, 299:17
unclamped - 273:24
uncomfortable [2] 166:11, 220:8
uncommon [5] 27:24, 95:8, 196:5, 247:4, 396:11
undelivered - 282:5
understand [38] 11:11, 11:16, 12:17, 22:23, 67:2, 70:20, 87:14, 106:14, 112:7, 130:11, 136:13, 159:16, 160:4, 168:21, 177:13, 178:11, 186:16, 199:4, 202:24, 205:1, 208:6, 216:12, 225:3, 249:4, 252:4, 253:18, 263:18, 270:20, 288:1, 288:2, 297:11, 303:13, 304:19, 322:7, 352:5, 356:6, 369:3, 402:13
understanding [34] 30:16, 33:7, 34:9, 34:10, 35:10, 40:1, 75:7,

91:4, 93:4, 95:19, 106:4, 106:7, 106:13, 131:25, 134:20, 140:19, 141:13, 141:20, 142:21, 159:8, 160:10, 187:18, 203:24, 207:8, 207:16, 288:19, 288:21, 288:22, 291:13, 322:9, 332:9, 348:17, 387:4, 407:12
understood [10] 119:9, 128:16, 145:12, 146:18, 173:6, 181:1, 227:9, 323:12, 352:11, 355:19
undeveloped - 372:19
undilate - 128:20
unduly [2] 381:9, 381:12
uneasy [7] 215:9, 215:18, 215:25, 215:25, 216:4, 216:5, 216:7
unethical - 303:10
unexpectedly - 54:9
unfold - 113:12
unidentified - 373:24
unit [22] 25:13, 25:20, 28:21, 42:7, 42:14, 59:23, 69:24, 70:9, 72:2, 75:12, 78:24, 82:19, 98:5, 134:7, 134:8, 180:14, 190:13, 237:7, 247:8, 261:19, 288:24, 320:11
United [2] 1:1, 1:17
units - 38:11
universal - 92:12
University - 16:18
unknown - 97:8
unless [7] 16:4, 133:10, 143:19, 304:2, 351:19, 370:7, 403:3
unnatural - 195:11
unnecessarily - 314:15
Unpleasantly - 220:20
unprecedented [8] 133:6, 161:20, 166:5, 167:6, 206:24, 219:23, 256:3, 290:13
unreliable [2] 242:1, 242:3
unsafe - 397:12
unstable [3] 164:4, 164:14, 176:3
unsure [9] 7:25, 62:7, 100:7, 103:13, 120:20, 120:20, 177:7, 290:16, 356:22
unusual [2] 149:1, 204:5
unwilling - 47:25
upon [2] 214:25, 340:19
upper - 62:9
upset [9] 155:16, 158:11, 159:4, 203:20, 203:25, 204:1, 232:10, 232:13, 402:2
upsetting - 86:23
upside - 51:6
urge - 313:6
urgency [2] 198:9, 374:23
urinate [2] 313:22, 317:6
urinated - 316:20
urinating [2] 316:24, 317:3
urine - 313:15
uses - 263:14
using [3] 196:25, 367:16, 391:23
usual - 190:6
usually [16] 14:25, 21:9, 61:11, 61:13, 89:14, 92:7, 92:8, 123:12, 175:23, 242:16, 314:5, 334:12, 372:22, 372:23, 392:3, 396:2
uterus [7] 35:1, 47:13, 71:16, 79:2, 89:13, 275:9, 313:23

**V**

vag [2] 240:17, 241:23
vaginal - 84:1
vaginally - 83:14
vague [9] 42:13, 43:24, 49:21, 50:11, 164:18, 175:11, 283:21, 284:11, 284:19
vagueness - 285:5
various [3] 31:16, 54:22, 315:25
verbal [2] 223:20, 223:22
verbalized - 313:4
verify - 374:17
version - 372:8
versus [7] 26:25, 119:11, 162:10, 217:11, 220:2, 249:9, 402:14
via [3] 2:9, 3:6, 4:7
viability [3] 115:23, 115:25, 140:13
viable [2] 154:20, 246:5
video [2] 394:10, 403:9
Videographer [10] 3:12, 150:12, 150:14, 238:9, 238:11, 292:19, 292:22, 341:10, 341:12, 403:10
VIDEOTAPED - 1:7
view [33] 60:16, 121:17, 125:20, 129:8, 131:12, 131:15, 143:13, 158:20, 177:3, 182:1, 183:9, 183:10, 191:7, 191:10, 198:17, 200:23, 212:21, 216:20, 217:3, 217:10, 219:22, 222:1, 222:4, 227:18, 228:2, 229:1, 229:14, 253:1, 258:4, 297:11, 329:7, 361:6, 386:19
viewed [2] 220:2, 229:22
views [13] 198:15, 215:6, 215:18, 216:10, 216:11, 219:16, 221:6, 221:14, 221:16, 222:25, 223:12, 223:25, 229:4
violate - 301:24
violating - 193:8
violation - 328:17
visible [2] 123:10, 124:4
visit [3] 80:14, 133:3, 133:13
visits [2] 14:18, 25:19
vital [10] 56:3, 82:5, 147:15, 175:19, 175:20, 184:2, 199:17, 275:11, 281:21, 328:9
vitals [2] 275:4, 307:6
vividly [2] 343:24, 357:12
void [2] 313:6, 313:24
voided [2] 313:5, 316:17
voiding - 320:4
volume - 336:10
voluntary - 99:12

**W**

wait [52] 7:23, 10:24, 33:9, 50:5, 79:19, 106:21, 106:21, 132:16, 133:5, 148:18, 148:18, 148:18, 164:3, 164:15, 164:20, 180:13, 192:8, 195:3, 198:5, 208:9, 222:12, 226:2, 242:9, 243:11, 243:20, 243:22, 244:8, 245:6, 248:5, 248:5, 248:16, 255:1, 255:2, 255:2, 255:19, 256:21, 256:21, 256:21, 257:23, 267:22, 286:16, 286:16, 286:16, 296:4, 297:25, 298:5, 302:10, 302:17, 303:3, 325:21, 334:2, 376:4
waited [3] 78:25, 303:4, 303:7
waiting [18] 196:17, 196:17, 197:16, 251:13, 251:13, 251:22, 253:24, 254:11, 254:17, 254:24, 254:25, 255:9, 255:13, 256:17, 293:17, 317:19, 374:20, 390:11
waive - 403:9
waived [3] 4:16, 403:12, 407:16
walk [3] 199:8, 199:10, 345:5
walked [2] 230:1, 327:12
wall - 71:16
wanted [55] 47:9, 106:5, 106:8, 106:9, 108:14, 109:22, 110:20, 110:20, 114:6, 117:6, 117:8, 142:11, 149:7, 154:19, 154:20, 154:22, 162:10, 162:15, 175:4, 187:15, 195:20, 204:2, 204:2, 217:12, 227:5, 252:21, 261:16, 270:20, 270:22, 274:17, 277:3, 278:12, 278:13, 278:14, 278:23, 291:25, 316:2, 316:5, 319:5, 322:21, 322:24, 322:25, 331:8, 331:23, 343:21, 345:12, 348:25, 354:2, 357:18, 358:7, 360:20, 369:9, 369:18, 374:25, 387:15
wanting [4] 115:5, 115:8, 252:17, 318:17
wants [5] 55:8, 237:9, 237:11, 237:14, 397:17
warning [4] 223:6, 223:11, 223:16, 223:19
warrant [2] 343:10, 349:5
Warren [15] 2:15, 3:5, 278:17, 279:6, 289:11, 289:16, 291:6, 293:11, 296:13, 296:23, 299:2, 300:24, 312:6, 320:10, 320:15
waste - 111:22
watch [6] 77:7, 78:11, 78:12, 244:16, 244:16, 245:6
watchful - 122:13
watching [7] 77:1, 82:8, 93:25, 113:11, 167:7, 191:25, 266:13
Watts [153] 1:6, 7:17, 12:12, 50:20, 62:12, 64:19, 64:20, 66:9, 66:11, 74:10, 75:8, 81:12, 81:23, 82:1, 82:14, 82:20, 87:15, 87:20, 91:5, 92:20, 94:8, 94:12, 94:23, 96:1, 96:17, 96:24, 97:11, 97:15, 97:17, 98:20, 99:2, 99:2, 99:17, 100:8, 100:17, 100:21, 101:13, 103:18, 104:3, 104:9, 104:25, 105:16, 105:21, 105:25, 106:2, 106:5, 108:9, 109:4, 109:7, 110:1, 110:4, 110:6, 113:5, 113:24, 114:3, 114:17, 115:12, 115:16, 115:18, 121:12, 125:5, 125:18, 128:17, 129:6, 133:17, 133:20, 135:3, 135:22, 136:15, 136:19, 137:25, 138:3, 139:5, 142:14, 143:23, 147:13, 150:19, 154:17, 157:25, 163:2, 164:25, 165:23, 168:15,

169:9, 174:19, 187:5, 189:10, 189:17, 190:9, 195:25, 198:21, 199:1, 200:5, 200:12, 201:5, 202:8, 203:13, 203:25, 206:19, 213:14, 214:7, 214:11, 214:14, 214:18, 224:23, 233:5, 233:8, 233:11, 233:14, 233:17, 233:22, 234:10, 234:15, 237:6, 240:3, 245:19, 246:16, 247:13, 247:21, 249:4, 249:19, 250:17, 252:25, 253:14, 257:9, 270:11, 274:10, 274:12, 274:14, 274:19, 274:24, 276:1, 276:5, 276:23, 278:5, 329:17, 329:21, 334:17, 335:2, 341:16, 347:10, 357:15, 361:18, 393:12, 393:23, 394:1, 395:21, 397:17, 397:21, 398:20, 400:6, 402:8, 407:8
ways [5] 54:22, 199:7, 315:25, 333:20, 369:17
we'll [26] 48:23, 65:4, 65:4, 68:7, 69:18, 125:6, 160:23, 162:5, 169:6, 175:3, 180:13, 180:13, 184:21, 185:13, 187:4, 199:6, 207:13, 211:22, 216:23, 250:1, 252:22, 277:16, 313:22, 336:9, 340:23, 394:14
we're [91] 10:24, 26:25, 27:11, 56:3, 56:14, 57:14, 64:18, 69:10, 85:15, 88:9, 93:25, 121:21, 121:23, 121:24, 121:25, 122:17, 130:25, 131:1, 133:4, 136:3, 139:16, 146:6, 150:17, 162:22, 164:20, 166:11, 167:22, 177:7, 180:9, 180:16, 180:20, 180:21, 182:5, 184:19, 191:25, 198:18, 201:4, 203:21, 209:11, 211:5, 211:21, 211:21, 211:24, 218:21, 221:21, 222:9, 225:18, 227:11, 228:7, 234:7, 234:20, 234:25, 237:11, 237:20, 239:2, 239:4, 244:16, 248:11, 248:12, 248:13, 252:16, 254:20, 254:23, 255:1, 255:18, 255:19, 258:18, 266:12, 266:13, 288:25, 288:25, 293:17, 306:1, 306:15, 306:20, 312:15, 312:15, 312:15, 316:15, 333:17, 341:2, 342:7, 363:8, 374:14, 374:15, 374:15, 379:11, 379:12, 382:7, 387:20, 390:21
we've [34] 36:19, 36:23, 85:4, 85:12, 132:22, 145:7, 145:8, 150:6, 166:11, 208:2, 212:22, 218:10, 220:7, 221:22, 222:13, 235:8, 238:12, 240:13, 248:12, 248:16, 248:17, 256:3, 266:14, 273:23, 318:22, 331:12, 363:6, 368:22, 368:23, 374:9, 384:13, 398:16, 398:17, 399:13
Wednesday [2] 15:12, 348:13
week [16] 21:8, 25:19, 26:19, 27:14, 27:24, 28:2, 28:15, 68:20, 230:19, 230:24, 236:22, 236:24, 246:2, 248:16, 382:9, 396:4
weekly - 396:3
weeks [65] 77:1, 78:1, 78:3, 78:14, 78:24, 79:11, 88:1, 88:21, 92:6, 92:7, 92:10, 92:17, 110:25, 111:17, 111:21, 112:8, 112:11, 133:12, 133:15, 134:22, 134:24, 139:14, 140:13, 140:15, 140:21, 141:11, 142:12, 142:13, 147:9, 154:6, 154:11, 155:3, 169:14, 225:13, 225:24, 226:13, 227:6, 227:17, 234:3, 240:7, 240:10, 246:2, 247:3, 247:4, 247:4, 248:16, 249:12, 252:20, 252:21, 269:14, 271:11, 286:15, 287:16, 288:3, 334:8, 334:12, 338:11, 360:23, 361:10, 363:7, 372:24, 373:3, 376:8, 382:9, 382:9
weigh - 275:13
weird - 213:14
welcome - 11:19
well-being [5] 41:19, 41:20, 95:13, 269:20, 301:8
wellness [25] 201:25, 202:14, 202:18, 202:21, 202:22, 203:2, 203:7, 203:9, 203:11, 204:14, 205:14, 278:16, 279:5, 279:8, 289:10, 289:25, 293:10, 296:12, 296:15, 296:22, 296:23, 297:3, 297:12, 297:13, 301:2
weren't [10] 62:3, 132:25, 167:18, 186:8, 198:24, 208:12, 224:18, 239:21, 318:18, 331:5
wet - 312:22
what's [14] 36:15, 39:23, 40:1, 144:19, 154:8, 167:22, 180:8, 237:20, 237:22, 280:18, 303:7, 303:9, 316:12, 326:6
whatever [23] 101:19, 118:2, 157:6, 159:25, 164:21, 169:15, 179:15, 182:24, 184:18, 222:6, 264:2, 269:7, 269:7, 270:17, 275:22, 286:1, 360:15, 368:8, 368:8, 368:13, 376:18, 396:7, 397:5
Whereupon [11] 7:1, 50:23, 213:9, 260:18, 306:16, 336:7, 336:11, 336:15, 336:25, 337:3, 338:22
whether [57] 35:21, 38:15, 42:17, 57:1, 57:19, 58:2, 58:6, 59:5, 61:9, 62:5, 62:7, 62:18, 93:22, 110:1, 116:2, 121:5, 126:20, 128:13, 128:23, 137:24, 147:18, 147:21, 149:7, 154:16, 158:21, 159:22, 160:9, 162:22, 164:22, 166:23, 169:13, 171:20, 187:8, 197:23, 199:1, 202:10, 218:11, 227:13, 227:14, 229:9, 244:6, 244:19, 245:12, 248:25, 250:17, 251:6, 297:18, 331:13, 331:13, 333:15, 335:11, 343:21, 345:11, 352:6, 359:1, 361:3, 362:23
who's [7] 51:24, 63:2, 138:20, 242:25, 253:4, 359:7, 392:7
who've [3] 79:21, 139:19, 225:24
whole [15] 7:5, 193:2, 220:4, 258:14, 267:23, 301:20, 336:13, 342:2, 353:12, 362:6, 363:6, 364:14, 376:10, 376:10, 389:1
whose [5] 41:6, 66:22, 67:8, 248:13, 295:2
William - 3:12
willing [3] 271:17, 291:4, 331:3
willingly - 343:16
Windham [3] 2:18, 4:8, 407:6
wipe - 394:13
wise - 398:12
wisely - 166:9
wish [6] 159:5, 159:6, 231:15, 280:7, 280:10, 340:17
wishes [6] 121:22, 133:15, 140:17, 141:14, 163:22, 174:19
within [11] 1:13, 4:12, 65:22, 172:4, 178:19, 199:18, 305:4, 309:16, 328:15, 335:25, 407:15
witness [8] 4:14, 4:17, 7:3, 33:11, 195:8, 344:17, 405:16, 406:3
witnessed - 230:1
witnesses [2] 67:5, 68:8
woman [10] 41:4, 41:5, 41:16, 41:19, 90:16, 273:24, 318:20, 358:23, 359:2, 363:14
woman's [2] 42:18, 141:14
womb [2] 75:6, 116:3
women [8] 40:12, 86:18, 114:24, 358:18, 359:1, 359:23, 388:3, 388:15
won't [5] 120:6, 222:2, 223:18, 351:18, 399:9
wonder [4] 86:21, 195:25, 196:5, 349:25
wondered - 98:9
wondering [3] 112:9, 280:18, 282:8
workday [3] 59:13, 60:9, 213:24
worker - 63:6
workplace - 25:17
works [4] 24:7, 84:23, 306:22, 353:12
worried [16] 190:24, 190:25, 191:2, 193:3, 204:20, 204:21, 204:23, 205:3, 205:4, 205:11, 205:13, 205:14, 236:10, 237:21, 309:23, 319:5
worry - 187:4
worse [3] 191:22, 381:23, 381:25
worth - 28:4
wouldn't [24] 28:23, 64:14, 122:7, 138:15, 160:15, 182:22, 182:23, 183:1, 202:11, 255:13, 255:15, 270:1, 274:9, 299:9, 314:14, 316:12, 326:1, 340:18, 345:16, 357:20, 360:9, 360:10, 365:25, 372:17
wrap - 387:21
wrapping - 388:1
write-up [6] 207:14, 210:4, 212:1, 212:3, 219:6, 230:20
writing [5] 60:11, 65:19, 65:22, 231:23, 293:1
written [6] 60:3, 60:5, 187:16, 187:16, 230:23, 232:6
wrong [7] 238:16, 251:17, 278:12, 374:24, 379:22, 387:24,

388:6
wrote [15] 118:15, 161:5, 171:8, 173:22, 174:15, 174:18, 212:11, 218:1, 219:7, 263:17, 292:25, 293:16, 294:12, 307:22, 350:13

**Y**

yards - 376:10
yeah [55] 22:24, 45:17, 51:2, 68:2, 89:2, 108:20, 120:1, 120:23, 130:10, 138:6, 139:22, 145:6, 149:19, 150:10, 187:24, 195:2, 195:11, 197:16, 200:17, 209:10, 221:7, 231:3, 235:7, 238:22, 260:12, 265:21, 267:24, 270:2, 280:21, 292:8, 300:10, 301:15, 304:17, 306:3, 306:11, 310:19, 314:3, 326:1, 327:14, 329:6, 334:11, 337:13, 338:6, 345:7, 345:18, 350:21, 351:14, 365:4, 367:21, 379:25, 382:24, 388:8, 390:6, 393:15, 401:14
yesterday [6] 15:9, 15:9, 15:10, 15:14, 116:25, 117:2
yet [13] 82:2, 183:24, 257:21, 261:1, 262:20, 266:17, 278:21, 279:23, 280:16, 280:23, 281:3, 298:15, 379:9
you'd [2] 148:16, 149:20
you'll [3] 345:2, 349:14, 379:15
young - 53:6
Youngstown [8] 2:15, 2:19, 4:9, 20:12, 21:13, 21:14, 407:2, 407:6
yours - 298:15
yourself [7] 29:10, 87:17, 109:8, 194:16, 316:24, 337:4, 337:18

**Z**

Zoom [2] 2:9, 3:6
Zupko [6] 2:16, 289:21, 291:8, 300:19, 334:13, 334:13