LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

# CASE NO. 4:25-CV-00049

# BRITTANY WATTS

**vs**

# BON SECOURS MERCY HEALTH, ET AL.

## DEPONENT:

## DR. JOHN STEWART

## DATE:

## MARCH 31, 2026

a courtroom powerhouse

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
HON. JUDGE SARA LIOI

BRITTANY WATTS,
Plaintiff,
vs. CASE NO.: 4:25-CV-00049
BON SECOURS MERCY HEALTH;
MERCY HEALTH YOUNGSTOWN
LLC D/B/A ST. JOSEPH
WARREN HOSPITAL; CONNIE
MOSCHELL; JORDAN CARRINO;
PARISA KHAVARI; SUZANNE
ZUPKO; FRED RAINES; CITY
OF WARREN, OHIO; NICHOLAS
CARNEY; UNKNOWN OFFICERS,
and UNKNOWN MEDICAL
PROFESSIONALS,
Defendants.

DEPOSITION OF
DR. JOHN STEWART
MARCH 31, 2026
1:00 P.M. (ET)
Remote Proceeding
Ellina DeLillo, 2025-RE-885927

APPEARANCES OF COUNSEL

On behalf of the Plaintiff, BRITTANY WATTS:

THERESA KLEINHAUS, ESQ.
JULIA RICKERT, ESQ.
RACHEL BRADY, ESQ.
RENEE SPENCE, ESQ.
LOEVY + LOEVY
311 North Aberdeen Street
3rd Floor
Chicago, Illinois 60607
tess@loevy.com
brady@loevy.com
julia@loevy.com
spence@loevy.com
APPEARED VIA VIDEOCONFERENCE

APPEARANCES OF COUNSEL (CONTINUED)

On behalf of the Defendants, CONNIE MOSCHELL, JORDAN CARRINO, PARISA KHAVARI, SUZANNE ZUPKO, FRED RAINES, BON SECOURS MERCY HEALTH AND MERCY HEALTH YOUNGSTOWN LLC D/B/A ST. JOSEPH WARREN HOSPITAL:

THOMAS PRISLIPSKY, ESQ.
PATRICK KASSON, ESQ.
REMINGER CO., LPA
200 Civic Center Drive
Suite 800
Columbus, Ohio 43215
tprislipsky@reminger.com
pkasson@reminger.com
APPEARED VIA VIDEOCONFERENCE

On behalf of the Defendants, CITY OF WARREN, OHIO AND NICHOLAS CARNEY:

ZACHARY W. ANDERSON, ESQ.
MAZANEC, RASKIN & RYDER - CLEVELAND
34305 Solon Road
100 Franklin's Row
Cleveland, Ohio 44139
zanderson@mrrlaw.com
APPEARED VIA VIDEOCONFERENCE

APPEARANCES OF COUNSEL (CONTINUED)

On behalf of the Witness, DR. JOHN STEWART:

GREGORY T. ROSSI, ESQ.
HANNA CAMPBELL & POWELL, LLP
3737 Embassy Parkway
Suite 100
Akron, Ohio 44333
grossi@hcplaw.net
APPEARED VIA VIDEOCONFERENCE

INDEX OF EXAMINATION

WITNESS: DR. JOHN STEWART


| EXAMINATION | PAGE |
|---|---|
| Direct By Ms. Kleinhaus | 11 |
| Cross By Mr. Prislipsky | 103 |


INDEX TO EXHIBITS


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | Brittany Medical Records Reflecting Office Visit In Mercy Health Warren Women's Center With MFM Note Included (09-19-2023) | 34 |
| 2 - | Brittany Watts Medical Records Reflecting Her Leaving Against Medical Advice Note By Dr. Parisa Khavari (09-9-2023) | 38 |
| 3 - | Dr. John Stewart Analysis, Recommendations, Plan, & Impression Note Of Brittany Watts (09-20-2023) | 55 |
| 4 - | Brittany Watts Medical Records Reflecting Pitocin Ordered For Postpartum Only (09-20-2023) | 75 |
| 5 - | Brittany Watts Medical Records Reflecting Lab Results (09-20-2023) | 77 |

INDEX TO EXHIBITS (CONTINUED)


| PLAINTIFF'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| 6 - | Brittany Watts Medical Records Reflecting Clinical Ethics Consultation Note (09-20-2023) | 85 |
| 7 - | Ethical & Religious Directives For Catholic Health Care Services By The US Conference Of Catholic Bishops | 99 |
| DEFENDANTS' | | |
| A - | End Of September 20th Consultation Note By Dr. John Stewart (Hospital page 665) | 108 |
| B - | Hospital page 662-663 Indicated Brittany Watts Not Taking Tylenol & No Apparent Distress | 110 |
| C - | Hospital page 771 Indicating Pain Assessment Done | 113 |
| D - | Hospital page 708 Indicating Nurses Assessment Of Brittany Watts Regarding Dysuria | 114 |
| E - | Medical Records On September 19th Depicting Urinalysis Of Brittany Watts | 115 |
| F - | Hospital page 672 Depicting Nurse Elaine Anderson Note Regarding Brittany Watts Pad Checked | 117 |
| G - | Hospital page 712 Depicting Nurse EA Flowsheets | 117 |

INDEX OF EXAMINATION (CONTINUED)


| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| H - | Hospital page 714 Depicting Another Nurse Check Of Brittany Watts Pad & Maternal Vitals of Temperature | 118 |
| I - | Hospital page 684 Brittany Watts Lab Results Depicting Components & Results | 146 |
| J - | Hospital page 789 Brittany Watts Lab Results On September 19th | 147 |
| K - | [redacted] | 147 |
| L - | Hospital page 658 Indicating Clinical Ethics Consultation Note By Nurse Deanna Ford | 147 |
| M - | Amended Complaint By Brittany Watts Referring To The Standard Of Care To Perform D&E Procedure | 147 |

The VIDEO deposition of DR. JOHN STEWART was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40202, via videoconference in which all participants attended remotely, on TUESDAY, MARCH 31, 2026, commencing at 1:00 p.m. (ET); said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was administered remotely pursuant to 7-31-2020 administrative actions, 2020-OHIO-3861.

It is agreed that ELLINA DELILLO, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

THE REPORTER: My name is Ellina DeLillo. I'm the online video technician and court reporter today representing Kentuckiana Court Reporters located at 730 West Main Street, Suite 101, Louisville, Kentucky, 40202. Today is the 31st day of March 2026. The current time is 1:00 p.m. We are conveyed by videoconference to take the deposition of Dr. John Stewart in the matter of Brittany Watts v. Bon Secours Mercy Health, Mercy Health Youngstown, LLC, D/B/A St. Joseph Warren hospital et al., pending in the district court of the Northern District of Ohio Eastern Division. Case number 425-CV-00049. Will everyone but the witness please state your appearance, how you are attending, and the location you're attending from, starting with Plaintiff's counsel?

MS. KLEINHAUS: Yes. Good afternoon. This is Theresa Kleinhaus, along with Rachel Brady and Julia Rickert, appearing remotely from Chicago on behalf of Brittany Watts.

MR. ANDERSON: My name is Zach Anderson, attorney representing the City of Warren and Detective Nicholas Carney, and I'm attending the deposition via Zoom in Solon, Ohio.

MR. PRISLIPSKY: Tom Prislipsky, representing

Mercy Health, Fred Raines, Dr. Khavari, Connie Moschell, Suzanne Zupko. I'm attending remotely from our office in Youngstown.

MR. ROSSI: And this is Greg Rossi, Gregory Rossi. I'm here with Dr. Stewart in his office in Toledo.

THE REPORTER: Okay, perfect. And Dr. Stewart, will you please state your full name for the record?

THE WITNESS: It's John William Stewart, Jr.

THE REPORTER: All right. And typically, this is where I would ID the witness, but counsels off record have agreed to stipulate on the ID of the witness. Do all parties still agree that the witness is, in fact, Dr. John Stewart?

MS. KLEINHAUS: I do.

MR. PRISLIPSKY: Yes.

THE REPORTER: Perfect. Dr. Stewart, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE REPORTER: Counsel, you may proceed.

MS. KLEINHAUS: Thank you.

DIRECT EXAMINATION

BY MS. KLEINHAUS:
**Q. Dr. Stewart, can you hear me okay?**
A. I can.
**Q. Okay. I'm going to turn up the volume. I can't hear you very well. Can you say that again?**
A. Yes, ma'am. I -- I can. Let me --
**Q. Okay, great.**
A. -- on max.
**Q. Great. Thank you. Sir, have you given a deposition before?**
A. I have.
**Q. On how many occasions have you done that?**
A. Not more than ten. Probably not less than five.
**Q. Okay. Just to remind you kind of how things will go today, I'm going to be asking you questions on behalf of Ms. Watts, the plaintiff in this lawsuit. Some of the other attorneys may also have questions for you. They may object. That's fine. That's their job. And if you understand my question, I expect you to answer it. And if you don't understand it, please tell me that; is that fair?**
A. (No verbal response.)
**Q. Sorry, I just couldn't hear you.**
MS. KLEINHAUS: Is everybody else able to hear

him?

THE REPORTER: I cannot.

MR. PRISLIPSKY: I'm not getting anything on my end.

MS. KLEINHAUS: Let's go off the record for a quick second to fix it.

THE REPORTER: Off record. The time is 1:03 p.m.

(A recess was taken.)

THE REPORTER: Back on record. The time is 1:06 p.m. Counsel, you may proceed.

MS. KLEINHAUS: Thank you. Renee Spence, on behalf of Brittany Watts, has also joined the Zoom.

BY MS. KLEINHAUS:

**Q. Sir, before we took our brief break, I was reminding you, if I ask a bad question, will you tell me that so that I can ask you one that makes sense to you?**

A. Yes, I will.

**Q. Thank you. Do you have any medical conditions? Are you on any medications that would prevent you from providing accurate testimony today?**

MR. ROSSI: Well -- objection. I think that that question -- I mean, he can answer whether or not there's anything to affect his testimony, but he's not going to answer any questions about his

medical condition.
BY MS. KLEINHAUS:
**Q. Yeah, I'm not asking you to identify any medical conditions or any medications. Is there anything in your current medical status that would prevent you from providing accurate testimony today?**
A. No.
**Q. Okay. And as we've already seen with Zoom, things can get a little bit tricky. If I freeze or there's a problem, just wave your arms and I'll do my best to fix it, okay?**
A. Yes.
**Q. And I'm going to do my best not to talk over you, and if you can do your best not to talk over me, that'll make Ellina's life a lot easier; is that fair?**
A. Perfect.
**Q. Okay. Sir, what's the highest level of education that you have?**
A. Medical doctor.
**Q. And where did you receive your degree from?**
A. University of Cincinnati.
**Q. And what year did you graduate from UC?**
A. 1987.
**Q. Did you go directly from undergrad to medical school?**

A. No, I did not.
**Q. Okay. What year did you graduate from undergrad?**
A. 1973.
**Q. And where did you obtain your undergraduate degree?**
A. Ohio University.
**Q. And generally, what did you do for work between when you graduated from undergrad and when you went to medical school?**
A. Okay. I was a medical technologist for 10 years. And then in 1977, I started a master's program at the University of Dayton and have a master's in clinical chemistry from the University of Dayton. I then went to Louisiana State University to pursue a Ph.D., and I'm all but dissertation in the Ph.D. from Louisiana State University. And then from -- and that ended in 1983. And then I started medical school in 1983 at University of Cincinnati.
**Q. And what was your Ph.D. that you were ABD in?**
A. Clinical chemistry.
**Q. And what did you do next after you graduated from UC in 1987?**
A. From 1987 through 1991, I was a -- a resident and intern at St. Joseph Mercy Hospital in Ann Arbor.

And then in -- from '91 to '93, I was in fellowship in maternal fetal medicine at Metro Health Medical Center in Cleveland, Ohio.

**Q. Did you do any other fellowships besides the one that you just identified in Cleveland?**

A. No.

**Q. Okay. Have we covered all of your educational background and training?**

A. Yes.

**Q. Okay.**

A. I did think about going to law school because I could have gone for free, but I had to go to work and pay some bills.

**Q. It gets that way sometimes. I think you made the right choice. After you completed your fellowship in Cleveland, what did you do for work?**

A. I stayed at Metro Health Medical Center until -- until 1995, and then I -- I moved to Akron to a private practice in Akron, and I was in the private practice, or I was in solo practice there until I think 2022. And then in 2022, I moved to -- I went to Warren and (Inaudible). And then in 2024, I came to Toledo, and I'm currently in Toledo.

**Q. And what is your -- who is your employer in Toledo now?**

A. Bon Secours.
THE REPORTER: I'm sorry. I didn't get that.
THE WITNESS: Bon Secours, the hospital -- it's St. Vincent Hospital, but Bon Secours, I guess, is the managing or owner of the hospital.
BY MS. KLEINHAUS:
**Q. And so do I -- did I understand it right, from 1995 to 2022 you were in private practice in Akron?**
A. Yes.
**Q. Okay. And when you say private practice, private practice as maternal fetal --**
A. Medicine specialist.
**Q. -- medicine specialist, right?**
A. At one point in time, my practice was obtained by the Cleveland Clinic, and I don't remember exactly what those dates were, but that was part of that Akron practice.
**Q. Okay. And your current role in Toledo is also in maternal fetal medicine, right?**
A. Yes.
**Q. Okay. And so from 1991 to the present, you've been in maternal fetal medicine; is that accurate?**
A. 1993 is when I finished my fellowship.
**Q. Okay.**
A. So '91 is when I started, but '93 was when I

finished.
**Q. Got it. Do you have any board certifications?**
A. I am doubly boarded. I'm boarded in obstetrics and gynecology and maternal fetal medicine.
**Q. Do you publish any research or articles in the area of maternal fetal medicine?**
A. I have not for a while.
**Q. And when you say for a while, have you published anything, like, in the last 10 years?**
A. No.
**Q. Okay. Busy taking care of patients?**
A. I'm a worker bee not a -- not a -- not a writer.
**Q. And have you presented at any conferences in the last 10 years?**
A. No.
**Q. What documents did you review in preparation for your deposition today?**
A. The only thing I reviewed was my consultation note.
**Q. And when you say your consultation note, can you describe for me what you mean?**
A. The -- when Brittany was in the hospital, I was consulted by Dr. Khavari, and I just reviewed the consult note that I wrote at that time.

**Q. Have you ever reviewed the complaint in this lawsuit, meaning the legal document that initiates the lawsuit?**

A. I have not.

**Q. So you were at Bon Secours in Warren for two years from '22 to '24; is that right?**

A. Yes.

**Q. And excuse my ignorance, but were there multiple maternal fetal medicine specialists there at that time, or were you the only one in that role? How many of you were there?**

A. Between the two hospitals, there were originally four of us, but I was the primary provider at St. Joseph. The rest were primarily at St. Elizabeth. But once a month, I would rotate to St. Elizabeth, and typically somebody would rotate to St. Joe's when I was at St. Elizabeth.

**Q. And how would you be called in -- typically, how would you be called in to consult on a case at St. Joseph's?**

A. What would happen would be the attending physician would notify the secretary at the hospital, and the secretary would typically call my office and let my secretary know that there was a consultation in the hospital.

**Q. And then can you walk me through what you would typically do for a consultation? Would you review records before you arrived or have a conversation with the attending? What would your process be?**

A. Usually, I would go to the hospital and I would review the -- the hospital chart, and then I would go and talk to the patient, and then I would write my note. But the consultation there was very infrequent. I would say maybe once or twice a month at the most, so it wasn't a very common occurrence.

**Q. And when you say consultation, you mean attending to someone in the hospital, right?**

A. Correct.

**Q. Okay. And then the remainder of your time would be seeing patients in -- sorry, regular medical appointments?**

A. Maternal fetal medicine primarily does ultrasounds, so it was mostly an ultrasound practice. And then I did do -- I did manage diabetics, people with blood pressure problems, so the more complicated -- but I did not have a -- a practice of my own that I was delivering. It was all consultation.

**Q. Okay. And when you say it was mostly an ultrasound practice, would the ultrasound take place -- if you're doing a consultation of someone in the**

**hospital, would the ultrasound take place at bedside?**
A. Would not do -- did not do ultrasounds on patients in the hospital.
**Q. Okay. Prior to the case we're here talking about today with Brittany Watts, had you, before that, been called in to consult on a patient of Dr. Khavari's before?**
A. I -- I don't really remember.
**Q. Do you know if you knew Dr. Khavari before being called in to consult on Brittany Watts's situation?**
A. Yes. I -- saw a number of Dr. Khavari's patients as an outpatient. And if I did see any on the inpatient side, it was very infrequent and I don't remember that, but I did see a lot of her patients in -- in the ultrasound part.
**Q. And when you would see patients outpatient for the ultrasound part, would you be the one performing the ultrasound?**
A. No, I had two ultrasound technologists that would perform the ultrasound.
**Q. And would you be the one interpreting the results from the ultrasound?**
A. Yes.
**Q. Are you familiar with Nurse Connie Moschell?**

A. No.

**Q. Going back one step to Dr. Khavari, did you have any kind of social relationship with her? And by that, I mean, like, spend any time together outside of work?**

A. No.

**Q. Prior to the Brittany Watts situation, had you ever been involved in an ethics consultation while you were at St. Joseph in Warren?**

A. I do not remember.

**Q. I want to ask you some questions related to various medical diagnoses in patients during pregnancy, and this will all be very remedial for you, but if you can just stick with us to make sure I'm understanding the medical records correctly. Can you explain what placental abruption is?**

A. It's a premature separation of the placenta from the uterus.

**Q. And what constitutes premature for purposes of abruption?**

A. Anytime there's an abruption, it's a premature. So the placenta is supposed to detach from the uterus after birth, not -- not when the patient is still carrying the child.

**Q. And is placental abruption something that you**

**are always able to see on the ultrasound or the imaging?**
A. Almost never --
MR. PRISLIPSKY: Objection to form.
BY MS. KLEINHAUS:
**Q. That was an objection, but you should still answer the question.**
A. Almost never. It's -- ultrasound is not a very good modality to detect abruption.
**Q. What -- are there modalities that you consider more reliable to detect abruption?**
A. There is none. Usually what happens is there's just significant bleeding, and the causes for bleeding are very limited, and so if you -- if you've eliminated the -- other causes, you just assume that it's an abruption.
**Q. So it's like a differential diagnosis type situation?**
A. If there's -- you look -- if there's not a cut in the vagina, there's not a tumor in the vagina, the bleeding's not coming from the cervix, and there's not a placenta previa, it's an abruption. Those are the five most common causes of bleeding at that point in time. And if it's not any -- I mean, a tumor's obvious, bleeding from a cut in -- is obvious, bleeding from the cervix is obvious, looking to see where the placenta is

is obvious, and so it's -- it's a diagnosis of elimination.

**Q. Okay. Can you explain what the rupture of the membranes is?**

A. It's when the bag of water around the baby has broken.

**Q. And how do you typically diagnose that that has occurred?**

A. There are certain chemical tests that you can use, and also you can look at the amount of fluid that's remaining around the baby on ultrasound.

**Q. Am I correct that there's an increased risk of infection for the patient once the rupture of the membranes has occurred?**

A. You are correct.

**Q. And what would you use to determine whether infection has set in?**

A. There would be a -- a number of different parameters. Fever would be one, chills, you can use white count, that's -- that's helpful as well. And then you can look at the -- the discharge that's coming out in the vagina as well.

**Q. You mentioned the white count, meaning the white blood cell count, right?**

A. Correct.

**Q. Is there a way for you to distinguish -- or strike that, please. Is the white blood count sometimes elevated in pregnancy even without infection?**

A. It -- it -- the white count in pregnancy may be slightly higher than not pregnant, but it usually stays within the normal limits. But it's not, like, the only reason that you can have an elevated white count. People in active labor will have an elevated white count. People can have what's called a leukemoid reaction where they just have an elevated white count. So it's not the only reason for an elevated white count.

**Q. When you say, "It," you mean infection isn't the only reason?**

A. Yes.

**Q. And is the decrease or absence of amniotic fluid something you can typically detect on the imaging?**

A. Yes.

**Q. I'm going to be asking you some questions about induction and the process of induction. Can you describe what some of the methods are that can be used to induce labor?**

A. Are you talking term, preterm --

**Q. Preterm.**

A. -- you'll have to specify--

**Q. Like, in the -- sorry. Didn't mean to**

**interrupt you. In the case of a second trimester situation like Ms. Watts's, what are the options for induction?**

A. You can use Cytotec. You could use Pitocin. Those are the -- the two primary.

**Q. Okay. Cytotec can be placed inside the vagina in order to administer the medication; is that right?**

A. It can, but it can also be taken orally as well.

**Q. Okay. And then what about Pitocin? How is that administered?**

A. That would be intravenously.

**Q. How long does it take for Cytotec to take effect or have an effect?**

MR. PRISLIPSKY: Objection to form. Doctor, every time I object, please just go ahead and answer.

THE WITNESS: Okay. Just making sure. I -- I've been trained by -- by Mr. Rossi to keep my mouth shut.

MR. ROSSI: You can go ahead.

THE WITNESS: It -- takes as long as it takes. For some people, it works very quickly. For other people, it may take days, so it is -- it -- there's no particular timeline there for an -- for timing.

BY MS. KLEINHAUS:
**Q. And what about Pitocin?**
A. Same.
**Q. I want to switch topics here to the concept of elopement or patients leaving the hospital without being advised to do so or told to do so. Other than Brittany Watts, which we'll talk about later, have you had other patients that you consulted on in the hospital that have left the hospital against medical advice?**
MR. ROSSI: Objection. Tessa, he may answer, but please do not reveal any --
MS. KLEINHAUS: Oh, no. Now I can't hear you, Greg.
MR. ROSSI: He may answer, but I'm asking him not to reveal any PHI or, you know --
MS. KLEINHAUS: Oh, yeah.
BY MS. KLEINHAUS:
**Q. Don't tell me anybody's names ever.**
A. I'm sure that it's happened but it -- it tends to be relatively an infrequent occurrence, so I'm sure in my 30-some year career that people have left the hospital without my permission.
**Q. Has it been your experience that they're more likely to leave the hospital against medical advice if there's been a delayed and unexplained delay in care?**

MR. PRISLIPSKY: Objection to form.
THE WITNESS: I'm not sure I understand the question.
BY MS. KLEINHAUS:
**Q. Sure. Is the patient's perception of whether they're receiving treatment, is that -- can that be related to them leaving the hospital?**
MR. PRISLIPSKY: Objection. Speculation.
THE WITNESS: You're asking me to -- to imagine what the patient's thinking, and I really can't do that. Everybody has their own reasons. It could be for family reasons. It could be for a number of different reasons. And -- it's one of those things where you don't say, well, why did you leave? And so it's kind of an individual choice. And so for me to answer that is -- I -- I just can't really answer that.
BY MS. KLEINHAUS:
**Q. Okay. You don't know why people have left against medical advice?**
A. They've left for a number of different reasons. There's not a reason. It could be, I need to feed my cat. But -- but again, I usually don't go into, why are you leaving?
**Q. Turning specifically to the Brittany Watts**

**case or situation at the hospital, on how many occasions did you consult on her care?**

A. One time. Well, I take -- in the hospital once I did see her the day before she was -- the -- the day before the consultation.

**Q. Okay. And where did you see her the day before the consultation?**

A. I saw her in Dr. Khavari's office.

**Q. And is that a typical part of your practice that you could be called in to consult in-patient care at the -- at an OBGYN practitioner's office?**

A. That was the first time I've ever done that in Akron -- or in -- in Warren.

**Q. And how did it happen that you ended up doing that consult at Khavari's office?**

A. Wasn't a consult. I did --

**Q. What was it?**

A. Dr. Khavari asked me if we could do an ultrasound, so my ultrasound tech and I went up and did an ultrasound at Brittany in Dr. Khavari's office.

**Q. And I don't know the geography for your office and her office. Were you in the same building?**

A. We were in the same building. She was one floor up.

**Q. Okay. And do you have a recollection, your**

**own memory, of going to her office and doing that ultrasound?**

A. I do remember doing the ultrasound.

**Q. So you would've seen her if -- I'll represent to you your consult with her in the hospital was September 20th, so you would've seen her in Dr. Khavari's office September 19th; is that right?**

A. Correct.

**Q. And tell me what you recall about that visit with her. What would you call it? It's not a consult. What would you call your trip to Dr. Khavari's office on the 19th?**

A. It was an ultrasound for gestational age and anatomy.

**Q. And what do you recall from that -- doing that ultrasound?**

A. That the baby was about 21 plus weeks. The anatomy did appear to be normal, and the fluid around the baby was very, very low. And the baby did have a bladder that we could see, and that's important because one of the reasons for low fluid might be that the kidneys were not working, but if there's fluid in the bladder, it tells you that the baby's kidneys are working. So it wasn't low fluid because of no kidneys. It was low fluid because she was probably ruptured. And

in talking to Dr. Khavari, she said that she could see fetal hair coming through the cervix. And so that tells me that the bag of water was no longer intact as well. And so I assumed that the patient was ruptured because the cervix was open, you could see hair, and the fluid around the baby was very, very low.

**Q. And what was the clinical significance of that to you?**

A. That she was ruptured.

**Q. And what would you expect the course of treatment to be then if the membranes were ruptured at that point?**

A. A lot of it --

MR. PRISLIPSKY: Objection.

THE WITNESS: -- depends on the patient's wishes. I've had people that have wanted to continue the pregnancy and have -- have done that, and I've had people that have not wanted to continue the pregnancy and have done that as well.

BY MS. KLEINHAUS:

**Q. Was the pregnancy viable at that point?**

MR. PRISLIPSKY: Objection.

THE WITNESS: 22 weeks is the threshold of viability. And because the baby was 21 weeks, it was felt to be non-viable, but it did have a

heartbeat.
BY MS. KLEINHAUS:
**Q. What was your impression of Brittany Watts when you encountered her on the 19th in Dr. Khavari's office?**
A. I'm not sure what you mean by that question.
**Q. Do you recall seeing her in Dr. Khavari's office?**
A. Do recall seeing her.
**Q. Okay. Did you have any impression about her emotional state or her affect or how she was behaving?**
A. I was somewhat -- I thought Brittany was much younger than the 33 years that she appeared to be. My impression was more that she appeared to be younger. I didn't notice anything in terms of emotions or -- or anything like that, and affect. But I'm not the most sensitive person come -- when it comes to those kind of things. But I -- I do remember my impression that I was surprised that she was 33. I thought she was much younger.
**Q. Were you part of any discussions with her about what the course of treatment would be, what would happen next?**
A. I don't remember if I talked to her about it at that point in time or in the hospital the next day.

I did tell her -- I'm relatively certain that I told her that the prognosis was not very good because she was ruptured so early.

**Q. When you saw her on the 19th, did you consider her to be in labor at that point?**

A. No.

**Q. Did you have a conversation with Dr. Khavari after completing the ultrasound at her office on the 19th?**

A. I don't remember it word for word. I'm sure that we had a discussion, and I told her what my findings were.

**Q. Do you remember what her response was?**

A. I do not.

**Q. Was one of the possible courses of treatment, at that point, an induction?**

A. I don't think that the patient had decided -- say that again because that's not a very good question. It's a very broad question, and I'm -- and I'm not sure exactly how to answer that.

**Q. Okay. After the ultrasound that you performed on the 19th, where you determined gestational age and that there was low fluid and determined that the prognosis was not very good for the baby, what -- was one of the courses of treatment or one of the options of**

**treatment induction?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Yes.

BY MS. KLEINHAUS:

**Q. Did you recommend induction on the 19th?**

A. I did not. To my -- to my -- to my knowledge, I did not.

**Q. And why not?**

A. Because I felt that we needed to get more information. I did not think that Brittany had the appropriate knowledge to make that decision at this point in time, and that we needed to gain more information.

**Q. Okay. And then after your ultrasound in Dr. Khavari's office, she was then sent to the hospital, right?**

A. Again, I was not part of that.

**Q. Okay.**

A. I do -- I do know she went to the hospital, but I was not the one that made that decision.

**Q. Right. When you say you thought she needed more information and the medical team needed more information, were you anticipating that information would be gathered at the hospital?**

A. Yes.

MS. KLEINHAUS: Okay. I'm going to show you what we'll mark as Exhibit 1.
(Plaintiff's Exhibit 1 was marked for identification.)
BY MS. KLEINHAUS:
**Q. And I'll share it on my screen. Hang on one second. Are you able to see that, sir?**
A. Yes.
**Q. Okay. And I'll represent to you this is a portion of Brittany Watts' medical records. Obviously, her records are extensive. This is just a few pages. I'm going to scroll down here. Do you see this section that's labeled "Vitals"?**
A. Yes.
**Q. And there's a BP. That's for blood pressure, right?**
A. Right.
**Q. And it shows 82 over 41. Do you see that?**
A. I do.
**Q. And was that concerning to you that in her visit on the 19th, her blood pressure was 82 over 41?**
MR. PRISLIPSKY: Objection to form.
BY MS. KLEINHAUS:
**Q. You can go ahead, sir.**
A. I wasn't aware of that.

**Q. Say that again?**
A. I was not aware of that blood pressure, but it's not surprising given that -- again, I thought she was relatively young and healthy. It's not unusual when you're pregnant to have your blood pressure decrease.
**Q. Okay. Did you -- would her blood pressure have been related at all to any of the other symptoms that you identified during that ultrasound, or not necessarily?**
A. No.
**Q. Okay. Going further down here. Okay. In the notes section, do you see this bolded section?**
A. Yes.
**Q. Okay. Can you read through that to yourself? And then I'll ask you a couple questions about it.**
A. Okay.
**Q. Okay. Having looked at that, where it says, "MFM," that's maternal fetal medicine, right?**
A. Correct.
**Q. And that is -- you were the one who were -- was present and performed -- or your tech performed the ultrasound, right?**
A. Correct.
**Q. Okay. And is this medical note consistent with your memory of that visit with Brittany Watts on**

**the 19th at Dr. Khavari's office?**

A. I'm not certain about the statement such as, "Comfort measures were reviewed with her," and that she was, "adamant that no interventions be performed," because that would've been a discussion with Dr. Khavari, and I may not have been present for that. And so -- and -- and "All risk of prematurity had been reviewed with her." Again, I would not have been necessarily present for that.

**Q. It says here that she was offered a C-section and she was adamant that she didn't want that intervention performed. Are you surprised that a C-section was offered to her?**

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Go ahead, sir.**

A. Again, there have been times when I could not induce labor and have had to perform a C-section. So am I surprised? No, because I've been in that situation where I've tried to induce somebody that would not induce, and so you have to do that. So I'm not surprised to see that. And for some people, they want everything done for their baby because they're trying to save the baby, and that would include a cesarean section, so I'm not surprised to see that at all.

**Q. Am I understanding you correctly that the C-section would be something that would be done if the -- if an induction wasn't working and there was some reason or some urgency?**

MR. PRISLIPSKY: Objection. Form.

THE WITNESS: Again, if the patient wanted everything done for the baby and the baby was showing signs of distress in labor, then you would probably perform a cesarean section.

BY MS. KLEINHAUS:

**Q. Were you aware, on the 19th, for this visit, what her white blood cell count was?**

A. No.

**Q. Did you have any discussion with any -- or strike that, please. Did you have any discussion with an ethics person or an ethics consult related to Brittany Watts on the 19th?**

A. No.

**Q. Did you have any discussion with any risk management team on the 19th?**

A. No.

**Q. Okay. I'm going to stop sharing here. Did you have any other interaction with Dr. Khavari with regard to Brittany Watts on the 19th?**

A. No.

**Q. And you didn't see Brittany Watts again on the 19th, right?**
A. Correct.
MS. KLEINHAUS: Okay. I'm going to show you what we'll mark as Exhibit 2.
(Plaintiff's Exhibit 2 was marked for identification.)
BY MS. KLEINHAUS:
**Q. Bear with me for a second. Okay. Can you see that okay?**
A. Yes.
**Q. Okay. Can you review what's in front of you there as part of Exhibit 2?**
A. I can't see below, "She understood" -- yes. Thank you. Okay. I saw that.
**Q. Okay.**
A. Saw it all.
**Q. Okay. You saw all of Dr. Khavari's note there, correct?**
A. Yes.
**Q. Okay. Have you seen this medical note before?**
A. No.
**Q. Okay. It says, "Reviewed with her, that since she continued to bleed, I will consult MFM regarding induction of labor." MFM is you or one of your other**

**colleagues for maternal fetal medicine, correct?**

A. Yes.

**Q. And what is the -- I'll represent to you I think this is, like, at least eight hours after when she would've been in the office and been seen for the ultrasound. What is the significance of the fact that she is continuing to bleed at this point?**

A. Again, it could be from labor. It could be just the fact that there -- there is an -- a small abruption that is occurring.

**Q. And it says, "I will consult MFM regarding induction of labor." Am I correct that if there would've been induction of labor at this point, it would've been through Cytotec or Pitocin?**

A. Correct.

**Q. Okay. Is there -- assuming that the patient wanted induction, is there any reason, in your view, that an induction couldn't have been started at this point in the evening on the 19th?**

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Go ahead, sir.**

A. You -- you can -- that would've been considered a termination of pregnancy. It's a Catholic hospital. There's still a -- fetal heartbeat. You

can't just start an induction without the okay of the ethics committee. Catholic hospitals do not generally perform terminations with a fetal heartbeat present.

**Q. And how did you come to understand that policy that you're describing?**

A. It's -- it's a Catholic doctor -- doctrine and it's a Catholic hospital. Catholics do not believe in terminations of pregnancy.

**Q. And just to make sure I'm understanding how you're using the term termination of pregnancy, in this case, the purpose of the induction would be to treat Brittany Watts, but your understanding was that the baby could not survive on its own outside the womb; is that right?**

MR. PRISLIPSKY: Objection. Form. Foundation.

THE WITNESS: I'm not sure I understand the question as well.

BY MS. KLEINHAUS:

**Q. Okay. It seems that you're considering induction under these circumstances, because there's a heartbeat, to be a termination of the pregnancy. Do I have that right?**

A. Yes. Correct.

**Q. Okay. But would you agree with me the reason for inducing labor at this point wouldn't be in order to**

**terminate the pregnancy, it would be in order to treat Brittany Watts?**

MR. PRISLIPSKY: Objection. Form. Foundation.

THE WITNESS: The bleeding was not significant that it was life-threatening at that time, so it would have been to terminate the pregnancy to stop the bleeding.

BY MS. KLEINHAUS:

**Q. Are there other hospitals in the Warren area that did not have that same policy as to induction?**

A. Unfortunately, in that particular area, for five counties around that area, Warren is the only hospital that does OB, and so no other hospital in a five-county area could have done that.

**Q. Okay. Further into this note, it says, "She understood that her white count is elevated. She understood the risk of hemorrhage, sepsis, DIC, and death." Do you see that part?**

A. I do.

**Q. What does DIC mean?**

A. Disseminated intravascular coagulation. It's when you -- you start bleeding and you use all of your coagulation factors.

**Q. And what is the consequence of that?**

A. Usually death.

**Q. So am I understanding correctly that at this point, she is at risk of hemorrhage, sepsis, something that causes death, and death, but she's not at enough risk to start the induction because there's a fetal heartbeat?**

A. Correct.

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Okay. I'm going to stop sharing Exhibit 2. Were you informed that she left the hospital against medical advice on the 19th?**

A. I don't think I was informed on the 19th. I think I was informed on the 20th.

**Q. And just to be clear on the division of responsibilities, you were consulting on the case for Dr. Khavari. Is it fair to say Dr. Khavari was the physician in charge of Ms. Watts' treatment after she went to the hospital on the 19th?**

A. Yes. Just to clarify, I was only asked to do an ultrasound on the 19th, which I did.

**Q. Okay. Did I say consult again?**

A. You did.

**Q. Okay. Probably doesn't ring the same way for me as it does for you, so you can just correct me if I say that again. So on the 19th, the physician making**

**decisions about the care for Ms. Watts is Dr. Khavari, correct?**

A. Correct.

**Q. Okay. If we can just stop and take a quick five-minute break.**

A. Okay.

THE REPORTER: We are now off record. The time is 1:56 p.m.

(A recess was taken.)

THE REPORTER: We're back on the record for the deposition of Dr. John Stewart being conducted by videoconference. My name's Ellina DeLillo. Today is March 31st, 2026. The current time is 2:04 p.m. And so you may proceed.

MS. KLEINHAUS: Thanks.

BY MS. KLEINHAUS:

**Q. Dr. Stewart, you were explaining earlier that on the 19th, if an induction had been started, that would've been considered a termination because it was a Catholic hospital and the baby didn't have a chance of survival. I wanted to ask if there had been a C-section on the 19th, would the fetus have had a realistic chance of survival?**

A. I'm a maternal fetal medicine specialist. I'm not a neonatologist. You would have to ask a

neonatologist that question. I just do the delivery. I don't predict the baby's outcome.

**Q. Would you have -- or at a Catholic hospital, is there the same reservations about doing a C-section as doing an induction for a baby at this gestational age?**

MR. PRISLIPSKY: Objection to form. Foundation.

BY MS. KLEINHAUS:

**Q. Go ahead, sir.**

A. Can you rephrase that? Because I'm not sure I -- I understand exactly what you're asking.

**Q. If I understood your testimony before the break, an induction on the 19th would have been considered termination of the pregnancy and contrary to Catholic teaching; is that right?**

A. If you did a C-section, the assumption would be that we would be delivering the baby to save the baby's life. It would not be -- and so that -- that would be performed because of that. That would not be a termination of pregnancy. That would be a delivery. There's a difference between a delivery and a termination. Induction of the labor at that point in time would have been a termination because it would have not been done to save the baby's life. You -- because the patient was not in labor.

**Q. Am I correct that your prognosis, your understanding of the baby's ability to survive outside the womb at that gestational age was that it had a very poor prognosis. Whether the method for childbirth was induction or C-section, the baby had a very poor prognosis; is that right?**

A. Just because you have a poor prognosis doesn't mean that it's an inevitable. There's always a chance. And -- and people -- some people want every chance for their baby to survive, so poor prognosis or not, they still want everything done.

**Q. Sure. I understand that. Some people want that. I just am just narrowly focused on the prognosis for the baby isn't based on whether it's an induction or a C-section. The prognosis is, unfortunately, very poor, no -- either way, right?**

A. Correct.

**Q. Okay.**

A. But if you're terminating the pregnancy, it's zero. If you're do -- doing the delivery not to save the baby, it's a -- it's a termination of pregnancy, and the prognosis is zero. Zero survivability if you're doing it to stop the pregnancy, not to save the baby's life.

**Q. Well, if we can just put aside the reason that**

**it's being done, which is obviously a separate issue and a complicated issue. Just, like, on the medical side of things, whether the baby leaves the womb because there's an induction or a C-section, the baby's prognosis is the same, right?**

MR. PRISLIPSKY: Objection.

THE WITNESS: No. No, I can't answer that question because again, I don't understand it and I don't think it's the correct question, to be honest with you.

BY MS. KLEINHAUS:

**Q. What part of it don't you understand?**

A. Why are you performing the induction or the delivery? To save the baby's life or to stop the pregnancy. Makes a big difference, especially in a Catholic hospital. If it's doing to stop the pregnancy, not to save the baby's life, that's an abortion. If the C-section is done to save the baby's life, that's a different story.

**Q. So is the gestational age of the baby the primary -- one of the biggest, if not the biggest, factor in their ability -- the baby's ability to survive outside the womb?**

A. Yes.

**Q. And that is the same whether the baby arrives**

**via labor or C-section, right?**

A. You have -- you're -- not including intent in the decision to deliver. If the --

**Q. Right. I'm not. I'm just asking about prognosis.**

A. I understand. But -- but what you're trying to say is that intent is not important here. The intent has to do with the decision to deliver or not deliver. If the intent is to continue -- is to try to get the baby farther along, then you would not do an induction, you would not do a C-section. If the intent is to stop the pregnancy, then it really doesn't -- then that's a different story. That's a different -- you're -- mixing scenarios here, and -- and it's not the same.

THE REPORTER: Mr. Stewart, could you just put the microphone a little closer to you again? Thank you.

THE WITNESS: That's what happens when I take a break? I get slack.

BY MS. KLEINHAUS:

**Q. We talked earlier about your understanding that at a Catholic hospital, an induction cannot be performed if there's a fetal heartbeat and the fetus would not be viable, right? That's your understanding?**

MR. PRISLIPSKY: Objection to form. Misstates

his testimony. Foundation as well.

THE WITNESS: Again, it depends on why are you delivering. If you're delivering to stop the pregnancy, that's not allowed at a Catholic hospital, if there's a heartbeat. If the baby is dead, you can certainly induce. They have no problems with that. But the Catholic Church, the Catholic hospital does not believe in stopping a pregnancy that has a heartbeat, period.

BY MS. KLEINHAUS:

**Q. Okay. And I understand that. I'm not trying to be dense about that. Is there a policy -- a hospital policy that you're familiar with that lays that out?**

A. Not that I'm familiar with. I just -- just general knowledge that Catholic hospitals do not do terminations of pregnancy, period.

**Q. And that includes an induction where the fetus would not be viable outside the womb, right?**

A. If there's a heartbeat present, correct.

**Q. Okay. Okay. Moving on from, in our timeline, from September 19th, when you saw Brittany Watts, and then she gets sent to the hospital, and then she leaves against medical advice. She returned the next day, on September 20th. You're aware of that, right?**

A. Yes.

**Q. And I think you testified earlier, you learned on the 20th that she had left against medical advice on the 19th, right?**

A. Correct.

**Q. And how did you learn that information?**

A. I think -- I think it may have been from one of my techs. I -- I don't -- I did not have a discussion with Dr. Khavari or the hospital. I think -- I'm not sure how the techs know -- knew, but that's - - I -- I just heard that.

**Q. Okay.**

A. So there was no direct communication --

**Q. Okay.**

A. -- with me, Dr. Khavari, or the hospital.

**Q. And you're saying techs, like T-E-C-H-S, the medical techs, right?**

A. The ultrasound technologists. Correct.

**Q. Okay. You're not saying texts, like text messages, right?**

A. Oh. No, no, no, no. No.

**Q. Okay.**

A. As in ultrasound technologist.

**Q. Got it. Do you have memory -- besides, you know, the medical note that you looked at for the 20th, do you have your own recollection of consulting on**

**Brittany Watts' situation on September 20th?**

A. Pretty much what's in the note is what I recall.

**Q. How were you contacted to do the consult on the 20th?**

A. Dr. Khavari let, I think, somebody in labor and delivery know that she wanted a consult. And so labor and delivery called my office, and my -- my secretary told me that there was a consult in the hospital for me.

**Q. Did you have any conversation with Dr. Khavari before you went to see Brittany Watts?**

A. No.

**Q. Would you -- would it have been your practice to review the medical notes, the medical records for Brittany Watts before you went to see her?**

A. No.

**Q. And what happened when you went to see Brittany Watts on the 20th?**

A. We had a -- an additional discussion regarding her wishes for the pregnancy. I did look at her labs, and saw that the white count was up even a little bit more compared to the day before. And -- and we went over her options, continue the pregnancy or to stop the pregnancy.

**Q. And what were her wishes?**
A. As I recall, she elected to not continue the pregnancy.
**Q. And am I correct that she was informed of all the risks to her health at that point, right?**
A. Correct.
**Q. What were the risks to her health at that point?**
A. They hadn't changed from the day before. Infection, bleeding, DIC, death.
**Q. So it's all the same categories of risk as the day before, correct?**
A. Correct.
**Q. Would you agree that she was at greater risk as more time had passed and there was more time for the infection to set in?**
MR. PRISLIPSKY: Objection.
BY MS. KLEINHAUS:
**Q. Go ahead, sir.**
A. The longer that you're ruptured, the -- the higher the risk, but again, the risk is still relatively low. And if she was infected, typically you'd just go into labor and she was not showing any signs of -- of labor, so that I would place the risk at best minimally worse than the day before. I've had one patient that

was ruptured for 14 weeks before she went into labor.

**Q. What do you tell patients about if their water breaks at home? How long can they just hang out at home in that condition before they need to be seen by somebody?**

MR. PRISLIPSKY: Objection. Form. Foundation. Broad. Vague.

THE WITNESS: It -- it -- a lot of it depends on the timing of rupture.

BY MS. KLEINHAUS:

**Q. What do you mean by that?**

A. Well, if you rupture at 15 weeks, it's a different story than if you rupture at 37 weeks, so you have to be more specific.

**Q. How is it different? The risks of infection are different?**

A. Typically, what happens if you rupture at 37, you go into labor. That's different than if you rupture at -- at 15 when you may not go into labor. The prognosis for the baby's very different at 15 weeks than it is at 37 weeks.

**Q. Sure. So let me clarify. Do you give advice to patients if their water breaks and labor does not begin, that they should seek medical attention?**

A. If they call me and I'm notified of their

water breaking, I send them to labor and delivery to confirm because many times, people think that they have ruptured their membranes and they have not.

**Q. Fair enough. Let's take the people who are correct and they're right and their water has broken and labor has not begun. What is the advice for those folks?**

A. That they should -- and -- and when I was practicing OB, because I practiced OB in addition to MFM, I would send them in sooner rather than later.

**Q. And the reason for that is the -- or one of the big reasons for that is the risk of infection, right?**

A. Not that soon after, no.

**Q. What about 36 hours of ruptured membranes and no labor? Is that a high risk of infection?**

A. It takes a while. It's unusual for somebody at 37 weeks to be ruptured for 36 hours for -- to not go into labor, okay? So that's a different scenario than somebody that's at 15 weeks that ruptures, that you don't necessarily expect them to go into labor. So you've got to be more specific in terms of, there's a difference between 15 and 37. There's a difference between 15 and 40. So you have to be -- if you want to give me -- you can give me hypotheticals, but that

doesn't necessarily pertain to this case.

**Q. I'm not saying it pertains to this case. I'm just asking what is the advice if someone has ruptured membranes and no labor, they need to be seen because of a risk of infection, right?**

A. Depends on the gestational age as to how soon they need to be seen. Typically, if somebody ruptures under 20 weeks gestation, we confirm the rupture and we send them home, so they don't stay in the hospital.

**Q. Sure.**

A. And --

**Q. But someone does see them, right?**

A. -- that's usually the recommendation, yes.

**Q. Okay.**

A. But we already know she's ruptured.

**Q. Say that again. I'm sorry.**

A. We already know that Brittany's ruptured.

**Q. Right. When you see her on September 20th, her membranes -- that sounded weird the way I said it. The water has been broken for, like, 24 hours at least at that point, right?**

A. Correct.

**Q. Okay. And you had some concerns about the possibility of infection at that point, right?**

A. Yes.

**Q. And her white blood cell count was quite elevated at that point, right?**

A. I would not --

MR. PRISLIPSKY: Objection. Form.

THE WITNESS: -- not really quite -- it was slightly elevated, not quite.

BY MS. KLEINHAUS:

**Q. When you spoke with Brittany Watts on the 20th, did you describe the fetus in any detail to her?**

A. No.

**Q. Did you have any conversation with the nursing staff when you were consulting on Brittany Watts' case on the 20th?**

A. I usually have the nurse in the room with me, and then I -- so that they kind of know what the plan is. That way, they're privy to the plan. And so -- so there may have been a -- I'm sure there was a discussion, but I don't remember it independently.

MS. KLEINHAUS: Okay. I'm going to show you what we'll mark as Exhibit 3, which is the note you mentioned earlier that I believe you said you reviewed in preparation for your deposition. So bear with me for a second while I do that.

(Plaintiff's Exhibit 3 was marked for identification.)

BY MS. KLEINHAUS:
**Q. Okay. Sir, are you able to see that okay?**
A. Yes.
**Q. Okay. Go ahead and read through that from the top and just let me know when you'd like me to scroll down, okay?**
A. Okay. Hold -- well, back -- back that up a little bit.
**Q. We're still here at the top. Let me see if that helps.**
A. Which -- note is this?
**Q. This is the ethics consult, actually. So let's -- let me go -- I'm sorry, mine's --**
A. That's very -- that's --
**Q. -- let's go down here.**
A. Yeah, that's very different than my note. Okay.
**Q. This is the note that you reviewed in preparation for today, right?**
A. Correct.
**Q. Okay.**
A. Okay.
**Q. Stopping here. Do you see where it says, "Current meds"?**
A. Yeah.

**Q. Right over -- right over here?**
A. Yes.
**Q. Okay. The only medications she's getting at this time is fluids, right?**
A. Correct.
**Q. Okay. Intended to maintain her hydration, right?**
A. Correct.
**Q. No other medications, right?**
A. Correct.
**Q. Okay. Just let me know when I can scroll down further.**
A. You can keep going. Okay. Keep going.
**Q. You see some results here? There's a top result that says --**
A. Yes.
**Q. -- WBC?**
A. White count, high, yes.
**Q. Okay. You would agree that that's a high blood -- high white blood cell count, right?**
MR. PRISLIPSKY: Objection.
THE WITNESS: It's elevated.
BY MS. KLEINHAUS:
**Q. I'm sorry, I just didn't hear your answer.**
A. Yes, it's slightly elevated. Part of the

problem with the Ls and the Hs is that the normals that are being used are not pregnancy normals, they're non-pregnant normals. So what may be normal for pregnancy may show up different because they're using the wrong normals.

**Q. Do you think they're using the wrong normals here in labor and delivery?**

A. I do.

MR. PRISLIPSKY: Objection. Form. Foundation as to labor and delivery.

THE WITNESS: Pregnant patients have different normal values than non-pregnant patients.

BY MS. KLEINHAUS:

**Q. What are the normal values for pregnant patients?**

A. The hemoglobin hematocrit tends to be lower during pregnancy. The MPV may be higher, maybe also higher in pregnancy. And -- and if you keep -- if you keep scrolling, the CO2 level was -- is lower in pregnancy and there are different changes, physiological changes, but they're not using the correct normals. They're using a non-pregnant normal.

**Q. So --**

A. You have to be careful when you're interpreting these values.

**Q. -- okay. Are you suggesting that there is a range of normals for pregnancy?**

A. Not suggesting there is.

**Q. Okay. What is the range of normals for pregnancy?**

A. For what -- for what value? For what?

**Q. Well, we're looking under results here -- I'm sorry, just let me finish. We're looking under results here, and you're saying they're using the wrong range of normals, right? And the value is 14.9, and then it has the reference range. So can you explain what the reference range you think should be used here --**

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. -- would be?**

MR. PRISLIPSKY: Objection. Sorry. Objection to form. Misstates his testimony.

THE WITNESS: Yeah. That white count may be slightly elevated, but some of the other -- but what happens when you look at this, you see all these abnormal values that aren't really normal. If you roll down a little bit more --

BY MS. KLEINHAUS:

**Q. I will, but I just want to first answer this question, which is there a different reference range**

**that you think is appropriate here?**
A. For what --
**Q. Based on your clinical experience with people in pregnancy.**
A. -- for what -- for what parameter?
**Q. For the white blood count value --**
A. That's for --
**Q. -- which you say is -- they're using the wrong range. Isn't that what you're saying?**
MR. PRISLIPSKY: Objection.
THE WITNESS: No, I did not say that.
BY MS. KLEINHAUS:
**Q. Oh, okay.**
A. I just said when you're -- like, if you stop right -- well, keep going. That 21 low, that's not correct, okay? That's too low for pregnancy. I mean, that's -- that's normal for -- for it to be low during -- due to the physiological changes of pregnancy. So not all of these normal ranges pertain. If you want to go over individual analytes, I'm more than happy to do that, but I'm just making an overall general statement that there is a range there that isn't necessarily true in pregnancy.
**Q. Yes. I'm just following up on that, asking what the range -- you think the range should be for**

**pregnancy.**
A. For what analyte? For what specific --
**Q. Start with the white blood cell count.**
A. That one is correct.
**Q. Okay. It is high, right?**
MR. PRISLIPSKY: Objection. Asked and answered.
BY MS. KLEINHAUS:
**Q. Okay. Okay. You see this section here labeled IMP?**
A. Yes.
**Q. What does IMP stand for?**
A. Impression.
**Q. Say it again. Impression?**
A. Yes.
**Q. Okay. So here in the -- and you completed this section, right? This is your --**
A. Yes.
**Q. -- words. Okay. All right. So in paragraph 1 under impression, it refers to G2P0, that's two gestations, zero --**
A. Deliveries.
**Q. -- childbirths?**
A. Full-term deliveries. It's full-term.
**Q. Full-term deliveries. Okay. And she's at 21**

**weeks and six days with abruption, right?**

A. Correct.

**Q. "Premature rupture of membranes, elevated white count, advanced cervical dilation." I think that's one of the terms we didn't talk about yet. What does it mean to be at advanced cervical dilation?**

A. She's dilated more than you would expect at this point in time in the pregnancy.

**Q. And that could be one of the symptoms of miscarriage, right?**

A. No, you can have painless cervical dilatation that's not a symptom of miscarriage. It's a totally different thing.

**Q. Right. It could not be, but it also could be, right?**

A. Yes.

**Q. Okay. The next part says, "The patient is having currently a small amount of bleeding, but she does have what we believe to be a placental abruption."**

A. Correct.

**Q. "Because of this, mom is at great risk if she completely abrupt --" I think it should be abrupts, "in terms of hemorrhaging and dying. Does not make sense to me to wait till mom has bleeding to death before we deliver a non-viable pregnancy, despite the fact that**

**there is a heartbeat."**
A. Yeah.
**Q. You see that part?**
A. Yes.
**Q. And that was your clinical judgment, having reviewed the information that you had about the patient, correct?**
A. Correct.
**Q. And you stand by that, correct?**
A. I do.
**Q. The next part says, "Her white count is more than twice what it has been in the past. Both of these white counts in the last two days have been elevated. This is a sign that the body is fighting infection. Given that the patient is prematurely ruptured, she is at great risk of her infection. Does not make good clinical sense to me that we would wait until mom shows signs of sepsis and then try to save mom's life with antibiotics, at the same time delivering the baby."**
A. Correct.
**Q. And that was based on all of the medical information that you had about the patient, right?**
A. Correct.
**Q. And you stand by it, right?**
A. I do.

**Q. The next part says, "The patient does not desire resuscitation for this baby, plus the baby is too early from a gestational age for any reasonable chance of survival. I do recognize that there's a fetal heartbeat. Waiting until the fetal heartbeat stops until Mom shows signs of infection, or until Mom is bleeding to death, does not make sense to me, both as a cath (phonetic)" --**
A. Should be --
**Q. -- "and as a physician." That should be Catholic, right?**
A. (No verbal response.)
**Q. Sorry. That should say Catholic, right?**
A. Yes.
**Q. Okay. Sorry if I didn't hear you. And what we -- what you have here in paragraph 4 was based on what you observed about her symptoms at the time and your clinical judgment based on what you knew about the patient, right?**
A. Correct.
**Q. And you stand by it, right?**
A. I do.
**Q. Okay. Did you typically type out notes like this or would you do, like, a dictation?**
A. It was a dictation.

**Q. Okay. So the robot got cath again instead of Catholic; is that right?**

A. Yes. And the same with above when it said, "Until Mom has bleeding," it would be obviously until Mom is bleeding.

**Q. Got it. Okay. And why did you include here in your note that both as a Catholic and as a physician?**

A. Because I recognized what I was asking a Catholic hospital to do was to terminate a pregnancy. And that's not what Catholic hospitals do, generally. There are exceptions, but that's -- and -- and I was saying that, knowing that I don't believe in terminations, but I am still recommending this because it -- it -- medically, it's the right thing to do, despite the fact that I'm a Catholic and don't believe in terminations.

**Q. Sure.**

A. That's why.

**Q. Okay. And maternal fetal medicine, you're kind of in a unique spot because you actually have two patients, sort of; is that right? The mom and the baby, and based on your clinical judgment, evaluating what was going on for both of those patients, it was your recommendation, as a Catholic and a physician that she should have the induction, right?**

A. As long as the ethics committee agreed with that, yes.

**Q. Okay. And that part about, as long as the ethics committee agreed with that, that's not something that you documented in your note, right?**

A. It is not.

**Q. Okay.**

A. But that's the understanding because we cannot proceed with this unless we have permission from the ethics committee to do this.

**Q. Okay. Putting aside this situation with Brittany Watts, have you had other occasions where you've had to consult with the ethics committee about an induction?**

A. I -- I think I have recently done that here but I'm not -- I can't -- I'm -- I'm not absolutely positive because not every hospital has ethics committees -- well, I'm sorry, that's a -- that's not true. Every hospital has ethics committees, but again, Catholic hospitals are unique in that they do not perform terminations in it, generally.

**Q. Okay. So in terms of consulting with ethics about an induction, am I right that you think you may have had that happen since you've moved on from St. Joseph's and Warren?**

A. Correct.
**Q. Did you ever have an ethics consult about an induction before the Brittany Watts situation?**
A. Not that I can remember, no.
**Q. Okay. Looking below that, it says, "Plan." And I realize this may be painfully obvious, but what's under the plan is what you are recommending the next steps of treatment should be, right?**
A. Correct.
**Q. Okay. And paragraph 1 says, "My recommendation, instead of waiting until mom is on death's door before proceeding with treatment to deliver this baby, my recommendation would be that the patient would be delivered, either with Cytotec or with Pitocin;" is that right?**
A. Correct.
**Q. And that was based on the information that you had about the patient and your clinical judgment about her situation, right?**
A. But again, that would be dependent on the ethics committee agreeing or not agreeing with my recommendation.
**Q. Right. And you should feel free to add that, but I understand what you're saying. There's always the possibility that the ethics committee could be involved,**

**but just in terms of your clinical judgment at the time, what's listed here under plan was what you recommended, right?**

A. Correct.

**Q. The next part says, "Again, I feel we would be endangering the mother by waiting for hemorrhage and/or sepsis, or her to stop the fetal" -- or --**

A. For the fetal heartbeat to stop, basically.

**Q. -- for the fetal heartbeat to stop, right? And that's consistent with what we've already talked about. There was a risk of hemorrhage or sepsis or death if she was not given treatment, right?**

A. (No verbal response.)

**Q. Okay. The Cytotec or Pitocin that could be administered, I know you testified earlier, it can take quite a long time for those drugs to work but the actual placement or administration of them can be done fairly quickly. Am I right about that?**

A. Assuming that you have permission to do so, correct.

**Q. Right. From a clinical perspective, it can -- it's a medication that can be administered fairly simply, right?**

A. Correct.

**Q. I think -- oh, I'm going to stop sharing here**

**now that we've gotten through Exhibit 3. I think sepsis was one of the terms that I neglected to talk to you about at the start. So can you explain what sepsis is?**

A. Sepsis is, kind of, an overwhelming infection, and -- and it usually involves fever. Usually there's -- if you're talking about with rupture of membranes, there's usually pus coming out of the -- out of the vagina. The pulse is generally -- there's a number of different things associated with sepsis.

**Q. Okay. And would you agree with me it's an extremely dangerous condition?**

A. I would agree with that.

**Q. Including circumstances where antibiotics cannot stop the infection?**

A. (No verbal response.)

**Q. Even if Brittany Watts had not had an infection and the fetus still had a heartbeat, would there still have been some risks to Ms. Watts?**

MR. PRISLIPSKY: Objection. Form. Foundation. Broad. Vague. And speculative.

THE WITNESS: Yeah, I would agree that -- can you be a little more specific with that question?

BY MS. KLEINHAUS:

**Q. Sure. Even if she didn't have an infection**

**and the fetus still had a heartbeat, were there still severe risks to her, including hemorrhage?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Yes, there were risks, but at that time, she was not at increased risk compared to the day before. And she appeared to be stable medically.

BY MS. KLEINHAUS:

**Q. And would you agree with me that patients can shift from stable to unstable, sometimes quite quickly if there's an infection, right?**

A. I would agree that I cannot predict the future, yes.

**Q. Fair enough. But in other words, a patient could be stable and you -- with an infection and things could take a rapid turn for the worse, things could take a rapid turn for the better, right?**

A. Correct.

**Q. Did you ever have any discussion with Brittany Watts about what would happen if she miscarried at home?**

A. No.

**Q. Have you ever had any conversation with Brittany Watts or any other patient, advising them that if they have a miscarriage at home, they need to bring the products of conception, the fetal remains, to the**

**hospital?**

A. I've never had that discussion with anybody.

MR. ROSSI: Tessa, can I ask who is Pat that's on the --

MR. PRISLIPSKY: That's my partner, Pat Kasson.

MR. ROSSI: Thanks.

BY MS. KLEINHAUS:

**Q. Knowing that Brittany Watts had left the hospital the day before on the 19th against medical advice, did you feel that there was some risk on the 20th that she would leave again if she did not receive treatment, besides hydrating fluids?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Again, you're asking me to predict the future and to -- and to -- to go into somebody's mind and predict their -- their behavior based on that. I can't answer that.

BY MS. KLEINHAUS:

**Q. Okay. So fair to say you weren't thinking about it either way, whether she might leave again?**

A. Yeah. In -- in fact, it never occurred to me.

**Q. It's noted several times in the medical records that the fetus was at 21 weeks and six days. Did you have the impression that the care team was trying to wait to start the induction until they reached**

**the 22-week gestational age mark?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Again, you're asking me to predict what somebody else was thinking, and I'm not sure I can do that.

BY MS. KLEINHAUS:

**Q. And just to clarify, I don't want you to guess or speculate. I just want to know from your conversations and your experiences, did you have that impression?**

A. I did not.

MR. PRISLIPSKY: Same objection.

BY MS. KLEINHAUS:

**Q. Fair to say that the plan that you outlined in that note that we just looked at, of starting the induction with Cytotec or Pitocin, from a medical standpoint, that plan of care could have been started immediately when you left the bedside, correct?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Not without permission from the ethics committee.

BY MS. KLEINHAUS:

**Q. Right. When I say clinical, I'm not taking into account Catholic social teaching. I mean, clinically, putting aside the ethics committee, it could**

**have been started right away, right?**

MR. PRISLIPSKY: Objection.

THE WITNESS: I -- I would have been violating hospital policy had it been started right away. And so if I'm at a different hospital, it's a different story, but I am dealing with the hospital that I'm at and I couldn't -- and you cannot do that without permission. Otherwise, I could have been in a lot of trouble because I'm not following the standard of care.

BY MS. KLEINHAUS:

**Q. Okay. If you were at another hospital that didn't have that same policy, could your clinical treatment plan have been initiated as soon as you left Brittany Watts' bedside?**

MR. PRISLIPSKY: Objection.

THE WITNESS: In that -- in that hypothetical situation, yes, but that was not the reality that we were dealing with.

BY MS. KLEINHAUS:

**Q. Okay. I'll represent to you that the induction was not started after you left the bedside and more than six hours after your visit with her, Brittany Watts left the hospital again. When did you learn that the induction had not been started after you recommended**

**it?**

A. Most likely the next day, again, through the -- through the grapevine.

**Q. Okay.**

A. I was -- I was not in touch with it. I did my consult, same -- same as I did the ultrasound, was not in -- in contact with anybody. I did my consult, was not in contact with anybody else.

**Q. Okay. When you say through the grapevine, I assume you mean not a medical note, but some staff member would have informed you; is that right?**

A. Probably my ultrasound technologist.

**Q. The source of all information.**

A. Yeah. I mean, hospitals have these grapevines and it -- it just -- yes.

**Q. What was your reaction when you learned that the induction had not been started and Brittany Watts had left the hospital?**

A. I was disappointed that she left because I didn't think it was in her best medical interest to leave.

**Q. Any other reaction?**

A. No.

**Q. And just to be clear, I think you were alluding to this before, that you did your consult and**

**moved on. On the 20th, Brittany Watts' care was being directed by Dr. Khavari, right?**

A. Correct.

MS. KLEINHAUS: Okay. I'm going to show you what we'll mark as our next exhibit. Just bear with me while I share my screen.

(Plaintiff's Exhibit 4 was marked for identification.)

BY MS. KLEINHAUS:

**Q. I muted myself, sorry. Okay. Can you see that exhibit okay?**

A. Yes.

**Q. Okay. And this shows an order for Pitocin. Do you see that?**

A. Yes.

**Q. From the 20th, correct?**

A. Looks like it.

**Q. Okay. The admin instructions say, "Postpartum use only," all caps, "After delivery of baby excessive bleeding, uterine atony." Do you see that part?**

A. I do.

**Q. Do you have an understanding of why Pitocin would be prescribed only for postpartum use?**

A. Typically, after a -- a patient delivers the baby, you use Pitocin to shrink the uterus to reduce the

amount of bleeding that the patient's having. In this -- this particular order, it was for postpartum only. It was not to induce the labor. It was -- it was after the labor was completed and the baby was delivered. Typically, you use Pitocin to reduce the amount of bleeding that the patient's having.

**Q. Okay. Do you know of a clinical reason to only allow it to be used after the baby has been delivered and not to induce?**

MR. PRISLIPSKY: Objection.

THE WITNESS: But this order is not for an induction. This order is for a postpartum patient. It's not for a -- a patient that's still pregnant.

BY MS. KLEINHAUS:

**Q. I got that part. So this is the date that you're advising an induction using Pitocin is necessary and Khavari is ordering Pitocin only postpartum, right?**

A. If she -- when she got the okay from the ethics committee, then she would have given an order for Pitocin or Cytotec to start the induction. It could have been either/or. This is -- this is just kind of a routine order for a postpartum patient. It's not for an induction.

**Q. Right. Do -- putting aside the ethics committee, which we'll call an ethical reasoning, is**

**there any clinical reason on the 20th to only prescribe Pitocin for postpartum rather than for induction?**

A. Because as of that time, the decision to induce the labor had not been completed. The recommendation was there, but the actual induction had not started, and so you would not order it until you decided to start the induction.

**Q. Okay. And the person responsible for making that decision and ordering the induction was Dr. Khavari, right?**

A. Correct.

**Q. Okay. I'm going to stop sharing this. When you consulted on Brittany Watts's case on the 20th, there was an ultrasound on that date as well, right?**

A. Yes.

**Q. Okay. And did you review any medical records or notes related to that ultrasound in preparation for your deposition today?**

A. No.

MS. KLEINHAUS: Okay. I'm going to show you what we'll mark as the next exhibit.

(Plaintiff's Exhibit 5 was marked for identification.)

BY MS. KLEINHAUS:

**Q. Okay. Are you able to see that, sir?**

A. What I see is the white count.

**Q. Right. That's the top part of this exhibit.**

A. Yes.

**Q. Underneath the white count, there's HGB. What does that stand for?**

A. Hemoglobin blood count.

**Q. Okay. And this one's marked as low. Is this one of the ones that you agree is low or you think they should have used a different range?**

A. I think they should have used a different range. What happens in pregnancy is the -- the blood volume increases and -- and the concentration of -- of the -- the hemoglobin and hematocrit decreases, and it's from physiological changes in pregnancy.

**Q. Okay. And for us laypeople looking at 11.3, doesn't mean anything to us, but what would you think would be an actual low value for a pregnant person?**

MR. PRISLIPSKY: Objection. Asked and answered earlier.

BY MS. KLEINHAUS:

**Q. Go ahead, sir.**

A. Again, it's not unusual to have a -- hemoglobin of 10 or -- or a hematocrit of 30. But again, what -- what happens with pregnancy is the amount of blood in your body increases by almost 50 percent.

So you have twice as much blood in your -- in your -- in your veins, but it's just not as concentrated and that's normal in pregnancy.

**Q. Looking below that, it's got the result date for the transabdominal ultrasound. Am I correct that this would've been performed by one of your ultrasound techs and then you would've interpreted the results?**

A. You are wrong.

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Okay. Please explain how it would've worked.**

A. This would've been done by one of the hospital ultra sonographers, and it would've been in read by one of the -- one of the radiologists at the hospital, not by me.

**Q. Got it. And you said you haven't reviewed this before, correct?**

A. Not specifically for this. I may have read it at the time, but -- but not specifically for this deposition, no.

**Q. Okay. I'm going to scroll down, go ahead and read through it, and then I want to ask you a couple questions about it.**

A. Okay. I'm good.

**Q. Okay. It says here, "No sign of placental**

**abruption." I think you clarified earlier that's not necessarily something that's going to be very easy to detect on an ultrasound, right?**

A. The -- the chance of seeing it is somewhere between 10 and 15 percent. It's very low -- very low.

**Q. Okay. It says -- I'm going to butcher this word, but it says "severe" --**

A. Oligohydramnios, just means low -- low fluid.

**Q. Okay. Severely low, right?**

A. Yes.

**Q. Okay. Almost no amniotic fluid at this point in the pregnancy?**

A. Correct.

**Q. Okay. No urine visible in the bladder?**

A. Not -- let me see. I'm not -- hold on a second. I don't see where it says anything about the bladder. Can you point it out for me?

**Q. Can -- actually, let's -- we can move on. When there's this severe lack of amniotic fluid, there is no realistic chance of that refilling, right?**

MR. PRISLIPSKY: Objection.

THE WITNESS: I have seen it occur rarely in my career. So when you say, "No," I -- I do not agree with that.

BY MS. KLEINHAUS:

**Q. Okay. It would be extremely, extremely rare, right?**

A. Yeah, unusual. Correct.

**Q. And the fetus needs the amniotic fluid to continue developing past the stage that it was at 21 weeks and five days or six days, right?**

A. Can you reword that because I'm not sure I agree with it entirely. I mean, you make it sound like if there's no fluid, the baby would die, and that's not true. I've had people with very low fluid whose babies did fine for 10 weeks, so I'm not sure I agree with that -- that question.

**Q. Okay. Is it fair to say that the baby that can survive for ten weeks in the womb without any amniotic fluid is the exception, not the rule?**

A. Again, it depends on -- on when the patient delivers. It used to be ruptured membranes delivered relatively quickly. Now, we use antibiotics and -- and it's not unusual for us to get ten to -- you know, ten, 14 days, two weeks, three weeks with babies that have very low fluid. So the fluid does not cause the baby to pass away. No.

**Q. It -- there's a note here, "Normal appearance of the cervix with normal cervical length." Do you see that part?**

A. I do.
**Q. And what's the significance of that? The cervical length, why is that being evaluated?**
A. They were trying to see if the patient was dilated or not. I do actually independently remember this ultrasound, and they did not measure the cervix accurately, and so that statement is not true.
**Q. Okay. And tell me -- when you say you do independently remember this ultrasound, what do you mean by that?**
A. I -- I remember -- I know one of my ultrasound techs told me about the ultrasound because, again, they follow things much closer than I do, and -- and they -- we were able to pull up the images, and you could see that the measurement was not taken at the proper spot.
**Q. So did you form an opinion about whether it was longer or shorter than normal cervical length?**
A. Well, clearly it was shorter because we could see the baby's head. So what -- it couldn't have been normal length if we could see the baby's hair sticking through the cervix.
**Q. Okay. And I just want to make sure I'm understanding. When you say you could see the hair sticking through the cervix, you mean on, like, on the**

**imaging, you recall seeing the hair sticking through the cervix?**

A. No. Dr. Khavari told me when she did a spectrum exam on the patient, that she could see the baby's hair.

**Q. Okay. So that was based on her note about that, right? Okay. Anything else that you recall that you believed was inaccurate about the measurements or the interpretation of this ultrasound imaging?**

A. No.

**Q. Okay. Put that to the side. Okay. So we've spoken several times in your deposition today about this ethics committee, ethics --**

MS. KLEINHAUS: Hang on. Are you guys talking during the deposition?

MR. ROSSI: I'm asking him if he's doing okay. I think he may want a break.

MS. KLEINHAUS: Do you want a break?

THE WITNESS: If I could, please.

MS. KLEINHAUS: Yeah, sure. Let's take a break. Take a --

THE WITNESS: Thank you.

MS. KLEINHAUS: -- five-minute break. Okay.

MR. ROSSI: In fact, I thought I was talking loudly enough that everybody could hear me, but --

MS. KLEINHAUS: That's okay.
THE REPORTER: We are now off the record. The time is 3:02 p.m.
(A recess was taken.)
THE REPORTER: We are back on the record for the deposition of Dr. John Stewart being conducted by videoconference. My name's Ellina DeLillo. Today is March 31st, 2026. The current time's 3:09 p.m. Counsel, you may proceed.
BY MS. KLEINHAUS:
**Q. So we've been talking throughout your deposition about this ethics consult or an ethics committee reviewing in this case, correct?**
A. Yes.
**Q. And when you saw Brittany Watts on September 20th, were you aware of any ethics consult that was underway or discussion?**
A. No. But after I saw her, I knew we would have to get an ethics committee opinion to proceed with the termination.
**Q. And when you say termination, you're referring to the induction, right?**
A. Same thing. Same thing.
**Q. Did you initiate an ethics consult after you saw her and believed an induction was necessary and that**

**you would need the ethics consult sign off?**

A. I did not. I assumed that Dr. Khavari did that. I did not personally do that.

**Q. And in this case, what was your understanding of what the ethical question was that had to be resolved?**

A. Again, we had a heartbeat. And to stop the pregnancy, we'd be considering an abortion, and so we needed permission from the ethics committee to proceed with the stopping of the pregnancy.

**Q. And in this case, the ethics consult conclusion was to go forward with the induction as you had suggested, right?**

MR. PRISLIPSKY: Objection. Form. Foundation.

THE WITNESS: That was my understanding, but again, I was not notified of that.

MS. KLEINHAUS: Okay. I'll show you what we'll mark as our next exhibit.

(Plaintiff's Exhibit 6 was marked for identification.)

BY MS. KLEINHAUS:

**Q. Okay. Can you see that okay, sir?**

A. Yes.

**Q. Okay. I'm just going to scroll down. So the way these medical records show up is not consistent with**

**the page breaks. So do you see "Clinical Ethics Consultation Note" at the top?**
A. Yes.
**Q. Okay. Have you reviewed this note before?**
A. I have not.
**Q. Have you reviewed this type of note of an ethical consultation before?**
A. Again, I have done very few ethics consults, so I'm -- I don't remember if I have or have not.
**Q. Okay.**
A. Because primarily, I'm a consultant, so I don't necessarily manage the -- I make recommendations, and then I leave that to the attending physician.
**Q. Understood. Looking here under history and context, it's listing the various symptoms that Ms. Watts had, correct?**
A. Correct.
**Q. And then under process, it says, "Consult by physician." And based on the testimony you just gave, that would be Dr. Khavari, right?**
A. Yes.
**Q. Spoke directly with NM. Is that nurse manager?**
A. Nurse midwife, I think.
**Q. Okay.**

A. Could be nurse manager, but usually I -- I would guess it's nurse midwife, but I'm not positive.

**Q. Okay. And then it lists the ethical question and concern, lists the gestational age, the premature rupture of membranes, vaginal bleeding, amniotic fluid not detected, advanced cervical dilation, high risk of spontaneous. AB is abortion, right?**

A. Correct.

**Q. And spontaneous abortion is sometimes called miscarriage, right?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Depending on the gestational age, yes.

BY MS. KLEINHAUS:

**Q. As well as risk of infection and potential for hemorrhaging if untreated. You agree that Ms. Watts had all of those symptoms and risks, right?**

A. Yes.

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Okay. Looking below this under analysis, it goes through her symptoms again, notes an elevated white blood count. It says, "While she is being closely watched for further signs of infection, physicians are concerned that any delay in treatment could cause harm**

**to the patient and are recommending induction to avoid serious bleeding or infection." That's accurate, right?**

A. Yes.

**Q. And patient is in agreement for induction. And the next part says, "Ethics supports the clinical judgment of the physician or physicians who recommend treatment that includes inducing patient at this point in time." You see that part?**

A. I do.

**Q. Okay. So -- and this is signed off by Deanna Ford. Do you know Ms. Ford?**

A. I -- not by name. I may be -- I mean, I spent very little time in labor and delivery, so if that was a nurse, I don't know. I -- I couldn't tell you the -- the labor and delivery nurse's names so I don't know who that is.

**Q. Fair enough. So looking at the bottom of this note, it says, "Electronically signed by Deanna Ford at 3:31 p.m. on the 20th of September." That's the same date that you had just a few hours before recommended the induction, right?**

A. Correct.

**Q. Okay. And so I know previously in your testimony, you had said many times that, you know, this induction cannot start until ethics signs off, and you**

**would agree with me that in this case, ethics did sign off, right?**

A. Yes.

MR. ROSSI: Objection (Inaudible) --

BY MS. KLEINHAUS:

**Q. Okay. As far as you -- I'm going to -- well, I guess I have one more question before I stop sharing this one. So as far as you know, at this point on September 20th, after you have recommended induction and ethics has signed off, is there any reason to delay the induction?**

MR. PRISLIPSKY: Objection.

THE WITNESS: Again, that's such a vague question. I'm not sure that I can answer it.

BY MS. KLEINHAUS:

**Q. Do you know of any reasons that an induction could not have been started at this point?**

MR. PRISLIPSKY: Objection.

THE WITNESS: I'm not aware of what was going on in labor and delivery. I don't know how busy it was. I don't know if there were other people. I don't know. There's many - many different factors here for me to -- to try to make a comment on that. It's just impossible for me to say.

BY MS. KLEINHAUS:

**Q. In terms of the clinical information that you have about this situation, as well as the ethics information from this exhibit and your training in -- as a Catholic and in a Catholic hospital, you don't know of any clinical or ethical reason for delaying treatment at this point, right?**

MR. PRISLIPSKY: Objection.

THE WITNESS: When you say clinical, does that include what's -- how busy labor and delivery is? Does that include -- is there nursing available? Are there nurses that are willing to -- to do the termination because that can be a problem as well? There's a lot of different reasons why things may have been delayed if they were delayed.

BY MS. KLEINHAUS:

**Q. Okay. And put it -- okay. I understand what you're saying about staffing. Putting aside staffing issues and other issues on the labor and delivery floor, are you aware of any other reasons for a delay at this point?**

A. I'm not.

**Q. Okay. I'm going to stop sharing. You mentioned whether there are nurses who are willing to do the induction which would be considered a termination at this hospital. Were you aware of nurses in this case**

**involved in Brittany Watts's care who were not willing to do an induction?**

A. Again, nameless, faceless, I -- I really don't -- I can't really comment on any individual nurse or -- or their belief.

**Q. Sure. And I'm not asking you to -- if you -- I'm just asking more general question, not like names and demographics, but did you -- were there nurses who were involved in this case that were not willing to do the induction?**

A. Again, you're asking me, I don't know.

**Q. Okay. It never came to your attention that there is some --**

A. I did not --

**Q. Sorry. Just let me finish this question. Like, it never came to your attention that there was some hesitation on the part of the nurses to do this induction?**

A. I did not pull the nurses to see who was in favor or who was not. Again, that's individual beliefs. Unfortunately or unfortunately, hospitals cannot force people to do things that they do not feel that they are ethically capable of doing. So do I know the individual nurse's feelings? I do not. Can I comment it? I cannot.

**Q. Okay. Can I just ask? Generally, did you get the sense that was an issue or you didn't get that sense at all? You had no idea?**

MR. PRISLIPSKY: Objection. Asked and answered.

BY MS. KLEINHAUS:

**Q. You had no idea?**

A. I have no idea.

**Q. Okay. I'll represent to you that after the ethics consult on the 20th, eventually, no induction was started. Brittany Watts left the hospital. She eventually had a miscarriage at home. Did you -- and then she ends up coming back to the hospital. Were you informed of that she had left, she had the miscarriage, she came back?**

A. No.

MR. PRISLIPSKY: Objection.

THE WITNESS: No.

BY MS. KLEINHAUS:

**Q. Okay. Did you consult on her case at all after September 20th?**

A. No.

**Q. And just as a general matter, the -- as a maternal fetal medicine doctor, after a patient has lost -- has had a miscarriage or lost the baby, do you**

**continue to consult or is your role over after that occurs?**

A. I'm done.

**Q. Okay. In Ms. Watts's case, she had retained placenta and then had to be treated for that. You weren't involved in any of that care, correct?**

A. I don't -- I do not -- that's GYN surgery. I don't do any GYN surgery.

**Q. Okay.**

A. The only surgeries I do would be a cerclage or a -- or a C-section. Nothing gynecologic, and that would be considered a gynecologic procedure.

**Q. Did you ever see the fetal autopsy report for the fetus in this case?**

A. No.

**Q. Did you ever see any of the photos from that fetal autopsy?**

A. No.

**Q. I'll represent to you that the autopsy report -- I don't think diagnosis is the right word, but it includes information about the prolonged intrauterine demise. Are you familiar with that term?**

A. I -- I know what an intrauterine demise is. I -- I -- again, I -- I'm not sure what they mean by prolonged.

**Q. Was that conclusion that there was an intrauterine demise consistent with some of the symptoms that you had observed about this pregnancy?**

MR. PRISLIPSKY: Objection. Form. Foundation. Calls for an opinion outside his area.

THE WITNESS: Could you say the question again, please?

BY MS. KLEINHAUS:

**Q. Yeah, maybe I can ask it better. So basically, I -- if I understand correctly, it means that the baby died within the uterus. The demise occurs in the uterus, right?**

A. Correct.

**Q. And so I'm asking you as a maternal fetal medicine doctor, is that consistent with the symptoms that you had seen about this pregnancy?**

MR. PRISLIPSKY: Same objection.

THE WITNESS: I -- I'm not exactly sure how -- how to answer that. I mean, we know that there was a heartbeat. We know that the heartbeat stopped at some point in time. I don't know exactly when the heartbeat stopped, so you're asking me a question that I'm -- I'm not sure I can answer accurately.

BY MS. KLEINHAUS:

**Q. Do you have an understanding -- or strike**

**that, please. Could one of the contributing factors for the fetal demise have been the lack of amniotic fluid?**

MR. PRISLIPSKY: Objection. Form. Foundation.

THE WITNESS: Could it? Yes. It's possible. Did it? I don't know.

BY MS. KLEINHAUS:

**Q. Okay. After your care for -- or your involvement in Brittany Watts's care had concluded, at some later point, was there some sort of debrief meeting or discussion among the hospital staff about this patient and this incident?**

A. Not that I -- I'm aware of or not that I can remember.

**Q. Do you recall participating in a Zoom format discussion of the case at some point after your care for her had concluded?**

A. No.

**Q. When did you learn that there was a lawsuit related to Brittany Watts' experiences at the hospital?**

MR. PRISLIPSKY: Objection to form.

THE WITNESS: I -- I don't remember exactly.

BY MS. KLEINHAUS:

**Q. Other than conversations with your attorney, which I do not want to know about, have you ever discussed this lawsuit with anyone?**

A. In vague terms, I'm sure I told people that I was being sued but I never discussed the actual events of the case.

**Q. Okay. And actually, you're not being sued. You're just a witness, so hopefully, this will be less painful for you for that reason.**

A. So yeah -- but yeah, I -- not the -- not the particulars, no.

**Q. Okay. Have you ever had any conversations about this lawsuit with Dr. Khavari?**

A. I have not.

**Q. Have you ever had conversations about this lawsuit with any nurses from St. Joseph's and Warren?**

A. I have not.

**Q. And I'll represent to you, there has been some testimony in this case that nurses believed that your clinical note from September 20th about Brittany Watts contained exaggerations or was inaccurate to some degree. I assume you disagree with them on that, correct?**

A. They're allowed to have their opinions and I have mine. Again, I think that the -- chart is a medical record and I try to accurately portray what my opinions are.

**Q. And you don't believe there's anything**

**inaccurate in your conclusions from that September 20th note, correct?**

A. I do not.

**Q. And when you said earlier about the lawsuit, you know, you thought that you're being sued and good news, you're not. But why did you think that you're being sued just because you have to give a deposition in this case?**

A. Probably. I'm relatively ignorant in terms of the law, and I -- I knew there was a lawsuit, and I just assumed that I would be part of it because I was part of her care. That typically is what happens.

**Q. Okay. I think I'm almost through. Let's just take a five-minute break and go off the record.**

A. Okay.

THE REPORTER: We are now off record. The time is 3:28 p.m.

(A recess was taken.)

THE REPORTER: We are back on record for the deposition of Dr. John Stewart being conducted by videoconference. My name's Ellina DeLillo. Today is March 31st, 2026. The current time's 3:43 p.m. Counsel, you may proceed.

BY MS. KLEINHAUS:

**Q. Hey, Dr. Stewart, homestretch. We talked**

**earlier about you had thought maybe you were a defendant in this case. I was wondering, did you ever receive a letter related to this lawsuit through the hospital?**

A. I don't believe so. No.

**Q. And earlier you were -- you testified in response to several questions that you understood that there would have to be an ethics consult for an induction where the -- that was 21 weeks with a fetal heartbeat, right?**

A. Yes.

**Q. And was that understanding based on any specific policy that you're aware of, that there had to be an ethics consult?**

A. I don't know that there's a specific policy for that, but I can tell you, at a Catholic hospital, you can't just -- can't decide to terminate a pregnancy. I would've been kicked off staff if I had done that without an ethics consult.

**Q. Okay. And you understood that an induction to save the life of the mother, or because of risks to the mother, would not be considered an abortion, correct?**

A. But it is an abortion. The problem -- I think one of the problems with this whole area is that we have very limited vocabulary, and so abortion applies to every -- every stopping of the pregnancy. Whether it's

medically necessary, elective, it's still an abortion. I mean, if you would look up the -- the definition of abortion, that's what we were doing.

MS. KLEINHAUS: Okay. I'm going to show you an additional exhibit here. Give me one second to get sorted.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MS. KLEINHAUS:

**Q. Okay. Are you able to see this exhibit, sir?**

A. Yes.

**Q. Okay. And I'll just scroll down a little bit. This is from the U.S. Conference of Bishops related to Catholic healthcare services. Do you know either way whether you've ever been provided with this?**

A. I have not.

**Q. You know that you have not? Okay. All right. I am going to take us to a portion of this. Okay. So we're under this section that's called Directives and -- okay. We're in a part that's called Issues in Care for the Beginning of Life. Talks about church teaching with that. And then looking at Paragraph 45** here, it says, "Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is

never permitted." You see that part?

A. I do.

**Q. Okay. And so do you understand that to mean if the only purpose of a medical procedure is to terminate a pregnancy, that is forbidden, correct?**

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

**Q. Go ahead, sir.**

A. Yes.

**Q. Okay. Looking at Paragraph 47, it says, "Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child." Do you see that part?**

A. I do.

**Q. Okay. And would you agree with me that the induction that you were recommending for Brittany Watts would fall under this directive here, number 47, where the direct purpose was to cure a serious pathological condition of the pregnant woman?**

A. I would agree with that, but once again, to just do an elective -- an abortion without the consent of the hospital just wasn't done. Just because it can

be done doesn't mean that you can do it in -- in a vacuum.

**Q. Sure.**

A. That's what --

**Q. I'm not suggesting that. I'm not suggesting that. I --**

A. Okay.

**Q. I just wanted to make sure that the procedure that you were recommending, the reason that you were recommending it was not to terminate the pregnancy. You were recommending it to treat the serious pathological condition of the pregnant woman, correct?**

A. Correct. And the ethics committee was involved to -- to see if they agreed with my recommendation. You cannot do this in a vacuum. I can't just suddenly decide to do this. There are -- I understand what the bishops are saying, but -- but again, in my understanding is that even if it's to save the life of the mother, it's a very rare situation in a Catholic hospital. And you -- and then, plus, Roe v. Wade had been overturned at this point in time, and so we have those considerations as well. So you can't just look at this in a vacuum and say, "Well, this line here says you can do it, therefore you should have done it."

**Q. Oh, no, I -- I'm not suggesting that. Okay. I'm going to stop sharing that. Did you ever receive any type of litigation hold or information that there was an -- a litigation hold related to evidence for Brittany Watts's care at St. Joseph?**

MR. ROSSI: Objection.

THE WITNESS: I -- I --

MR. ROSSI: Go ahead. You may answer.

THE WITNESS: I'm not sure what that is.

BY MS. KLEINHAUS:

**Q. Okay. Did you ever receive any type of information from the hospital related to litigation involving Brittany Watts?**

A. I don't know if I got -- I don't -- I don't remember.

**Q. I assume based on what you testified to earlier, in the course of your career, you have been sued, correct?**

A. Yes.

MR. ROSSI: Objection. You can answer.

THE WITNESS: Yes.

BY MS. KLEINHAUS:

**Q. Were any of those instances while you were employed by Bon Secours?**

MR. PRISLIPSKY: Objection.

MR. ROSSI: Objection. I would like -- Tess, I would like a continuing objection to this line of questioning, please.

MS. KLEINHAUS: Sure.

MR. ROSSI: Go ahead. You can answer, Doctor.

THE WITNESS: No.

BY MS. KLEINHAUS:

**Q. Were you ever told by anyone at the hospital to preserve evidence related to the care of Brittany Watts in any way?**

MR. PRISLIPSKY: Objection.

MR. ROSSI: Objection. But go ahead.

THE WITNESS: I don't remember.

MS. KLEINHAUS: Okay. That's all I have for right now. Other attorneys may have questions for you.

MR. PRISLIPSKY: Zach, do you want to go? Do you want me to go?

MR. ANDERSON: Go ahead. I got nothing.

MR. PRISLIPSKY: Okay.

MR. ANDERSON: Dr. Stewart, thank you for your time. I appreciate it.

THE WITNESS: Certainly.

CROSS-EXAMINATION

BY MR. PRISLIPSKY:

Q. Dr. Stewart, my name is Tom Prislipsky. We introduced ourselves before we got started today. I need to turn down my volume here so we don't have feedback, but hopefully, I could still hear your answers. I first want to talk about your involvement on September 19th, 2023 when you told Ms. Kleinhaus about how you became involved seeing Ms. Watts at Dr. Khavari's office. Do you remember that?
A. Yes, sir. I do.
Q. And it's your understanding that after Dr. Khavari examined Ms. Watts and you participated in interpreting the ultrasound, Ms. Watts was admitted to the hospital, correct?
A. Yes, sir.
Q. And I believe your statement was, and I wrote it down, that the clinicians, meaning Dr. Khavari, needed more information on Ms. Watts, right?
A. Yes, sir.
Q. That additional information could come from physician consultations, correct?
A. Yes, sir.
Q. Were you aware on September the 20th that Dr. Pacey examined, or at least met with, Ms. Watts on September the 19th?
A. I'm not sure who Dr. Pacey is. Is that a

neonatologist?

**Q. Yes.**

A. I -- was aware that -- that the neonatologist had had a discussion with Ms. Watts. Yes.

**Q. And monitoring and additional information could be the application of TOCO?**

A. I'm not certain. Could be, yes.

**Q. And --**

A. I'm sorry. Yes.

**Q. And a TOCO would give the providers information about Ms. Watts's contractions, correct?**

A. Yes, sir.

**Q. Also, vital signs being checked on by the nurses would provide additional information?**

A. Yes.

**Q. And I'm -- I assume you would be aware or would expect that when Ms. Watts was admitted on September the 19th, the nurses did check on her vital signs throughout the rest of the time that she was there, fair?**

A. I would assume that they would do that, yes.

**Q. Ms. Kleinhaus had showed you a vital sign earlier in the day, and asked you some questions about it. I want you to assume that the record shows that later on September the 19th, when the nurses checked her**

**vital signs, Ms. Watts's vital signs for her blood pressure were 116/64 and 106/54. For a pregnant patient in the second trimester, that would be within normal limits, correct?**
A. Yes.
**Q. Okay. And when we talk about additional information, let's just go about which physicians examined Ms. Watts or had interaction with her on September 19th. We had an examination by a board-certified obstetrician, right?**
A. Yes.
MS. KLEINHAUS: Objection. Foundation.
BY MR. PRISLIPSKY:
**Q. Well, we know Dr. Khavari saw her in the office, true?**
A. (No verbal response.)
**Q. Did you say yes, sir?**
A. Are you talking to me?
**Q. Yes. You know that Dr. Khavari examined Ms. Watts in the office on September the 19th?**
A. I'm sorry. Yes.
**Q. Okay. You spoke with Ms. Watts after you reviewed the ultrasound on September 19th, correct?**
A. Yes.
**Q. And to your understanding, Neonatology spoke**

**with Ms. Watts on September the 19th, correct?**
MS. KLEINHAUS: Objection. Foundation.
THE WITNESS: I -- I didn't know if --
MS. KLEINHAUS: Calls for speculation.
THE WITNESS: I -- I knew -- I was assuming that that would be part of the information that she would get when she went over to the hospital. Yes.
BY MR. PRISLIPSKY:
**Q. All right. And you are aware that before additional information could be ascertained on the 19th, Ms. Watts left the hospital, correct?**
A. Only in hindsight. I was not aware of it when it happened.
**Q. Now, Ms. Kleinhaus had showed you a note that Dr. Khavari had written that talked about the possibility of a maternal and fetal medicine consult. Do you remember seeing that?**
A. I do.
**Q. Okay. That note was authored at around 7:20 p.m. on September the 19th. And I want you to assume, Doctor, that at -- if at 7:20 p.m. or thereabouts on September 19th, 2023, Dr. Khavari had written an order for a maternal fetal medicine consultation. In all likelihood, you're not going to examine Ms. Watts until the following day on September the 20th, fair?**

A. Correct.
MS. KLEINHAUS: Objection. Calls for speculation.
BY MR. PRISLIPSKY:
**Q. You can answer, sir.**
A. Correct.
**Q. All right. I want to start going through your notes.**
MR. PRISLIPSKY: And, Lina, I don't have Bates stamped copies, but what I do have are the hospital numbers. So I'm going to do my best to get you these with the hospital numbers. And if I could have the share screen function.
(Defendants' Exhibit A was marked for identification.)
BY MR. PRISLIPSKY:
**Q. Okay, Dr. Stewart. The first note that I want to show you is the end of your September 20th consultation note. And this is on Hospital Page 665. And your impression was that Ms. Watts, 33-year-old African American female, Gravida 2, Para 0, which means that this was her second pregnancy. She had yet to deliver a live child, correct?**
A. Correct.
**Q. "At 21 weeks, six days with abruption,**

**premature rupture of membranes, and elevated white count." And I read that correctly, true?**

A. Correct.

**Q. All right. I want to flush out some of that information. So your impression on September the 20th and from the 19th was that Ms. Watts had signs of a placental abruption, correct?**

A. Correct.

**Q. And I think what you told us earlier is that a placental abruption really cannot be diagnosed via an ultrasound, correct?**

A. It's not a very efficient modality. Correct.

**Q. All right. Typically, it would be a clinical diagnosis, right?**

A. Correct.

**Q. And I think you gave us some of the signs. And here are some of the signs and symptoms of a placental abruption, significant abdominal pain. You had said, quote, "significant bleeding, and then potentially elevated white count," fair?**

A. Correct.

MS. KLEINHAUS: Objection to form.

BY MR. PRISLIPSKY:

**Q. All right. I want to go in, flesh out more of the information we have about these issues. So let's**

**first talk about Ms. Watts and -- well, issues with pain.**

MR. PRISLIPSKY: All right. I'm going to put up Hospital Page 662.

(Defendant's Exhibit B was marked for identification.)

BY MR. PRISLIPSKY:

**Q. And this is still part of your medical record, doctor. And one of the things that is auto populated when you review or when you prepare a note at St. Joe's is it tells whether a patient is on current medications, correct?**

A. Yes.

**Q. All right. And it says specifically for Ms. Watts whether she was taking any pain medications, including Tylenol, before September the 20th, 2023, when she returned, correct?**

A. Yes.

**Q. And when we have the record here going from 662 to 663, it said, "Patient not taking" any Tylenol. That was reported on September 20th, 2023, correct?**

MS. KLEINHAUS: Objection. Incomplete hypothetical.

MR. PRISLIPSKY: It wasn't a hypothetical. It was --

MS. KLEINHAUS: I -- okay.
MR. PRISLIPSKY: -- the question.
MS. KLEINHAUS: Well, lacks foundation and speculation.
BY MR. PRISLIPSKY:
**Q. Well, Doctor, you're a physician. This recording is in your medical record. Isn't it fair that your interpretation of this note in your medical record was that Ms. Watts was not taking Tylenol on September 20th, 2023?**
MS. KLEINHAUS: Objection. Misrepresents the document. Incomplete hypothetical.
BY MR. PRISLIPSKY:
**Q. You can answer, Doctor.**
A. Correct.
**Q. All right. If we go to Hospital Page 663, a little bit more detail, what you do when you see a patient on a consultation is you go in, you get a history, you review their symptoms, systems as well, and then you conduct a physical examination, correct?**
A. Correct.
**Q. If you said, "Yes," sir, I didn't hear you.**
A. Yes.
**Q. Okay. Under your physical examination, you say, "Well-developed, well-nourished African-American**

**female in no apparent distress." When you say, "In no apparent distress" in your note, Doctor, what does that mean?**

A. She did not appear to be in pain.

**Q. Okay. Under the "Abdominal Exam: Gravid, soft, non-tender, no rebound, no guarding, no contractions palpated." So I want to ask you some questions about no rebound, no guarding.**

A. Okay.

**Q. I -- I'm assuming as a maternal fetal medicine specialist, you've seen the terms before, RRG, which is rebound guarding, and what would be the third? A rebound guarding rigidity, correct?**

MS. KLEINHAUS: Objection to form.

THE WITNESS: Yes.

BY MR. PRISLIPSKY:

**Q. You can answer, sir.**

A. Yes.

**Q. And a patient who is complaining of abdominal pain can have a physiological response when you, as a physician, palpate their abdomen. That would be known as guarding, correct?**

A. Yes.

**Q. And here you say there's no guarding, correct?**

A. Correct.

**Q. There you also say, "No tenderness." So during this examination, you physically put your hand on her abdomen. One of the purposes for putting your hand on her abdomen was to see if she was tender, or it elicited pain, fair?**

A. Yes.

**Q. And when you did that, it did not elicit any symptoms of pain for Ms. Watts, correct?**

A. Yes.

MR. PRISLIPSKY: All right. Doctor, I'm going to show you Hospital Page 771.

(Defendant's Exhibit C was marked for identification.)

BY MR. PRISLIPSKY:

**Q. And through your years working with Epic in the hospitals, you're familiar with how nurses document, fair?**

A. Yes.

**Q. All right. And on Page 771, at 11:05, a nurse with the initials EA did a specific pain assessment for Ms. Watts, and this is on September the 20th, 2023, correct?**

A. Yes.

**Q. And when she did that assessment to assess Ms. Watts for pain, it was recorded as none, correct?**

A. Yes.
**Q. And that is actually consistent with your examination when you saw Ms. Watts a couple of hours or about an hour later, correct?**
A. Yes.
MR. PRISLIPSKY: All right. Let's go to a few pages up. Hospital Page 708.
(Defendant's Exhibit D was marked for identification.)
BY MR. PRISLIPSKY:
**Q. One of the items that the nurses assessed was dysuria or dysuria, whether Ms. Watts complained of pain while urinating, correct?**
A. Yes.
**Q. And Ms. Watts reported that she did not have any pain while urinating, correct?**
A. Yes.
**Q. So when you examined her, and according to the nurse's documentation on September the 20th, 2023, Ms. Watts did not have any complaints of abdominal pain, correct?**
A. Correct.
**Q. Let's turn to another category or subcategory of a sign and symptom that is consistent with a placental abruption. You had said, and I quoted you on**

**this, you had said, "Significant bleeding," correct?**
A. Correct.
**Q. All right. Now, when the patient comes into the hospital and is admitted to the labor and delivery unit, it is routine for the physicians to order a urinalysis, correct?**
A. Yes.
MR. PRISLIPSKY: All right. A urinalysis was ordered on September 19th, 2023, the day before you saw Ms. Watts.
(Defendant's Exhibit E was marked for identification.)
BY MR. PRISLIPSKY:
**Q. And the urinalysis, you're familiar that looks at different aspects of a patient's urine: the color, the turbidity, whether there are different things in the urine, such as sugar, ketones, et cetera, correct?**
A. Yes.
**Q. One of the things that are assessed in the urinalysis are red blood cells, fair?**
A. Yes.
**Q. And red blood cells, if a patient is bleeding significantly, the blood from the bleeding, and I'm talking about a patient bleeding from a placental abruption, can show up in a urinalysis, fair?**

MS. KLEINHAUS: Objection to form.
THE WITNESS: Yes and no. Again --
BY MR. PRISLIPSKY:
**Q. All right.**
A. -- there -- you're -- you're lumping abruption into massive abruption -- abruption. You can have a small abruption that can have bleeding. You can have a large abruption that usually is painless.
**Q. Okay.**
A. You can have abruption with significant pain. Also, depending, you can get a clean catch urine where you catch -- where you wash the blood away with the initial part of the urine, and then when you collect it -- because -- because the blood is not coming from the bladder, it's coming from the vagina. So just because there's not blood in the urine doesn't mean she was not bleeding.
**Q. Understand. We're going to go through a few more notes about the issue of bleeding. But fair to say the urinalysis did not reveal any blood in the test, correct?**
A. Did not reveal blood in the -- in the bladder. Correct.
MR. PRISLIPSKY: All right. All right. We're going to go to Hospital Page 672.

(Defendant's Exhibit F was marked for identification.)

BY MR. PRISLIPSKY:

**Q. And again, I'm assuming -- well, let me ask this: On September the 20th, when you did your consultation, and when you do consultations, do you typically review the nurse's notes, or do you typically not review them?**

A. Do not.

**Q. All right. So on September the 20th at 12:30, you would not have been aware of Elaine Anderson's note that said that Ms. Watts's pad was checked and "no additional bleeding noted," correct?**

A. Correct.

MS. KLEINHAUS: Objection to form. Incomplete hypothetical.

MR. PRISLIPSKY: Now, we're going to go to Hospital Page 712.

(Defendant's Exhibit G was marked for identification.)

BY MR. PRISLIPSKY:

**Q. And again, I'm assuming you do not typically review the nurse's flow sheets, fair?**

A. Yes.

**Q. So you would not have been aware that on**

**September the 20th, again, EA, who I assume is Elaine Anderson, when assessing Ms. Watts for vaginal bleeding at approximately 11:09 on the 20th, documented that there was "scant red" blood, fair?**

A. Correct.

MR. PRISLIPSKY: We're going to go to Hospital Page 714.

(Defendant's Exhibit H was marked for identification.)

BY MR. PRISLIPSKY:

**Q. And similarly, four hours, five hours later, you would not have been aware that another nurse documented at 8:00, which would be 2019, for vaginal bleeding, that there was number of zero pad on the number of pads saturated per hour, and it says, "Pad on since 7:00 to 7:30 a.m. to date." Did I read that correctly, Doctor?**

A. What I'm looking at, that kind of contraindicates what's above it, where it says that there's a small amount of blood. So if there's a small amount of blood, where is it? Not on the (Inaudible) --

**Q. I understand. Sorry, go ahead. I didn't mean to cut you off, sir.**

A. So it doesn't make sense to me that in one

place, you say that she's bleeding, and in another place, you say that she's not bleeding.

**Q. Well, it says that --**

A. I --

**Q. -- it's small and intermittent, correct, sir?**

A. And -- and you can have a small abruption that stops bleeding. Just because you have an abruption doesn't mean you continue to bleed. You can tear some of the placenta off and the bleeding will slow down and stop. Doesn't mean --

**Q. All right.**

A. -- (Inaudible) placental abruption there.

**Q. And according to the documentation, the same pad that she had been wearing between 7:00 and 7:30 had not yet even been saturated by 8:19, correct?**

MS. KLEINHAUS: Objection to form. Incomplete hypothetical.

THE WITNESS: According to that, but again, that's, like, eight -- seven hours after I've seen the patient.

BY MR. PRISLIPSKY:

**Q. Understand. And I'm just asking if you were made aware of that on September the 20th, sir?**

A. Oh, I got -- I gave my consult and done. No further communications, other than the fact that

the -- the ethics committee agreed with the recommendation.

**Q. All right. Now, we're going to talk about some other hallmarks or signs of an infection, and you had said before earlier, I think, that signs of an infection would be a patient who is febrile, correct?**

A. Yes.

**Q. What do you consider to be a fever, 100.4?**

A. Or above, yes.

**Q. All right. So again, you're aware that the nurses on September the 20th, when we talk about monitoring, were monitoring Ms. Watts's vital signs pretty regularly, fair?**

MS. KLEINHAUS: Objection. Foundation. Given that this is a 958-page group of medical records. Go ahead.

MR. PRISLIPSKY: All right. I'll withdraw it. I'm sorry. I didn't mean to interrupt you.

BY MR. PRISLIPSKY:

**Q. Doctor, you would expect that the nurses were checking Ms. Watts's vital signs occasionally on September the 20th, fair?**

A. Yes.

**Q. All right. At 9:16, her temperature was 98. That's normal, correct?**

A. Yes.
**Q. At 10:47, it's 98.2. That's normal, correct?**
A. Yes.
**Q. And we see that the pulse ox here is 99 percent, correct?**
A. Yes.
**Q. You had talked about sepsis earlier, and let me see if I could give you my understanding of sepsis. If a patient has an infection and the body's inflammatory response to that infection is so overwhelming, it essentially shuts down the -- some of the patient's organs. Is that a fair description of sepsis?**
MS. KLEINHAUS: Objection to form. Compound question.
THE WITNESS: I never said that --
MS. KLEINHAUS: Leading. You can just ask him what sepsis is.
MR. PRISLIPSKY: I'll ask the questions as I see it. Thank you.
BY MR. PRISLIPSKY:
**Q. Doctor, is that a fair description of sepsis?**
MR. ROSSI: Well, everybody's kind of talking over everybody, including him. So let's all try to talk separately, so Ellina can get this accurately.

Why don't you re-ask your question, Tom?
MR. PRISLIPSKY: Sure.
BY MR. PRISLIPSKY:
**Q. Doctor, is a sepsis -- let's take it in -- a few steps. Sepsis is the body's overwhelming inflammatory response to an infection; is that fair?**
A. Yes.
**Q. And sepsis can cause an organ failure; is that also fair?**
A. Yeah.
**Q. And one of the things that you could see in a patient who is septic is the body shunts blood to vital organs, fair?**
A. Yes.
**Q. Now, when we have a pulse ox of 99 percent at 10:47, that is absolutely normal, correct?**
A. It is normal, yes.
**Q. And to kind of cut to the chase, you did not believe on September the 20th at all that Ms. Watts was showing any signs or symptoms of sepsis, correct?**
A. Correct. That doesn't mean she could not become septic because she was at increased risk for it, but she did not show signs of it at that point in time.
**Q. And that's one of the reasons why it's important for a patient to stay in the hospital, because**

**if they become unstable, medical attention could arrive quickly, fair?**

MS. KLEINHAUS: Objection to form. Calls for speculation. You can answer.

THE WITNESS: Yes.

BY MR. PRISLIPSKY:

**Q. All right. We go through the vital signs. At 11:00, her pulse ox again was 99 percent, correct?**

A. Yes. Yes. I'm sorry.

**Q. No, you're fine. I was going through the rest of her vital signs. At 11:20, her temperature is 98.9. Sorry, I may have that wrong. At 12:33, her temperature is 98.2. At 12:49, it's 97.5. At 2:01 p.m., it's 98.9; 3:00, 98.5; 4:08, 98.9; 5:36, 98.8. Did I read all those correctly, sir?**

A. Looks like it to me, yes.

**Q. And none of those temperatures that were recorded for Ms. Watts were indicative of a fever, correct?**

A. No.

**Q. All right. I want to ask you about vital signs. Sorry, not about vital signs. Excuse me. About labs. Now, I can stop sharing for a moment. You are familiar of how the labs or the lab operated at St. Joe's Hospital, correct?**

A. (No verbal response.)
MS. KLEINHAUS: Objection to form.
BY MR. PRISLIPSKY:
**Q. I didn't hear if you said yes, sir.**
A. Yes.
**Q. Okay. There is one lab that analyzes specimens from the entire hospital, correct?**
A. Yes, I think. I'm -- I'm not absolutely positive of the, you know --
**Q. Okay.**
A. -- of the laboratory.
**Q. All right. It -- you are not -- strike that. I have never seen a lab in any hospital, Doctor, that is specifically dedicated for analyzing specimens for pregnant women. Are you familiar with that at all?**
A. That doesn't mean that there's not different values for them. Just because it's not included in -- in the -- in the -- but everybody -- it's assumed that the physicians taking care of pregnant women know that, but I think it becomes a bit too confusing to have 18 different normals.
**Q. Okay.**
A. Typically --
**Q. And then -- I'm sorry, I didn't mean to interrupt you. Go ahead, sir.**

A. Typically, you get one normal value for each analyte, okay? But there are -- just like if you have a child, they have different -- they have different values than an adult. But they do -- they -- they generally do not specify, this is an adult sample. This -- so I'm not surprised that there aren't specific pregnancy normals.

**Q. Okay.**

A. Although, if you go to books, there are specific pregnancy normals.

**Q. And it's expected that maternal fetal medicine specialists like yourself will understand that, and will know what is the within normal limit range for a pregnant woman, fair?**

A. Correct.

**Q. All right, Doctor. As part of your practice, do you use UpToDate?**

A. I do.

**Q. Okay. Would it surprise you that UpToDate states that the normal range for a second trimester mom, which would've been Ms. Watts' white count, is between 5.6 to 14.8?**

A. It would. That's not typically what I would expect.

**Q. All right. Let's go back to some of the**

**medical records, and we're going to go to Hospital Page Number 684. And I want to ask you some additional questions about the lab. So this is the lab that you were talking about on September 20th, 2023, that was collected at 10:00 a.m., correct?**

A. Correct.

**Q. All right. The white count, which is WBC, represents the analysis of white blood cells in the body, correct?**

A. Correct.

**Q. When a patient has an infection, typically, additional white blood cells are created to fight that infection, correct?**

A. Correct.

**Q. And there are different components of cells within the white blood cell, correct?**

A. Correct.

**Q. And that's when we talk about if a fractionated white blood -- white count, or a white count with the differential is ordered, it gives the different components of the white blood cell, correct?**

A. Correct.

**Q. All right. So when we look at the lab values from September 20th, 2023, I want to ask you about neutrophils, and ask specifically about absolute**

**neutrophils. And what occurs physiologically when a patient has a bacterial infection, the body creates additional white blood cells, and creates -- the early sign of a -- of an infection is elevated neutrophils, fair?**

A. Fair.

MS. KLEINHAUS: Objection to form. Compound. Incomplete hypothetical. Go ahead.

BY MR. PRISLIPSKY:

**Q. Same question about UpToDate. Would you be surprised if UpToDate says that, for a second trimester mother, that the normal or within normal limits neutrophils absolute would be 3.8 to 12.3?**

A. I do not consider UpToDate an authoritarian (Inaudible). I use it often as one of many references that I use in my day-to-day practice.

**Q. Okay.**

A. So to specifically say that UpToDate is the be-all or the end-all is not a fair statement.

**Q. Fair enough. So just so that we can put this in the context though, on the 20th, when you saw Ms. Watts, her white count was 14.9, and the absolute neutrophils were 12.44, correct?**

A. Both of those are increased. Correct.

**Q. All right. Well, and I think you said**

**something earlier that I don't know if you intended to say. So let's go through the previous day's lab, because I think you had said that the labs on the 20th, the white count actually increased from the 19th. And I get it, Doctor, you haven't seen Ms. Watts in three and a half years. Is that your vague recollection of what happened between the 19th and the 20th?**

A. That's what I recall, but I don't remember exact numbers.

**Q. Understand. And I don't think anyone would expect you to. So we're going to go to page 684, which are the labs from the previous day -- strike that. Those are not the labs. We're going to go to 789. Excuse me. Okay. These are the labs, Doctor, so we're on the same page, from September 19th, 2023; is that fair?**

A. Yes.

**Q. Okay. Ms. Watts' white count was actually, the day before, 16.7, and the absolute neutrophils were 14.02. So actually, between September 19th and September 20th, Ms. Watt's white count actually went down, fair?**

A. Correct.

MS. KLEINHAUS: Objection to form.

BY MR. PRISLIPSKY:

Q. And did you say yes, sir?
A. Yes.
Q. Now, when we're talking about white count, a white count will only tell you if there are white blood cells increasingly being produced, it does not tell you the cause of why white -- why blood -- why additional white blood cells are being produced, fair?
A. Agree.
Q. So an elevated white blood count is just consistent with an infection, true?
A. Correct.
[redacted]
Q. Well, you were aware that Ms. Watts was

[redacted]

[redacted]

[redacted]

**Q. Isn't one of the risks of Pitocin is that it actually increases the risk of a placental abruption?**

A. Correct.

**Q. Is it one of the risks of using Cytotec, especially if it's -- if vaginally, is increased risk of placental abruption?**

A. Correct.

MS. KLEINHAUS: Objection to form.

BY MR. PRISLIPSKY:

**Q. So when we turn now to kind of your consult and afterwards, after your consultation on September the 20th, 2023, what you expected was an ethics consult,**

**fair?**

MS. KLEINHAUS: Objection to form. Calls for speculation.

BY MR. PRISLIPSKY:

**Q. Did you say yes, sir?**

A. Yes.

**Q. All right. So Ms. Kleinhaus had showed you part of the ethics consult, but she didn't show you both notes. So let me go over both notes.**

A. Again, I really wouldn't have looked at them and carefully.

**Q. I completely understand, but I just want to make sure that --**

A. I was not making the decision. Dr. Khavari was.

**Q. I understand.**

A. Made my recommendations. I was done.

**Q. And bear with me, Doctor. Let me try to find that note. Okay. All right. So we are going to go to Hospital Page 658. And let me put this up on the screen, sir. All right. I'm assuming, based on what you just told me, you were not aware that after Ms. Ford issued her first -- or consult note, that she wrote a second note a short time afterwards?**

A. Correct.

**Q. All right. So I want to go through with this, and read the highlighted part, "To be clear with Brittany, if induction occurs, there should be a well-documented conversation with her (informed consent) that the procedure is only to prevent harm to her, and is not intended to terminate a potentially viable pregnancy. I would recommend good communication and documentation from any and all providers and caregivers on the intent of the treatment plan of care, so there are no misunderstandings about induction." And in fairness, Doctor, I think that's essentially what you said earlier, true?**

MS. KLEINHAUS: Objection to form.

THE WITNESS: Yes.

BY MR. PRISLIPSKY:

**Q. And what you would have expected is that you had just told me earlier that Dr. Khavari was the attending physician, correct?**

A. Yes. And I would defer to her to have this conversation, not me.

**Q. And that was going to be my point. You make a recommendation as the consultant, to the attending physician, and it's up to the attending physician to agree or disagree, correct?**

A. Correct.

**Q. And if there was going to be an induction, you would have expected that that conversation about the induction would have been from Dr. Khavari, correct?**
A. Correct.
**Q. And you would have expected, before the medication was started, there would have been a very detailed, in-depth conversation with Dr. Khavari and Ms. Watts about the induction, true?**
A. Correct.
**Q. For one, we know that patients change their mind all the time, correct?**
MS. KLEINHAUS: Objection to form about what we know.
THE WITNESS: I wouldn't say all the time.
BY MR. PRISLIPSKY:
**Q. It is not uncommon for patients to change their mind about the treatment plan, fair?**
A. Not uncommon. It's not all the time.
**Q. Understand. And already that's why I rephrased it. I'm assuming you were not aware, Doctor, that Ms. Watts testified under oath that she had said that it was important to her that, if the baby could survive, she wanted it to survive. You were not aware of that testimony under oath, correct?**
A. Correct.

**Q. And she had been in the hospital twice in a two-day period, fair?**

A. Yes.

**Q. And during that time period, as we just saw, Ms. Watts' white count actually decreased from the 19th to the 20th, correct?**

A. Yes.

**Q. The -- she did not have significant bleeding, correct?**

MS. KLEINHAUS: Objection to form.

THE WITNESS: She did have bleeding, not necessarily significant.

MR. PRISLIPSKY: Okay. She did not have any complaints of abdominal pain, correct?

MS. KLEINHAUS: Objection to form. Incomplete as to when she complained of sharp pains in the abdomen. Go ahead.

THE WITNESS: You can have a low-grade infection and not have pain. Correct.

BY MR. PRISLIPSKY:

**Q. I understand, but she did not complain of abdominal pain when you examined her, and when the nurses assessed her, correct?**

A. Correct.

MS. KLEINHAUS: Objection to form.

MR. PRISLIPSKY: And what you would have expected, because I mean, let -- I think you've said this several times. If this baby is delivered on September 20th, it essentially is a death sentence for the baby, fair?

MS. KLEINHAUS: Objection to form.

THE WITNESS: Yeah, could you rephrase that, maybe?

BY MR. PRISLIPSKY:

**Q. Sure. Let me rephrase it. If the baby is delivered on September the 20th, the baby is not going to survive to a degree of probability, correct?**

A. I would agree with that statement.

**Q. All right. And what you would have anticipated is that Dr. Khavari had a conversation with Ms. Watts, going over her history for the last 48 hours, the results of her testing over the last 48 hours, the options of either expectant management or induction, the risks of induction, including increased risk of a placental abruption, which was a concern, you would have expected all of that to have been discussed before an order was written for either Pitocin or Cytotec, fair?**

MS. KLEINHAUS: Objection to form. It's compound. It's vague.

BY MR. PRISLIPSKY:

**Q. Doctor, was there anything vague about -- was there anything --**

MS. KLEINHAUS: I'm sorry. Just -- can you just ask -- rather than summarizing your theory of the case, can you just ask him the -- a direct question, please, instead of leading and these compound questions?

MR. PRISLIPSKY: Well, first of all, please don't give a speaking objection. This is in federal court, and you know more -- better than that.

BY MR. PRISLIPSKY:

**Q. Second of all, Doctor, was my question vague in any respect?**

MR. ROSSI: Why don't we -- why don't we put in a new question other than --

MR. PRISLIPSKY: Hey, Greg, I can't hear you. Can you move closer?

MR. ROSSI: Put in -- well, let's just put in a new question, please.

MR. PRISLIPSKY: Sure. All right.

BY MR. PRISLIPSKY:

**Q. Doctor, you've already told us that you would've anticipated Dr. Khavari would have spoken to Ms. Watts correct?**

A. Yes.

**Q. All right. And before an order for induction would be placed, that conversation had to have occurred, correct?**

A. That would be me assuming that.

**Q. Fair enough. Well, that's what you would have anticipated, that there is an informed consent conversation between Dr. Khavari and Ms. Watts prior to the order being placed, fair?**

A. Again, that's an assumption, yes.

**Q. Okay. And these are the things that I'm assuming you would have expected, or assumed to be discussed, the risks of an induction, fair?**

A. Yes.

**Q. And that using Pitocin actually increases the risk of a placental abruption, true?**

MS. KLEINHAUS: Objection. Incomplete hypothetical. Go ahead.

THE WITNESS: It does increase it, but again, you're very limited in terms of induction. So you -- you're -- you have to -- you have to choose whichever medicine that you think is going to cause the less harm. There are side effects to everything.

BY MR. PRISLIPSKY:

**Q. And that -- and that's my point. The patients**

**have a right to know that, true?**
A. Correct.
**Q. And that Cytotec also increases the risk of a placental abruption, correct?**
A. Yes.
**Q. Okay. And then, I'm assuming that you would've also expected that the conversation would give the time frame, like you had given earlier, it could take hours, it could take days for the baby to be delivered, correct?**
A. Again, you're -- I'm -- you're -- I'm -- I'm assuming, but I don't know for a fact.
**Q. Okay. And that's the point. No one knows, if an induction would've occurred in this case, how long it would've taken for the baby to have been delivered, true?**
A. You can make an educated guess, based on how soon after she left, that the baby delivered, that it probably wouldn't have taken very long, but again, that would be just speculation and a guess.
**Q. And that's my question. You cannot give an opinion to a reasonable degree of probability how long it would've taken, fair?**
A. Nobody can.
**Q. Okay. And then the other thing that we talked**

**about is that you would've anticipated a conversation that this decision, if the induction is ordered, is not to terminate the baby's life, but for the health and safety of the patient, Ms. Watts, correct?**

A. Correct.

**Q. Did you say yes, sir?**

A. Yes.

**Q. Okay. And then I'm assuming you also would've expected a conversation, potentially, about the possibility of expectant management, and what that would've shown, or would've been as an option, fair?**

A. Actually, I had that discussion with her as well.

**Q. And then at that point in time, she declined, correct?**

A. She declined which one?

**Q. Expectant management.**

A. Yes.

**Q. Now, when a mom delivers a baby, and it's a fetal demise, I'm assuming that the mom cannot go home immediately. She has to stay in the hospital for a number of hours, to wait, to ensure that there is no hemorrhage, correct?**

MS. KLEINHAUS: Objection. Calls for speculation. Foundation. You can answer if you

know.

THE WITNESS: That's the typical, but I've had moms go home very quickly.

BY MR. PRISLIPSKY:

**Q. Okay. And Doctor, when we talk about the placental abruption, and I know you're concerned about placental abruption on September the 20th, you are aware that Ms. Watts did not deliver until September 22nd, correct?**

A. I don't remember the exact time frame, sir.

**Q. All right. I want you to assume, Doctor, she delivered at around 5:48 on September 22nd. When she left the hospital and eloped on September the 20th, she didn't abrupt, correct?**

MS. KLEINHAUS: Objection to form. Foundation. Calls for speculation.

THE WITNESS: Yeah, I'm not sure what you mean by that question.

BY MR. PRISLIPSKY:

**Q. She did not have a placental abruption at all, you're aware of, correct?**

MS. KLEINHAUS: Objection to form. Calls for speculation. Foundation.

THE WITNESS: Where -- I'm not sure where that information came from, but I mean, clinically, I

thought she had an abruption.
BY MR. PRISLIPSKY:
**Q. Fair enough. But I'm saying, are you aware that up until the time that she returned, and even when she was in the hospital on this 22nd, she did not have an abruption before the delivery?**
MS. KLEINHAUS: Objection to form. Foundation. Calls for speculation.
THE WITNESS: And I disagree with that statement. I think, again, by definition, because she was having bleeding, she had a small abruption.
BY MR. PRISLIPSKY:
**Q. Okay.**
A. She didn't have a complete abruption, but she had an abruption.
**Q. All right. And what you were concerned about, when you were making your recommendations to Ms. Watts, is that she did not have a complete abruption, which would then turn into a significant hemorrhage, correct?**
MS. KLEINHAUS: Objection to form. Foundation. Go ahead.
THE WITNESS: Correct.
BY MR. PRISLIPSKY:
**Q. All right. And you're aware she did not have a complete abruption up until the time she delivered the**

**baby, correct?**

MS. KLEINHAUS: Objection to form. Foundation. Calls for speculation.

THE WITNESS: That's a hypothetical. I can't comment on it.

BY MR. PRISLIPSKY:

**Q. All right. Doctor, one of the things that you did not recommend for Ms. Watts was a dilatation and evacuation, correct?**

A. Correct. It requires a special skill that nobody in -- in Warren has, and also requires special instruments to destroy the fetus during the delivery process. And again, we did not have that present, so that was not, in my mind, a viable recommendation.

**Q. Okay. I'm going to show you the lawsuit that Ms. Watts has filed in this case, and it's talking about September 19th, September 20th, "The standard of care for a person in Ms. Watts' condition was to induce labor or perform a dilation and evacuation, which is known as a D&E procedure." And what you just told us, sir, is that that was not a viable option, correct?**

A. Correct.

**Q. Doctor, when you saw Ms. Watts on September the 19th, was she clinically stable?**

A. She was.

**Q. When you last saw her on September the 20th, was she clinically stable?**

A. She was.

**Q. You are licensed in -- to practice medicine in the state of Ohio?**

A. I am.

**Q. You are board-certified by the American Board of Obstetrics and Gynecology?**

A. I am.

**Q. And you have subspecialties in -- a certification in maternal fetal medicine?**

A. I am.

**Q. I'm assuming that you spend probably close to 100 percent of your professional time in the active clinical practice of medicine?**

A. Yes.

MR. PRISLIPSKY: Okay. Doctor, I don't have any other questions. Thank you for your time.

MS. KLEINHAUS: I don't have anything based on that. And so I think, Dr. Stewart, you may actually be free to go.

THE REPORTER: Before we hop off on record, any follow-up --

MS. KLEINHAUS: Hey, Greg, we can't hear you. Are you talking, Greg? Sorry.

MR. ROSSI: Zach, any other questions or any questions?

MR. ANDERSON: I have no further questions. Thanks, Greg.

THE REPORTER: All right. And before we hop off, I -- quickly, before I get orders of transcripts, I do want to ask Mr. Prislipsky, I just want to clarify the documents that you showed, did you want to go with the -- do you want to mark them as exhibits, I'm assuming?

MR. PRISLIPSKY: Yes, because they're highlighted, so what I will do is we will send those to you over the next couple of days, if that's okay?

THE REPORTER: Yeah, that's perfect. It's just the due date of the transcript, but I did want to clarify, did you want to do numbers or letters?

MR. PRISLIPSKY: Why don't we mark them as Defendant's Exhibit A, and then we'll --

THE REPORTER: Okay.

MR. PRISLIPSKY: Just provide the numbers.

THE REPORTER: Okay. So I marked them as we went. So I have A through M, and I can send you a list as well.

(Defendants' Exhibit I was marked for identification.)

(Defendants' Exhibit J was marked for identification.)

(Defendants' Exhibit K was marked for identification.)

(Defendants' Exhibit L was marked for identification.)

(Defendants' Exhibit M was marked for identification.)

MR. PRISLIPSKY: That would be perfect. Thank you very much. And then that way, it'll give me a response from the e-mail.

THE REPORTER: Of course. And Ms. Kleinhaus, I do have seven exhibits, and my e-mail is in the chat for anyone that is to need it. And then before we get off record, I will ask orders of transcripts starting with Ms. --

MS. KLEINHAUS: I'm sorry, Ellina.

THE REPORTER: Yes.

MS. KLEINHAUS: I think -- could you go ahead and put it in the chat? Somehow I don't see it in the chat.

THE REPORTER: Of course. And Ms. Kleinhaus, starting with you, how would you like your order of transcript starting with the --

MS. KLEINHAUS: We will do whatever is the

cheapest version of the transcript in PDF.

THE REPORTER: Regular E-Tran? And did you want a copy of the video?

MS. KLEINHAUS: Not at this time.

THE REPORTER: Okay. Perfect. E-Tran, no video. And Mr. Prislipsky?

MR. PRISLIPSKY: Yes, I'll take a -- I'll order it.

THE REPORTER: Copy of video?

MR. PRISLIPSKY: Yes, please. Are you able to sync it?

THE REPORTER: Yeah, I can follow up the e-mail with the production for that. And Mr. Anderson?

MR. ANDERSON: Nothing at this time. Thank you.

THE REPORTER: No order. And Mr. Rossi?

MR. ROSSI: Yes. So Dr. Stewart is going to read the transcript, and will you all agree -- he'll try to have it done within 28 days of receipt. Will everybody agree that he can have more time if necessary beyond that?

MR. PRISLIPSKY: Yes.

THE REPORTER: Okay. Did you want a copy of the E-Tran and video as well? I'm sorry. I can't

hear him.

MR. ROSSI: Yes, I'll take a copy of both, please.

THE REPORTER: E-Tran and video. And for read and sign, is your e-mail that you provided me before we got on record okay to send it to?

MR. ROSSI: Send it to me with the errata sheet and signature page, and then I will get that to Dr. Stewart, and we will return everything to you.

THE REPORTER: Okay. Sounds perfect. All right. I'm going to get us off record. I just ask everyone to hang out for any spelling clarifications that I might have. We are now off record. The time is 4:43 p.m.

(Deposition concluded at 4:43 p.m. ET)

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



ELLINA DELILLO,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 03/21/2027
SUBMITTED ON: 04/09/2026

**Exhibits**

**Exhibit 1_ Stewart** 34:2,3
**Exhibit 2_ Stewart** 38:5,6, 13 42:9
**Exhibit 3_ Stewart** 55:20, 24 69:1
**Exhibit 4_ Stewart** 75:7
**Exhibit 5_ Stewart** 77:22
**Exhibit 6_ Stewart** 85:19
**Exhibit 7_ Stewart** 99:7
**Exhibit A_ Stewart** 108:14 146:18
**Exhibit B_ Stewart** 110:5
**Exhibit C_ Stewart** 113:12
**Exhibit D_ Stewart** 114:8
**Exhibit E_ Stewart** 115:11
**Exhibit F_ Stewart** 117:1
**Exhibit G_ Stewart** 117:19
**Exhibit H_ Stewart** 118:8
**Exhibit I_ Stewart** 146:24
**Exhibit J_ Stewart** 147:1
**Exhibit K_ Stewart** 147:3
**Exhibit L_ Stewart** 147:5
**Exhibit M_ Stewart** 147:7

**0**

**0** 108:21

**1**

**1** 34:2,3 61:20 67:10
**10** 14:11 17:9, 15 78:23 80:5 81:11
**100** 145:14
**100.4** 120:8
**101** 9:4
**106/54** 106:2
**10:00** 126:5
**10:47** 121:2 122:16
**11.3** 78:15
**116/64** 106:2
**11:00** 123:8
**11:05** 113:19
**11:09** 118:3
**11:20** 123:11
**12.3** 127:13
**12.44** 127:23
**12:30** 117:10
**12:33** 123:12
**12:49** 123:13
**14** 52:1 81:20
**14.02** 128:20
**14.8** 125:22
**14.9** 59:10 127:22
**15** 52:12,19,20 53:20,23,24 80:5
**16.7** 128:19
**18** 124:20
**1973** 14:4
**1977** 14:12
**1983** 14:18,19
**1987** 13:23 14:23,24
**1991** 14:24 16:21
**1993** 16:23
**1995** 15:18 16:8
**19th** 29:7,12 31:4 32:4,9,22 33:5 34:21 36:1 37:11,17,20,24 38:2 39:19 42:11,12,18,20, 25 43:18,22 44:13 48:21 49:3 71:9 104:6,24 105:18,25 106:9,20,23 107:1,10,20,22 109:6 115:9 128:4,7,15,20 130:10 136:5 144:17,24
**1:00** 9:6
**1:03** 12:7
**1:06** 12:11
**1:56** 43:8

**2**

**2** 38:5,6,13 42:9 108:21
**20** 54:8
**2019** 118:13
**2022** 15:21 16:8
**2023** 104:6 107:22 110:16, 21 111:10 113:21 114:19 115:9 126:4,24 128:15 132:25
**2024** 15:22
**2026** 9:6 43:13 84:8 97:22
**20th** 29:6 42:13 48:24 49:2,24 50:1,5,19 54:18 55:9,13 71:11 75:1,16 77:1,13 84:16 88:19 89:9 92:10,21 96:17 97:1 104:22 107:25 108:18 109:5 110:16,21 111:10 113:21 114:19 117:5, 10 118:1,3 119:23 120:11, 22 122:19 126:4,24 127:21 128:3,7, 21 132:11,25 136:6 137:4,11 142:7,13 144:17 145:1
**21** 29:17 30:24 60:15 61:25 71:23 81:5 98:8 108:25
**22** 18:6 30:23
**22-week** 72:1
**22nd** 142:8,12 143:5
**24** 18:6 54:20
**25th** 130:11
**28** 148:20
**2:01** 123:13
**2:04** 43:13

**3**

**3** 55:20,24 69:1
**3.8** 127:13
**30** 78:23
**30-some** 26:21
**31st** 9:5 43:13 84:8 97:22
**33** 31:13,19
**33-year-old** 108:20
**36** 53:15,18
**37** 52:13,17,21 53:18,23
**3:00** 123:14
**3:02** 84:3
**3:09** 84:8
**3:28** 97:17
**3:31** 88:19
**3:43** 97:22

**4**

**4** 64:16 75:7
**40** 53:24
**40202** 9:5
**41** 34:18,21
**425-CV-00049** 9:13
**45** 99:22
**47** 100:10,20
**48** 137:16,17
**4:08** 123:14
**4:43** 149:14,15

**5**

**5** 77:22
**5.6** 125:22
**50** 78:25
**5:36** 123:14
**5:48** 142:12

**6**

**6** 85:19
**658** 133:20
**662** 110:4,20

**663** 110:20 111:16
**665** 108:19
**672** 116:25
**684** 126:2 128:11

**7**

**7** 99:7
**708** 114:7
**712** 117:18
**714** 118:7
**730** 9:4
**771** 113:11,19
**789** 128:13
**7:00** 118:16 119:14
**7:20** 107:19,21
**7:30** 118:16 119:14

**8**

**82** 34:18,21
**866** 130:12
**8:00** 118:13
**8:19** 119:15

**9**

**91** 15:1 16:25
**93** 15:1 16:25
**958-page** 120:15
**97.5** 123:13
**98** 120:24
**98.2** 121:2 123:13
**98.5** 123:14
**98.8** 123:14
**98.9** 123:11,13, 14
**99** 121:4 122:15 123:8
**9:16** 120:24

**A**

**a.m.** 118:16 126:5
**AB** 87:7
**ABD** 14:20
**abdomen** 112:21 113:3,4 136:17
**abdominal** 109:18 112:5, 19 114:20 136:14,22
**ability** 45:2 46:22
**abnormal** 59:21
**abortion** 46:17 85:8 87:7,9 98:21,22,24 99:1,3,23 100:24
**abrupt** 62:22 142:14
**abruption** 21:16,20,21,25 22:8,10,15,21 39:10 62:1,19 80:1 108:25 109:7,10,18 114:25 115:25 116:5,6,7,8,10 119:6,7,12 132:15,19 137:20 139:15 140:4 142:6,7, 20 143:1,6,11, 14,15,18,25
**abrupts** 62:22
**absence** 24:15
**absolute** 126:25 127:13, 22 128:19
**absolutely** 66:16 122:16 124:8
**account** 72:24
**accurate** 12:21 13:6 16:22 88:2
**accurately** 82:7 94:23 96:23 121:25
**active** 24:8 145:14
**actual** 68:16 77:5 78:17 96:2
**adamant** 36:4, 11
**add** 67:23
**addition** 53:9
**additional** 50:20 99:5 104:19 105:5, 14 106:6 107:10 117:13 126:2,12 127:3 129:6
**admin** 75:18
**administer** 25:7
**administered** 25:11 68:15,22
**administration** 68:17
**admitted** 104:12 105:17 115:4
**adult** 125:4,5
**advanced** 62:4,6 87:6
**advice** 26:9,24 27:20 42:11 48:23 49:2 52:22 53:6 54:3 71:10
**advised** 26:6
**advising** 70:23
**affect** 12:24 31:11,16
**affirm** 10:19
**African** 108:21
**African-american** 111:25
**afternoon** 9:17
**age** 29:13 32:22 44:6 45:3 46:20 54:6 64:3 72:1 87:4,12
**agree** 10:13 40:24 51:14 57:19 69:11,13, 22 70:9,12 78:8 80:23 81:8,11 87:16 89:1 100:18,23 129:8 134:24 137:13 148:19, 21
**agreed** 10:12 66:1,4 101:14 120:1
**agreeing** 67:21
**agreement** 88:4
**ahead** 25:16,21 34:24 36:16 39:22 44:9 51:19 56:4 78:21 79:21 100:8 102:8 103:5,12,19 118:23 120:16 124:25 127:8 136:17 139:17 143:21 147:19
**Akron** 15:18,19 16:8,16 28:13
**allowed** 48:4 96:21
**alluding** 74:25
**American** 108:21 145:7
**amniotic** 24:15 80:11,19 81:4, 15 87:5 95:2
**amount** 23:10 62:18 76:1,6 78:24 118:20, 21
**analysis** 87:21 126:8
**analyte** 61:2 125:2
**analytes** 60:20
**analyzes** 124:6
**analyzing** 124:14
**anatomy** 29:14,18
**and/or** 68:6
**Anderson** 9:21 103:19,21 118:2 146:3 148:14,15
**Anderson's** 117:11
**Ann** 14:25
**answers** 104:5
**antibiotics** 63:19 69:14 81:18
**anticipated** 137:15 138:23 139:6 141:1
**anticipating** 33:23
**anybody's** 26:18
**Anytime** 21:21
**apparent** 112:1,2
**appearance** 9:14 81:23
**appeared** 31:13,14 70:6

**appearing** 9:19
**application** 105:6
**applies** 98:24
**appointments** 19:16
**approximately** 118:3
**Arbor** 14:25
**area** 17:6 41:9, 11,12,14 94:5 98:23
**arms** 13:10
**arrive** 123:1
**arrived** 19:3
**arrives** 46:25
**articles** 17:5
**ascertained** 107:10
**aspects** 115:15
**assess** 113:24
**assessed** 114:11 115:19 136:23
**assessing** 118:2
**assessment** 113:20,24
**association** 131:23
**assume** 22:14 74:10 96:19 102:16 105:16, 21,24 107:20 118:1 142:11
**assumed** 30:4 85:2 97:11 124:18 139:11
**assuming** 39:16 68:19 107:5 112:10 117:4,22 133:21 135:20 139:4,11 140:6, 12 141:8,20 145:13 146:10
**assumption** 44:16 139:9
**atony** 75:20
**attending** 9:14,15,23 10:2 18:21 19:4,12 86:13 134:18, 22,23
**attention** 52:24 91:12,16 123:1 132:10
**attorney** 9:22 95:23
**attorneys** 11:18 103:15
**authored** 107:19
**authoritarian** 127:14
**auto** 110:9
**autopsy** 93:13, 17,19
**avoid** 88:1
**aware** 34:25 35:2 37:11 48:24 84:16 89:19 90:19,25 95:12 98:12 104:22 105:3, 16 107:9,12 117:11,25 118:12 119:23 120:10 129:25 130:5,15,17 133:22 135:20, 23 142:7,21 143:3,24

**B**

**babies** 81:10, 20
**baby** 23:5,11 29:17,19 30:6, 24 32:24 36:23, 24 37:7 40:12 43:20 44:5,17 45:5,10,14,21 46:3,20,25 47:10 48:5 63:19 64:2 65:21 67:13 75:19,25 76:4,8 81:9,13,21 92:25 94:11 135:22 137:3,5, 10,11 140:9,15, 18 141:19 144:1
**baby's** 29:23 44:2,18,24 45:2,23 46:4, 14,17,18,22 52:20 82:20,21 83:5 141:3
**back** 12:10 21:2 43:10 56:7 84:5 92:13,15 97:19 125:25
**background** 15:8
**bacteria** 131:23 132:2
**bacterial** 127:2 129:19,22
**bad** 12:16
**bag** 23:5 30:3
**based** 45:14 60:3 63:21 64:16,18 65:22 67:17 71:17 83:6 86:19 98:11 102:16 133:21 140:17 145:19
**basically** 68:8 94:10
**Bates** 108:9
**be-all** 127:19
**bear** 38:9 55:23 75:5 133:18
**bedside** 20:1 72:18 73:15,22
**bee** 17:12
**begin** 52:24
**Beginning** 99:21
**begun** 53:6
**behalf** 9:19 11:17 12:13
**behaving** 31:11
**behavior** 71:16
**belief** 91:5
**beliefs** 91:20
**believed** 83:8 84:25 96:16
**big** 46:15 53:12
**biggest** 46:21
**bills** 15:13
**birth** 21:23
**bishops** 99:13 101:17
**bit** 13:9 50:22 56:8 59:22 99:12 111:17 124:20
**bladder** 29:20, 23 80:14,17 116:15,22
**bleed** 38:24 39:7 119:8
**bleeding** 22:12,13,22,24 41:4,7,22 51:10 62:18,24 64:7 65:4,5 75:20 76:1,6 87:5 88:2 109:19 115:1,22,23,24 116:7,17,19 117:13 118:2, 14 119:1,2,7,9 136:8,11 143:11
**bleeding's** 22:20
**blood** 19:20 23:24 24:2 34:15,21 35:2, 5,6 37:12 55:1 57:20 60:6 61:3 78:6,11,25 79:1 87:23 106:1 115:20,22,23 116:12,14,16, 20,22 118:4,20, 21 122:12 126:8,12,16,19, 21 127:3 129:4, 6,7,9 130:21
**board** 17:2 145:7
**board-certified** 106:10 145:7
**boarded** 17:3
**body** 63:14 78:25 122:12 126:9 127:2
**body's** 121:9 122:5
**bolded** 35:12
**Bon** 9:9 16:1,3, 4 18:5 102:24
**books** 125:9
**bottom** 88:17
**BP** 34:15
**Brady** 9:18
**break** 12:15 43:5 44:13 47:19 83:17,18, 21,23 97:14
**breaking** 53:1
**breaks** 52:3,23 86:1
**bring** 70:24
**Brittany** 9:8,20 12:13 17:23 20:5,10 21:7 26:6 27:25 28:20 31:3,12 33:10 34:10 35:25 37:17,24

38:1 40:12 41:2 48:21 50:1,12, 16,19 55:8,12 66:12 67:3 69:17 70:19,23 71:8 73:15,23 74:17 75:1 77:13 84:15 91:1 92:11 95:8,19 96:17 100:19 102:5, 13 103:9 134:3

**Brittany's** 54:17

**broad** 32:19 52:7 69:21

**broken** 23:6 53:5 54:20

**building** 28:22, 23

**busy** 17:11 89:20 90:9

**butcher** 80:6

**C**

**C-SECTION** 36:10,13,18 37:2 43:22 44:4,16 45:5,15 46:4,18 47:1,11 93:11

**call** 18:23 29:10,11 52:25 76:25 131:18

**called** 18:18,19 20:6,10 24:9 28:10 50:8 87:9 99:19,20

**Calls** 94:5 107:4 108:2 123:3 132:1 133:2 141:24 142:16,22 143:8 144:3

**capable** 91:23

**caps** 75:19

**care** 17:11 26:25 28:2,10 43:1 71:24 72:17 73:10 75:1 91:1 93:6 95:7,8,15 97:12 99:21 102:5 103:9 124:19 134:9 144:17

**career** 26:21 80:23 102:17

**careful** 58:24

**carefully** 133:11

**caregivers** 134:8

**Carney** 9:23

**carrying** 21:24

**case** 9:12 18:19 20:4 25:1 28:1 40:11 42:15 54:1,2 55:12 77:13 84:13 85:4,11 89:1 90:25 91:9 92:20 93:4,14 95:15 96:3,16 97:8 98:2 138:5 140:14 144:16

**cat** 27:23

**catch** 116:11, 12

**categories** 51:11

**category** 114:23 131:20

**cath** 64:8 65:1

**Catholic** 39:24 40:2,6,7 43:20 44:3,15 46:16 47:22 48:4,7,8, 15 64:11,13 65:2,7,9,10,15, 24 66:20 72:24 90:4 98:15 99:14 101:20

**Catholics** 40:7

**cell** 23:24 37:12 55:1 57:20 61:3 126:16,21

**cells** 115:20,22 126:8,12,15 127:3 129:5,7 130:21

**Center** 15:2,17

**cerclage** 93:10

**certification** 145:11

**certifications** 17:2

**cervical** 62:4, 6,11 81:24 82:3,18 87:6

**cervix** 22:20,25 30:2,5 81:24 82:6,22,25 83:2

**cesarean** 36:24 37:9

**cetera** 115:17

**chance** 43:20, 23 45:8,9 64:3 80:4,20

**change** 135:10,16

**changed** 51:9

**charge** 42:17

**chart** 19:6 96:22

**chase** 122:18

**chat** 147:13,20, 21

**cheapest** 148:1

**check** 105:18

**checked** 105:13,25 117:12

**checking** 120:21

**chemical** 23:9

**chemistry** 14:14,21

**Chicago** 9:19

**child** 21:24 100:15,16 108:23 125:3

**childbirth** 45:4

**childbirths** 61:23

**chills** 23:19

**choice** 15:15 27:15

**choose** 139:20

**church** 48:7 99:21

**Cincinnati** 13:21 14:19

**circumstances** 40:20 69:14

**City** 9:22

**clarifications** 149:12

**clarified** 80:1

**clarify** 42:19 52:22 72:7 146:8,16

**clean** 116:11

**clear** 42:14 74:24 134:2

**Cleveland** 15:3,5,16 16:15

**Clinic** 16:15

**clinical** 14:14, 21 30:7 60:3 63:5,17 64:18 65:22 67:18 68:1,21 72:23 73:13 76:7 77:1 86:1 88:5 90:1, 5,8 96:17 109:13 145:15

**clinically** 72:25 142:25 144:24 145:2

**clinicians** 104:16

**close** 145:13

**closely** 87:23

**closer** 47:16 82:13 138:17

**CO2** 58:19

**coagulation** 41:21,23

**colleagues** 39:1

**collect** 116:13

**collected** 126:5 130:10

**color** 115:15

**Comfort** 36:3

**comment** 89:23 91:4,24 144:5

**committee** 40:2 66:1,4,10, 13 67:21,25 72:21,25 76:19, 25 83:13 84:13, 19 85:9 101:13 120:1

**committees** 66:18,19

**common** 19:10 22:22

**communication** 49:12 134:7

**communications** 119:25

**compared** 50:23 70:5

**comparison** 131:20

**complain** 136:21

**complained** 114:12 136:16

**complaining** 112:19

**complaint** 18:1

**complaints** 114:20 136:14
**complete** 143:14,18,25
**completed** 15:15 61:16 76:4 77:4
**completely** 62:22 133:12
**completing** 32:8
**complicated** 19:20 46:2
**components** 126:15,21
**compound** 121:14 127:7 137:24 138:7
**concentrated** 79:2
**concentration** 78:12
**concept** 26:4
**conception** 70:25
**concern** 87:4 137:20
**concerned** 87:25 142:6 143:16
**concerns** 54:23
**concluded** 95:8,16 149:15
**conclusion** 85:12 94:1
**conclusions** 97:1
**condition** 13:1 52:4 69:12 100:13,22 101:12 144:18
**conditions** 12:20 13:4
**conduct** 111:20
**conducted** 43:11 84:6 97:20
**Conference** 99:13
**conferences** 17:14
**confirm** 53:2 54:8
**confusing** 124:20
**Connie** 10:1 20:25
**consent** 100:24 134:4 139:6
**consequence** 41:24
**considerations** 101:22
**considered** 39:24 43:19 44:14 90:24 93:12 98:21
**consistent** 35:24 68:10 85:25 94:2,15 114:2,24 129:10,13 130:24
**constitutes** 21:19
**consult** 17:25 18:19 20:6,10 28:2,10,15,16 29:5,10 37:16 38:24 39:11 42:21 50:4,7,9 56:12 66:13 67:2 74:6,7,25 84:12,16,24 85:1,11 86:18 92:10,20 93:1 98:7,13,18 107:16 119:24 130:18 132:23,25 133:8,23
**consultant** 86:11 134:22
**consultation** 17:19,21 18:24 19:2,8,11,22,25 21:8 28:5,7 86:2,7 107:23 108:19 111:18 117:6 132:24
**consultations** 104:20 117:6
**consulted** 17:24 26:8 77:13
**consulting** 42:15 49:25 55:12 66:22
**consults** 86:8
**contact** 74:7,8
**contacted** 50:4
**contained** 96:18
**context** 86:15 127:21
**continue** 30:17,18 47:9 50:24 51:2 81:5 93:1 119:8
**continued** 38:24
**continuing** 39:7 103:2
**contractions** 105:11 112:7
**contraindicates** 118:19
**contrary** 44:14
**contributing** 95:1
**conversation** 19:3 32:7 50:11 55:11 70:22 134:4,20 135:2,7 137:15 139:2,7 140:7 141:1,9
**conversations** 72:9 95:23 96:9,12
**conveyed** 9:7
**copies** 108:10
**copy** 148:3,9,24 149:2
**correct** 19:13 23:12,15,25 29:8 35:19,23 38:3,19 39:1,12,15 40:23 42:6,24 43:2,3 45:1,17 46:9 48:19 49:4,17 51:4,6,12,13 53:5 54:22 56:20 57:5,8,10 58:21 60:16 61:4 62:2,20 63:7,8,9,20,23 64:20 67:1,9,16 68:4,20,24 70:18 72:18 75:3,16 77:11 79:5,17 80:13 81:3 84:13 86:16,17 87:8 88:22 93:6 94:13 96:20 97:2 98:21 100:5 101:12,13 102:18 104:13,20 105:11 106:4,23 107:1,11 108:1,6,23,24 109:3,7,8,11,12,15,21 110:12,17,21 111:15,20,21 112:13,22,24,25 113:8,22,25 114:4,13,16,21,22 115:1,2,6,17 116:21,23 117:13,14 118:5 119:5,15 120:6,25 121:2,5 122:16,20,21 123:8,19,25 124:7 125:15 126:5,6,9,10,13,14,16,17,21,22 127:23,24 128:23 129:11,13,19,20,22 130:23 131:12 132:12,13,16,20 133:25 134:18,24,25 135:3,4,9,11,24,25 136:6,9,14,19,23,24 137:12 138:24 139:3 140:2,4,10 141:4,5,15,23 142:9,14,21 143:19,22 144:1,9,10,21,22
**correctly** 21:15 37:1 42:1 94:10 109:2 118:17 123:15
**counsel** 9:16 10:23 12:11 84:9 97:23
**counsels** 10:11
**count** 23:20,23,24 24:2,4,7,9,10,11 37:12 41:16 50:22 55:1 57:18,20 59:18 60:6 61:3 62:4 63:11 78:1,4,6 87:23 109:2,20 125:21 126:7,19,20 127:22 128:4,18,21 129:3,4,9,13,21 130:4 136:5
**counties** 41:12
**counts** 63:13
**couple** 35:15 79:22 114:3 146:13
**courses** 32:15,25
**court** 9:2,3,11 138:10
**covered** 15:7

**created** 126:12

**creates** 127:2, 3

**CROSS-EXAMINATIO N** 103:24

**crystallizing** 132:10

**cure** 100:12,21

**current** 9:6 13:5 16:18 43:13 56:24 84:8 97:22 110:11

**cut** 22:18,24 118:24 122:18

**Cytotec** 25:4,6, 13 39:14 67:14 68:14 72:16 76:20 132:11, 17 137:22 140:3

## D

**D&e** 144:20

**D/b/a** 9:10

**dangerous** 69:12

**date** 76:15 77:14 79:4 88:20 118:16 146:15

**dates** 16:16

**day** 9:5 28:4,5, 6 31:25 48:23 50:23 51:9,12, 25 70:6 71:9 74:2 105:23 107:25 115:9 128:12,19 130:18

**day's** 128:2

**day-to-day** 127:16

**days** 25:24 62:1 63:13 71:23 81:6,20 108:25 130:13 140:9 146:13 148:20

**Dayton** 14:13, 14

**dead** 48:6

**dealing** 73:6, 19

**Deanna** 88:10, 18

**death** 41:18,25 42:3 51:10 62:24 64:7 68:12 100:16 137:4

**death's** 67:12

**debrief** 95:9

**decide** 98:16 101:16

**decided** 32:17 77:7

**decision** 33:11,20 47:3,8 77:3,9 133:14 141:2

**decisions** 43:1

**declined** 141:14,16

**decrease** 24:15 35:5

**decreased** 136:5

**decreases** 78:13

**dedicated** 124:14

**defendant** 98:1

**defendant's** 110:5 113:12 114:8 115:11 117:1,19 118:8 146:18

**defendants'** 108:14 146:24 147:1,3,5,7

**defer** 134:19

**definition** 99:2 143:10

**degree** 13:20 14:6 96:19 137:12 140:22

**delay** 26:25 87:25 89:10 90:19

**delayed** 26:25 90:14

**delaying** 90:5

**Delillo** 9:1 43:12 84:7 97:21

**deliver** 47:3,8 62:25 67:12 108:23 142:8

**delivered** 67:14 76:5,9 81:17 137:3,11 140:10,15,18 142:12 143:25

**deliveries** 61:22,24,25

**delivering** 19:22 44:17 48:3 63:19

**delivers** 75:24 81:17 141:19

**delivery** 44:1, 20,21 45:20 46:14 50:7,8 53:1 58:7,10 75:19 88:13,15 89:20 90:9,18 115:4 143:6 144:12

**demise** 93:22, 23 94:2,11 95:2 141:20

**demographics** 91:8

**dense** 48:12

**dependent** 67:20

**depending** 87:12 116:11

**depends** 30:15 48:2 52:8 54:6 81:16

**deposition** 9:7,24 11:10 17:18 43:11 55:22 77:18 79:20 83:12,15 84:6,12 97:7,20 149:15

**describe** 17:22 24:20 55:9

**describing** 40:5

**description** 121:12,22

**desire** 64:2

**destroy** 144:12

**destruction** 99:25

**detach** 21:22

**detail** 55:9 111:17

**detailed** 135:7

**detect** 22:8,10 24:16 80:3

**detected** 87:6

**Detective** 9:23

**determine** 23:16

**determined** 32:22,23

**developing** 81:5

**diabetics** 19:19

**diagnose** 23:7

**diagnosed** 109:10 130:1,6

**diagnoses** 21:12

**diagnosis** 22:16 23:1 93:20 109:14

**DIC** 41:17,20 51:10

**dictation** 64:24,25

**die** 81:9

**died** 94:11

**difference** 44:21 46:15 53:23

**differential** 22:16 126:20

**dilatation** 62:11 144:8

**dilated** 62:7 82:5

**dilation** 62:4,6 87:6 144:19

**direct** 10:25 49:12 100:12, 21 138:5

**directed** 75:2

**directive** 100:20

**Directives** 99:19

**directly** 13:24 86:22 99:23,25

**disagree** 96:19 129:16,24 134:24 143:9

**disappointed** 74:19

**discharge** 23:21 130:25

**discussed** 95:25 96:2 137:21 139:12

**discussion** 32:11 36:5 37:14,15,19 49:8 50:20 55:18 70:19 71:2 84:17 95:10,15 105:4

141:12
**discussions** 31:21
**disease** 131:18,19
**Disseminated** 41:21
**dissertation** 14:16
**distinguish** 24:1
**distress** 37:8 112:1,2
**district** 9:11,12
**division** 9:12 42:14
**doctor** 13:19 25:15 40:6 92:24 94:15 103:5 107:21 110:9 111:6,14 112:2 113:10 118:17 120:20 121:22 122:4 124:13 125:16 128:5,14 131:2, 14 133:18 134:11 135:20 138:1,12,22 142:5,11 144:7, 23 145:17
**doctrine** 40:6
**document** 18:2 111:12 113:16
**documentation** 114:19 119:13 134:8
**documented** 66:5 118:3,13
**documents** 17:17 146:8
**door** 67:12
**doubly** 17:3
**drugs** 68:16
**due** 60:18
146:15
**dying** 62:23
**dysuria** 114:12

**E**

**e-mail** 147:11, 13 148:13 149:5
**E-TRAN** 148:2, 5,25 149:4
**EA** 113:20 118:1
**earlier** 43:17 47:21 49:1 55:21 68:15 78:19 80:1 97:4 98:1,5 102:17 105:23 109:9 120:5 121:7 128:1 134:12, 17 140:8
**early** 32:3 64:3 127:3
**easier** 13:15
**Eastern** 9:12
**easy** 80:2
**educated** 140:17
**education** 13:18
**educational** 15:7
**effect** 25:14
**effects** 139:22
**efficient** 109:12
**either/or** 76:21
**Elaine** 117:11 118:1
**elected** 51:2
**elective** 99:1 100:24
**Electronically**
88:18
**elevated** 24:3, 7,8,10,11 41:16 55:2,6 57:22,25 59:19 62:3 63:13 87:22 109:1,20 127:4 129:9,13,21 130:3
**elicit** 113:7
**elicited** 113:5
**eliminated** 22:14
**elimination** 23:2
**Elizabeth** 18:14,15,17
**Ellina** 9:1 43:12 84:7 97:21 121:25 147:17
**Ellina's** 13:15
**eloped** 142:13
**elopement** 26:5
**emotional** 31:11
**emotions** 31:15
**employed** 102:24
**employer** 15:24
**encountered** 31:4
**end** 12:4 108:18
**end-all** 127:19
**endangering** 68:6
**ended** 14:18 28:14
**ends** 92:13
**ensure** 141:22
**entire** 124:7
**Epic** 113:15
**errata** 149:7
**essentially** 121:11 134:11 137:4
**ethical** 76:25 85:5 86:7 87:3 90:5
**ethically** 91:23
**ethics** 21:8 37:16 40:2 56:12 66:1,4, 10,13,17,19,22 67:2,21,25 72:21,25 76:19, 24 83:13 84:12, 16,19,24 85:1, 9,11 86:1,8 88:5,25 89:1,10 90:2 92:10 98:7,13,18 101:13 120:1 132:25 133:8
**evacuation** 144:9,19
**evaluated** 82:3
**evaluating** 65:22
**evening** 39:19
**events** 96:2
**eventually** 92:10,12
**everybody's** 121:23
**evidence** 102:4 103:9
**exact** 128:9 142:10
**exaggerations** 96:18
**exam** 83:4 112:5
**examination** 10:25 106:9 111:20,24
113:2 114:3
**examine** 107:24
**examined** 104:11,23 106:8,19 114:18 130:17 136:22
**exception** 81:15
**exceptions** 65:11
**excessive** 75:19
**excuse** 18:8 123:22 128:14
**exhibit** 34:2,3 38:5,6,13 42:9 55:20,24 69:1 75:5,7,11 77:21,22 78:2 85:18,19 90:3 99:5,7,10 108:14 110:5 113:12 114:8 115:11 117:1, 19 118:8 146:18,24 147:1,3,5,7
**exhibits** 146:10 147:13
**expect** 11:20 30:10 53:21 62:7 105:17 120:20 125:24 128:11
**expectant** 137:18 141:10, 17
**expected** 125:11 132:25 134:16 135:2,5 137:2,21 139:11 140:7 141:9
**experience** 26:23 60:3 130:2

**experiences** 72:9 95:19
**explain** 21:15 23:3 59:11 69:3 79:11
**explaining** 43:17
**extensive** 34:11
**extremely** 69:12 81:1

F

**faceless** 91:3
**fact** 10:14 39:6, 9 62:25 65:15 71:21 83:24 119:25 130:25 140:12
**factor** 46:22
**factors** 41:23 89:22 95:1
**failure** 122:8
**fair** 11:22 13:15 42:16 53:4 70:14 71:19 72:14 81:13 88:17 105:20 107:25 109:20 111:7 113:5,17 115:20,25 116:19 117:23 118:4 120:13, 22 121:12,22 122:6,9,13 123:2 125:14 127:5,6,19,20 128:16,22 129:7 131:20 133:1 135:17 136:2 137:5,22 139:5,8,12 140:23 141:11 143:3
**fairly** 68:17,22
**fairness** 134:11
**fall** 100:20
**familiar** 20:25 48:13,14 93:22 113:16 115:14 123:24 124:15
**family** 27:12
**farther** 47:10
**favor** 91:20
**febrile** 120:6
**federal** 138:9
**feed** 27:23
**feedback** 104:4
**feel** 67:23 68:5 71:10 91:22
**feelings** 91:24
**fellowship** 15:1,15 16:23
**fellowships** 15:4
**felt** 30:25 33:9
**female** 108:21 112:1
**fetal** 15:2 16:11,19,22 17:4,6 18:9 19:17 30:2 35:18 39:1,25 40:3 42:4 43:24 47:23 64:4,5 65:19 68:7,8,9 70:25 92:24 93:13,17 94:14 95:2 98:8 107:16,23 112:10 125:11 141:20 145:11
**fetus** 43:22 47:23 48:17 55:9 69:18 70:1 71:23 81:4 93:14 99:25 144:12
**fever** 23:19 69:6 120:8 123:18
**fight** 126:12
**fighting** 63:14
**filed** 144:16
**find** 133:18
**findings** 32:12
**fine** 11:19 81:11 123:10
**finish** 59:8 91:15
**finished** 16:23 17:1
**five-county** 41:14
**five-minute** 43:5 83:23 97:14
**fix** 12:6 13:11
**flesh** 109:24
**floor** 28:24 90:18
**flow** 117:23
**fluid** 23:10 24:16 29:18,21, 22,24,25 30:5 32:23 80:8,11, 19 81:4,9,10, 15,21 87:5 95:2
**fluids** 57:4 71:12
**flush** 109:4
**focused** 45:13
**folks** 53:7
**follow** 82:13 148:12
**follow-up** 145:23
**forbidden** 100:5
**force** 91:21
**Ford** 88:11,18 133:22
**form** 22:3 25:15 27:1 34:22 37:5 40:15 41:3 44:7 47:25 52:6 55:4 58:9 59:17 69:20 82:17 85:14 94:4 95:3,20 109:22 112:14 116:1 117:15 119:16 121:14 123:3 124:2 127:7 128:24 129:14 131:15 132:21 133:2 134:13 135:12 136:10, 15,25 137:6,23 142:15,22 143:7,20 144:2
**format** 95:14
**forward** 85:12
**found** 130:22
**foundation** 40:15 41:3 44:7 48:1 52:6 58:9 69:20 85:14 94:4 95:3 106:12 107:2 111:3 120:14 141:25 142:15, 23 143:7,20 144:2
**fractionated** 126:19
**frame** 140:8 142:10
**Fred** 10:1
**free** 15:12 67:23 145:21
**freeze** 13:9
**front** 38:12
**full** 10:8
**full-term** 61:24,25
**function** 108:13
**future** 70:13 71:15

G

**G2p0** 61:20
**gain** 33:12
**gathered** 33:24
**gave** 86:19 109:16 119:24
**general** 48:15 60:21 91:7 92:23
**generally** 14:8 40:2 65:10 66:21 69:9 92:1 125:4
**geography** 28:21
**gestation** 54:8
**gestational** 29:13 32:22 44:5 45:3 46:20 54:6 64:3 72:1 87:4,12
**gestations** 61:21
**give** 10:19 52:22 53:25 97:7 99:5 105:10 121:8 138:9 140:7,21 147:10
**good** 9:17 22:8 32:2,18,24 63:16 79:24 97:5 132:3 134:7
**graduate** 13:22 14:2
**graduated** 14:9,22
**grapevine** 74:3,9
**grapevines** 74:14
**Gravid** 112:5

**Gravida** 108:21
**great** 11:7,9 62:21 63:16
**greater** 51:14
**Greg** 10:4 26:13 138:16 145:24,25 146:4
**Gregory** 10:4
**group** 120:15
**guarding** 112:6,8,12,13, 22,24
**guess** 16:4 72:7 87:2 89:7 140:17,20
**guys** 83:14
**GYN** 93:7,8
**gynecologic** 93:11,12
**gynecology** 17:4 145:8

**H**

**hair** 30:2,5 82:21,24 83:1,5
**half** 128:6
**hallmarks** 120:4
**hand** 10:18 113:2,3
**hang** 34:6 52:3 83:14 149:12
**happen** 18:21 28:14 31:23 66:24 70:20
**happened** 26:19 50:18 107:13 128:7
**happy** 60:20
**harm** 87:25 134:5 139:22
**he'll** 148:19
**head** 82:20
**health** 9:9 10:1 15:2,17 51:5,7 141:3
**healthcare** 99:14
**healthy** 35:4
**hear** 11:2,5,24, 25 26:12 57:24 64:15 83:25 104:4 111:22 124:4 138:16 145:24 149:1
**heard** 49:10
**heartbeat** 31:1 39:25 40:3,21 42:5 47:23 48:5,9,19 63:1 64:5 68:8,9 69:18 70:1 85:7 94:20,22 98:9
**helpful** 23:20
**helps** 56:10
**hematocrit** 58:16 78:13,23
**hemoglobin** 58:16 78:6,13, 23
**hemorrhage** 41:17 42:2 68:6,11 70:2 141:23 143:19
**hemorrhaging** 62:23 87:16
**hesitation** 91:17
**Hey** 97:25 138:16 145:24
**HGB** 78:4
**high** 53:16 57:18,19,20 61:5 87:6
**higher** 24:5 51:21 58:17,18
**highest** 13:17
**highlighted** 134:2 146:12
**hindsight** 107:12
**history** 86:14 111:19 137:16
**hold** 56:7 80:15 102:3,4
**home** 52:3 54:9 70:20,24 92:12 141:20 142:3
**homestretch** 97:25
**honest** 46:9
**hop** 145:22 146:5
**hospital** 9:10 14:25 16:3,4,5 17:23 18:22,25 19:5,6,12 20:1, 3 26:5,8,9,22, 24 27:7 28:1,3 29:5 31:25 33:15,19,24 39:25 40:7 41:13 42:10,18 43:20 44:3 46:16 47:22 48:5,8,12,22 49:8,14 50:10 54:9 65:9 66:17,19 71:1,9 73:4,5,6,12,24 74:18 79:12,14 90:4,25 92:11, 13 95:10,19 98:3,15 100:25 101:20 102:12 103:8 104:13 107:7,11 108:10,12,19 110:4 111:16 113:11 114:7 115:4 116:25 117:18 118:6 122:25 123:25 124:7,13 126:1 130:12 133:20 136:1 141:21 142:13 143:5
**hospitals** 18:12 40:2 41:9 48:15 65:10 66:20 74:14 91:21 113:16
**hour** 114:4 118:15
**hours** 39:4 53:15,18 54:20 73:23 88:20 114:3 118:11 119:19 137:16, 17 140:9 141:22
**Hs** 58:1
**hydrating** 71:12
**hydration** 57:6
**hypothetical** 73:17 110:23, 24 111:12 117:16 119:17 127:8 129:15 131:7 132:1 139:17 144:4
**hypotheticals** 53:25

**I**

**ID** 10:11,12
**idea** 92:3,7,8
**identification** 34:4 38:7 55:25 75:8 77:23 85:20 99:8 108:15 110:6 113:13 114:9 115:12 117:2, 20 118:9 146:25 147:2,4, 6,8
**identified** 15:5 35:8
**identify** 13:3
**ignorance** 18:8
**ignorant** 97:9
**images** 82:14
**imagine** 27:9
**imaging** 22:1 24:16 83:1,9
**immediately** 72:18 141:21
**IMP** 61:10,12
**important** 29:20 47:7 122:25 135:22
**impossible** 89:24
**impression** 31:3,10,14,18 61:13,14,20 71:24 72:10 108:20 109:5
**in-depth** 135:7
**in-patient** 28:10
**inaccurate** 83:8 96:18 97:1
**Inaudible** 15:22 89:4 118:22 119:12 127:15 129:23
**incident** 95:11
**include** 36:24 65:6 90:9,10
**included** 124:17
**includes** 48:17 88:7 93:21
**including** 47:2 69:14 70:2 110:16 121:24 137:19
**Incomplete** 110:22 111:12 117:15 119:16 127:8 129:14 131:6,25 136:15 139:16
**increase** 139:18

**increased** 23:12 70:5 122:22 127:24 128:4 132:18 137:19

**increases** 78:12,25 132:15 139:14 140:3

**increasingly** 129:5

**independently** 55:18 82:5,9

**indicative** 123:18

**individual** 27:15 60:20 91:4,20,23

**induce** 24:21 36:18,20,21 48:6 76:3,9 77:4 144:18

**inducing** 40:25 88:7

**induction** 24:19 25:3 32:16 33:1,5 37:3 38:25 39:12,13,17,18 40:1,11,20 41:10 42:4 43:18 44:5,13, 22 45:5,14 46:4,13 47:10, 22 48:17 65:25 66:14,23 67:3 71:25 72:16 73:22,25 74:17 76:12,16,20,23 77:2,5,7,9 84:22,25 85:12 88:1,4,21,25 89:9,11,16 90:24 91:2,10, 18 92:10 98:8, 19 100:19 134:3,10 135:1, 3,8 137:18,19 139:1,12,19 140:14 141:2

**inevitable** 45:8

**infected** 51:22

**infection** 23:13,17 24:3, 12 51:10,16 52:15 53:12,16 54:5,24 63:14, 16 64:6 69:5, 15,18,25 70:11, 15 87:15,24 88:2 120:4,6 121:9,10 122:6 126:11,13 127:2,4 129:10, 19,22,24 130:7 131:3,4,23 136:19

**infections** 131:12

**inflammatory** 121:10 122:6

**information** 33:10,13,22,23 49:5 63:6,22 67:17 74:13 90:1,3 93:21 102:3,12 104:17,19 105:5,11,14 106:7 107:6,10 109:5,25 142:25

**informed** 42:10,12,13 51:4 74:11 92:14 134:4 139:6

**infrequent** 19:8 20:14 26:20

**initial** 116:13

**initials** 113:20

**initiate** 84:24

**initiated** 73:14

**initiates** 18:2

**inpatient** 20:14

**inside** 25:6

**instances** 102:23

**instructions** 75:18

**instruments** 144:12

**intact** 30:3

**intended** 57:6 99:23,25 128:1 134:6

**intent** 47:2,7,9, 11 134:9

**interaction** 37:23 106:8

**interest** 74:20

**intermittent** 119:5

**intern** 14:25

**interpretation** 83:9 111:8

**interpreted** 79:7

**interpreting** 20:22 58:25 104:12

**interrupt** 25:1 120:18 124:25

**intervention** 36:12

**interventions** 36:4

**intrauterine** 93:21,23 94:2

**intravascular** 41:21

**intravenously** 25:12

**introduced** 104:2

**involved** 21:8 67:25 91:1,9 93:6 101:14 104:7

**involvement** 95:8 104:5

**involves** 69:6

**involving** 102:13

**issue** 46:1,2 92:2 116:19

**issued** 133:23

**issues** 90:18 99:20 109:25 110:1

**items** 114:11

**J**

**job** 11:19

**Joe's** 18:16 110:10 123:25

**John** 9:8 10:9, 14 43:11 84:6 97:20

**joined** 12:13

**Joseph** 9:10 14:25 18:14 21:9 102:5

**Joseph's** 18:20 66:25 96:13

**Jr** 10:9

**judgment** 63:5 64:18 65:22 67:18 68:1 88:6

**Julia** 9:18

**K**

**Kasson** 71:5

**Kentuckiana** 9:3

**Kentucky** 9:5

**ketones** 115:17

**Khavari** 10:1 17:24 20:9 21:2 28:18 30:1 32:7 36:6 37:23 42:16 43:1 49:8,14 50:6,11 75:2 76:17 77:10 83:3 85:2 86:20 96:10 104:11,16 106:14,19 107:15,22 130:6,17 133:14 134:17 135:3,7 137:15 138:23 139:7

**Khavari's** 20:6,12 28:8, 15,20 29:7,11 31:4,7 33:15 36:1 38:18 104:8

**kicked** 98:17

**kidneys** 29:22, 23,24

**kind** 11:15 21:3 27:15 31:17 55:15 65:20 69:5 76:21 118:18 121:23 122:18 132:10, 23

**Kleinhaus** 9:17,18 10:15, 24 11:1,25 12:5,12,14 13:2 16:6 22:4 26:1, 12,16,17 27:4, 18 30:20 31:2 33:4 34:1,5,23 36:15 37:10 38:4,8 39:21 40:18 41:8 42:8 43:15,16 44:8 46:11 47:20 48:10 51:18 52:10 55:7,19 56:1 57:23 58:13 59:14,23 60:12 61:8 69:24 70:8 71:7,18 72:6, 13,22 73:11,20 75:4,9 76:14 77:20,24 78:20 79:10 80:25 83:14,18,20,23 84:1,10 85:17, 21 87:14,20 89:5,15,25

90:15 92:6,19 94:8,24 95:6,22 97:24 99:4,9 100:7 102:10, 22 103:4,7,14 104:6 105:22 106:12 107:2,4, 14 108:2 109:22 110:22 111:1,3,11 112:14 116:1 117:15 119:16 120:14 121:14, 17 123:3 124:2 127:7 128:24 129:14 131:6, 14,25 132:21 133:2,7 134:13 135:12 136:10, 15,25 137:6,23 138:3 139:16 141:24 142:15, 22 143:7,20 144:2 145:19, 24 147:12,17, 19,22,25 148:4

**knew** 20:9 49:9 64:18 84:18 97:10 107:5

**knowing** 65:12 71:8

**knowledge** 33:6,11 48:15

**L**

**lab** 123:24 124:6,13 126:3, 23 128:2

**labeled** 34:13 61:10

**labor** 24:8,21 32:5 36:18 37:8 38:25 39:8,12, 13 40:25 44:22, 25 47:1 50:6,8 51:23,24 52:1, 18,19,23 53:1, 6,16,19,21 54:4 58:7,10 76:3,4 77:4 88:13,15 89:20 90:9,18 115:4 144:18

**laboratory** 124:11

**labs** 50:21 123:23,24 128:3,12,13,14

**lack** 80:19 95:2

**lacks** 111:3

**large** 116:8

**last** 17:9,15 63:13 137:16, 17 145:1

**law** 15:11 97:10

**lawsuit** 11:17 18:2,3 95:18,25 96:10,13 97:4, 10 98:3 144:15

**laypeople** 78:15

**lays** 48:13

**leading** 121:17 138:6

**learn** 49:5 73:24 95:18

**learned** 49:1 74:16

**leave** 26:24 27:14 71:11,20 74:21 86:13

**leaves** 46:3 48:22

**leaving** 26:5 27:7,24

**left** 26:9,21 27:19,21 42:10 49:2 71:8 72:18 73:14,22,24 74:18,19 92:11, 14 107:11 140:18 142:13

**legal** 18:2

**length** 81:24 82:3,18,21

**letter** 98:3

**letters** 146:16

**leukemoid** 24:9

**level** 13:17 58:19

**licensed** 145:4

**life** 13:15 44:18,24 45:24 46:14,17,18 63:18 98:20 99:21 101:19 141:3

**life-threatening** 41:5

**likelihood** 107:24

**limit** 125:13

**limited** 22:13 98:24 139:19

**limits** 24:6 106:4 127:12

**Lina** 108:9

**list** 146:23

**listed** 68:2

**listing** 86:15

**lists** 87:3,4

**litigation** 102:3,4,12

**live** 108:23

**LLC** 9:10

**localized** 129:23

**located** 9:3

**location** 9:15

**long** 25:13,22 52:3 66:1,3 68:16 140:14, 19,22

**longer** 30:3 51:20 82:18

**looked** 35:17 49:24 72:15 133:10

**lost** 92:25

**lot** 13:15 20:15 30:13 52:8 73:8 90:13

**loudly** 83:25

**Louisiana** 14:15,17

**Louisville** 9:4

**low** 29:19,21, 24,25 30:6 32:23 51:22 60:15,16,17 78:7,8,17 80:5, 8,9 81:10,21

**low-grade** 136:18

**lower** 58:16,19

**Ls** 58:1

**lump** 131:19

**lumping** 116:5

**M**

**made** 15:14 33:20 119:23 133:17

**Main** 9:4

**maintain** 57:6

**make** 13:15 21:14 33:11 40:9 62:23 63:16 64:7 81:8 82:23 86:12 89:23 101:8 118:25 133:13 134:21 140:17

**makes** 12:17 46:15

**making** 25:18 42:25 60:21 77:8 133:14 143:17

**manage** 19:19 86:12

**management** 37:20 137:18 141:10,17

**manager** 86:23 87:1

**managing** 16:5

**March** 9:5 43:13 84:8 97:22

**mark** 34:2 38:5 55:20 72:1 75:5 77:21 85:18 146:9,17

**marked** 34:3 38:6 55:24 75:7 77:22 78:7 85:19 99:7 108:14 110:5 113:12 114:8 115:11 117:1, 19 118:8 146:21,24 147:1,3,5,7

**massive** 116:6

**master's** 14:12,13

**maternal** 15:2 16:11,19,22 17:4,6 18:9 19:17 35:18 39:1 43:24 65:19 92:24 94:14 107:16, 23 112:10 125:11 145:11

**matter** 9:8 92:23

**max** 11:8

**meaning** 18:2 23:23 104:16

**means** 80:8 94:10 108:21

**measure** 82:6

**measurement** 82:15

**measurements** 83:8

**measures**

36:3

**medical** 12:19 13:1,4,5,19,24 14:10,11,18 15:2,17 19:15 21:12,15 26:9, 24 27:20 33:22 34:10 35:24 38:21 42:11 46:2 48:23 49:2,16,24 50:15 52:24 63:21 71:9,22 72:16 74:10,20 77:16 85:25 96:23 100:4 110:8 111:7,8 120:15 123:1 126:1

**medically** 65:14 70:7 99:1

**medication** 25:7 68:22 135:6

**medications** 12:20 13:4 57:3,9 100:11 110:11,15

**medicine** 15:2 16:12,13,19,22 17:4,6 18:9 19:17 35:18 39:1 43:24 65:19 92:24 94:15 107:16, 23 112:10 125:11 139:21 145:4,11,15

**meds** 56:24

**meeting** 95:9

**member** 74:11

**membranes** 23:4,14 30:11 53:3,15 54:4,19 62:3 69:8 81:17 87:5 109:1 131:5,10,24

**memory** 29:1 35:25 49:23

**mentioned** 23:23 55:21 90:23

**Mercy** 9:9 10:1 14:25

**messages** 49:19

**met** 104:23

**method** 45:4

**methods** 24:20

**Metro** 15:2,17

**MFM** 35:18 38:24,25 39:11 53:10

**microphone** 47:16

**midwife** 86:24 87:2

**mind** 71:16 135:11,17 144:14

**mine** 96:22

**mine's** 56:13

**minimally** 51:24

**miscarriage** 62:10,12 70:24 87:10 92:12,14, 25

**miscarried** 70:20

**Misrepresents** 111:11

**Misstates** 47:25 59:17

**misunderstandings** 134:10

**mixing** 47:13

**modalities** 22:9

**modality** 22:8 109:12

**mom** 62:21,24 63:17 64:6 65:4,5,21 67:11 125:20 141:19, 20

**mom's** 63:18

**moment** 123:23

**moms** 142:3

**monitoring** 105:5 120:12

**month** 18:15 19:9

**Moschell** 10:2 20:25

**mother** 68:6 98:20,21 101:19 127:12

**mouth** 25:20

**move** 80:18 138:17

**moved** 15:18, 21 66:24 75:1

**Moving** 48:20

**MPV** 58:17

**multiple** 18:9

**muted** 75:10

**N**

**name's** 43:12 84:7 97:21

**nameless** 91:3

**names** 26:18 88:15 91:7

**narrowly** 45:13

**necessarily** 35:9 36:9 53:21 54:1 60:23 80:2 86:12 131:17, 20 136:12

**needed** 33:9, 12,21,22 85:9 104:17

**neglected** 69:2

**neonatologist** 43:25 44:1 105:1,3

**Neonatology** 106:25

**neutrophils** 126:25 127:1,4, 13,23 128:19

**news** 97:6

**Nicholas** 9:23

**NM** 86:22

**non-pregnant** 58:3,12,22

**non-tender** 112:6

**non-viable** 30:25 62:25

**normal** 24:6 29:18 58:3,12, 14,22 59:21 60:17,19 79:3 81:23,24 82:18, 21 106:3 120:25 121:2 122:16,17 125:1,13,20 127:12

**normals** 58:1, 2,3,5,6,21 59:2, 4,10 124:21 125:7,10

**Northern** 9:11

**note** 17:20,21, 25 19:8 35:24 38:18,21 41:15 49:24 50:2 55:20 56:11,16, 18 65:7 66:5 72:15 74:10 81:23 83:6 86:2,4,6 88:18 96:17 97:2 107:14,19 108:17,19 110:10 111:8 112:2 117:11 133:19,23,24

**noted** 71:22 117:13

**notes** 35:12 50:15 64:23 77:17 87:22 108:8 116:19 117:7 133:9

**notice** 31:15

**notified** 52:25 85:16

**notify** 18:22

**number** 9:12 20:12 23:18 27:12,21 69:10 100:20 118:14, 15 126:2 141:22

**numbers** 108:11,12 128:9 146:16, 20

**nurse** 20:25 55:14 86:22,24 87:1,2 88:14 91:4 113:19 118:12

**nurse's** 88:15 91:24 114:19 117:7,23

**nurses** 90:11, 23,25 91:8,17, 19 96:13,16 105:14,18,25 113:16 114:11 120:11,20 136:23

**nursing** 55:11 90:10

**O**

**oath** 135:21,24

**OB** 41:13 53:9

**OBGYN** 28:11

**object** 11:19 25:16

**objection** 12:22 22:3,5 25:15 26:10 27:1,8 30:14,22

33:2 34:22 36:14 37:5 39:20 40:15 41:3 42:7 44:7 46:6 47:25 51:17 52:6 55:4 57:21 58:9 59:13,16 60:10 61:6 69:20 70:3 71:13 72:2,12, 19 73:2,16 76:10 78:18 79:9 80:21 85:14 87:11,19 89:4,12,18 90:7 92:4,17 94:4,17 95:3,20 100:6 102:6,20,25 103:1,2,11,12 106:12 107:2 108:2 109:22 110:22 111:11 112:14 116:1 117:15 119:16 120:14 121:14 123:3 124:2 127:7 128:24 129:14 131:6, 14,15,25 132:21 133:2 134:13 135:12 136:10,15,25 137:6,23 138:9 139:16 141:24 142:15,22 143:7,20 144:2

**observed** 64:17 94:3

**obstetrician** 106:10

**obstetrics** 17:4 145:8

**obtain** 14:5

**obtained** 16:14

**obvious** 22:23, 24,25 23:1 67:6

**occasionally** 120:21

**occasions** 11:12 28:1 66:12

**occur** 80:22

**occurred** 23:8, 14 71:21 139:2 140:14

**occurrence** 19:10 26:20

**occurring** 39:10

**occurs** 93:2 94:11 127:1 134:3

**offered** 36:10, 13

**office** 10:3,5 18:23 28:8,11, 15,20,21,22 29:1,7,11 31:5, 8 32:8 33:15 36:1 39:5 50:8 104:8 106:15, 20

**Ohio** 9:12,24 14:7 15:3 145:5

**Oligohydramnios** 80:8

**one's** 78:7

**online** 9:2

**open** 30:5

**operated** 123:24

**Operations** 100:11

**opinion** 82:17 84:19 94:5 140:22

**opinions** 96:21,24

**option** 141:11 144:21

**options** 25:2 32:25 50:24 137:18

**orally** 25:8

**order** 25:7 40:25 41:1 75:13 76:2,11, 12,19,22 77:6 107:22 115:5 137:22 139:1,8 147:23 148:7, 17

**ordered** 115:9 126:20 141:2

**ordering** 76:17 77:9

**orders** 146:6 147:15

**organ** 122:8

**organs** 121:12 122:13

**originally** 18:13

**outcome** 44:2

**outlined** 72:14

**outpatient** 20:13,17

**overturned** 101:21

**overwhelming** 69:5 121:11 122:5

**owner** 16:5

**ox** 121:4 122:15 123:8

**P**

**p.m.** 9:6 12:8, 11 43:8,13 84:3,9 88:19 97:17,22 107:20,21 123:13 149:14, 15

**Pacey** 104:23, 25

**pad** 117:12 118:14,15 119:14

**pads** 118:15

**pages** 34:11 114:7

**pain** 109:18 110:2,15 112:4, 20 113:5,8,20, 25 114:12,16, 20 116:10 136:14,19,22

**painful** 96:6

**painfully** 67:6

**painless** 62:11 116:8

**pains** 136:16

**palpate** 112:21

**palpated** 112:7

**Pap** 130:6,18, 20 132:7

**Para** 108:21

**paragraph** 61:19 64:16 67:10 99:22 100:10

**parameter** 60:5

**parameters** 23:19

**part** 16:16 20:16,18 28:9 31:21 33:17 38:13 41:18 46:12 57:25 62:17 63:3,11 64:1 66:3 68:5 75:20 76:15 78:2 81:25 88:5,8 91:17 97:11 99:20 100:1,16 107:6 110:8 116:13 125:16 133:8 134:2

**participated** 104:11

**participating** 95:14

**particulars** 96:8

**parties** 10:13

**partner** 71:5

**pass** 81:22

**passed** 51:15

**past** 63:12 81:5

**Pat** 71:3,5

**pathological** 100:13,21 101:12

**patient** 19:7 20:6 21:23 23:13 30:4 32:17 37:6 39:16 44:25 51:25 62:17 63:6,15,22 64:1,19 67:13, 18 70:14,23 75:24 76:12,13, 22 81:16 82:4 83:4 88:1,4,7 92:24 95:11 106:2 110:11, 20 111:18 112:19 115:3, 22,24 119:20 120:6 121:9 122:12,25 126:11 127:2 141:4

**patient's** 27:5, 10 30:15 76:1,6 115:15 121:12

**patients** 17:11 19:15 20:3,13, 15,17 21:12 26:5,8 52:2,23 58:11,12,15 65:21,23 70:9 135:10,16 139:25

**pay** 15:13

**PDF** 148:1

**pending** 9:11

**people** 19:19 24:8,9 25:23,24 26:21 27:19 30:16,18 36:22 45:9,12 53:2,4 60:3 81:10

89:21 91:22 96:1
**percent** 78:25 80:5 121:5 122:15 123:8 145:14
**percentage** 132:6
**perception** 27:5
**perfect** 10:7,17 13:16 146:14 147:9 148:5 149:10
**perform** 20:21 36:18 37:9 40:3 66:21 144:19
**performed** 32:21 35:21 36:4,12 44:19 47:23 79:6
**performing** 20:18 46:13
**period** 48:9,16 136:2,4
**permission** 26:22 66:9 68:19 72:20 73:8 85:9
**permitted** 100:1,14
**person** 31:17 37:16 77:8 78:17 144:18
**personally** 85:3
**perspective** 68:21
**pertain** 54:1 60:19
**pertains** 54:2
**Ph.d.** 14:16,20
**PHI** 26:15
**phonetic** 64:8
**photos** 93:16
**physical** 111:20,24
**physically** 113:2
**physician** 18:22 42:17,25 64:10 65:7,24 86:13,19 88:6 104:20 111:6 112:21 134:18, 23
**physicians** 87:24 88:6 106:7 115:5 124:19
**physiological** 58:20 60:18 78:14 112:20
**physiologically** 127:1
**Pitocin** 25:4,10 26:2 39:14 67:15 68:14 72:16 75:13,22, 25 76:5,16,17, 20 77:2 132:11, 14 137:22 139:14
**place** 19:24 20:1 51:24 119:1,2
**placement** 68:17
**placenta** 21:17,22 22:21, 25 93:5 119:9
**placental** 21:16,25 62:19 79:25 109:7,10, 18 114:25 115:24 119:12 132:15,19 137:20 139:15 140:4 142:6,7, 20
**plaintiff** 11:17
**plaintiff's** 9:16 34:3 38:6 55:24 75:7 77:22
85:19 99:7
**plan** 55:15,16 67:5,7 68:2 72:14,17 73:14 134:9 135:17
**point** 16:14 22:22 30:12,21 31:25 32:5,16 33:12 39:7,13, 19 40:25 42:2 44:22 51:5,8 54:21,24 55:2 62:8 80:11,17 88:7 89:8,17 90:6,20 94:21 95:9,15 101:21 122:23 134:21 139:25 140:13 141:14
**policy** 40:4 41:10 48:12,13 73:4,13 98:12, 14
**poor** 45:4,5,7, 10,16
**populated** 110:9
**portion** 34:10 99:18
**portray** 96:23
**positive** 66:17 87:2 124:9 130:22 132:7
**possibility** 54:24 67:25 107:16 141:10
**postpartum** 75:18,23 76:2, 12,17,22 77:2
**postponed** 100:14
**potential** 87:15
**potentially** 109:20 134:6 141:9
**practice** 15:19, 20 16:8,10,11, 14,17 19:18,21,
24 28:9 50:14 125:16 127:16 145:4,15
**practiced** 53:9
**practicing** 53:9
**practitioner's** 28:11
**predict** 44:2 70:12 71:15,16 72:4
**pregnancy** 21:12 24:3,4 30:17,19,21 39:24 40:8,10, 21 41:1,6 44:14,20 45:19, 21,23 46:15,16 47:12 48:4,9,16 50:21,24,25 51:3 58:2,4,17, 18,20 59:2,5 60:4,16,18,23 61:1 62:8,25 65:9 78:11,14, 24 79:3 80:12 85:8,10 94:3,16 98:16,25 99:24 100:5 101:10 108:22 125:6, 10 134:7
**pregnant** 24:5 35:5 58:11,14 76:13 78:17 100:13,22 101:12 106:2 124:15,19 125:14 129:12 132:6
**premature** 21:17,19,22 62:3 87:4 109:1 131:4,9,24
**prematurely** 63:15
**prematurity** 36:7
**preparation** 17:17 55:22 56:19 77:17
**prepare** 110:10
**prescribe** 77:1
**prescribed** 75:23
**present** 16:21 35:21 36:6,9 40:3 48:19 131:24 144:13
**presented** 17:14
**preserve** 103:9
**pressure** 19:20 34:15,21 35:2,5,6 106:2
**preterm** 24:22, 23
**pretty** 50:2 120:13
**prevent** 12:21 13:6 134:5
**previa** 22:21
**previous** 128:2,12
**previously** 88:23
**primarily** 18:14 19:17 86:11
**primary** 18:13 25:5 46:21
**prior** 20:4 21:7 139:7
**Prislipsky** 9:25 10:16 12:3 22:3 25:15 27:1,8 30:14,22 33:2 34:22 36:14 37:5 39:20 40:15 41:3 42:7 44:7 46:6 47:25 51:17 52:6 55:4 57:21 58:9 59:13,16 60:10 61:6 69:20 70:3

71:5,13 72:2, 12,19 73:2,16 76:10 78:18 79:9 80:21 85:14 87:11,19 89:12,18 90:7 92:4,17 94:4,17 95:3,20 100:6 102:25 103:11, 17,20,25 104:1 106:13 107:8 108:4,9,16 109:23 110:3,7, 24 111:2,5,13 112:16 113:10, 14 114:6,10 115:8,13 116:3, 24 117:3,17,21 118:6,10 119:21 120:17, 19 121:19,21 122:2,3 123:6 124:3 127:9 128:25 129:17 131:11,21 132:5,22 133:4 134:15 135:15 136:13,20 137:1,9,25 138:8,11,16,20, 21 139:24 142:4,19 143:2, 12,23 144:6 145:17 146:7, 11,17,20 147:9 148:6,7,10,23

**private** 15:19 16:8,10,11

**privy** 55:16

**probability** 137:12 140:22

**problem** 13:10 58:1 90:12 98:22

**problems** 19:20 48:7 98:23

**procedure** 93:12 100:4 101:8 134:5 144:20

**proceed** 10:23

12:11 43:14 66:9 84:9,19 85:9 97:23

**proceeding** 67:12

**process** 19:4 24:19 86:18 144:13

**produced** 129:5,7

**production** 148:13

**products** 70:25

**professional** 145:14

**prognosis** 32:2,24 45:1,4, 6,7,10,13,15,22 46:4 47:5 52:20

**program** 14:12

**prolonged** 93:21,25

**proper** 82:16

**proportionately** 100:12

**provide** 105:14 146:20

**provided** 99:15 149:5

**provider** 18:13

**providers** 105:10 134:8

**providing** 12:21 13:6

**publish** 17:5

**published** 17:9

**pull** 82:14 91:19

**pulse** 69:9 121:4 122:15 123:8

**purpose** 40:11 100:4,12,21

**purposes** 21:19 113:3

**pursue** 14:15

**pus** 69:8

**put** 45:25 47:15 83:11 90:16 110:3 113:2 127:20 131:22 133:20 138:14, 18 147:20

**putting** 66:11 72:25 76:24 90:17 113:3

**Q**

**question** 11:20 12:16,23 22:6 27:3 31:6 32:18,19 40:17 44:1 46:8,9 59:25 69:23 81:12 85:5 87:3 89:7,14 91:7,15 94:6,22 111:2 121:15 122:1 127:10 130:5 132:4 138:6,12, 15,19 140:21 142:18

**questioning** 103:3

**questions** 11:16,18 12:25 21:11 24:18 35:15 79:23 98:6 103:15 105:23 112:8 121:19 126:3 132:9 138:7 145:18 146:1,2, 3

**quick** 12:6 43:4

**quickly** 25:23 68:18 70:10 81:18 123:2 142:3 146:6

**quote** 109:19

**quoted** 114:25

**R**

**Rachel** 9:18

**radiologists** 79:14

**Raines** 10:1

**raise** 10:18

**range** 59:2,4,9, 11,12,25 60:9, 22,25 78:9,11 125:13,20

**ranges** 60:19

**rapid** 70:16,17

**rare** 81:1 101:19

**rarely** 80:22

**re-ask** 122:1

**reached** 71:25

**reaction** 24:10 74:16,22

**read** 35:14 56:4 79:13,18,22 109:2 118:16 123:14 134:2 148:19 149:4

**realistic** 43:23 80:20

**reality** 73:18

**realize** 67:6

**reason** 24:7, 11,13 27:22 37:4 39:17 40:24 45:25 53:11 76:7 77:1 89:10 90:5 96:6 101:9

**reasonable** 64:3 140:22

**reasoning** 76:25

**reasons** 27:11, 12,13,22 29:21 53:12 89:16 90:13,19 122:24

**rebound** 112:6,8,12,13

**recall** 29:9,15 31:7,9 50:3 51:2 83:1,7 95:14 128:8

**receipt** 148:20

**receive** 13:20 71:11 98:2 102:2,11

**receiving** 27:6

**recently** 66:15

**recess** 12:9 43:9 84:4 97:18

**recognize** 64:4

**recognized** 65:8

**recollection** 28:25 49:25 128:6

**recommend** 33:5 88:6 134:7 144:8

**recommendation** 54:13 65:24 67:11,13,22 77:5 101:15 120:2 134:22 144:14

**recommendations** 86:12 133:17 143:17

**recommended** 68:2 73:25 88:20 89:9

**recommending** 65:13 67:7 88:1 100:19 101:9,10,11

**record** 10:8,12 12:5,7,10 43:7, 10 84:2,5 96:23 97:14,16,19 105:24 110:8, 19 111:7,8 145:22 147:15 149:6,11,13

**recorded** 113:25 123:18
**recording** 111:7
**records** 19:3 21:15 34:10,11 50:15 71:23 77:16 85:25 120:15 126:1
**red** 115:20,22 118:4
**reduce** 75:25 76:5
**reference** 59:11,12,25
**references** 127:15
**referring** 84:21
**refers** 61:20
**refilling** 80:20
**regard** 37:24
**regular** 19:15 148:2
**regularly** 120:13
**related** 21:11 27:7 35:7 37:16 77:17 95:19 98:3 99:13 102:4,12 103:9
**relationship** 21:3
**reliable** 22:10
**remainder** 19:14
**remaining** 23:11
**remains** 70:25
**remedial** 21:13
**remember** 16:15 20:8,15 21:10 29:3 31:18,24 32:10, 13 55:18 67:4 82:5,9,11 86:9 95:13,21 102:15 103:13 104:8 107:17 128:8 142:10
**remind** 11:15
**reminding** 12:16
**remotely** 9:19 10:2
**Renee** 12:12
**rephrase** 44:10 137:7,10
**rephrased** 135:20
**report** 93:13,20
**reported** 110:21 114:15 130:9,11,13
**reporter** 9:1,2 10:7,10,17,23 12:2,7,10 16:2 43:7,10 47:15 84:2,5 97:16,19 145:22 146:5, 14,19,21 147:12,18,22 148:2,5,9,12, 17,24 149:4,10
**Reporters** 9:3
**represent** 29:4 34:9 39:3 73:21 92:9 93:19 96:15
**representing** 9:3,22,25
**represents** 126:8
**requires** 144:10,11
**research** 17:5
**reservations** 44:4
**resident** 14:24
**resolved** 85:6
**respect** 138:13
**response** 11:23 32:13 64:12 68:13 69:16 98:6 106:16 112:20 121:10 122:6 124:1 147:11
**responsibilities** 42:15
**responsible** 77:8
**rest** 18:14 105:19 123:10
**result** 57:15 79:4 100:15
**results** 20:23 57:14 59:7,8 79:7 130:20 137:17
**resuscitation** 64:2
**retained** 93:4
**return** 149:9
**returned** 48:23 110:17 143:4
**reveal** 26:11,15 116:20,22
**revealed** 130:6
**review** 17:17 19:2,6 38:12 50:15 77:16 110:10 111:19 117:7,8,23
**reviewed** 17:19,24 18:1 36:3,8 38:23 55:22 56:18 63:6 79:16 86:4,6 106:23
**reviewing** 84:13
**reword** 81:7
**Rickert** 9:19
**rigidity** 112:13
**ring** 42:23
**risk** 23:12 36:7 37:19 41:17 42:2,4 51:11, 14,21,24 53:12, 16 54:5 62:21 63:16 68:11 70:5 71:10 87:6,15 122:22 132:15,18 137:19 139:15 140:3
**risks** 51:5,7 52:15 69:19 70:2,4 87:17 98:20 131:3 132:11,14,17 137:19 139:12
**robot** 65:1
**Roe** 101:21
**role** 16:18 18:10 93:1
**roll** 59:22
**room** 55:14
**Rossi** 10:4,5 12:22 25:19,21 26:10,14 71:3,6 83:16,24 89:4 102:6,8,20 103:1,5,12 121:23 138:14, 18 146:1 148:17,18 149:2,7
**rotate** 18:15,16
**routine** 76:22 115:5
**RRG** 112:11
**rule** 81:15
**rupture** 23:3, 13 52:9,12,13, 17,18 54:8 62:3 69:7 87:5 109:1 131:4,24
**ruptured** 29:25 30:4,9,11 32:3 51:20 52:1 53:3,15,18 54:3,15,17 63:15 81:17 130:25 131:10
**ruptures** 53:20 54:7

### S

**safely** 100:14
**safety** 141:4
**sample** 125:5
**saturated** 118:15 119:15
**save** 36:24 44:17,24 45:20, 23 46:14,17,18 63:18 98:20 101:18
**scant** 118:4
**scenario** 53:19
**scenarios** 47:14
**school** 13:25 14:10,18 15:11
**screen** 34:6 75:6 108:13 133:21
**scroll** 34:12 56:5 57:11 79:21 85:24 99:12
**scrolling** 58:19
**Secours** 9:9 16:1,3,4 18:5 102:24
**secretary** 18:22,23,24 50:9
**section** 34:12 35:12 36:25 37:9 61:9,17 99:19
**seek** 52:24
**send** 53:1,10 54:9 146:12,22 149:6,7

**sense** 12:17 62:23 63:17 64:7 92:2 118:25

**sensitive** 31:17

**sentence** 137:4

**separate** 46:1

**separately** 121:25

**separation** 21:17

**sepsis** 41:17 42:2 63:18 68:7,11 69:1,3, 5,10 121:7,8, 13,18,22 122:4, 5,8,20

**September** 29:6,7 48:21,24 50:1 54:18 84:15 88:19 89:9 92:21 96:17 97:1 104:6,22,24 105:18,25 106:9,20,23 107:1,20,22,25 108:18 109:5 110:16,21 111:9 113:21 114:19 115:9 117:5,10 118:1 119:23 120:11, 22 122:19 126:4,24 128:15,20,21 130:10,11 132:10,24 137:4,11 142:7, 8,12,13 144:17, 23 145:1

**septic** 122:12, 22

**services** 99:14

**set** 23:17 51:16

**severe** 70:2 80:7,19

**Severely** 80:9

**sexually** 130:7 131:2,12,18,19

**share** 34:6 75:6 108:13

**sharing** 37:22 42:9 68:25 77:12 89:7 90:22 102:2 123:23

**sharp** 136:16

**sheet** 149:7

**sheets** 117:23

**shift** 70:10

**short** 133:24

**shorter** 82:18, 19

**show** 34:1 38:4 55:19 58:4 75:4 77:20 85:17,25 99:4 108:18 113:11 115:25 122:23 133:8 144:15

**showed** 105:22 107:14 133:7 146:8

**showing** 37:8 51:23 122:20

**shown** 141:11

**shows** 34:18 63:17 64:6 75:13 105:24

**shrink** 75:25

**shunts** 122:12

**shut** 25:20

**shuts** 121:11

**side** 20:14 46:2 83:11 139:22

**sign** 63:14 79:25 85:1 89:1 105:22 114:24 127:4 149:5

**signature** 149:8

**signed** 88:10, 18 89:10

**significance** 30:7 39:6 82:2

**significant** 22:12 41:4 109:18,19 115:1 116:10 136:8,12 143:19

**significantly** 115:23

**signs** 37:8 51:23 63:18 64:6 87:24 88:25 105:13, 19 106:1 109:6, 16,17 120:4,5, 12,21 122:20, 23 123:7,11,22

**similarly** 118:11

**simply** 68:23

**sir** 11:9 12:15 13:17 34:7,24 36:16 39:22 44:9 51:19 56:2 77:25 78:21 85:22 99:10 100:8 104:9,14, 18,21 105:12 106:17 108:5 111:22 112:17 118:24 119:5, 23 123:15 124:4,25 129:1 130:14,16 133:5,21 141:6 142:10 144:20

**situation** 20:11 21:7 22:17 25:2 28:1 36:19 50:1 66:11 67:3,19 73:18 90:2 101:19

**skill** 144:10

**slack** 47:19

**slightly** 24:5 55:6 57:25 59:19

**slow** 119:9

**small** 39:9 62:18 116:7 118:20,21 119:5,6 143:11

**smear** 130:6, 18,21

**smears** 132:7

**social** 21:3 72:24

**soft** 112:6

**solemnly** 10:18

**solo** 15:20

**Solon** 9:24

**somebody's** 71:16

**sonographers** 79:13

**sooner** 53:10

**sort** 65:21 95:9

**sorted** 99:6

**sound** 81:8

**sounded** 54:19

**Sounds** 149:10

**source** 74:13

**speaking** 138:9

**special** 144:10, 11

**specialist** 16:12,13 43:24 112:11

**specialists** 18:9 125:12

**specific** 52:14 53:22 61:2 69:23 98:12,14 113:20 125:6, 10

**specifically** 27:25 79:18,19 110:14 124:14 126:25 127:18

**specify--** 24:24

**specimen** 130:22

**specimens** 124:7,14

**spectrum** 83:4

**speculate** 72:8

**speculation** 27:8 107:4 108:3 111:4 123:4 132:1 133:3 140:20 141:25 142:16, 23 143:8 144:3

**speculative** 69:21

**spelling** 149:12

**Spence** 12:12

**spend** 21:4 145:13

**spent** 88:12

**spoke** 55:8 86:22 106:22, 25

**spoken** 83:12 138:23

**spontaneous** 87:7,9

**spot** 65:20 82:16

**St** 9:10 14:25 16:4 18:14,15, 16,17,20 21:9 66:25 96:13 102:5 110:10 123:25

**stable** 70:6,10, 15 144:24 145:2

**staff** 55:12 74:10 95:10 98:17

**staffing** 90:17

**stage** 81:5

**stamped** 108:10
**stand** 61:12 63:9,24 64:21 78:5
**standard** 73:9 144:17
**standpoint** 72:17
**start** 40:1 41:22 42:4 61:3 69:3 71:25 76:20 77:7 88:25 108:7
**started** 14:12, 18 16:25 39:18 43:18 72:17 73:1,4,22,25 74:17 77:6 89:17 92:11 104:2 135:6
**starting** 9:15 72:15 147:16, 23,24
**state** 9:14 10:8 14:15,17 31:11 145:5
**statement** 36:2 60:22 82:7 104:15 127:19 137:13 143:10
**states** 125:20
**status** 13:5
**stay** 54:9 122:25 141:21
**stayed** 15:17
**stays** 24:6
**step** 21:2
**steps** 67:8 122:5
**Stewart** 9:8 10:5,7,9,14,17 11:2 43:11,17 47:15 84:6 97:20,25 103:21 104:1 108:17 145:20
148:18 149:9
**stick** 21:14
**sticking** 82:21, 25 83:1
**stipulate** 10:12
**stop** 37:22 41:6 42:9 43:4 45:23 46:14,16 47:11 48:3 50:24 60:14 68:7,8,9, 25 69:15 77:12 85:7 89:7 90:22 102:2 119:10 123:23
**stopped** 94:20, 22
**stopping** 48:8 56:23 85:10 98:25
**stops** 64:5 119:7
**story** 46:19 47:13 52:13 73:6
**Street** 9:4
**strike** 24:2 37:15 94:25 124:12 128:12
**subcategory** 114:23
**subspecialties** 145:10
**suddenly** 101:16
**sued** 96:2,4 97:5,7 102:18
**sugar** 115:17
**suggested** 85:13
**suggesting** 59:1,3 101:5 102:1
**Suite** 9:4
**summarizing** 138:4
**supports** 88:5
**supposed** 21:22
**surgeries** 93:10
**surgery** 93:7,8
**surprise** 125:19
**surprised** 31:19 36:12,19, 22,25 125:6 127:11
**surprising** 35:3
**survivability** 45:22
**survival** 43:21, 23 64:4
**survive** 40:13 45:2,10 46:22 81:14 135:23 137:12
**Suzanne** 10:2
**swear** 10:18
**switch** 26:4
**symptom** 62:12 114:24
**symptoms** 35:7 62:9 64:17 86:15 87:17,22 94:2,15 109:17 111:19 113:8 122:20
**sync** 148:11
**systemic** 129:23
**systems** 111:19

**T**

**T-E-C-H-S** 49:15
**takes** 25:22 53:17
**taking** 17:11 72:23 110:15, 20 111:9 124:19
**talk** 13:13,14 19:7 26:7 62:5 69:2 104:5 106:6 110:1 120:3,11 121:25 126:18 142:5
**talked** 31:24 47:21 68:10 97:25 107:15 121:7 140:25
**talking** 20:4 24:22 30:1 69:7 83:14,24 84:11 106:18 115:24 121:23 126:4 129:3 144:16 145:25
**Talks** 99:21
**teaching** 44:15 72:24 99:22
**team** 33:22 37:20 71:24
**tear** 119:8
**tech** 28:19 35:21
**technician** 9:2
**technologist** 14:11 49:22 74:12
**technologists** 20:20 49:17
**techs** 49:7,9, 15,16 79:7 82:12
**tells** 29:23 30:2 110:11
**temperature** 120:24 123:11, 12
**temperatures** 123:17
**ten** 11:13
81:14,19
**tender** 113:4
**tenderness** 113:1
**term** 24:22 40:10 93:22
**terminate** 41:1,6 65:9 98:16 100:5 101:10 134:6 141:3
**terminating** 45:19
**termination** 39:24 40:10,21 43:19 44:14,20, 22,23 45:21 84:20,21 90:12, 24 99:24
**terminations** 40:3,8 48:16 65:13,16 66:21
**terms** 31:15 53:22 62:5,23 66:22 68:1 69:2 90:1 96:1 97:9 112:11 139:19
**Tess** 103:1
**Tessa** 26:10 71:3
**test** 116:20 132:7
**testified** 49:1 68:15 98:5 102:16 135:21
**testimony** 10:19 12:21,24 13:6 44:12 48:1 59:17 86:19 88:24 96:16 135:24
**testing** 137:17
**tests** 23:9
**text** 49:18
**texts** 49:18
**that'll** 13:15

**theory** 138:4
**thereabouts** 107:21
**Theresa** 9:18
**thing** 17:19 62:13 65:14 84:23 140:25
**things** 11:15 13:9 27:13 31:18 46:3 69:10 70:15,16 82:13 90:13 91:22 110:9 115:16,19 122:11 139:10 144:7
**thinking** 27:10 71:19 72:4
**thought** 31:12, 19 33:21 35:3 83:24 97:5 98:1 143:1
**threshold** 30:23
**till** 62:24
**time** 9:6 12:7, 10 16:14 17:25 18:10 19:14 21:4 22:22 25:16 28:3,12 31:25 33:12 41:5 43:7,13 44:23 51:15 57:4 62:8 63:19 64:17 68:1,16 70:5 77:3 79:19 84:3 88:8,13 94:21 97:16 101:21 103:22 105:19 122:23 132:3 133:24 135:11,14,18 136:4 140:8 141:14 142:10 143:4,25 145:14,18 148:4,15,21 149:13
**time's** 84:8 97:22
**timeline** 25:25 48:20
**times** 36:17 53:2 71:22 83:12 88:24 137:3
**timing** 25:25 52:9
**TOCO** 105:6,10
**today** 9:2,5 11:16 12:21 13:6 17:18 20:5 43:12 56:19 77:18 83:12 84:8 97:21 104:2
**told** 26:6 32:1, 11 50:9 82:12 83:3 96:1 103:8 104:6 109:9 133:22 134:17 138:22 144:20
**Toledo** 10:6 15:22,23,25 16:18
**Tom** 9:25 104:1 122:1
**top** 56:5,9 57:14 78:2 86:2
**topics** 26:4
**totally** 62:12
**touch** 74:5
**trained** 25:19
**training** 15:8 90:3 130:2
**transabdominal** 79:5
**transcript** 146:15 147:24 148:1,19
**transcripts** 146:7 147:15
**transmitted** 130:7 131:2,12, 18,19
**treat** 40:11
41:1 101:11
**treated** 93:5
**treatment** 27:6 30:11 31:22 32:15,25 33:1 42:17 67:8,12 68:12 71:12 73:14 87:25 88:7 90:5 134:9 135:17
**treatments** 100:11
[redacted]
**tricky** 13:9
**trimester** 25:1 106:3 125:20 127:11
**trip** 29:11
**trouble** 73:9
**true** 60:23 66:19 81:10 82:7 106:15 109:2 129:10 134:12 135:8 139:15 140:1, 16
**truth** 10:20,21
**tumor** 22:19
**tumor's** 22:23
**turbidity** 115:16
**turn** 11:4 70:16,17 104:3 114:23 132:10, 23 143:19
**Turning** 27:25
**two-day** 136:2
**Tylenol** 110:16,20 111:9
**type** 22:16 64:23 86:6
102:3,11
**typical** 28:9 142:2
**typically** 10:10 18:16,18,23 19:2 23:7 24:16 51:22 52:17 54:7 64:23 75:24 76:5 97:12 109:13 117:7,22 124:23 125:1, 23 126:11 131:8

**U**

**U.S.** 99:13
**UC** 13:22 14:23
**ultra** 79:13
**ultrasound** 19:18,24 20:1, 16,18,19,20,21, 23 22:1,7 23:11 28:19,20 29:2, 3,13,16 32:8,21 33:14 35:8,22 39:6 42:20 49:17,22 74:6, 12 77:14,17 79:5,6 80:3 82:6,9,11,12 83:9 104:12 106:23 109:11
**ultrasounds** 19:18 20:2
**unanswerable** 131:16
**unborn** 100:15,16
**uncommon** 135:16,18
**undergrad** 13:24 14:3,9
**undergraduate** 14:5
**Underneath** 78:4
**understand** 11:20,21 16:7 27:2 40:4,16 44:11 45:12 46:8,12 47:6 48:11 67:24 90:16 94:10 100:3 101:17 116:18 118:23 119:22 125:12 128:10 133:12, 16 135:19 136:21
**understanding** 21:14 37:1 40:9,12 42:1 45:2 47:21,24 66:8 75:22 82:24 85:4,15 94:25 98:11 101:18 104:10 106:25 121:8
**understood** 38:14 41:16,17 44:12 86:14 98:6,19
**underway** 84:17
**unexplained** 26:25
**unique** 65:20 66:20
**unit** 115:5
**University** 13:21 14:7,13, 14,15,17,19
**unstable** 70:10 123:1
**untreated** 87:16
**unusual** 35:4 53:17 78:22 81:3,19
**Uptodate** 125:17,19 127:10,11,14, 18
**urgency** 37:4

**urinalysis** 115:6,8,14,20, 25 116:20

**urinating** 114:13,16

**urine** 80:14 115:15,17 116:11,13,16

**uterine** 75:20

**uterus** 21:18, 23 75:25 94:11, 12

**V**

**vacuum** 101:2, 15,23

**vagina** 22:19 23:22 25:6 69:9 116:15 132:2

**vaginal** 87:5 118:2,13

**vaginalis** 129:18 130:1,8, 23

**vaginally** 132:18

**vague** 52:7 69:21 89:13 96:1 128:6 131:15 137:24 138:1,12

**values** 58:12, 14,25 59:21 124:17 125:3 126:23

**veins** 79:2

**verbal** 11:23 64:12 68:13 69:16 106:16 124:1

**version** 148:1

**viability** 30:24 99:24

**viable** 30:21 47:24 48:18 99:25 100:15 126:7

134:6 144:14, 21

**video** 9:2 148:3,6,9,25 149:4

**videoconference** 9:7 43:12 84:7 97:21

**view** 39:17

**Vincent** 16:4

**violating** 73:3

**visible** 80:14

**visit** 29:9 34:21 35:25 37:11 73:23

**vital** 105:13,18, 22 106:1 120:12,21 122:12 123:7, 11,21,22

**Vitals** 34:13

**vocabulary** 98:24

**volume** 11:4 78:12 104:3

**W**

**Wade** 101:21

**wait** 62:24 63:17 71:25 141:22

**waiting** 64:5 67:11 68:6

**walk** 19:1

**wanted** 30:16, 18 37:6 39:17 43:21 50:7 101:8 135:23

**Warren** 9:10, 22 15:21 18:5 21:9 28:13 41:9,12 66:25 96:13 144:11

**wash** 116:12

**watched** 87:24

**water** 23:5 30:3 52:2,23 53:1,5 54:20

**Watt's** 128:21

**Watts** 9:8,20 11:17 12:13 20:5 21:7 26:7 27:25 31:3 35:25 37:17,24 38:1 40:12 41:2 43:1 48:21 50:12,16,19 55:8 66:12 67:3 69:17,19 70:20, 23 71:8 73:24 74:17 84:15 86:16 87:16 92:11 96:17 100:19 102:13 103:10 104:7, 11,12,17,23 105:4,17 106:8, 20,22 107:1,11, 24 108:20 109:6 110:1,15 111:9 113:8,21, 25 114:3,12,15, 20 115:10 118:2 122:19 123:18 127:22 128:5 129:25 130:17 135:8, 21 137:16 138:24 139:7 141:4 142:8 143:17 144:8, 16,23

**Watts'** 34:10 42:17 50:1 55:12 73:15 75:1 95:19 125:21 128:18 136:5 144:18

**Watts's** 20:10 25:2 77:13 91:1 93:4 95:8 102:5 105:11 106:1 117:12 120:12, 21

**wave** 13:10

**WBC** 57:17

**wearing** 119:14

**weeks** 29:17 30:23,24 52:1, 12,13,20,21 53:18,20 54:8 62:1 71:23 81:6,11,14,20 98:8 108:25

**weird** 54:19

**Well-developed** 111:25

**well-documented** 134:4

**well-nourished** 111:25

**West** 9:4

**whichever** 139:21

**white** 23:20,23, 24 24:2,4,7,8, 10,11 37:12 41:16 50:22 55:1 57:18,20 59:18 60:6 61:3 62:4 63:11,13 78:1,4 87:22 109:1,20 125:21 126:7,8, 12,16,19,21 127:3,22 128:4, 18,21 129:3,4, 6,7,9,13,21 130:3,21 136:5

**William** 10:9

**wishes** 30:16 50:21 51:1

**withdraw** 120:17

**woman** 100:13,22 101:12 125:14 129:12

**womb** 40:13

45:3 46:3,23 48:18 81:14

**women** 124:15,19 132:7

**wondering** 98:2

**word** 32:10 80:7 93:20

**words** 61:19 70:14

**work** 14:8 15:12,16 21:5 68:16

**worked** 79:11

**worker** 17:12

**working** 29:22, 24 37:3 113:15

**works** 25:23

**worse** 51:25 70:16

**would've** 29:4, 6 36:5 39:5,13, 14,23 43:19 79:6,7,11,12,13 98:17 125:21 138:23 140:7, 14,15,23 141:1, 8,11

**write** 19:7

**writer** 17:13

**written** 107:15, 22 137:22

**wrong** 58:5,6 59:9 60:8 79:8 123:12

**wrote** 17:25 104:15 133:23

**Y**

**year** 13:22 14:2 26:21

**years** 14:12 17:9,15 18:6 31:13 113:15

128:6

**young** 35:4

**younger** 31:13,14,20

**Youngstown** 9:10 10:3

**Z**

**Zach** 9:21 103:17 146:1

**Zoom** 9:24 12:13 13:8 95:14

**Zupko** 10:2