Case: 4:25-cv-00049-SL  Doc #: 113-4  Filed:  08/07/26  1 of 36.  PageID #: 6208

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


BRITTANY WATTS,

    Plaintiff,

vs.                                        Case No.

BON SECOURS                                4:25-CV-00049

MERCY HEALTH, et al.,              Judge Sara Lioi

    Defendants.


- - - - -

Deposition of

BRITTANY WATTS,

called for examination under the Applicable Rules
of Federal Civil Procedure, taken before me,
Julieanne Ross, a Registered Professional Reporter
in and for the State of Ohio, pursuant to notice
and agreement of counsel, at the offices of
Mazanec, Raskin & Ryder Co., LPA, 34305 Solon
Road, 100 Franklin's Row, Cleveland, Ohio, on
Thursday, October 23rd, 2025, at 10:36 a.m.

- - - - -

Deposition of Brittany Watts                                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

record real quick.

            (Discussion had off the record.)

            MR. PINZONE:  Okay, we can go back on.

BY MR. PINZONE:

Q.    All right.  Have you at any point in time been diagnosed with any type of learning or mental disability?

A.    No.

Q.    So prior to your miscarriage, my understanding is the first time you would have gone to the hospital and sought any type of medical help would have been around September 19th, 2023; is that correct?

A.    That's correct.

Q.    Tell me what prompted that visit.

A.    I was sitting in my living room.  We have two living rooms in our home, there was an upper and a lower living room.

            I was sitting in the lower living room and I experienced spotting.  Because I had gotten up and went to the restroom to use the restroom as normal, and I looked behind me and there was spotting.

            And I called the ObGyn and I scheduled an appointment with her.  And during that time when I was scheduling the appointment I was also

Deposition of Brittany Watts                     Brittany Watts, vs. Bon Secours Mercy Health, et al.,

experiencing some -- the urgency to have to use
the restroom.

          But that's when I realized, okay,
something is definitely wrong.  But it wasn't like
urine, it was whatever -- it was the fluid.

Q.     Okay.  Okay.

A.     That's what I realized now, that it was the fluid.

          So because it just -- it felt like I had
to use the restroom, but it was, like, not
actually using the restroom.

          So when I did call her I was very
adamant about having to make an appointment with
her to rectify the situation.

Q.     All right.  What was the name of your ObGyn?

A.     Parisa Khavari.

Q.     And this all would have happened on the same day
that you actually went to the hospital that
September 19th?

A.     Yes.

Q.     And would this have been the first indication to
you that there's something going on here that's
not normal?

A.     Yes.

Q.     Based on some of the symptoms you've described for
me, would that have indicated to you at that point

that you might have been pregnant?

A. Yes, yes.

Q. So where do you go to see Dr. Khavari?

A. I go to the -- she had a practice that is -- that was located behind the hospital in a medical building.

Q. Got it.

A. They were in the same parking lot.

Q. So when you first go and you schedule the appointment you're going to her actual office that's in the same area?

A. Yes, yes.

Q. Did you talk to anyone about the appointment before you went?

A. No.

Q. How did you get there?

A. I drove.

Q. Were you by yourself?

A. Yes.

Q. So tell me what happens once you get to Dr. Khavari's office.

A. Okay. I check in and I'm waiting a couple of minutes to be called back. And she calls me back and she has me sit on the table and she does the sonogram.

And upon looking between my legs she said that she can see the head.  And she tells me that, "You're a lot farther along than what you're assuming."  And she said, "You're about five months."

And I'm just baffled.  I'm just beside myself.  Because I had no other symptoms, no other wherewithal to say that, "Oh, well, I'm this far along."

Like, I wasn't showing anything.  And she said, "Well, we can see the head."  And that's when she had me go over to the hospital.

But I didn't drive over to the hospital.  Like I said, it was in the same parking lot.  They took me over by ambulance --

Q.    Okay.

A.    -- to the hospital.

Q.    Okay.  So at this point in time this is the first, the first actual confirmation --

A.    Yes.

Q.    -- that you're pregnant, right?

A.    Yes.

Q.    So tell me what happens once you get to the hospital.

A.    I am taken to labor and delivery, but not rushed

to labor and delivery. I was just taken at normal speed.

And they had me -- they hooked me up to an IV. And I had not seen Dr. Khavari for the rest of that time until maybe after 4:00 or 5:00 o'clock, after her office hours. But they had been in contact with her, but no actual thing -- no actual work was done.

Q. **So with all those circumstances though you ultimately get to labor and delivery, right?**

A. Yes.

Q. **Okay. And can you tell me who were the medical folks that are giving you some treatment once you get there?**

MS. RICKERT: Objection to foundation. You can answer.

A. Okay. I don't remember their names exactly, but I do remember there were quite a few, quite a few young women that were on the floor that day.

Q. **Okay. Was there any specific doctor that saw you that day?**

A. Other than Dr. Khavari, no.

Q. **Okay. And you don't recall any of the names of the nurses at that point?**

A. No.

A.   Yes, after hours of waiting, yes.

Q.   Was there an instance where you actually did get to speak with Dr. Khavari?

A.   I spoke to her briefly.  And after hours, like I said, after hours of waiting I got frustrated.

Q.   Okay.

A.   I did express to her my frustration.

Q.   What did you specifically tell her as far as I'm frustrated right now?

A.   I told her that I was in a lot of pain and I just felt like if you had brought me over here in an emergent situation I felt like you could have been more present.

Q.   All right.  And what was her response to that?

A.   She told me that she had other patients to see and it was during office hours.

Q.   All right.  So at some point in time you leave the hospital; correct?

A.   Yes.

Q.   Okay.  Tell me, describe the steps you took in leaving the hospital.

A.   I unhooked myself from the IV and I got -- I went down to the elevator.  I got in my car and I left.

Q.   Did you have to put your normal clothes on?  Were you in a gown before that?

floors.

Q.    Okay.  And at that point in time, again, you had not informed your mom that you were pregnant; correct?

A.    That's correct.

Q.    All right.  So there was then a second visit to the hospital; is that correct?

A.    Yes.

Q.    All right.  Can you tell me when that was in relation to the first visit?

A.    That was the following day.

Q.    And tell me what motivated that visit.

A.    Because I wanted to see if there had been any resolve as to my prior visit, to see if there could be any action taken instead of me sitting and waiting like I did the previous day.

Because she knew I had been there.  She knew what the situation was.  So I wanted to see if she was going to act on anything that she was telling me.

Q.    Okay.  And so when you go to the hospital the second day --

A.    Yes.

Q.    -- do you initially go through the emergency room?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    And where do they take you once you're at the emergency room?

A.    Up to labor and delivery.

Q.    Got it.  And do you recall the nurses who were present the second time that you were at the hospital?

A.    No.  The only nurse that I recall is the nurse from the third day.

Q.    Okay.  Did you have an opportunity to speak with Dr. Khavari the second time you went to the hospital?

A.    Not until later on, again, that afternoon.  But they did inform her that I did come back.

Q.    I'm going to back up real quick.

      During the first visit was there an ultrasound done?

A.    At her office, yes.

Q.    Okay.  And did you have an opportunity to view the ultrasound?

A.    No, I did not.

Q.    Was there ever an ultrasound done while you were at the hospital?

A.    No, I do not remember that.

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q.     When you had the opportunity to speak with Dr.
Khavari the second time you were there, can you
tell me what was discussed?

A.     They had taken the decision to induce my labor,
but that wasn't actually done.  But they were
waiting for a decision from an Ethics Committee to
do the procedure.

Q.     Okay.  Do you remember anything else about that
discussion with Dr. Khavari?

A.     No.

Q.     Okay.  At some point you -- well, let me ask you
this, were there any other medical services
provided that you can think of during that second
stay at the hospital?

A.     No.

Q.     You ultimately decide to leave the hospital again?

A.     Yes.

Q.     Okay.  Tell me how you did that.

A.     The same way that I left the previous day.

Q.     Did you fill out some paperwork?

A.     No.

Q.     No paperwork this time?

A.     No.

Q.     Did you speak with anyone --

A.     No.

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q. -- letting them know that you were going to leave?

A. No.

Q. And so since this was the next day, would this have been around September 21st?

A. Yes.

Q. Okay.

MR. PRISLIPSKY:  Wait, second day that she was there?

Q. So when were you admitted through the ER the second time?  What day were you admitted?

A. That was the 21st.

Q. That was the 21st?

A. Yes.

MS. RICKERT:  I think it was the 19th and then the 20th.  The second day was the 20th.

A. Yes, yes.

MR. PRISLIPSKY:  Yes.

Q. For the second day?

A. Yes, yes.

Q. Okay.  Fair enough.

MS. RICKERT:  The records will show one way or the other.

Q. Yeah, all these dates are part of the record, so --

A. Yes, yes, understood.

And once I got to my appointment my friend said, "You don't look good. You're going to go to the hospital. I'm going to call for you to get to the hospital."

And once I got to the hospital, that's when the police showed up to my house. And that's when I was questioned by Officer Carney while I was tethered to my hospital bed and my IV.

Q. Okay. So I'm going to back up a little bit. Okay?

A. Okay.

Q. All right. So you wake up, it's early in the morning; correct?

A. Yes.

Q. And you're in pain and discomfort; correct?

A. Yes, yes.

Q. Now, you were aware before this that there's potential for miscarriage --

A. Yes.

Q. -- based on your hospital visits; correct?

A. Yes.

Q. Okay. So you went to the toilet because of cramping?

A. Yes.

Q. Okay. And then I think you said you thought you

Q. were going to have a number two?

A. Uh-huh.

Q. Would I be correct in stating that after the splash you realized that you had miscarried?

A. Yes.

Q. Okay. So at that point in time you're aware that you miscarried?

A. Uh-huh.

Q. You're light-headed and you lay down on the floor. Is that accurate?

A. Yes.

Q. All right. Was your mom home at that point in time?

A. She was.

Q. You didn't indicate to your mom --

A. No, no.

Q. Okay. What was the reason for not getting your mom's help?

A. Because I still at that point had not expressed to her that there was no pregnancy.

Q. All right. And were you concerned about her finding out about the pregnancy?

A. That's correct.

Q. So after a couple times back and forth on the toilet because you were still bleeding; correct?

A.    Correct.

Q.    **And you said at one point you actually looked in the toilet and you saw blood?**

A.    Yes, blood.  Yes, blood.

Q.    **All right.  You saw blood.**

**Did you see anything else in the toilet?**

A.    No.

Q.    **At some point you tried to flush the toilet; correct?**

A.    That's correct.

Q.    **All right.  Tell me approximately when you would have tried to flush the toilet.**

A.    Immediately after I wiped and thought that I had enough wherewithal to get enough blood off of me that I could, you know, function.

Q.    **All right.**

A.    Then I flushed the toilet.

Q.    **Okay.  My understanding is you also used a plunger after you flushed the toilet?**

A.    That's correct.

Q.    **What was the reason for using the plunger?**

A.    Because there was so much blood and matter in the toilet, that it was not going down.

Q.    **Okay.  So I take it when you flushed the toilet it backed up and started going up; correct?**

A.    Yes, but not overflowing.  It did not overflow.

Q.    Okay.  It didn't overflow --

A.    No.

Q.    -- but it got higher; correct?

A.    Yes, that's correct.

Q.    And then you used a plunger to try to get it down?

A.    Correct.

Q.    Did you get any of the water and materials down in the toilet?

A.    Yes.

Q.    All right.

      Okay.  You talked a little bit about your clean-up efforts.

A.    Yes.

Q.    You were cleaning yourself up first it sounds like?

A.    Yes.

Q.    All right.  And then you went ahead and you cleaned up the bathroom area?

A.    Yes.

Q.    Okay.  Did you call anyone during this period of time?

A.    No, no.  I didn't even scream because I couldn't. And not because I didn't want to wake anyone, it's just my body went into complete shock.

Q.   Okay.  How long was the period of time between the miscarriage and when you went to your appointment?

A.   That was a matter of maybe two hours.

Q.   Two hours?

A.   Yes.

Q.   Okay.  What was your appointment for?

A.   I had a hair appointment because I had an event later on that afternoon.

Q.   Who was your hair appointment with?

A.   Her name is Helen.

Q.   And where is her location?

A.   She actually lived right around the corner from me in Warren.

Q.   Was it a house or --

A.   Yes, she has.

Q.   Do you know her address?

A.   No, no.

Q.   Is she still there?

A.   Not that I know of, no.

Q.   What was her last name?

A.   Jethroe.

Q.   I'm sorry?

A.   J-e-t-h-r-o-e.

Q.   Do you know if she is still in the Warren area by any chance?

on the floor or on the toilet.

Q.    All right.  Did she indicate that she was going to do any additional clean-up?

A.    No, no.

Q.    How far is the -- oh, any other discussions that you can recall with your mom about the miscarriage?

A.    No.

Q.    Okay.  So how long does it take your mom to drive you to the hospital?

A.    About 15 minutes.

Q.    All right.  Were you still bleeding at that point in time?

A.    Yes, yes.

Q.    All right.  You were able to converse with your mom though, right?

A.    Yes, yes.

Q.    All right.  Were you able to physically get up and actually move yourself into the hospital?

A.    Yes, yes.

Q.    All right.  And I take it they bring you to --

A.    Labor and delivery.

Q.    Got it.

A.    Immediately.

Q.    Immediately?

A.    Yes.

Q.    Were you able to walk up to it?

A.    Yes.

Q.    Okay.  Tell me what happens once you get to labor and delivery.

A.    I am brought into labor and delivery.  I am hooked up to IVs and given fluids, because they could obviously see that I was in dire distress.

And I'm sitting there waiting and I'm not aware of what's going on downstairs, if my mother had left or if she had stayed there and waited or anything.

But my phone went off saying that there was a notification that somebody was in the driveway, but I'm not sure who it was.  So that really didn't make any difference to me.

So when I was able to get to my phone I seen that there were police officers in my -- in my driveway and all over the yard.

Q.    Let me ask you a quick question.

A.    Okay.

Q.    And I think I know the answer, but I assume that there's some sort of Ring camera or --

A.    Yes, that's correct.

Q.    And you can actually see on your phone when

Q.    Okay.  Four cars.

Would the video have captured, you know, what the officers were doing?  Does it have that wide of a view?

A.    Yeah, they were walking.  It would show them walking about the property, the front of the property.

Q.    Okay.  What type of camera did you have?

A.    It was a Vivint camera.

Q.    What was it called?

A.    Vivint.

Q.    Vivint?

A.    Yes.

Q.    And based on what you were seeing you believed your mom was home at that point in time?

A.    Yes, yes.

Q.    Anything else that you recall seeing on the video?

A.    No.

Q.    And you couldn't hear anyone talking through the video?

A.    No, no.  But I was wondering why they were there, because I had not known that the nurse called the police.

Q.    Okay.  Did you ask the nurse after you saw that?

A.    Yeah, I asked her why they were there because I

wasn't -- she was the only one that knew that I was there, so -- and my mother didn't mention anything about being in distress or anything.

So that brought me to, "Well, she called the police.  The nurse called the police."

Q.    Okay.  Did you actually speak with the nurse about that phone call?

A.    I didn't ask her why.  I just mentioned to her that they were there and I was wondering why they were there.

Q.    What was her response?

A.    She -- I don't remember what she said, but it was to the fact that, "Well, we need to find the remains."

Q.    Okay.  Okay.

How long between when you saw that video and when Detective Carney arrived?

A.    Maybe 30 to 45 minutes.

Q.    30 to 45 minutes.  Okay.

A.    Yes.

Q.    Did you have any discussions with any medical providers about Detective Carney coming to talk to you?

A.    No, no.

Q.    Okay.  So describe for me what type of room you're

Q.    Okay. Anything else?

A.    No.

Q.    So I take it though, and some of these might sound a little silly, but at no time did Detective Carney physically abuse you in any way?

A.    No, no.

Q.    Okay. Did he ever threaten you?

A.    No, not at all.

Q.    All right. Did he ever yell or swear at you?

A.    No, no.

Q.    In fact, have you ever listened to the tape-recorded interview?

A.    Briefly.

Q.    Okay. And you would agree with me that during that discussion he was asking you questions trying to get clarification in regards to what happened to the fetus; correct?

A.    Correct.

Q.    Okay. And Nurse Moschell was there, too; correct?

A.    Yes, she was; correct.

Q.    And she was also asking you some questions about that?

A.    Yes, yes.

Q.    Okay. Was there anything that you would have stated to Detective Carney that you believe would

for both parties just using numbers.

MR. PINZONE:  Just using numbers?

MR. KASSON:  Right.  So then, yeah, we just use numbers, so at trial when we submit a joint set, which the judge will want us to do, they would be numbered and they would match up with the numbers we used in a deposition.

If we didn't submit a 3, that would be fine, right.  It's so much easier.

MR. PINZONE:  I'm fine with that.

(Discussion had off the record.)

(Thereupon, Exhibit 1 was marked for purposes of identification.)

Q.  You've been handed what's marked Defendants -- I'm sorry, Exhibit 1.  Take a look at that.  I've just got a couple quick questions for you.

A.  Okay.

Q.  With Exhibit 1 do you recognize that as the Miranda warnings that you would have put your initials and signature on?

A.  Yes.

Q.  All right.  And this is what Detective Carney would have handed to you while you were in the hospital; correct?

A.  Correct.

Q.    Am I also correct that Detective Carney actually walked you through these verbally?

A.    Correct.

Q.    At any point during your conversation with Detective Carney at the hospital did you ever tell him that you did not want to talk to him?

A.    No.

Q.    All right.

A.    I was scared to do so.

Q.    Okay.  Tell me again why you were afraid to do so.

A.    Because he's a police officer.  And from what I understand about police officers they can be very aggressive.

Q.    Okay.  Now, we talked before during this conversation with him he never became aggressive with you; correct?

A.    Right.  But, I mean, if I did disagree, I wouldn't know what the repercussions would be to disagree to talk to somebody.

Q.    Regardless, you did not at any point in time ask --

A.    No.

Q.    -- Detective Carney?

A.    No.

Q.    -- to leave?  Okay.

MS. RICKERT:  Let him finish his question before you answer, just for the court reporter's sake.

THE WITNESS:  I'm sorry.

**Q.     And you made -- and you signed this --**

A.     Yes.

**Q.     -- Exhibit 1 knowingly and voluntarily; correct?**

A.     Correct.

**Q.     Do you recall when he was actually -- Detective Carney was going through the Miranda warnings with you, at one point he actually said since you were receiving some medical care, if you told him to stop he would leave?**

A.     Yes, I do remember that.

**Q.     So what I'm going to do, I'm going to first -- and we will mark, end up marking this as Exhibit 2. This is the recorded interview.  Okay?**

**I'll play it on my computer and then I will give it to the court reporter as the exhibit. I think I've got additional copies here.**

(Thereupon, Exhibit 2 was marked for purposes of identification.)

MR. PINZONE:  And this is what would have been produced in Discovery.

MS. RICKERT:  Oh, I have that.  I

Q.   And I can play it for you, too.  Whatever you feel more comfortable with.  But if you look at the bottom of Page 3 going on to 4 --

          MS. RICKERT:  Page numbers are up there(indicating).

A.   Okay.

Q.   And you can even read through Page 5.  So if you look at Pages 4 through 5 -- they are at the bottom.  I'm sorry, I should have told you that.

A.   Oh, you're fine.  You're fine.

Q.   Or, I'm sorry, in the top right-hand corner.

A.   Yeah, yeah, top right.

Q.   Those would be from -- actually 3 through 5, that would be where you're talking a little bit with Detective Carney about your dad being a Warren PD officer?

A.   Yes.

Q.   And you guys actually talk about knowing some of the old police officers that he used to work with?

A.   Yes, yes.

Q.   Did that help put you at ease?

A.   A little bit, yes.

Q.   All right.  I think if we were to look in this, too, at some point you do say, "Hey, I'm a little nervous."

A.  Yes.

Q.  But you also said, "It's okay, he's nice", about Detective Carney; correct?

A.  He seemed nice.  But now that we're here, you know, just to be honest.

Q.  All right.  Well, again, at that point in time --

A.  Yeah.

Q.  -- you expressed you were nervous; correct?

A.  Yes.

Q.  And then someone asked if you wanted to keep talking, and you said, "It's okay, he seems nice."

A.  Yes.

Q.  All right.  So without having to review the entire transcript --

A.  Okay.

Q.  -- I'm going to ask you some general questions about what you recall.  Okay?

A.  Okay.

Q.  You would agree with me that throughout this conversation you would have told Detective Carney that you did have a miscarriage; correct?

A.  Yes.

Q.  You would agree with me that you would have told Detective Carney that the miscarriage happened on the toilet; is that correct?

A.    Correct.

Q.    Okay.  You also would have told Detective Carney that you flushed the toilet and then plunged the toilet; is that correct?

A.    Correct.

Q.    Okay.  There was some difficulty explaining where the fetus might be, whether it was still in the toilet or thrown out by a bucket; correct?

A.    Yes.

Q.    Okay.  Tell me what you recall telling him about the bucket and your maybe lack of knowledge about what you were throwing out in the bucket.

A.    Well, when I was scooping I didn't see anything in the toilet because there was blood everywhere.  It was bright red.

      And I was in the state of delirium.  I was never unconscious.  So from my point of view it was just water and blood and tissues that I was throwing away.

Q.    All right.  Okay.

      There was a point in time though during your interview with Detective Carney and as stated by Nurse Moschell, you understood that at that point in time you were far along enough in your pregnancy where it would be a fully formed fetus;

got down to the police station.

I never got booked.  I never got fingerprinted.  I never went through the normal course of being arrested.

So I was just -- I sat in a room and I went -- I remember going before a judge for an arraignment, I believe that's what they called it.  Yeah, I went for an arrangement.  I pled not guilty.  And they let me go.  He let me go.

And I went home with my mother because she followed behind in her car.

Q.    Got it.

So, and this all happened in --

A.    The same day, yeah.

Q.    -- the same day.  Okay.

So from the time he picked you up until you were released, how long do you think that was?

A.    Maybe an hour.

Q.    About an hour.  Okay.

A.    Yes, yes.

Q.    Did he explain to you why you weren't going to go through the normal booking process?

A.    No, he never said why.

Q.    And so when you said you were sitting in a room, where were you sitting in a room at, if you know?

hospital, "You're not in trouble and you're not under arrest."

Q.    Understood.

After the miscarriage did you have any other conversations with any type of police officer, official employee from the City of Warren?

A.    No, no.

Q.    Did you ever have any conversations with a prosecutor about the case?

A.    No, no.

Q.    Did you have any conversations with any medical providers about the criminal charge?

A.    No.

Q.    Did you ever review a police report?

A.    No.

Q.    You wouldn't have any knowledge of communications between Detective Carney and a prosecutor; correct?

A.    No, I would not.

Q.    All right.  Did you attend a preliminary hearing in Municipal Court?

A.    Yes.

Q.    At that point in time you were represented by an attorney; correct?

A.     Correct.

Q.     And what was the name of the attorney?

A.     Her name was Traci.

Q.     Okay.  Is that Traci Timko Rose, if you know?

A.     Tarci Timko.  I'm not sure.

Q.     Yeah, I might have known her as Traci Timko Rose.

A.     Okay.

Q.     But it might be just Traci Timko now.

A.     Yes.

Q.     So you were present for the preliminary hearing; correct?

A.     Yes, yes.

Q.     And you were able to observe and hear witnesses?

A.     Yes.  That was November the 2nd.

Q.     November the 2nd of?

A.     That same year.

Q.     That same year, 2023?

A.     Yes, yes.

Q.     Okay.  So during that preliminary hearing there were witnesses that were presented; correct?

A.     Yes, yes.

Q.     They were under oath?

A.     Yes.

Q.     And your attorney had an opportunity to cross-examine them; correct?

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A.    Yes.

Q.    Okay.  Do you remember Detective Carney testifying?

A.    Yes.

Q.    All right.  What do you recall about Detective Carney's testimony?

A.    I remember she asked him a series of questions.  I don't recall what his answers were.  But there was one point when he got off of the stand, I heard him say, "I'll do it again."

Q.    Okay.  Was this while he was still testifying or while he was stepping down?

A.    While he was stepping down.

Q.    Okay.  Do you know who he directed that comment to?

A.    My attorney.

Q.    Okay.  And --

A.    But I heard him say it.

Q.    You heard him say it?

A.    Yes.

Q.    And do you know what he was responding to?

A.    I don't know what she said to him, but that's what stuck out to me, for him to say that he would do this again.

Q.    Okay.  Did your attorney make any response?

MS. RICKERT:  Objection to form and foundation.

A.    Yes.

Q.    **All right.  And you can understand how someone would think that a baby ten inches long that you felt enough to name, being halfway flushed down would be an inappropriate way to treat that baby's body?**

MS. RICKERT:  Objection to form and foundation.

A.    Yes.

Q.    **And you could see how some folks might think that, right?**

A.    Correct.

Q.    **All right.  And, in fact, you probably think that in looking at it in retrospect, don't you?**

MS. RICKERT:  Objection to form and foundation.

A.    Yes.

Q.    **Okay.  You wish you hadn't have flushed the baby down, don't you?**

MS. RICKERT:  Objection to form and foundation.

A.    Yes.

Q.    **Okay.  Let's talk about the folks at the hospital.**

The nurses, had you ever met any of those nurses before, the nurses you've sued?

A. No.

Q. Had you -- how long have you known Dr. Khavari?

A. Well into any teenage years.

Q. Okay. And Dr. Khavari had always been good to you?

A. Yes.

Q. You liked Dr. Khavari?

A. Yes.

Q. You can't think of any reason Dr. Khavari would want to hurt you, can you?

A. No.

Q. Dr. Khavari always seemed like she cared about you?

A. Correct.

Q. And do you still see Dr. Khavari?

A. No.

Q. Do you have any reason to believe she developed -- strike that.

Do you have any reason to think Dr. Khavari didn't like you for some reason?

A. No.

Q. Okay. And the nurses, not having ever had any relationship with them previously, do you have any

reason to think they were out to get you?

A.   No.

Q.   Okay.  Do you have any reason to think that any of the folks at the hospital that you had never met before were out to get you?

A.   No.

Q.   Okay.  And in that meeting where Nurse Moschell was in there with the detective, it was clear in that meeting that all they were trying to do was trying to find out where the baby's body was?

          MS. RICKERT:  Objection to form and foundation.

A.   Correct.

Q.   Right.  And you would want them to find the baby's body, wouldn't you?

A.   Yes.

Q.   And you had no reason not to try to help them find the baby.  Fair?

A.   Fair.

Q.   And what they were doing if I recall from the recording is they were asking you questions and then the detective was on the phone with somebody at the scene trying to direct them somewhere to find the baby, right?

A.   Correct.

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q.    And you wanted to help them find the baby in that meeting, right?

A.    Correct.

Q.    Because you knew it was the right thing to do to try to find the baby?

A.    Correct.

Q.    And you knew it was the right thing to do to try to find the baby even though you didn't know what the laws were, right?

A.    Correct.

Q.    For example, did you know that Ohio had a law that requires a baby over the age of 20 weeks who dies to have an autopsy?

            MS. RICKERT:  Objection to foundation and form.

A.    No.

Q.    And without knowing the law though, you still knew it was the right thing for somebody to go try to find the baby, right?

A.    Correct.

Q.    All right.  And -- but at the time you came to the hospital for that third time after the miscarriage, had you told any law enforcement that you had had a baby at your house?

A.    No.

CERTIFICATE

The State of Ohio,    )
                      )                SS:
County of Summit.     )

       I, Julieanne Ross, a Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the witness, **BRITTANY WATTS**, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

       I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

       I do further certify that I am not a relative, counsel or attorney for either party, that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D), or otherwise interested in the outcome of this action.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Stow, Ohio, on this 4th day of November, 2025.

_Julieanne Ross_
Julieanne Ross, Notary Public
in and for the State of Ohio
My commission expires:
December 29, 2029.



**Julieanne Ross**
Notary Public
State of Ohio
Recorded in Summit County
My Commission Expires
December 29, 2029