IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

HON. JUDGE SARA LIOI

CASE NO. 4:25-CV-00049

BRITTANY WATTS,

Plaintiff

V.

BON SECOURS MERCY HEALTH;

MERCY HEALTH YOUNGSTOWN

LLC D/B/A ST. JOSEPH WARREN

HOSPITAL, ET AL.,

Defendants

DEPONENT:  NICHOLAS CARNEY

DATE:      DECEMBER 15, 2025

REPORTER:  MADISON BOOKS



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Correct.  It is my report.

Q.   Okay.  And is it your understanding that reports -- the reports you wrote during an investigation were turned over to the prosecutor and the criminal defendant?

A.   Yes.

Q.   Okay.  And all of your recordings, video or audio, were also turned over to the prosecutor and the criminal defendant, right?

A.   Are we speaking of this case?

Q.   As your general practice?

A.   General practice, yes.  Anything -- the defense attorney will file discovery for anything that they request, and that is handed over usually by Sergeant Laprocina, who has access to all that.  And that is then given to whatever defense counsel was requesting, whether they're requesting recordings and/or just our narratives, because those have to be -- they have to be printed out through Detective Laprocina, because our secretaries don't have access to it.

Q.   When you say, "narratives," what are you talking about?

A.   Detective notes.

Q.   Is that different than a report?

A.   Yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  Are you familiar with the phrase, Brady evidence?

MR. PINZONE:  Objection.  Go ahead.

THE WITNESS:  No, I'm not.

BY MS. BRADY:

Q.   Okay.  So if I'm understanding you correctly, then the way the Warren Police Department deals with evidence that a criminal defendant could use, to defendants themselves, is that the Warren Police Department will keep it unless the prosecutor asks for it?

MR. PINZONE:  Objection.  Go ahead.

THE WITNESS:  For any time I went and spoke with a prosecutor at the Warren -- through Warren Municipal, if they requested a copy of a interview or anything like that, then that would be provided. 99.9 percent of the time, they never requested any kind of recordings or interviews.

BY MS. BRADY:

Q.   And could a criminal defendant request that evidence themselves?

MR. PINZONE:  Objection.

THE WITNESS:  I don't know if a defendant can file for discovery.  I know it is normally done through their representation, as the defense

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

attorney would have to file.

BY MS. BRADY:

Q. Okay. But a criminal defendant or the criminal defendant's defense attorney would have access to any information that would otherwise be available to the Warren prosecutor?

A. Oh, absolutely.

Q. Okay. And --

A. They would have to put in some for discovery.

Q. Okay. But that would be turned over only if it was requested, and not --

A. Correct.

Q. -- by default, right?

A. Correct.

Q. Okay. During --

MR. PINZONE: Hold on real quick.

THE WITNESS: One second. These -- I'm -- I'm having trouble seeing you because the lights are -- there -- that's perfect.

MR. PINZONE: Yeah.

MS. BRADY: Is there any way we could compromise and meet halfway in the middle on the lights?

MR. KASSON: We can put the shade -- yeah, maybe we can put the shades up.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc#: 113-5 Filed: 08/07/26 5 of 56 PageID #: 6248
The Deposition of NICHOLAS CARNEY, taken on December 19, 2025

69

of instructor led education about child abuse investigations?

A. Yes.

Q. How many hours?

A. I would -- I mean, between sex crimes and child abuse, hundreds.

Q. Okay. What about just child abuse specifically?

A. I don't know. I -- I would have to go through all my certificates of training to give you a -- a --

Q. Can you give me a ballpark?

A. Probably 800 hours, different seminars, and not all of it was -- was, per se, training. A lot of it was seminars, where you hear stories, and you'd leave there going, well, I learned nothing in this. So you know, one of those, where it's just like, here's eight hours of my life I'm never getting back. Some are -- I did go to some good ones, and a lot were horrible.

Q. Okay.

A. I didn't learn any -- I mean, didn't learn anything.

Q. Okay. All right. So in 2023, how did -- how did you decide whether you were going to pursue charges following an investigation?

A. Per policy and procedure at the Warren Police

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Department, we have to go through a prosecutor for filing charges, unless it's a misdemeanor.

Q. Okay. And when you say go through a prosecutor, can you walk me through what that process looks like?

A. So basically my job is I would collect all the facts that I could, and or evidence, and go up, and find a prosecutor that's available to sit down and talk with for a little bit, run the case by him or her, and they would determine what charge, if a charge would be filed, or if a charge would not be filed.

Q. Okay. And then who actually filed the charges?

A. If it's my case, I would sign the charge.

Q. Okay. So the prosecutor advised on what charges could be filed, and you were the one who actually filed them?

A. Not could be filed. He would tell me what to file.

Q. Okay. And were you required to do what the prosecutor told you?

A. Yes.

Q. And what was the consequence if you didn't?

A. It wasn't pretty. Basically, you get called in the captain's office and get your butt reamed,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. Yes.

Q. Okay. And how were you educated about the policy where you are required to file charges if the prosecutor tells you to?

A. Basically, on the -- on the job training, you know, you -- I go up there when I, you know, I, you know, you -- your first day, you're scared to death, and you're getting this crash course. Well, this is how we do it, boom, boom, boom. And -- but that also relates to patrol. I'm not allowed to file charges, felony, without the prosecutors saying I can.

Q. All right. And so, you said it was on the job training. Is it also a written policy that requires you to do what the prosecutor says?

A. When it comes to filing felony charges, yes.

Q. Okay. It's a written policy?

A. Yes.

Q. Okay. And were you trained on that policy?

A. Yes. Through the -- through the department, of how it's done.

Q. Okay. And do you, as the investigator, have discretion about whether to bring the results of an investigation to the prosecutor in the first place?

A. I have to take all my cases to a -- to a prosecutor except for two. It's unfounded, which means

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 8 of 56. PageID #: 6251
The Deposition of Nicholas Carney, taken on December 19, 2025

80

different ones that have come and gone.

Q. Okay. Do you remember their names?

A. Traci Timko was the main one that I knew of. Louis Guarnieri (phonetic), Gil Blair, Nick Graham, Jim Sanders, Cheryl -- I can't even think of her name right now. She actually just left. So we have two new prosecutors. Zelensky, I believe the name was. I think that might be it, that I -- I can recall. There might have been some fill-ins here and there, but --

Q. In 2023, how did you decide which prosecutor you were going to consult about the case you were investigating?

A. I don't decide. Normally there's two prosecutors, and one is taking complaints that day, and the other one has already -- has either started court, or is about to start court. So you would go up, and it'd be like what prosecutor's available for -- to consult with.

Q. Were there any prosecutors that you preferred working with over others?

A. No, I -- I think I had a good working relationship with all of them.

Q. Were there any prosecutors who were more likely to approve charges?

A. No, I wouldn't say that.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  All right.  So when you were dispatched to the hospital, what exactly were you told?

A.   There were officers on scene at Mrs. Watts' house on Todd Avenue, Northwest.  They were finding bloody tissue.  So Sergeant Orth called me and said, I need you to go to -- excuse me.  St. Joe's, says there's a female that showed up, was pregnant a day ago and now she's there and there's no baby.  And he goes, we have officers on scene.  And can you go and interview her, please?  So I then responded to the St. Joseph.

Q.   And what -- did you believe that you were interviewing Brittany Watts or you were instructed to interview Brittany Watts in connection with a crime?

A.   I had no idea what I was walking into. This --

Q.   So how did you -- oh, go ahead.

A.   This was uncharted territory for me.

Q.   Why do you say that, uncharted territory?

A.   Never had a call like this.

Q.   Like what?

A.   Where I got to go to the hospital and there's a baby missing.

Q.   So it was your belief that Ms. Watts' baby was missing?

A.   Well, she was pregnant in the day prior and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

now there's no baby. And then that was the concern of why I was dispatched there.

Q. Okay. So how did you know --

A. And --

Q. I'm sorry, I interrupted. Go ahead.

A. And what officers are finding on scene.

Q. How did you know what kinds of questions to ask Brittany?

A. What do you mean by how do I know it?

Q. Like you said this was uncharted territory and you didn't know what had happened. How did you know what questions to even start asking her?

A. My primary goal that early afternoon was, okay, there's a baby somewhere and we got to find a baby. So I'm being told by medical staff this baby was quite possibly born alive.

Q. And when you say you were told by medical staff that the baby was possibly born alive, was that Nurse Connie Moschell who told you that?

A. Yes.

Q. Okay. Did Nurse Connie Moschell tell you that there was a chance that the baby might still be alive?

A. Yes.

Q. All right. Do you remember what time you got dispatched to the hospital?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113.5 Filed: 08/07/26 11 of 56. PageID #: 6254
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025
128

hospital no longer pregnant and without her baby?

A.    From what I obtained, the information I -- I obtained from Nurse Moschell.  My immediate was, oh my God, there might be a baby out there alive somewhere.

Q.    And as far as you were trained, if Ms. Watts had shown up at the hospital having given birth to a live baby, but without the baby, would she have committed a crime?

A.    Can you repeat that?

Q.    Yeah.  Based on your training and understanding of the law, if Ms. Watts had had a baby at home and then come to the hospital without the baby, would she have committed a crime in doing that?

MR. PINZONE:  Objection.  Go ahead.

THE WITNESS:  I -- that would -- I don't believe so, but I -- I can't -- I guess I'm not an attorney.  I don't know if there is anything on that --

BY MS. BRADY:

Q.    Okay.

A.    -- law-wise.

Q.    Did you learn how far pregnant Ms. Watts was before you started interviewing her?

A.    I told -- was told 22 weeks, but it could be two weeks more or two weeks less.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 12 of 56. PageID #: 6255
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

129

Q.   Okay.   Who told you that?

A.   Nurse Moschell.

Q.   Okay.   And did you attach any significance to the number 22 or 22 to 24 weeks?

A.   What do you mean by significance?

Q.   Like did that -- did that number mean anything to you in terms of your understanding of the fetus' viability?

A.   Okay.   I was told that the baby quite possibly could be born alive.

Q.   Okay.   Did you have an understanding about whether the baby would survive, even if it had been born alive?

MR. KASSON:   Objection, asked and answered.

THE WITNESS:   Can you repeat that?

BY MS. BRADY:

Q.   Yeah.   Do you -- did you have an understanding about whether the baby would survive had it been born alive?

A.   I was told that the baby could be alive for five minutes, an hour, a day.   A miracle the baby could live is basically what I was told.

Q.   Okay.   So you were told that the baby might survive?   Like --

A.   Yeah, anything could happen.   You know, they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 13 of 56. PageID #: 6256
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

130

-- I was told that the baby was possibly born a lot.

Q.  Okay.  And you were told that it might have a long-term chance of survival or a chance of long-term survival?

A.  They said a miracle, which they clarify that chances are slim.

Q.  Okay.  And who said that?

A.  Nurse Moschell.

Q.  Did you consider double checking with a doctor or another medical professional at the hospital the information that Nurse Moschell provided you?

A.  She's the main one I talked to.  She seemed to know Mrs. Watts case well, and I was obtaining all my information from her.  So I don't know.

Q.  Okay. Did you -- yep.  Did you consider double checking the information that she gave you?

A.  No, I did not.

Q.  So when you got to the hospital, you believed you were trying to find a living baby that had just been born, right?

A.  Yes.

Q.  And that was because of the information that was communicated to you from Nurse Moschell?

A.  Yes.

Q.  What did you make of the bloody tissue that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151

Q.   Okay.  So you memorialized everything she told you?

A.   I'm not saying that.  I'm just saying that this is what I remember, like, her saying.  Like, the main stuff that we were -- I was at the hospital for.

Q.   Okay.  Did you eventually form a belief that Brittany Watts had committed a crime in connection with this?

A.   I had no idea at the time.

Q.   Did you ever form a belief that Brittany Watts had committed a crime?

A.   Not until -- you mean during -- while I'm at the hospital?

Q.   At any point during the investigation.

A.   I was not sure.

Q.   Okay.  When you got -- when you discovered that the fetus was in the toilet, the P-trap, did you think that a crime had been committed?

A.   I was not sure.

Q.   Okay.  You were provided with information that Brittany didn't want the baby, right?

A.   Yes.  By, actually, Ms. Watts herself.

Q.   Okay.  What about her?

A.   I -- I believe she was saying that she didn't want the baby and not to tell her mother.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

remember that?

A. I didn't -- like I said, I wasn't able to read this until the following Monday -- Monday or Tuesday.

Q. Okay. So you learned this information eventually, that the nurse said that Brittany told her that she didn't want the baby?

A. Correct.

Q. Okay. And Nurse Moschell might have told you that directly, but you don't remember. Is that fair to say?

A. Correct.

Q. Okay. But you did eventually learn that the nurse had provided this information, right?

A. Correct.

Q. All right. Okay. So you said you didn't audio-record the conversation you had with Connie Moschell before you started interviewing Brittany, right?

A. Correct.

Q. And I might have asked you this, but can you tell me why you didn't audio-record it?

A. I don't have an answer for that. I -- I just didn't.

Q. Okay. And then at some point -- actually, strike that. Did you ask Connie Moschell anything about

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Brittany's physical or mental state?

A.   Yes.

Q.   What did you ask her?

A.   I said, is she able to be interviewed?

Q.   Okay.  Why did you ask Connie Moschell that question?

A.   Well, I didn't know, being that she was in the hospital, if she had been sedated or if she was, you know, unconscious.  I was like, is she able to be -- am I able to talk with her?  And then eventually, when -- at the start of my recording, you can hear me say, okay, can you introduce me?

Q.   Okay.  And what did Connie Moschell tell you about Brittany Watts' mental state?

A.   That she was fine to be spoken to.

Q.   Okay.  And do you know on what she based that conclusion?

A.   No, I do not.

Q.   Okay.  But you relied on her representation to you that Brittany was in a state capable of being interviewed?

A.   Yes, I did.

Q.   Did Connie Moschell tell you that Brittany Watts hadn't gotten any medical care for her pregnancy prior to about three days ago, or three days before the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

whatever's best for you.

MS. BRADY: Okay, great. So we'll plan on a 15-minute break at some point here before 2:45; is that fair?

MR. PINZONE: Yeah, whatever works.

MS. BRADY: Okay.

BY MS. BRADY:

Q. Did Connie Moschell volunteer any information about Brittany Watts' psychological state?

A. Not that I recall.

Q. Do you remember speaking with a nurse named Jordan Carrino?

A. There were a few nurses that came in and out, but I don't recall speaking to any other nurse besides Connie Moschell.

Q. Okay. And you asked Connie Moschell if Brittany was in a mental state capable of being interviewed, right?

MR. PINZONE: Objection.

THE WITNESS: I asked -- yes. I asked if she was able to be interviewed.

BY MS. BRADY:

Q. Okay. And what you wanted to know was whether she was conscious and not on any sort of mind-altering medication, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

159

A.   I wanted her to be awake and alert and be able to answer questions.

Q.   Okay.  So why didn't you ask Connie Moschell whether Brittany Watts was awake, alert, and able to answer questions?

A.   Why did I or didn't I?

Q.   Did you not?

A.   I did ask.

Q.   Did you say, is Brittany Watts awake, alert, and capable of answering questions?

A.   Not that -- not that exact phrase.  I asked basically, was she able to be interviewed?

Q.   Okay.  And you relied on the nurses' representation about Brittany Watts' mental and physical state in deciding whether or not she was able to be interviewed?

A.   Yes.

Q.   Did you ask Connie Moschell to sit in on the interrogation?

A.   No.

Q.   Did she sit in on the interrogation?

A.   Yes, she did.

Q.   Okay.  Why?

A.   Ms. Watts was in the hospital.  I'm not going to decline a hospital representative from being in the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 19 of 56. PageID #: 6262
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

160

room.

Q.   But you didn't want her there?

A.   I never said that.

Q.   But you didn't ask her to sit in?

A.   I didn't ask her, but it really didn't affect my interview with Ms. Watts.

Q.   Did you talk to Connie Moschell about whether you needed to read Brittany Watts her Miranda warnings?

A.   No.

Q.   Did you talk -- before the interview started, did you talk to Connie Moschell about Brittany Watts' personality or character traits or anything?

A.   No.

Q.   How did Connie Moschell end up participating in the interview with you?

A.   How -- how do you mean by participating?

Q.   Like, she was in the interview with -- room -- I'm sorry.  Strike that.  Connie Moschell was in the hospital room while you were interviewing Brittany Watts, right?

A.   Yes.

Q.   And she was asking questions to Brittany Watts, right?

A.   Yes.

Q.   And she was talking to Brittany Watts during

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Did you read Ms. Watts her Miranda warnings?

A. Yes.

Q. Okay. Was Ms. Watts a suspect when you were interviewing her?

A. No, she was not.

Q. Okay. So why did you read her her Miranda warnings?

A. Again, I'm walking into a situation where we have a missing baby. I don't know exactly what she's going to say. I wanted to make sure that she understood her rights, that she didn't have to talk to me. And at that time, I had no idea what I was dealing with, besides a missing baby.

Q. Okay. Is it part of your typical practice to conduct interviews with -- strike that. Is it part of your practice to do an interview of a person who is -- after a person has been Mirandized, to have a layperson participate in those interviews with you?

A. It is not. This was not a normal call. This was the first kind of call in my career I've ever answered like this. So this was new to me and --

Q. Is -- yeah, let me re-ask my question, because I don't -- I don't think you answered the question that I asked. My question was: Was it part of your typical practice to perform interviews with laypeople by your

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 21 of 56. PageID #: 6264
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

164

A. Yes.

Q. Okay. And did you and Nurse Moschell discuss how you were going to go about interviewing Brittany Watts?

A. No. No.

Q. Were you surprised when Connie Moschell started asking questions to Ms. Watts?

A. No. No, I wasn't.

Q. Did it bother you?

A. No.

Q. Why not?

A. I'm trying to find a baby. If she can help, I'll take all the help I can get.

Q. Okay. Did Connie Moschell say anything to Brittany Watts that you thought was problematic?

A. Not to my recollection, no. She was very kind and sweet to her.

Q. You recall her -- you recall Connie Moschell telling Brittany Watts that Brittany wasn't in trouble?

A. Yes.

Q. Okay. And you heard Connie Moschell tell Brittany Watts that you were there to help her?

A. We were there to help.

Q. Who were you there to help?

A. Brittany and this baby.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  Why did you tell her that you could simplify your language for her?

A.   I believe, and I use this language with most people I interview, if I go into what I call cop talk and you don't understand what I'm asking, and I say, don't answer a question just to answer a question.  If you don't understand, tell me you don't understand and I'll simplify it for you.  And I kind of joke on that cops, especially when this cop talk and people don't understand it.  And if you just want me to simplify it for you, I'll simplify it for you.

Q.   Okay.  All right.  So you read Brittany Watts her Miranda warnings at the beginning of the interview, right?

A.   I think we spoke for a few minutes and then I did that.

Q.   Okay.  And why did you read her her Miranda warnings?

A.   Again, I didn't know what I was walking into, so I just wanted to make sure I covered my bases legally and that she knew she was free to leave -- or not free to leave, but I would leave, and that she knew she didn't have to talk to me.

Q.   Because she couldn't have left that interview, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 23 of 56. PageID #: 6266
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

172

A. No.

Q. Sorry. Could she have left the interview?

A. I guess she could have, but I -- I even told her I didn't want her to do -- that she was there for medical reasons, and I told her I would leave.

Q. Okay. And she was hooked up to an IV, so it's not like she could just get up and walk away, right?

A. I mean, you can do anything or try to do something, but I -- I doubt she would do that.

Q. Okay. It wasn't realistic to assume that she would be able to leave the interview?

A. No, no, no.

Q. Okay. So you told her that if she didn't want to talk to you that you would leave?

A. Correct.

Q. Okay. And did you take into consideration the power dynamic in the room when you were talking to her?

MR. PINZONE: Objection. Go ahead.

THE WITNESS: What do you mean by power dynamic?

BY MS. BRADY:

Q. Like your relative positions and ability to assert yourselves?

A. What do you mean, assert ourselves?

Q. Like if she decided she didn't want to talk to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. PINZONE:  Objection.

THE WITNESS:  The interview?  Yes.

BY MS. BRADY:

Q.  Okay.  Brittany Watts did not know at the time you interrogated her that what she said could be used against her in a criminal case, right?

MR. PINZONE:  Objection.

THE WITNESS:  Yes, she did.

BY MS. BRADY:

Q.  How is it that she knew that?

A.  She signed off on it.  So --

Q.  What did she sign off on?

A.  Anything you say can, and you -- can and will be used against you in a court of law.

Q.  Okay.  Because I thought you told me earlier that you didn't tell her that, that you just told her that she had the right not to speak to you, and she had the right to an attorney?

A.  Well, I -- you're misconstruing what I said. I went through the entire form with her.

Q.  Okay.

A.  I read each line.  I have them initial.

MS. BRADY:  Let's take a look at it.  We'll call this Exhibit 3.

(Exhibit 3 was marked for identification.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

BY MS. BRADY:

Q. All right. Did something pop up on your screen here?

A. Yeah, it's here.

MS. BRADY: Okay. So for the record, this is a one-page document beginning at Bates label City of Warren 387.

BY MS. BRADY:

Q. And I'll zoom in here so you can see this is a Warren Police Department. The person whose signature appears at the bottom here under the witness form, is that your signature?

A. I mean, if you want, yeah.

Q. Okay. And then it's signed Brittany Watts here, right?

A. Uh-huh.

Q. Okay. And you had her sign this form at 1524?

A. That's -- yeah, that's the time it would've been signed.

Q. Okay. So these were the admonishments she was given. She "has the right to remain silent. Anything you say may be used against you in a court of law. You have the right to talk to a lawyer for advice before we ask any questions. You have the right to have a lawyer with you during questioning, and that if you can't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 26 of 56. PageID #: 6269

afford attorney, one will be appointed to you prior to any questioning." Do you see that?

A. Yes.

Q. Okay. So you read her all of these statements and she signed off?

A. Yes.

Q. Okay. And then there's the voluntary waiver. She says, "I've read this statement of my constitutional rights, and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer. I know what I'm doing. No promises or threats have been made against me, and I waive my rights." Do you see that?

A. Yes.

Q. Okay. And she says, "I have also been advised that I'm not under arrest at this time and free to leave," okay?

A. Correct.

Q. So she signed off on all of these?

A. Yes.

Q. Okay. So she knew that there was potential for a criminal investigation or some sort of criminal prosecution to arise from her interview, right?

A. I couldn't answer for Ms. Watts.

Q. Well, I mean, she signed off on a document

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

saying that she understands that her statements could be used against her in a criminal case, right?

A.   She signed off on it, yes.

Q.   You think there's a possibility that she didn't understand what she was signing?

MR. PINZONE:  Objection.

THE WITNESS:  No.  I believe she understood what she was signing.

BY MS. BRADY:

Q.   Okay.  So in that case, she did know that there was a possibility that there was -- there would be some sort of criminal investigation or criminal proceedings following your interview with her, right?

MR. PINZONE:  Objection.  Go ahead.

THE WITNESS:  Again, I didn't know what I was dealing with.  So this was the first kind of call I was ever on like this.  So I didn't know it was going to be criminal or what it was going to be.  I had -- the goal was to find a baby.

BY MS. BRADY:

Q.   Yeah.  So that wasn't quite my question.  My question was: Based on her signature on that Miranda waiver form, she was made aware and understood that there could potentially be criminal charges or some sort of criminal proceeding against her in connection with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MR. PINZONE: Objection.

THE WITNESS: It could.

BY MS. BRADY:

Q. Okay. And do you agree that if a person is in a condition where they're physically tethered to a location and have just experienced a tragic loss and are grieving, that that could render their mental state such that they were not truly consenting to be interviewed?

MR. PINZONE: Objection.

THE WITNESS: Not in her case.

BY MS. BRADY:

Q. Why?

A. I believe she was alert, well-spoken, talking to me. At any time, I think she could have said, I'm done talking, or I want an attorney.

Q. Do you think that your telling Brittany that she didn't need to be scared contributed to her feeling that she could talk to you without repercussion?

A. No.

Q. Why not?

A. I didn't feel she needed to be scared.

Q. Even though there was the potential that there could be a criminal investigation and her statements could be used against her?

A. I didn't feel there was a reason for her to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   What were you there to help her do?

A.   We wanted to find her baby.

Q.   It seems to me that if that's what you were doing, you wouldn't have Mirandized her.

A.   Again, I was walking into a call I've never been on.  So I Mirandized her so she knew she didn't have to talk to me and was free to leave, in the sense that I would leave.

Q.   Did Brittany Watts ask for help?

A.   How do you mean?

Q.   You -- she was told that you were there to help.  Did she ask for help?

A.   During the interview?

Q.   Yeah.

A.   I don't recall her asking for help.

Q.   Okay.  All right.  So how long was your interview with Brittany?

A.   It was a little over an hour.

Q.   Okay.

A.   Just that.

Q.   And at any point during your interrogation did you step out of the room and talk to Connie Moschell about what was going on during the interview?

A.   I was just confirming from the statements Ms. Watts was giving, we are looking for a full form

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL  Doc #: 113-5  Filed: 08/07/26  30 of 56.  PageID #: 6273
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

184

baby, correct?  And she said, yes.  That was the one time I stepped out with Ms. Moschell.  The other times I stepped out, I was talking with my sergeant.

Q.   Okay.  So you and Connie Moschell stepped out of the room so that you could ask Connie Moschell about the physical characteristics of the fetus that Brittany Watts had delivered at home; is that right?

A.   Correct.

Q.   Okay.  And did -- were you interested to know what Brittany Watts thought the miscarried fetus would look like?

A.   I believe we went over that in the interview. I asked her some questions about what she had delivered.

Q.   Okay.  And what did she tell you?

A.   She was too scared to look.

Q.   So did she ever tell you that she knew that the fetus would be fully formed when she miscarried it?

MR. PINZONE:  Objection.

THE WITNESS:  I don't believe she did.

BY MS. BRADY:

Q.   Okay.  Did you look at any medical records before, during, or immediately after the interview before you left the hospital?

A.   No.

Q.   Did you communicate with anyone after the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

interview ended, but before you left the hospital?

A.    Sergeant Laprocina.

Q.    What did you communicate with him or what did you talk to him about?

A.    This shed in the backyard that didn't exist.

Q.    Okay.  What specifically did you talk to -- with him about that shed?

A.    According to Ms. Watts, she said she got a black bucket, removed the remains, and threw them behind a shed.  I believe she said tan.  And I believe I made two or three phone calls to Sergeant Laprocina, and the third one was, politely putting it, he goes, there's no F-ing shed.

Q.    Okay.  And why were you talking with him about that?

A.    Again, we were looking for a baby, and she keeps repeating that she tossed whatever behind a shed.

Q.    Okay.  Did you talk to any nurses or medical staff after you concluded the interview?

A.    No.

Q.    Sorry, your answer was no?

A.    Yes.

Q.    When did you stop your audio recorder?

A.    As soon as the -- I was leaving and I believe she asked something about her mother finding out.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. So she was saying shed. You thought she meant garage. Doesn't that suggest to you that you thought she was confused about the words she was using?

A. No. My -- the thought process towards the end -- end of the -- end of the interview was that she knew the baby was in the toilet.

Q. Okay. So you developed the opinion during the course of your interview that she was lying to you?

MR. PINZONE: Objection.

THE WITNESS: Say that again.

BY MS. BRADY:

Q. You developed the opinion during the course of the interview that Brittany Watts was lying to you?

A. I wouldn't say lying. I -- just not being completely forthcoming.

Q. And did you ask her if the baby was in the toilet?

A. I believe several times.

Q. And what did she tell you?

A. The first few times, no, that she had taken it all out in this black bucket, but then she said it may be in the toilet.

Q. Okay. So she wasn't deceiving you, right? She said it might be?

A. Well, that took place -- we got to that point

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 33 of 56. PageID #: 6276
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

209

A.    Yes.

Q.    What did you do with the recording after you finished the recording?

A.    I put it on a terabyte, and I also downloaded it into a file for the complete -- for the report when it's completed.

Q.    And then what happened to it?  Do you know?

A.    It's -- I have to put it on a separate drive, and then it is given to Sergeant Laprocina to upload into the crime scene server.

Q.    What's the crime scene server?

A.    Crime scene server holds all the recordings, photographs, documentation, anything related to an investigation.

Q.    And that's the police department server?

A.    Yes.

Q.    Does the prosecutor have access to that server?

A.    No.

Q.    Did you give the recording to any prosecutor?

A.    Yes.

Q.    When?

A.    I don't know the exact date, but I -- it was given to the prosecutor, Diane Barber.

Q.    After the preliminary hearing?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL  Doc #: 113-5  Filed: 08/07/26  34 of 56.  PageID #: 6277
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

210

A.   Yes.

Q.   Okay.  And Diane Barber works for the Trumbull County Prosecutor's office; is that right?

A.   Yes, the County Police.

Q.   Okay.  And the preliminary hearing was handled by the Warren prosecutor, right?

A.   Yes.

Q.   Did you give the recording to anybody in the Warren prosecutor's office?

A.   No.

Q.   Okay.  I think you answered all these questions.  Just let me check -- actually, strike that.  Did you testify at the grand jury?

A.   Yes.

Q.   What questions were you asked at the grand jury?

A.   I have never seen the transcript, and I really don't remember the grand jury.

Q.   Who questioned -- who questioned you at the grand jury?

A.   Prosecutor Diane Barber.

Q.   What kinds of questions were asked of you at the grand jury?

A.   Pretty much, from what I can remember, the same questions I were asked at the prelim.  How did I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

get from A to B?  Yeah, I -- I really -- I have never seen the transcript from it.  I testified for, like, ten minutes and that was it.

Q.   Do you remember -- or actually, strike that. Do you know who else testified at the grand jury?

A.   I believe I -- I was the only one, unless they called Officer Smith, which I'm not sure they did because I didn't see him there.

Q.   Who's Officer Smith?

A.   He took the initial report.

Q.   Do you know whether the coroner or the forensic pathologist testified at the grand jury?

A.   I -- I have no idea.

Q.   Did the prosecutor introduce any exhibits through you at the grand jury, any documents?

A.   What -- what do you mean?  Like --

Q.   Like did she introduce any exhibits using you? Did she ask you to authenticate an exhibit and then enter it into evidence?

A.   I wasn't allowed to show evidence per the prosecutor.

Q.   The prosecutor told you that you weren't allowed to show evidence?

A.   Correct.

Q.   Did you want to show evidence?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   I had printed out some photographs to present as evidence, and I was told I was not allowed to show them.

Q.   What photographs did you print out?

A.   Photographs taken by Sergeant Laprocina and the coroner's office.

Q.   What were the photographs of?

A.   The baby.

Q.   Was it the photographs that you -- or that were introduced at the preliminary hearing?

A.   There was, I believe, only one photograph introduced at the prelim.

Q.   Okay.  I printed out a few more and I was told that we're not going to present those photos into evidence for the grand jury.  Why did you -- actually, strike that.  Do you typically bring your own evidence to grand juries?

A.   I -- I always bring my folder with photos, if need be, and my report, just to refresh my memory if there's a question about a date or time, or --

Q.   Why did you choose the specific photos you chose to bring to the grand jury?

A.   I usually always bring photos on most cases that would need to be shown as evidence.

Q.   Do you typically bring photos in conjunction

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 37 of 56. PageID #: 6280
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

215

A.   No, I was not.

Q.   Do you, as you sit here today, believe that Brittany Watts's bathroom was a crime scene?

A.   At the time, yes.

Q.   As you said here -- why do you believe that, at the time, it was a crime scene?

A.   There was a dead baby in the toilet.

Q.   Okay.  And why was that -- what made that a crime scene to you?

A.   There was a dead baby in the toilet.

Q.   Why did you think that that was a crime?

A.   Because there was a dead baby in the toilet.

Q.   Sure.  Are you familiar with the concept of miscarriage?

A.   Yes.

Q.   Okay.  So not all deceased fetuses are victims of a crime, right?

A.   Correct.

Q.   Okay.  And what made you believe that this particular deceased fetus was the victim of a crime?

A.   I didn't know it was a victim of a crime.  We don't know until the -- the body's sent for an autopsy, and that's the coroner's decision.

Q.   Okay.  But you believed it was a crime scene?

A.   It was treated as a crime scene.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL  Doc #: 113-5  Filed: 08/07/26  38 of 56.  PageID #: 6281
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

217

and just making sure this was a murder investigation.

BY MS. BRADY:

Q.   Okay.  And what did the coroner's report tell you about whether this was a murder investigation?

A.   He advised that it wasn't -- that she had lost all her -- I'm going to mess it -- embryotic [sic] fluid.

Q.   Amniotic fluid.

A.   Amniotic fluid, prior to giving birth.

Q.   Okay.  And so, the coroner concluded that the fetus had died in utero, right?

A.   Correct.

Q.   Okay.  So you knew this wasn't a murder?

A.   Correct.

Q.   Okay.  After you got the coroner's report, did you form an opinion about whether a crime had been committed?

A.   No.

Q.   So you had no opinion about whether Ms. Watts committed a crime in connection with her miscarriage?

A.   No, I did not.

Q.   Okay.  And do you today?

A.   What?

        MR. PINZONE:  Objection.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. BRADY:

Q. Have an opinion about whether Ms. Watts committed a crime in connection with her miscarriage.

A. I'm not an attorney. I let the attorneys handle that. I collect the --

Q. So you have no opinion?

A. No.

Q. Okay. So we talked a little bit earlier about the conversation that you had with Dr. Khavari. And I'm going to put up your preliminary hearing transcript.

MS. BRADY: We'll call this Exhibit 5. And for the record, this is the entire preliminary hearing transcript. It's a 67-page document beginning at Bates label City of Warren 745.

(Exhibit 5 was marked for identification.)

BY MS. BRADY:

Q. Have you reviewed this transcript, Mr. Carney?

A. It's been a while, but I did.

Q. Can you look like you're squinting. Do you want me to zoom in?

A. Yeah, a little bit. Okay. That's -- that's good. Yeah, that's good.

Q. Okay. So you had a chance to review your preliminary hearing transcript?

A. Yes.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

A.   Yes.

Q.   Okay.  Did you understand what that meant?

A.   Yes.

Q.   So you knew that, even if Brittany Watts delivered or miscarried, that her fetus would not be viable?

A.   Yes.

Q.   Okay.  And so you knew that that meant the fetus had no chance of survival outside of the uterus, right?

A.   That's not what I was told by --

Q.   What were you --

A.   -- hospital staff and -- everybody said this baby could be born alive.

Q.   Okay.  So after you interrogated Brittany Watts at the hospital, you went to her home on Todd Avenue, right?

A.   Yes.

Q.   Okay.  And you saw the toilet before it had been removed, right?

A.   Yes.

Q.   And were you aware of what was in the toilet at that time?

A.   When I arrived on scene, the coroner's office was on scene, and Sergeant Laprocina told me that he had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reached into the trap and felt, I can't remember if he said one or two feet.

Q. He reached into the trap and saw feet or felt feet?

A. He felt feet.

Q. Okay. Was the toilet still intact when you got there?

A. Yes.

MS. BRADY: Okay. I'm going to put up what we'll call Exhibit 6, which is a photo from the bathroom of Ms. Watts. This is a one-page document Bates labeled City of Warren 170.

(Exhibit 6 was marked for identification.)

BY MS. BRADY:

Q. Does this look familiar to you?

A. Yes.

Q. Okay. Is this what you recall the scene of Ms. Watts's bathroom looking like when you arrived?

A. I believe -- I believe it might have been filled higher, but I -- I'm not sure.

Q. Okay. So you agree that you can't see any of the fetus from this vantage point from above the toilet?

A. Correct.

Q. Okay. And when did you -- actually, strike that. When you observed the toilet like this, did that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

grand jury testimony. Did you intend to show pictures of the miscarried fetus to the grand jury?

A. That was the intention of bringing pictures, yes.

Q. And why did you want to show those photos to the grand jury?

A. Again, we usually show evidence. Show evidence of murders, child pornography. It's -- it's common practice to show evidence to the grand jury.

Q. Did you understand what crime Ms. Watts was charged with?

A. Yes.

Q. Okay. And why did you think photos of the deceased fetus were relevant to the crime that she had been charged with?

A. That the -- so the grand jury could understand that this wasn't just matter, you know, globs or -- I don't want to sound ignorant or disgusting, but a fully-developed baby.

Q. And when you say fully developed, what do you mean?

A. It had hair, eyes, nose, ten fingers, ten toes, a penis.

Q. Do you know when fetuses develop those physical characteristics?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    Okay.   But you saw these photos within a couple of days?

A.    Yeah.   Well, we had the weekend, and I came back Monday.   And like I said, it would've been Monday afternoon or Tuesday morning.

Q.    Okay.   And you had seen these photos before you spoke with the prosecutor, right?

A.    Yes.

Q.    So did it occur to you that this was what Brittany Watts was looking at and thinking about when she said she disposed of the remains of her miscarriage in her yard?

A.    Yes.

Q.    Okay.  Okay.  So did you learn -- when did you learn --

A.    I'm here.

Q.    When did you learn that the grand jury had declined to indict Brittany Watts?

A.    There -- they had, for some reason, the -- an immediate reporting, so I found out within an hour.

Q.    When you say for some reason they did an immediate reporting, why do you say for some reason? Is it unusual?

A.    It's unusual.  It's unusual to immediately report a grand jury decision.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE WITNESS:  That's not my decision.  Again, I collect the facts, present it.  If it's true bill, it's true bill.  If it's no bill, it's no bill.

BY MS. BRADY:

Q.   And you had no position -- or no opinion about whether you thought she should be indicted?

A.   No.

Q.   Did you think the grand jury would indict her?

A.   I have no idea ever walking into a grand jury with how they're going to go.

Q.   Okay.  Did you attend the autopsy?

A.   No.

Q.   Did you get the full autopsy report?

A.   Sergeant Laprocina did.

Q.   Okay.  But you learned within a week that the fetus had died in utero, right?

A.   I believe the autopsy was done on the 28th, and Sergeant Laprocina advised me of that.

Q.   Okay.  What was your reaction?

A.   Okay.

Q.   And did you continue investigating at that point?

A.   No, because I took -- I met with the prosecutor on October 4th in the morning.  I believe that -- I -- I believe that date is correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. Why did you communicate with the prosecutor about this case after you learned the fetus had been born deceased?

A. Well, it's -- I -- I just can't close out this case. I just can't be like, no, this is not a homicide. I'm closing it. So as I do with -- again, 99.9 percent of my cases I present to a prosecutor, lay out what happened, and make -- let them make the decision if the charges are filed or not filed.

Q. So you learned from the coroner's report that this was not a homicide, right?

A. Correct.

Q. And you learned from the coroner's report that Brittany Watts was not at fault for what happened to the fetus, right?

A. I wouldn't say that. I --

MR. PINZONE: Objection.

THE WITNESS: Yeah, I learned it was not a homicide.

BY MS. BRADY:

Q. Okay. Did you -- did you think that Ms. Watts was at fault for what had happened to the fetus before it was miscarried?

A. That I didn't know. That's why I took it to the prosecutor.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NICHOLAS CARNEY, taken on December 19, 2023

243

Q.   Okay.  And do you familiarize yourself with the coroner's entire report in those cases?

A.   I -- like, memorize the coroner's report?

Q.   Familiarize yourself with it, yeah, something.

A.   I'll familiarize myself with it, but normally I will talk with Sergeant Laprocina, who is very well-versed in this stuff, and he kind of -- he gets all of that.  I don't -- and he will kind of run it down for me.  But again, I still present just to -- anytime you have a dead child, I just can't say, okay.  I'm closing this out on my own.

Q.   So every time a child dies of natural causes, you present it to the prosecutor?

A.   Yes.

Q.   Every single time?

A.   Yeah.

Q.   So you presented this case to the prosecutor -- strike that.  The first time you communicated with a prosecutor about this case was October 4th, right?

A.   Yes.

Q.   Everything you worked on in the case up until the point you got it to the prosecutor was your investigation; is that right?

A.   Mine and Sergeant Laprocina's.

Q.   And what documents did you give or present to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the prosecutor?

A.   The initial police -- police report, the notes I had up in that -- up until that point, photographs.  I believe that was it.

Q.   You said the notes you had up until that point.  Were those notes different from what was in your report?

A.   No.  You know how we talked about the continuing report?

Q.   Yeah.

A.   That side that were in there up to that point of meeting him on October 4th.

Q.   Okay.  So you gave him your report and everything that was in the report up until October 4th?

A.   Correct.

Q.   Okay.  Did he read your report?

A.   Yes.

Q.   Okay.  Did he ask you any questions?

A.   Yes.

Q.   What did he ask you?

A.   I -- I don't recall the exact questions.  We just kind of go over the case, so I don't really remember the exact questions he asked me because --

Q.   And you said you did not provide him with the recording of your interview with Brittany?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 48 of 56. PageID #: 6291
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

245

A.   He never requested it.  So no, it wasn't provided.

Q.   Okay.  Did you give him the transcript of that interview?

A.   We didn't have a transcript yet.

Q.   When was the transcript prepared?  Do you know?

A.   I believe once all this started.

Q.   This, you mean like the civil lawsuit?

A.   Yes.

Q.   Okay.

A.   We -- we didn't transcribe interviews.

Q.   Did you tell the prosecutor that the recording existed?

A.   Yes.

Q.   Did you tell the prosecutor -- actually, strike that.

Did the prosecutor ask you any questions about Brittany's intent or about evidence establishing her state of mind?

A.   I -- I really can't recall a conversation at two and a half years ago.

Q.   Is it possible that he asked questions about evidence regarding -- or relating to Brittany Watt's intent?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

point while you were investigating Brittany Watts?

A. No, because it -- we're comparing -- it's apples and oranges. I didn't know if Mrs. Watts -- if I had something -- or if I had something or nothing. And that's why, again, I just took everything up to the prosecutor's office.

Q. And then the abuse of a corpse case that you had previously worked on didn't cross your mind at all while you were investigating Brittany Watts?

A. To be honest, not really. Two different circumstances.

Q. When you saw the fetus, the miscarried fetus in the P-trap of the toilet, what was your reaction?

A. I was nervous because it was my job to -- for the coroner's office, for us to remove it. And I was nervous in the sense, I didn't want to damage the body. But really that was -- you know, I made sure I did it properly. It took me about an hour, but I held the baby real quick as I took it out of trap. I then handed it to Sergeant Laprocina, who placed it down. And we left.

Q. Did you have any sort of emotional reaction to seeing the deceased fetus in the P-trap?

A. No.

Q. It didn't make any impact on you?

A. No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 50 of 56. PageID #: 6293
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

257

Q.   And when you learned that Brittany Watts told you she had plunged the toilet after she scooped out what she believed to be the remains of her miscarriage, did that bother you?

A.   No.

Q.   It didn't strike you as inappropriate in any way that she plunged the toilet after scooping out what she believed to be the remains of her miscarriage?

A.   No, I didn't really have any motion.

Q.   Okay.  So you arrested Brittany Watts after filing -- or after signing the Criminal Complaint. Where did you arrest her?

A.   At her home.

Q.   Did you put handcuffs on her?

A.   Yes, I did.

Q.   Why?

A.   Yes, I did.

Q.   Why?

A.   I didn't know her.  She seemed nice enough, but I just put -- I had her sit in the front seat.  I just put handcuffs on her in the front.  That was kind of from around safety.  I don't know her from Adam.  And I've had the nicest people, I thought were the nicest people, wig out on me.  And so, at least if she starts swinging, I got something to grab onto.  But she was --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 51 of 56. PageID #: 6294
The Deposition of NICHOLAS CARNEY, taken on December 19, 2025
258

she didn't say two words.

Q. Did you consider asking if she would self-report to the police station?

A. No, because I want to get her down there as soon as possible.

Q. I don't think I understand why arresting her and handcuffing her in her home would have gotten her to the station sooner?

A. I didn't handcuff her in her home.

Q. Where did you handcuff her?

A. When she came out of the house, I pointed at the front seat. I didn't even get out of my car. She hopped in. I said, listen, I got to put these on you, at least for the ride. She said, okay. And put her in -- in the front. You know, I was trying to get down there as quick as possible.

Q. And why did you think that you transporting her -- picking her up at her home and transporting her to the police station was going to get her to the station more quickly than if you would've asked her to take herself to the station?

A. Because I want to make sure I talked with the judge before she got arraigned.

Q. What did you talk with the judge about?

A. I asked if he could give her a personal bond.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113.5 Filed: 08/07/26 52 of 56. PageID #: 6295
The Deposition of NICHOLAS CARNEY, taken on December 15, 2025

259

And even do me a bigger favor, and not even get her fingerprinted so she didn't have to go to the county jail.

Q. And you talked to the judge before you arrested her or after?

A. After.

Q. Okay. So you arrested her and brought her to the station, and then you spoke to the judge?

A. Yes.

Q. And where was she while you were speaking to the judge?

A. I had -- her mom followed us down, so I had them both sit in the Courtroom number 1, not in handcuffs.

Q. Did she -- did she say anything to you?

A. No.

Q. Did you read her, her Miranda warnings when you arrested her?

A. No. I didn't ask her any questions.

Q. Do you recall testifying at the preliminary hearing that the abuse element of the abuse of corpse statute was that she had plunged after she miscarried. Do you remember that?

A. Yes.

Q. Okay. Who determined that the act of plunging

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the toilet was the thing that made it abuse of a corpse?

A.   The prosecutor.

Q.   And so the prosecutor told you to say that the plunging was the abuse?

A.   That was on the charge I approved filing.

Q.   Did the prosecutor tell you to tell the judge that the thing that was the abuse, the act of abusing a corpse was plunging the toilet?

A.   What do you mean, tell me?

Q.   Did the prosecutor instruct you to tell that to the judge?

A.   During the preliminary?

Q.   Yes.

A.   They don't instruct us to say anything.

Q.   Okay.

A.   But it -- it's on the warrant that was approved by the prosecutor.

Q.   I'm going to put up Exhibit 5 again, which is the Transcript from the Preliminary Hearing.  So I'm on Page 33 of this Transcript.  And the question around Line 17 is: "When you filed charges in the complaint, you listed that abuse of -- abuse of a corpse was for forceful disposal of human remains.  Is your -- are you -- is abuse of a corpse delivery into a toilet?" And you say, "Abuse of a corpse is the action of her

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 54 of 56. PageID #: 6297
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

302

their client admitted under oath with the lawyer sitting next to her, but she thought it was an inappropriate way to dispose of the baby?

MS. BRADY: Objection. Form, foundation. Misstates the evidence and leading.

BY MR. KASSON:

Q. You think that's fair?

A. I think it's ridiculous.

Q. Yeah. Isn't it? All right. Let's talk about -- I'm going to bounce around, and I'll be effective at how I can read my own handwriting, okay?

A. Yeah.

Q. All right. Let's talk about going to the prosecutor.

A. Yes, sir.

Q. You had had two other cases where a baby had been born prematurely through a miscarriage, stillborn or not. You had taken both of those to the prosecutor. One was prosecutor, one wasn't, right?

A. Correct.

Q. And in this case, you didn't know whether it should be prosecuted or not, did you?

A. No.

Q. And that's why you took it to the prosecutor, fair?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 113-5 Filed: 08/07/26 55 of 56. PageID #: 6298
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023
303

A.   Correct.

Q.   In cases where it's determined to be a suicide, you've had a bunch of those and you know how that goes, right?

A.   Correct.

MS. BRADY:  Objection.  Form and foundation.

BY MR. KASSON:

Q.   This was --

MS. BRADY:  -- and leading.

BY MR. KASSON:

Q.   -- this was an example of a situation where you did know, right?

A.   Correct.

MS. BRADY:  Objection.  Form, leading.

BY MR. KASSON:

Q.   And you totally relied upon the prosecutor as to whether or not you were going to charge her, fair?

A.   Yes.

MS. BRADY:  Objection.  Form and leading.

BY MR. KASSON:

Q.   Relied upon the prosecutor to determine what you were going to charge her with?

A.   Yes.

MS. BRADY:  Objection.  Form and leading.

BY MR. KASSON:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to type written form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



MADISON BOOKS,

COURT REPORTER / NOTARY

MY COMMISSION EXPIRES ON: 11/08/2027

SUBMITTED ON: 01/20/2026

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com