**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRITTANY WATTS, | ) | CASE NO.:  4:25-CV-00049 |
| | ) | |
| Plaintiff, | ) | JUDGE:  SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| BON SECOURS MERCY HEALTH, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, and Parisa Khavari's Motion for Summary Judgment**

Defendants Bon Secours Mercy Health ("Bon Secours"), Mercy Health Youngstown LLC

d/b/a St. Joseph Warren Hospital ("St. Joseph"), Connie Moschell, and Parisa Khavari (collectively

"Hospital Defendants"), respectfully move for an Order granting a Summary Judgment in their favor.

A Memorandum explaining why this Motion should be granted is attached.

Respectfully Submitted,

/s/ Thomas A. Prislipsky

Thomas A. Prislipsky (0067623)
**REMINGER CO., LPA**
950 Windham Court Suite 200
Youngstown, Ohio 44512
Tel: 330-744-1311 | Fax: 330-744-7500
tprislipsky@reminger.com

/s/ Patrick Kasson

Patrick Kasson (0055570)
Thomas N. Spyker (0098075)
Chloe E. Schelhaas (0105919)
**REMINGER CO., LPA**
955 Yard Street, Suite 330
Columbus, Ohio 43212
Tel: 614-228-1311 | Fax: 614-232-2410
pkasson@reminger.com
tspyker@reminger.com
cschelhaas@reminger.com

*Counsel for Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, and Parisa Khavari*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... iii

STATEMENT OF THE ISSUES ............................................................................................... v

MEMORANDUM IN SUPPORT ............................................................................................. 1

    I.       INTRODUCTION & SUMMARY OF ARGUMENT ...................................................... 1

    II.     STATEMENT OF FACTS ................................................................................................ 1

        A.    Watts is admitted to St. Joseph and leaves against medical advice. ......................... 1

        B.    Watts returns to St. Joseph and receives stabilizing treatment. .............................. 2

        C.    The nurses asked for an "appropriate" ethics consult. ............................................ 2

        D.    Watts miscarries, then flushes *and plunges* the fully formed baby down the toilet. 3

        E.    Watts returns to St. Joseph without the baby, prompting concern. ......................... 4

        F.    Warren Police search for the baby while Detective Carney visits Watts. ................ 5

        G.    Police find the one-pound, 11-inch-long discarded baby jammed in the toilet pipes. 5

        H.    Prosecutor Blair and Judge Ivanchak *independently* determined probable cause existed despite having the key evidence Watts claims prevents probable cause. ............ 6

    III.    LAW AND ARGUMENT ................................................................................................. 7

        A.    Watts Cannot Demonstrate Dr. Khavari Caused Her Injuries. ................................. 7

            1.    Watts' informed choice to leave against medical advice precludes finding Dr. Khavari caused her miscarriage. ........................................................................... 7

            2.    The claimed breaches did not proximately cause any injuries. ............................... 8

            3.    Watts Released Dr. Khavari and Hospital Defendants From Liability. .................. 11

        B.    Watts' Claims Against Dr. Khavari are Time-Barred. .............................................. 12

            1.    Every claim against Dr. Khavari has a one-year statute of limitations. ................ 12

            2.    The "180-day letter" did not toll the statute of limitations because it did not specifically say a claim was forthcoming against Dr. Khavari. ...................................... 12

            3.    Because the case was not filed within one year, it is time-barred. ......................... 14

        C.    Watts Was Stable, and Left Despite Receiving Stabilizing Care, Barring Her EMTALA Claim. ................................................................................................................ 14

        D.    Moschell Cannot be Liable Under Section 1983 Because She is Not a State Actor. ... 17

i

E.    Both the Section 1983 and State Law Conspiracy Claims Fail for Lack of Shared Plan and Overt Acts in Furtherance. ...................................................................... 18

  1.    Watts' Section 1983 conspiracy claim fails because Moschell and Carney did not have a shared plan and there is no underlying deprivation. ........................................... 18

  2.    Because there is no underlying unlawful act and no plan or agreement to cause injury to Watts, her state law conspiracy claim fails. ..................................................... 23

F.    The False Arrest and Malicious Prosecution Claims are Barred by Independent Probable Cause Findings. .............................................................................................. 24

  1.    The prosecutor and judge *independently* found probable cause, knowing the key facts. ............................................................................................................................. 24

  2.    There was probable cause. ..................................................................................... 26

  3.    Moschell did not report a crime or actively participate in the prosecution. ......... 27

  4.    Because probable cause existed and Moschell did not initiate the prosecution, Watts' state law malicious prosecution claim fails. ........................................................ 28

G.    Watts' constitutional interrogation claim fails. ....................................................... 28

H.    Watts Cannot Prevail on Her Due Process Claim Because She Has State Remedies Available and Her Claim Has an Explicit Textual Source That Governs the Claim. ....... 29

I.    The Hospital Defendants' Did Not Intentionally or Negligently Cause Watts Emotional Distress. ....................................................................................................... 30

J.    Because the Hospital Defendants Were Authorized to Disclose Medical Information about the Baby, the Unauthorized Disclosure Claim Fails. ............................................. 31

K.    The Hospital Defendants Enjoy Immunity. ............................................................. 33

  1.    The Hospital Defendants enjoy immunity under R.C. 2921.22 and 3705.20. ........ 33

  2.    The Hospital Defendants are entitled to immunity for statements made to law enforcement. ................................................................................................................... 34

L.    Watts' Medical Malpractice Claim is Mooted by a collateral source. ....................... 35

CERTIFICATE OF COMPLIANCE .......................................................................... 37

CERTIFICATE OF SERVICE ................................................................................... 38

ii

## TABLE OF AUTHORITIES

**Cases**

*A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 8 (1995) ................................................................................................................... 35

*Anderson v. County of Hamilton*, 780 F. Supp. 2d 635, 652 (S.D. Ohio 2011) ........................... 18

*Betzko v. Mick*, 2022-Ohio-999, ¶ 21 (12th Dist.) ....................................................................... 28

*Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 402 (1999)............................................... 31, 33

*Blick v. Ann Arbor Pub. School Dist.*, 105 F.4th 868, 887 (6th Cir. 2024) .................................. 18

*Braley v. City of Pontiac*, 906 F.2d 220, 225 (6th Cir. 1990)...................................................... 29

*Brawley v. Plough,* 75 Ohio Misc. 2d 36, 39 (Ohio C.P. 1995) ................................................... 28

*Bringman v. Fredericktown*, 2016 U.S. Dist. LEXIS 142173, *11 (S.D.Ohio 2016) ............. 24, 27

*Bruni v. Tatsumi*, 46 Ohio St.2d 127 ............................................................................................. 8

*Burkes v. Stidham*, 107 Ohio App. 3d 363, 375 (8th Dist. 1995)................................................. 31

*Cadle v. Gas Busters Prd.,* 441 Fed. App'x. 310, 312 - 313 (6th Cir. 2011) ............................... 16

*Carter v. Carter*, 1989 Ohio App. LEXIS 3659, at *3 (3rd Dist. Sep. 19, 1989)............................ 13

*Cascone v. Herb Kay,* 6 Ohio St. 3d 155, 159 (1983)................................................................. 7, 8

*Craig v. Amos*, 2026-Ohio-129, ¶ 32 (5th Dist.)......................................................................... 28

*Desmond v. Cnty. Of Monroe*, 2024 U.S. Dist. LEXIS 127029 *5 (E.D.Mich 2024)................... 30

*Dressler v. Rice*, 739 F.App'x 814, 824 (6th Cir. 2018)............................................................... 17

*Estate of Stevic v. Bio-Medical Application of Ohio, Inc.*, 121 Ohio St. 3d 488, 488 (2009)....... 12

*Fulton v. Firelands Community Hosp.,* 2006-Ohio-1119, ¶ 13 (6th Dist.)..................................... 13

*Galuten v. Williamson Cty. Hosp. Dist.*, No. 21-5007, 2021 U.S. App. LEXIS 21536, at *15-16 (6th Cir. 2021)......................................................................................................................... 14

*Genthner v. Clovis Cmty. Hosp.,* 2016 U.S. Dist. LEXIS 119331, *7 (E.D. Cal. Sept. 1, 2016) . 16

*Gregg v. Ohio Dep't of Youth Servs.,* 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009)...................... 19

*Guy v. McCartney*, 2002-Ohio-3035, ¶ 23 (7th Dist.) ................................................................. 28

*Hahn v. Kotten*, 43 Ohio St. 2d 237, 246 (1975) ........................................................................ 34

*Halasah v. City of Kirtland*, 2013 U.S. Dist. LEXIS 71042, at *22 (N.D.Ohio 2013)................. 26

*Hale v. State Farm,* 2018-Ohio-3035, ¶ 24 (5th Dist.). ............................................................. 7, 8

*Healy v. Planned Parenthood of Greater Ohio*, 2023 U.S. Dist. LEXIS 57851, at *9 (S.D.Ohio 2023) ........................................................................................................................................ 17

*In re Writ of Mandamus (Turner)*, 2023-Ohio-2158 ..................................................................... 13

*In Re: Fordson Eng. Corp.,* 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982) .................................... 16

*Johnson v. Mercy Health Care*, 2025-Ohio-1157, ¶ 27 (6th Dist.) .............................................. 12

*Kelley v. Buckley*, 2011-Ohio-1362, ¶ 70 (8th Dist.) ................................................................... 23

*Kelly v. Accountancy Bd.,* 88 Ohio App.3d 453, 459 (10th Dist. 1993) ...................................... 34

*Knisley v. Bra*y, 2004-Ohio-4553, ¶ 13 (10th Dist.) ..................................................................... 7

*Korreckt v. Ohio Health*, 2011-Ohio-3082.................................................................................... 8

*Lansing v. City of Memphis,* 262 F. 3d 821, 833 (6th Cir. 2000) ................................................. 18

iii

*Leta v. TriHealth, Inc.*, No. 23-3406, 2024 U.S. App. LEXIS 1548, at *7 (6th Cir. 2024) .......... 17

*Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St. 3d 453, 455 (2018) ..................................... 11

*Massengale v. Perhacs*, 2025 U.S. Dist. LEXIS 107434, *16 (N.D. Ohio May 6, 2025) ...... 29, 30

*Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) ............................................. 17, 18

*Mosley v. Evans*, 90 Ohio App. 3d 633, 636 (1993) ........................................................ 34

*Nat'l Union Fire Ins. Co. v. Wuerth*, 122 Ohio St. 3d, 594, 597 (2009) ......................................... 12

*Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022) ......................................... 24

*Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App. 3d 176 (8th Dist. 1984) .......................... 34

*Popke v. Hoffman*, 21 Ohio App. 454, 456 (6th Dist. 1926) ......................................... 34

*Rome v. Flower Mem. Hosp.,* 70 Ohio St. 3d 14, 16 (1994) ............................................... 12

*Rush v. Univ. of Cincinnati Physicians., Inc.* 2016-Ohio-947, ¶ 23 (1st Dist.) ............................... 12

*Ryan v. Randolph*, 2004-Ohio-442, ¶ 14 (5th Dist.) ................................................... 13

*S&T Bank, Inc. v. Advance Merch. Servs., LLC,* 2024-Ohio-4757, ¶ 59 (1st. Dist.) .................... 23

*Schaney v. Krankovich*, 2021-Ohio-2762, ¶ 39 (7th Dist.) ......................................... 30

*Stakich v. Russo*, 2021-Ohio-1098, ¶ 28 (8th Dist.) ................................................... 31

*Stokes v. Meimaris*, 111 Ohio App. 3d 176, 189 (8th Dist. 1996) ........................................ 34

*Straley v. Morris*, 2026-Ohio-213, ¶ 9 (2026) ............................................... 36

*Sygula v. Regency Hosp. of Cleveland East,* 2016-Ohio-2843, ¶ 26 (8th Dist.) .......................... 31

*Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) ............................................... 24

*Tillimon v. Sullivan,* 1988 Ohio App. LEXIS 2616 (6th Dist.) ......................................... 34

*United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997) ......................................... 29

*Voyticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005) ........................................ 24

*Waad v. Farmers Ins. Exchange*, 762 F.App'x 256, 262 (6th Cir. 2019) ......................... 27, 28

*Watts v. Bon Secours Mercy Health,* No. 4:25-cv-49, 2026 U.S. Dist. LEXIS 44057, at *19 (N.D. Ohio 2026) ................................................................... 24

*Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) ............................................... 17

*Whipple v. Render*, 1989 Ohio App. LEXIS 3493, *2 (9th Dist.) ........................................ 34

**Statutes**

R.C. 2305.113(A), (B), (E) ................................................................... 12, 13, 14

R.C. 2323.41 ........................................................................... 35

R.C. 2323.43 ........................................................................... 35

R.C. 2921.22(A)(1), (C), (D), (I) ........................................................... 33, 34

R.C. 2927.01(B) ....................................................................... 27

R.C. 3705.20(A), (B) ................................................................... 33, 34

## STATEMENT OF THE ISSUES

1. **A Medical Negligence Claim and EMTALA Cannot Be Maintained Where a Patient Left Against Medical Advice, Denied Interventions, The Care Received Did Not Fall Below the Standard of Care, and the Statute of Limitations Was Not Tolled by a Sufficient 180-Day Letter.**

2. **Plaintiff Cannot Maintain a Claim Under § 1983 Where A Hospital Nurse is Not a State Actor, There's No Shared Plan to Constitute a Conspiracy, a Prosecutor and Judge Independently Find Probable Cause, and Plaintiff Validly Waived Her Miranda Rights.**

3. **Where State Remedies and Constitutional Claims Govern, a Due Process Claim Cannot be Maintained.**

4. **Intentional and Negligent Infliction of Emotional Distress Cannot be Maintained Where There is No Intent to Cause Emotional Distress and No Dangerous Incident.**

5. **A Legitimate Police Interest of Finding a Baby or its Remains is a Sufficient Countervailing Interest to Provide Hospital Defendants with a Qualified Privilege to Disclose Medical Information About the Baby.**

6. **Hospital Defendants Are Entitled to Immunity Where State Law and a Qualified Privilege Protects the Conduct at Issue.**

7. **Without a Viable State Law Claim, There is No Claim For Vicarious Liability.**

8. **Where Plaintiff Has Been Made Whole Through a Collateral Source, Her Medical Malpractice Claim is Mooted.**

v

**MEMORANDUM IN SUPPORT**

## I.  INTRODUCTION & SUMMARY OF ARGUMENT

Watts claimed she had put an 11-inch, *fully formed* baby in a bucket in her backyard. According to her own police expert, this was a matter the police should investigate, even if there was no crime. And Nurse Moschell simply asked the police to get the baby or tell her what to do. From that arose a lawsuit that is *completely contradicted by Watts, her criminal defense lawyer, and her experts*. Watts disputes nearly everything the Complaint says about the hospital visits. Her criminal defense lawyer agrees that Watts' conduct appears to be covered by the abuse of corpse statute. And the viability information which purportedly exonerated Watts was provided by the Hospital Defendants—from the start.  All this, in addition to the undisputed fact that a prosecutor and judge each *independently* determined probable cause, despite having the key viability facts Watts says precludes finding probable cause. And neither relied upon *anything* Nurse Moschell said or asked Watts.

Oddly, Watts asks for damages from Dr. Khavari for the miscarriage Watts had at home, despite releasing that claim. But Watts made a "choice" to leave, *expressly deciding to have the miscarriage at home*, having been told and understanding the risks. Of course, Watts' "choice" has spawned a time-barred malpractice claim, for the results of her choice.

## II.  STATEMENT OF FACTS

### A. Watts is admitted to St. Joseph and leaves against medical advice.

On September 19, 2023, Watts visited Dr. Khavari. (Watts 10:9-11:15, Doc. 106-1, PageID #1092-93 (Ex. A)).[1] Dr. Khavari determined Watts was pregnant with a 20–21-week-old baby. (Khavari 62:10-12, 71:24-72:4, Doc. 106-2, PageID #1295, 1304-05 (Ex. B); Watts 19:17-19, Doc.

---

[1] Citations to depositions in this Motion correspond to the full transcripts previously filed with this Court. Additionally, the referenced excerpts are attached to this Motion as exhibits.

**1**

106-1, PageID #1101). Because Watts appeared to be losing amniotic fluid and was dilated, she was transferred to St. Joseph. (Khavari 62:1-63:10, Doc. 106-2, PageID #1295-96).

There, the nurse took her vitals, checked on the baby via doppler, took Watts' history, ensured labs were done, and placed an IV for supportive fluids. (Hudak 35:22-36:11, Doc. 106-7, PageID #2249-50 (Ex. C); Watts 14:3-4, 123:3-15, Doc. 106-1, PageID #1096, 1205; Khavari Dep 225:22-226:13, Doc. 106-3, PageID #1458-59). Impatient, Watts *voluntarily* left against medical advice. (Watts 16:20-17:6, Doc. 106-1, PageID #1098-99). Dr. Khavari informed Watts that, by leaving, she risked infection, hemorrhage, infertility, emergent hysterectomy, and death. (Khavari 88:4-18, Doc. 106-2, PageID #1321). Knowing this, Watts signed a form stating that she was leaving against medical advice. (Watts 99:9-20 Doc. 106-1, PageID #1181; Watts Ex. 5, Doc. 109-2).

### B. Watts returns to St. Joseph and receives stabilizing treatment.

The next day, Watts returned to the hospital. (Watts 18:6-11, 19:3-5, Doc. 106-1, PageID #1100-01). Dr. Khavari ordered blood work, IV fluids, cultures, *antibiotics*, an ultrasound, a consult with maternal fetal medicine, Dr. Stewart, and a consult with pediatrics. (Khavari 92:8-19, 94:1-5, Doc. 106-2, PageID # 1325, 1327; Carpenter 70:18-21, Doc. 106-5, PageID #2075 (Ex. D)). The ultrasound showed the baby had a strong heartbeat. (Khavari 226:19-227:10, Doc. 106-2, PageID #1459-60). Watts was clinically stable with normal vitals and without a fever, heavy bleeding, or signs of sepsis. (Khavari 227:11-24, PageID #1460; Stewart 120:20-6, 122:15-23, 145:1-3, Doc. 106-11, PageID #4034-4036, 4059 (Ex. E)). On consult, Dr. Stewart recommended that Watts be induced. (Khavari 114:12-17, Doc. 106-2, PageID #2528).

### C. The nurses asked for an "appropriate" ethics consult.

As explained by Watts' expert, nurses always have the right to ask for an ethics consult. (Gelsomino 106:11-15, Doc. 106-8, PageID #2770 (Ex. F)). And here, *Watts' nursing expert agrees*

the consult was not inappropriate. (*Id.* at 107:4-8, PageID #2771). Simply, multiple experienced nurses believed that Dr. Stewart was functionally ordering an abortion, which was prohibited in a Catholic hospital (Rechichar 39:12-22, 42:18-43:5, Doc. 111-1, PageID #6084, 6088 (Ex. G); Stewart 39:16-40:3, Doc. 106-11, PageID #3953-3954). Regardless, Dr. Stewart agreed there had to be an ethics consult—before the induction. (Stewart 84:15-85:10, Doc. 107-1, PageID #3998-3999). So Rechichar notified Dr. Khavari of her belief that an ethics consult was needed. (Rechichar 12:15-18; 29:17-31:11, Doc. 111-1, PageID #6057, 6074-75). Because Watts was in stable condition, the nurses' ethics concern was addressed *before* proceeding with the induction. (Khavari 114:22-115:5, Doc. 106-2, PageID #1347-48). The ethics committee recommended proceeding with the induction. (Moschell 179:19-24, Doc. 106-12, PageID #3525 (Ex. H); Stewart 88:4-9, Doc. 107-1, PageID #4002; Ford 41:5-18, Doc. 106-6, PageID #2279 (Ex. I)).

But Dr. Khavari was in surgery from 2:15 p.m. until about 6:15 p.m. (Khavari Dec. at ¶ 3, Ex. J). After Dr. Khavari was out of surgery, she went to discuss informed consent with Watts and to order the induction. (Ex. J Khavari Dec. at ¶ 4; Khavari 109:21-110:9, Doc. 106-2, PageID #1342-43). But Watts had already left the hospital *again*. (*Id.* at 96:12-18, 97:2-10, 109:21-110:9, PageID #1329-30, 1342-43). Watts didn't want to wait for the procedure. (Watts 100:7-23, Doc. 106-1, PageID #1182). So, she made a "choice" and left the hospital against medical advice—not telling anyone. (*Id.*). Watts knew and accepted the risks. (Watts 99:17-20;102:15-22, Doc. 106-1, PageID #1181, 1184; Khavari 88:4-18, Doc. 106-2, PageID #1321). Critically, Watts agrees there was "nothing" the hospital did to drive her out—other than she did not want to wait. (Watts 103:13-17, Doc. 106-1, PageID #1185).

**D. Watts miscarries, then flushes *and plunges* the fully formed baby down the toilet.**
More than a day later on September 22nd, while using the bathroom, she heard a splash. (Watts 25:17-23, 27:12:-28:8, 64:16-18, PageID #1107, 1109, 1146). Watts tried to flush, but the

3

toilet clogged. (Watts 29:8-10, 29:22-30:5, Doc. 106-1, PageID #1111-12; Khavari 160:11-22, Doc. 106-2, PageID # 1393). Because it was not flushing, Watts used a plunger. (Watts 29:18-20, Doc. 106-1, PageID #111).

Knowing *the baby would be fully formed*, Watts always knew that the only place the baby could be was inside the toilet. (*Id.* at 88:22-25; 89:5-9, PageID #1170-71). In fact, Watts *told* nurse Hudak on the phone that she flushed the baby down the toilet. (Hudak 137:18-138:19, Doc. 106-7, PageID #2551-52). After plunging the baby down the toilet, Watts went to a hair appointment. (Watts 32:10-13, Doc. 106-1, PageID #1114).

### E. Watts returns to St. Joseph without the baby, prompting concern.

On September 22, 2023, Watts was immediately admitted and given IV fluids. (Watts 36:9-37:8, PageID #1118). Upon arrival to labor and delivery, Watts informed the nurses the *baby was in a bucket in the back yard*. (Moschell 268:8-12, Doc. 106-12, PageID #3614; Carrino 68:5-22, Doc. 106-4, PageID #1925 (Ex. K)). Being human, the nurses were understandably upset: a baby was exposed to animals, insects, children—whatever. (Moschell 270:4-271:3, Doc. 106-12, PageID #3616-17; Harvey 101:6-13, Doc. 106-9, PageID #2968 (Ex. L)).

Moschell contacted folks internally to determine how to get the baby to the hospital. (Carrino 95:19-20, 96:7-13, Doc. 106-4, PageID #1952-53). Then  Moschell called the police and asked them to find the baby or tell her what to do. (Moschell Ex. 5, Doc. 110). Watts' police expert characterized this as a request for service, compared to a request for investigation of a crime. (Harvey 89:1-4, Doc. 106-9, PageID #2956). But it was a matter of police concern, regardless of if a crime was committed. (*Id.* at 101:6-10, PageID #2968).

**F.  Warren Police search for the baby while Detective Carney visits Watts.**

The officers at Watts' residence could not find the baby. (Carney 124:1-10, Doc. 106-3, PageID #1615). So, Carney was sent to the hospital. (*Id*). When Carney arrived, he met with Moschell to gather more information. (*Id.* at 127:23-128:4, PageID # 1618-19).

After introducing himself, Carney read Watts her *Miranda* rights. (Carney 162:1-2, 177:4-20, PageID #1653, 1668). Watts voluntarily waived her rights and chose to speak with Carney. (Carney 177:4-20, Doc. 106-3, PageID # 1668; Watts 51:5-14, Doc. 106-1, PageID #1133; Watts Ex. 1, Doc. 108-1, PageID #4091). Watts noted she wanted to get this off her chest. (Watts Ex. 3 at 13:16-24, Doc. 108-2, PageID #4104). And in retrospect, Watts agreed she wanted to help find the baby. (Watts 92:7-19, Doc. 106-1, PageID #1174).

But, during the conversation with Carney, Watts *continuously lied*, stating that she used a black bucket to remove the baby and put it behind a shed. (Carney 185:6-10, Doc. 106-3, PageID #1676). It was clear to Carney that Watts did not want the police to search the bathroom—where Watts admits she knew the baby was. (*Id.* at 189:10-13, PageID #1680). Eventually, Watts confessed that the baby might be in the toilet. (*Id.* at 294:18-25, PageID #1785). Of course, Watts knew this all along. (Watts 88:21-89:9, Doc. 106-1, PageID #1170-71).

**G.  Police find the one-pound, 11-inch-long discarded baby jammed in the toilet pipes.**

Sergeant Laprocina reached into the toilet and felt the baby's feet sticking up in the pipe entrance. (Carney 220:22-221:2, Doc. 106-3, PageID #1711-12). The officers and coroner found the one-pound baby jammed in the toilet pipe. (*Id.* at 256:12-20, 315:4-8, Doc. 106-3, PageID #1747, 1806; Carney Ex. 10, Doc. 109-6). Watts' baby was fully developed with pronounced physical features such as hair, eyes, nose, ten fingers, ten toes, and genitalia. (Carney 220:20-23, Doc. 106-3, PageID #1711,  Ex. 10, Doc. 109-6).

**H. Prosecutor Blair and Judge Ivanchak *independently* determined probable cause existed despite having the key evidence Watts claims prevents probable cause.**

On October 4, 2023, Carney presented the facts of Watts' case to Warren County Prosecutor Gil Blair. (Carney 238:1-9, Doc. 106-3, PageID #1729 (Ex. M); Blair 45:4-18, Doc. 106-13, PageID #3831 (Ex. N)). Blair reviewed the police report and officer narratives. (Blair 47:11-18 Doc. 106-13, PageID #3833). Notably, Watts' criminal defense lawyer's central defense to probable cause was the baby was not viable and had died in utero. (Timko 32:12-33:1, 80:13-81:4, 101:20-103:17, Doc. 106-10, PageID #3057-58, 3105-06, 3126-28 (Ex. O)). And this fact was presented **by Carney** *before* Blair made the decision to charge. (Timko 101:20-102:12, Doc. 106-10, PageID #3126-27; Blair 46:5-8, 49:22-50:4; Doc. 106-13, PageID #3832, 3835-86). And of course, Carney received that information from the Hospital Defendants. (Carney 128:22-130:8, Doc. 106-3, PageID #1619-20; Timko 80:19-24, Doc. 106-10, PageID #3105). But the viability of the baby was never a consideration in Blair's decision to approve charges. (Blair 103:4-21, Doc. 106-13, PageID #3889). Blair determined that plunging a baby down the toilet would outrage community sensibilities. (*Id.* at 44:1-6, 64:1-15, PageID #3830, 3850). As such, Blair approved charges against Watts on October 4, 2023, for abuse of a corpse. (*Id*. at 42:18-21, PageID #3828). In his view, the statute did not require intent. (*Id.* at 106:10-14, PageID #3892). Importantly—the decision to charge was Blair's **independent** decision. (*Id.* at 42:14-21, PageID #3828).

On November 2, 2023, a preliminary hearing was held. (Carney Ex. 5, Doc. 180-10, PageID #4260-4326). After considering testimony, *the lack of viability evidence*, and arguments, Judge Ivanchak found probable cause existed. (*Id.* at pg. 65, PageID #4324).

6

## III.   LAW AND ARGUMENT

### A.  Watts Cannot Demonstrate Dr. Khavari Caused Her Injuries.

#### 1.  Watts' informed choice to leave against medical advice precludes finding Dr. Khavari caused her miscarriage.

Watts suffered a miscarriage at home by choice yet seeks damages from Dr. Khavari for that miscarriage. (Second Am. Compl. ¶ 6, Doc. 97, PageID # 996). But Watts' claim is barred by her intentional intervening act of leaving the hospital against medical advice, which prevented Dr. Khavari from performing the induction. (Watts Ex. 5, Doc. 109-2).

To start, a plaintiff's actions can break the causal connection to a defendant's claimed negligence. *Knisley v. Bra*y, 2004-Ohio-4553, ¶ 13 (10th Dist.). If Watts' action is a new and independent intervening cause of the injury, Dr. Khavari is absolved of liability. *Id.*; *Hale v. State Farm,* 2018-Ohio-3035, ¶ 24 (5th Dist.). An intervening act breaks the causal connection if "that intervening actor was a conscious and responsible agency which could or should have eliminated the hazard, and whether the intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Cascone v. Herb Kay,* 6 Ohio St. 3d 155, 159 (1983).

Here, the miscarriage happened a day and a half after Dr. Khavari came to Watts' room at 7 p.m. to obtain consent and order the induction. (Ex. J Khavari Dec at ¶ 4-7). Watts had been advised that if she left before birth—she was exposed to harm and risked infection, hemorrhage, infertility, emergent hysterectomy, and death. (Khavari 88:4-18, Doc. 106-2, PageID #1321). She understood those risks. (Watts 99:9-20, Doc. 106-1, PageID #1181). And when she left on September 20th, she still understood those risks. (*Id.* at 101:10-102:22, PageID #1181-82). Yet, Watts made a ***conscious decision to have the miscarriage at home*** and not wait for the treatment:

Q:  And **one of the choices was you could stay and have the procedure**?

A:  Correct.

7

Q:  And you made a decision **to leave because that's the** *choice* **you wanted to make**, right?

A:  Correct.

(*Id.* at 100:11-16, PageID #1181).

Q:  All right. And so **you made a choice, because you didn't want to wait for the procedure, to go home** *and have the miscarriage there*, **right?**

A:  Correct.

(*Id.* at 101:6-9, PageID #1181).

Q:  … Now, going home, you certainly **understood that whatever happened at home was probably riskier** than if you stayed in the hospital?

A:  Correct.

Q:  **And you made the choice to accept that risk**?

A:  Correct.

(*Id.* at 102:15-22, PageID #1182) (emphasis added). Watts admits her knowing act of leaving the hospital was not, in any way, driven by anything the Hospital Defendants did—she just didn't want to wait for the care. (*Id.* at 101:6-9, 103:13-17, PageID #1181, 1183).

Critically, Watts didn't *just* choose to leave. **Watts consciously and deliberately chose** *to have the miscarriage at home.* (*Id.* at 101:6-9, PageID #1181). She cannot transfer the results of her decision to Dr. Khavari, who would have obtained consent and performed the induction just a few minutes after Watts left—a day and half before Watts' miscarriage at home. (Ex. J Khavari Dec at ¶ 2-5; *Cascone v. Herb Kay,* 6 Ohio St. 3d 155, 159 (1983); *Hale v. State Farm,* 2018-Ohio-3035, ¶ 24 (5th Dist.).

2. **The claimed breaches did not proximately cause any injuries.**

Watts *must* establish proximate cause between the claimed breach and injury—would the breach have made a difference in her outcome. *Korreckt v. Ohio Health*, 2011-Ohio-3082, ¶ 11

(10th Dist.) (citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, ¶ 1 of the syllabus (1976)). Here, Watts claims Dr. Khavari fell below the standard of care in three ways: (a) failure to order a D&E (dilation and evacuation/abortion); (b) failure to stop the ethics consult; and (c) failure to order an induction on September 19 and September 20, 2023. (Second Am. Compl., ¶ 153-157, Doc. 97, PageID # 1022-23).

*First,* the failure to order a D&E did not result in any injury to Watts. It could not have been ordered. To start, Watts didn't want a D&E. (Watts 112:3-5, Doc. 106-1, PageID #1194; Stewart 98:19-99:3, Doc. 107-1, PageID #4012-4013). So, failing to order something Watts would not have consented to obviously did not cause harm. (*Id.*). Moreover, Watts' own expert agrees— a D&E was inappropriate. (Carpenter 26:21-24, Doc. 106-5, PageID #2031). To be sure, a D&E would have required Dr. Khavari to abort the baby by cutting up the baby—into little pieces— while the baby still had a heartbeat and was inside Watts. (*Id.* at 50:18-51:1, PageID #2055). This was not within the standard of care. (*Id.* at 26:21-24, PageID #2031). As a result, there cannot be any harm proximately caused by failing to order a procedure not within the standard of care, that Watts didn't want.

*Second,* Watts' counsel's obsession with the ethics consult is perplexing—there was nothing Dr. Khavari could or should have done to stop it. To start, Watts wanted exactly what happened in ethics—a "deliberate" discussion about whether an induction was warranted:

> Q: … **you would want the hospital *to proceed slowly*** before they took an action like inducing you that would end up killing the baby, right?
> …
> A: Correct.
>
> Q: You would want the hospital **to be *very deliberate* in its thought process** before they took that, right?
> …
> A: Correct.

**9**

Q:  And **if there were people who thought—had second thoughts about, *you would want the medical professionals to talk about that* and figure it out before they went ahead with that procedure**, right?

…

A:  Correct.

Q:  And that would be reasonable to do, because it was important to you that if the baby could survive, you wanted it to survive?

…

A:  Correct.

(Watts 111:1-23, Doc. 106-1, PageID #1193) (emphasis added). Even Watts understands the ethics consult was not frivolous—it was "reasonable." (*Id*.) As important, *Watts' nursing expert* refused to say the consult was inappropriate—much less frivolous:

Q:  . . . **it is within the purview of a nurse to request an ethical consultation**?

A:  Yes. **Always**.

Q:  And you don't believe it was inappropriate for ethics to get involved?

A:  **I do not think it was inappropriate for ethics *to be consulted* and involved.**

(Gelsomino 106:11-15, 107:4-8, Doc. 106-8, PageID #2270-71) (after reviewing the entire case). Likewise,  the ethics call did not fall below the standard of care per Watts' other expert. (Carpenter 25:20-26:1, 171:13-17, Doc. 106-5, PageID #2030-31, 2176).

Similarly, Dr. Stewart was clear his suggestion of an induction was contingent upon an ethics consultation: "…You can't just start an induction without the okay of the ethics committee…" (Stewart 40:16-41:3; *see also* 65:19-66:2; 68:1-6, Doc. 107-1, PageID #3954-3955; PageID #3979-3980; PageID #3982). Dr. Stewart could not unilaterally decide to terminate Watts' pregnancy—a 21-week-old baby with a heartbeat—without the consult, or he would have been fired. (*Id.* at 98:5-99:3, PageID #4012-4013). So, there is no proximate cause—an ethic consult had to happen and was appropriate. (*Id*.).

**10**

*Third,* the claimed failure to order an induction quicker did not result in any harm to Watts. On September 19th Watts' vitals were stable. (Carpenter 57:8-11, 58:19-16, Doc. 106-5, PageID #2062-63). Dr. Khavari asked Watts on the 19th if she wanted any interventions, a c-section, or a vacuum delivery, but Watts did not want any interventions taken. (Khavari 62:1-63:10, Doc. 106-2, PageID #1295-96). *Indeed, Watts declined the consult with maternal fetal medicine to specifically discuss induction on the 19th.* (Carpenter 67:4-9, Doc. 106-5, PageID #2072). Dr. Khavari's treatment for Watts on the 19th was all within the standard of care. (*Id.* at 55:17-56:1, 57:3-7, PageID #2060-63).

Watts was also stable on September 20th. (*Id*. at 25:20-26:1, 80:1-3, PageID #2030-31, 2085). And the induction could not have been ordered until Watts gave informed consent with Dr. Khavari. (Khavari 109:14-110:9, Doc. 106-2, PageID #1342-43). Watts' own expert agrees the informed consent was needed before the induction occurred. (Carpenter 25:20-26:1, 171:13-17, Doc. 106-5, PageID #2030-31, 2176). But Dr. Khavari was in surgery from about 2:15 p.m. until about 6:15 p.m. And after that surgery/paperwork was completed, she came to obtain informed consent and then order the induction. (Ex. J Khavari Dec at ¶ 2-5). But of course, Watts had left a few minutes earlier, which prevented the consent and the induction. (Khavari 109:21-110:9, Doc. 106-2, PageID #1342-43; Watts 99:21-102:14, Doc. 106-1, PageID #1181-83). Dr. Khavari didn't refuse the induction—she just waited until she was able to obtain informed consent as everyone agrees she should have. (Ex. J Khavari Dec at ¶ 1-5). And because Watts was stable during the ethics call and Dr. Khavari's surgery, there was no harm. (Carpenter at 80:1-3, Doc. 106-5, PageID #2085).

### 3.  Watts Released Dr. Khavari and Hospital Defendants From Liability.

On September 19, 2023, Watts left against medical advice. (Watts Ex. 5, Doc. 109-2). In doing so, Watts released the Hospital Defendants from liability for claims and damages resulting

**11**

from her decision to leave against medical advice. (Watts Ex. 5, Doc. 109-2). And she knew she released the hospital from *any* liability for her choice to leave. (Watts 99:13-16, Doc. 106-1, PageID #1181). When Watts returned on the 20th and left against medical advice *again*, she *knew* she would have had to sign a second form releasing liability. (*Id.* at 101:10-25, PageID #1181). Instead, she left without telling anyone. (*Id.*). Watts' release of liability is an absolute bar. *Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St. 3d 453, 455 (2018).

### B. Watts' Claims Against Dr. Khavari are Time-Barred.
#### 1. Every claim against Dr. Khavari has a one-year statute of limitations.

Watts' claims against Dr. Khavari are all medical claims under R.C. 2305.113. So, they are governed by the one-year statute of limitations. R.C. 2305.113(A). To be sure, a "medical claim" is "*any* claim," including derivative and ancillary claims, asserted against a statutorily enumerated medical provider "that arises out of the medical diagnosis, care, or treatment of any person." R.C. 2305.113(E)(3) (emphasis added); *see also Estate of Stevic v. Bio-Medical Application of Ohio, Inc.*, 121 Ohio St. 3d 488, 488 (2009).

All the claims arise from actions Dr. Khavari took in the medical care of Watts. (Second Am. Compl. ¶ 145-157, Doc. 97, PageID #1021-1023). They are thus "medical claims" regardless of how they are captioned. *Estate of Stevic,* 121 Ohio St. 3d at 488; *Rome v. Flower Mem. Hosp.,* 70 Ohio St. 3d 14, 16 (1994). As such, the one-year statute of limitations controls. R.C. 2305.113(A).

#### 2. The "180-day letter" did not toll the statute of limitations because it did not specifically say a claim was forthcoming against Dr. Khavari.

A plaintiff can extend the statute of limitations by 180 days if the plaintiff "gives *to the person who is the subject of [the] claim* written notice that the claimant is considering bringing an action upon that claim." R.C. 2305.113(B)(1) (emphasis added); *Johnson v. Mercy Health Care*, 2025-Ohio-1157, ¶ 27 (6th Dist.). But Watts never sent an 180-day letter specifically notifying *Dr. Khavari* a claim was coming.

Watts will almost certainly argue that a letter addressed to the hospital was an 180-day letter tolling the statute of limitations for Dr. Khavari. Not true. While the statute allows the letter to Dr. Khavari to be "addressed" to her employer, the notice must be given to "to **the person** who is the subject of [the claim]." R.C. 2305.113(B)(1) and (2) (emphasis added). This makes sense, as medical claims can only be brought against a person. *Rush v. Univ. of Cincinnati Physicians., Inc.* 2016-Ohio-947, ¶ 23 (1st Dist.) (citing *Nat'l Union Fire Ins. Co. v. Wuerth*, 122 Ohio St. 3d, 594, 597 (2009)). And here, the letter does not *specifically* say the claim is against Dr. Khavari—only the catchall phrase—the hospitals agents and employees. (*See* Khavari. Ex. 4, Doc. 108-5, PageID #4188-4190). The only time Dr. Khavari is mentioned is with respect to preservation of evidence. (*Id.*).

Ohio law is consistent—in the context of notice—a notice must state the person's name *in connection* with a legal notice. *See In re Writ of Mandamus (Turner)*, 2023-Ohio-2158, ¶ 5 (8th Dist.); *Carter v. Carter*, 1989 Ohio App. LEXIS 3659, at *3 (3rd Dist. Sep. 19, 1989). In fact, cases addressing this exact issue on the prior similar statute—for which the relevant portion about notice has not been materially changed—are clear that the letter must specifically identify the physician it is providing notice to as a target. For example, in *Smith v. Gill*, the court held that a letter sent to the healthcare group failing to name the physician *as a potential defendant* did not comply with R.C. 2305.113. 2010-Ohio-4012, ¶ 20 (8th Dist.). This is directly on point. Likewise, the courts in *Fulton* and *Ryan* t held a 180-letter was insufficient when it did not *expressly* identify the physician as a potential party. *Fulton v. Firelands Community Hosp.,* 2006-Ohio-1119, ¶ 13 (6th Dist.); *Ryan v. Randolph*, 2004-Ohio-442, ¶ 14 (5th Dist.); *Est. of Altizer v. Arbors at Gallipolis*, 2026-Ohio-369, ¶ 47 (2026).

Here, Dr. Khavari did not receive a letter expressly addressed to her identifying that she specifically would be subject of a medical malpractice claim. (Khavari 218:8-9, Doc. 106-2, PageID

13

# 1451; Khavari Ex. 4, Doc. 108-5, PageID #4188-4190). As a result, the 180-day letter is ineffective to extend the statute of limitations. *Smith*, 2010-Ohio-4012, ¶ 20. To hold any other way would allow parties to completely circumvent the intent of the statute—that someone who might be sued receives notice. Simply, writing to a hospital and generally indicating all its "agents and employees" could be defendants would allow a *form letter* to cover every hospital employee in every case. This obviously isn't what was intended by "gives <u>*to the person*</u> *who is the subject of [the] claim* written notice." R.C. 2305.113(B)(1) (emphasis added).

### 3. Because the case was not filed within one year, it is time-barred.

The claimed malpractice occurred in September of 2023 (Second Am. Compl. ¶ 154, Doc. 97, PageID # 1022). Yet the lawsuit was not filed until January 10, 2025. (*See* Compl., Doc. 1). As a result, all medical claims against Dr. Khavari are time-barred. R.C. 2305.113(A).

### C. Watts Was Stable, and Left Despite Receiving Stabilizing Care, Barring Her EMTALA Claim.

Watts *willingly* left against medical advice, *twice.* (Watts 99:9-20, 101:15-20, 102:1-22 Doc. 106-1, PageID #1181, 1183-84; Watts Ex. 5, Doc. 109-2). And admits she was receiving stabilizing treatment when she left. (Watts 122:24-123:22, Doc. 106-1, PageID #1204-05). Yet, Watts asserts the Hospital Defendants "failed to provide stabilizing treatment," in violation of the Emergency Medical Treatment and Labor Act ("EMTALA"). (Second Am. Compl. ¶ 121-130, PageID # 1017-1019). Obviously not true. EMTALA imposes, in relevant part, a *duty to stabilize* the condition *before transferring* or *discharging* a person who has an *emergency* medical condition. *Galuten v. Williamson Cty. Hosp. Dist.*, No. 21-5007, 2021 U.S. App. LEXIS 21536, at *15-16 (6th Cir. 2021).

*First*, on September 19, 2023, Watts' own expert plainly admits that Watts was clinically stable and received stabilizing treatment that met the standard of care. (Carpenter 55:9-56:1, 56:21-57:11, Doc. 106-5, PageID #2060-62). Indeed, Watts declined the consult with maternal fetal

medicine to specifically discuss induction on the 19th. (Carpenter 67:4-9, PageID #2072). Dr. Khavari's treatment for Watts on the 19th—having her admitted to the hospital, ordering IV fluids, placing a consult to Dr. Stewart—was all within the standard of care. (Carpenter 55:17-56:1, 57:3-7, PageID #2060-63). And Watts *admits* she was being monitored, her vitals were being checked, and she was being hydrated with IV fluids. (Watts 122:24-123:15, Doc. 106-1, PageID #1204-05). No care was refused.

*Second,* on September 20, 2023, Watts indisputably received stabilizing care. When Watts returned to the emergency department she was immediately admitted. (Watts 18:21-19:5, PageID #1100-01). The labor and delivery nurses did an assessment of Watts, while Dr. Khavari put in orders. (Khavari at 92:8-19, Doc. 106-2, PageID #1325). And the orders were followed—Watts received fluids, antibiotics, bloodwork, an ultrasound, and a consult with a maternal fetal expert within a few hours. (Watts 132:10-13, 102:8-10, Doc. 106-1, PageID #1214, 1184; Khavari 95:2-9, Doc. 106-2, PageID #1328). To be sure, Watts—now a nursing student—agrees she was receiving supportive care to stabilize her. (Watts 122:14-123:22, Doc. 106-1, PageID #1204-05). True, the induction was delayed by an ethics consult that was necessary per Dr. Stewart and appropriate through Watts' nurse expert. (Gelsomino 106:11-15, 107:4-8, Doc. 106-8, PageID #2770-71; Stewart 84:11-23, 98:5-18, Doc. 107-1, PageID #3998, #4012). But the induction was planned *before discharge*. (Ex. J Khavari Dec at ¶ 1, 5, 7). And Dr. Khavari never *refused* it before discharge – Watts just left before discharge. (Watts 100:7-16, Doc. 106-1, PageID #1182).

Importantly, Watts was clinically stable. (Stewart 144:15-145:3, Doc. 107-1, PageID #4058-4059; Khavari 84:9-24, Doc. 106-2, PageID #1317; Carpenter 68:34-4, 80:1-3, Doc. 106-5, PageID #2073, 2085). To be sure, her vitals were normal. (Carpenter 80:1-3, PageID #2085). Her white blood count was heading down due to the antibiotics. (*Id.* at 80:4-6, PageID #2085).

**15**

And the only care that was suggested, and agreed on by all the experts—an induction—was going to be ordered when Dr. Khavari finished her surgery and arrived at 7:00 p.m., if she obtained consent. (Ex. J Khavari Dec. at ¶ 7).

Faced with this, Watts' lawyers contend that a D&E was medically necessary to stabilize her. (Second Am. Compl. ¶ 127-130, PageID #1018-1019). But Watts' expert clearly indicates that the standard of care did not require a D&E. (Carpenter 26:21-24, Doc. 106-5, PageID #2031). Simply, a D&E was not a viable option. (Stewart 144:15-145:3, Doc. 107-1, PageID #4058-4059; Khavari 84:9-24, Doc. 106-2, PageID #1317). So, a D&E (a functional abortion) was not required to stabilize Watts, never mind that Watts would not consent to an abortion. (Watts 112:3-5, Doc. 106-1, PageID #1194).

*Finally,* Watts argues that a constructive discharge occurred. (Second Am. Compl. ¶ 129 PageID #1019). Watts' counsel pleads she was forced out of the hospital due to the way she was treated. (*Id.*). But like so much in the pleadings, Watts disagrees:

> Q: . . . and there was ***nothing any of the hospital folks did to drive you out****, you just didn't want to wait*, right?
>
> A: *Correct.*

(Watts 102:16-103:17, Doc. 106-1, PageID #1184-85). And this is not an isolated quote. The entire line of questioning is clear Watts left because of a service issue—too long of a wait—versus anything that was going on around her. (*Id.* at 100:14-102:9, PageID #1182-84). Watts' admission that there was "nothing" the hospital employees did ends this issue. *Cadle v. Gas Busters Prd.,* 441 Fed. App'x. 310, 312 - 313 (6th Cir. 2011) (emphasis added) (citing *In Re: Fordson Eng. Corp.,* 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982)).

Importantly, the EMTALA does not contemplate the concept of a "constructive discharge" case outside of dumping cases. Indeed, 42 U.S.C. § 1395dd(e)(4) notes that a transfer or discharge

**16**

does not include the movement of an individual who leaves a facility without permission—there is no exception for a so-called constructive discharge. *Id*. And here, Watts undeniably left without permission (eloped) before discharge. *See, e.g., Genthner v. Clovis Cmty. Hosp., 2*016 U.S. Dist. LEXIS 119331, *7 (E.D. Cal. Sept. 1, 2016) (Elopement precludes EMTALA claim even where plaintiff claimed she waited four hours for proper treatment).

### D.  Moschell Cannot be Liable Under Section 1983 Because She is Not a State Actor.

Watts must show Moschell acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). "The private party's actions so approximate state action that they may be fairly attributed to the state." *Leta v. TriHealth, Inc.*, No. 23-3406, 2024 U.S. App. LEXIS 1548, at *7 (6th Cir. 2024). Importantly, providing information to the police, responding to questions, and offering witness testimony is not action taken 'under color of law.'" *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009). Logically, the act of calling the police and providing information is not enough. *Healy v. Planned Parenthood of Greater Ohio*, 2023 U.S. Dist. LEXIS 57851, at *9 (S.D.Ohio 2023) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009)); *Dressler v. Rice*, 739 F.App'x 814, 824 (6th Cir. 2018). Even malicious conduct doesn't transform private conduct into state action. *Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020).

Moschell had two relevant contacts with the police. First, Moschell called asking for help. (Moschell Ex. 5, Doc. 110). As conceded by Watts' nursing expert, Watts' baby had been a patient of the hospital as well. (Gelsomino 76:4-16, Doc. 106-8, PageID #2740). And Moschell heard that this 11-inch, fully formed baby was sitting in a bucket in the backyard—exposed to rodents, animals, insects, children—whatever. (Moschell 268:8-12, 269:10-15, Doc. 106-12, PageID #3614-15). Per Watts' police expert, this is clearly a matter the police should handle, even if there is no crime. (Harvey 101:6-13, 115:13-16, Doc. 106-9, PageID #2968, 2982). This act—asking the police to get the body of the baby or tell Moschell what to do—aside from just being human—

**17**

does not convert Moschell's conduct into state action. *Dressler,* 739 F. App'x at 824. To be sure, she did not even report a crime—she asked the police for a service—to get the baby or tell her what to do. (Moschell Ex. 5, Doc. 110; Harvey 89:1-4, Doc. 106-9, PageID #2956). Simply, the mere fact that assistance was available from a police officer cannot form the nexus for state and private action. *Lansing v. City of Memphis,* 262 F. 3d 821, 833 (6th Cir. 2000); *Moldowan,* 578 F. 3d at 399.

Next, Moschell was present for the questioning regarding where the baby was located. (Moschell 321:1-322:9, Doc. 106-12, PageID #3667-68; Carney Ex. 4, Doc. 108-9, PageID #4200-4259). Again, simply being present—and asking where the baby (a former patient) is, is not state action. (Moschell 321:1-322:9, Doc. 106-12, PageID #3667-68). To be sure, Watts wanted the nurses to help her find the baby. (Watts 93:1-10, Doc. 106-1, PageID #1175). And Moschell's presence in the room was clearly as a nurse. (Moschell 321:1-24, Doc. 106-12, PageID #3667). So, she cannot have liability—merely for being in the room with the police officer and asking a few questions herself—trying to locate a former patient's body. *Moldowan*, 578 F.3d at 351, 399. After all, Watts wanted her help. (Watts 93:1-10, Doc. 106-1, PageID #1175).

### E.  Both the Section 1983 and State Law Conspiracy Claims Fail for Lack of Shared Plan and Overt Acts in Furtherance.

#### 1.  Watts' Section 1983 conspiracy claim fails because Moschell and Carney did not have a shared plan and there is no underlying deprivation.

For Watts to prevail on her conspiracy claim under Section 1983, she must demonstrate (1) that at least two people have agreed *to a single plan* to deprive plaintiff of rights protected by Section 1983; (2) that each alleged co-conspirator has shared the plan's *illegal* objective; and (3) the co-conspirators have taken an "overt act" to carry out the plan. *Blick v. Ann Arbor Pub. School Dist.*, 105 F.4th 868, 887 (6th Cir. 2024). Plus, "an actual deprivation of a constitutional right" is needed. *Anderson v. County of Hamilton*, 780 F. Supp. 2d 635, 652 (S.D. Ohio 2011).

### i. There is no evidence of a shared plan to deprive Watts of her rights.

Watts' claim that Moschell and Carney shared a plan to deprive Watts of her rights is rank speculation, based upon Jenga-like stacking of inferences. All Watts offers is Moschell saying she would love to be in the room when Watts was asked about the location of the baby. (Second Am. Compl. ¶ 64, Doc. 97, PageID # 1008). But that is not enough.

To infer a common plan and the same legal objective requires the Court stack multiple inferences—which is prohibited. *Gregg v. Ohio Dep't of Youth Servs.,* 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009). To get there from the "love to" comment, the Court must, at a minimum, infer that: (1) Carney's invitation to "join" meant an agreement to act in concert, *rather than just be present*; (2) Moschell understood that and further agreed on an actual plan to violate Watts' rights; (3) that plan was to get Watts' to confess where the baby was, for the purpose of violating her rights; (4) the plan—and Moschell's agreement with Carney—extended past the questioning, and contemplated an unlawful arrest and charging outcome; (5) that the eventual charge would not be based on probable cause (and yet still somehow survive the independent judgment of the prosecutor); and (6) Moschell took some overt act, after the agreement, in furtherance of this overarching goal. This type of rank speculation and stacking of inferences are both prohibited on summary judgment. *Id.* at 859.

In addition, it makes absolutely no sense. It is undisputed that the key fact used by Watts in her defense of probable cause—that the baby was not viable[2]—was specifically provided by Moschell to Carney. (Carney 128:22-130:8, Doc. 106-3, PageID #1619-20). And then Carney provided that claimed crucial piece of evidence to the prosecutor—before his probable cause

---

[2] Watts' defense lawyer takes the position that the baby isn't a corpse if it dies shortly after birth because it wasn't a viable pregnancy, so a lack of viability means a lack of probable cause. (Carney Ex. 5 at 50:1-6, 56:6-63:11, Doc. 108-10, PageID #4309, 4315-4322)

finding. (Blair 54:2-11, Doc. 106-13, PageID #3840). If the Court stacks inferences and concludes that Carney and Moschell knew an abuse of corpse charge was without probable cause—*why would the single fact Watts argued prohibited probable cause—lack of viability of the baby—be conveyed* to the police, prosecutor and judge? (Carney Ex. 5, Doc. 108-10, PageID #4260-4326). Consider—Watts claims they knew there was no probable cause because the baby was not viable––but Carney made sure everyone knew that. There was no plan to have Watts illegally charged. Rather, it is exactly as Watts agreed—they were just trying to find the location of the baby:

> Q:  And in the meeting where Nurse Moschell was in there with that detective, **it was clear** in that meeting that ***all* they were trying to do was to find out where the baby's body was**?
>
> A:  **Correct**.

(Watts 92:7-13, Doc. 106-1, PageID #1174) (emphasis added). From that point, there was no participation by Moschell or the hospital—in any way—in connection with the criminal prosecution. (Carney 321:22-23, Doc. 106-3, PageID #1812). There was no shared plan or conspiracy—just illogical speculation based on stacked inferences.

### ii.    There was no illegal objective or overt act.

As Watts agreed, all they were trying to do was find the baby—a former hospital patient. (Gelsomino 76:4-16, Doc. 106-8, PageID #2740; Watts 92:7-93:10, Doc. 106-1, PageID #1174-75). And according to Watts' police expert—the baby needed to be found, regardless of if a crime was committed. (Harvey 101:6-10, Doc. 106-9, PageID #2968). Likewise, finding the baby—to prevent its decomposition—could be and was helpful to Watts. (Harvey 115:13-16, PageID #2982). To be sure, Moschell's comments at the time indicated a subjective belief on her part that finding the baby would prevent Watts from being charged. (Moschell 305:12-23, Doc. 106-12, PageID #3651). And that is what occurred—the coroner determined the baby had died in utero,

which is purportedly why the grand jury found no probable cause—as argued by Watts' counsel. (Timko 32:7-33:1, Doc. 106-10, PageID #3057; Carney Ex. 5 at 46:2-6, Doc. 108-10, PageID #4305).

Plus, Moschell's phone call to the police occurred before she even knew who Carney was and before they met at the hospital for the first time. (Carney 105:4-15, Doc. 106-3, PageID #1596). So, Moschell obviously could not perform an overt act in furtherance of a conspiracy— when she had not even talked to the alleged co-conspirator prior to meeting at the hospital. (*Id.*).

### iii.    There is no constitutional deprivation connected to Moschell's actions.

*First*, ignoring her own police expert, Watts contends that Moschell and Carney agreed to interrogate Watts without probable cause to do so or without any justification. (Second Am. Compl. ¶ 116-118, Doc. 97, PageID# 1016-1017). *These defendants implore the Court to listen to the actual audio.* (Watts Ex. 2, Doc. 110).  But regardless,

- Watts wanted the nurses to help her find the baby. (Watts 92:14-19, Doc. 106-1, PageID #1174). And she simply wanted to get it off her chest. (Watts Ex. 3 at 13:16-24, Doc. 108-2, PageID #4104).

- Watts presented to the hospital without the baby and told Moschell it was in a bucket outside. (Moschell 268:8-12, 269:10-15, Doc. 106-12, PageID #3614-15).

- This is **a legitimate issue which the police should investigate, according to Watts' own police expert,** even without a crime being committed. (Harvey 101:6-13, 115:1-25, Doc. 106-9, PageID #2968, 2982).

- Watts had given different stories about the baby, having previously told another nurse she had flushed the baby down the toilet. (Carney 185:6-10, Doc. 106-3, PageID #1676).

- Despite saying the baby was in a bucket in the backyard, Watts knew—when she arrived at the hospital—the baby was actually in the toilet. (Watts 88:21-89:2, Doc. 106-1, PageID #1170-71).

- Watts signed the *Miranda* form voluntarily and knowingly. (Watts Ex. 1, Doc. 108-1, PageID #4091). At no point did she tell Carney to leave. (Watts 50:20-25, Doc. 106-1, PageID #1132).

- Carney told Watts she did not have to speak with him, and he would leave at any time. (Watts Ex. 3 at 7:15-8:5, Doc. 108-2, PageID #4098-4099).

*Second*, Watts asserts Moschell and Carney agreed to unreasonably seize and prosecute Watts without probable cause. But Moschell did not instigate Watts' arrest or prosecution.

- No one from the hospital in any way pushed for charges against Watts. (Carney 321:22-24, PageID #1812).

- The prosecutor who found probable cause never considered any of the questions Moschell asked or anything she said. (Carney 321:2-19, PageID #1812).

- Moschell had no role in filing the charge against Watts, was not involved in the preliminary hearing in which probable cause was determined and was not involved in issuing the arrest warrant or arresting Watts. (Carney 259:7-9, 250:25-251:9, 257:10-13, 320:2-4, 321:2-24, PageID #1741-1742, 17481750, 1811-12; Carney Ex. 5, at pg. 2, Doc. 108-10, PageID #4261).

- Watts' criminal counsel agrees that plunging the baby down the toilet appears to fall within the statute upon which Watts was charged. (Timko 81:13-82:8, Doc. 106-10, PageID #3106-07). Simply, what Watts did on its face was a violation of the statute. (*Id.*). And the only reason Watts' criminal counsel argued against probable cause was the baby wasn't viable—as she argued at the probable cause hearing. (Carney Ex. 5 at 56:6-63:11, Doc. 108-10, PageID #4315-4322).

- At the time Moschell was involved, the coroner had not yet rendered his opinion the baby ***died in utero***. (Carney Ex. 5 at 14:13-15:19, 27:11-13, Doc.108-10, PageID #4273-4274, 4286). So, she couldn't know there was no probable cause— the alleged key fact had yet to be discovered.

- As Prosecutor Blair noted, there is no intent requirement of the statute he charged Watts with. (Blair 106:10-14, PageID #3892).

Simply, there was no agreement to seize Watts—it was the prosecutor's *independent* call, who knew the baby was not viable—the centerpiece of the probable cause defense. (Blair 42:14-21, 54:2-11, Doc. 106-13, PageID #3828, 3840). Moschell was not involved.

### 2. Because there is no underlying unlawful act and no plan or agreement to cause injury to Watts, her state law conspiracy claim fails.

To succeed on her state law conspiracy claim, Watts must prove: "(1) a malicious combination of two or more persons, (2) causing injury to another person or property, and (3) the existence of an unlawful act independent from the conspiracy itself." *Kelley v. Buckley*, 2011-Ohio-1362, ¶ 70 (8th Dist.). There must be an underlying unlawful act to maintain a conspiracy claim. *Id.* The parties involved in the conspiracy *must* have a common understanding to commit an unlawful act. *S&T Bank, Inc. v. Advance Merch. Servs., LLC,* 2024-Ohio-4757, ¶ 59 (1st. Dist.). And "the malice involved in the tort is 'that state of mind under which a person does a wrongful act purposely, **without a reasonable or lawful excuse**, to the injury of another.'" *Kelley* at ¶ 70.

To start, Moschell did not act with the requisite state of mind for a civil conspiracy. *Id.* Moschell had a legitimate and lawful purpose in her actions. Watts informed the nurses she discarded the baby outside in a bucket. (Moschell 268:8-12, 269:10-15, Doc. 106-12, PageID #3614-15). Moschell simply wanted to find the baby. (*Id.* at 305:7-11, PageID #3651). As did Watts. (Watts 93:1-10, Doc. 106-1, PageID #1175). And if the baby was outside in a bucket, it certainly couldn't be left there—per Watts' expert. (Harvey 101:6-13, Doc. 106-9, PageID #2968). *Aside from being an understandable human reaction*, it was an issue the police should address. (*Id.*). Moschell merely aided the police to find the baby—which Watts wanted. (Watts 93:1-10, Doc. 106-1, PageID #1175; Moschell 305:7-11, PageID #3651).

Next, Moschell's acts were independent of Carney's, as she had no role in filing the charge against Watts, the preliminary hearing, the arrest warrant, or arresting Watts. (Carney 259:7-9, 250:25-9, 257:10-13, 320:2-4, 321:2-24, Doc. 106-3, PageID #1741-1742, 1748, 1750, 1811-12; Carney Ex. 5, at pg. 2 Doc. 108). Nothing Moschell did was used by the prosecutor or the judge. (Blair 88:5-17, Doc. 106-13, PageID #3874; Carney 321:17-24, Doc. 106-3, PageID #1812; Ex. 5

**23**

at 2, Doc. 108). And both knew the centerpiece of Watts' probable defense—the viability of the baby—before they found probable cause. (Blair 42:14-21, 54:2-11, Doc. 106-13, PageID #3828, 3840; Carney Ex. 5 at 56:6-63:11 Doc 108-10, PageID #4315-4322).

**F. The False Arrest and Malicious Prosecution Claims are Barred by Independent Probable Cause Findings.**

Aside from the fact Moschell had no involvement in the prosecution, the finding of probable cause defeats any claim for false arrest, false imprisonment, and malicious prosecution under 42 U.S.C. 1983. *Bringman v. Fredericktown*, 2016 U.S. Dist. LEXIS 142173, *11 (S.D.Ohio 2016). Watts must "prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010); *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005). She cannot.

**1. The prosecutor and judge *independently* found probable cause, knowing the key facts.**

On October 4, 2023, Prosecutor Blair independently determined probable cause existed to bring an abuse of a corpse charge against Watts. (Blair 42:18-21; 61:9-16, Doc. 106-13, PageID #3828, 3847). Simply, a "prosecutor's independent charging decision breaks the causal chain for a malicious prosecution claim." *Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022); *Watts v. Bon Secours Mercy Health,* No. 4:25-cv-49, 2026 U.S. Dist. LEXIS 44057, at *19 (N.D. Ohio 2026) ("… an independent investigation by law enforcement would defeat a malicious prosecution claim…").

Here, Blair reviewed the information brought forth by Carney and determined that there was sufficient information to charge Watts with an abuse of a corpse charge. (Blair 47:11-24, 67:19-68:16, Doc. 106-13, PageID #3853-54; Carney 243:17-244:4, Doc. 106-3, PageID #1734-45). Indeed, Blair was certain that abuse of a corpse was the proper charge, as flushing a baby

**24**

down the toilet would outrage community sensibilities. (Blair 64:1-15, Doc. 106-13, PageID #3850). He is right as a picture tells a thousand words:



(Carney Ex. 10). **This is not something that happens to thousands of women each year.** Blair obviously could conclude an abuse of corpse occurred independently:



25

(*See* Ex. P, Photos produced by Watts). And Blair did not believe there was an intent requirement in the statute, so any claim that Carney failed to give details on intent is irrelevant. (Blair 106:10-14, Doc. 106-13, PageID #3892). Plus, Blair didn't rely upon anything Moschell said. (*Id.* at 88:5-17, PageID #3874). Rather, he had in front of him the lack of viability issue and disagreed that it mattered. (*Id.* at 54:2-11, PageID #3840).

Then, Judge Ivanchak found probable cause. (Carney Ex. 5, at pg. 65 Doc. 108-10, PageID #4324). He heard the arguments that the lack of viability defeated probable cause—the only argument Watts made. (Carney Ex. 5 at 56:15-63:11 Doc. 108-10, PageID #4315-4322). Yet he heard no testimony or evidence from Moschell. (*Id.* at 2). And Watts' lawyer cross-examined the witnesses. (*Id.*). She made a conscious choice not to question Carney about the hospital interview because those facts would not have mattered. (Timko 124:9-14, Doc. 106-10, PageID #3149). Rather, the prosecution was driven solely based upon the above photos of the baby jammed down a toilet pipe. (*Id.* at 81:13-82:8, PageID #3106-07). The central basis to Watts' defense—the baby was not viable and the death occurred in utero—was in front of the magistrate judge, yet he found probable cause. (Carney Ex. 5 at 46:2-4, 56:15-63:11, Doc. 108-10, PageID #4305, 4315-4322).

And where "facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the intitiating party." *Halasah v. City of Kirtland*, 2013 U.S. Dist. LEXIS 71042, at *22 (N.D.Ohio 2013). So, his finding breaks the chain of causation for Moschell. *Id.*

### 2.  There was probable cause.

*First*, Watts' criminal lawyer concedes the abuse of a corpse statute appears to apply. (Timko 81:13-82:8, Doc. 106-10, PageID #3106-07). It is her belief the baby was not a "corpse" because it did not take a breath and died in utero/not viable. (Carney Ex. 5 at 50:1-6, 51:19-52:3, Doc. 108-10, PageID #4310-4311; Timko 83:2-4, Doc. 106-10, PageID #3108). But the prosecutor

did not believe a baby only becomes a corpse if it viable. (Timko 25:6-11, Doc. 106-10, PageID #3050; Carney Ex. 5 at 51:19-53:15, Doc. 108-10, PageID #4310-4312). And this is hardly a clear issue under Ohio law—as conceded by Watts' lawyer. (Timko 97:23-98:5, Doc. 106-10, PageID #3122-23). There is no statute on point. (*Id.* at 84:19-22, PageID #3109). Simply, the above photos are enough to demonstrate probable cause. (Carney Ex. 10, Doc. 109-6). Watts jammed a fully formed baby down a toilet, then lied about it.

Probable cause does not require certainty. *Bringman v. Fredericktown,* 2016 U.S. Dist. LEXIS 142173, at *11 (S.D. Ohio 2016). Here, you have an act which appeared to be covered by the statute. (Timko 81:19-82:8, Doc. 106-10, PageID #3106-07). The disposal of the baby would clearly outage reasonable community sensibilities. R.C. 2927.01(B). Because probable cause existed for Watts' arrest and prosecution, her claims fail. *Bringman* at *11.

### 3. Moschell did not report a crime or actively participate in the prosecution.

There is *no* evidence that Moschell "made, influenced, or participated in the decision to prosecute" as required to prove a malicious prosecution claim. *Waad v. Farmers Ins. Exchange*, 762 F.App'x 256, 262 (6th Cir. 2019). Even if Moschell had passed along information to the prosecutor—she did not—that *is not* enough to "participate" in the decision. *Id.*

*First,* Moschell never even reported a crime. When Moschell called 9-1-1, she stated, "I need to have someone go find this baby or direct me on what I need to do." (Moschell Ex. 5, Doc. 110). Watts' expert this is request for service. (Harvey 86:4-8, 89:1-4, Doc. 106-9, PageID #2953, 2956). And it was a legitimate police interest to want the baby to be found, even if a crime had not been committed. (*Id.* at 115:1-25, PageID #2982). If the baby was in a bucket, it was a matter for the police. (*Id.* 101:6-13, PageID #2968). And finding the body quickly would benefit Watts—it would preserve the evidence allowing the coroner to provide the key to Watts' defense. (Harvey 115:9-25, PageID #2982).  Asking the police for help – a service – is not enough.

27

*Second,* Moschell had no role in filing the charge against Watts, the preliminary hearing, issuing the arrest warrant, or arresting Watts. (Carney 259:7-9, 250:25-9, 257:10-13, 320:2-4, 321:2-24, Doc. 106-3, PageID #1741-1742, 1748, 1750, 1811-12; Carney Ex. 5, at pg. 2). And no one from the Hospital ever pushed for Watts to be charged. (Carney 321:22-24, Doc. 106-3, PageID #1812). Rather, Moschell and the Hospital Defendants provided the key piece of information Watts' counsel argued on probable cause—the baby wasn't viable. (Carney Ex. 5 at 56:15-63:11, Doc. 108-10, PageID #4315-4322; Timko 102:19-103:8, Doc. 106-10, PageID#3127-28).

### 4. Because probable cause existed and Moschell did not initiate the prosecution, Watts' state law malicious prosecution claim fails.

To succeed on a malicious prosecution claim, Watts must prove (1) malice in initiating or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. *Betzko v. Mick*, 2022-Ohio-999, ¶ 21 (12th Dist.). To start, a bind-over order following a preliminary hearing is *prima facie* evidence of probable cause. *Guy v. McCartney*, 2002-Ohio-3035, ¶ 23 (7th Dist.). This negates any claim of lack of probable cause. *Brawley v. Plough,* 75 Ohio Misc. 2d 36, 39 (Ohio C.P. 1995). Watts' claim fails because probable cause existed and was independently found by the prosecutor and judge. (*See* Section F, *supra*); *Craig v. Amos*, 2026-Ohio-129, ¶ 32 (5th Dist.); *Waad v. Farmers Ins. Exchange*, 762 F.App'x 256, 262 (6th Cir. 2019); *Brawley v. Plough,* 75 Ohio Misc. 2d 36, 39 (Ohio C.P. 1995).

In addition, as discussed above, the Hospital Defendants did not initiate—in any way—the prosecution. (*See* Section F.3, *supra*).

### G. Watts' constitutional interrogation claim fails.

An individual may waive *Miranda* rights if done so "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). And where an individual makes voluntary statements without being interrogated or pressured by an interrogator, the statements are

admissible even in the absence of *Miranda* warnings. *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997). Again, the Court should listen to the actual audio. (Watts Ex 2, Doc. 110).

Watts voluntarily participated. (*See* Section E.1.iii, *supra*). She wanted to help them find the baby. (Watts 92:14-19, Doc. 106-1, PageID #1174). And there is nothing to suggest Watts was mentally unable to consent. True, at 5:00 a.m.—*nine hours prior*—she had a miscarriage. But by the time of the interrogation, she had fluids, normal vital, her hemoglobin was at a normal level for a postpartum individual—she was stable. (Carpenter 68:24-69, 71:17-24, 80:1-12, 102:20-21, Doc. 106-5, PageID #2074, 2076, 2085, 2107). And Watts has no qualified psychiatric expert to say Watts was mentally unable to consent.[3] Simply, Watts, the police, and Moschell all believed that the statements were voluntary—her counsel is the only one who disagrees.

### H. Watts Cannot Prevail on Her Due Process Claim Because She Has State Remedies Available and Her Claim Has an Explicit Textual Source That Governs the Claim.

Where an individual has an adequate state remedy, a procedural due process claim will not stand. *Massengale v. Perhacs*, 2025 U.S. Dist. LEXIS 107434, *16 (N.D. Ohio May 6, 2025) (citing *Braley v. City of Pontiac*, 906 F.2d 220, 225 (6th Cir. 1990)). As for a substantive due process claim, where there is "an explicit textual source in the Constitution," that source, and not the Fourteenth Amendment, will govern. *Id.* at *15-16.

Watts claims the Hospital Defendants "intentionally fabricated evidence against Watts that was then used to deprive her of liberty." (Second Am. Compl. ¶ 113, Doc. 97, PageID # 1016). Watts simply has attempted to re-plead a Fourth Amendment claim as a due process claim. But the Fourth Amendment governs, and Watts cannot succeed because probable cause existed.

---

[3] Watts' MD expert—not a psychologist—has given a psychological opinion. He merely states Watts was giving statements "against her interests" so she must have been mentally impaired. (Carpenter 97:13-98:24, Doc. 106-5, PageID #2102). Under this theory, any person who confess to a crime would be impaired. And he ignores Watts' own testimony that she wanted to speak to the police. (*Id.* at 113:3-21, PageID #2118).

*Massengale*, 2025 U.S. Dist. LEXIS 107434 at *16. Even if the Fourteenth Amendment governed, there is no record evidence Moschell deprived Watts of her liberty or influenced her criminal proceedings. (Carney 259:7-9, Doc. 106-3, PageID #1750; Carney Ex. 5, at pg. 2, Doc. 108-10; Blair 43:14-21, 47:11-24, 67:19-68:16, 88:5-17, Doc. 106-13, PageID #3829, 3833, 3853-54, 3874).

And Watts has asserted state law remedies, barring her procedural due process claim. (Doc. 97, PageID #1019-1025); *Massengale*, 2025 U.S. Dist. LEXIS 107434 ("Failure 'to plead that [a plaintiff] lacks an adequate state remedy that comports with procedural due process' will doom a due process claim") (quoting *Desmond v. Cnty. Of Monroe*, 2024 U.S. Dist. LEXIS 127029 *5 (E.D.Mich 2024)).

## I. The Hospital Defendants' Did Not Intentionally or Negligently Cause Watts Emotional Distress.

*First,* the negligent infliction of emotional distress claim fails for the lack of a "dangerous incident" caused by the Hospital Defendants. *Schaney v. Krankovich*, 2021-Ohio-2762, ¶ 39 (7th Dist.). Simply, this claim is reserved for individuals who are in close proximity to a dangerous event—that is not the case here. *Id.*; (Carpenter 58:9-16, 80:1-3, Doc. 106-5, PageID #2063, 2085; Stewart 144:23-145:3, Doc. 106-5, PageID #2149-2150; Khavari 173:12-23, 210:6-14, 227:11-14, Doc. 106-2, PageID #1406, 1443, 1460).

*Second,* there is no conduct which rises to the level of intentional infliction of emotional distress. Start with the ethics consult. Watts' own nursing expert agrees it was not inappropriate for the nurses to ask for a consult. (Gelsomino 106:11-15, 107:4-8, Doc. 106-8, PageID #2770-71). Indeed, it was absolutely required based upon the course of treatment that was recommended. (Stewart 84:15-85:10, Doc. 106-5, PageID #2089-2090).

30

In addition, Moschell asking the police for a service—to tell her what to do or get the baby—cannot be considered extreme conduct. (Moschell Ex. 5, Doc. 110; Harvey 89:1-4, PageID #2956). Simply bringing something to the attention of the police is not extreme and outrageous conduct. *See Stakich v. Russo*, 2021-Ohio-1098, ¶ 28 (8th Dist.). Indeed, Watts' own police expert asserts this is an issue the police needed to investigate and that the baby needed to be found quickly. (Harvey 115:13-25, Doc. 106-9, PageID #2982). And Watts herself agreed she wanted to help the police find the baby. (Watts 92:14-93:10, Doc. 106-1, PageID #1174). Calling the police is not enough. *Burkes v. Stidham*, 107 Ohio App. 3d 363, 375 (8th Dist. 1995) (finding that reporting perceived behavior plaintiff found concerning to police was not extreme and outrageous); *Sygula v. Regency Hosp. of Cleveland East,* 2016-Ohio-2843, ¶ 26 (8th Dist.) (reporting to law enforcement as required by law was not extreme and outrageous).

## J. Because the Hospital Defendants Were Authorized to Disclose Medical Information about the Baby, the Unauthorized Disclosure Claim Fails.

Medical providers may disclose information—when there is an interest of the public, the patient, the physician, or a third party—which justifies the creation of a conditional or qualified privilege absent any statutory mandate to the contrary. *Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 402 (1999). If a countervailing interest requires disclosure, that can outweigh a patient's interest in confidentiality. *Id.* at 395.

Initially, it is important to remember that the baby was a patient as well—as agreed by Watts' nursing expert. (Gelsomino 76:4-16, PageID #2740). So, Moschell learned that the baby (a former patient) is in a bucket outside exposed. (Moschell 268:5-12, PageID #3614). As agreed by Watts' police expert, this is an event the police should be involved with *regardless of a crime*—they should get the baby. (Harvey 115:13-16, Doc. 106-9, PageID #2982). So, there is no dispute—per Watts' police expert—Moschell called the police about a matter that was a police concern.

31

(Harvey 89:1-4, PageID #2956). And it was likewise—as agreed by Watts' nursing expert—a concern about a former patient of the hospital—the baby. (Gelsomino 76:4-16, Doc. 106-8, PageID #2740). The other interests are obvious—beyond just being human and not wanting a baby to be outside in a bucket. As Watts' expert noted, there is an interest in the police preserving the body from decomposition—which favors Watts. (Harvey 115:9-20, Doc. 106-9, PageID #2982). And in this case, the ability to determine the baby died in utero was central to her defense. (Carney Ex. 5 at 57:8-63:11, Doc. 108-10, PageID #4316-4322). Likewise, simply not having a fully formed baby exposed to animals, insects, and children is obviously a countervailing interest—unless you are not human. Even Watts' expert agrees. (Harvey 101:6-13, Doc. 106-9, PageID #2968).

With respect to the phone call, Watts' counsel ignores what was said. Watts contends that Moschell implied to the police dispatcher that she did something wrong or illegal. (Second Am. Compl. ¶ 56, Doc. 97, PageID # 1006). Not so. In fact, nowhere in the audio of Moschell's call to law enforcement are any statements related to whether Watts did anything wrong or illegal. (Moschell Ex. 5, Doc. 110; Harvey Ex. 2, Doc. 108-24, PageID #4529). Simply, Moschell let dispatch know that the baby was roughly 22 weeks, had no prenatal care, the baby was discarded outside in a bucket, and it was unclear if the baby was alive or born alive. (Harvey Ex. 2, Doc. 108-24, PageID #4529, Moschell Ex. 5, Doc. 110). The lack of prenatal care was mentioned to establish that the gestation or size of the baby was just an estimate. (Moschell 338:8-17, Doc. 106-12, PageID #3684). Moschell provided the information that she believed would be needed to find the baby. (*Id.* at 333:1-7, 334:20-25, PageID #3679-80). And it was Watts' interest to find the baby as soon as possible. (Harvey 115:3-16, Doc. 106-9, PageID #2982).

And Watts *wanted* the baby to be found and *knew* finding the baby was the right thing to do. (Watts 93:1-10, Doc. 106-1, PageID #1175). As Watts agreed, if Moschell did not call the

32

police, the baby was not going to be found. (*Id.* at 94:8-17, PageID #1176).

Finally, the information disclosed by Moschell was about the baby. (Moschell Ex. 5, Doc. 110). Its size, care it received, its purported location, etc. (Moschell Ex. 5, Doc. 110). And as noted by Watts' nursing expert, the baby was considered a separate patient—the nurses had two patients. (Gelsomino 76:4-16, Doc. 106-8, PageID #2740). As a result, Watts has no standing to bring any claim about information given about the baby—a separate patient. (Gelsomino 76:4-16, Doc. 106-8, PageID #2740); *Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 402 (1999).

### K.  The Hospital Defendants Enjoy Immunity.
#### 1.  The Hospital Defendants enjoy immunity under R.C. 2921.22 and 3705.20.
Under R.C. 2921.22(A)(1), the Hospital Defendants are mandated to report felonies and deaths. People acquiring knowledge of fetal deaths are required to report it. R.C. 2921.22(C). And a duty to cooperate with the police. R.C. 2921.22(D). Plus, Ohio law requires that "[t]he fetal death of the product of human conception of at least twenty weeks of gestation [] be registered on a fetal death certificate." R.C. 3705.20(A); *see also* R.C. 3705.16. And a death certificate was needed before the baby could be buried. R.C. 3705.20(B) (emphasis added).

Critically, R.C. 2921.22(I) explicitly provides that disclosure of information pursuant to R.C. 2921.22 does not give rise to any liability for breach of privilege or confidence. That is because "[t]he purpose of R.C. 2921.22 is to compel the release of information necessary to aid in the solving of crimes without fear of recourse against the divulging party." *Whipple v. Render*, 1989 Ohio App. LEXIS 3493, *2 (9th Dist.); *Kelly v. Accountancy Bd.,* 88 Ohio App.3d 453, 459 (10th Dist. 1993). Disclosure of information pursuant to R.C. 2921.22 includes participation in a criminal investigation. *Kelly*, 88 Ohio App.3d at 458-460.

It was in the interest of both the baby and Watts for the police to find the baby. (Harvey 115:9-25, Doc. 106-9, PageID #2982). So, Moschell put in a service request to the police to find

33

the baby or tell her what to do. (Moschell Ex. 5, Doc. 110; Harvey 89:1-4, Doc. 106-9, PageID #2965). In doing so, Moschell did not state Watts "did not care it was alive" and made no mention of whether Watts did anything wrong or illegal as alleged by Watts. (*Compare* Second Am. Compl. ¶ 55, Doc. 97, PageID # 1006; Moschell Ex. 5, Doc. 110; Harvey Ex. 2, Doc. 108-24, PageID #4529). Moschell did not know for certain where the baby was, if the baby was alive, or what condition the police would find the baby in. (Moschell 337:18-338:7, Doc. 106-12, PageID #3683-84). But Moschell, like Watts' expert, knew that the baby *needed* to be found. (Moschell Dep 266:23-12, Doc. 106-12, PageID #3612; Harvey 101:6-13, 115:9-25, Doc. 106-9, PageID #2968, 2982). Moschell thus cannot be liable for asking for help from the police to find the baby—which is what Watts wanted as well. (Watts 92:14-25, Doc.#106-1, PageID #1174); *See* R.C. 2921.22; R.C. 3705.20.

### 2. The Hospital Defendants are entitled to immunity for statements made to law enforcement.

Statements made to police officers are protected by a qualified privilege. *Popke v. Hoffman*, 21 Ohio App. 454, 456 (6th Dist. 1926); *Stokes v. Meimaris*, 111 Ohio App. 3d 176, 189 (8th Dist. 1996); *see also Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App. 3d 176 (8th Dist. 1984)); *Tillimon v. Sullivan,* 1988 Ohio App. LEXIS 2616 (6th Dist.) The privilege applies when:

> (1) [the defendant] acted in good faith; (2) there was an interest to
> be upheld; (3) the statement was limited in its scope to the purpose
> of upholding that interest; (4) the occasion was proper; and (5) the
> publication was made in a proper manner and only to proper parties.

*Mosley v. Evans*, 90 Ohio App. 3d 633, 636 (1993); *Hahn v. Kotten*, 43 Ohio St. 2d 237, 246 (1975); *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 8 (1995). All present here.

To be sure, the actions by Moschell were taken in good faith. (Moschell 266:23-267:12, 270:15-271:2, Doc. 106-12, PageID #3612-13, 3616-17). And Watts wanted the baby to be found.

34

(Watts 93:1-10, Doc. 106-1, PageID #1175). Regardless of the viability, the former patient baby needed to be found  (Harvey 51:16-24, 101:6-13, 115:13-16, Doc. 106-9, PageID #2918, 2968, 2982; Gelsomino 76:4-16, Doc. 106-8, PageID #2740). Simply, Watts' expert concedes this was an issue the police needed to handle—the publication was to the proper party, the police. (Harvey 101:6-10, Doc. 106-9, PageID #2968). And Moschell was not certain, nor could anyone at the hospital be certain, the baby was not born alive. (Moschell 337:18-338:7, Doc. 106-12, PageID #3683-84). So, there were legitimate police interests to find the baby as soon as possible. (Harvey 115:13-16, Doc. 106-9, PageID #2982). The information relayed to dispatch was *about the baby* and was only disclosed to the dispatcher or police in order to find the baby—it was limited in scope. (Moschell Ex. 5, Doc. 110). Thus, immunity precludes this claim.

### L.  Watts' Medical Malpractice Claim is Mooted by a collateral source.

Under R.C. 2323.43, Watts' damages are capped at $250,000. R.C. 2323.43. And R.C. 2323.41 permits collateral sources of money to be introduced—with no exception for GoFundMe payments. R.C. 2323.41. Watts' criminal lawyer and friend set up a GoFundMe page. (Timko 77:22-78:25, Doc. 85-2, PageID # 790). Watts' GoFundMe page—to this day—seeks payment for the same damages alleged in her Second Amended Complaint. (GoFundMe, Doc. 85-8). The GoFundMe has raised more than $252,000 to compensate Watts. (*Id.*; Timko 78:21-25, Doc. 85-2, PageID # 790). And *all* of the money raised went directly to Watts. (Timko 78:21-25, Doc. 85-2, PageID # 790). Since Watts has already recovered more than the damage cap, her claim is moot and there are no damages to recover. *Straley v. Morris*, 2026-Ohio-213, ¶ 9 (2026).

Respectfully submitted,

*Chloe Schelhaas*

Patrick Kasson (0055570)
Thomas N. Spyker (0098075)
Chloe E. Schelhaas (0105919)
955 Yard Street, Suite 330
Columbus, Ohio 43212
Tel: (614) 228-1311 | Fax: (614) 232-2410
E: pkasson@reminger.com
E: cschelhaas@reminger.com

Thomas A. Prislipsky (0067623)
**REMINGER CO., LPA**
950 Windham Court Suite 200
Youngstown, Ohio 44512
Tel: (330) 744-1311 | Fax: (330) 744-7500
E: tprislipsky@reminger.com


*Attorneys for Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, and Parisa Khavari*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's initial standing order (DOC #41), Counsel certifies that this motion is in compliance with the page limitation under L.R. 7.1(f) as extended per this Court's Order.

*Chloe Schelhaas*
Chloe E. Schelhaas (0105919)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been filed electronically this 7th day of

August, 2026.  All parties will receive notice of this filing by operation of the Court's electronic

filing system.

*Chloe Schelhaas*
Chloe E. Schelhaas (0105919)