Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

**EXHIBIT A**

BRITTANY WATTS,

    Plaintiff,

vs.

BON SECOURS

MERCY HEALTH, et al.,

    Defendants.

Case No.

4:25-CV-00049

Judge Sara Lioi

- - - - -

Deposition of

BRITTANY WATTS,

called for examination under the Applicable Rules of Federal Civil Procedure, taken before me, Julieanne Ross, a Registered Professional Reporter in and for the State of Ohio, pursuant to notice and agreement of counsel, at the offices of Mazanec, Raskin & Ryder Co., LPA, 34305 Solon Road, 100 Franklin's Row, Cleveland, Ohio, on Thursday, October 23rd, 2025, at 10:36 a.m.

- - - - -

Deposition of Brittany Watts                              Brittany Watts, vs. Bon Secours Mercy Health, et al.,

record real quick.

(Discussion had off the record.)

MR. PINZONE:  Okay, we can go back on.

BY MR. PINZONE:

Q.  All right.  Have you at any point in time been diagnosed with any type of learning or mental disability?

A.  No.

Q.  So prior to your miscarriage, my understanding is the first time you would have gone to the hospital and sought any type of medical help would have been around September 19th, 2023; is that correct?

A.  That's correct.

Q.  Tell me what prompted that visit.

A.  I was sitting in my living room.  We have two living rooms in our home, there was an upper and a lower living room.

I was sitting in the lower living room and I experienced spotting.  Because I had gotten up and went to the restroom to use the restroom as normal, and I looked behind me and there was spotting.

And I called the ObGyn and I scheduled an appointment with her.  And during that time when I was scheduling the appointment I was also

experiencing some -- the urgency to have to use the restroom.

But that's when I realized, okay, something is definitely wrong.  But it wasn't like urine, it was whatever -- it was the fluid.

Q. Okay.  Okay.

A. That's what I realized now, that it was the fluid.

So because it just -- it felt like I had to use the restroom, but it was, like, not actually using the restroom.

So when I did call her I was very adamant about having to make an appointment with her to rectify the situation.

Q. All right.  What was the name of your ObGyn?

A. Parisa Khavari.

Q. And this all would have happened on the same day that you actually went to the hospital that September 19th?

A. Yes.

Q. And would this have been the first indication to you that there's something going on here that's not normal?

A. Yes.

Q. Based on some of the symptoms you've described for me, would that have indicated to you at that point

to labor and delivery.  I was just taken at normal speed.

And they had me -- they hooked me up to an IV.  And I had not seen Dr. Khavari for the rest of that time until maybe after 4:00 or 5:00 o'clock, after her office hours.  But they had been in contact with her, but no actual thing -- no actual work was done.

Q.   So with all those circumstances though you ultimately get to labor and delivery, right?

A.   Yes.

Q.   Okay.  And can you tell me who were the medical folks that are giving you some treatment once you get there?

MS. RICKERT:  Objection to foundation. You can answer.

A.   Okay.  I don't remember their names exactly, but I do remember there were quite a few, quite a few young women that were on the floor that day.

Q.   Okay.  Was there any specific doctor that saw you that day?

A.   Other than Dr. Khavari, no.

Q.   Okay.  And you don't recall any of the names of the nurses at that point?

A.   No.

Deposition of Brittany Watts                        Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A.  Yes, after hours of waiting, yes.

Q.  Was there an instance where you actually did get to speak with Dr. Khavari?

A.  I spoke to her briefly.  And after hours, like I said, after hours of waiting I got frustrated.

Q.  Okay.

A.  I did express to her my frustration.

Q.  What did you specifically tell her as far as I'm frustrated right now?

A.  I told her that I was in a lot of pain and I just felt like if you had brought me over here in an emergent situation I felt like you could have been more present.

Q.  All right.  And what was her response to that?

A.  She told me that she had other patients to see and it was during office hours.

Q.  All right.  So at some point in time you leave the hospital; correct?

A.  Yes.

Q.  Okay.  Tell me, describe the steps you took in leaving the hospital.

A.  I unhooked myself from the IV and I got -- I went down to the elevator.  I got in my car and I left.

Q.  Did you have to put your normal clothes on?  Were you in a gown before that?

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A.    No, I was in my normal clothes when I left.

Q.    Did you inform anyone that you were leaving?

A.    Yes, I did.

Q.    All right. Who did you inform?

A.    I informed the nurses that were on duty. And then they made me sign an AMA.

But my reason for signing it was because I had not received any medical advice because I was left waiting. I was left sitting there with no resolve. I had not received any medical advice as to what the next step was going to be.

Q.    Okay. So did you drive yourself home?

A.    Yes.

Q.    Okay. Did you speak with anyone about that initial stay at the hospital?

A.    No.

Q.    So at this point your mom doesn't know you're pregnant; correct?

A.    No, no.

Q.    And what's your mom's name?

A.    Annette.

Q.    And if I'm understanding the living arrangements, your mom was living upstairs mainly, right?

A.    Yeah, we both have -- yes, she has the upstairs and I have the downstairs. Yeah, there's two

floors.

Q. Okay. And at that point in time, again, you had not informed your mom that you were pregnant; correct?

A. That's correct.

Q. All right. So there was then a second visit to the hospital; is that correct?

A. Yes.

Q. All right. Can you tell me when that was in relation to the first visit?

A. That was the following day.

Q. And tell me what motivated that visit.

A. Because I wanted to see if there had been any resolve as to my prior visit, to see if there could be any action taken instead of me sitting and waiting like I did the previous day.

Because she knew I had been there. She knew what the situation was. So I wanted to see if she was going to act on anything that she was telling me.

Q. Okay. And so when you go to the hospital the second day --

A. Yes.

Q. -- do you initially go through the emergency room?

A. Yes.

Q.    Okay.

A.    Yes.

Q.    And where do they take you once you're at the emergency room?

A.    Up to labor and delivery.

Q.    Got it.  And do you recall the nurses who were present the second time that you were at the hospital?

A.    No.  The only nurse that I recall is the nurse from the third day.

Q.    Okay.  Did you have an opportunity to speak with Dr. Khavari the second time you went to the hospital?

A.    Not until later on, again, that afternoon.  But they did inform her that I did come back.

Q.    I'm going to back up real quick.

During the first visit was there an ultrasound done?

A.    At her office, yes.

Q.    Okay.  And did you have an opportunity to view the ultrasound?

A.    No, I did not.

Q.    Was there ever an ultrasound done while you were at the hospital?

A.    No, I do not remember that.

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A.    Correct.

Q.    And you said at one point you actually looked in the toilet and you saw blood?

A.    Yes, blood.  Yes, blood.

Q.    All right.  You saw blood.

Did you see anything else in the toilet?

A.    No.

Q.    At some point you tried to flush the toilet; correct?

A.    That's correct.

Q.    All right.  Tell me approximately when you would have tried to flush the toilet.

A.    Immediately after I wiped and thought that I had enough wherewithal to get enough blood off of me that I could, you know, function.

Q.    All right.

A.    Then I flushed the toilet.

Q.    Okay.  My understanding is you also used a plunger after you flushed the toilet?

A.    That's correct.

Q.    What was the reason for using the plunger?

A.    Because there was so much blood and matter in the toilet, that it was not going down.

Q.    Okay.  So I take it when you flushed the toilet it backed up and started going up; correct?

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A. Yes, but not overflowing. It did not overflow.

Q. Okay. It didn't overflow --

A. No.

Q. -- but it got higher; correct?

A. Yes, that's correct.

Q. And then you used a plunger to try to get it down?

A. Correct.

Q. Did you get any of the water and materials down in the toilet?

A. Yes.

Q. All right.

Okay. You talked a little bit about your clean-up efforts.

A. Yes.

Q. You were cleaning yourself up first it sounds like?

A. Yes.

Q. All right. And then you went ahead and you cleaned up the bathroom area?

A. Yes.

Q. Okay. Did you call anyone during this period of time?

A. No, no. I didn't even scream because I couldn't. And not because I didn't want to wake anyone, it's just my body went into complete shock.

A. She still is, but I'm not aware of her address at this time.

Q. Got it.

So how long is it to drive to Helen's place?

A. Not even five minutes.

Q. And at that point in time you felt well enough to drive, right?

A. Yes, yes.

Q. All right. And you felt that you had cleaned yourself up well enough at that point to go get your hair appointment taken care of; correct?

A. Yes.

Q. Okay. Describe for me what you recall as far as additional clean-up around or in the toilet.

A. Toilet paper, paper towels, tissues.

Q. And I think at some point you tried to remove some of the liquids and materials from the toilet; correct?

A. Right.

Q. All right. Can you tell me how you did that?

A. With a bucket, a black bucket.

Q. And how did you actually get the material and liquid into the bucket?

A. I scooped it.

Q. Am I also correct that Detective Carney actually walked you through these verbally?

A. Correct.

Q. At any point during your conversation with Detective Carney at the hospital did you ever tell him that you did not want to talk to him?

A. No.

Q. All right.

A. I was scared to do so.

Q. Okay. Tell me again why you were afraid to do so.

A. Because he's a police officer. And from what I understand about police officers they can be very aggressive.

Q. Okay. Now, we talked before during this conversation with him he never became aggressive with you; correct?

A. Right. But, I mean, if I did disagree, I wouldn't know what the repercussions would be to disagree to talk to somebody.

Q. Regardless, you did not at any point in time ask --

A. No.

Q. -- Detective Carney?

A. No.

Q. -- to leave? Okay.

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

MS. RICKERT: Let him finish his question before you answer, just for the court reporter's sake.

THE WITNESS: I'm sorry.

Q. And you made -- and you signed this --

A. Yes.

Q. -- Exhibit 1 knowingly and voluntarily; correct?

A. Correct.

Q. Do you recall when he was actually -- Detective Carney was going through the Miranda warnings with you, at one point he actually said since you were receiving some medical care, if you told him to stop he would leave?

A. Yes, I do remember that.

Q. So what I'm going to do, I'm going to first -- and we will mark, end up marking this as Exhibit 2. This is the recorded interview. Okay?

I'll play it on my computer and then I will give it to the court reporter as the exhibit. I think I've got additional copies here.

(Thereupon, Exhibit 2 was marked for purposes of identification.)

MR. PINZONE: And this is what would have been produced in Discovery.

MS. RICKERT: Oh, I have that. I

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q.   And you put it out back?

A.   Yes.

Q.   And you threw it on the ground?

A.   Yes.

Q.   Okay.  And what was in the bucket, you didn't see anything that looked like a baby.  Fair?

A.   That's correct.

Q.   All right.  I think you told him earlier that you understood though at 21 weeks it would be a fully-formed baby?

MS. RICKERT:  Objection, foundation, and it misstates her testimony.

MR. KASSON:  Okay.  Just so we're clear, I mean, my view on Federal Rules is that the only thing you're going to waive is form and privilege. So I won't hold you to any other waiver of any other objections.

Q.   And your doctor had told you there was a head and so forth?

A.   Yes.

Q.   All right.  So at that point in time when you went back into the hospital and they were talking to you about, you know, there would be a full baby?

A.   Correct.

Q.   The only place it could be was in the toilet,

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

right?

A.   Correct.

Q.   And you knew that when you spoke to them?

A.   Correct.

Q.   Right.  And since you didn't see it in the bucket and you knew there was a baby anyway, you knew the only place it could be was in the toilet when you went to the hospital, right?

A.   Correct.

Q.   All right.

     MS. RICKERT:  Objection to foundation.

Q.   Let's talk about, like, how you view that generally.

     I mean, you ultimately learned you had a baby that was about 10 inches long or so, right?

A.   Okay.  Yes.

Q.   You felt enough about the baby that you named it?

A.   Yes, after the fact, after the fact.

Q.   Yeah, after the fact.

A.   Yes.

Q.   You know, from your just personal perspective, could you understand how someone might think disposing of a baby 10 inches long who you ultimately gave a name was an inappropriate way to dispose of a baby?

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

reason to think they were out to get you?

A.   No.

Q.   Okay.  Do you have any reason to think that any of the folks at the hospital that you had never met before were out to get you?

A.   No.

Q.   Okay.  And in that meeting where Nurse Moschell was in there with the detective, it was clear in that meeting that all they were trying to do was trying to find out where the baby's body was?

MS. RICKERT:  Objection to form and foundation.

A.   Correct.

Q.   Right.  And you would want them to find the baby's body, wouldn't you?

A.   Yes.

Q.   And you had no reason not to try to help them find the baby.  Fair?

A.   Fair.

Q.   And what they were doing if I recall from the recording is they were asking you questions and then the detective was on the phone with somebody at the scene trying to direct them somewhere to find the baby, right?

A.   Correct.

Deposition of Brittany Watts                    Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q.   And you wanted to help them find the baby in that meeting, right?

A.   Correct.

Q.   Because you knew it was the right thing to do to try to find the baby?

A.   Correct.

Q.   And you knew it was the right thing to do to try to find the baby even though you didn't know what the laws were, right?

A.   Correct.

Q.   For example, did you know that Ohio had a law that requires a baby over the age of 20 weeks who dies to have an autopsy?

          MS. RICKERT:  Objection to foundation and form.

A.   No.

Q.   And without knowing the law though, you still knew it was the right thing for somebody to go try to find the baby, right?

A.   Correct.

Q.   All right.  And -- but at the time you came to the hospital for that third time after the miscarriage, had you told any law enforcement that you had had a baby at your house?

A.   No.

Q.   Okay.  What you did is you just didn't want to wait for whatever care they were going to give you, you wanted to leave and go home?

A.   Yes.

Q.   All right.  And your thought process was, "If I'm going to have a miscarriage I'd rather have it at home"?

A.   Yes.

Q.   Okay.  So you made a personal choice to leave?

A.   Yes.

Q.   You signed an AMA form?

A.   Correct.

Q.   When you read it you saw the AMA form released the hospital from any liability for your choice to leave?

A.   Correct.

Q.   And the AMA form also told you you were taking medical risks in terms of leaving that would include death, right?

A.   Correct.

Q.   All right.  So you went back to the hospital the second time?

A.   Correct.

Q.   You signed admission paperwork?

A.   Correct.

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q. The admission paperwork taught to you -- well, you understand admission paperwork now, right?

A. Yes.

Q. Admission paperwork also has in it notations that you shouldn't leave against medical advice, right?

A. Correct.

Q. And, again, when you were back the second time in the hospital you had choices you could make, right?

A. Correct.

Q. And one of the choices was you could stay and have the procedure?

A. Correct.

Q. And you made a decision to leave because that's the choice you wanted to make, right?

A. Correct.

Q. And the reason you left is the length of service, right?  Or strike that.

The reason you left was the length of the delay?

A. Correct.

Q. You left over a service issue, right?

A. Correct.

Q. And you didn't leave because you thought they were going to perform a procedure you didn't want.  You

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

left because you didn't want to wait for it, right?

MS. RICKERT:  Objection to foundation and form.

A.  Correct.

Q.  All right.  And so you made a choice because you didn't want to wait for the procedure to go home and have the miscarriage there, right?

A.  Correct.

Q.  And you certainly understood that if you made the choice to leave the second time, that would be against medical advice?

MS. RICKERT:  Objection to foundation.

A.  Correct.

Q.  So what you did is you left without telling anybody, right?

A.  Correct.

Q.  Had you told somebody you know they would have had you sign a second AMA form, right?

A.  Correct.

Q.  But you knew leaving, you were leaving against AMA, against medical advice, and that the hospital would seek the same thing they sought when you signed the first form, right?

A.  Correct.

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

Q.    All right.  You made a decision to go.  And I think you pulled out your IV that time?

A.    Yes.

Q.    Okay.  And at that time was your IV -- when I've had IV's, a lot of times the IV is tethered to the bed and then it goes in your arm, right?

A.    Yes.

Q.    And so your IV was tethered to the side of the bed and went in your arm, right?

A.    Correct.

Q.    So you pulled it out of your arm.  And even though the IV was tethered to the bed you could still get up and leave?

A.    Yes.

Q.    All right.  So you went and you went home.

Now, going home, you certainly understood that whatever happened at home was probably riskier than if you stayed in the hospital?

A.    Correct.

Q.    And you made the choice to accept that risk?

A.    Correct.

Q.    And you understood that, and as you sit here today, it would have been a better course for you had you stayed at the hospital, right?

MS. RICKERT: Objection to foundation.

A.   Correct.

Q.   All right. It wouldn't have been as messy. There would have been people to take care of you, right?

A.   Correct.

Q.   You understood that you would have been hydrated with fluid?

A.   Correct.

Q.   And -- but you made the choice and accepted responsibility to go home and have the baby at home, right?

A.   Correct.

Q.   Okay. And there was nothing any of the hospital folks did to drive you out, you just didn't want to wait, right?

MS. RICKERT: Objection to foundation.

A.   Correct.

Q.   All right. Fair enough.

So you go home and that happens to you. You clean up.

When was your hair appointment the next morning?

A.   About 8:00.

Q.   About 8:00. Okay.

And after you had the miscarriage you

A.   Yes.

Q.   So you did speak to Sunny after the miscarriage?

A.   Yes.

Q.   Okay.  But in that conversation you didn't say anything to Sunny about the miscarriage itself?

A.   No.

Q.   We just did a double negative, that's my fault.
     In that conversation with Sunny did you say anything to her about the miscarriage?

A.   No.

Q.   All right.  So what did you tell her?

A.   I just told her that I'm at home and I'm going to get some rest.

Q.   Any idea as to how long that conversation would have lasted?

A.   No.

Q.   It sounds like if that's all you told her is you're home, you'll get some rest, it would only be a few seconds, right?

A.   Yes.

Q.   Any idea how Sunny would have known that the baby was in the toilet?

A.   No.

Q.   Okay.  Certainly the only person who would have known that was you, because you didn't tell your

Q.   All right.  So then because you would have liked to have the baby, you would want the hospital to proceed slowly before they took an action like inducing you that would end up killing the baby, right?

          MS. RICKERT:  Objection to foundation.

A.   Correct.

Q.   You would want the hospital to be very deliberate in its thought processes before they took that, right?

          MS. RICKERT:  Objection to foundation.

A.   Correct.

Q.   And if there were people who thought -- had second thoughts about it, you would want the medical professionals to talk about that and figure it out before they went ahead with that procedure, right?

          MS. RICKERT:  Objection to foundation and form.

A.   Correct.

Q.   And that would be reasonable to do, because it was important to you that if the baby could survive, you wanted it to survive?

A.   Correct.

          MS. RICKERT:  Objection to foundation.

Q.   Correct?

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

A.    Correct.

Q.    That's fair.

      If they had offered you an abortion you would have declined, right?

A.    Correct.

Q.    What you wanted, as what the doctor had proposed and made sense to you, induce you, the baby would be born naturally, and if it didn't make it, it didn't make it.

      But that was the way you'd want it to happen if you stayed at the hospital; correct?

      MS. RICKERT:  Objection to foundation and form.

A.    Correct.

Q.    All right.  Likewise, if there were laws that needed to be complied with, like the baby having an autopsy, you would want that to happen, right?

A.    Yes.

Q.    And this autopsy had to be reassuring for you because the autopsy showed that the baby likely died while it was still inside you, right?

A.    Yes.

Q.    So you know there was nothing that you could have done for it, right?

A.    Correct.

Q. All right.  Let's talk about Exhibit 3 if we might.  Go to Page 24, please.

There was a point in this interview where they wanted you to give consent for the bathroom to be searched, right?

A. Correct.

Q. And you told them that you didn't want to give consent because there's nothing in there, right?

A. Correct.

Q. All right.  You didn't want them going in the bathroom.  Fair?

A. Correct.

Q. All right.

Now that -- you understand from your nursing training the concept of stabilizing a patient, right?

A. Correct, yes.

Q. You understand the risks of treating a patient if they are not hydrated?

A. Correct.

Q. It's better to treat a patient if they are calmed down, the vitals are where they need to be, right?

A. Yes.

Q. And you know that on the 19th when you were there they were trying to stabilize you?

MS. RICKERT:  Objection to foundation.

A.    It didn't seem that way, but here we are.

Q.    Well, they were hydrating you?

A.    Okay.

Q.    Right?

A.    Yes.

Q.    They were checking your vitals?

A.    Yes.

Q.    They were monitoring you?

A.    Yes.

Q.    Now, you may not have known it at the time, but as a nurse now you know that's what they were trying to is stabilize you, right?

MS. RICKERT:  Objection to foundation.

A.    Okay.  Yes.

Q.    And the same thing on the 20th, you might not have understood it at the time, but having nursing training now, you understood on the 20th they were trying to stabilize you, right?

MS. RICKERT:  Objection to form and foundation.

A.    That's correct.

Q.    Okay.

A.    But having been told that there would be an induction and not having one, that raises concern

Deposition of Brittany Watts

Brittany Watts, vs. Bon Secours Mercy Health, et al.,

you never saw the fetus?

A. I remember saying I never saw the fetus, but I don't remember what he said.  So --

MS. RICKERT:  Okay.  That's all I've got.  I might have some follow-up.

MR. PINZONE:  No questions.

MR. KASSON:  A couple quick questions.

EXAMINATION OF BRITTANY WATTS

BY-MR.KASSON:

Q. When you left the hospital on the second visit there, they were giving you IV antibiotics, weren't they?

A. Correct.

Q. They were treating you for potential infection?

A. Correct.

Q. But what you actually told doctors -- strike that.

What you told the police in the statement here as the reason you left is you wanted to have it at home, right?

A. Correct.

Q. You didn't think when you left you were at risk of dying, did you?

A. No.

Q. You weren't frustrated because you thought, "I'm at risk of dying and they're not treating me",