IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

CASE NO:  4:25-cv-00049

BRITTANY WATTS,

Plaintiff

V.

BON SECOURS MERCY HEALTH; MERCY HEALTH YOUNGSTOWN LLC

D/B/A ST. JOSEPH WARREN HOSPITAL; CONNIE MOSCHELL;

JORDAN CARRINO; PARISA KHAVARI; CITY OF WARREN, OHIO;

NICHOLAS CARNEY; UNKNOWN OFFICERS, AND UNKNOWN MEDICAL

PROFESSIONALS,

Defendants

DEPONENT:  PARISA KHAVARI

DATE:     DECEMBER 19, 2025

REPORTER:  MADISON BOOKS

**EXHIBIT**

**B**



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And what did you determine about her condition?

A. So I determined that she was more than a month pregnant, and I examined her. I told her that she appeared to be at least five months pregnant. And I -- when I examined her, I said, your cervix is dilated.

I saw blood and amniotic fluid in the vaginal vault. I told her that I could see the baby's head and hair, and that she was dilated, and it appeared that she was in labor. And then I performed an ultrasound and told her I suspected that she was about 20, 21 weeks pregnant. And so she was further along than she thought. And then the nurse called for Dr. Stewart, who was one floor down, and his technician, to come perform an ultrasound to confirm this. This was confirmed. And I spoke with Dr. Stewart about her case. And then I told her that it appeared to be that she was in labor, and we would be taking her to the hospital.

I reviewed with her at that point that I thought she was maybe 20 to 21 weeks pregnant. I reviewed that the infant was previable, that it would not survive outside of the uterus. I asked her, did she want any interventions done, such as a C-section if the baby's heart rate was going down, and if it was evident that the baby was under stress, with the understanding

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-2 Filed: 08/07/26 3 of 20. PageID #: 6392
The Deposition of PARISA KHAVARI, taken on December 19, 2023

63

that the infant would not be surviving outside of the uterus, so that those surgical efforts, whether C-section, vacuum delivery, would not be helpful to the infant and would incur risk to her.

She said, no. She did not want anything -- anything done. She did not want a C-section. She did not want a vacuum delivery. So I called an ambulance. We transferred her over to the hospital. I called the hospital. I spoke with the nurse and relayed this information to the nursing staff.

Q. Okay. Now, a vacuum delivery is not a surgical delivery, is it?

A. It's an operative delivery.

Q. So it is?

A. Yes. It's a procedure.

Q. Okay. When would a C-section be appropriate in a situation like Ms. Watts was facing on the 19th?

A. If she told me that she wanted an intervention done, despite the fact that the infant would not survive outside of the uterus, then her wishes would be complied with. So if I saw that the infant was manifesting signs of fetal bradycardia, where the heart rate was going down, and there was evidence that it would be -- it would -- that it would have to intervene because the infant would be harmed by staying in -- inside the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

show you some of these notes from the 19th. Okay. Can you see my screen?

A. Yes.

Q. All right. So it's -- do you see that these are Medical Records of Ms. Watts?

A. Yes.

Q. And from September 19th, 2023?

A. Yes.

Q. All right. And are these your notes?

A. Yes.

Q. All right. So first, I want to start -- I believe you testified that you determined that Ms. Watts was -- that her fetus was a gestational age of 20 to 21 weeks. Do you see here where it says, "18-week sized"?

A. Yes. That's based on the pelvic exam, not on the ultrasound.

Q. Okay. Let's look down here. What's, "MFM"?

A. Maternal fetal medicine.

Q. Okay. Is that a person?

A. That's Dr. Stewart, yes.

Q. All right. And what -- so you did not perform the ultrasound?

A. I did, and then his technician did, also.

Q. All right. And this ultrasound -- it doesn't say here what the gestational age estimate was, right?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   That's correct.

Q.   Okay.  And we're going to go --

A.   It does state the estimated fetal weight, which was 15 ounces.  That's consistent with 425 grams.

Q.   Okay.  And what does that tell you?

A.   That it's -- it's previable.

Q.   Okay.  So it's not just the -- does it tell you anything about the gestational age?

A.   That's in the gestational age of about 20 weeks or so.

Q.   Okay.  About 20 weeks.  And so -- but this -- you had already noted the 18-week size, and that was just from your -- from feeling on the outside?

A.   Yes.  Well, by manual exam.

Q.   Okay.  And where is that indicated?

A.   Right there, on the records.

Q.   That it was by manual exam that you had determined 18-week size?

A.   Yeah.  One -- one of my hands is in the vagina.  The other is on the abdomen.

Q.   Okay.  And so -- because if we go up here, we can see this.  You're talking about a pelvic exam?

A.   Yeah.  That's the pelvic --

Q.   Okay.  So 15 ounces is consistent with approximately 20 weeks gestation?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-2 Filed: 08/07/26 6 of 20. PageID #: 6395
The Deposition of PARISA KHAVARI, taken on December 19, 2023

84

I offered to talk with her family for her. We had offered to bring her family in and help her, support her during the whole process. Explained to her there was no logical reason for her to go home to process things that -- you know, whatever she needed, I could, with the assistance of the nurse, provide for her, keep her safe in the hospital, in this -- in this setting, in this situation.

Q. At the time that you -- when you realized on the 19th that she was not in labor and talked to her about induction, did you talk to her about the possibility of a dilation and evacuation procedure?

MR. PRISLIPSKY: Objection. Asked and answered. But go ahead.

THE WITNESS: No. Again, because her cervix was already dilated, so it didn't make sense to perform a surgical procedure where a medical treatment would effect this -- a better outcome without the risk of uterine perforation.

BY MS. RICKERT:

Q. Okay. So that -- it was a medical determination that you made that a D&E would not be an option that should be offered to Ms. Watts?

A. That's correct.

Q. Okay. And -- so you said she was -- at that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

understanding that -- what the consequences are if she leaves the hospital.

BY MS. RICKERT:

Q.   Okay.  So what did you tell her the consequences were if she left the hospital?

A.   I explained to her that she could die.  She could have an infection.  She could hemorrhage.

Q.   Did you explain any other risks?

A.   Potential infertility if she ends up bleeding heavily and needs an emergency hysterectomy.

Q.   Any others?

MR. PRISLIPSKY:  Objection.  Go ahead.

THE WITNESS:  I'm sure I did.  I mean, it -- other than death, I don't -- it's pretty -- death and hemorrhage and infection and sepsis and stroke and heart attack and need for ICU stay, intubation. Those are -- you know, those all go -- part of the same package.

BY MS. RICKERT:

Q.   Right.  And this is -- she was leaving.  You still believed she would miscarry, correct?

A.   Yes.  Yes.

Q.   And did you give her any instruction?  Or -- well, strike that, actually.  Did you give her any information about what to expect if she were to miscarry



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL  Doc #: 114-2  Filed: 08/07/26  8 of 20.  PageID #: 6397
The Deposition of PARISA KHAVARI, taken on December 19, 2023

92

MR. PRISLIPSKY: Objection to form.

THE WITNESS:  It's behind the hospital.

BY MS. RICKERT:

Q.  Okay.  And did you then come to the hospital after learning that Ms. Watts had arrived?

A.  No, I did not come to the hospital.  I --

Q.  Why not?

A.  I asked the nurse what the vital signs were and what the nurse's assessment was, and then I gave the nurse orders with respect to what to do.

Q.  And this is the nurse, Elaine?

A.  Yes.

Q.  Okay.  What were the orders you gave her?

MR. PRISLIPSKY: Objection.  Form.  Go ahead and answer.

THE WITNESS:  I gave an order for blood work, for IV, and for her cultures, for an ultrasound, and for consult with maternal fetal medicine, Dr. Stewart.

BY MS. RICKERT:

Q.  Okay.  So did you said that you asked the nurse to get Ms. Watts's vitals, right?

A.  She had already gotten the vitals, so she --

Q.  Oh, okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   What did you do relating to Dr. Stewart at that time, when you were informed that Ms. Watts had returned on the 20th?

A.   I put in another consult for Dr. Stewart to see her.

Q.   Now, why -- what was Dr. Stewart's role in Ms. Watts's care?

MR. PRISLIPSKY:  Objection.  Asked and answered earlier.  You can answer.

THE WITNESS:  He is a maternal-fetal specialist.

BY MS. RICKERT:

Q.   Okay.  And is that -- that's something different than an OB-GYN?

A.   That's correct.

Q.   Okay.  Explain the difference.

A.   He's a specialist at high-risk pregnancies.

Q.   Okay.  Had you had occasion to call Dr. Stewart in at any other time?

A.   Yes, absolutely.

Q.   Okay.  And you had initially done so on the 19th?

A.   Yes.

Q.   And he concurred in your assessment that this was not a viable pregnancy, correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   That's correct.

Q.   And then on the 20th, when Ms. Watts returned, you had -- yeah.  How does it work?  How do you get Dr. Stewart involved?

A.   So we put in a consult.  We called -- called Dr. Stewart, could you please see the patient?  So I had called him and let him know that she had left against medical advice the day before, she was back on the floor again, and asked him to see the patient.

Q.   Okay.  And so did he -- you did not go see Ms. Watts that morning.  Did he?

A.   Yes.  He saw the -- he saw Ms. Watts later that day.

Q.   Did you see Ms. Watts later that day?

A.   No.  I wasn't able to, because she had already left the hospital.

Q.   Well, you know she was there the whole day, correct?

A.   Yes.

Q.   All right.  And you suspected the day before that she might have infection, right?

A.   That's correct.  Yes.

Q.   Did you -- when she returned the next day, did you order antibiotics for her?

A.   Yes, I did.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Quite a few years ago.

Q.   Prior to the filing of this lawsuit?

A.   Yes.

Q.   Okay.  So you have not discussed this lawsuit with her?

A.   No.

Q.   All right.

     MR. PRISLIPSKY:  That was a negative question. She said, you have not.  You said, no.  So you just may want to clarify.

     THE WITNESS:  Yeah.  I have not discussed this with -- with her.

BY MS. RICKERT:

Q.   Okay.  So what is your recollection of when the ethics consult was completed?

A.   Angila called me back and said that the ethics issue was resolved and that we could proceed on with induction.

Q.   And what time was that?

A.   It was probably around 6:00 or so.

Q.   And had you made any inquiries about the status of the ethics consultation prior to that time?

A.   That was when -- when I had spoken with Sue and she said that the ethics consultant had requested that I put in -- make sure that the consent showed that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-2 Filed: 08/07/26 12 of 20. PageID #: 6401
The Deposition of PARISA KHAVARI, taken on December 13, 2023

110

the patient was not requesting an abortion and that we were doing an induction because the patient had an infection and partial abruption. So then I had spoken with Ms. Ford and clarified the situation. The documentation was done. Then Angila had spoken with the nurses. Then Angea called me back, and then I went to discuss the situation with Ms. Watts, and I found that she wasn't in the room. And Sue paged me and said the patient left -- left the hospital.

Q. Now what time was it that you spoke with Deanna Ford?

A. Probably -- I -- I can't remember. Maybe 5:30, 5:00 or so.

Q. Now did Ms. Ford not already have the information that Ms. Watts was suffering from Premature ruptured membranes and placental abruption?

MR. PRISLIPSKY: Objection. Speculation. Go ahead.

THE WITNESS: I don't know what information she had.

BY MS. RICKERT:

Q. Well, I asked you earlier if you felt you should be part of the ethics consultation and you said no because all of the relevant information was in the records that had been provided, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

requested the ethics consult. It was my understanding that the patient was stable. So until the nurses were comfortable that the ethics questions had been clarified and answered, that then the induction would proceed.

Q. Did you understand that the -- one of the questions that needed to be answered before the ethics consult could conclude and the induction could proceed, was whether Ms. Watts understood the purpose of the induction?

A. That was what the -- the ethics consult note said. Yes.

Q. Okay. Did -- you were aware that Dr. Stewart had concluded that induction should go forward without delay, correct?

A. I didn't see in his note that it said without delay, but it says that, yes, induction should proceed on and go forward.

Q. He said they shouldn't wait until Ms. Watts was at death's store, but should proceed with induction, correct?

A. That's correct. Yes.

Q. But you did not feel that induction needed to go forward in any particular time period?

A. I was ready to put the orders in for induction to go forward when there was -- the nurse's concerns was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case?

A. In this case, Dr. Stewart was involved in providing his assessment and the patient was stable at that time, so we could wait for the ethics consult.

Q. Is this a conversation that you and Dr. Stewart had?

A. No. Because the ethics consult was -- the issues with the ethics consult were after the -- after Dr. Stewart had seen her.

Q. Right. So you did not consult with another physician about whether overriding the ethics consult would be appropriate?

A. No, because -- excuse me. Again, because it wasn't that long, I mean, between when the ethics consultant was being contacted and questions were going back and forth. It was, you know, a short period of time. So would -- but again, the patient was stable. So there was no reason to override things.

Q. If a patient arrives at the hospital at 9:00-something in the morning and induction is likely to be appropriate but you have to do these steps you talked about first, vitals and blood work, how soon could induction start?

MR. PRISLIPSKY: Objection. Form. Foundation. Broad and vague. You may answer.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. RICKERT:

Q. That's not possible? It is not possible that Ms. Watts did not see this fetus in the toilet?

MR. PRISLIPSKY: Objection. Asked and answered. Go ahead.

THE WITNESS: I agree. It is not possible.

BY MS. RICKERT:

Q. How have you determined that it is not possible?

A. Because of the size of the fetus.

Q. What about the size of the fetus? Did the fetus float?

A. I don't know if this fetus floated, but it's a pretty sizable fetus.

Q. It's the size of four sticks of butter, right?

A. I don't know what the size of four sticks of butter is. All I know is the estimated weight on the ultrasound was 15 ounces.

Q. Right. So it's under a pound, so it's actually smaller than four sticks of butter?

A. Yeah. 16 ounces is a pound. This was 15 ounces.

Q. Right. But your opinion is that there is no possible way that Ms. Watts wouldn't have seen the fetus?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. RICKERT:

Q.    And you didn't have any questions about why the delivery happened, right?  Because you already had examined her and knew that this was not a pregnancy that could continue, right?

MR. PRISLIPSKY:  Objection.

Go ahead, Doctor.

THE WITNESS:  Yes.  My assumption was that she had an infection and she had a partial abruption, so this was the consequence of that.

BY MS. RICKERT:

Q.    So Ms. Watts was in the hospital, then, for some days following her miscarriage, right?

A.    Yes.

Q.    Why was that?

A.    Because she had lost a fair amount of blood outside of the hospital, and she had an infection.  So because of that, she was at risk for sepsis.  So I had to make sure she had an adequate amount of antibiotics and monitor her for need for a transfusion and potential for re-bleeding.  So I kept her until I was sure that the infection had cleared and that she was stable for discharge.

Q.    So she had lost a potentially dangerous amount of blood before coming to the hospital?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of PARISA KHAVARI, taken on December 19, 2025

MR. PRISLIPSKY:  Objection.

THE WITNESS:  Yes.  Within -- within the bounds of whatever other issues are going on.  Again, you know, you have to consider multiple things.

BY MS. RICKERT:

Q.  Right.  Including the ethical concerns of the nurses?

A.  Yes.  I mean, as long as the patient is stable, this was the plan.  He saw her at around 1:00 p.m.  She had an ultrasound done.  That was finished at around 1:30, 1:40.  And then, you know, we were going to proceed on with induction.  There was the ethics concern.  Patient was still stable.  So that was addressed at that time.

Q.  Is a pregnancy loss -- does that have the potential to be highly -- a highly emotional situation for a woman?

A.  Yes.

Q.  And would you say that second-trimester pregnancy loss can be even more of an emotional situation than first trimester?

A.  It can be an issue no matter what the trimester.

Q.  Okay.  And would you agree with me that women grieve pregnancy loss in different ways?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case?

A.   No.

Q.   Now, you said you aren't sure if you saw this letter --

A.   Yes.  I'm not sure --

Q.   -- is that right?

A.   -- if I've seen that letter.

Q.   Was this letter ever sent to you?

A.   No.  I never got it.

Q.   So when -- sorry.  But you may have seen it?

A.   I may have seen it, yes.

Q.   Okay.  So it may have been shown to you?

A.   Yes.

Q.   Could it have been shown to you in August of 2024?

A.   No.

Q.   Why not?

A.   Because I -- I never received anything like this in August of 2024.

Q.   So you said you may have seen it.  When would that have been?

A.   After the attorney told me that --

        MR. PRISLIPSKY:  Wait.  That's fine.  You can say, after the attorney called.  You're not allowed to discuss anything we had discussed.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

September 19th, 2023, 12:00, 12:02.  That would be right after noon, correct?

A.  Yes.

Q.  And then 3:45 p.m.?

A.  Yeah.

Q.  Yes?

A.  Yes.

Q.  Baby heart rate at 12:02 is 180.  Baby heart rate at 140.  Is that, would you consider, a faint heart rate?

A.  Again, the definition of faint would mean that you can barely hear it.  You -- I don't think this would be faint.  It's 140, so...

Q.  Okay.  And if we go to September the 20th, we talked about the examination of the ultrasound.  Part of what is done during an ultrasound is that the baby's heart rate could be measured there too, correct?

A.  Yes.

Q.  Baby's heart rate at the ultrasound on September the 20th, 2023, which you had said earlier was between 1:00 and 1:30 or so, was 167; is that correct?

A.  Yes.

Q.  If we go to part of the Medical Record, later, for September the 20th, Page 446 -- it's actually 713 on the side.  It's 446 in my entire compilation.  At

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

9-20-2023 at 16:08 -- that's at 4:08, correct?

A. Yes.

Q. Baby's heart rate is 165; is that correct?

A. That's correct.

Q. And at 5:36, baby's heart rate is 156; is that correct?

A. Yes.

Q. A heart rate of 156 is a normal heart rate for a 21-week gestational baby, correct?

A. That's correct.

Q. Now, on September the 20th, the day that this was recorded, at 5:36 p.m., was Ms. Watts clinically stable?

A. Yes.

Q. Okay. Was she febrile?

A. No.

Q. Meaning, did she have a fever?

A. No, she didn't.

Q. To your knowledge, in terms of what you were informed, as well as your review of the Medical Records, was she bleeding heavily?

A. No.

Q. Were her vital signs abnormal?

A. No.

Q. You are aware that the -- a consultation with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com