Marshall Carpenter, M.D.
May 27, 2026

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

EXHIBIT
D

CASE NO.: 4:25-cv-00049

*************************

BRITTANY WATTS,            *

    PLAINTIFF             *

v.                        *

BON SECOURS MERCY HEALTH,*

et al,                    *

    DEFENDANTS           *

*************************

VIDEOTAPED

DEPOSITION OF:  MARSHALL CARPENTER, M.D.

REGUS

10 Dorrance Street, Suite 700

Providence, Rhode Island

May 27, 2026     10:02 a.m.

Pauline Bailey

Professional Court Reporter

Marshall Carpenter, M.D.
May 27, 2026

Q.    (By Mr. Prislipsky)  Well --

A.    Maybe I misunderstood your question.

Q.    No, it -- well, Dr. Stewart believed that before a conversation could occur with Ms. Watts about induction, that an ethics consultation needed to go forward, true?

A.    I understand that that was his conclusion.

Q.    And that met the standard of care, fair?

MS. SPENCE:  Objection.  Form.  Go ahead.

A.    The imposition of an ethics review is peculiar to this hospital and does not reflect standard of care.  It's not adverse to standard of care.  But it doesn't reflect, in this circumstance, in a -- in a general hospital an ethics review would not be required in this circumstance.

Q.    (By Mr. Prislipsky)  All right.  So, let me ask it in a different context.  The fact that an ethics consultation took place on September 20, 2023 did not fall below the standard of care; is that a fair statement?

Marshall Carpenter, M.D.
May 27, 2026

A.    That is correct.

THE VIDEOGRAPHER:  Doctor, your microphone just slipped.

Q.    (By Mr. Prislipsky)  And you are aware from Dr. Stewart's maternal-fetal medicine consultation he did not recommend dilation and evacuation, correct?

A.    Correct.

Q.    Do you recall in his deposition testimony that he said that it would have been improper to recommend a D & E?

A.    I don't recall that.  But if that's in the record I accept that.

Q.    Based upon what we talked about earlier I'm assuming you would not have any criticisms of Dr. Stewart's position on not offering or recommending a D & E on September 20, 2023?

A.    I think that was within the standard of care.

Q.    So, the standard of care did not require recommendation of a D & E on September 20, 2023, correct?

A.    Correct.

Marshall Carpenter, M.D.
May 27, 2026

A.    I have no idea.

Q.    So, when you say that the baby must be removed piecemeal, what do you mean by that?

A.    That -- that the cervical dimensions preclude removing the fetus intact.

Q.    All right.  So, how does the obstetrician remove the baby piecemeal?

A.    I'm not sure you -- you break up the fetal body.

Q.    All right.  So, do you have to stop the fetal heart rate first before you break up the fetal body, or do you remove the fetal body with a baby that has a beating heart?

MS. SPENCE:  Objection to form.

A.    I suspect that that may be reflected in various hospital policies.  But from a medical point of view, you don't have to.

Q.    (By Mr. Prislipsky)  So, when you're -- you're literally talking about dismembering a 20 week, 21 to 22 week gestational baby, correct?

A.    Correct.

Q.    And you're talking about that some hospitals may dismember that baby with the heart rate?

Marshall Carpenter, M.D.
May 27, 2026

A.    Yes.

Q.    Mom obviously has to consent to that procedure?

A.    Yes.

Q.    Do you know whether the standard of care requires the physician who's performing a D & E to articulate the steps that are involved in performing the procedure such as saying the baby has a heartbeat, we may inject medication into the baby's heart to stop it, or we may dismember your baby even though it has a heartbeat?

MS. SPENCE:  Objection.  Form and foundation.

A.    You'll have to repeat the first part of your question.

Q.    (By Mr. Prislipsky)  Sure.  Let me break that down.  That was a long question.  Do you know whether the standard of care requires a physician who is going to perform a D & E on a second trimester baby with a heartbeat, does the physician have to describe the procedure to the patient?

A.    Yes, I believe the physician should describe whatever procedure is planned.  In this

Marshall Carpenter, M.D.
May 27, 2026

foundation.

A.    I accept the testimony.

Q.    (By Mr. Prislipsky)  So, again, similar to my question earlier, if this D & E would have been offered to Ms. Watts on September 19th or September 20th you have no idea and no opinion whether she would have said yes to that, fair?

A.    That would be speculative.

Q.    On September -- September 19th did Dr. Khavari meet the standard of care by seeing Ms. Watts the day that she called her office?

A.    Yes.

MS. SPENCE:  Objection to form.

Sorry, on which date?

MR. PRISLIPSKY:  September 19th.

MS. SPENCE:  I withdraw my objection.

Q.    (By Mr. Prislipsky)  On September 19th did Dr. Khavari meet the standard of care by asking Dr. Stewart to perform an ultrasound in her office?

A.    It was appropriate.

Q.    Did Dr. Khavari meet the standard of care by having her admitted to the hospital September 19th?

A.    It was appropriate.

Q.    Do you recall the testimony of the nurses that when Dr. Khavari's office called the hospital to say that Ms. Watts was being admitted that they assembled the operating room in the event that she needed to go for an emergency surgery?

A.    And you're asking me whether that was in fact the case or...

Q.    Do you remember that first?

A.    No, I don't remember that but I accept it.

Q.    I want you to assume that in the event that she had a placental abruption with a significant hemorrhage --

A.    Yes.

Q.    -- that the nurses assembled the operating room in the event that she needed to have surgery immediately upon admission, that would have met the standard of care?

A.    Yes.

Q.    Do you recall that Dr. Khavari, on September 19th, consulted anesthesia for an epidural?

A.    I recall that.

Q.    That met the standard of care?

A.    Yes.

Q.    Dr. Khavari ordered IV fluids on September 19th?

A.    I believe so.

Q.    That met the standard of care?

A.    Yes.

Q.    On September 19th when Ms. Watts arrived at St Joe's, she was clinically stable, correct?

A.    Yes.

Q.    She arrived, according to the record, at 11:40 a.m.  Do you recall that?

MS. SPENCE:  Objection.  Foundation.

A.    I accept that.

Q.    (By Mr. Prislipsky)  Do you recall that her vital signs were within normal limits?

A.    Yes.

Q.    And prospectively and retrospectively she was not septic when she arrived on September 19, 2023, true?

A.    Correct.

MS. SPENCE:  Objection to form.

Q.    (By Mr. Prislipsky)  And when she

Marshall Carpenter, M.D.
May 27, 2026

left on September 19, 2023 she was not septic, correct?

A. We have no evidence that she was.

Q. So, let me flip your answer around. You're not going to testify that when Ms. Watts left the hospital on September 19, 2023 to a degree of probability she was septic, fair?

A. Correct.

Q. On September 19, 2023 when Ms. Watts left the hospital she was clinically stable?

MS. SPENCE: Objection. Foundation.

A. With respect to her vital signs the fact that she had ruptured membranes and placental separation by definition made her unstable. But her vital signs were stable. There was no signs of sepsis.

Q. (By Mr. Prislipsky) All right. Have you ever had a patient who was in her second trimester admitted to the hospital for placental abruption leave AMA?

A. Well, the most obvious is I don't recall. Certainly there's a scenario that one might have occurred.

Q. You've been practicing for 40 years?

Marshall Carpenter, M.D.
May 27, 2026

support from a subspecialist on the issue of induction meets the standard of care?

A.    Yes.

Q.    All right.  And on September 19th we already asked you that question.  Dr. Khavari's plan and offer was for Ms. Watts to be seen by a maternal fetal medicine to discuss specifically induction and she declined, correct?

A.    Yes.

Q.    Right.  Have -- with antibiotics, the issue of the antibiotics, can you and I agree that Ms. Watts did not sustain a physical injury because antibiotics were not offered to her or administered on September 19, 2023?

MS. SPENCE:  Objection.  Foundation.  Form.

A.    She's not -- my understanding is she's not attempted to seek pregnancy subsequently.  So, we don't know whether her infection might have affected that.  I think it's unlikely, but that's an outlier issue.

Q.    (By Mr. Prislipsky)  Let me ask it a different way.

A.    Yeah.

Marshall Carpenter, M.D.
May 27, 2026

Q.    You are not going to go to trial and say that Ms. Watts not receiving antibiotics on September 19, 2023 was a proximate cause of an injury; is that fair?

MS. SPENCE:  Objection.

A.    It seems to me to be the same question.  I -- I'm -- what I would testify to is that the lack of imposition of antibiotics at that time did not result in any acute injury.  As to whether there's any injury or not, then I'd have to give that -- that other opinion.

Q.    (By Mr. Prislipsky)  All right.  Now let's turn to September 20th.  You are aware that Ms. Watts returned to St. Joe's on September 20th, correct?

A.    Yes.

Q.    Can we agree that her clinical condition from September 19th to September 20th actually improved?

MS. SPENCE:  Objection to form.

A.    I don't recall data that would support that assertion.  I'm open to your disclosing that to me.

Q.    (By Mr. Prislipsky)  I will.  First

Marshall Carpenter, M.D.
May 27, 2026

improved.

Q.    Do you recall on September 20th that Ms. Watts signed a consent releasing the hospital of liability if she left before discharge?

A.    On the 19th?

Q.    The 20th.  At the time she was --

A.    I don't -- I don't recall that there was -- that she signed a document upon her departure.  But if she did, okay.

Q.    Flip it around.  When she was admitted on the 20th she signed a consent saying that if she left prior to her discharge she's releasing the hospital from liability, do you remember that?

MS. SPENCE:  Objection.  Foundation.

A.    I accept that she signed it if that's in the documentation.

Q.    (By Mr. Prislipsky)  On the 20th Dr. Khavari ordered a consultation with pediatrics, do you recall that?

A.    Yeah.

Q.    That was reasonable and met the standard of care?

A.    Yes.

Marshall Carpenter, M.D.
May 27, 2026

Q.   And on the 20th Ms. Watts understood that the baby could be born with a heartbeat?

A.   Yes.

Q.   And that she was told that resuscitation could be offered literally one day later if the baby was born on the 21st, do you recall that?

MS. SPENCE:  Objection.  Foundation.

A.   I don't understand your question.  I understand she said that the baby could receive the -- upon birth the neonate could receive care at that hospital.

Q.   (By Mr. Prislipsky)  All right.  And that would have been reasonable to tell her that on September 20th?

A.   Yes.

Q.   All right.  Dr. Khavari also ordered the maternal-fetal medicine consultation on the 20th?

A.   Yes.

Q.   That was reasonable?

A.   Yes.

Q.   She ordered IV fluids?

A.   Yes.

Marshall Carpenter, M.D.
May 27, 2026

Q.    (By Mr. Prislipsky)  Her vital signs remained stable on September 20th?

A.    Yes.

Q.    Her white count had a two gram drop from September 19th to September 20th?

A.    Yes.

Q.    The baby still had a heartbeat on the 20th?

A.    Yes.

Q.    She had started antibiotics on the 20th?

A.    Yes.

Q.    All right.  Is it reasonable for a physician, if they're going to have a conversation with the patient about induction, to gather as much information as possible so that they could discuss the risks, the benefits, and changes in the patient's condition before they have that conversation with the patient?

A.    Spoken as a generalization I agree with that.

Q.    And you saw the ethics consultation note where it recommended that if the decision for induction was to go forward with either Pitocin or

Marshall Carpenter, M.D.
May 27, 2026

right.  And I think I had asked you if you have any information from any sources about Ms. Watts and what she did on September 21st, the day that between her leaving on the 20th and the day she delivered.

A.    I have none.

Q.    All right.  Now, in your report, Doctor, you have made opinions about Ms. Watts' psychological state on September 22nd, correct?

A.    I have an opinion that a patient in the circumstances may be vulnerable.  That's my opinion.

Q.    All right.  And that's a little bit different than how you expressed it in your report. I believe in your report you specifically said on September 22nd that she had impaired cognition. So, I want to make sure I understand your opinion as we --

A.    Oh, on the 22nd?

Q.    22nd, yes, sir.

A.    Okay.

Q.    Yes.

A.    On the 22nd I think evidence that we have suggests that she was not acting in her best

Marshall Carpenter, M.D.
May 27, 2026

interest.

Q. All right. So, is it your opinion on September 22nd that she had impaired cognition?

A. Well, that's a psychological term. I'm -- the evidence that we have I that she did not act in her best interest or in a rational way, so that that implies to me as a maternal-fetal medicine physician that she had impaired judgment.

Q. All right.

A. Whether she could spell or, you know, do addition and subtraction I have no idea.

Q. You have no training in psychiatry I assume, correct?

A. No.

Q. No training in psychology?

A. No.

Q. You've been offering services as an expert witness probably for 30 to 40 years, fair?

A. Since the late '70s I think.

Q. 55 years. Have you ever been asked to give an opinion in any of the cases you reviewed as an expert witness to address the psychological functioning of a patient or plaintiff?

A. No.

Marshall Carpenter, M.D.
May 27, 2026

Q.   (By Mr. Prislipsky)  She had the cognitive ability to say that she had taken Tylenol?

MS. SPENCE:  Objection.  Form.

A.   She remembered taking Tylenol.

Q.   (By Mr. Prislipsky) Do you remember her vital signs, she was not hypotensive, she was not febrile, she was not tachypneic, and she was not hypoxic?

MS. SPENCE:  Objection to form.

A.   Correct.

Q.   (By Mr. Prislipsky)  She had the cognitive ability to sign consents when she returned to the hospital?

MS. SPENCE:  Objection to form.

A.   Well, she signed the consent.

Q.   (By Mr. Prislipsky)  She -- again, she was not tachycardic?

A.   Correct.

Q.   Her hemoglobin was stable?

A.   I accept that, I accept that.

Q.   On the 22nd when she was in the hospital bed she had the ability and knew that the police were at her home?

Marshall Carpenter, M.D.
May 27, 2026

labor and delivery, true?

A.    Correct.

Q.    She ordered labs, right?

A.    Right.

Q.    She ordered vital signs?

A.    Yeah.

Q.    She ordered a urinalysis?

A.    Yeah.

Q.    And she discussed with Ms. Watts potential for maternal-fetal medicine consultation for induction.  True?

A.    Yes.

Q.    You had said that written consent does not need to be given.  I want to make sure we cover this in some detail.  Consent needs to be given by the patient prior to induction, correct?

A.    Yes.

Q.    And I'm assuming you, as an expert witness, of not only as an expert but also as a physician have reviewed thousands of medical records?

A.    Yes.

Q.    Right?  In medical records it's standard, especially in labor and delivery, for the