



LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA

# CASE NO. 4:25-CV-00049

# BRITTANY WATTS

## vs

# BON SECOURS MERCY HEALTH, ET AL.

# DEPONENT:

# DR. JOHN STEWART

# DATE:

# MARCH 31, 2026



schedule@kentuckianareporters.com

877.808.5856  |  502.589.2273



www.kentuckianareporters.com

colleagues for maternal fetal medicine, correct?

A. Yes.

Q. And what is the -- I'll represent to you I think this is, like, at least eight hours after when she would've been in the office and been seen for the ultrasound. What is the significance of the fact that she is continuing to bleed at this point?

A. Again, it could be from labor. It could be just the fact that there -- there is an -- a small abruption that is occurring.

Q. And it says, "I will consult MFM regarding induction of labor." Am I correct that if there would've been induction of labor at this point, it would've been through Cytotec or Pitocin?

A. Correct.

Q. Okay. Is there -- assuming that the patient wanted induction, is there any reason, in your view, that an induction couldn't have been started at this point in the evening on the 19th?

MR. PRISLIPSKY: Objection.

BY MS. KLEINHAUS:

Q. Go ahead, sir.

A. You -- you can -- that would've been considered a termination of pregnancy. It's a Catholic hospital. There's still a -- fetal heartbeat. You

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-5 Filed: 08/07/26 3 of 15. PageID #: 6435
The Deposition of DR. JOHN STEWART, taken on March 31, 2026

40

can't just start an induction without the okay of the ethics committee. Catholic hospitals do not generally perform terminations with a fetal heartbeat present.

Q. And how did you come to understand that policy that you're describing?

A. It's -- it's a Catholic doctor -- doctrine and it's a Catholic hospital. Catholics do not believe in terminations of pregnancy.

Q. And just to make sure I'm understanding how you're using the term termination of pregnancy, in this case, the purpose of the induction would be to treat Brittany Watts, but your understanding was that the baby could not survive on its own outside the womb; is that right?

MR. PRISLIPSKY: Objection. Form. Foundation.

THE WITNESS: I'm not sure I understand the question as well.

BY MS. KLEINHAUS:

Q. Okay. It seems that you're considering induction under these circumstances, because there's a heartbeat, to be a termination of the pregnancy. Do I have that right?

A. Yes. Correct.

Q. Okay. But would you agree with me the reason for inducing labor at this point wouldn't be in order to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  So the robot got cath again instead of Catholic; is that right?

A.   Yes.  And the same with above when it said, "Until Mom has bleeding," it would be obviously until Mom is bleeding.

Q.   Got it.  Okay.  And why did you include here in your note that both as a Catholic and as a physician?

A.   Because I recognized what I was asking a Catholic hospital to do was to terminate a pregnancy. And that's not what Catholic hospitals do, generally. There are exceptions, but that's -- and -- and I was saying that, knowing that I don't believe in terminations, but I am still recommending this because it -- it -- medically, it's the right thing to do, despite the fact that I'm a Catholic and don't believe in terminations.

Q.   Sure.

A.   That's why.

Q.   Okay.  And maternal fetal medicine, you're kind of in a unique spot because you actually have two patients, sort of; is that right?  The mom and the baby, and based on your clinical judgment, evaluating what was going on for both of those patients, it was your recommendation, as a Catholic and a physician that she should have the induction, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. As long as the ethics committee agreed with that, yes.

Q. Okay. And that part about, as long as the ethics committee agreed with that, that's not something that you documented in your note, right?

A. It is not.

Q. Okay.

A. But that's the understanding because we cannot proceed with this unless we have permission from the ethics committee to do this.

Q. Okay. Putting aside this situation with Brittany Watts, have you had other occasions where you've had to consult with the ethics committee about an induction?

A. I -- I think I have recently done that here but I'm not -- I can't -- I'm -- I'm not absolutely positive because not every hospital has ethics committees -- well, I'm sorry, that's a -- that's not true. Every hospital has ethics committees, but again, Catholic hospitals are unique in that they do not perform terminations in it, generally.

Q. Okay. So in terms of consulting with ethics about an induction, am I right that you think you may have had that happen since you've moved on from St. Joseph's and Warren?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

but just in terms of your clinical judgment at the time, what's listed here under plan was what you recommended, right?

A.   Correct.

Q.   The next part says, "Again, I feel we would be endangering the mother by waiting for hemorrhage and/or sepsis, or her to stop the fetal" -- or --

A.   For the fetal heartbeat to stop, basically.

Q.   -- for the fetal heartbeat to stop, right? And that's consistent with what we've already talked about.   There was a risk of hemorrhage or sepsis or death if she was not given treatment, right?

A.   (No verbal response.)

Q.   Okay.  The Cytotec or Pitocin that could be administered, I know you testified earlier, it can take quite a long time for those drugs to work but the actual placement or administration of them can be done fairly quickly.  Am I right about that?

A.   Assuming that you have permission to do so, correct.

Q.   Right.  From a clinical perspective, it can -- it's a medication that can be administered fairly simply, right?

A.   Correct.

Q.   I think -- oh, I'm going to stop sharing here

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Dr. John Stewart, taken on March 31, 2026

MS. KLEINHAUS:  That's okay.

THE REPORTER:  We are now off the record.  The time is 3:02 p.m.

(A recess was taken.)

THE REPORTER:  We are back on the record for the deposition of Dr. John Stewart being conducted by videoconference.  My name's Ellina DeLillo.  Today is March 31st, 2026.  The current time's 3:09 p.m. Counsel, you may proceed.

BY MS. KLEINHAUS:

Q.  So we've been talking throughout your deposition about this ethics consult or an ethics committee reviewing in this case, correct?

A.  Yes.

Q.  And when you saw Brittany Watts on September 20th, were you aware of any ethics consult that was underway or discussion?

A.  No.  But after I saw her, I knew we would have to get an ethics committee opinion to proceed with the termination.

Q.  And when you say termination, you're referring to the induction, right?

A.  Same thing.  Same thing.

Q.  Did you initiate an ethics consult after you saw her and believed an induction was necessary and that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. JOHN STEWART, taken on March 31, 2026

85

you would need the ethics consult sign off?

A.   I did not.  I assumed that Dr. Khavari did that.  I did not personally do that.

Q.   And in this case, what was your understanding of what the ethical question was that had to be resolved?

A.   Again, we had a heartbeat.  And to stop the pregnancy, we'd be considering an abortion, and so we needed permission from the ethics committee to proceed with the stopping of the pregnancy.

Q.   And in this case, the ethics consult conclusion was to go forward with the induction as you had suggested, right?

MR. PRISLIPSKY:  Objection.  Form.  Foundation.

THE WITNESS:  That was my understanding, but again, I was not notified of that.

MS. KLEINHAUS:  Okay.  I'll show you what we'll mark as our next exhibit.

(Plaintiff's Exhibit 6 was marked for identification.)

BY MS. KLEINHAUS:

Q.   Okay.  Can you see that okay, sir?

A.   Yes.

Q.   Okay.  I'm just going to scroll down.  So the way these medical records show up is not consistent with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to the patient and are recommending induction to avoid serious bleeding or infection." That's accurate, right?

A. Yes.

Q. And patient is in agreement for induction. And the next part says, "Ethics supports the clinical judgment of the physician or physicians who recommend treatment that includes inducing patient at this point in time." You see that part?

A. I do.

Q. Okay. So -- and this is signed off by Deanna Ford. Do you know Ms. Ford?

A. I -- not by name. I may be -- I mean, I spent very little time in labor and delivery, so if that was a nurse, I don't know. I -- I couldn't tell you the -- the labor and delivery nurse's names so I don't know who that is.

Q. Fair enough. So looking at the bottom of this note, it says, "Electronically signed by Deanna Ford at 3:31 p.m. on the 20th of September." That's the same date that you had just a few hours before recommended the induction, right?

A. Correct.

Q. Okay. And so I know previously in your testimony, you had said many times that, you know, this induction cannot start until ethics signs off, and you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

earlier about you had thought maybe you were a defendant in this case. I was wondering, did you ever receive a letter related to this lawsuit through the hospital?

A. I don't believe so. No.

Q. And earlier you were -- you testified in response to several questions that you understood that there would have to be an ethics consult for an induction where the -- that was 21 weeks with a fetal heartbeat, right?

A. Yes.

Q. And was that understanding based on any specific policy that you're aware of, that there had to be an ethics consult?

A. I don't know that there's a specific policy for that, but I can tell you, at a Catholic hospital, you can't just -- can't decide to terminate a pregnancy. I would've been kicked off staff if I had done that without an ethics consult.

Q. Okay. And you understood that an induction to save the life of the mother, or because of risks to the mother, would not be considered an abortion, correct?

A. But it is an abortion. The problem -- I think one of the problems with this whole area is that we have very limited vocabulary, and so abortion applies to every -- every stopping of the pregnancy. Whether it's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

medically necessary, elective, it's still an abortion. I mean, if you would look up the -- the definition of abortion, that's what we were doing.

MS. KLEINHAUS: Okay. I'm going to show you an additional exhibit here. Give me one second to get sorted.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MS. KLEINHAUS:

Q. Okay. Are you able to see this exhibit, sir?

A. Yes.

Q. Okay. And I'll just scroll down a little bit. This is from the U.S. Conference of Bishops related to Catholic healthcare services. Do you know either way whether you've ever been provided with this?

A. I have not.

Q. You know that you have not? Okay. All right. I am going to take us to a portion of this. Okay. So we're under this section that's called Directives and -- okay. We're in a part that's called Issues in Care for the Beginning of Life. Talks about church teaching with that. And then looking at Paragraph 45 here, it says, "Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the -- the ethics committee agreed with the recommendation.

Q.    All right.  Now, we're going to talk about some other hallmarks or signs of an infection, and you had said before earlier, I think, that signs of an infection would be a patient who is febrile, correct?

A.    Yes.

Q.    What do you consider to be a fever, 100.4?

A.    Or above, yes.

Q.    All right.  So again, you're aware that the nurses on September the 20th, when we talk about monitoring, were monitoring Ms. Watts's vital signs pretty regularly, fair?

MS. KLEINHAUS:  Objection.  Foundation.  Given that this is a 958-page group of medical records. Go ahead.

MR. PRISLIPSKY:  All right.  I'll withdraw it. I'm sorry.  I didn't mean to interrupt you.

BY MR. PRISLIPSKY:

Q.    Doctor, you would expect that the nurses were checking Ms. Watts's vital signs occasionally on September the 20th, fair?

A.    Yes.

Q.    All right.  At 9:16, her temperature was 98. That's normal, correct?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Why don't you re-ask your question, Tom?

        MR. PRISLIPSKY:  Sure.

BY MR. PRISLIPSKY:

Q.   Doctor, is a sepsis -- let's take it in -- a few steps.  Sepsis is the body's overwhelming inflammatory response to an infection; is that fair?

A.   Yes.

Q.   And sepsis can cause an organ failure; is that also fair?

A.   Yeah.

Q.   And one of the things that you could see in a patient who is septic is the body shunts blood to vital organs, fair?

A.   Yes.

Q.   Now, when we have a pulse ox of 99 percent at 10:47, that is absolutely normal, correct?

A.   It is normal, yes.

Q.   And to kind of cut to the chase, you did not believe on September the 20th at all that Ms. Watts was showing any signs or symptoms of sepsis, correct?

A.   Correct.  That doesn't mean she could not become septic because she was at increased risk for it, but she did not show signs of it at that point in time.

Q.   And that's one of the reasons why it's important for a patient to stay in the hospital, because

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

baby, correct?

MS. KLEINHAUS: Objection to form. Foundation. Calls for speculation.

THE WITNESS: That's a hypothetical. I can't comment on it.

BY MR. PRISLIPSKY:

Q. All right. Doctor, one of the things that you did not recommend for Ms. Watts was a dilatation and evacuation, correct?

A. Correct. It requires a special skill that nobody in -- in Warren has, and also requires special instruments to destroy the fetus during the delivery process. And again, we did not have that present, so that was not, in my mind, a viable recommendation.

Q. Okay. I'm going to show you the lawsuit that Ms. Watts has filed in this case, and it's talking about September 19th, September 20th, "The standard of care for a person in Ms. Watts' condition was to induce labor or perform a dilation and evacuation, which is known as a D&E procedure." And what you just told us, sir, is that that was not a viable option, correct?

A. Correct.

Q. Doctor, when you saw Ms. Watts on September the 19th, was she clinically stable?

A. She was.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   When you last saw her on September the 20th, was she clinically stable?

A.   She was.

Q.   You are licensed in -- to practice medicine in the state of Ohio?

A.   I am.

Q.   You are board-certified by the American Board of Obstetrics and Gynecology?

A.   I am.

Q.   And you have subspecialties in -- a certification in maternal fetal medicine?

A.   I am.

Q.   I'm assuming that you spend probably close to 100 percent of your professional time in the active clinical practice of medicine?

A.   Yes.

MR. PRISLIPSKY:  Okay.  Doctor, I don't have any other questions.  Thank you for your time.

MS. KLEINHAUS:  I don't have anything based on that.  And so I think, Dr. Stewart, you may actually be free to go.

THE REPORTER:  Before we hop off on record, any follow-up --

MS. KLEINHAUS:  Hey, Greg, we can't hear you. Are you talking, Greg?  Sorry.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com