UNITED STATES DISTRICT COURT

FOR THE NORTHEN DISTRICT OF OHIO

EASTERN DIVISION

CIVIL NO.: 4:25-CV-00049



BRITTANY WATTS,                        )
                                       )
          Plaintiff,                   )    VIDEOTAPED DEPOSITION
                                       )
     VS.                               )              OF
                                       )
BON SECOURS MERCY HEALTH ET AL.,  )         CONNIE MOSCHELL
                                       )
          Defendants.                  )


     Deposition taken before me, Gina M. DeProfio, a
Notary Public within and for the State of Ohio, on
March 17, 2026, pursuant to Notice and at the time and
place therein specified, to be used pursuant to the Rules
of Civil Procedure or by agreement of counsel in the
aforesaid cause of action, pending in the United States
District Court for the Northern District of Ohio, Eastern
Division.

that this was the right approach?

A.            Yes.

Q.            Okay.  So have you ever previously concluded that an ethics consultation was needed because you disagreed with a doctor's medical assessment?

A.            No.  And I don't think the ethics consult was placed on this case because of the disagreement with the note.  The ethics consult was placed because we were going to induce instead of doing expectant management.  It didn't have anything to do with his note.  It had to do with the induction that would follow.

Q.            I see.  So it wasn't -- if Elaine had not told you that Dr. Stewart told Brittany he would write whatever he needed to write to get this done, you still would have thought an ethics consultation was appropriate?

A.            Yes.

Q.            Okay.  Now, after the ethics consult came back and -- do you remember the result?

A.            Yes.

Q.            And what was it?

A.            The decision was made to proceed with induction.

Q.            All right.  And what was your feeling

Q.            And it wasn't I flushed?

A.            Right.

Q.            It was very specific?

A.            It was very specific.

Q.            And this is -- that's what -- as relayed to you by Sunnie?

A.            Yes.

Q.            You did not -- you never heard this?

A.            I did not.

Q.            Okay.  And so at that point what was your thinking?

A.            I was very concerned.  Now we're watching for her to come.  We're hoping that she's not hemorrhaging to death because we've got something hanging out, which we assume is a cord.  And that's why I texted her, I'm assuming, because I don't recall ever texting, but I -- she's not yet come, and she said -- I texted her, okay.  And then I tell her that she's here.

Q.            Uh-huh.

A.            And then later this text is after -- I don't know the time frame on this because --

Q.            The times are on the right.

A.            I mean, I'm saying in relation to the detective did not come until around 2:00.  The patient came around 1:00, and I spent a good bit of time trying

to help her find someone to bring this baby.  I said -- because she told me when I entered her room that it was in a bucket by the garage, and I'm like, oh, that is -- in my mind I'm thinking, that is so much better than flushed down the toilet.  So, okay.  We can get this baby and bring it to the hospital because we have a post -- after 20-week delivery of a fetal demise.  By Ohio law this needs to be reported.  We need to have a proper disposal of the -- as you, you know, said, it could be a cremation or a burial.  You can't just leave it in a bucket by the garage.  We need to have this baby.  She told me that she would find someone to go get it.

Okay.  She arrives at 1:00.  It's by 2:00 --

Q.           Hold on a second.  You didn't talk to Brittany before she arrived, did you?

A.           No.  No, I did not.

Q.           Okay.  So she didn't tell you that she would have someone retrieve it --

A.           Yes.

Q.           -- prior to her arrival?

A.           No.

MR. PRISLIPSKY:  Wait for her to finish the whole question so you guys speak the same language.

Q.           Yeah.  Okay.  So Brittany arrives.  Do you think that when you texted Sunnie she's here that

that was soon after she arrived?

A.            Yes.

Q.            Okay.  So it was around 12:39?

A.            (Nodding head.)

            MR. PRISLIPSKY:  You're nodding your head.  Just to make sure, did you mean to say yes?

A.            Yes.

Q.            All right.  So you -- Brittany told you that the baby was in a bucket in the backyard?

A.            Yes.  She told me when I went in to her -- to her room to -- to talk to her that the baby was in a bucket by the garage.

Q.            And you found that sickening?

A.            I mean, I found it relieving, to be honest, because if you lose the baby, there -- you know, at least it's not in the toilet.  It's terrible that it's anywhere, in a bucket or by a garage, but it's so much better.  I'm like, bring it here.  I mean, it's a fetal demise.  We handle these.  We -- we know that it's not -- it can't survive, but with the dignity of this life, bring the baby in and let's -- we had already explained -- not myself, but there -- other nurses had stated they had explained to her the process after it was born and what we would do, so you can't just leave --

Q.            Who?

A.              Sunnie.

Q.              Okay.  Go ahead.

A.              So the baby's in a bucket.  Go -- go get it.  Do you have somebody that can bring the baby in?  Yes, I will find somebody.  I said, okay.  That will help, because then we have the baby.  We can have a proper whatever, burial, cremation, whatever.  If you don't want to choose, then we would arrange with the funeral home and have it done properly.

Q.              What made you think that it was your responsibility to get this baby to the hospital?

A.              Well, I have a patient who has delivered a baby, and there's no baby.  It is my responsibility for that child to find where it is.  What if it's 24 weeks?  What if it's still alive?

Q.              You knew it wasn't.

                MR. PRISLIPSKY:  Objection.

A.              I was hoping at that point, since it's been so long, that it isn't, but it could have been.  We -- we have to determine the well-being of this baby.  At this point we have to find the baby.

Q.              Okay.  So when you learned hours earlier that she had delivered, why didn't you call 911?

A.              Well, because she was instructed to come to the hospital, so we hoped that she's coming.  I

wouldn't call 911 prior to her arrival.

Q.          Yeah.  You got to get her there first; right?

A.          Well, I need to get her there to see if she -- does she have the baby?  Did she flush it?  I can't determine what went on in her home until I get the patient to me.

Q.          Right.  But you're saying there might be a living baby?

A.          There could have been.

Q.          At Brittany Watts' home?

A.          Yes.

Q.          I mean, time is of the essence; right?

A.          Yes.

Q.          Time really matters?

A.          It matters, but it's also -- I also have knowledge that if she really delivered at 5:40, whatever, it's most likely, but I cannot determine that until I know.  It -- I can't tell you if it was alive or dead until we see the baby.  You understand?  I wanted to find that baby.

Q.          You wanted to?

A.          I -- I felt the need to.

Q.          What was that need?

A.          Because the baby has a life, too.  This

is her child.  It can't be in a bucket by the garage indefinitely.  If I would have done nothing this day, where would this baby be?

Q.          I don't know.  Neither do you.

A.          It would have been in the toilet stuck.

Q.          To this day?

A.          Until she -- well, she would have had to fix it.

Q.          Okay.

A.          But that's not okay.  That baby's 22 weeks gestation.  It has a life.  We have to -- by law, it has to be properly -- this is a -- this is a person. This is a human.

Q.          Did you think this was your legal responsibility?

A.          I thought it was my responsibility as her nurse to help her, and she seemed very willing to try at first, and then told me no one could go get it.  No one can go get it.

Q.          Where did you document that she told you no one could go get it?

A.          I didn't.

Q.          You documented that she told you someone could?

A.          No, Jordan, I believe, was documenting

to -- the burden of trying to get this baby to the hospital, I'm trying to give her time to help me so it doesn't turn into anything bigger, and then I called the police.  Within that hour, I did what I felt I needed to do.  I don't think there's any amount of time that it should be in the bucket or the toilet.

Q.          Okay.  And you called the police because she will be charged; right?

MR. PRISLIPSKY:  Object -- objection.

A.          No, absolutely not.  I called them to go and find this baby and bring it to the hospital.

Q.          So there was no connection between your text saying we have to have a fetus or she will be charged and you calling the police?

A.          No.

Q.          Totally separate?

A.          I did not think she would be charged. If we have the fetus, what would they charge her for?  I had no -- no legal thoughts on this at all that Brittany -- I was trying to prevent her -- by bringing the fetus, everything should be fine.  Once we have the baby at the hospital, we will proceed as if she brought it herself.

Q.          Okay.  We are going to return to the medical records, and let's see if I can find the right

Q.            All right.  And -- and we agree that Detective Carney asked you to join him in the -- in the hospital room?

A.            I don't know that he asked me.  I remember asking him if he needed me to come with him, and he said if you want to come, and I said, well, she's our patient, and I feel like she should have a nurse with her, you know, while she's being questioned or interviewed or spoken to.  And he was absolutely like he thought that would help him, if I came along.  He didn't ask me to come.  I asked him if he needed me, and he said I could come.

And I know during the time of the interview there were incidences where her IV was going off that I corrected.  At one point she questioned me about her bleeding.  He had stepped out to speak to someone, and so I was able to assess her bleeding.  I don't feel -- I would not feel comfortable -- I didn't feel comfortable that day just sending him in there with her alone.  I felt like that would scare her maybe or be intimidating or just -- maybe just she needed a presence of a nurse with her.  And that's why I went in with her.

Q.            Okay.  So he didn't ask you to?

A.            He did not.

Q.            And --

A.                That I recall.  I just remember asking him, do I need to?  He said, you can.  And I said, I feel it would be better for Brittany.

Q.                And you also said that he felt it would be helpful?

A.                Just, I guess, to support her.  Like maybe to help him understand what she -- I don't know what he meant by that.  But that's what was my understanding.

Q.                Okay.  Did he say that, that he thought it would -- it would help him if you came in?

A.                He just thought it would be -- I don't know if he used the word good, helpful, beneficial.  I don't remember the exact word.

Q.                Okay.

A.                But he thought it would be good for me to come.

Q.                And you guys had a -- some shared goals; right?

A.                Yes.

Q.                You wanted to get Brittany to tell you what had happened with the baby?

A.                Yes.

Q.                Both of you wanted that?

A.                I wanted them to find the baby.  That

333

A.                    Well, because I had been directed that I was -- it was acceptable to call them, and when they asked me questions, now we have a call where I'm talking to a dispatcher.  They need information, so I'm giving them, you know, this is what she said.  The baby's in a bucket.  This -- you know, I'm giving them information that I feel that they need.

Q.                    Did they need to know that she had not had prenatal care?

A.                    I -- no, they probably don't need to know that.  I believe I did say that.  I did listen to my recording, and I'm not sure why I said that.  Maybe to paint the picture of the fact that we don't know how far along that the fetus is because there had been no care.  So now I don't know whether it's a 22-week, a 20-week, a 24-week.  I wasn't saying it in a way like she didn't get care.  It was -- I don't know what we're looking at with the fetus.

Q.                    Now -- okay.  When it comes to estimating fetal age, we talked about the ways that that's done.  There was nothing about the fact that she didn't have prenatal care that inhibited assessing the fetal age at the time -- on the 19th and 20th of September; right?

A.                    Well, typically when you have prenatal

care, the very first ultrasound that you have is the most accurate.  The further you wait into your pregnancy, it's less accurate.

Q.          Okay.

A.          So that initial ultrasound is going to be the best determination of a gestational age later on. That's not to say you can't give an estimate, but that 21 weeks is definitely an estimate at that point.

Q.          So you're talking about like a ten-week ultrasound?

A.          Yeah, they actually do them at eight, ten, twelve weeks, right in there; usually ten.

Q.          Now, did Susan Zupko -- Suzanne Zupko tell you that you were under no medical privacy obligations anymore --

A.          No.

Q.          -- with regard to Brittany Watts?

A.          No.

Q.          Okay.  You just decided that?

A.          Well, she gave me the option to call the police, so I assumed that I was not -- that I was not under -- that I could -- I was permitted to do that, and -- and I can't just call the police and say, go look at this address for a baby without giving them more information.  I gave them what I thought they needed.

MS. RICKERT:  This is very strange.  Let me see if this next one --

(Whereupon an audio recording is being played.)

Q.            Okay.  Did you hear yourself say that you were going to be sick?

A.            No.

Q.            All right.  I'm afraid to start it again.

A.            I thought that was her saying --

Q.            Oh.

A.            -- she -- the dispatch --

Q.            Oh, you heard somebody say it?

A.            Somebody said something in there.  Yeah, that was not me.

Q.            That wasn't you saying you're going to be sick?

A.            No, no.

Q.            Okay.  And you heard yourself say that it is certainly not alive anymore?

A.            But I then followed with we cannot be cert- -- we -- we cannot be sure because we haven't -- she didn't look.  But I -- I -- again, by this time, you would think, but you have to confirm, and that's what I was reveal- -- saying to her by that statement.  I'm certain it's not alive, but then I followed it with, but

we cannot be sure.

Q.            But you were certain?

MR. PRISLIPSKY:  Objection.

A.            I was not certain.  How would I be certain?  I mean, I -- I am thinking that, but you don't know.  You -- saying, you know, yeah, I'm certain, but then you can't really be sure until we see the baby.

Q.            Okay.  And you talked about Brittany's lack of prenatal care?

A.            And that was right after she asked how many weeks, and that's -- I was establishing that we don't really know for sure because when you have prenatal care, you have a more accurate estimate.  That was my --

Q.            Okay.  And it's always an estimate; right?

A.            It is always an estimate, but it is more accurate when it's done throughout.

Q.            Any reason the dispatcher needed to have that explanation?

A.            No.

Q.            Okay.  Let's listen to this last one.

(Whereupon an audio recording is being played.)

Q.            Okay.  So there was a fair amount of medical information in that call; right?

A.            Yes.