UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

**EXHIBIT L**

BRITTANY WATTS,

     Plaintiff,

Vs.                                               Case No. 4:25-CV-00049

                                       Judge:  Sara Lioi

BON SECOURS MERCY HEALTH, et al,

     Defendants.
_____/

Deposition of DAVE HARVEY, MPA, INCI, taken in the above entitled action before Crystal Lee Davidson, CSR-2327, a Notary Public and Certified Shorthand Reporter in and for the County of Wayne, at Howell Area Chamber of Commerce, Summit Conference Room, 123 East Washington Street, in the City of Howell, on the 16th day of June, 2026, commencing at 12:09 o'clock p.m., pursuant to the Federal Rules of Civil Procedure.

APPEARANCES:

RACHEL BRADY
JULIA RICKERT (Via Zoom)
LOEVY & LOEVY
Attorneys at Law
311 North Aberdeen Street, Third Floor
Chicago, Illinois

     On behalf of the Plaintiff

PATRICK KASSON
REMINGER CO., L.P.A.
Attorneys at Law
200 Civic Center Drive, Suite 800
Columbus, Ohio   43215

     On behalf of the Defendants Bon Secours Mercy Health, Mercy Health Youngstown, LLC d/b/a St. Joseph Warren Hospital, Connie Moschell, Jordan Carrino and Parisa Khavari



potential that the baby was born alive, is that correct?

MS. BRADY:  Objection, foundation.

THE WITNESS:  I don't know if she said it exactly like that.

Q.  (By Mr. Pinzone)  I think you cited to your report that she indicated that there was the potential that the baby could be born alive, it could survive for five minutes, an hour, maybe even longer, but it would be a miracle if the baby were still alive, is that correct?

A.  That would be more correct, yes.

Q.  Based on the information that Nurse Moschell provided to Detective Carney at the hospital, it would be appropriate for him to further investigate what had happened with Miss Watts and her baby, correct?

A.  Yes.

Q.  And you would agree with me that if there is even a minimal chance or very small chance of that baby being still alive, he would want to try to conduct a thorough but quick investigation as to where that baby might be, correct?

MS. BRADY:  Objection, form.

THE WITNESS:  He would definitely want to go as quickly as he could to get information of where that baby was, yes.

Q.  (By Mr. Pinzone)  And he would have to balance that with



someone's tire.

That would be service work?

A.   Absolutely.

Q.   All right.  In connection with service work there is something called service calls where folks call the police and ask not necessarily to report a crime but to make a request for service, fair?

A.   Yes.

Q.   Okay.  Now, the call that Nurse Moschell made to talk about the baby that was in the bucket in the backyard, did you read that, or did you just listen to that?

A.   I believe I read it also.

Q.   Okay.

A.   I'm not positive.  It could have been just the call.

Q.   Okay.  I'm going to give you, we're on two, aren't we, John?  I have used this before.  This is just the transcript of the call.  I think it's improperly labeled a 911 call.

(Whereupon Deposition Exhibit No. 2 was
marked by the court reporter.)

Q.   (By Mr. Kasson)  Take a look at Exhibit 2.  I will represent to you this is a transcript of that call that was made.

MS. BRADY:  And I'll just object to this because it hasn't been certified, and I don't know for



Q.   (By Mr. Kasson)  Certainly the first thing she asks is get the baby or tell me what to do.

That is a service request?

A.   I would agree with that.

Q.   Okay.  All right.  Now, let's talk about your testimony generally.

How do you determine what information that you are going to get when you review a case?  Is it a combination of you saying I want certain things, and the lawyer who is retaining you is sending you over things, or you decided yourself what you want?

A.   For the most part I get information initially from the attorneys, and then based on that review, I may or may not ask for more of what I want to see.

Q.   You obviously don't know everything that is in the attorney's file, fair?

A.   That would be fair.

Q.   And if there is something in the attorney's file that would impact your opinion, you would expect the lawyers to send it to you, wouldn't you?

MS. BRADY:  Objection to foundation.

THE WITNESS:  I would expect them to send me everything that I need, yes.

Q.   (By Mr. Kasson)  And you certainly understand as an expert that whether you have all of the information can



MR. KASSON:  Well, I'll tell you the baby had all of its limbs, all of its digits, every outward and normal feature that a baby would have.  Accept that.

MS. BRADY:  Objection to form.

Q.  (By Mr. Kasson)  The baby in a bucket in a backyard gets exposed to animals, insects, children.

Do you believe that is something that the police ought to take a look at?

A.  Certainly.

Q.  Okay.  You wouldn't want it just left there sitting there, would you?

A.  I would not, no.

Q.  Okay.  Let's talk about dishonesty in investigations.

When you were actively investigating, if you caught a witness in an inconsistency, that would impact your belief as to whether or not there was potentially some intent there, right?

MS. BRADY:  Objection, form.

THE WITNESS:  Possibly.  It depends on a lot of circumstances involved, yes.

Q.  (By Mr. Kasson)  Police officers as part of their regular duties infer things from what appear to be lies, fair?

MS. BRADY:  Objection, form.



Q.   (By Mr. Kasson)  Well, we know the police had already
made a decision they were going to go to the house and
look for the baby in the bucket?

A.   Right.  They were dispatched to do that, yes.

Q.   And we know that the police called Carney at the
hospital and told him they couldn't find the baby,
right?

A.   Yeah, correct.

Q.   All right.  And we know that when it comes to preserving
evidence, reserving bodies, it's important because they
can degrade over time, right?

A.   Yes.

Q.   It would be in a legitimate police interest to want to
find the baby as soon as possible so they could preserve
the body, fair?

A.   Yes.

Q.   Okay.  And in this case preservation of the body could
benefit Miss Watts as it did to show that it died in
utero, fair?

A.   Certainly.

Q.   I mean when an infant dies, the preservation of the body
could benefit the mother to know that there was no
trauma, it died in utero, the mother had nothing to do
with it, right?

A.   Yes.

