IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

HON. JUDGE SARA LIOI

CASE NO. 4:25-CV-00049



BRITTANY WATTS,

Plaintiff

V.

BON SECOURS MERCY HEALTH;

MERCY HEALTH YOUNGSTOWN

LLC D/B/A ST. JOSEPH WARREN

HOSPITAL, ET AL.,

Defendants

DEPONENT:  NICHOLAS CARNEY

DATE:      DECEMBER 15, 2025

REPORTER:  MADISON BOOKS



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Yes.

Q.   Okay.  And is there a 311 service also?

A.   I don't believe so.

Q.   All right.  Do you know someone named Connie Moschell?

A.   I know of her.  I've met her.

Q.   Okay.  When did you meet her?

A.   At St. Joe's Hospital.

Q.   Okay.  Was that in September of 2023 --

A.   Yes.

Q.   -- when you met her in connection with the investigation into Brittany Watts?

A.   Correct.

Q.   Okay.  Had you met her before that?

A.   If I have, I do not remember.

Q.   How many times did you communicate with her?

A.   Just that day.

Q.   Okay.  The day you went to the hospital to interrogate Brittany Watts?

A.   Yes, ma'am.

Q.   Okay.  Did you talk to her after that at all?

A.   No, I did not.

Q.   Okay.  Do you know someone named Suzanne Zupko?

A.   Suzanne Zupko?  Not to my knowledge, no.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-13 Filed: 08/07/26 3 of 20. PageID #: 6491
The Deposition of NICHOLAS CARNEY, Taken on December 15, 2023

124

Q.   Okay.  All right.  So when you were dispatched to the hospital, what exactly were you told?

A.   There were officers on scene at Mrs. Watts' house on Todd Avenue, Northwest.  They were finding bloody tissue.  So Sergeant Orth called me and said, I need you to go to -- excuse me.  St. Joe's, says there's a female that showed up, was pregnant a day ago and now she's there and there's no baby.  And he goes, we have officers on scene.  And can you go and interview her, please?  So I then responded to the St. Joseph.

Q.   And what -- did you believe that you were interviewing Brittany Watts or you were instructed to interview Brittany Watts in connection with a crime?

A.   I had no idea what I was walking into. This --

Q.   So how did you -- oh, go ahead.

A.   This was uncharted territory for me.

Q.   Why do you say that, uncharted territory?

A.   Never had a call like this.

Q.   Like what?

A.   Where I got to go to the hospital and there's a baby missing.

Q.   So it was your belief that Ms. Watts' baby was missing?

A.   Well, she was pregnant in the day prior and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-13 Filed: 08/07/26 4 of 20. PageID #: 6492
The Deposition of NICHOLAS GARNER, taken on December 15, 2023

128

hospital no longer pregnant and without her baby?

A. From what I obtained, the information I -- I obtained from Nurse Moschell. My immediate was, oh my God, there might be a baby out there alive somewhere.

Q. And as far as you were trained, if Ms. Watts had shown up at the hospital having given birth to a live baby, but without the baby, would she have committed a crime?

A. Can you repeat that?

Q. Yeah. Based on your training and understanding of the law, if Ms. Watts had had a baby at home and then come to the hospital without the baby, would she have committed a crime in doing that?

MR. PINZONE: Objection. Go ahead.

THE WITNESS: I -- that would -- I don't believe so, but I -- I can't -- I guess I'm not an attorney. I don't know if there is anything on that --

BY MS. BRADY:

Q. Okay.

A. -- law-wise.

Q. Did you learn how far pregnant Ms. Watts was before you started interviewing her?

A. I told -- was told 22 weeks, but it could be two weeks more or two weeks less.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  Who told you that?

A.   Nurse Moschell.

Q.   Okay.  And did you attach any significance to the number 22 or 22 to 24 weeks?

A.   What do you mean by significance?

Q.   Like did that -- did that number mean anything to you in terms of your understanding of the fetus' viability?

A.   Okay.  I was told that the baby quite possibly could be born alive.

Q.   Okay.  Did you have an understanding about whether the baby would survive, even if it had been born alive?

MR. KASSON:  Objection, asked and answered.

THE WITNESS:  Can you repeat that?

BY MS. BRADY:

Q.   Yeah.  Do you -- did you have an understanding about whether the baby would survive had it been born alive?

A.   I was told that the baby could be alive for five minutes, an hour, a day.  A miracle the baby could live is basically what I was told.

Q.   Okay.  So you were told that the baby might survive?  Like --

A.   Yeah, anything could happen.  You know, they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NICHOLAS GARNEY, taken on December 15, 2023

130

-- I was told that the baby was possibly born a lot.

Q.   Okay.   And you were told that it might have a long-term chance of survival or a chance of long-term survival?

A.   They said a miracle, which they clarify that chances are slim.

Q.   Okay.   And who said that?

A.   Nurse Moschell.

Q.   Did you consider double checking with a doctor or another medical professional at the hospital the information that Nurse Moschell provided you?

A.   She's the main one I talked to.   She seemed to know Mrs. Watts case well, and I was obtaining all my information from her.   So I don't know.

Q.   Okay.  Did you -- yep.  Did you consider double checking the information that she gave you?

A.   No, I did not.

Q.   So when you got to the hospital, you believed you were trying to find a living baby that had just been born, right?

A.   Yes.

Q.   And that was because of the information that was communicated to you from Nurse Moschell?

A.   Yes.

Q.   What did you make of the bloody tissue that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

afford attorney, one will be appointed to you prior to any questioning." Do you see that?

A. Yes.

Q. Okay. So you read her all of these statements and she signed off?

A. Yes.

Q. Okay. And then there's the voluntary waiver. She says, "I've read this statement of my constitutional rights, and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer. I know what I'm doing. No promises or threats have been made against me, and I waive my rights." Do you see that?

A. Yes.

Q. Okay. And she says, "I have also been advised that I'm not under arrest at this time and free to leave," okay?

A. Correct.

Q. So she signed off on all of these?

A. Yes.

Q. Okay. So she knew that there was potential for a criminal investigation or some sort of criminal prosecution to arise from her interview, right?

A. I couldn't answer for Ms. Watts.

Q. Well, I mean, she signed off on a document



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

interview ended, but before you left the hospital?

A.   Sergeant Laprocina.

Q.   What did you communicate with him or what did you talk to him about?

A.   This shed in the backyard that didn't exist.

Q.   Okay.  What specifically did you talk to -- with him about that shed?

A.   According to Ms. Watts, she said she got a black bucket, removed the remains, and threw them behind a shed.  I believe she said tan.  And I believe I made two or three phone calls to Sergeant Laprocina, and the third one was, politely putting it, he goes, there's no F-ing shed.

Q.   Okay.  And why were you talking with him about that?

A.   Again, we were looking for a baby, and she keeps repeating that she tossed whatever behind a shed.

Q.   Okay.  Did you talk to any nurses or medical staff after you concluded the interview?

A.   No.

Q.   Sorry, your answer was no?

A.   Yes.

Q.   When did you stop your audio recorder?

A.   As soon as the -- I was leaving and I believe she asked something about her mother finding out.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. Yes.

Q. Okay. Did you understand what that meant?

A. Yes.

Q. So you knew that, even if Brittany Watts delivered or miscarried, that her fetus would not be viable?

A. Yes.

Q. Okay. And so you knew that that meant the fetus had no chance of survival outside of the uterus, right?

A. That's not what I was told by --

Q. What were you --

A. -- hospital staff and -- everybody said this baby could be born alive.

Q. Okay. So after you interrogated Brittany Watts at the hospital, you went to her home on Todd Avenue, right?

A. Yes.

Q. Okay. And you saw the toilet before it had been removed, right?

A. Yes.

Q. And were you aware of what was in the toilet at that time?

A. When I arrived on scene, the coroner's office was on scene, and Sergeant Laprocina told me that he had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reached into the trap and felt, I can't remember if he said one or two feet.

Q.   He reached into the trap and saw feet or felt feet?

A.   He felt feet.

Q.   Okay.  Was the toilet still intact when you got there?

A.   Yes.

MS. BRADY:  Okay.  I'm going to put up what we'll call Exhibit 6, which is a photo from the bathroom of Ms. Watts.  This is a one-page document Bates labeled City of Warren 170.

(Exhibit 6 was marked for identification.)

BY MS. BRADY:

Q.   Does this look familiar to you?

A.   Yes.

Q.   Okay.  Is this what you recall the scene of Ms. Watts's bathroom looking like when you arrived?

A.   I believe -- I believe it might have been filled higher, but I -- I'm not sure.

Q.   Okay.  So you agree that you can't see any of the fetus from this vantage point from above the toilet?

A.   Correct.

Q.   Okay.  And when did you -- actually, strike that.  When you observed the toilet like this, did that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.   Why did you communicate with the prosecutor about this case after you learned the fetus had been born deceased?

A.   Well, it's -- I -- I just can't close out this case.  I just can't be like, no, this is not a homicide. I'm closing it.  So as I do with -- again, 99.9 percent of my cases I present to a prosecutor, lay out what happened, and make -- let them make the decision if the charges are filed or not filed.

Q.   So you learned from the coroner's report that this was not a homicide, right?

A.   Correct.

Q.   And you learned from the coroner's report that Brittany Watts was not at fault for what happened to the fetus, right?

A.   I wouldn't say that.  I --

MR. PINZONE:  Objection.

THE WITNESS:  Yeah, I learned it was not a homicide.

BY MS. BRADY:

Q.   Okay.  Did you -- did you think that Ms. Watts was at fault for what had happened to the fetus before it was miscarried?

A.   That I didn't know.  That's why I took it to the prosecutor.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-13 Filed: 08/07/26 12 of 20. PageID #: 6500
The Deposition of NICHOLAS CARNEY, taken on December 13, 2024

243

Q. Okay. And do you familiarize yourself with the coroner's entire report in those cases?

A. I -- like, memorize the coroner's report?

Q. Familiarize yourself with it, yeah, something.

A. I'll familiarize myself with it, but normally I will talk with Sergeant Laprocina, who is very well-versed in this stuff, and he kind of -- he gets all of that. I don't -- and he will kind of run it down for me. But again, I still present just to -- anytime you have a dead child, I just can't say, okay. I'm closing this out on my own.

Q. So every time a child dies of natural causes, you present it to the prosecutor?

A. Yes.

Q. Every single time?

A. Yeah.

Q. So you presented this case to the prosecutor -- strike that. The first time you communicated with a prosecutor about this case was October 4th, right?

A. Yes.

Q. Everything you worked on in the case up until the point you got it to the prosecutor was your investigation; is that right?

A. Mine and Sergeant Laprocina's.

Q. And what documents did you give or present to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the prosecutor?

A.    The initial police -- police report, the notes I had up in that -- up until that point, photographs.  I believe that was it.

Q.    You said the notes you had up until that point.  Were those notes different from what was in your report?

A.    No.  You know how we talked about the continuing report?

Q.    Yeah.

A.    That side that were in there up to that point of meeting him on October 4th.

Q.    Okay.  So you gave him your report and everything that was in the report up until October 4th?

A.    Correct.

Q.    Okay.  Did he read your report?

A.    Yes.

Q.    Okay.  Did he ask you any questions?

A.    Yes.

Q.    What did he ask you?

A.    I -- I don't recall the exact questions.  We just kind of go over the case, so I don't really remember the exact questions he asked me because --

Q.    And you said you did not provide him with the recording of your interview with Brittany?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 4:25-cv-00049-SL Doc #: 114-13 Filed: 08/07/26 14 of 20. PageID #: 6502
The Deposition of NICHOLAS CARNEY, taken on December 15, 2023

250

A.   The Court secretary who is there, right outside the offices of the prosecutors.

Q.   Okay.  And where it says, "Complainant," here, "Detective Nicholas Carney, and then below that, "Eric Laprocina," whose signature is that on the complainant's signature line?

A.   That's -- that's mine.

Q.   Okay.  So you are listed as the complainant. And you are the complainant who signed the Criminal Complaint in Brittany Watts's criminal case, right?

A.   Yes.

Q.   This Probable Cause Checklist, that's Page 1 of this PDF, when does this get filled out, if you know?

A.   That is filled out after the prosecutor makes a decision -- decision, whether charges are going to be filed or not.  And it is electronically sent to the -- I'm trying to explain this.  There's like a row of criminal complaint lines.  So after a charge is approved, that's sent electronically.  Then you go up and they pull up the case and have you sign.  That's why my signature looks so small because we sign on one of those electric digital pads.  And the -- that's for the Court case, that 23CRA is the Court case.

Q.   Okay.  And this refers to -- this Probable Cause Checklist refers to -- does the complaint allege

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

point while you were investigating Brittany Watts?

A.    No, because it -- we're comparing -- it's apples and oranges.  I didn't know if Mrs. Watts -- if I had something -- or if I had something or nothing.  And that's why, again, I just took everything up to the prosecutor's office.

Q.    And then the abuse of a corpse case that you had previously worked on didn't cross your mind at all while you were investigating Brittany Watts?

A.    To be honest, not really.  Two different circumstances.

Q.    When you saw the fetus, the miscarried fetus in the P-trap of the toilet, what was your reaction?

A.    I was nervous because it was my job to -- for the coroner's office, for us to remove it.  And I was nervous in the sense, I didn't want to damage the body.  But really that was -- you know, I made sure I did it properly.  It took me about an hour, but I held the baby real quick as I took it out of trap.  I then handed it to Sergeant Laprocina, who placed it down.  And we left.

Q.    Did you have any sort of emotional reaction to seeing the deceased fetus in the P-trap?

A.    No.

Q.    It didn't make any impact on you?

A.    No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   And when you learned that Brittany Watts told you she had plunged the toilet after she scooped out what she believed to be the remains of her miscarriage, did that bother you?

A.   No.

Q.   It didn't strike you as inappropriate in any way that she plunged the toilet after scooping out what she believed to be the remains of her miscarriage?

A.   No, I didn't really have any motion.

Q.   Okay.  So you arrested Brittany Watts after filing -- or after signing the Criminal Complaint. Where did you arrest her?

A.   At her home.

Q.   Did you put handcuffs on her?

A.   Yes, I did.

Q.   Why?

A.   Yes, I did.

Q.   Why?

A.   I didn't know her.  She seemed nice enough, but I just put -- I had her sit in the front seat.  I just put handcuffs on her in the front.  That was kind of from around safety.  I don't know her from Adam.  And I've had the nicest people, I thought were the nicest people, wig out on me.  And so, at least if she starts swinging, I got something to grab onto.  But she was --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

And even do me a bigger favor, and not even get her fingerprinted so she didn't have to go to the county jail.

Q.   And you talked to the judge before you arrested her or after?

A.   After.

Q.   Okay.  So you arrested her and brought her to the station, and then you spoke to the judge?

A.   Yes.

Q.   And where was she while you were speaking to the judge?

A.   I had -- her mom followed us down, so I had them both sit in the Courtroom number 1, not in handcuffs.

Q.   Did she -- did she say anything to you?

A.   No.

Q.   Did you read her, her Miranda warnings when you arrested her?

A.   No.  I didn't ask her any questions.

Q.   Do you recall testifying at the preliminary hearing that the abuse element of the abuse of corpse statute was that she had plunged after she miscarried. Do you remember that?

A.   Yes.

Q.   Okay.  Who determined that the act of plunging

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NICHOLAS CARNEY, taken on December 15, 2025
315

A.    This is the baby I cut from the trap.

Q.    Okay.  And it looks to me the -- is the baby still sitting in part of the trap?

A.    Yeah, we had just -- I was able to chisel it a little bit and it just kind of cracked open.  And as soon as it cracked open crack, I can't remember if it was Sergeant Laprocina or coroner's office that took this picture.

Q.    Okay.  This is the baby -- this is the baby sitting in part of the trap that it was stuck in, right?

A.    Yes, sir.

Q.    After you cracked open the toilet to get the baby out?

A.    Yes, sir.

Q.    Okay.  Did the prosecutor have that photo when he decided to indict Ms. Watts?

A.    (Inaudible).

        MS. BRADY:  Objection.  Foundation.

        THE WITNESS:  (Inaudible).

BY MR. KASSON:

Q.    Okay.  Let's talk about your desire to find a baby.  That was your perspective, fair?

A.    Yes, sir.

Q.    All right.  If the hospital had told you there's a one-half percent chance the baby could still

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   It's not true.

Q.   Once you left the hospital, did anybody from the hospital have any involvement in the investigation?

A.   No.

Q.   Once you left the hospital, did anybody have any involvement in the decision to prosecute?

A.   (Inaudible).

MS. BRADY:  Objections.  Form.  And foundation.

BY MR. KASSON:

Q.   The only --

MS. BRADY:  Also, to the previous question as well.

BY MR. KASSON:

Q.   The only involvement the folks from the hospital had is the information you received at the hospital and the fact that Ms. Moschell was in there during the interview, fair?

A.   Yes.

MS. BRADY:  Objection.  I believe that misstates the testimony.

BY MR. KASSON:

Q.   And the -- and the interview itself, Ms. Moschell asked some questions; you understand that?

A.   Uh-huh.

Q.   Got to say yes or no.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Yes, sir.

Q.    All right, but the prosecutor and his decision to indict never got to hear any of the questions Ms. Moschell asked, correct?

A.    They did not.

Q.    I'm sorry?

A.    No.

Q.    You just double negative -- did a double negative and it's my fault the way I asked the question. Did the prosecutor in the decision to indict ever get to hear the recording and the stuff Ms. Moschell said?

A.    No, he never requested it.

Q.    All right.  And did anybody from the hospital do anything to push the -- I said the indict, the prosecutor give you okay to charge?

A.    Not the charges.

Q.    Let me ask that again, so we're got a clear record.  Did the prosecutor in the decision to charge, did he hear anything Ms. Moschell said?  No, sir.

MS. BRADY:  Objection.  Foundation.

BY MR. KASSON:

Q.    Did anybody from the hospital in any way push charging Ms. Watts?

A.    No, sir.

MS. BRADY:  Objection.  Foundation.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com