IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION



BRITTANY WATTS,

    Plaintiff,

vs.                                    CASE NO.: 4:25-CV-00049

BON SECOURS MERCY HEALTH; MERCY HEALTH YOUNGSTOWN LLC

D/B/A ST. JOSEPH WARREN HOSPITAL; CONNIE MOSCHELL;

JORDAN CARRINO; PARISA KHAVARI; SUZANNE ZUPKO; FRED

RAINES; CITY OF WARREN, OHIO; NICHOLAS CARNEY; UNKNOWN

OFFICERS, and UNKNOWN MEDICAL PROFESSIONALS,

    Defendants.

DEPOSITION OF

GIL BLAIR

January 20, 2026

10:13 A.M. ET

Remote Proceeding

Ellina DeLillo, 2025-RE-885927



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

same way that there's a right to discovery before a criminal trial?

A.    Is there a right to that?  I -- I -- you know, to be honest, I haven't -- we always just did it.  I mean, you know, the counsel would come in for a prelim, and they would get our reports.  They would get what we had.  We never -- there was never a hide the ball type thing.  I think there is a right, to a certain degree, but a preliminary hearing is actually just a probable cause hearing, and different judges handle it differently.  I know that in our court, the judges would allow a pretty thorough preliminary hearing, you know, on a lot of -- a lot of subjects.

Q.    Okay.  All right.  So I'm going to ask you now about the specific charging decision in Brittany Watts' case.  So that was --

A.    Okay.

Q.    -- from the records, looks like October 4th of 2023, you made the decision to approve charges against Brittany Watts.

A.    Yes.

Q.    Do you have an independent recollection of the decision to approve charges against Brittany Watts?

A.    I -- I have a recollection of the case, you know, just because I remember the case.  It was, you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of GPL BLAIR, taken on January 20, 2026

43

know, a somewhat unusual case and, you know, something we obviously don't see every day. And I remember the photos that I saw.

Q. Okay. Did you have any involvement in Brittany Watts' prosecution, other than approving charges?

A. I did not.

Q. Okay. And did you have any involvement in the case, other than that one conversation you had with Detective Carney, where you decided to approve charges?

A. No. No. I was in the office. I know they were, you know, getting ready for the preliminary hearing, things like that. But I -- I did not participate in any way in the preliminary hearing and, you know, other -- once I made the -- the -- the decision, the charge was filed, and that ended my involvement.

Q. And before the day when you decided to file -- or approve charges, had you spoken with anybody from the police department about the case?

A. Other than Detective Carney coming in that day, no. This wasn't a case that we were having ongoing discussions on or anything like that.

Q. Okay. And you said that the case was a little bit unusual. What makes you say that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   I think he came to the office looking for a prosecutor.  And then you know, I was the one available, so...

Q.   Okay.  And then when you met with him and he introduced the case to you, what do you remember him saying?

A.   You know, traditionally, he would -- to say I remember the exact details of the conversation, I can't tell you that.  I -- I do recall he said, we have this case, you know, and I think he -- he told me he and Detective Laprocina had had the -- the -- the body was found in a toilet and that the coroner's office did not do the removal.  They instructed the police department to do the removal.

And -- you know, and he, you know, said at that point, it had been investigated.  The coroner's office had completed an investigation.  And I'm sure he gave a summary of how he became involved.

Q.   Okay.  And do you remember learning -- actually, strike that.  Did you -- do you remember what he told you about the coroner's report -- or the coroner's conclusions?

A.   The -- the only thing, I think, that the coroner concluded that the child was deceased at the time of birth, and that, you know -- I -- I -- there was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

never a mention that this was a homicide or a -- a -- you know, a manslaughter or anything like that.  It was just, you know, this -- you know, we had this situation, so...

Q.    But you knew at the time you decided to approve charges that the fetus had died in utero?

A.    I -- we knew that it had -- it had -- was deceased when it was born, yes.

Q.    Okay.  And did you speak with Detective Carney about whether he though that those -- that coroner's findings was erroneous in some way?

A.    Oh, he never indicated anything like that to me.

Q.    Okay.  So Detective Carney never told you that he thought the coroner's report was incorrect?

A.    No.

Q.    Okay.  And so Detective Carney brings you this case, he explains some of the facts, and he told you that he was seeking approval of charges for abuse of a corpse; is that right?

MR. PINZONE:  Objection.

THE WITNESS:  I think he -- I think he was asking, do you think that there is a charge here for this?

BY MS. BRADY:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  And what did you say?

A.   I said, let's look at it.  And I -- you know, we have a criminal law handbook on our -- on our desks. And I looked at it, and my thought was, based on what was contained in the report and based on the photos I was looking at, that this was a situation that -- that may well offend community standards.

Q.   Okay.  And did you consult with any other prosecutors before you decided to approve charges?

A.   I don't believe that I did.

Q.   So you reviewed Detective Carney's police report, right?

A.   Well, I reviewed the police report, and in -- that police report not only contained the -- the narratives from a Detective Carney, but also the narrative from a variety of other police officers on the Warren Police Department.  Because as I recall, Detective Carney was actually called into the situation.

Q.   Okay.  So you reviewed all of the other -- I think, Detective Laprocina wrote some details about what happened when they went to Brittany Watts' home and that kind of thing.  You reviewed the whole thing?

A.   Yeah.  And then there were road officers that actually had, you know, responded there as well.

Q.   Okay.  And when Detective Carney presented the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   It did.

BY MS. BRADY:

Q.   Okay.  I'm going to zoom in in a second here, but just to get this on the record, this is a three-page document beginning at Bates label City of Warren 384.  This is the dispatch summary that was generated during this case.  Does this look familiar to you. like something that you reviewed when you approved charges?

A.   I --

MR. PINZONE:  And, Rachel, just to interject, again, the highlighting is from your office, correct?

MS. BRADY:  Yes, the highlighting is mine.

MR. PINZONE:  Okay.

THE WITNESS:  I -- you know, I can't -- I -- I -- I would love to tell you for certain that I did or did not, but I think these are items that may well be contained in the -- in the actual incident report.  So I can't tell you for certain that I reviewed these radio call logs.

BY MS. BRADY:

Q.   Okay.  Did you review any medical records?

A.   The only thing I think I reviewed was that -- you know, just the -- the summary that the child was deceased at birth and that -- you know, that -- and like

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I said, there -- the medical records were somewhat irrelevant at that point because, you know, there -- we weren't looking at anything on the medical end. It was just the disposition of the remains.

Q. Okay. So you don't remember if you looked at this dispatch log. Did Detective Carney tell you that the nurse at the hospital had said that Brittany Watts, who was the mother, said that she didn't want the baby and didn't want to look to see if it was alive?

A. No. That -- that -- and that wouldn't have been -- I -- I don't think that was ever said to me. And I would've recalled that.

Q. Okay. Did you recall -- or do you recall being told that Brittany Watts had been to the hospital a couple of times before the day she miscarried?

A. I think I did hear that at one point or another. Whether it was the -- the day of the charge or later, I -- I don't recall that, but...

Q. Okay. Did Detective Carney tell you that he had interrogated or interviewed Ms. Watts while she was in the hospital?

A. I believe that he did say that he had met with her and interviewed her, yes.

Q. And did you learn from the autopsy, or from Detective Carney himself, that the fetus had no injuries

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

there were things like that.

Q. Okay. Did Detective Carney tell you what hospital staff had said?

A. I believe that it was recorded by other officers that there was a -- possibly a baby next to a -- a garage.

Q. Okay. Did Detective Carney present Ms. Watts as having engaged in deception about the whereabouts of the fetus?

A. No. He -- he generally would present his report, and you'd look at the underlying evidence. No, he -- he -- I don't think he ever said anything negative. You know, it wasn't a case where he wanted to go arrest her, or -- I -- I think he actually -- and I -- I think I recall this, he said, I don't want to, you know, I want to call them and let them come in. And, you know, I think he was kind of handling it with sensitivity.

Q. Do you know, as a matter of practice, whether the Warren Police Department -- when they were executing an arrest warrant, whether a suspect could turn themselves into the police station?

A. Sometimes, yes. They -- if they would allow them to come to the police station and -- and actually avoid the -- even the police station. Sometimes they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

know, sometimes a -- a lawyer to be alerted, or someone to say, hey, they came back.  The charge is going to be filed.  You may want to turn yourself in.

Q.   Okay.  And do you remember what Brittany Watts's charge for abuse of a corpse, what F level that was?

A.   I think it's an F5.  I think it's a felony five level.

Q.   Okay.  All right.  So we talked a bit about this earlier, but when you, as a prosecutor, were deciding to approve charges, you went through each of the elements of a charge, and made sure that there was sufficient evidence on each one of those elements to establish what you thought could be probable cause; is that right?

A.   Yes.  Generally, yes.

Q.   Okay.  And as you understood the abuse of a corpse felony statute in 2023, what were the elements?

A.   I think they had to know -- knowingly engage in conduct that involved community standards --

Q.   Okay.  So you understood there --

A.   -- involving a corpse.

Q.   I'm sorry.  Go ahead.

A.   Involving a -- yeah, involving a corpse.  And I don't, you know, I don't have the exact language of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL BLAIR, taken on January 20, 2026

64

Q.   Okay.  So you looked at this section of the code, and you were deciding which one of these statutes -- or which one of these sections to charge.  Based on this, what elements were you looking to satisfy, or to make sure that there was evidence to satisfy?

A.   Okay.  So what I had looked at in this case was, you know, a person, which would've been, you know, Brittany Watts, except as authorized by law, which there was, you know, that -- and then shall treat a human corpse in a -- in a way that would outrage reasonable community sensibilities, and, you know, flushing a human body down a toilet, you know, I -- I thought, would likely outrage community's sensibilities, and I thought this was something that, you know, the Court -- it should be charged, and the Court should look at it.

Q.   And did you have an understanding about the legal definition of a human corpse at the time you decided to approve charges on this case?

A.   Well, I mean, is -- when you look at the definitions of human corpse, I think it's a -- a -- a deceased human being.

Q.   Okay.  And were you curious at all, or did it enter your thought process about whether a deceased fetus would qualify as a human corpse?

A.   Well, I think in this case, we had -- you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE WITNESS:  That wasn't -- that wasn't part of my consideration in this.

BY MS. BRADY:

Q.  Okay.  And you said earlier that one of the elements you considered was the intent to recklessly or knowingly do -- to treat a human corpse in this way. Looking now at the statute --

A.  Yeah, that doesn't appear to be a -- an element of the -- the offense.

Q.  Okay.  So were you considering evidence of Ms. Watts's subjective intent when you decided to approve charges?

A.  I don't know that that -- I -- I -- I mean, I said that I -- I -- I did, and I think I was looking at what, you know, had been done, but, you know, it's not an element of the offense, but, you know -- you know, I -- as I look at the offense, it's -- it's not an element of the offense.

Q.  Okay.  Okay.  So as you sit here today, can you summarize all of the evidence you reviewed that convinced you that there was probable cause on each element of the abuse of corpse felony?

You mentioned earlier that you thought there was some deception about where the fetal remains were, and the photographs.  Anything else?  Oh, and what Ms.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Watts said during her interrogation.  Anything else?

A.  Well, there was -- I mean, when you look at the totality of the circumstances, you look at the evidence that was presented, we had road officers dispatched to a home, looking for a baby in a location that the person purportedly told them it was located. The baby was not there.  However, there was evidence of blood.

Officers then looked around, and I believe Brittany's mother came home, ultimately giving them access to the property, and -- and where they found this baby, you know, located in a toilet, that there were feet protruding from the -- the trap in the toilet that were ultimately visible.  When officers chipped away the toilet, there was a -- a human corpse in the toilet, and that was the basis.

Q.  So it was your understanding that the fetus's feet were visible from outside the toilet?

A.  I think -- well, not -- not until they drained water from the toilet, as I recall, but there were, you know, it was -- it was a -- a human corpse in that toilet.

Q.  Okay.  And did you have an understanding that any part of the fetus was visible from outside the toilet before the water was drained, or the water and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

A.  I did.

Q.  And are you familiar with that name as it -- at least as it appears in the police report?

A.  Yes, I've seen that name in the police report.

Q.  Okay.  Did any of the information Nurse Moschell provided Detective Carney, at least as it's outlined in the police report -- did any of that information factor into your determination to approve charges?

MS. BRADY:  Objection.  Foundation.

THE WITNESS:  No.  On the -- the abuse of the corpse issue, no, it did not play into it.  You know, could I say for a fact that that information wouldn't be in some way relevant as the case proceeded for one thing or another, but the -- the likelihood of the child surviving or the cause of death was not an issue in the charge.

BY MR. SPYKER:

Q.  Do you know the name Fred Raines, R-A-I-N-E-S?

A.  I do know the name Fred Raines.

Q.  Okay.  Who's Fred Raines to you?

A.  Well, Fred Raines, I think, is currently a -- an officer with the Mercy Health Police Department, or at one time he was, but he is also, I believe, a retired narcotics investigator who worked undercover for a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

provided to Detective Carney, apparently, by a nurse.

BY MS. BRADY:

Q.   Yes.  And you never learned from a doctor anything about the fetus's viability, right?

A.   It wasn't an issue in the case.  That was never -- we were never discussing a homicide.  We were never discussing any of that.  We were just discussing the status of the body and -- and being in a toilet.

Q.   Sure.  And you were never provided any information via Detective Carney from a doctor, that -- anything about the fetus's viability, right?

A.   And once again, that wasn't -- it wasn't an issue.  I think, as I said, there might have been some discussion that if the child -- the child was going to be born prematurely, and it was unlikely that it -- it could survive, but that was -- that was not a discussion -- there was never a discussion of a homicide.  There was never a discussion that the mother somehow caused the death of the child.  That was not ever requested or -- or brought to me in any fashion.

Q.   Sure.  And I understand all of that, but I -- I'm asking a very specific question, and my question is whether you were provided information through Detective Carney from a doctor, anything regarding the fetus's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

and --

Q.   Based on the evidence that's given to them, right?

A.   Well, based upon the facts and evidence that they see at the time, yes.

MS. BRADY:  Okay.  I do not have any more questions, so I'm done again for now.  Thank you.

RECROSS-EXAMINATION

BY MR. SPYKER:

Q.   I'll try not to bounce you back too many times, but I have three narrow lines to follow up based on what was just asked.  Is ill intent an element of revised code 2927.01B?

A.   Does not appear to be, no.

Q.   Okay.  Without delving into the medical crisis aspect of it, I understand you're not a medical professional, Detective Carney was not, can you agree with me that flushing the toilet is not part of a medical crisis?  That's a action that happens afterwards, fair?

MS. BRADY:  Objection.  Form and foundation.

THE WITNESS:  I -- I -- I -- I don't know that I can make that determination.

BY MR. SPYKER:

Q.   Fair enough.  Have you been presented, as you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com