**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRITTANY WATTS, | ) | CASE NO. 4:25-cv-49 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| BON SECOURS MERCY HEALTH, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is plaintiff Brittany Watts's ("Watts") motion for discovery sanctions. (Doc. No. 118.) Defendants Bon Secours Mercy Health, Mercy Health Youngstown LLC d/b/a St. Joseph Warren Hospital ("Mercy Health"), Connie Moschell, and Parisa Khavari (collectively, "Hospital Defendants")[1] filed a response. (Doc. No. 124.) For the following reasons, Watts's motion is granted in part and denied in part.

## I. BACKGROUND

After having written multiple opinions in this case (Doc. No. 29; Doc. No. 73; Doc. No. 74; Doc. No. 95; Doc. No. 105; Doc. No. 121), the Court assumes the parties are well-acquainted with the background facts. As relevant to the present motion, Watts brings multiple claims against defendants, including claims under 42 U.S.C. § 1983 stemming from defendants' alleged role in Watts's prosecution following her miscarriage in September 2023 and a claim for medical negligence stemming from care she received, or did not receive, in connection with her miscarriage at Mercy Health. (*See* Doc. No. 97 (Second Amended Complaint) ¶¶ 98–120, 153–157.)

---

[1] Watts does not allege discovery violations by defendants Nicholas Carney and the City of Warren, Ohio and does not seek discovery sanctions against these defendants.

The present dispute concerns the remedy for Hospital Defendants' conceded discovery violation. As part of Hospital Defendants' initial disclosures, they were required to disclose "a description by category and location—of all . . . tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses[.]" Fed. R. Civ. P. 26(a)(1)(A)(ii). Hospital Defendants did not identify any physical evidence. Watts also served requests for production on defendant Mercy Health, seeking "[a]ll physical evidence relating to any of the allegations in [Watts's] Complaint or any of Defendants' defenses to [Watts]'s Complaint." ("General Production Request") (Doc. No. 118-1 (Mercy Health's Response to Watts's Request for Production), at 4.)[2] On July 17, 2025, defendant Mercy Health stated that it did not have any documents and/or physical evidence responsive to this General Production Request. (*Id.*, at 4, 6.)

While reviewing materials for her expert report in January 2026, however, Hospital Defendants' expert, Dr. Theonia Boyd, asked to look at the slides from Watts's surgery. (*See* Doc. No. 124-4 (Prislipsky Decl.) ¶¶ 1.) Accordingly, she was given the four pathology slides to examine. The slides were identified in the Mercy Health medical records as being from the placenta and umbilical cord from the miscarriage. (Doc. No. 124, at 3–5.) It is important to note that the four slides examined by Dr. Boyd were identified and described in the Mercy Health medical records in two places, as follows:

A1: Cord and membranes
A 2: Cross-section near cord insertion
A3 and A4: Additional cross-sections

[2] All page number references to the record are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

(Doc. No. 124-1 (Surgical Pathology Report and Surgical Pathology Consultation Report), at 2–3; Doc. No. 118-5 (Surgical Pathology Consultation Report), at 1). In a telephonic conference call, counsel for the parties later clarified that a copy of Watts's Mercy Health medical records, including the Surgical Pathology Report and Surgical Pathology Consultation Report, was first sent to Watts on March 26, 2024, a second copy was sent on March 5, 2025, and a third copy with Bates numbers was produced during discovery on July 17, 2025. (Minutes of proceedings [non-document], Sept. 23, 2026.)

On page one of her expert report, which is slightly over four-pages, Dr. Boyd clearly listed "Pathology slides from Mercy Health" as the first item of "Materials received and reviewed[.]" (Doc. No. 124-3 (Boyd Expert Report), at 1.) Additionally, Dr. Boyd discusses her conclusions from her review of the slides, autopsy report, police scene photographs, and autopsy photographs in clearly identified separate sections of her report. (*Id.*, at 1–4.) Hospital Defendants admit they should have supplemented their response to Watts's request for production in late January 2026, when they realized Dr. Boyd was going to review the slides. (Doc. No. 124, at 9.) They maintain their failure to do so was not gamesmanship, but a simple mistake. (*Id.*, at 10; *see* Doc. No. 124-4 ¶¶ 2–3.)

Hospital Defendants argue that Watts knew about the slides when Dr. Boyd's expert report was provided to Watts with Hospital Defendants' expert disclosures on May 28, 2026. (Doc. No. 124, at 4–6.) Given this notice, Hospital Defendants maintain Watts could have cured the surprise and mitigated any harm at that time, but did not do so. (*Id.*, at 7, 11–12, 15.) In the following months, Hospital Defendants note that Watts's counsel did not request the slides from Hospital Defendants, even though Watts's counsel had multiple conversations with Hospital Defendants' counsel concerning the production of additional information from their experts, and even though

Watts's counsel served subpoenas asking for discovery from Hospital Defendants' other experts, with one subpoena including a section explicitly asking for physical evidence. (*Id.*, at 11–12 (citing Doc. No. 124-3; Doc. No. 124-8 (Hospital Defendants' Expert Disclosure Email); Doc. No. 124-4 (Prislipsky Decl.) ¶¶ 5–6, 8; Doc. No. 124-5 (Kasson Decl.) ¶¶ 5–6; Doc. No. 124-6 (Watts's Subpoenas to Hospital Defendants' Expert Witnesses).)

Watts's counsel do not claim to have specifically asked Hospital Defendants about the existence of the slides and, even though the slides were specifically identified and discussed in Dr. Boyd's report and identified in the hospital records, insist that Watts was entitled to rely upon the Hospital Defendants initial response to Watts's General Production Request "and thus [had] no reason to believe these slides existed or to inquire about them specifically." (Doc. No. 118, at 6.) Additionally, Watts's counsel state that "[Watts] was not certain the slides referenced in the report were actual physical specimens" until Dr. Boyd's deposition on August 11, 2026. (*Id.*, at 3.)

During Dr. Boyd's deposition, Watts's counsel questioned Dr. Boyd extensively about the slides and conclusions Dr. Boyd drew from her review of the slides under a microscope. (*See* Doc. No. 123-1 (Boyd Dep.) 12:20–19:5, 20:16–33:21, 38:1–39:5, 43:6–52:5, 62:17–63:25, 82:6–84:2.) The questioning strongly suggests that Watts's counsel were on notice about the existence of the slides.

On August 12, 2026, one day after Dr. Boyd's deposition, Watts's counsel emailed Hospital Defendants, stating that Dr. Boyd relied on slides provided by Mercy Health, the slides were not produced in discovery, and that Watts's counsel did "not believe their existence was revealed until Dr. Boyd's disclosure." (Doc. No. 118-7 (Email Correspondence), at 1.) In a response email on August 14, 2026, Hospital Defendants state that Watts "knew about these specimens pre-suit[,]" as Watts had relevant medical records which made it "clear there are specimens." (*Id.*, at 2). In a

reply email later that day, Watts's counsel did not dispute having the medical records pre-suit but stated they had "no way of knowing from the medical records . . . whether the specimens still existed[.]" (*Id.*, at 3; *see also* Minutes of proceedings [non-document], Sept. 23, 2026.)

This Court's second amended case management plan and trial order ("Second Amended CMPTO") set trial on a two-week standby period beginning January 11, 2027. (Doc. No. 69.) It also ordered parties to file a joint status report every forty-five days, in which counsel must apprise the Court of "any developments that might give rise to a request to deviate from the schedule outlined" in the order. (*Id.*, at 2; *see also* Doc. No. 39, at 2.) The joint status report of June 29, 2026, filed by Watts's counsel, did not raise any discovery issues related to the slides. (Doc. No. 96.) The joint status report of August 13, 2026 (two days after Watts's counsel deposed Dr. Boyd), also filed by Watts's counsel, did not raise any discovery issues related to the slides and affirmed that the "parties have completed depositions of all Rule 26(a)(2)(B) experts and are on track to finish discovery by the discovery deadline" of August 18, 2026. (Doc. No. 117, at 1.)

Watts filed this motion on August 20, 2026, seeking "an order barring those portions of Dr. Boyd's report and testimony that rely on her microscopy; awarding [p]laintiff fees and costs for meeting and conferring about this issue, and in preparing and filing this motion; and granting any other relief the Court deems just and proper." (Doc. No. 118, at 11.) Hospital Defendants filed their opposition on September 3, 2026. (Doc. No. 124.) Watts did not file a reply.

## II. LEGAL STANDARD

Under Fed. R. Civ. P. 26(a)(1)(A)(ii), a party must provide as part of its initial disclosures to other parties "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely

for impeachment[.]" And under Fed. R. Civ. P. 26(e)(1), a "party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"

If a party fails to provide information as required by Rule 26(a) or (e), the party is "not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The exclusion of such evidence is 'automatic and mandatory' unless the offending party can show that its nondisclosure was substantially 'justified or harmless.'" *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668 (6th Cir. 2024) (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn*., 388 F.3d 976, 983 (6th Cir. 2004) (citation omitted)). Additionally, Rule 37(c)(1) grants courts the discretion to "impose other appropriate sanctions" including "payment of the reasonable expenses, including attorney's fees, caused by the failure[.]" Fed. R. Civ. P. 37(c)(1)(C).

The Sixth Circuit has held that "district courts should consider five factors when assessing substantial justification and harmlessness." *RJ Control Consultants*, 100 F.4th at 668. "Those factors are:

> '(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.'"

*Id.* at 668–69 (quoting *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citation omitted)); (Doc. No. 118, at 5; Doc. No. 124, at 6). "'District courts have broad discretion in applying these factors and need not apply each one rigidly. The factors simply lend themselves to the task at the

heart of Rule 37(c)(1): separating honest, harmless mistakes from the type of underhanded gamesmanship that warrants the harsh remedy of exclusion.'" *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (quoting *Bentley v. Highlands Hosp. Corp.*, No. 15-cv-97, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016) (Thapar, J.) (internal quotation marks and citation omitted)). A district court's imposition of sanctions for noncompliance is reviewed for abuse of discretion. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 25-3765, 2026 WL 2454184, at *21 (6th Cir. Aug. 21, 2026) (citation omitted).

## III. DISCUSSION

In the present case, Hospital Defendants concede that "Request for Production No. 19 should have been supplemented in late January of 2026, when they realized Dr. Boyd was going to review the slides." (Doc. No. 124, at 9 (citing Doc. No. 124-4 (Prislipsky Decl.) ¶ 2); *see also id.*, at 10–11.) After considering the *Howe* factors, the Court denies Watts's request to enter an order barring those portions of Dr. Boyd's report and testimony that rely on her microscopy; the Court grants Watts reasonable fees and costs to the extent Watts wishes to have an expert examine the slides and either supplement or issue an expert report, and relief as further provided herein.

### A. Surprise to the Party Against Whom the Evidence Would be Offered

According to Hospital Defendants, Watts knew about the existence of the slides on May 28, 2026, the day Watts received Dr. Boyd's expert report. (Doc. No. 124, at 6 (citing Doc. No. 124-2 (Boyd Expert Report), at 1; Doc. No. 124-8 (Hospital Defendants' Expert Disclosure Email).) They argue that Dr. Boyd's report discloses that she reviewed the slides because: (1) under the "'Materials received and reviewed'" section, Dr. Boyd states that she "'reviewed records sent to me relevant to my subspecialty and expert opinion' [sic]" and that the first item identified was "'Pathology slide from Mercy Health' [sic]"; (2) "Dr. Boyd provided an in-depth review of the

slides which is specifically laid out in her report"; and (3) Dr. Boyd provided a "pathological interpretation of the placenta and fetus[,]" including by considering "'[m]icroscopically'" the umbilical cord's appearance. (Doc. No. 124, at 4–5 (quoting Doc. No. 124-3, at 1–2).) Hospital Defendants also argue that Watts knew about the slides before Dr. Boyd's deposition on August 11, 2026, as Dr. Boyd was questioned about the slides at length by Watts's counsel. (*Id.*, at 7 (citing Doc. No. 123-1 (Boyd Dep.) 13:19–15:13, 43:13–49:25).)

Conversely, Watts argues that she "was not certain the slides referenced in the report were actual physical specimens that had been provided to Dr. Boyd, as opposed to photos or a report" until Dr. Boyd's deposition on August 11, 2026. (Doc. No. 118, at 3.) Additionally, Watts insists that she was entitled to rely upon Defendant Hospital's initial response to her General Production Request "and thus [had] no reason to believe these slides existed or to inquire about them specifically." (Doc. No. 118, at 6 (citing Doc. No. 118-1, at 4).)

The Court has considered Watts's reliance upon Mercy Health's initial representations in response to the General Production Request. After reviewing the cited materials in context of this case, however, the Court finds that the language and structure of Dr. Boyd's expert report put Watts on notice of the existence of the slides when Watts received Dr. Boyd's expert report on May 28, 2026. Furthermore, the Court finds that the Surgical Pathology Report and the Surgical Pathology Consultation Report in Watts's Mercy Health medical records, first sent to Watts on March 26, 2024, sent again on March 5, 2025, and produced during discovery on July 17, 2025, put Watts on notice of the possibility of relevant physical evidence. (*See* Doc. No. 118, at 3 (describing the Surgical Pathology Consultation Report); Minutes of proceedings [non-document], Sept. 23, 2026.)

Both the Surgical Pathology Report and Surgical Pathology Consultation Report describe "a specimen . . . in buffered formalin labeled as 'Brittany Watts, placenta'" that "consists of a portion of placenta with attached membranes and umbilical cord." (Doc. No. 118-5, at 1; Doc. No. 124-1, at 2.) Both reports also state four slides were created from the specimen: "A1: Cord and membranes", A2: Cross-Section near cord insertion", "A3 and A4: Additional cross-sections[.]" (Doc. No. 118-5, at 1; Doc. No. 124-1, at 2.)

Rule 26(e)(1)(A) requires a party to supplement its disclosures "if the additional or corrective information *has not otherwise been made known* to the other parties during the discovery process or in writing[.]" (emphasis added). The duty to supplement does not require putting form over substance. *See Charvat v. Echostar Satellite, LLC*, No. 2:7-cv-1000, 2009 WL 2949294, at *3 (S.D. Ohio Sept. 11, 2009) (collecting cases). Watts should have known about the slides when she received Dr. Boyd's expert report, and Watts was on notice about the possibility of relevant physical evidence when she came into possession of the pathology reports. The Court also notes that Watts was able to effectively question Dr. Boyd about her reliance on the slides during her deposition.

**B. Watts's Ability to Cure the Surprise**

To the extent Watts was surprised, she could have cured it.

Hospital Defendants maintain that Watts could have cured (and still can cure) any surprise and mitigated any harm. (Doc. No. 124, at 7, 11–12, 15.) They argue that Watts knew of the slides from Dr. Boyd's expert report, which Watts received in May 2026, and suggest that Watts could have requested the slides be sent to Watts's expert after Dr. Boyd's expert report was shared, and then asked to submit a supplemental report from Watts's expert. (*Id.*, at 11 (citing Doc. No. 124-3; Doc. No. 124-8; Doc. No. 124-4 ¶¶ 5–6, 8).) Hospital Defendants also note Watts's counsel did

not seek the slides in multiple, lengthy conversations with Hospital Defendants' counsel concerning the production of additional information from Hospital Defendants' experts. (*Id.*, at 11-12 (citing Doc. No. 124-5 ¶¶ 5–6; Doc. No. 124-6).) Furthermore, Watts sent subpoenas asking for broad discovery from Hospital Defendants' experts, with one subpoena having a designated section requesting physical evidence, but did not request the slides in Dr. Boyd's subpoena. (*Id.*, at 11 (citing Doc. No. 124-6; Doc. No. 118-3).) Hospital Defendants also state that it is customary for opposing counsel to request slides if opposing counsel wishes a pathologist to review them in medical malpractice cases. (*See id.*, at 11 (citing Doc. No. 124-4 ¶¶ 5–6).) And finally, Hospital Defendants argue Watts's expert still has time to review the slides before trial. (*Id.*, at 7, 12.)

Watts believes that even if she were to receive the materials now, "[p]laintiff's deadline to disclose experts passed in May 2026, [Doc.] No. 69, and expert discovery is closed . . . and this Court has been clear that no further extensions will be given, Text Order of August 17, 2026." (Doc. No. 118, at 6.) Watts notes that Hospital Defendants have not produced any "documents relating to the chain of custody of these physical materials, and therefore there are no guarantees that the chain of custody has been preserved." (*Id.*, at 7.) And plaintiff argues that "additional expert discovery compounds prejudice when the expert deadline has passed." (Doc. No. 118, at 6–7 (citing Doc. No. 95, at 9)); *but see Hall v. Siskin Steel & Supply Co., Inc.*, No. 1:20-cv-136, 2021 WL 6335447, at *3 (E.D. Tenn. Sept. 9, 2021) ("'Harmlessness . . . is the key under Rule 37, not prejudice.'" (quoting *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003))).

The Court finds that Watts was on notice of the possibility of relevant physical evidence from the pathology reports. (*See* Doc. No. 118, at 3; Doc. No. 118-5, at 1; Doc. No. 124-1, at 2–3.) Furthermore, the Court finds to the extent Watts was surprised on May 28, 2026, Watts could have cured the surprise. Watts was on notice of the existence of the slides after Watts received Dr.

Boyd's expert report, and Watts could have asked Hospital Defendants about the existence of the slides or requested the slides be sent to Watts's expert for review. This factor weighs in favor of Hospital Defendants.

The Court also notes that its CMPTOs require parties to file a joint status report to the Court every forty-five days, in which counsel must apprise the court of "any developments that might give rise to a request to deviate from the schedule outlined in this Case Management Plan and Trial Order." (Doc. No. 69, at 2; *see also* Doc. No. 39, at 2.) The purpose of these reports is to allow the Court to more effectively manage the case and avoid having to resolve discovery disputes long after the fact. If Watts was unhappy with the apparent existence of the slides and Dr. Boyd's review of them, Watts should have known this discovery dispute may involve a party seeking to deviate from the case management plan and trial order, and therefore Watts should have raised this discovery issue in a joint status report.

Watts failed to do so. The joint status report of June 29, 2026, filed by Watts's counsel, did not raise any discovery issues related to the slides. (Doc. No. 96.) The joint status report of August 13, 2026, also filed by Watts's counsel, did not raise any discovery issues related to the slides. (Doc. No. 117.) Instead, the August 13, 2026 status report affirmed that the "parties have completed depositions of all Rule 26(a)(2)(B) experts and are on track to finish discovery by the discovery deadline" of August 18, 2026. (*Id.*, at 1.) Dr. Boyd's deposition was on August 11, 2026, and Watts's counsel sent the following email to Hospital Defendants' counsel on August 12, the following day:

> Hi Pat and Tom,
>
> Your expert Dr. Boyd relied for her opinions on pathology slides that Mercy Health provided to her. These materials were not produced in discovery, and I do not believe their existence was revealed until Dr. Boyd's disclosure.

> If I have overlooked something, please let me know when you produced these materials or when you informed Plaintiff of them during fact discovery. If you did neither, please explain your justification for withholding these materials from Plaintiff.
>
> Thanks,
>
> Julia

(Doc. No. 118-7, at 1.) After Hospital Defendants' counsel responded on August 14, 2026, Watts's counsel replied later that day. (*Id.*, at 2–3.) In her email, Watts's counsel stated: (1) the slides were not disclosed in Hospital Defendants' initial disclosures or in response to Watts's requests for production; (2) "[r]evealing the continued existence of these specimens in Dr. Boyd's report after the close of fact discovery and after [Watts]'s expert reports were disclosed to you is no substitute for complying with discovery obligations"; and (3) "[a]ssuming you have no further justification to provide, what occurred appears to be a serious discovery violation. [Watts] will proceed accordingly." (*Id.*, at 3.) Given the degree of Watts's concern, Watts should have raised this discovery issue in her previous joint status reports so that Court could have addressed the matter in a timely fashion.

Additionally, the Court finds that any surprise to Watts can be cured. The Court's remedy does so. Watts states that even if she were to receive the materials now, "[Watts] would need time to identify an expert, have the expert analyze the materials, and disclose a report." (Doc. No. 118, at 6.) Watts also notes that she has concerns "relating to the chain of custody of these physical materials[.]" (Doc. No. 118, at 7.) Watts concludes that Hospital Defendants "denied [her] an opportunity to have physical evidence analyzed by her own experts." (*Id.*, at 9.) The Court's remedy, set forth more fully below, gives Watts time to have an expert, or experts, analyze the slides and address the slides in an expert report, or expert reports. It also gives Watts an opportunity to pursue discovery relating to the chain of custody of the slides.

### C. Extent to Which Allowing the Evidence would Disrupt the Trial

When discussing this factor, Hospital Defendants argue that any harm to Watts could have been cured if Watts had asked "that the slide[s] be sent to their expert on the date of Dr. Boyd's disclosure . . . as trial was seven months away." (Doc. No. 124, at 7; *see also id.* at 9, 12, 14.) Hospital Defendants also argue that any harm still can be cured if Watts is given an opportunity to review the slides. (*Id.*, at 7, 9, 12, 14.) Additionally, Hospital Defendants argue the slides will not cause any disruptions to trial because the slides do not change Hospital Defendants' arguments, and Hospital Defendants' arguments are supported by other evidence in the record. (*See id.*, at 7–8.)[3] Hospital Defendants conclude that there "is still sufficient time prior to trial" for Watts to review these slides "as this issue is not one affecting the current briefings on summary judgement." (*Id.*, at 14 (citing Doc. No. 114 (Motion for Summary Judgment)).)

Watts disagrees. Watts argues that even if she were to receive the materials now, "[she] would need time to identify an expert, have the expert analyze the materials, and disclose a report." (Doc. No. 118, at 6.) Watts also notes that she has concerns "relating to the chain of custody of these physical materials[.]" (*Id.*, at 7.)

The Court finds its order should only have minimal, if any, disruptions to the case management plan and none on the trial. The schedule established in the Court's order cures any surprise to Watts, while not disturbing the proposed trial timeline. Moreover, how the umbilical cord was detached from the fetus is a disputed question of fact that should not affect summary judgment. (*See* Doc. No. 118, at 4 (citing Doc. No. 118-6 (Carpenter Expert Report), at 8); Doc.

[3] Hospital Defendants maintain the slides are not necessary for Dr. Boyd's opinion, as Dr. Boyd also relies on the photographs from the police and from the coroner's office. (Doc. No. 124, at 8 (citing Doc. No. 124-2 (Boyd Decl.) ¶¶ 1, 3–4; Doc. No. 123-1 (Boyd Dep.) 8:21–25, 20:16–21:4, 43:13–46:10, 48:22–49:15, 82:6–24).) In a declaration, Dr. Boyd states that "even without the slides" her opinion would be "the same[,]" and she "was clear on this point" in her deposition. (Doc. No. 124-2 ¶ 4.)

No. 124, at 12-13 (citing Doc. No. 123-1 (Boyd Dep.) 43:13–46:10, 46:25–48:4, 71:16–72:1; Doc. No. 106-2 (Khavari Dep.) 169:2–170:6; Doc. No. 124-2 (Boyd Decl.) ¶¶ 1–2).) And the Court notes that Watts has already thoroughly questioned Dr. Boyd about the slides. (Doc. No. 124, at 7 (citing Doc. No. 123-1 (Boyd Dep.) 13:19–15:13, 43:13–49:25)); *cf. Howe*, 801 F.3d at 749 (noting movant's opportunity to cross-examine plaintiff-witnesses). This factor weighs in favor of Hospital Defendants.

**D. The Importance of the Evidence**

The Sixth Circuit has explained that the importance of the evidence factor "'can cut both ways. The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure.'" *RJ Control Consultants*, 100 F.4th at 670 (quoting *Bisig*, 940 F.3d at 220 (quotation omitted)). In *Bisig*, the magistrate judge found the documents in dispute "highly essential[,]" but weighed this factor in favor of the nonmovant because movants "made no efforts to cure their surprise." *See Bisig*, 940 F.3d at 220, 222 (finding the magistrate judge "appropriately found" the nonmovant's disclosure to be harmless).

Hospital Defendants represent that the "slides are not critical for Dr. Boyd's opinions[,]" Dr. Boyd's opinions are supported by the photographs from the police and the coroner's office, and that Dr. Boyd's opinion would be the same even without the slides. (Doc. No. 124, at 8 (citing Doc. No. 124-2 (Boyd Decl.) ¶¶ 1, 3–4 ("I could have just as easily relied upon the pathology report contained in the medical records."); Doc. No. 123-1 (Boyd Dep.) 8:21–25, 20:16–21:4, 43:13–46:10, 48:22–49:15, 82:6–24).) Watts argues that "[a]ssuming for the sake of argument that the evidence is important to [Hospital] Defendants, it is important to [p]laintiff, too, since she needs to be able to rebut it" and concludes Watts would be "doubly prejudiced, because she does not have the chance to analyze it." (Doc. No. 118, at 7.)

The Court has considered the arguments and the evidence supplied by both parties. The court is mindful that the Hospital Defendants bear the burden in this motion. *See RJ Control Consultants*, 100 F.4th at 668. Yet the Court also notes Watts's failure to cure her surprise, *see Bisig*, 940 F.3d at 220, 222, and her failure to raise this discovery dispute in previous status reports. Further, the Court recognizes that the slides could be important to the resolution of the dispute. *See Bisig*, 940 F.3d at 220; *see also RJ Control Consultants*, 100 F.4th at 670; *Ohio Pub. Emps. Ret. Sys.*, 2026 WL 2454184, at *21. Upon careful weighing of the facts, the Court concludes that the importance of the evidence factor does not favor Hospital Defendants or Watts.

**E. The Nondisclosing Party's Explanation for its Failure to Disclose the Evidence**

Hospital Defendants' counsel admit they erred by failing to supplement their previous discovery responses. (Doc. No. 124, at 2, 9 (citing Doc. No. 124-4 (Prislipsky Decl.) ¶¶ 2–3; Doc. No. 124-3, at 1).) Mr. Thomas A. Prislipsky, counsel of record for Hospital Defendants, states in a declaration that when initially responding to Request for Production No. 19, "I did not feel any physical evidence was necessary in the case" as the medical records included in the pathology report described the placenta's abnormalities and did not list any umbilical cord abnormalities, and that "[g]iven how Requests asked—under broad terms—for anything relevant to the case, I did not think that the actual samples would matter." (Doc. No. 124-4 ¶ 2.) Continuing, Prislipsky states that in "late January of 2026, Dr. Boyd wanted to look at the slides from Ms. Watts's surgery, I assumed to confirm what was in the hospital pathology report." (*Id.* ¶ 3.) Prislipsky admits "[w]hen that occurred, I should have supplemented the Rule 34 Response and apologize for not doing so." (*Id.* ¶ 3.) Hospital Defendants represent that there was no gamesmanship in their failure to supplement—it was a simple mistake. (Doc. No. 124, at 10.)

On the other hand, Watts argues that Hospital Defendants "offer no explanation for their failure to disclose this evidence other than to say that they are 'specimens,' and 'not documents,' and 'can't be produced.'" (Doc. No. 118, at 8 (quoting Doc. No. 118-7 (Email Correspondence), at 2 (email of Mr. Matrick Kasson)).) To the extent Hospital Defendants' counsel represent that the slides cannot literally be produced, they are incorrect. *See* Fed. R. Civ. P. 34(a)(1)(B) ("A party may serve on any other party a request within the scope of Rule 26(b) . . . to produce . . . any designated tangible things"). Hospital Defendants, however, repeatedly state that they would have, and still offer to, send the slides to Watts's expert overnight. (Doc. No. 124, at 2, 5, 9; Doc. No. 124-5 (Kasson Decl.) ¶ 7 (stating that if Watts had asked, Hospital Defendants would have sent the slides to Watts and are still willing to do so).) Watts also argues that Hospital Defendants try to "divert the blame[,]" as Hospital Defendants' production of over 1,200 pages of Watts's medical records, some of which may mention the slides, does not excuse Hospital Defendants for their failure to supplement their previous discovery responses, nor does the fact that Watts sent the hospital a preservation letter. (Doc. No. 118, at 8–9). The Court agrees that these actions do not excuse Hospital Defendants' failure to timely supplement their previous discovery responses. But the listing of the slides in the hospital records and the prominent reference to the slides in Dr. Boyd's expert report should have put Watts's counsel on notice that the slides existed and caused them to inquire specifically about the slides if they thought the slides were relevant to the issues in the case.

The Court is familiar with the history and discovery disputes in this case, and after consideration of all the evidence cited in parties' briefing, the Court finds that Hospital Defendants' failure to supplement their discovery responses was not a bad-faith error. *See Howe*, 801 F.3d at 749 (distinguishing late disclosures that are "more likely the result of negligence, confusion, and

lack of information" from late disclosures that result from "underhanded gamesmanship"). Moreover, the Court notes that Watts did not file a Notice of Request for Local Rule 37.1 Telephone Conference prior to filing this motion, as is required by the Court's previous order.[4] (Doc. No. 13, at 3; *see* Doc. No. 124, at 10.) Nor did Watts raise this issue in the parties' joint status reports, even after Watts received Dr. Boyd's expert report (*see* Doc. No. 96), after Dr. Boyd's deposition, and after Watts's email to Hospital Defendants about this discovery issue (*see* Doc. No. 117; Doc. No. 118-7, at 1). To the extent Watts argues that Hospital Defendants "denied [Watts] an opportunity to have physical evidence analyzed by her own experts" (Doc. No. 118, at 9), the Court's remedy addresses this injury.

—

The Court has carefully considered the parties' arguments, the relevant facts, and the applicable law. The Court has weighed Watts's surprise before and after Watts received Dr. Boyd's expert report; Watts's ability to meaningfully cure the surprise; the minimal extent to which allowing the evidence would disrupt the case management plan and trial; the importance of the evidence; and Hospital Defendants' explanation for their failure to timely disclose the slides, which the Court concludes was not a bad-faith error. The Court finds the degree and timing of the surprise, and the ability of Watts to cure the surprise, especially significant.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Watts's request to enter an order barring those portions of Dr. Boyd's report and testimony that rely on her microscopy. The Court GRANTS Watts's request for reasonable fees and costs to the extent Watts wishes to have an expert examine

---

[4] Like the Court's status reports, Local Rule 37.1 serves the important purpose of allowing the Court to address potential discovery disputes early before they affect the trial schedule, and before it becomes necessary for the parties and the Court to commit time and resources to motion practice. By failing to follow the local rules, Watts's counsel contributed to the problem now presented in this sanctions motion.

the slides and either supplement or issue an expert report. Additionally, the Court ORDERS the following:

- Watts may request the slides from Hospital Defendants. Upon request, Hospital Defendants must provide the slides to Watts as soon as practicable.

- Watts may find new experts, or ask existing experts, to review the slides. Watts's experts may author new expert reports, or amend existing expert reports, concerning the slides.

- Watts must provide any updated expert disclosures to all defendants by October 30, 2026.

- To the extent any of Watts's expert reports express new opinions related to the slides, all defendants may depose these experts by November 25, 2026, the deadline for completing discovery concerning the slides. The scope of any additional deposition is limited to these new opinions.

- Watts will have until November 25, 2026, to conduct discovery related to chain of custody issues with respect to the slides.

- Any *Daubert* motions must be filed by the deadline for parties to file all trial-related motions.

- Hospital Defendants must pay Watts's reasonable fees and costs for discovery concerning the slides, including from experts, except that parties will pay their own fees and costs for additional discovery concerning the chain of custody.

The Court advises the parties that the orders in this memorandum opinion supplement, and do not replace, the Court's Second Amended CMPTO.

**IT IS SO ORDERED**.

Dated: September 24, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**